# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

NATALIE REESER,

        Plaintiff,

                          CASE NO:2:14-cv-11916

vs.

HENRY FORD HOSPITAL,

        Defendant.
_____/

        Volume I of the deposition of NATALIE REESER, taken before me, Lauri A. Sheldon, CSR 4045, RPR, on March 23, 2015, at 39500 High Pointe Boulevard, Suite 350, Novi, Michigan, commencing at or about 10:07 a.m.

APPEARANCES:

    MILLER COHEN, P.L.C.
    BY:  KEITH D. FLYNN, ESQUIRE
    600 W. Lafayette Boulevard, 4th Floor
    Detroit, Michigan  48226
    313-964-4454
    Appearing on behalf of the Plaintiff.

    VARNUM, LLP
    BY:  TERRENCE J. MIGLIO
    39500 High Pointe Boulevard, Suite 350
    Novi, Michigan  48375
    248-567-7400
    tjmiglio@varnumlaw.com
    Appearing on behalf of the Defendant.

Natalie Reeser
3/30/2015

### Page 25

1  A  Susan Smart is my supervisor at Quest, or was my
2     supervisor, and Karen Knolls (ph), I believe, is the
3     supervisor for Northern Michigan. Both of them have me
4     on call waiting for a position.
5  Q  What did you do to prepare for today's deposition?
6  A  Looked at emails I wrote, text messages, and spoke with
7     my attorney.
8  Q  These text messages that your attorney handed me at the
9     beginning of the deposition, where did they come from?
10 A  My cell phone. My old cell phone, actually.
11 Q  And what are they dated, do you know?
12 A  Yep. January 17th, 2014.
13 Q  Who are they to and from?
14 A  They are from me to Alicia Estell thanking her for
15    working for me so I could go down and meet with the HR,
16    Jill Hood, and her informing me that she was never given
17    the approval by Fiona in order for her to work for me, so
18    that was our conversation back and forth. It was pretty
19    obvious she set me up to be fired that day, and my
20    co-worker agreed.
21 Q  Why didn't you turn these over earlier?
22 A  They were in a cell phone that was smashed and I just had
23    it fixed yesterday.
24 Q  Had the cell phone fixed?
25 A  Correct.

### Page 26

1  Q  Who fixed it for you?
2  A  The Sprint store in Radio Shack. I had to buy the
3     battery pack to go in there to turn it on.
4  Q  Which Sprint store?
5  A  In Flat Rock.
6  Q  And you say it was smashed?
7  A  It -- Well, the charger port on it was smashed, so it
8     doesn't charge, so it hasn't been on since November of
9     2014, so I went to the store to get the battery charger
10    so we could charge it and I could turn it on to get all
11    the stuff I needed.
12 Q  And is this all the stuff you got off of it?
13    MR. FLYNN: Objection as to form.
14    THE WITNESS: That's the text messages that I
15    wanted to turn over, yes.
16 Q  (Continuing by Mr. Miglio): Did you have any other text
17    messages that were on there to anybody at Henry Ford
18    Health System, including your supervisor?
19 A  No.
20 Q  Supervisors?
21 A  No.
22 Q  Now, you said --
23 A  Oh... Nevermind.
24 Q  Were there other text messes to and from you?
25 A  There is a conversation between me and Denise Goldsmith

### Page 27

1     on there.
2  Q  What do you mean a conversation?
3  A  Text message conversation between me and Denise Goldsmith
4     also is on the cell phone.
5  Q  Why didn't you copy that?
6  A  I meant to. I forget to tell Keith I found it.
7  Q  What is that conversation about?
8  A  She texted me because she removed items from the office
9     after I was walked out.
10 Q  Who's Denise Goldsmith?
11 A  She works for Henry Ford. She works for you guys. She's
12    a lab assistant.
13 Q  Why would she remove items for you?
14 A  I didn't know why she would do that.
15 Q  And you're saying she went to the Clinton Township
16    facility.
17 A  She worked there the very next day after I was walked out
18    and she took it upon herself to take two photos and some
19    dumb bells home with her and texted me that she had took
20    them because she didn't know what happened to me.
21 Q  And you didn't ask her to take those?
22 A  I did not.
23 Q  When did you learn that she had taken those?
24 A  The very next day when she texted me.
25 Q  Do you remember being asked whether or not you removed

### Page 28

1     those items from the work station?
2  A  Yes, I do.
3  Q  And at any time did you ever indicate to anybody that you
4     were aware that Denise Goldsmith had taken them?
5  A  No.
6  Q  Is there a reason for that?
7  A  Yes.
8  Q  Why?
9  A  I didn't tell on Miss Goldsmith because she still works
10    for you guys and I didn't want her to lose her job.
11 Q  Did you sit in and listen to the depositions of Fiona
12    Bork and Martha Wiseheart?
13 A  Yes, I did.
14 Q  Did you record those depositions?
15 A  No.
16 Q  Who sat with you in the room?
17 A  Nobody. Just me.
18 Q  Where were you at when you listened to them?
19 A  I was in my bedroom at my house.
20 Q  Okay. Listening on what, your cell phone?
21 A  My cell phone.
22 Q  What's the cell phone number?
23 A  586-843-6020.
24 Q  Is that the cell phone you had during the entire time you
25    were employed by Henry Ford Health System?

Natalie Reeser
3/30/2015

Page 29

1   A   It's the same phone number, not same cell phone.
2   Q   So what else did you look at in preparation for today's
3       deposition?
4   A   Nothing else. The facts.
5   Q   What facts?
6   A   The facts of the case. It speaks for itself.
7   Q   I didn't ask you what the facts of the case spoke or
8       said. I just asked you what you looked at.
9   A   The facts of the case and the emails and texts.
10  Q   What are the facts of the case? What emails did you look
11      at specifically?
12  A   Emails that I had wrote back and forth with Fiona and
13      Jill Hood.
14  Q   Did you produce all the emails that you took from Henry
15      Ford Health system?
16  A   Yes, I did.
17  Q   And when did you print those off?
18  A   Afterwards from my phone.
19  Q   You printed the emails off --
20  A   I was able to forward the email -- all of my emails from
21      Henry Ford account to my personal email before -- Yes, I
22      was able to do that.
23  Q   And who gave you permission to do that?
24  A   I didn't know I needed permission to have my emails
25      forwarded to myself.

Page 30

1   Q   How many emails were there?
2           MR. FLYNN: Objection. You've already got
3       them. Why don't you count them?
4   Q   (Continuing by Mr. Miglio): How many emails were there?
5   A   You can count them.
6   Q   Do you have any idea how many?
7   A   Nope.
8   Q   Well, I was given by your lawyer a stack of emails that
9       were about two or three inches thick. Is that what
10      you're saying you forwarded to your home?
11  A   Not all of them. I mean I can still access my Henry Ford
12      email from my cell phone today.
13  Q   Do you understand that you took information concerning
14      patients?
15  A   I never took information concerning patients.
16  Q   Do you know that you forwarded emails containing patient
17      information?
18  A   No, never.
19  Q   You would know that would be against the law.
20  A   Yep. That would break HIPAA laws.
21  Q   So if you did, then you would have broken HIPAA laws.
22  A   Right, but I didn't.
23          MR. FLYNN: Objection. Calls for a legal
24      conclusion.
25          (Exhibit 1 marked.)

Page 31

1   Q   (Continuing by Mr. Miglio): Let me show you what's been
2       marked as Exhibit No. 1. I want you to take a look at
3       this. Take your time.
4           MR. FLYNN: Go ahead and look at it all.
5           THE WITNESS: Okay.
6   Q   (Continuing by Mr. Miglio): Let me know when you're done
7       reading it.
8   A   Okay.
9   Q   Have you ever seen that document before?
10  A   Yep. Yes.
11  Q   When have you seen it before today?
12  A   Well, I wrote most of the emails.
13  Q   Okay. But in terms of the portion that's Complaint and
14      Demand for Jury Trial, have you ever seen that before?
15      It has your lawyer's name at the end of the --
16  A   I believe I got a copy of that in the mail.
17  Q   Do you remember if you saw it before or after you
18      understood that it had been filed with the Court?
19  A   I don't understand your question.
20  Q   Well, you understand it was filed with the Court?
21  A   Yes.
22  Q   Okay. Did you see it before it was filed with the Court?
23  A   Yes.
24  Q   Okay. Did you review it before it was filed with the
25      Court?

Page 32

1   A   Yes.
2   Q   Okay. And at the time you reviewed it was it accurate
3       and truthful as far as you were concerned?
4   A   Yes.
5   Q   And let me ask you to look at this Exhibit D to the
6       complaint, and let me ask you what is that?
7   A   Oh, I believe it's what I filled out online.
8   Q   Filled out -- that online?
9   A   Correct.
10  Q   Okay.
11  A   Or no. This was sent to me in the mail. I had called in
12      early January, and the man on the phone from FLSA
13      confirmed that I did have a case and that he would be
14      sending me the paperwork in the mail.
15  Q   When did you get the paperwork?
16  A   Closer to the end of January.
17  Q   What did you do with it?
18  A   I filled it out.
19  Q   And then what did you do with it?
20  A   Sent it in?
21  Q   Sent it in.
22  A   Correct.
23  Q   Okay. Before working for Quest Diagnostics where did you
24      work?
25  A   Henry Ford Medical Laboratories.

8 (Pages 29 to 32)

Tri-County Court Reporters
248-608-9250

Natalie Reeser
3/30/2015

Page 33

1  Q  Did you ever work for anybody between the time that you
2     left Henry Ford Health System and the time you started at
3     Quest Diagnostics?
4  A  No, I did not. I was on unemployment from Henry Ford.
5        (Exhibit 2 marked.)
6  Q  (Continuing by Mr. Miglio): Let me show you what we've
7     marked as Exhibit No. 2 and ask you to take a look at
8     this.
9  A  Okay.
10 Q  Ever seen that before?
11 A  I'm sure I have.
12 Q  Is that your signature that appears on that?
13 A  Yes.
14 Q  And did you understand that you were swearing or
15    attesting to the accuracy of the answers to the
16    interrogatories?
17 A  Yes, I do.
18 Q  Who is Davis-Smith?
19 A  Davis-Smith is the staffing service that staffs Quests
20    employees for the first six months -- Well, first three
21    months, and then you get hired in through Quest.
22 Q  So you worked for Davis-Smith first before you became a
23    full-time employee for Quest.
24 A  Correct. It's a staffing service steppingstone that they
25    use. In order to get hired through Quest, you go through

Page 34

1     Davis-Smith. Davis-Smith sets you up, and then you get
2     hired in fully if you complete your three months of
3     probationary period.
4        (Exhibit 3 marked.)
5  Q  (Continuing by Mr. Miglio): All right. Let me show you
6     what's been marked as Exhibit No. 3, and I want you to
7     verify that those are the text messages which were turned
8     over to me today which you claim you retrieved from your
9     cell phone.
10 A  Yes, they are.
11 Q  What kind of a cell phone is it?
12 A  A Samsung Galaxy III.
13 Q  When did you retrieve them?
14 A  Yesterday.
15       (Exhibit 4 marked.)
16 Q  (Continuing by Mr. Miglio): I show you what's been marked
17    as Exhibit 4 and ask you to take a look at this.
18 A  Do you want 3 back?
19 Q  Yeah.
20 A  Okay.
21 Q  Have you seen these before?
22 A  Yes.
23 Q  And did you prepare the answers to these?
24 A  Yes.
25 Q  And the answers were truthful?

Page 35

1  A  Yes.
2        (Exhibit 5 marked.)
3  Q  (Continuing by Mr. Miglio): I show you what's been marked
4     as Exhibit No. 5 and ask you to take a look at this.
5  A  Okay.
6  Q  Have you ever seen that document before?
7  A  Not sure if I've ever seen this one.
8  Q  Have you had the opportunity to read it?
9  A  Yep. Yes.
10 Q  Does it reflect the job duties that you had when you
11    worked for Henry Ford Health System in the labs?
12 A  I also had more job duties than that's listed here, but
13    yes.
14 Q  Well, tell me what's listed there, whether or not what's
15    listed there were job duties that you understood you were
16    responsible to perform.
17       MR. FLYNN: Objection as to form.
18 Q  (Continuing by Mr. Miglio): Go ahead. Do you understand?
19 A  No, I don't understand.
20 Q  What's listed here, were you required to do these job
21    duties?
22 A  Yes.
23 Q  And you're saying they were -- in addition to what's
24    listed here, there were more job duties that you were
25    required to perform; is that what you're saying?

Page 36

1  A  I was given direct orders from Martha Wiseheart on a
2     daily basis to do all of her administrative assistant
3     work.
4  Q  We'll get through this a lot quicker if you just listen
5     to my questions.
6        MR. FLYNN: Objection. She's answering your
7     question.
8        THE WITNESS: I answered the question.
9  Q  (Continuing by Mr. Miglio): Were there additional job
10    duties other than what's listed on Exhibit 5 that you
11    were required to do?
12       MR. FLYNN: Objection. Asked and answered.
13    You can answer.
14       THE WITNESS: On a daily basis Martha Wiseheart
15    directed me to do her administrative assistant jobs.
16 Q  (Continuing by Mr. Miglio): So the answer to my question
17    is yes.
18 A  No. There's more.
19 Q  Okay. The answer to my question that you were required
20    to do job duties in addition to what's listed on
21    Exhibit 5 is yes?
22       MR. FLYNN: Objection. Asked and answered.
23 Q  (Continuing by Mr. Miglio): Correct?
24 A  I don't know what you're asking. I gave my answer.
25 Q  What additional job duties did you have other than what's

9 (Pages 33 to 36)

Natalie Reeser
3/30/2015

### Page 85

1         MR. MIGLIO: You don't know.
2         THE WITNESS: I don't know.
3         MR. FLYNN: Objection. Asked and answered.
4  Q (Continuing by Mr. Miglio): All right. So every email
5     I'm going to show you today you don't know you got a
6     copy.
7  A Correct.
8  Q All right. Well, look at 27 again. Can you tell me
9     whether that contains patient information, like the
10    patient's name?
11        MR. FLYNN: Objection. Calls for a legal
12    conclusion.
13        THE WITNESS: I'm not an attorney. I don't
14    know.
15 Q (Continuing by Mr. Miglio): Do you recognize a patient's
16    name on that document?
17        MR. FLYNN: Objection.
18        THE WITNESS: It could have been a patient. I
19    don't know.
20 Q (Continuing by Mr. Miglio): When you wrote, "Jacob Denz,
21    our first patient this morning at 7:30 a.m.," what did
22    that mean exactly?
23 A I don't know. I'm not -- This is from 2011, sir. It's
24    now 2015.
25 Q Well, don't you think that maybe Jacob Denz was a patient

### Page 86

1     that morning?
2  A I'm not sure.
3  Q Well, let's ask you this way: Why would you keep a copy
4     or print a copy off of this?
5  A I don't know. If it pertains to this lawsuit, it's
6     probably because Fiona agrees that Clinton Township is my
7     primary location.
8  Q That's the significance of this?
9         MR. FLYNN: Objection. Misconstrues her
10    testimony.
11        THE WITNESS: I answered --
12 Q (Continuing by Mr. Miglio): That's the significance of
13    this email?
14        MR. FLYNN: Same objection.
15        THE WITNESS: I already answered. I have no
16    idea.
17 Q (Continuing by Mr. Miglio): That's the only thing you can
18    think of as to why you would keep a copy?
19        MR. FLYNN: Same objection.
20        THE WITNESS: I have no idea.
21        (Exhibit 28 marked.)
22 Q (Continuing by Mr. Miglio): I show you what's been marked
23    as Exhibit 28. Have you ever seen this before?
24 A I do believe so, yes.
25 Q Is that something that you were given as part of your

### Page 87

1     employment at Henry Ford Health System?
2  A No. I saw this yesterday.
3  Q Okay. You've never seen this before either.
4  A No.
5  Q Have you ever read anything that's similar to what's set
6     forth here?
7         MR. FLYNN: Now, I'd like to note for the
8     record --
9         THE WITNESS: I don't know.
10        MR. FLYNN: -- this is taken out of context. I
11    think that there are several other pages --
12        THE WITNESS: Yeah, there is.
13        MR. FLYNN: -- that are typically attached to
14    this.
15 Q (Continuing by Mr. Miglio): How do you suppose I got it
16    from your lawyer if you didn't have it? Do you have an
17    explanation for that?
18 A I don't know. It might be -- It might be something I
19    gave him in my stuff.
20 Q (Continuing by Mr. Miglio): Well, if you gave it to your
21    lawyer, wouldn't you have seen it before yesterday since
22    it was turned over to me some time ago?
23 A Right, but I didn't remember seeing it until yesterday.
24 Q Well, how about this: Take a look at the second
25    paragraph there that says, "Code of Conduct/Duty to

### Page 88

1     Report."
2  A Hm-hmm.
3  Q It says, "Never leave a site at any time without prior
4     authorization from a manager." Do you see that?
5  A Yes.
6  Q That was a rule that you were well aware of --
7         MR. FLYNN: Objection.
8         MR. MIGLIO: -- when you worked at Henry Ford
9     Health System?
10        MR. FLYNN: Objection. This document is taken
11    out of context of the full document.
12        MR. MIGLIO: I don't know what that means, but
13    go ahead.
14        MR. FLYNN: She should review the full
15    document.
16 Q (Continuing by Mr. Miglio): Just asking you, "Never leave
17    a site at any time without prior authorization from a
18    manager."
19 A Correct, but that has --
20 Q That particular rule was well known to you when you
21    worked at Henry Ford Health System, correct?
22        MR. FLYNN: Objection. Let the witness answer.
23    She was getting ready to answer your question.
24 Q (Continuing by Mr. Miglio): Correct?
25 A That is code of conduct. That has nothing to do with

Natalie Reeser
3/30/2015

Page 137

1   sure that Natalie knows exactly what this patient and her
2   samples. The mother was informed that the (Meier) gift
3   card would be sent to her."
4   Q   Now, what is the second and third page?
5   A   Those are the specimens that are to be collected from the
6       patient. That's online. You can pull that off. It's --
7   Q   Okay.
8   A   It's access anyone can have.
9   Q   So why did you keep and take a copy of this?
10  A   I didn't. It was attached to this email.
11  Q   But my question is --
12  A   As an attachment.
13  Q   -- why did you take this email?
14  A   I was probably sending it to Jill to show that I was a
15      highly proficient phlebotomist and that they were sending
16      problems to me.
17  Q   Why don't we see the email to Jill, then?
18  A   All of these documents were attachments, so -- or
19      delivered to her in person, so I -- I don't know why you
20      wouldn't have that.
21  Q   Well, why did you keep a copy of this?
22  A   I didn't keep a copy of this. If you look at it, 1-16-14
23      I still worked at Henry Ford, and that's the day I
24      forwarded all this stuff or printed off stuff for Jill
25      Hood.

Page 138

1   Q   Well, I know, but it was turned over to me in the Court
2       case, and I'm wondering why you kept a copy of that and
3       took it from the facility.
4   A   I already answered the question. I don't have any other
5       answer for it.
6   Q   Well, I understand you gave a copy, you claim you gave a
7       copy, to Jill Hood, but my question is why when you left
8       the employ of Henry Ford Health System did you take this
9       with you?
10  A   I don't know if I did.
11  Q   Well, how did it get to me if you didn't take it with
12      you?
13  A   There was several emails sent back and forth from Jill
14      Hood with attachments on it.
15  Q   That's not my question. My question is --
16  A   So I might have received it in an attachment.
17  Q   Okay. But you left Henry Ford Health System with a copy
18      of this, didn't you?
19  A   No. It was forwarded to Jill Hood.
20  Q   Okay. Well, how did I get it from your lawyer? Do you
21      think your lawyer went to Jill Hood and got it?
22  A   Then maybe I had a copy of it.
23  Q   Do you see what's blacked out there?
24  A   Yes.
25  Q   What do you think is in there?

Page 139

1   A   I have no clue.
2   Q   Well, don't you know that that's the patient's name?
3   A   Possibly.
4   Q   Do you know that I got this from your lawyer with the
5       patient's name not redacted?
6   A   Possibly.
7   Q   And if you took this without redacting the patient's name
8       that would have been inappropriate and a violation of
9       HIPAA, wouldn't it?
10          MR. FLYNN: Objection. Calls for a legal
11      conclusion.
12          THE WITNESS: I'm not a lawyer.
13      INNOCENT/ISN'T
14  Q   (Continuing by Mr. Miglio): Isn't that what you said
15      earlier, that taking information that identified patients
16      would be a violation of the law, HIPAA?
17          MR. FLYNN: Objection.
18          MR. MIGLIO: I mean we can go back and look for
19      it.
20          MR. FLYNN: Objection. Misconstrues her
21      earlier testimony and calls for a legal conclusion.
22  Q   (Continuing by Mr. Miglio): So what I want to know is --
23  A   I'm not a lawyer.
24  Q   I didn't say you were. What I want to know is why did
25      you keep a copy of this information with the patient's

Page 140

1   name on it?
2           MR. FLYNN: Objection. Asked and answered.
3           THE WITNESS: I answered the question, sir. I
4       have no other answer.
5   Q   (Continuing by Mr. Miglio): Did you keep originals of all
6       of that stuff or did you give it to your lawyer?
7   A   I have no clue.
8   Q   So you don't know whether you still have the emails that
9       you produced.
10  A   I have no clue if I have this email still in my
11      possession.
12  Q   I didn't ask you about this email. I asked you about the
13      emails that you made copies of. Do you still have them
14      in your possession?
15  A   Yes.
16  Q   All right.
17          MR. MIGLIO: Well, we're going to want to see
18      the originals, if she has them.
19          MR. FLYNN: Everything that we have has been
20      produced in discovery. There are no remaining emails.
21          MR. MIGLIO: I don't care whether there are --
22      I want to see the originals.
23          THE WITNESS: The original looks exactly the
24      same.
25          MR. FLYNN: We gave you the originals, because

Natalie Reeser
3/30/2015

### Page 157

1 A  "Displays a positive attitude in a timely manner" she put
2     me as two because I started complaining about lunches and
3     she took that as harassment and aggression.
4 Q  So you were complaining about what?
5 A  The fact that I didn't get a lunch.
6 Q  Okay. So where is the -- Just tell me the particular
7     category that you were complaining that you were rated
8     down in?
9 A  Number two.
10 Q  "Display a positive attitude/respond in a timely manner."
11 A  Correct. She allowed her personal feelings for me to
12     definitely bring down that to a 2.
13 Q  Anywhere else that you disagreed with the rating or you
14     were complaining about the rating?
15 A  Nope. I was fully successful in all our categories.
16 Q  So this is why you wanted to have a meeting with --
17 A  No.
18 Q  -- HR?
19 A  No.
20 Q  Okay.
21 A  I wanted a meeting with HR because I wasn't given a lunch
22     break and I was tired of not being paid for the time that
23     I spent there drawing patients and still not given a
24     lunch break.
25 Q  So let's look at Exhibit 59 again.

### Page 158

1 A  Hm-hmm.
2 Q  January 13 you say, "Fiona, if we need to sit down with
3     HR, I understand, but I feel you changed the two markers
4     to 2.2 on me due to personal feelings and not based on my
5     job performance. I would like to see a copy of these
6     several of complaints. I know -- and I know I had two
7     and that's why I was sent -- I sent to training; however,
8     it was found that the tape provided to me was wrong, so
9     it was not strong enough to hold the skin; hence, the
10     bruise."
11     Okay. So where is the reference to you
12     complaining about lunch here?
13 A  There's no reference in that email about lunch. It's the
14     reason why all of a sudden she started changing
15     everything is because I brought up lunches to her.
16 Q  When you say "changing everything," I only thought you
17     complained about the two that you had here.
18 A  She also -- I mean when I talk about changing things, I'm
19     talking about taking away my location, calling me at
20     home, harassing me.
21 Q  Calling you --
22 A  Things like that.
23 Q  When did she call you at home and harass you?
24 A  Early January or early February. Somewhere in there.
25     She called me at -- somewhere around 8 o'clock at night

### Page 159

1     and basically told me off because I had reported that I
2     was reporting to the State --
3 Q  Okay.
4 A  -- about lunches. And she said, "How dare you," and she
5     said that I'll be sorry, and from that moment on all of a
6     sudden then she started changing my review, changing my
7     sites, sending me here. Everything started going
8     downhill once Fiona found out that I wanted to go to
9     lunch.
10 Q  So you don't know whether it was January or February when
11     she called you at home.
12     MR. FLYNN: Objection. Misconstrues her
13     earlier testimony.
14 Q  (Continuing by Mr. Miglio): Is that what you're saying?
15 A  I don't recall exactly when it was, but it was Jan -- I
16     believe it was in January or early February, yes.
17 Q  All right. And you say she called you at home at 8 p.m.
18 A  Approximately 8:30, 8:45. Somewhere late at night. It
19     was late at night.
20 Q  And did she call you on your cell phone?
21 A  I don't recall what she called me on, whether it was my
22     house phone or cell phone.
23 Q  What was your house phone number?
24 A  I don't recall. I don't know my phone numbers by heart.
25 Q  Did you have a land line?

### Page 160

1 A  At the time.
2 Q  Okay. You had a land line as of January of 2014.
3 A  No, I didn't have a land line as of January 2014. I had
4     a land line at some point in time.
5 Q  Well, I'm asking you when you say she called you at home
6     at that time, whether it was January or early February
7     2014, did you have a land line?
8 A  Not in 2014, no.
9 Q  Okay. So what number could she have called you on, then?
10 A  It was probably my home cell phone.
11 Q  And what number was that?
12 A  586-843-6020.
13 Q  Okay. And in January 2014 who was the carrier for your
14     cell phone?
15 A  Sprint. Still same carrier.
16 Q  And do you remember when the phone call came in
17     looking --
18 A  It could have also been on my work cell phone.
19 Q  Okay.
20 A  I'm not sure.
21 Q  Okay. You took your work cell phone home?
22 A  We had to keep our work cell phone on us 24 hours a day.
23 Q  What was that number?
24 A  I have no clue.
25 Q  All right. So it was either on your personal cell phone

40 (Pages 157 to 160)

Natalie Reeser
3/30/2015

### Page 161

1  or your work cell phone.
2  A  Correct.
3  Q  And this was a call she made to you at -- around 8
4     o'clock in late January/early February.
5  A  Correct.
6  Q  All right. Have you ever seen any record of that call
7     coming in?
8  A  What do you mean by "record"?
9  Q  Well, have you ever looked at your phone records to see
10    if you got an incoming call from anybody?
11 A  I never received incoming phone records before. I don't
12    receive a bill, except for it comes out monthly out of my
13    bank account.
14 Q  So when she called you did you make a note of that?
15 A  Yeah, I informed Jill Hood in the letters.
16 Q  You informed Jill Hood in letters or in emails?
17 A  In emails.
18 Q  Okay. So you sent Jill Hood an email saying that she was
19    threatened -- that Fiona called you at 8 o'clock some
20    night and threatened you.
21 A  No. I explained that when I sat down with Jill Hood.
22 Q  Well, you just said you sent it in letters. I'm asking
23    you did you explain it in writing or are you saying you
24    did that verbally?
25 A  I did that verbally when I sat face to face with her.

### Page 162

1     Her letter -- The letters I sent her was asking for a
2     meeting with HR.
3  Q  So you didn't send anything to Jill Hood in writing
4     indicating -- describing this phone call that you claim
5     you got with Fiona; is that what you're saying?
6  A  I'm not sure. I'll have to look at my letters.
7  Q  So now, what would you have to look at?
8  A  It was two years ago almost. I would have to look at the
9     letters I wrote Jill Hood.
10 Q  Well, that would be a pretty significant call, wouldn't
11    it?
12 A  It was. And it was definitely stated to Jill Hood in our
13    HR meeting.
14 Q  But you didn't make a note, you didn't write down any
15    notation or anything like that, make a written --
16    document it?
17 A  I went in the very next day and I told Martha all about
18    it, and Martha pulled me aside and told me I needed to go
19    to HR, that Fiona was out of line.
20 Q  All right. Did you document Martha's conversation with
21    you?
22 A  Yeah. Jill Hood knows through conversation that Martha
23    is the one that told me to come to her.
24 Q  Well, I looked through all these emails. You seem to be
25    a prolific email writer. Are you telling me that you

### Page 163

1     never put into an email a description of the call you got
2     from Fiona at 8 o'clock some night in late January/early
3     February?
4        MR. FLYNN: Well, objection as form.
5        THE WITNESS: It was part of the conversation
6     that I had while I was in present HR office.
7  Q  (Continuing by Mr. Miglio): Okay. Did you record any
8     conversations with Fiona or anybody else?
9  A  Yes, I did.
10 Q  And when did you record them?
11 A  Don't recall the exact date.
12 Q  What conver -- How many were there that you recorded?
13 A  Two.
14 Q  Okay. And what were the conversations about?
15 A  The one was her calling me harassing me at work about the
16    fact that I saw her paycheck and how she felt it was
17    personal, that I should have never seen her paycheck, but
18    she left it up on my screen while I was doing work. It
19    wasn't my fault. And the second one was I recorded my
20    exit.
21 Q  You recorded your exit?
22 A  Correct. When Fiona walked in with the security guards,
23    I hit "record."
24 Q  Okay. Where are those recordings?
25 A  On my cell phone right here. He didn't know about it

### Page 164

1     until yesterday, though. I just got the cell phone
2     fixed.
3        MR. MIGLIO: Off the record.
4        MR. FLYNN: Okay.
5        (Whereupon a recess was taken at or about the
6     hour of 2:16 p.m., and the deposition was resumed at or
7     about the hour of 3:01 p.m.)
8  Q  (Continuing by Mr. Miglio): So when you made these
9     recordings, did you inform anybody that you were
10    recording them?
11 A  Nope.
12 Q  And who's listened to them?
13 A  Me, my attorney, and Jill Hood.
14 Q  Okay. And what's the recording that you played for Jill
15    Hood?
16 A  The 16-minute conversation of Fiona harassing me, telling
17    me it was personal, that I am an excellent phlebotomist.
18    Things like that.
19 Q  Well, what does she say exactly on the tape?
20 A  Basically that she wanted to know why I didn't tell her
21    that I saw her paycheck stub.
22 Q  And what was the date of that conversation?
23 A  I don't recall right now. Somewhere in January.
24 Q  So where has this phone been that you just said you got a
25    battery for or something?

Natalie Reeser
3/30/2015

## Page 165

1  A  It was in a box. It's smashed. I mean the whole phone
2     is smashed. The screen's smashed. Everything's smashed.
3  Q  So where has it been?
4  A  It's been in a box in my storage unit.
5  Q  And what prompted you to go and get it out and try and
6     fix it?
7  A  Because I remembered I had recordings on it.
8  Q  And so you played both recordings for Mr. Flynn?
9  A  Yesterday, yep. And that was the first time he found out
10    about the recording. He didn't know I recorded my exit.
11 Q  Well, when did he find out about the first recording?
12        MR. FLYNN: Objection as to foundation.
13        THE WITNESS: It's in the paperwork that Jill
14    Hood saw -- listened to the recording I recorded, so.
15 Q  (Continuing by Mr. Miglio): So your attorney knew about
16    the other recording before yesterday is what you're
17    saying.
18 A  Yes, but he did not have access to it, because the phone
19    was smashed until yesterday when I got it fixed.
20 Q  And whose idea was it to get it fixed?
21 A  Mine. One hundred percent.
22        MR. MIGLIO: So you didn't tell me about it. I
23    had to go four-and-a-half hours before she finally
24    disclosed that she had a tape-recording that would have
25    been responsive to discovery requests, counsel. Is that

## Page 166

1  what I'm hearing?
2        MR. FLYNN: No. What you're hearing is that
3  you're hearing about recordings that we planned to
4  produce as soon as we can. We're having difficulty
5  getting them off the phone.
6        MR. MIGLIO: Why would they be difficult to get
7  off the phone? You play the phone and another phone
8  records it.
9        MR. FLYNN: That's what we finally figured out
10 that we plan on doing.
11       MR. MIGLIO: When were you going tell me you
12 had the recordings?
13       MR. FLYNN: Well, when we send you our
14 supplemental responses, and we were hoping to get those
15 out tomorrow.
16       MR. MIGLIO: Wouldn't you think that it would
17 be important for us to have the recordings for purposes
18 of this deposition?
19       MR. FLYNN: Well, I couldn't get you the
20 recordings, so how am I going to -- How would you be able
21 to have them for this deposition if I don't have access
22 to them?
23       MR. MIGLIO: You handed me texts, partial
24 texts, that you said you got off this phone, that she had
25 other texts on top of that, and then you didn't say

## Page 167

1  anything about a recording.
2        MR. FLYNN: Well, first off, I was not aware
3  that there were additional texts. Second off, in terms
4  of recordings, like I had indicated to you earlier during
5  our break and also while I'm -- like I'm indicating to
6  you on the record, all that's stopping us from getting
7  those to you is the fact that we were having difficulty
8  getting it off the phone.
9        MR. MIGLIO: If I knew that you weren't going
10 to have the recording in time for the deposition, I might
11 have moved the deposition in order to have it.
12       MR. FLYNN: If you'd like to schedule another
13 date for the specific purpose of examining the witness as
14 to those recordings, I'd be happy to agree to that.
15       MR. MIGLIO: Is there anything else --
16       MR. FLYNN: This is literally something that
17 just came up.
18       MR. MIGLIO: Is there anything else that you
19 want to say about stuff that you haven't produced but you
20 know is out there?
21       MR. FLYNN: Again, like I indicated just now,
22 that's the only thing that I'm aware of being out there.
23 And like I indicated earlier, we've given you all of the
24 emails that we have, all the originals, all copies of the
25 original emails.

## Page 168

1        THE WITNESS: There's one set of text messages
2  that are coming, and that's Denise Goldsmith texting me
3  telling me that she took the items the next day and the
4  two recordings.
5        MR. MIGLIO: Why weren't those produced today?
6        THE WITNESS: He wasn't aware of it, because
7  last night I went home and went through the phone and
8  just found them.
9        MR. FLYNN: So as a result, we plan to get
10 those to you as well. Again, we apologize for this, but
11 I mean it just came up. We didn't think -- Obviously,
12 Miss Reeser didn't believe that the phone was
13 salvageable.
14       THE WITNESS: Correct.
15       MR. FLYNN: But apparently it is.
16       MR. MIGLIO: I want to see the phone, too.
17       MR. FLYNN: We can present it to you today if
18 you like.
19       THE WITNESS: Yeah, I can go get it. It's in
20 my car.
21       MR. FLYNN: If that's what you prefer. I was
22 just going to email you the files off of it that are
23 relevant to the case.
24       THE WITNESS: I'm also going to screen shot the
25 date and time they were taken.

42 (Pages 165 to 168)

```
STATE OF MICHIGAN    )
                     )    ss:
COUNTY OF MACOMB     )
```

I hereby certify that the foregoing attached pages are a full and complete transcript of the proceedings held on the date and at the place hereinbefore set forth. I reported stenographically the proceedings held in the matter hereinbefore set forth, and the testimony so reported was subsequently transcribed under my direction and supervision, and the foregoing is a full, true and accurate transcript of my original stenotype notes.

_____
Lauri A. Sheldon CSR-4045, RPR

Notary Public
Macomb County, Michigan
My Commission Expires:
February 8, 2022