UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATALIE REESER,

      Plaintiff,                                Hon. George Caram Steeh

                                            Case No.: 2:14-cv-11916

v.

HENRY FORD HOSPITAL,

      Defendant.

| | |
|---|---|
| MILLER COHEN, P.L.C. | VARNUM LLP |
| Keith D. Flynn (P74192) | Terrence J. Miglio (P30541) |
| Attorney for Plaintiff | Barbara E. Buchanan (P55084) |
| 600 W. Lafayette Blvd., 4th Floor | Attorneys for Defendant |
| Detroit, MI 48226 | 39500 High Pointe Blvd., Ste. 350 |
| 313-964-4454 | Novi, MI 48375 |
| kflynn@millercohen.com | 248-567-7828 |
| | tjmiglio@varnumlaw.com |
| | bebuchanan@varnumlaw.com |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**NOW COMES** Defendant, **HENRY FORD HOSPITAL** ("Defendant"), by and through its attorneys, **VARNUM LLP**, and for its Motion for Summary Judgment states as follows:

1.      In this action, Plaintiff Natalie Reeser ("Plaintiff") alleges a claim for retaliation under the Fair Labor Standards Act ("FLSA"), and  a claim for violation of Michigan's Whistleblower Protection Act ("WPA").

2.     Pursuant to FED. R. CIV. P. 56(c), Defendant is entitled to Summary Judgment on both of Plaintiff's claims, because there is no genuine issue of material fact that:

    a.  Defendant Henry Ford Hospital was not a legal entity subject to suit and was not Plaintiff's employer;

    b.  Plaintiff cannot set establish a *prima facie* FLSA retaliation claim and, even if she could, she has not adduced any evidence that her act of abandoning her job in violation of established policy and procedure was pretext for retaliation; and

    c.  Plaintiff cannot establish a *prima facie* case of a violation of the Michigan WPA.

3.     Defendant's counsel sought concurrence in the relief sought in this motion from Plaintiff's counsel on May 4, 2015.  Concurrence was not given, thus making it necessary to file this Motion.

**WHEREFORE**, Defendant respectfully requests that this Honorable Court grant its Motion for Summary Judgment, dismiss Plaintiff's Complaint in its entirety with prejudice, and award such other relief as the Court deems appropriate.

Respectfully submitted,

VARNUM LLP


By:     */s/ Terrence J. Miglio*
        Terrence J. Miglio (P30541)
        Barbara E. Buchanan (P55084)
        Attorneys for Defendants
        39500 High Pointe Blvd, Suite 350
        Novi, Michigan 48375
        (248) 567-7828

Dated: May 15, 2015

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATALIE REESER,

     Plaintiff,
                                     Hon. George Caram Steeh
                                     Case No.: 2:14-cv-11916

v.

HENRY FORD HOSPITAL,

     Defendant.

| MILLER COHEN, P.L.C. | VARNUM LLP |
|---|---|
| Keith D. Flynn (P74192) | Terrence J. Miglio (P30541) |
| Attorney for Plaintiff | Barbara E. Buchanan (P55084) |
| 600 W. Lafayette Blvd., 4th Floor | Attorneys for Defendant |
| Detroit, MI 48226 | 39500 High Pointe Blvd., Ste. 350 |
| 313-964-4454 | Novi, MI 48375 |
| kflynn@millercohen.com | 248-567-7828 |
| | tjmiglio@varnumlaw.com |
| | bebuchanan@varnumlaw.com |

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION
<u>FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INDEX OF AUTHORITIES ........................................................................iv

CONCISE STATEMENT OF ISSUES PRESENTED ..............................................v

CONTROLLING / MOST APPROPRIATE AUTHORITY ...................................vi

STATEMENT OF FACTS........................................................................1

    A.    Plaintiff's Position Of Laboratory Assistant With Defendant...............1

    B.    The Outreach Program Policy Against Leaving A Site Without Authorization From Ms. Bork.................................................................3

    C.    The Practice Regarding Lunch Breaks...................................................4

    D.    Plaintiff's Complaints to Human Resources..........................................5

    E.    Events Leading to Plaintiff's Suspension And Subsequent Termination. ......................................................................................12

ARGUMENT ........................................................................................16

    A.    Defendant Henry Ford Hospital Is Not a Legal Entity Subject To Suit, Was Not Plaintiff's Employer And Is Not A Proper Party...................................................................................................16

    B.    Plaintiff Cannot Establish a *Prima Facie* Case of Unlawful Retaliation Because She Cannot Demonstrate A Causal Connection Between Her Alleged Protected Activity And Her Suspension/Termination....................................................................17

    C.    Even if Plaintiff Could Establish A *Prima Facie* Retaliation Claim, She Cannot Establish That Henry Ford's Legitimate, Nondiscriminatory Reason For Suspending and Terminating Her Was Pretextual..............................................................................20

    D.    Plaintiff's Whistleblowers' Protection Act Claim Fails Because She Cannot Establish A *Prima Facie* Claim.......................................21

E.    Plaintiff Has No Evidence To Refute Defendant's Legitimate Reason for Her Suspension and Termination and Thus Cannot Demonstrate Pretext. ...........................................................................22

CONCLUSION .....................................................................................................23

# INDEX OF AUTHORITIES

## <u>Cases</u>

*Adair v. Charter County of Wayne,*
    452 F.3d 482 (6th Cir.2006) ................................................................ 17, 18

*Conner v. Schnuck Mkts., Inc.,*
    121 F.3d 1390 (10th Cir.1997) .....................................................................21

*Debano-Griffin v. Lake Cnty.,*
    493 Mich. 167; 828 N.W.2d 634 (2013) ......................................................21

*Henry v. City of Detroit,*
    234 Mich.App. 405; 594 N.W.2d 107 (1999).........................................22

*In re Martin,*
    450 Mich. 204; 538 N.W.2d 399 (1995) ......................................................22

*Kaufman & Payton, P.C. v. Nikkila,*
    200 Mich.App. 250; 503 N.W.2d 728 (1993) ..............................................22

*Kuhn v. Washtenaw County,*
    709 F.3d 612 (6th Cir.2013) .........................................................................23

*Manzer v. Diamond Shamrock Chem. Co.,*
    29 F.3d 1078 (6th Cir.1994) ........................................................................20

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792; 93 S.Ct. 1817; 36 L.Ed.2d 668 (1973) ..................................18

*Pettit v. Steppingstone, Ctr. for the Potentially Gifted,*
    429 F.App'x 524 (6th Cir.2011) .......................................................... 18, 20

*Shallal v. Catholic Soc. Services of Wayne County,*
    455 Mich. 604; 566 N.W.2d 571 (1997)…………………………………..21

*Skrjanc v. Great Lakes Power Serv. Co.,*
    272 F.3d 309 (6th Cir.2001) ........................................................................20

iv

## CONCISE STATEMENT OF ISSUES PRESENTED

I.    Whether Defendant is entitled to summary judgment on each of Plaintiff's claims for the reason that there is no genuine issue of material fact that the named Defendant, Henry Ford Hospital, is not Plaintiff's employer under any theory alleged in the complaint.

Defendant answers "yes"


II.   Whether Defendant is entitled to summary judgment on Plaintiff's claim of retaliation under the Fair Labor Standards Act where there is no genuine issue of material fact that Plaintiff was terminated for the legitimate, non-retaliatory reason that she admittedly left her worksite without obtaining authorization and closed it to clients and patients in violation of Defendant's Medical Laboratory department policy.

Defendant answers "yes"

III.  Whether Defendant is entitled to summary judgment on Plaintiff's claim of retaliation under the Michigan Whistleblowers' Protection Act because there is no genuine issue of material fact that Plaintiff cannot demonstrate a causal connection between any alleged complaints and her suspension/termination for admittedly leaving her worksite without obtaining authorization and even if she could do so, she cannot demonstrate that such suspension/termination is a pretext for retaliation.

Defendant answers "yes"

## CONTROLLING / MOST APPROPRIATE AUTHORITY

*Adair v. Charter County of Wayne*,
    452 F.3d 482 (6th Cir. 2006)

*Kaufman & Payton, P.C. v. Nikkila*,
    200 Mich. App. 250; 503 N.W.2d 728 (1993)

*Kuhn v. Washtenaw County*,
    709 F.3d 612 (6th Cir. 2013)

*Manzer v. Diamond Shamrock Chem. Co*.,
    29 F.3d 1078 (6th Cir. 1994)

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792; 93 S.Ct. 1817; 36 L.Ed.2d 668 (1973)

*Pettit v. Steppingstone, Ctr. for the Potentially Gifted*,
    429 F.App'x 524 (6th Cir. 2011)

*Shallal v. Catholic Soc. Services of Wayne County,*
    455 Mich. 604; 566 N.W.2d 571 (1997)

*Skrjanc v. Great Lakes Power Serv. Co*.,
    272 F.3d 309, 317 (6th Cir. 2001)

## STATEMENT OF FACTS

**A.     Plaintiff's Position Of Laboratory Assistant With Defendant.**

On May 16, 2011, Plaintiff was hired as a full-time laboratory assistant or "Laboratory Service Representative" in the  Laboratory Outreach Services division of Henry Ford Health System ("HFHS")[1] (Ex. 1, Offer Letter.)  She was suspended and subsequently terminated on March 7, 2014 for leaving her work site without permission of her supervisor.  Fiona Bork, Sales Manager, Henry Ford Medical Laboratories, was Plaintiff's immediate supervisor. (Ex. 2, Bork Dep. pp. 128-129.) Ms. Bork was recruited to start the Outreach Laboratory Services Program ("Outreach Program") which provides laboratory and pathological services for physicians outside of HFHS. (*Id*. at p. 32.)  Ms. Bork's responsibility is to contract with non-HFHS physicians to get them to send their lab work to HFHS. (*Id*. at pp. 32, 53-56.) Lab work for the contracting physicians' patients is either collected at a "draw site" set up in the physicians' own offices (Warren and West Bloomfield) or "patient service centers" (Shelby Township and Clinton Township facilities). (*Id*. at pp. 52-54.) Physicians sign an agreement to use the Outreach Program laboratory services based upon advertised hours of operation for the draw sites and the patient

---

[1] As indicated below, the named Defendant, Henry Ford Hospital is not a legal entity subject to suit, was not Plaintiff's employer and therefore summary judgment should be entered dismissing the case on that basis alone.  For purposes of argument only, it is assumed that Plaintiff named the proper defendant.

service centers. (*Id*. at pp. 53-54.) Physicians are induced to contract with the Outreach Program based upon the fact that there will be a draw site and/or service center that is open at advertised times for the convenience of their patients. (Ex. 2, Bork Dep., p. 54).

As a Laboratory Service Representative, Plaintiff essentially performed the duties of a phlebotomist. (Ex. 2, Bork Dep., p. 35; Ex. 3, Job Description.)  She drew blood, processed samples and registered patients among other duties. (*Id*.) Ms. Bork supervised thirty phlebotomists including Plaintiff, two Sales Reps, and six couriers (who picked up lab specimens). (Ex. 2, Bork Dep., p. 23.)

All of the phlebotomists were told when they were hired that they could be required to work at any of the Outreach Program sites. (Ex. 2, Bork Dep., p. 36.) They are all trained to work at any of the sites. (*Id*. at p. 66.) Ms. Bork assigns the phlebotomists to the particular sites based on need. (*Id*. at p. 48.) If there is a shortage of staff at a site for whatever reason, Ms. Bork will pull staff from a different site to cover the shortage. (*Id*. at pp. 36-37.)  For the majority of the time she was employed by Defendant, Plaintiff worked at the Clinton Township Patient Service Center ("CTPSC") (Ex. 2, Bork Dep., p. 129.)

When she was hired, Plaintiff was informed that she would be rotated between sites, as needed, like all other phlebotomists. (*Id*. at pp. 36, 49, 66, 80-81, 195)  The CTPSC's operating hours are 7:30 a.m. to 5:00 p.m., Monday through

Thursday, and 7:30 a.m. to 11:30 a.m. on Fridays. (*Id*. at p. 58.) CTPSC is the least busiest site. (*Id*. at p. 48.)  It is staffed with only one phlebotomist, who is required to take care of patients who walk in without notice during the advertised hours of operation. (*Id*. at pp. 58, 86.)  Hours may go by when there are no patients at the site.  (*Id.* at p. 86.)

**B.    The Outreach Program Policy Against Leaving A Site Without Authorization From Ms. Bork.**

The Outreach Program maintained a policy that prohibited employees from leaving a site without permission of a manager.  HFH Policy 2.56 provides:

Code of Conduct/Duty to Report:

- **Never leave a site at any time without prior authorization from a manager.** (Ex. 4, Policy 2.56 – HFML Employee Policies and Guidelines and Plaintiff's acknowledgement)

Plaintiff expressly acknowledged receipt of the policy (*Id*.) Plaintiff also admitted that she was aware that she and all other Laboratory Outreach Services employees were required to receive permission from a manager to leave the site during their working hours. (Ex. 5, Plaintiff's Dep., pp. 153, 154.)  Ms. Bork testified that "If I'm contacted by an employee and they ask me if they can leave early and they don't have coverage, it will be denied. I can't leave a site without coverage." (Ex. 2, Bork Dep., p. 97.)  She also testified it was  not sufficient  for a phlebotomist to ask another employee to cover his or her shift. "No. It's-you need to get approval from your supervisor.  That is clear to everybody.  That has always

3

been clear." (*Id.* at pp. 112-113.)    Moreover, since Plaintiff was the only phlebotomist working at CTPSC, if she left without having coverage the site would have to be closed, would not be able to serve patients, and business would be negatively affected. (*Id.* at p. 53.)  Throughout her employment, Plaintiff had consistently emailed Ms. Bork asking for permission to leave the site. (See, e.g., Ex. 6, Nov. 19, 2012 email; Oct. 8, 2012 email; Oct. 23, 2012 email; Sept. 5, 2013 email; July 15, 2013 email.)  In several of those requests, Plaintiff noted that she was aware that policy required her to receive such authorization. (*Id.*; Ex. 14, Plaintiff Sept. 5, 2013 email.)

The policy had been consistently and repeatedly enforced:  Five other employees supervised by Ms. Bork, were <u>terminated for the same violation as Plaintiff – leaving a site without authorization.</u> (Ex. 7, Defendant's Second Supplemental Responses to Plaintiff's First Set of Interrogatories, No. 6; Ex. 8, Personnel Record Excerpts; Ex. 2, Bork Dep., pp. 114-120; *see also* Ex. 9, Hood Dep., pp. 46-47.)  Jill Hood, the HFHS Human Resources Business Partner who had responsibility for the Outreach Program testified that there have been no circumstances that she was aware of where an employee was spared termination for "job abandonment," walking off the job, which is considered a "Group 2 Violation" (Ex. 9, Hood Dep., 49-50; Ex. 10, Corrective Action Policy 5.17.)

**C.    The Practice Regarding Lunch Breaks**.

Ms. Hood testified that HFHS employees who work eight hours are entitled to a 30 minute lunch break. (Ex. 9, Hood Dep., pp. 35-36.) If an employee is able to leave their worksite for the lunch, the lunch break is unpaid (*Id*.)  If they are unable to leave the site they are to be paid for the lunch break. (*Id*. at pp. 35-36, 64.) She testified that while a lunch break is "highly encouraged," there are times when due to patient care issues, a lunch break may not be feasible. (*Id*. at pp. 59-61.)

Ms. Bork had an incorrect understanding of what was considered an unpaid lunch with respect to phlebotomists who worked at the CTPSC.  She testified that since phlebotomists at CTPSC had significant down time to eat lunch albeit at the site, that was considered an unpaid lunch:

> A   Okay.  Prior--my knowledge was that as long as somebody had a break to eat, that we were in accordance with policy, and there is significant down time at Clinton Township. It's the slowest site, so there were lots of times where there were hours where there were no patients coming in, so they could take their--well, what I considered the lunch, but not leave the site in case a patient walked in. It was brought to my attention that that is not considered a lunch.  (Ex. 2, Bork Dep., p. 86.)

Thus, only when a phlebotomist so busy at the site that they could not take a lunch break, would the employee be paid for that time. (Ex. 2, Bork Dep., p. 108.)

**D.   Plaintiff's Complaints to Human Resources**.

In early January 2014, Plaintiff and Ms. Bork completed Plaintiff's annual performance review process. This process requires each employee to prepare a self-evaluation form and submit it electronically to her supervisor, who then reviews and evaluates it, and electronically sends it back to the employee. (Ex. 2, Bork Dep., pp. 122-23.) The review assesses individual areas of performance on a rating scale of up to a "5." (*Id*. at p. 124.) When Ms. Bork reviewed Plaintiff's 2013 self-evaluation, she inadvertently rated Plaintiff a "2" in one of the areas of assessment. (*Id*. at pp. 148-49.) She explained:  "It was one of these categories on the annual review. It should have been a 3 instead of a 2. . . . It was just a typo.  It wasn't like I assessed something and changed it.  It should have been a 3." (*Id*.) As part of the annual performance review process, Ms. Bork attempted to meet with Plaintiff on Tuesday, January 14, 2014 to discuss the review. (*Id*. at pp. 146-47.) Ms. Bork testified that she went to the CTPSC to meet with Plaintiff partly because she noticed the mistaken "2" and "wanted to make sure that Natalie knew it should have been a 3 and not a 2, but [Ms. Bork] couldn't change it because it wasn't in [her] in-box.  It was in [Plaintiff's] in-box." (*Id*. at pp. 147-48.)  Plaintiff however refused to meet with Ms. Bork.  (*Id.* pp. 146-47)

Because she was angry about her performance rating, on January 14, 2014 Plaintiff contacted Jill Hood requesting a meeting. (Ex. 11, Jan. 14-16, 2014 email chain.)   On Wednesday January 15, Ms. Hood proposed meeting on Friday

6

January 17 at 12:30 p.m. (*Id.*) While Plaintiff claimed that Ms. Bork prevented her from attending the meeting, the uncontroverted facts are otherwise. Before Plaintiff was able to secure authorization to have another laboratory assistant, Alicia Estell, cover for her, Ms. Bork had notified all laboratory assistants of a conference call scheduled for 12:30 p.m. on the 17th to discuss electronic medical records (Ex. 12, Jan. 16 email chain.) Although Plaintiff had not yet received permission to have Ms. Estell work for her on the 17th and so had not confirmed the meeting with Ms. Hood, Plaintiff told Ms. Bork that she would be in a meeting at the time of the conference call. (*Id.*) Ms. Bork asked Plaintiff to move her meeting just 15 minutes to 12:45 p.m. so that she could participate in the conference call. (*Id.*) Ms. Bork approved Plaintiff's request to have Ms. Estell work for Plaintiff that day so that Plaintiff could attend her meeting. (Ex. 5, Plaintiff Dep., p. 196.) However, when Plaintiff received that approval, she never informed Ms. Estell. Shortly after 11:00 a.m. on Friday the 17th, Plaintiff received a text from Ms. Estell stating that she was not at the facility because Plaintiff had not informed her that Ms. Bork had approved the schedule change. (Ex. 13, Estell texts.)

Eventually, Plaintiff met with Ms. Hood on Monday, January 20, 2014. In that meeting, Plaintiff made a number of complaints about Ms. Bork.  Plaintiff summarized her complaints in a letter dated January 20, 2014, (Ex. 15, Jan 20, 2014 letter from Reeser to Hood).

**Ms. Hood investigated each of Plaintiff's complaints and found that virtually all of them were without merit and in some instances Plaintiff had lied about the facts.   The remaining complaints were resolved, including Plaintiff's complaint that she should be paid for lunches since she could not leave CTPSC.**  In a document entitled "Meeting with Natalie Reeser: January 20, 2014,"  Ms. Hood described the complaints Plaintiff raised at the meeting (in black) and described the results of her follow up investigation (in red).  (Ex. 16, Hood Jan. 20, 2014, Meeting Summary.)

With respect to her Performance Review, Plaintiff was upset that she had received a "2" in the "Display a Positive Attitude/Respond in a Timely Manner" performance area. Ms. Hood discovered that the rating was based upon several complaints that Defendant had received from patients about being bruised as a result after having blood drawn by Plaintiff.  While Plaintiff claimed the bruising was caused by a type of tape that was being used at the time, the bruises were at the venipuncture site itself and would not have been caused by tape (which could cause bruising only on the points where the tape adheres to the skin). (Ex. 2, Bork Dep., p. 155.) Ms. Hood learned that when  Plaintiff underwent re-training, the trainer in fact, found an error in Plaintiff's blood drawing technique. (Ex. 17, Investigation Summary; Ex. 18, Venipuncture Competency Checklist.)

With respect to other "2" ratings Plaintiff complained about in her performance evaluation, Ms. Hood learned that one of the "2" ratings was merely a an admitted typographical error by Ms. Bork, which had been changed to a "3" prior to the meeting. (Ex. 16, Hood Jan. 20, 2014 meeting summary; Ex. 2, Bork Dep., pp. 148-49.)  The remaining "2" rating was given as a result of Plaintiff not meeting a goal "To Grow CTPSC to 20 plus customers a day".  However, because Ms. Hood felt that the goal was not within Plaintiff's direct control, she requested that it be deleted (which ultimately improved Plaintiff's overall performance score.) (Ex. 17, Investigation Summary.)   Incredibly, Plaintiff objected to the goal deletion, *even though it was to her benefit*. (Ex. 5, Plaintiff Dep., p. 223.)

Plaintiff also complained that Ms. Bork began to treat her poorly after Plaintiff saw Ms. Bork's confidential salary information, which had inadvertently been left on Plaintiff's computer screen, and Plaintiff told a coworker about it. (Ex. 16, Hood Jan. 20, 2014 meeting summary.) Plaintiff claimed that Ms. Bork called her and threatened her, saying "This is not ending anytime soon." (*Id*.) Plaintiff had recorded that call and played it for Ms. Hood. (*Id*.) Contrary to Plaintiff's allegation, Ms. Bork made no such threat on the call. (*Id*.)

In response to Plaintiff's complaint that Ms. Bork failed to notify Ms. Estell that she approved Plaintiff's coverage for the meeting with Ms. Hood on January 17, Ms. Hood investigated and learned that Ms. Bork sometimes sent the

9

"approval" email to both employees or, if there was a personal note that needed to be placed in the email, she sent the approval only to the requesting employee. (*Id*.) To alleviate Plaintiff's concern, Ms. Hood recommended that, in the future, Ms. Bork send notice to both employees. (*Id*.)

Plaintiff also complained about that  Ms. Bork had asked Plaintiff to remove a personal screen saver from her computer. (Ex. 16, Hood Jan. 20, 2014 meeting summary.) Ms. Hood investigated this complaint and found that, because the computer was located where it could be viewed by patients, it had to have an HFHS screen saver. (*Id*.)

Plaintiff also complained that Ms. Bork had embarrassed her in front of a patient after Plaintiff did not make a copy of the patient's insurance card. (*Id*.) Plaintiff claimed that the reason she did not do so because the patient had been at the site the day before. (*Id*.)  Ms. Bork explained that it is policy that all insurance cards must be copied each year and the patient's insurance card had not been copied since before the New Year (*Id*.)

Plaintiff complained that she was not permitted to take a 30-minute lunch break while working at the CTPSC.  Plaintiff claimed that Ms. Bork told all employees who worked at the CTPSC that, if they want to remain at that location, they could not have a lunch or break. (*Id*.) Ms. Hood's investigation determined that the practice with respect to lunch breaks at CTPSC was incorrect and

conducted a review of Plaintiff's schedules, payroll records, and compensation records for the prior two years. (Ex. 17, Investigation Summary.) The review resulted in a finding that Plaintiff had worked 81 hours through lunch over the previous two years.  Plaintiff was paid her for the unpaid lunches  including overtime pay for any hours that crossed the 40-hour per week threshold. (*Id*.) Other employees who worked at the CTPSC were also reimbursed for unpaid lunches (Ex. 9, Hood Dep., pp. 184-186.)  Ms. Hood's investigation also included interviewing the staff regarding whether they were told by Ms. Bork that if they took breaks she would no longer allow them to work at the CTPSC. (*Id*.) Not only did none of the employees validate Plaintiff's claim, they indicated that Ms. Bork had provided them with the written procedure for reporting when a lunch break was not received. (*Id*.) Indeed, *Plaintiff  had received and acknowledged* receipt of these procedures. (Ex. 4, Policy 2.56 – HFML Employee Policies and Guidelines and signature page.)

As a result of Ms. Hood's investigation of the lunch break practice, a new procedure was put into effect on February 25, 2014. (Ex. 19, Bork Feb. 24, 2014 email.) (*Id*.)  Notice was provided to the CTPSC patients and physician clients, that that the site would be closed for 30 minutes each day. This  allowed the laboratory assistant to take a lunch break without having to remain on site. (Ex. 2, Bork Dep., p. 90.)

Finally, Plaintiff complained that  Ms. Bork asked her to commit perjury at an unemployment hearing for a former employee (*Id*.)  Ms. Hood reviewed emails between Ms. Bork and Plaintiff and concluded that Plaintiff had been disingenuous. (Ex. 9, Hood Dep., pp. 138-139; Ex. 20, Emails regarding Judy Hale.)[2]

In a letter dated March 5, 2014, Ms. Hood summarized the conclusions of her investigation. (Ex. 17, Investigation Summary.)

**E.     Events Leading to Plaintiff's Suspension And Subsequent Termination.**

On February 25, 2014, Plaintiff began work at the CTPSC at 7:30 am. (Ex. 5, Plaintiff Dep., p. 260.)  In her deposition, she testified that she received a call from Ms. Bork that morning telling her that her site was being changed, that Ms. Bork was not going to pay her for her lunches, and that Ms. Bork was angry at her for going to HR. (Ex. 5, Plaintiff Dep., pp. 260-264.)  **The evidence unequivocally establishes that no such conversation took place:** Phone records from Ms. Bork's work or personal cell phones show that no such calls were made to Plaintiff's phone at CTPSC, 586-228-2774, or Plaintiff's personal cell phone, 586-834-6020, on February 25, 2014.  (Ex. 21, Bork personal cell phone records.)

---

[2] At her deposition, Plaintiff claimed that she "misspoke" in her complaint that Ms. Bork asked her to commit perjury.  (Ex. 5, Plaintiff Dep., pp. 244-246.)

Plaintiff testified that after the alleged call from Ms. Bork, she sent an email to Ms. Bork and two other employees (Martha Wiseheart, Ms. Bork's counterpart on the operations side of Henry Ford Medical Laboratories, and Luain Hajjar, neither of whom had any supervisory authority for Plaintiff): "I AM VERY UPSET AND AM PUTTING A NOTE ON THE DOOR AND TAKING A 30 MINUTE LUNCH TODAY." (Ex. 22, Plaintiff Feb. 25, 2014 email.) She then went to Ms. Wisehart who was working at the site, told her about her alleged conversation with Ms. Bork, went and got her coat, waved to Ms. Wisehart, put a sign on the door and left the site for 30 minutes. (Ex. 5, Plaintiff Dep., pp. 264-265.) Plaintiff admitted that she did not request or receive permission to leave the site from Ms. Bork. (Ex. 5, Plaintiff Dep., pp. 265-266.)  She claims Ms. Wisehart only told her she needed to go to HR, but did not give her permission to leave. (*Id*.)

When Plaintiff sent the email, Ms. Bork was training an employee and did not see it. (Ex. 2, Bork Dep., p. 252.) Ms. Hajjar, upon seeing the email, immediately interrupted the training to notify Ms. Bork. (Ex. 2, Bork Dep., p. 253.) Ms. Bork immediately forwarded Plaintiff's email to Ms. Hood. (Ex. 24, Bork Feb. 25, 2014 email to Hood.)  Ms. Hood called Ms. Bork upon receiving the email indicating that Plaintiff was leaving the site (Ex. 9, Hood Dep., pp. 188-190, 194.) They discussed the situation and decided to suspend Plaintiff pending an investigation. (*Id*.) Ms. Bork went to CTPSC and informed Plaintiff she was

13

suspended. (Ex. 2, Bork Dep., p. 142;  Ex. 30, Plaintiff Feb. 25, 2014, 11:17 p.m. email.)

Later that day, Ms. Hood spoke to Plaintiff who said that she had engaged in the same conduct on similar occasions – that is, left the site without her supervisor's permission. (Ex. 9, Hood Dep. pp. 195-196). Plaintiff claimed that there were occasions when she left after posting  a sign on the door of the site as she did on February 25.  (Ex. 5, Plaintiff Dep., pp. 299-300.)  When asked for the sign she posted on that date, she said she had "shredded" it. (Ex. 5, Plaintiff Dep., pp. 151-152.) Ms. Hood asked Plaintiff to provide a statement indicating what took place on that date and when on previous occasions did she leave the site without authorization (Ex. 9, Hood Dep. p. 195.)

Ms. Hood then investigated the situation. In addition to obtaining information from Plaintiff (Ex. 31, Emails Between Hood And Plaintiff Post-Termination), she obtained statements from Ms. Bork, Ms. Wisehart and other employees. (Ex. 32, Statements by Bork, Wiseheart, Anger, and Hajair.)

The investigation revealed:

- Plaintiff did not obtain permission from her supervisor or anyone for that matter to leave the site in fact, she made no effort to obtain Ms. Bork's permission;
- Plaintiff could not identify a single time when she had left CTPSC without permission;
- No other employees were aware of Plaintiff or any other employees leaving the site without permission or posting a sign; and

- Plaintiff was aware of the policy prohibiting an employee from leaving the site without permission and in fact had followed that policy in the past. (Ex. 9, Hood Dep., pp. 187-199, 239, 248, 254, 255, 275-276.)

Plaintiff was informed of her termination by Hood via telephone on March 7, 2015. (Ex. 25, Hood March 7 email). She was given the opportunity to resign or appeal the decision to the HFHS ADR process. (*Id*.) She failed to respond and was informed she was terminated. (Ex. 26, Jill Hood email, dated March 21, 2014).

## F.    Plaintiff's Complaint with Michigan Department of Licensing And Regulatory Affairs (LARA).

On February 27, 2015 two days after her suspension, Plaintiff filed a Complaint with LARA alleging she was not paid for her lunches when she worked at CTPSC. (Complaint with date stamp).   Ms. Bork testified that she did not know anything about Plaintiff making a complaint to the State until after Plaintiff was no longer employed by Henry Ford. (Ex. 2, Bork Dep., p 249.)

Plaintiff alleges that Ms. Bork called her at home in the evening on February 18, 2014 to threaten Plaintiff about making a complaint to the state. (Complaint, ¶20, ECF Document #1.)  In her deposition Plaintiff testified that the call was "Early January or early February.  Somewhere in there. She called me at -- somewhere around 8 o'clock at night" (Ex. 5, Plaintiff's Dep. pp. 158-159.)  **As with the call Plaintiff claimed to have received from Ms. Bork on the day she**

**walked off the site, the evidence unequivocally demonstrates that no such call was ever made: There were no calls or texts to or from Ms. Bork's personal phone and Plaintiff's phone on any date between January 1, 2014 and March 31, 2014.** (Ex. 21, Plaintiff's Sprint Records.) And there were no calls to or from Ms. Bork's work phone and Plaintiff's phone on February 18, 2014. (*Id*.) Indeed, the only calls between Plaintiff and Ms. Bork in the entire three-month period occurred on January 31, 2014 in the morning: a call from Ms. Bork's work phone at 9:16:54 a.m., which lasted for 25 seconds and a call from Plaintiff to Ms. Bork's work phone at 9:27:36 a.m., which lasted for 35 seconds. (*Id*.)

In a decision issued on May 14, 2014, LARA found no merit to Plaintiff's claim. (Ex. 34, LARA Decision.)

## ARGUMENT

### A.   Defendant Henry Ford Hospital Is Not a Legal Entity Subject To Suit, Was Not Plaintiff's Employer And Is Not A Proper Party.

The only named Defendant in this case is Henry Ford Hospital. Henry Ford Hospital. Henry Ford Hospital is not a legal entity but merely an assumed name. Plaintiff was informed of this fact in answers to interrogatories very early on in this case. (Ex. 27, Defendant's Third Supplemental Answers to Plaintiff's First Interrogatories, Interrogatory Answer No. 8).  Plaintiff could have also learned this information from the Michigan Department of Licensing and Regulatory

16

Affairs. (Ex. 28, Certificate of Assumed Name).   Plaintiff knew this this information and failed to name or amend to name the proper party.   Actions brought under the FLSA and the Whistleblowers can only be brought against a Plaintiff's employee. (29 U.S.C. § 215(a)(3); MCLA 15.361 *et. seq*.) Henry Ford Hospital was not Plaintiff's employer or even an legal entity subject to suit. Accordingly summary Judgment should be entered in favor of Defendant.

**B.    Plaintiff Cannot Establish a *Prima Facie* Case of Unlawful Retaliation Because She Cannot Demonstrate A Causal Connection Between Her Alleged Protected Activity And Her Suspension/Termination**.

To establish a *prima facie* case of retaliation under the FLSA[3], a plaintiff must prove that "(1) he or she engaged in a protected activity under the FLSA;[4] (2) his or her exercise of this right was known to the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action."

---

[3] The burden-shifting analysis in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to a FLSA claim of retaliation. *See, e.g., Moore v. Freeman*, 355 F.3d 558, 562 (6th Cir. 2004); *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F.App'x 524, 533 (6th Cir. 2011) (applying the burden-shifting test to a FLSA retaliation claim).

[4] Defendant agrees that termination is an adverse employment action for purposes of Plaintiff's *prima facie* claim of retaliation.   Defendant does not concede that Plaintiff can establish the first or second elements of her *prima facie* case.   However, solely for purposes of argument in this Motion, Defendant assumes that Plaintiff could establish the first three elements of her *prima facie* retaliation claim.

17

*Adair v. Charter County of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006), citing *Williams v. Gen. Motor Corp.*, 187 F.3d 553, 568 (6th Cir. 1999). If Plaintiff can establish a *prima facie* case, the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's [discharge]." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802; 93 S.Ct. 1817 (1973).  If the Defendant does so, the burden shifts back to Plaintiff to identify evidence to establish that Defendant's proffered reason was not the true reason for her discharge, but was merely a pretext for retaliation. *Adair v. Charter County of Wayne*, 452 F.3d 482, 489 (6th Cir.2006); *see also McDonnell Douglas*, 411 U.S. at 802.

In order to establish the element of causal connection for retaliation under the FLSA, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action. *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F.App'x 524, 533 (6th Cir.2011) (citing EEOC v. Dennison Corp., 104 F.3d 858, 861 (6th Cir.1997)).  Plaintiff must put forth evidence which deduces a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable

inferences from that evidence. *Id.*  Temporal proximity, alone, is <u>not enough to establish the causal connection element</u> for retaliation claims. *Id.*[5]

The only alleged protected activity Plaintiff engaged in was her complaint to Jill Hood that she was not paid for lunch breaks. Even assuming this could be deemed "protected activity" under the FLSA (or the WPA, see below), the *only* evidence supporting causal connection is that coincidental timing of Plaintiff's suspension and termination which *Plaintiff herself triggered* when she violated department policy and abandoned her worksite.[6]  Plaintiff can point to no evidence suggesting disparate treatment for job abandonment, which is one way a Plaintiff can put forth evidence "which deduces a causal connection" in order to make out a

---

[5]  Defendant anticipates that Plaintiff may seek to rely upon a "direct evidence" theory to avoid the application of the McDonnell-Douglas burden-shifting analysis.  Direct evidence requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action, but it also requires the conclusion that unlawful retaliation was a motivating factor in the employer's action." *Fuhr v. Hazel Park School Dist.*, 710 F.3d 668, (6th Cir.2013) (internal quotations and citations omitted.)  However, Plaintiff's purported "direct evidence" cannot meet this standard and must not be considered by this Court for the reasons set forth in the Facts, above:  the only statements Plaintiff asserts were in alleged phone calls that phone records demonstrate unequivocally <u>did not ever occur.</u> Plaintiff has failed to present admissible evidence that constitutes "direct evidence" and must therefore rely upon the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93S.Ct. 1817, 36 L.Ed.2d 668 (1973).

[6] Plaintiff's LARA Complaint was filed on February 27, 2014, two days *after* Plaintiff was suspended, so this could not have been protected activity triggering an alleged retaliatory termination. (See Facts.)

19

prima facie case. HFHS has not disciplined any employees who walked off the job with anything less than termination. Accordingly, Plaintiff is unable to establish a *prima facie* claim of retaliation under the FLSA and Defendant is entitled to summary judgment in its favor on this claim.

**C.    Even if Plaintiff Could Establish A *Prima Facie* Retaliation Claim, She Cannot Establish That Henry Ford's Legitimate, Nondiscriminatory Reason For Suspending and Terminating Her Was Pretextual.**

Assuming Plaintiff could establish a *prima facie* claim of retaliation, Plaintiff must still show that a genuine issue of material fact exists as to whether Defendant's proffered reason for her discharge – her admitted departure from the work site without obtaining authorization – (1) has no basis in fact, (2) did not actually motivate Defendant's decision, or (3) was insufficient to warrant the challenged decision. See *Manzer v. Diamond Shamrock Chem. Co*., 29 F.3d 1078, 1084 (6th Cir.1994)); *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F.App'x 524, 535 (6th Cir.2011).

Plaintiff is required to produce evidence beyond that in her *prima facie* case to "rebut[] the proffered legitimate, nondiscriminatory reason for taking the challenged action.'" *Pettit*, 429 F. App'x at 536, quoting *Blair v. Henry Filters*, 505 F.3d 517, 533 (6th Cir.2007). As set forth above, Plaintiff can offer <u>no evidence</u> beyond temporal proximity, which as a matter of law cannot establish pretext. See *Skrjanc v. Great Lakes Power Serv. Co*., 272 F.3d 309, 317 (6th

20

Cir.2001). "Temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Id*., citing *Conner v. Schnuck Mkts., Inc*., 121 F.3d 1390, 1397–98 (10th Cir.1997) (noting that temporal proximity alone does not constitute a pretext for retaliatory discharge under the FLSA).

At best, Plaintiff's has a self-serving *belief* that she did not need authorization to leave the worksite. However, the soundness of Defendant's business judgment in maintaining the HFML policy requiring authorization and suspending and terminating Plaintiff for violating it "may not be questioned as a means of showing pretext." *Debano-Griffin v. Lake Cnty*., 493 Mich. 167, 180; 828 N.W.2d 634, 641 (2013) (citation and internal quotation marks omitted).

Plaintiff simply has no evidence to offer to even attempt to show that her suspension and termination has no basis in fact, did not actually motivate Defendant's decision, or was insufficient to warrant suspension and termination. For these reasons, Plaintiff cannot demonstrate pretext and Defendant is entitled to summary judgment in its favor on Plaintiff's FLSA retaliation claim.

**D.   Plaintiff's Whistleblowers' Protection Act Claim Fails Because She Cannot Establish A *Prima Facie* Claim.**

To establish a *prima facie* case of Whistleblowers' Protection Act retaliation, Plaintiff must prove 1) she engaged in protected activity, 2) an adverse

employment action, and 3) a causal connection. *Shallal v. Catholic Soc. Services of Wayne County*, 455 Mich. 604, 610; 566 N.W.2d 571, 574 (1997).

Defendant does not concede that Plaintiff can demonstrate by the required "clear and convincing evidence" standard[7] that she reported or was about to report, violations of law, regulation, or rule to a public body. *Id.* at 611; *Henry v. City of Detroit,* 234 Mich. App. 405, 409-10; 594 N.W.2d 107, 110-11 (1999). Moreover, Defendant asserts that Plaintiff cannot establish that Defendant was objectively aware that she was about to make a report **before** she was fired. See *Kaufman & Payton, P.C. v. Nikkila*, 200 Mich. App. 250, 257–58; 503 N.W.2d 728, 732 (1993).

However, for purposes of argument in this Motion, Defendant assumes Plaintiff can show elements one and two for her *prima facie* claim. She cannot demonstrate the third element, causal connection for the same reasons as set forth above regarding Plaintiff's FLSA retaliation claim. Defendant is therefore entitled to summary judgment on Plaintiff's retaliation claim under the WPA.

**E.     Plaintiff Has No Evidence To Refute Defendant's Legitimate Reason for Her Suspension and Termination and Thus Cannot Demonstrate Pretext.**

---

[7] The Michigan Supreme Court has recognized that the "clear and convincing evidence standard" is "the most demanding standard applied in civil cases," and has been incorporated into Michigan statutory enactments. See *In re Martin*, 450 Mich. 204, 226–27, 227 n. 22; 538 N.W.2d 399 (1995).

Assuming Plaintiff could establish a *prima facie* claim under the WPA, the burden shifts to Defendant to set forth a legitimate business reason for the adverse employment action. *Kuhn v. Washtenaw County*, 709 F.3d 612, 629 (6th Cir.2013). In response to Defendant's legitimate business reason for suspension and discharge, again – Plaintiff's admitted departure from the work site without obtaining authorization – the burden shifts back to Plaintiff to establish that the proffered reason is pretextual. *Kuhn*, 709 F.3d at 629. As with Plaintiff's FLSA claim, see Facts and Argument above, Plaintiff has no evidence to refute, let alone demonstrate, that Defendant's decisions to suspend and then terminate Plaintiff after investigation of her job abandonment are pretextual. Plaintiff cannot demonstrate pretext and Defendant is entitled to summary judgment in its favor on Plaintiff's WPA retaliation claim.

## CONCLUSION

For all of the foregoing reasons, Defendant respectfully requests that the Court grant its Motion for Summary Judgment and dismiss Plaintiff's Complaint with prejudice.

Respectfully submitted,

VARNUM LLP

By:    */s/ Terrence J. Miglio*
       Terrence J. Miglio (P30541)
       Barbara E. Buchanan (P55084)

23

Attorneys for Defendants
39500 High Pointe Blvd, Suite 350
Novi, Michigan 48375
(248) 567-7828

Dated: May 15, 2015

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 15, 2015, I caused the foregoing documents to be electronically filed with the Clerk of the Court using the ECF System, which will send notification of such filing to all counsel of record; and that I caused all documents filed under seal in the foregoing documents to be served upon counsel of record by United States Mail.

<u>*/s/Terrence J. Miglio*</u>
Terrence J. Miglio (P30541)
39500 High Pointe Blvd.
Suite 350
Novi, Michigan 48375
(248) 567-7828
tjmiglio@varnumlaw.com