Exhibit 2

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATALIE REESER,

     Plaintiff,

v                    Case No. 2:14-cv-11916-GCS-MJH
                    Hon. George Caram Steeh

HENRY FORD HOSPITAL,

     Defendant.

_____/

DEPOSITION OF FIONA BORK

    Taken by the Plaintiff on the 16th day of March, 2015, at the office of Keith D. Flynn, 600 W. Lafayette Blvd., Detroit, Michigan at 11:00 a.m.

APPEARANCES:

For the Plaintiff:    MR. KEITH D. FLYNN (P74192)
                       Miller Cohen, P.L.C.
                       600 W. Lafayette Blvd., 4th Floor
                       Detroit, Michigan 48226-0840
                       313.964.4454

For the Defendant:    MR. TERRANCE J. MIGLIO (P30541)
                       MS. BARBARA E. BUCHANAN (P55084)
                       Varnum LLP
                       39500 High Pointe Blvd., Suite 350
                       Novi, Michigan 48375
                       248.567.7828

Reported by:        TAMARA A. O'CONNOR
                       CSMR 2656, CER 2656

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 21

1   because I was a Regional Sales Manager as well
2   during that time.
3       I started off as a rep, and then District
4   Sales Manager and then Regional Sales Manager, and
5   then District Sales Manager, and then Account
6   Executive.
7       For a short term I was a specialty sales
8   rep, and Quest at the time tried vertical markets,
9   but there weren't enough prospects.
10      So I moved to an Account Executive, which
11  would allow me to call on various types of
12  specialties instead of just one.
13  Q   So how else were your other positions with Quest
14      different than the Account Executive position?
15  A   Well, if I was in an Account Executive position, I
16      was 100% selling.  As a Regional Sales Manager and
17      District Sales Manager I managed sales reps.
18      Then when I started with the organization,
19  it was a Sales Service Rep, so you protected a base
20  of business and tried to grow that business
21  organically.
22  Q   So you had managerial functions in the positions
23      that you came from and moved into the Account
24      Executive position?
25  A   Correct.

Page 22

1   Q   Were those earlier positions a little bit closer to
2       what you're currently doing?
3   A   Yes.  Well, no.  In terms of managing, managing
4       people, yes, but I was managing sales reps.
5   Q   Okay.  What led you to leave Quest to go to Henry
6       Ford?
7   A   Well, I was recruited by a physician that I had met
8       20 years prior that wanted to start an Outreach
9       program with Henry Ford, and I loved the idea of
10      starting something new from ground zero.
11      So I was very interested in doing that,
12  and I felt that--I mean, I had really done
13  everything I had wanted to do with Quest.
14  Q   Any other positions that are relevant to what you
15      are currently doing that you held prior to Quest?
16      MR. MIGLIO:  Object to the form of the
17  question, but go ahead.  You can answer.
18      THE WITNESS:  I was a phlebotomist when I
19  was going to school.
20  Q   (By Mr. Flynn)  When were you a phlebotomist?
21  A   I started off as a phlebotomist as a senior in high
22      school in a Health Occupations class, and worked as
23      a phlebotomist in a laboratory for many years while
24      going to college.
25  Q   Were you certified?

Page 23

1   A   No.  On the job training.
2   Q   Have you ever been certified?
3   A   For phlebotomy?
4   Q   Uh-huh.
5   A   No.
6   Q   So in your--could you describe what your current
7       position entails?
8   A   I manage two sales reps, six couriers and 30
9       phlebotomists.  My job is to develop strategies to
10      grow our business, and--
11  Q   How many couriers, did you say?
12  A   Six, soon to be seven.
13  Q   What is a courier?
14  A   A courier is--they go to our medical facilities, pick
15      up lab specimens and return them back to the lab.
16      They are also trained to troubleshoot printers that
17      we have on-sites, and they deliver supplies to the
18      physician offices.
19  Q   Okay.  So do you do any--so your primary task is
20      managing this team.  Correct?
21  A   Well, you use the word "primary," but I have to not
22      only grow the business, but I have to manage the
23      team.
24  Q   And what does managing the team entail?  What kinds
25      of decisions are you responsible for?

Page 24

1   A   Hiring, training, if there is disciplinary action,
2       annual reviews, mid-year reviews, day-to-day
3       operational questions.
4       If they run into situations they are not
5   sure how to handle, they contact me.  Approving
6   expenditures if a van breaks down, or if we need to
7   order something specific for a site.
8   Q   So could you take me through like a typical day's
9       work in your current position?
10  A   Well, I would tell you "typical" is not a word I
11      would use for any of the days, because it's not the
12      same every day.  I could get a call from an employee
13      that can't come into work, an employee that is going
14      to be late for work.
15      I could get a call from an angry physician
16  about lab work.  I could get a call from a patient
17  about a bad experience.  I could get a call from the
18  hospital regarding a system that is down.
19      I could get a call from Client Service
20  that they are looking for a specimen that was
21  delivered and can't find at the time.  I could be
22  preparing for calling on a prospect to sell new
23  business.
24      I could be going to different sites that
25  are currently operated by the Wyandotte facility or

9 (Pages 21 to 24)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 29

1          MR. FLYNN: Okay.
2     Q    (By Mr. Flynn) What were you going to say, ma'am?
3     A    If I go on vacation and I have to--
4     Q    What other--
5     A    I have to put somebody in charge in my absence.
6     Q    Any other situation where you have communicated to
7          employees who you manage that they are to reach out
8          to someone else, other than yourself?
9     A    No, not for approval. No.
10         REPORTER: Not for--
11         THE WITNESS: Any approval.
12         REPORTER: Approval.
13         THE WITNESS: If it requires approval.
14    Q    (By Mr. Flynn) And what requires approval?
15    A    Stepping outside of policy, if you are not going to
16         follow policy.
17    Q    What else?
18    A    I think that covers it.
19    Q    Okay, so only for stepping outside of policy?
20    A    If you're not going to follow policy, if you need to
21         leave, then you have to contact me. If you are
22         going to be late you have to contact me.
23    Q    Anything else?
24    A    Not that I can think of right now.
25    Q    How often are you in meetings in a given week?

Page 30

1     A    Henry Ford meetings, management meetings, or with
2          clients, or--
3     Q    Well, let's break it down. So first Henry Ford
4          meetings?
5     A    Well, I have an 8:00 o'clock Monday meeting, and
6          then every day we have a defect call.
7          REPORTER: I'm sorry?
8          THE WITNESS: Defect. That can last ten
9          minutes to 45 minutes. Once a month on Wednesdays
10         from 7:00 to 9:00.
11    Q    (By Mr. Flynn) What is that meeting?
12    A    That is a leadership meeting.
13    Q    When are the defect calls?
14    A    They are at 11:00 o'clock. 10:00 o'clock on Monday,
15         11:00 o'clock, Tuesday, Wednesday, Thursday, and
16         noon on Friday.
17         REPORTER: None on Friday?
18         THE WITNESS: Noon on Friday.
19    Q    (By Mr. Flynn) Any other meetings for Henry Ford?
20    A    If I have a new employee, then I will be in
21         orientation with them for three hours.
22    Q    And is there any specific time that you schedule
23         those?
24    A    Usually from 12:00 to 3:00 typically.
25    Q    And if an emergency came up where approval needed to

Page 31

1          be issued for some change, who would be there to
2          handle those requests?
3     A    I am. My phone is on 24/7.
4     Q    Who is your supervisor?
5     A    John Waugh, W-A-U-G-H.
6     Q    And what is his position?
7     A    He is the Vice President of Laboratory Systems.
8     Q    And back up a second. You also said that you had
9          meetings with potential new clients?
10    A    Correct.
11    Q    In a typical week, how many hours would you spend at
12         those kinds of meetings?
13    A    Some weeks I don't have any. Other weeks I might
14         have three.
15    Q    And these meetings would last an hour, two hours?
16    A    It all depends on how much time the physician has.
17    Q    But again, your cell phone is always on, so if--
18    A    Always on.
19    Q    So if there was an issue, you would be aware of it?
20    A    Yes, if they call me.
21    Q    What about E-mails? What if you received an E-mail?
22    A    I may not know about it. That's why I always have
23         everyone call me if there is an urgent issue.
24    Q    Have you ever been disciplined in your current
25         position?

Page 32

1     A    No.
2     Q    And have you been subject to any form of
3          investigation?
4     A    What do you mean?
5     Q    For instance, Human Resources, have they ever
6          conducted an investigation about any decision that
7          you made?
8     A    No, at least not that I'm aware of.
9     Q    Let's go through the hierarchy a little bit.
10         Outreach Services, what is the Outreach Services?
11    A    Henry Ford used to be a closed system, so the only
12         patients that could be referred to any kind of Henry
13         Ford facility would have to be a physician that was
14         part of the Henry Ford Medical Group.
15         So if you had an order for lab work and it
16         was written by a physician that was not part of the
17         Henry Ford Medical Group, you would be turned away.
18         So I was asked to come over to start the
19         Outreach Program, which means we would call on
20         private physician practices and try to earn the
21         right to ask for their business so that they would
22         send the lab work to Henry Ford.
23    Q    And you manage several clinics as part of that?
24    A    We have two patient service centers.
25    Q    Where are those?

11  (Pages 29 to 32)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 33

1    A   Shelby Township and Clinton Township.
2    Q   Any others?
3    A   We now have one in Warren.
4    Q   When did you open that up?
5    A   Almost--I would say almost two years ago, and we
6        just opened another one in West Bloomfield in
7        February, but they are set up a little bit different
8        than Shelby and Clinton Township.
9    Q   How so?
10   A   The West Bloomfield one and Warren one, we rent
11       space within a physician office.  The Clinton
12       Township and Shelby Township, we have our own suite.
13   Q   Is there anyone there who directly supervises the
14       employees at that facility?
15   A   No.
16   Q   So everyone goes to you?
17   A   Correct.
18   Q   Who is Martha Wiseheart?
19   A   She is my counterpart on the Operations side.
20   Q   What is the Operations side?
21   A   Well, the operations.  She handles Pathology,
22       Informatics, Customer Service, anything that is I.T.
23       related or internal lab related.  She also handles
24       our readiness for inspections.
25   Q   And where is she located out of?

Page 34

1    A   She moves around like I do, but she might be at
2        Clinton Township.  She might be downtown.  I don't
3        always know.  I mean, I don't follow her schedule,
4        so--
5    Q   Does she supervise anyone?
6    A   She does, Client Service, Pathology, Informatics.
7    Q   So you don't report to her?
8    A   No.
9    Q   Who is Jill Hood?
10   A   She is the Senior Business Partner of Human
11       Resources.
12   Q   And what does she do?
13   A   I don't know what her job entails.  I don't know
14       everything that she does, but if I have a
15       disciplinary issue or an issue that has come up with
16       an employee, I contact her, so--
17   Q   Okay.  Do you contact her every single time?
18   A   Yes.
19   Q   For even mundane disciplines, written, verbal
20       warnings, for instance, you would contact her?
21   A   Yeah, any kind of disciplinary action.
22   Q   Is she your supervisor?
23   A   No.
24   Q   Does she supervise anyone?
25   A   I don't know.

Page 35

1    Q   What is a Laboratory Service Representative Outreach
2        employee?
3    A   That is a phlebotomist.
4    Q   And can you describe what their function is?
5    A   They draw blood.  They register patients.  They
6        process samples.  They train other employees.  They
7        provide customer service for--if they are in a
8        physician office, the physician may come to them and
9        ask them what a specimen requirement is.
10           They may come to them with a billing
11       question.  They may register patients, process
12       specimens.  They are customer service.  They are--
13           If there is a question about the portal
14       that we use for orders and results, they are trained
15       to be able to answer those questions if they are in
16       a client office.
17           They have to have an understanding of
18       billing and diagnosis codes.  They have to know what
19       is mandatory on the requisition that is submitted to
20       the lab for testing.
21           They are to confirm patient information,
22       their address, their demographic information,
23       insurance information on every visit.  They train
24       co-workers, new employees.
25   Q   Do they ever--is there ever a need for them to act

Page 36

1        almost like a courier and take samples from their
2        location elsewhere?
3    A   They could.  It's very rare that happens.  I can
4        only think of a couple of times where that happened.
5        One phlebotomist did a home draw and brought the
6        specimen back, so in essence he is transporting a
7        specimen, so--but very rare.
8    Q   So there is not really a need to have them travel
9        around a whole lot.  They mostly stay in their
10       facility?
11   A   No.  No, no.  That's not what you asked me.  When
12       they are hired, part of the requirement of being
13       hired is that they are flexible and able to travel
14       to different sites.
15   Q   How often do phlebotomists get called upon to move
16       to different sites?
17   A   It depends.
18   Q   On what?
19   A   If they are hired as a floater, then they are
20       travelling all the time.  It's a floating position.
21       If they are an east sider, they are required to be
22       able to travel to any of our east side sites.
23           If they are a west sider, they have to be
24       able to travel to any of our west side sites.  So
25       everybody knows when they are hired, if there is a

12  (Pages 33 to 36)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

| | Page 37 |
|---|---|
| 1 | shortage, if I am short-staffed, that they are going |
| 2 | to be required to go to another site. |
| 3 | Q You mentioned two other sites. Maybe I'm confused. |
| 4 | You said Shelby Township and Clinton Township, and |
| 5 | there is also Warren that you mentioned? |
| 6 | A Uh-huh. |
| 7 | Q West Bloomfield just opened in February? |
| 8 | A Uh-huh. |
| 9 | REPORTER: Yes? |
| 10 | THE WITNESS: Yes. Sorry. |
| 11 | Q (By Mr. Flynn) Are there any other sites but those |
| 12 | four that they would be asked to go to? |
| 13 | A Yes. |
| 14 | Q Okay. Well, what is the difference between those |
| 15 | other sites and the ones that you listed earlier? |
| 16 | A They are--the other sites are physician offices |
| 17 | where we provide phlebotomy service. |
| 18 | Q So these aren't facilities that are owned by Henry |
| 19 | Ford. They are just doctors' offices? |
| 20 | A Correct. |
| 21 | Q So how many total are there? |
| 22 | MR. MIGLIO: Physician offices? |
| 23 | THE WITNESS: That we-- |
| 24 | Q (By Mr. Flynn) Total number of offices or |
| 25 | facilities that Henry Ford would have to operate in? |

| | Page 38 |
|---|---|
| 1 | A Let's say there's ten right now. I would have to |
| 2 | look at the schedule to count all of them. |
| 3 | Q Does that ten number include the four that you |
| 4 | listed earlier? |
| 5 | A No. |
| 6 | Q Let me mark an exhibit. |
| 7 | (At 12:02 p.m., Plaintiff's |
| 8 | Deposition Exhibit 1 marked) |
| 9 | Q (By Mr. Flynn) You have got a document that has |
| 10 | been marked Plaintiff's Exhibit 1 in front of you. |
| 11 | Do you see that? |
| 12 | A Yes. |
| 13 | Q Just quickly, what does this appear to be? |
| 14 | A It's the job description for the Lab Service |
| 15 | Representative, Outreach. |
| 16 | REPORTER: Job description? |
| 17 | THE WITNESS: Job description of the Lab |
| 18 | Service Representative, Outreach Phlebotomist. |
| 19 | Q (By Mr. Flynn) So you have reviewed this document |
| 20 | before? |
| 21 | A Uh-huh. Yes. |
| 22 | Q And it says at the bottom, "Revision date, December |
| 23 | 28, 2012." Do you see that? |
| 24 | A I do. |
| 25 | Q Has it been revised since then? |

| | Page 39 |
|---|---|
| 1 | A No. |
| 2 | Q So as far as you are aware, this is correct to the |
| 3 | best of your knowledge, what a phlebotomist would be |
| 4 | expected to do as part of their job. Correct? |
| 5 | A Correct. |
| 6 | Q Could you read through it real quick and let me know |
| 7 | if you see anything that you disagree with? |
| 8 | A The principal duties and responsibilities? |
| 9 | MR. MIGLIO: Through the whole thing. |
| 10 | THE WITNESS: Oh, through the entire |
| 11 | thing? |
| 12 | Q (By Mr. Flynn) The whole thing, yeah. |
| 13 | A You want me to read it. |
| 14 | MR. MIGLIO: Yes. |
| 15 | THE WITNESS: Okay. "Functions with a |
| 16 | high..."-- |
| 17 | MR. MIGLIO: No, not out loud. He wants |
| 18 | you to read it to yourself. |
| 19 | THE WITNESS: Oh, I'm sorry. That's why I |
| 20 | was confused. Okay. |
| 21 | MR. MIGLIO: Do you understand what he is |
| 22 | asking you? |
| 23 | THE WITNESS: You are asking me to read |
| 24 | this entire document and let you know if I don't |
| 25 | agree with something. |

| | Page 40 |
|---|---|
| 1 | Q (By Mr. Flynn) Read the entire--correct. |
| 2 | A (Witness complied). Okay. |
| 3 | Q Do you see anything in there that you disagree with? |
| 4 | A No. |
| 5 | Q Okay. You can put that to the side for now. |
| 6 | A Okay. |
| 7 | Q Does Henry Ford maintain any written work place |
| 8 | policies? |
| 9 | A Written? |
| 10 | Q Yeah. |
| 11 | A Yes. |
| 12 | Q Okay. So how are the work place policies organized? |
| 13 | MR. MIGLIO: Object to the form of the |
| 14 | question. I don't understand what it means, but if |
| 15 | you do, go ahead and answer. |
| 16 | THE WITNESS: I don't. |
| 17 | Q (By Mr. Flynn) Well, okay. Is there--are there |
| 18 | levels of policies? Is there like a system-wide set |
| 19 | of policies, versus specific policies, for instance, |
| 20 | for Outreach? |
| 21 | A There are system-wide policies that we follow, but |
| 22 | within those policies you can customize your |
| 23 | call-in policy based on the type of work that you |
| 24 | are doing. |
| 25 | So there is a system-side policy for most |

13 (Pages 37 to 40)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 45

1     Bank or any of those.  They would report to John as
2     well.
3  Q  (By Mr. Flynn)  Anything else you can think of?
4  A  That would report to John?
5  Q  Yes, directly.
6  A  I mean, it would just be department managers that I
7     am aware of.
8  Q  How many departments, I guess is what I'm asking.
9  A  I really don't know.  I mean, there are several.
10    There is the lab, like I said, Cytology Manager,
11    Blood Bank Manager.  I think there is someone from
12    Pathology, Informatics somewhere in that department
13    that reports to him, but I don't have the org. chart
14    with me.
15          I mean, if you have it, I could tell you
16    who reports to him, but I don't know all of his
17    reports.
18 Q  You mentioned Smith who is the Lab Manager.  What
19    does that entail?
20 A  Well, I know that she has--the person that is in
21    charge of processing reports to her.  I know she has
22    something to do with some of the micro and CBCs,
23    with Urine micro and CBCs, but to be honest with
24    you, I couldn't tell you what her role is in all
25    that, but I know she talks about it on the defect

Page 46

1     calls.
2  Q  And so would you refer to yourself as a Department
3     Manager, Department Supervisor?
4  A  Yeah, Manager.
5  Q  So all the Department Managers are supervisory.
6     Correct?
7  A  As far as I know, they are all managers.
8  Q  So any employee of Henry Ford is--if you're an
9     employee of Henry Ford, the Outreach Division, you
10    answer--
11 A  Well, they are not part of Outreach.  The managers
12    you were just asking about, they are not in
13    Outreach.  They are a part of Henry Ford Hospital.
14 Q  What is John's position then in relation to
15    Outreach?
16 A  He is in charge--well, he is my direct manager, and
17    he is the Vice President of Lab Operations, so it's
18    a service line.  So there are Wyandotte employees in
19    the lab that report to him.
20          There is Clinton Township employees that
21    report to him.  There is West Bloomfield lab
22    positions that report to him as well.
23 Q  Can you think of--so these individuals who are
24    department managers, they are supervisors, as you
25    mentioned earlier?

Page 47

1  A  Yes.
2  Q  So employees who are in the laboratories, they have
3     to answer to the supervisors.  Correct?
4  A  To their supervisor.
5  Q  So it's their specific supervisor?
6  A  Their specific supervisor.
7  Q  What if supervisors give different instructions?
8  A  I don't know what you mean.
9          MR. MIGLIO:  I'll object to the form of
10    the question.
11 Q  (By Mr. Flynn)  So let's say that you had two
12    department managers who gave different instructions
13    to the same employee.
14          MR. MIGLIO:  Same objection.  What is the
15    question?
16          THE WITNESS:  I don't--yeah, I don't know
17    what you're asking.
18 Q  (By Mr. Flynn)  What would the employee be expected
19    to do, would the employee be expected to follow?
20 A  Nobody has two managers, so they would be expected
21    to follow their manager's directions.
22 Q  Vice versa.  Their manager would be the only one who
23    could discipline or discharge?
24 A  Correct.
25 Q  Now these sites that you listed earlier, you said

Page 48

1     Shelby Township, Clinton Township, Warren and West
2     Bloomfield.  How many employees staff each of those?
3  A  Shelby Township, it could be anywhere from four to
4     seven.  Shelby Township is our busiest site.
5     Clinton Township is the slowest site, and we have
6     one.
7  Q  By "employee," are you referring to phlebotomists?
8  A  Yes.  West Bloomfield we have two to possibly three,
9     and Warren we have one.
10 Q  So Warren is equally not as busy as Shelby?
11 A  No.  That's not true.
12 Q  Oh.  Well, explain that comment.
13 A  The Warren site is very busy, but not to the point
14    where I need to put a second person in.
15 Q  But Shelby is the most staffed?
16 A  Correct, and by far the busiest.
17 Q  Where do the floaters report to?
18 A  They are given a schedule.
19 Q  Okay, and what location would they be scheduled to?
20 A  It depends.  They could go to a nursing home.  They
21    could go to one of the sites.  They could go to a
22    physician's office.  It just depends on where the
23    need is.
24 Q  So they are just all around?
25 A  Correct.

15  (Pages 45 to 48)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 49

1  Q  And how many floaters are there?
2  A  Three.
3  Q  Has that ever changed?  Has there ever been
4     substantially more or substantially less than three?
5  A  There is more that travel.  The three that were
6     hired were hired as floaters, but there are other
7     employees that travel to many sites, based on a
8     need.
9  Q  What do you mean by that?
10 A  If I have a shortage, then they go to another site.
11    That's why when everyone is hired, they said--no
12    one is given a site.  They are all told that they
13    could work at any of our sites.
14 Q  So you are kind of indicating to me today that all
15    30 of them are kind of like floaters?
16 A  They all could, yes.
17 Q  How many typically do float?
18 A  I would say half of them.
19 Q  So about 15 of them move around?
20 A  Yeah, go to different sites.  Yeah.
21 Q  And how do you determine who moves around?
22        MR. MIGLIO:  You mean as a floater or
23    what?
24        MR. FLYNN:  No, any kind of movement, any
25    kind of transfer from facility to facility.

Page 50

1         MR. MIGLIO:  So the question is how does
2     she determine which phlebotomist--
3  Q  (By Mr. Flynn) So you have a question about the
4     question, ma'am?
5  A  Well, I do, because I'm not sure what you meant by
6     that.
7  Q  Okay.  How many would be expected--how would you
8     determine who to take out of a facility to move
9     someplace where you need an additional staff?
10        MR. MIGLIO:  I'll object to the form of
11    the question, but go ahead and answer it.
12        THE WITNESS:  100% of them.  They all are
13    required to be able to rotate and work at any site.
14 Q  (By Mr. Flynn) Well, I'm not saying what you
15    require them to do.  I'm saying how would you
16    determine--how would you pick between phlebotomists
17    to move to a different facility?
18 A  They are all trained to work, to be able to go to
19    any facility, so--
20 Q  But you have got to call somebody and say, "Okay."
21 A  I do.
22 Q  "I've got an empty position that needs to be filled.
23    I need you to go fill it."  How would you determine
24    the person to call?
25        MR. MIGLIO:  Object to the form of the

Page 51

1     question.
2         THE WITNESS:  I would look at the schedule
3     and I would see where I could pull somebody from,
4     and if I can pull somebody from Shelby because I've
5     got--to cover a site, then I will do that.
6         If I have to call somebody that was
7     scheduled to work later in the day, I'll call them
8     and ask them to come in earlier so I can move people
9     around.
10        It's a puzzle, because I can never leave a
11    site without a phlebotomist.  We're obligated to
12    provide phlebotomy coverage at all times.  So
13    sometimes I have to move four people because one
14    person called in.
15 Q  (By Mr. Flynn) Do you mean--okay.  Who are you
16    required to provide phlebotomy services to?
17 A  All of our sites.
18 Q  Even the four you mentioned earlier?
19 A  Absolutely.
20 Q  Okay, but those four are run by Henry Ford?
21 A  No.
22 Q  Okay.  So now I'm getting confused again.
23 A  Okay.
24 Q  Henry Ford runs those sites?
25 A  No.  We do.  Henry Ford Medical Laboratories does.

Page 52

1  Q  Okay, but you're a division of Henry Ford.  So when
2     I'm saying Henry Ford, I'm saying--
3  A  Oh, okay.  All right.  I get what you're saying now,
4     that they are not physician sites.  They're not
5     physician offices.
6  Q  Correct.
7  A  That's what you're saying.
8  Q  Correct.
9  A  Okay.
10 Q  So those sites are still Henry Ford sites, so
11    perhaps you--is there any contractual requirement
12    that you fully staff those sites necessarily?
13        MR. MIGLIO:  Objection as to the form of
14    the question.  Go ahead and answer if you can
15    understand what he is asking.
16        THE WITNESS:  Well, are you--tell me what
17    you mean by "contractually obligated."
18 Q  (By Mr. Flynn) Well, what obligates you to fully
19    staff the other--what obligates you to fully staff
20    the locations?
21 A  We have in each location, the sites that are not
22    within a physician office, we are in a medical
23    building, and we support the physicians in that
24    building.
25        So instead of putting a phlebotomist in

16  (Pages 49 to 52)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 53

1  their office, we have a draw site. So they depend
2  on that draw site being open the hours that we have
3  advertised that we will be open to provide coverage
4  for their patients.
5       So if I close the site, I have the
6  potential of losing business.
7  Q  Could you have a--are you aware of a contractual
8     obligation that creates that relationship?
9  A  In the physician offices we have a Laboratory
10    Services Agreement that contractually obligates us
11    to provide phlebotomy services. When we--
12  Q  What about the Outreach labs?
13  A  The Shelby and Clinton Township, we are obligated to
14    provide phlebotomy services to the physicians in the
15    office, because--
16  Q  Are you aware of a contract that states that though?
17       MR. MIGLIO: Do you want to let her finish
18    the question, finish her answer?
19       MR. FLYNN: Well, I'm trying to figure out
20    specifically "contract." That's what my question is
21    about.
22       THE WITNESS: All physicians sign a
23    Laboratory Services Agreement that we are going to
24    provide services.
25       The physician office, we have a Laboratory

Page 54

1  Service Agreement with what is called an IOP,
2  in-office phlebotomist, that we sign with that
3  physician.
4       For our two sites--and let me just
5  explain, walk you through this a little bit. When
6  we're calling on a prospect to get that business, we
7  sell them on the fact that we have a draw site in
8  the building and the hours that they will be open,
9  so that it's a convenience that patients can go
10  straight from the physician's office to our draw
11  site.
12  Q  (By Mr. Flynn) But do you have a contract with the
13    separate physicians in a facility where an Outreach
14    lab is located?
15       So, for instance, do you have a contract
16    at the Clinton Township facility? For instance, do
17    you have a contract with the doctors who are also in
18    that facility?
19  A  We don't have a contract. We have an agreement.
20  Q  So your answer--okay. Differentiate the two for me.
21  A  Okay. We don't have a contract that says in writing
22    that we will never close that site.
23  Q  That's what I was asking.
24  A  Okay, but that is not--you need to know--
25  Q  Well, my question was specific to a written

Page 55

1  contract, so an actual contract like the one you
2  have with the individual physicians.
3  A  Right, but if we close--
4  Q  None of that exists for the Clinton Township
5    facility or the Shelby Township facility. Correct?
6  A  Correct, but if we close the site, we would lose the
7    business.
8  Q  Well, that's all I'm asking. That's all I'm asking.
9    Okay. Well, let me ask you a different question
10    then. Have you ever had a situation where you have
11    lost a physician who is in the same facility as an
12    Outreach lab due to it not being staffed?
13  A  We--due to it not being staffed?
14  Q  Yeah.
15  A  We haven't closed--we don't--
16  Q  Is that a "yes" or a "no"? Have you ever lost
17    business over that?
18  A  No.
19       MR. MIGLIO: It's not a "yes" or "no."
20       THE WITNESS: It's not a really--
21  Q  (By Mr. Flynn) Well, you said no. Correct?
22  A  It's not--we have not closed a site. We don't--if
23    somebody calls in, I don't close the site.
24  Q  What happens if someone just doesn't show up for
25    work though?

Page 56

1  A  I get coverage there. I actually covered it myself.
2  Q  But there is a period of time in which there is
3    nobody there. Correct?
4  A  Correct.
5  Q  Have you ever lost business on account of someone
6    not being there?
7  A  No, but it has affected the relationship we have had
8    with that account.
9  Q  Okay. Can you give me a specific example?
10  A  One of the practices in Clinton Township, when
11    somebody was late and we didn't have coverage, they
12    called me to make me aware of it. They weren't
13    happy with it because that means a patient has to
14    come back.
15  Q  And who contacted you?
16  A  The office manager.
17  Q  And what office? What is this person's name?
18  A  I can't--I don't know her name right now, but it's
19    Dr. Garafalo's (phonetic) office.
20       REPORTER: Doctor--
21       THE WITNESS: Garafalo. I can look it up,
22    the spelling.
23       REPORTER: Garafalo?
24       MR. FLYNN: I'll be able to get you the
25    spelling.

17 (Pages 53 to 56)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 57

1     MR. MIGLIO: We'll get--we don't have to
2  look up things right now.
3     MR. FLYNN: Off the record.
4  Q  (By Mr. Flynn) Okay. So when did this conversation
5     take place?
6  A  I would have to look in my E-mails. I don't know.
7     I don't recall.
8  Q  Do you know about what year?
9  A  I really don't. I don't know if it was last year.
10    I can't remember.
11 Q  Do you recall what season?
12 A  No.
13 Q  You can't think of any other instances where that
14    has been the case?
15 A  No, not that I can recall right now.
16 Q  Now how are these facilities staffed? How many
17    phlebotomists are on call per shift?
18    MR. MIGLIO: Object to the form of the
19 question.
20    THE WITNESS: Yeah. I don't--what do you
21 mean?
22 Q  (By Mr. Flynn) Let me back up a little bit.
23 A  Yeah.
24 Q  Are there even shifts?
25 A  What do you mean by "even shifts"?

Page 58

1  Q  Are there shifts--so we're going to have this
2     facility open from 8:00 a.m. to noon, so there will
3     be one person, from noon to 4:00 or 5:00 p.m.--
4     Are there shifts where phlebotomists--one
5     phlebotomist leaves and the other one comes on?
6  A  Yes.
7  Q  Okay. What are the shifts like?
8  A  Well, Clinton Township is 7:30 to 5:00, so it's one
9     shift, Monday through Thursday, and 7:30 to 11:30 on
10    Friday, so it's one shift, one person.
11    Shelby Township, we're open from 7:00 to
12    7:00, Monday through Thursday, and 7:00 to 5:00 on
13    Friday. So we have a 7:00 to 3:30 shift. We have a
14    10:30 to 7:00 shift.
15    We have an 8:00 to 4:30 or a 9:00 to 5:30
16    shift. We have--in our other sites, the Warren
17    site, we match the physicians' hours, and it's one
18    site, and one person.
19    West Bloomfield, we match the physicians'
20    hours currently, and so we have one person that
21    starts earlier in the morning, finishes earlier in
22    the evening, and then the other person comes in
23    later and closes.
24 Q  So there is really only two that have shifts?
25 A  No. Then you have--well, are you just talking about

Page 59

1  the draw sites?
2  Q  Yeah.
3  A  Yes.
4  Q  Okay. The physicians' offices or the other clinics
5     that you operate in, those might be different
6     though?
7  A  Correct.
8  Q  So there might be shifts for them?
9  A  Well, the Bloomfield one we have different shifts
10    for, but the physician offices, we're there when
11    they're there, so--
12 Q  For the draw locations, I'm just going to refer to
13    Clinton Township, Shelby, Warren, West Bloomfield as
14    "draw locations." Is that correct nomenclature?
15 A  Yeah, draw sites.
16 Q  Draw sites. So for the Shelby draw site, how many
17    employees are on per shift?
18    MR. MIGLIO: Object to the form of the
19 question.
20 Q  (By Mr. Flynn) You can answer.
21    REPORTER: Object to the form?
22    MR. MIGLIO: I object to the form of the
23 question.
24    THE WITNESS: We have two openers and
25 typically two closers, and then in the middle of the

Page 60

1  day the openers are still there until 3:30, so
2  somebody might start at 10:00.
3     So there is overlap with the shifts.
4  Q  (By Mr. Flynn) So is there always two that are on?
5  A  Yes.
6  Q  I understand, okay.
7     MR. MIGLIO: When you get to a point, I'd
8  like to take a break, quickly.
9     MR. FLYNN: This is a good time.
10    (At 12:20 p.m., recess taken)
11    (At 12:46 p.m., back on the record)
12    (At 12:46 p.m., Plaintiff's
13    Deposition Exhibit 2 marked)
14 Q  (By Mr. Flynn) I have marked Exhibit 2. Exhibit 2
15    are the documents that you provided me earlier
16    today, so we are going to just put those as part of
17    the record.
18    Ms. Bork, you referenced a situation where
19    you had a complaint from a local doctor over the
20    Clinton Township facility. Correct?
21 A  Correct.
22 Q  Do you recall who was supposed to be scheduled to
23    handle the clinic at that time?
24 A  I don't recall.
25 Q  Do you recall what happened to the employee who was

18 (Pages 57 to 60)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 65

1  Q  And have you granted those requests?
2  A  Yes.
3  Q  And who can you think of who you have granted that
4     request for?
5  A  Shores Primary Care.
6  Q  Anyone else?
7        REPORTER:  What was that?  Shores?
8        THE WITNESS:  Shores Primary Care.
9     Women's Health.
10  Q  (By Mr. Flynn)  Anyone else?
11  A  Yeah.  Wyandotte Internal Medicine, Wyandotte/Allen
12     Park.
13  Q  Anyone else?
14  A  Union Lake, I've had them request who not to send.
15  Q  And do you recall who that individual was?
16  A  I would have to look at my notes.
17  Q  So you don't recall?
18  A  I don't recall.
19  Q  Anyone else that has requested a specific
20     phlebotomist be assigned to a location, including a
21     draw site?
22  A  No physician has requested that any specific person
23     be at a draw site that I recall.
24  Q  It could have happened.  You just can't recall
25     today?

Page 66

1  A  I don't recall any requests.
2  Q  So again, I'm trying to get at the inputs, how you
3     decide between phlebotomists in assigning them their
4     draw site.  How do you make that decision overall?
5     What are the inputs to that decision?
6  A  Well, where they live, because we keep the east
7     siders on the east side, west siders on the west
8     side, so that dictates where they go if we don't
9     have a shortage.
10        Other than that, like I said, everybody is
11     hired and trained to be able to work at any site.
12  Q  But you just said earlier that you might have the
13     more efficient phlebotomists opening, as opposed
14     closing.
15  A  No.  What I said was that my stronger phlebotomists
16     I have opening at a site.  I have strong people
17     closing as well, but what I said, the stronger ones
18     opening at Shelby because it's a very busy site.
19  Q  So you do make distinctions between phlebotomists in
20     assigning them their shift or their location.
21     Correct?
22  A  Well, I look at what they can handle, and the
23     phlebotomists that are scheduled at Shelby can
24     handle a very heavy workload.
25  Q  Any other inputs that you can think of for

Page 67

1     determining location or shift?  So it sounds like
2     it's--
3  A  I have--go ahead.
4  Q  Yeah, and you were shaking your head, "no," but you
5     didn't really say that verbally, or--
6  A  I didn't--you were going to ask me a question.
7        REPORTER:  "Any other inputs for
8     determining location."
9        THE WITNESS:  No, apart from when you
10     asked me if a physician asks for a certain person.
11  Q  (By Mr. Flynn)  Okay.  So let me clarify, because
12     we've been all over with this line of questions.  So
13     first off, correct me if I am wrong, but the inputs
14     are the location where the person lives, the any
15     kind of references that other doctors might give to
16     have the same phlebotomist, the skill level of the
17     phlebotomist, as well as some discussion with the
18     individual phlebotomist themselves.  Is that a
19     correct list?
20        MR. MIGLIO:  I'll object to the form of
21     the question.
22        THE WITNESS:  When you say a specific
23     discussion, what do you mean by that?  With the
24     employee?
25  Q  (By Mr. Flynn)  Conversation with a phlebotomist

Page 68

1     over where they would like to be assigned or what
2     would be in the best interests for Henry Ford in
3     terms of their location?
4  A  I don't have a conversation with any employee about
5     where they want to be assigned.  They are assigned
6     based on the need.
7  Q  Okay, and that's what I'm trying to get at, because
8     if they are all the same skill level, according to
9     you, then how do you tell between phlebotomists
10     where they go to meet the need?
11  A  Well, like you said, we look at location, east
12     siders on the east side, west siders on the west
13     side.
14  Q  And that's it?
15  A  Yeah.  I mean, they're all very good.
16  Q  Do you ever delegate this task?
17  A  What do you mean?
18  Q  Do you ever give this task to another subordinate?
19        MR. MIGLIO:  Objection as to form.
20        THE WITNESS:  To do what?
21  Q  (By Mr. Flynn)  Set the schedule?
22  A  No.  The schedules are always approved by me.
23  Q  Okay, but do you ever have someone initially put
24     together the schedule?
25  A  Yes.

20  (Pages 65 to 68)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 77

1  Q  Okay.  So you mentioned earlier that one of the
2     reasons for moving a phlebotomist would be due to a
3     patient or client complaint.
4        I'm asking you, can you recall any
5     specific instances involving moving or transferring
6     a phlebotomist due to a patient or client complaint?
7  A  Yes.
8  Q  Like who?
9  A  I don't recall the employee, but one was in Commerce
10    Township, a client in Commerce Township.
11 Q  And that person wasn't discharged?  They were just
12    moved to a different facility?
13 A  They ultimately ended up being discharged.
14 Q  What did they ultimately get discharged for?
15 A  Attendance issues.
16 Q  What were the attendance issues?
17 A  Tardiness.
18 Q  How often were they tardy?
19 A  I'd have to look at the file.
20 Q  Was it more than once?
21 A  Yes.  Oh, yes.
22 Q  Okay.  Was it more than five times?
23 A  Yes.
24 Q  Was it more than ten times?
25 A  Yes.

Page 78

1  Q  Was it more than 15 times?
2  A  I don't know, because it's--the disciplinary action
3     process is based on number of tardies within certain
4     time periods, so--
5  Q  So it could be anywhere from 10 to 15 perhaps?
6  A  Perhaps.
7  Q  At the facility that that employee was at, what
8     happened?  I mean, was there someone else who was on
9     shift as well to cover the facility?
10 A  No.
11 Q  So that could have also led to--according to your
12    testimony earlier, you had indicated that that could
13    lead to you losing business.  Correct?
14 A  Correct.
15 Q  Did you lose any business because of that?
16 A  The client was at risk.
17 Q  Client was at risk?  What do you mean by "at risk"?
18 A  We put them at risk, which means they were
19    dissatisfied enough that they could leave.
20 Q  So there was a complaint issued by that client
21    regarding the tardiness of the employee?
22 A  Correct.
23 Q  And is that the straw that broke the camel's back,
24    so-to-speak?  Did that lead to the discharge?  Can
25    you recall?

Page 79

1  A  No.  In fact, I'm wrong.  The employee was in
2     disciplinary action and transferred to another
3     division.
4  Q  Okay.  So you decided to move him out of--
5  A  I didn't move him out.
6  Q  Who moved him out?
7  A  She applied for another position.
8  Q  Okay, before you could discharge them?
9  A  Uh-huh.
10 Q  Yes?
11 A  Yes.
12 Q  Okay.  You mentioned that you had been in this
13    position for like five, six years now.  Right?
14 A  It will be six in July.
15 Q  So in those approximately six years, how many times
16    has the Clinton Township facility been under a
17    different phlebotomist?
18       Maybe a better way of asking the question
19    would be how many different phlebotomists have
20    worked Clinton Township?
21 A  Several.
22 Q  Can you give names?
23 A  We have CTO requests.  We had medical leaves, so we
24    had many phlebotomists that covered that site.
25 Q  Can you think of names?

Page 80

1  A  Shameeka Johnson, Cher Adams, Denise Goldsmith,
2     Deserie Miller.
3        REPORTER:  First name?
4        THE WITNESS:  Deserie.  D-E-S-E-R-I-E.
5        REPORTER:  Miller?
6        THE WITNESS:  Miller.  Alicia--
7  Q  (By Mr. Flynn)  This is just at the Clinton
8     facility?
9  A  Yes.
10 Q  Okay, and I'm sorry for cutting you off.  Who was
11    the--
12 A  I think Alicia Estell may have worked there.
13       REPORTER:  Alicia--
14       THE WITNESS:  Alicia Estell.  E-S-T-
15    E-L-L.
16 Q  (By Mr. Flynn)  Anyone else?
17 A  I'm sure there is.
18 Q  Natalie Reeser perhaps?
19 A  Oh, yeah.  Yeah.  Well, I thought that was a given,
20    but--
21 Q  Can a change in the facility that an individual
22    works in, can it ever be permanent?
23 A  Never permanent.
24 Q  Why is that?
25 A  It's not permanent for a number of reasons.  You're

23  (Pages 77 to 80)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

---

Page 81

1   hired--when you are hired, a requirement is being
2   flexible.
3            So I have to be able to move people as I
4   continue to add business, grow the business, to be
5   able to move them to other sites, so nobody is given
6   a permanent location.
7            They may be at a location for a period of
8   time, but they are never--it's never their permanent
9   home.
10  Q   Is it fair to say that a degree of who to schedule
11      where and what shift is somewhat subjective?
12  A   Yes and no. I mean, if I have physicians that make
13      that request, then it's not, and if I have employees
14      that come to me with certain issues about working
15      with certain people, it's not.
16           So I don't think it's a yes or no.
17  Q   Sometimes it can be. Sometimes it might not be?
18  A   Right.
19  Q   Do you recall anyone requesting that Natalie Reeser
20      be transferred?
21  A   That anyone requested?
22  Q   Any client or patient?
23  A   Requesting that she be transferred?
24  Q   Yeah.
25  A   No.

---

Page 82

1   Q   So can employees choose to be transferred?
2   A   Transferred if they want to apply for a different
3       position?
4   Q   Or if they want to be moved to a different facility
5       in Outreach. Can there request to be transferred?
6   A   Well, that's not really a "yes" or "no" either,
7       because if someone, let's say, requested to go to
8       Shores Primary Care, they really couldn't, because a
9       physician has requested a certain person be there.
10           So they could--I mean, people could ask
11      me, "Hey, would it be okay if I--could I ever work
12      at this site," or "If you ever need somebody to work
13      at this site, I'm happy to." That can happen.
14  Q   And has the occasion come where you granted such a
15      request?
16  A   I don't recall having any requests like that, where
17      they have wanted to stay at a certain location.
18  Q   Is there any procedure or criteria for granting such
19      a request if it is made?
20  A   I don't have a policy or a procedure for that.
21  Q   Okay. Has your authority ever been questioned or
22      your decision countermanded regarding transfers?
23           MR. MIGLIO: I will object to the form and
24      foundation for the question.
25           THE WITNESS: What do you--I'm not sure

---

Page 83

1   what you are asking me.
2   Q   (By Mr. Flynn) Well, you're the one who decides at
3       the end of the day who is scheduled where and what
4       time. Right?
5   A   Correct.
6   Q   Has your decision to schedule someone for a specific
7       location or specific shift ever been questioned or
8       countermanded?
9            MR. MIGLIO: I will object to the form and
10      the foundation of the question.
11  Q   (By Mr. Flynn) Meaning has anyone said, "No, you
12      can't do that"?
13  A   Oh, no. No.
14  Q   Do you have the authority to determine who receives
15      a lunch period?
16  A   Who--everyone.
17  Q   Everyone gets a lunch period?
18  A   Yes.
19  Q   Okay. It's mandatory. Right?
20  A   Correct.
21  Q   And how long is the lunch period?
22  A   Thirty minutes, unpaid.
23  Q   And they can leave the facility if they choose to go
24      someplace else to have their lunch?
25  A   Not everyone can. Certain sites we--they can't

---

Page 84

1   leave the site.
2   Q   What sites?
3   A   Clinton Township is considered a closed campus site.
4       The other sites where there is multiple people, they
5       do rotating lunches, so there is always coverage.
6   Q   So if lunch is mandatory, but you're not--but the
7       phlebotomists at Clinton Township cannot leave the
8       facility--well, let me back up a little bit.
9            You said that it's mandatory that there be
10      30-minute unpaid lunches. Correct?
11  A   Correct.
12  Q   So if a phlebotomist is at Clinton Township, for
13      instance, you are required to give them a 30-minute
14      unpaid lunch. Right?
15  A   Yes.
16  Q   Okay. So if they are not eligible for lunches of
17      any kind, aren't you violating the larger system-
18      wide policy?
19           MR. MIGLIO: Object to the form of the
20      question. She has never said that, but go ahead.
21           THE WITNESS: Ask me again.
22  Q   (By Mr. Flynn) Okay. Well, you just said that part
23      of Henry Ford, it's a Henry Ford policy, right, that
24      everyone gets mandatory 30-minute unpaid lunches?
25  A   Correct.

24  (Pages 81 to 84)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

| Page 85 |
| --- |

1   Q  So but you said that there is an exception for
2     Clinton Township. Right?
3   A  No.
4        MR. MIGLIO: Objection.
5   Q  (By Mr. Flynn) They get unpaid 30-minute lunches as
6     well?
7   A  Yes.
8   Q  Okay. So if an individual is receiving an unpaid
9     30-minute lunch but--well, let me clarify what you
10    said about Clinton Township.
11        You said Clinton Township phlebotomists
12    cannot leave the site. Correct?
13  A  Correct.
14  Q  So how do you rationalize then on one hand you are
15    required to give them an unpaid lunch, but then on
16    the other hand you are saying, "You have to stay at
17    the site"?
18        MR. MIGLIO: I'll object to the form of
19    the question. Do you want to rationalize what--what
20    is to rationalize? She just explained to you what
21    it was.
22        MR. FLYNN: Can you not put a speaking
23    objection on the record? Just a one-word objection,
24    sounds like form.
25  Q  (By Mr. Flynn) So now, Ms. Bork, if the Clinton

| Page 86 |
| --- |

1    Township facility you cannot leave the facility for
2    lunch, how do you rationalize that with the
3    system-wide mandatory unpaid 30-minute lunch policy?
4        MR. MIGLIO: I'll object to the form of
5    the question, and a lack of foundation for it.
6   Q  (By Mr. Flynn) Please answer the question.
7        MR. MIGLIO: Go ahead. You can answer.
8        THE WITNESS: Well, it's because of the
9    down time, the significant down time that we have at
10    Clinton Township.
11  Q  (By Mr. Flynn) Okay. Elaborate.
12  A  Okay. Prior--my knowledge was that as long as
13    somebody had a break to eat, that we were in
14    accordance with policy, and there is significant
15    down time at Clinton Township.
16        It's the slowest site, so there were lots
17    of times where there were hours where there were no
18    patients coming in, so they could take their--well,
19    what I considered the lunch, but not leave the site
20    in case a patient walked in.
21        It was brought to my attention that that
22    is not considered a lunch.
23  Q  Okay, and what brought that to your attention?
24  A  I got an E-mail from Natalie stating that down time
25    is not considered a lunch, and then H.R. reached out

| Page 87 |
| --- |

1    to me and asked me about the situation, and I
2    explained the situation.
3        They looked into it, got back to me and
4    said that that is considered engaged while waiting
5    or some term like that.
6   Q  Okay.
7   A  So that that is not considered a lunch. I said,
8    "Okay, no problem. I don't know that," and so it
9    was changed.
10  Q  So after that Clinton Township phlebotomist, they
11    were required to take an unpaid 30-minute lunch,
12    right, and they could leave the facility to take
13    that unpaid 30-minute lunch?
14  A  No, no, not immediately.
15  Q  Well, when did that change?
16  A  Once H.R.--once we got all the information to H.R.,
17    then we did our research, our time studies for
18    patients, notified patients and clients and then
19    changed it.
20  Q  Do you recall when?
21  A  No. I don't. Late February, early March maybe.
22  Q  Of 2014?
23  A  Yes.
24  Q  So now this is what I am having a hard time
25    understanding. What exactly did they say? Why was

| Page 88 |
| --- |

1    it not considered a lunch to force an employee to
2    stay there during their 30-minute unpaid lunch
3    period?
4        MR. MIGLIO: I will object to the form.
5    Who--what are you asking? Who said what?
6   Q  (By Mr. Flynn) Well, you mentioned H.R. discussed
7    the matter with you. Right?
8   A  Correct.
9   Q  Who with H.R. discussed the matter?
10  A  Jill. Jill Hood.
11  Q  Jill Hood. Do you recall about when this
12    conversation took place?
13  A  End of January.
14  Q  And at the end of January, what did Jill Hood tell
15    you?
16  A  She told me that that is not considered a lunch,
17    because she asked me if somebody walked in while
18    Natalie was eating, would she have to take care of
19    the patient. I said yes.
20        Then she asked me, if the phone rang,
21    would Natalie have to answer it, and I said yes, and
22    she said, "Well, then that is not really considered
23    a 30-minute uninterrupted break."
24        I said, "Okay, no problem. I wasn't aware
25    of that."

25 (Pages 85 to 88)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 89

1  Q  So after that, is it a fair statement to say that--
2     okay, well, back up a little bit.  Did she explain
3     why that is not a 30-minute uninterrupted lunch?
4  A  She said it was--I think the term is "engaged while
5     waiting," or "engaged while working."  I don't
6     recall the exact phrase that she used, but she said
7     that that--the employee should be able to do a
8     30-minute uninterrupted break.
9  Q  Did she instruct you as to where that terminology
10    came from, "engaged while working"?
11 A  No.
12 Q  Or "engaged while waiting"?
13 A  No.
14 Q  Okay.  Did she mention the Fair Labor Standards Act?
15 A  No.
16 Q  Did she mention any law of any kind?
17 A  No.  She just told me that wasn't correct, that
18    wasn't--that she had to have a 30-minute
19    uninterrupted break.  I mean, I accept it as truth,
20    and--
21 Q  So after that you implemented their policy, which is
22    a 30-minute uninterrupted break.  Right?
23 A  No.
24 Q  Why did you not implement their policy?  You were
25    just told by Jill Hood with H.R. that you were to

Page 90

1     implement that policy.  Correct?
2  A  Correct, but I explained to Jill and to you that I
3     couldn't do that immediately.
4  Q  And why could you not?
5  A  Because we had to figure out when we could shut the
6     Patient Service Center down, so we had to do a time
7     study to see when we had our biggest gaps to close
8     the site, so that it wouldn't affect patients.
9           We had to contact the client, the clients
10    around the area and patients that were coming, that
11    used to come in at different times to make sure that
12    they were aware that we would be closed for 30
13    minutes.
14 Q  When you told Jill Hood this, what did Jill Hood
15    say?
16 A  She understood that we would need to do that.
17 Q  What else did she say?
18 A  I don't recall, because we were working on getting
19    Natalie paid for her lunches, so--
20 Q  Did she indicate that you were to be--that you were
21    required to pay Natalie for any lunch period that
22    she was forced to stay at the facility?
23 A  Yeah.  We went--yes.
24 Q  And what required you to do that, according to Jill
25    during this conversation?

Page 91

1  A  Well, exactly what we talked about, that she hadn't
2     been given a 30-minute uninterrupted break.
3  Q  So around late January, you were under the
4     impression that you have to provide Natalie with a
5     paid--that you have to pay her for being at the
6     facility, even if she is eating lunch?
7  A  Correct.
8  Q  About when was this conversation?  You said late
9     January?
10 A  Late January was when it was first brought to my
11    attention, and then in February we were working on
12    collecting information.
13 Q  How else did the lunch policy change?  Were there
14    any other changes to the lunch policy around that
15    time?
16 A  No.
17 Q  Well, describe the procedure for how someone
18    requests a lunch.
19 A  Well, if they are at a physician site, they go to
20    lunch when the physician office goes to lunch.  At
21    Shelby they rotate, so we're open 12 hours.
22          The people who come in first take lunch
23    first, and they rotate through the staff, so they
24    get lunches.  That's how it works.
25 Q  What about Clinton Township?  If someone at Clinton

Page 92

1     Township needed to take a lunch, how would they go
2     about it?
3           MR. MIGLIO:  Are you talking about now or
4     before?
5           MR. FLYNN:  Before.
6           THE WITNESS:  Well, you know what happened
7     before.  I mean, before I knew, before Jill had
8     contacted me, they would eat at the site.
9  Q  (By Mr. Flynn)  After, what would you do?
10 A  After we implemented the change, we close now for 30
11    minutes.
12 Q  In the meanwhile, what did you do?  Did you pay--
13 A  Yes.  Natalie was paid for any lunches that she
14    didn't get.
15 Q  Had you ever had a decision to discipline or
16    discharge an employee overruled by H.R.?
17 A  H.R. makes all the decisions on disciplinary action
18    and termination, so they tell me.
19 Q  Well, didn't you say that you were responsible for
20    disciplining employees?
21 A  I'm responsible for sitting down with the employee
22    once the disciplinary action has been decided on by
23    H.R.
24 Q  Who initiates the disciplinary process?
25 A  I do.

26  (Pages 89 to 92)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 97

1  absence. Right?
2  A  They leave without approval?
3  Q  Okay, let's back up.
4  A  There's a difference.
5  Q  Okay. Well, explain the difference to me.
6  A  If I'm contacted by an employee, and they ask me if
7     they can leave early, and they don't have coverage,
8     it will be denied. I can't leave a site without
9     coverage.
10 Q  So you have got to get coverage. Where would you
11    search to get coverage?
12 A  Your fellow co-workers.
13 Q  So it could be anyone at Henry Ford?
14 A  No. Anyone within our department.
15 Q  Okay. Now I'm getting confused again.
16 A  Okay.
17 Q  By "department," do you mean the employees who you
18    manage?
19 A  Correct.
20 Q  So now how do you separate between someone who is
21    absent a day versus a No Call/No Show?
22       MR. MIGLIO: Objection as to the form.
23       THE WITNESS: What do you mean by "absent"
24    versus No Call?
25 Q  (By Mr. Flynn) Let's say they tell you that they

Page 98

1  are not going to be there.
2  A  Well, that's not a No Call/No Show. A No Call/No
3     Show is they didn't call, they didn't show up.
4  Q  So if they tell you that they are not going to be
5     there, that is not a No Call/No Show. What is it?
6       MR. MIGLIO: Objection as to the form.
7     You mean somebody just says, "I'm not going to be
8     there," or what? I mean, these are questions I--
9       MR. FLYNN: Mr. Miglio, are you going to
10    continue coaching the witness?
11      MR. MIGLIO: I'm not coaching the witness.
12      MR. FLYNN: I'm asking her a question. I
13    don't need your answer.
14      MR. MIGLIO: I'm giving you the
15    opportunity to ask her--
16      MR. FLYNN: I need her answer, not yours.
17    Put your speaking objection aside.
18      MR. MIGLIO: Are you done now?
19      MR. FLYNN: Yeah. I'd like an answer.
20      MR. MIGLIO: I'm giving you the
21    opportunity to ask her proper questions.
22      MR. FLYNN: No, no. No, you're giving--
23    your trying to hint at--
24      MR. MIGLIO: These are all objectionable.
25      MR. FLYNN: You're trying--you can place

Page 99

1  your objection.
2       MR. MIGLIO: I did.
3       MR. FLYNN: Then I would like an answer.
4       MR. MIGLIO: And the objection should put
5     you on notice.
6       THE WITNESS: Okay. What is your
7     question?
8  Q  (By Mr. Flynn) The question is--
9       MR. FLYNN: Well, can you read back the
10    question?
11      REPORTER: Well, we really didn't get very
12    far. It says, "If they tell you that..."--it says
13    if they--and then you say, "Is this if they said
14    they are not going to come in or..."--
15    "You're putting a speaking objection on."
16    "I'm giving you an opportunity to ask
17    a proper question."
18    So we really didn't get too far.
19 Q  (By Mr. Flynn) So my question is, let's say someone
20    tells you in advance, "I'm not going to be there."
21    At that point what kind of discipline is it? Is it
22    Group 1 or Group 2?
23      MR. MIGLIO: Objection as to the form of
24    the question.
25      THE WITNESS: If they call me on Monday to

Page 100

1  say they can't come to work Wednesday, then usually
2  that is a vacation request.
3     They put a CTO request in, and they find
4  out if there is someone that can cover for them, and
5  then we change the schedule and we have that site
6  covered. So there it's not--
7  Q  (By Mr. Flynn) I'm saying that if someone is unable
8     to work a shift, and they don't let you know that
9     they are not able to work a shift, but they just
10    don't bother showing up, you said that that is a No
11    Call/No Show. Right?
12 A  That is a No Call/No Show.
13 Q  So when is it not a No Call/No Show?
14      MR. MIGLIO: Objection to the form of the
15    question.
16      THE WITNESS: When is it not a No Call/No
17    Show?
18 Q  (By Mr. Flynn) Yeah. Let's say they call.
19 A  Well, they call and they say--they call me this
20    morning and say they are not coming to work today
21    because they're sick?
22 Q  Uh-huh.
23 A  Then it's an absence. It's an occurrence.
24 Q  What is an occurrence?
25 A  Like a demerit. It's an occurrence. It's a

28  (Pages 97 to 100)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 105

1  A  No, but everybody knew at the time.
2  Q  And how did they know?
3  A  Through conversation with me.
4  Q  And what would you tell them?
5  A  They knew that because of the significant down time
6  everybody was sitting eating their lunch, and that
7  they were staying at that site because we weren't
8  closing the site.
9  Q  Do you recall any specific conversations to that
10  effect?
11  A  With everybody, everybody that worked there knew
12  that. Anybody who was assigned there knew that.
13  Q  Okay, but anything in particular, any particular
14  conversation with anyone?
15  A  Everybody that worked there, I addressed that with
16  them, because they would have to know that. They
17  would have to know to bring a lunch.
18  Q  Did any of them object to that?
19  A  No.
20  Q  Now what happens if an employee--so you indicated
21  that you wouldn't pay employees initially for
22  working through their lunch until it was brought to
23  your attention that you couldn't do that?
24  A  Ask me the question again.
25  Q  So you indicated that you wouldn't pay people for

Page 106

1  their lunches that they were forced to work at the
2  facility until someone brought it to your attention
3  that you were required to do that?
4  A  No.
5      MR. MIGLIO:  Objection as to the form of
6  the question.
7  Q  (By Mr. Flynn)  You did pay individuals for working
8  through lunch?
9  A  I never said to anybody--I thought that what we were
10  doing was fine, that they got their break and ate
11  lunch.
12  Q  I'm asking whether or not you paid them during that
13  period of time where you thought that was fine.
14  A  Yes. They were all paid.
15  Q  And you approved the payment?
16  A  Yes. I had to do the research.
17  Q  At the time, after the research you approved the
18  payment?
19  A  Correct.
20  Q  But at the time you did not approve the payment?
21      MR. MIGLIO:  I will object to the form of
22  that question.
23      REPORTER:  I'm sorry?
24      MR. MIGLIO:  I'll object to the form of
25  the question.

Page 107

1  Q  (By Mr. Flynn)  At the time that they were working
2  these lunches, did you or did you not approve or
3  deny the request for payment?
4      MR. MIGLIO:  Objection to the form of the
5  question.
6      THE WITNESS:  They were not paid at the
7  time.
8  Q  (By Mr. Flynn)  Because you denied it.  Right?
9      MR. MIGLIO:  Objection to the form of the
10  question.
11      THE WITNESS:  The only time that the lunch
12  periods came up was at the end of January, and I did
13  not--they were not paid until I found out from H.R.
14  how we were going to handle the payment.
15  Q  (By Mr. Flynn)  So did you ever stop them from being
16  paid?
17      MR. MIGLIO:  Objection to the form of the
18  question.
19  Q  (By Mr. Flynn)  You did payroll.  Right?
20  A  I didn't do payroll at that time.
21  Q  Okay.  Well, that's a managerial function.  Who did
22  you delegate that to?
23  A  I never delegated it.
24  Q  Who did payroll?
25  A  Martha Wiseheart.

Page 108

1  Q  Okay, but she is in a different department.
2  A  She is in the same department.
3  Q  So can you ever recall authorizing an employee to
4  work through lunch?
5  A  Yes.
6  Q  Who can you recall authorizing that kind of work?
7  A  It depended, in a physician office or even at Shelby
8  if we were short or it got really busy and they
9  didn't get to take a lunch before they left.
10      Everyone was instructed to call me when
11  they couldn't take a lunch so that I would know why,
12  and they were instructed on how to put it on their
13  time card that they didn't get a lunch and that they
14  spoke with me.
15  Q  So they had to request permission in order to get
16  paid for lunch?
17  A  They had to let me know why they didn't get a lunch,
18  because it is mandatory.
19  Q  Did anyone complain about not receiving a lunch
20  prior to the changes that were made in January and
21  February?
22  A  No.
23      MR. MIGLIO:  Asked and answered. Whenever
24  you're ready, I'm ready for a break.
25      MR. FLYNN:  I would like to get through

30  (Pages 105 to 108)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 109

1    this line of questioning.
2    Q  (By Mr. Flynn)  So let's say you had a laboratory
3        employee--and this is before you implemented the
4        changes to the lunch policy.  Let's say you had a
5        laboratory employee who wanted to request a lunch.
6        How would they request it?
7            MR. MIGLIO:  Objection as to the form of
8    the question.
9            THE WITNESS:  I'm not sure what you're--if
10   they wanted to request a lunch?
11   Q  (By Mr. Flynn)  If they wanted a lunch and they need
12       to run that by you--right?
13           MR. MIGLIO:  Objection to the form of the
14   question.
15           THE WITNESS:  Why would they need to run
16   it by me?
17   Q  (By Mr. Flynn)  Well, because they--what if they
18       wanted to leave the facility?  Don't they have to
19       run it by you if they leave the facility?
20   A   Which facility?
21   Q   Okay.  Let's say the Clinton Township facility?
22   A   Yes.
23   Q   So how would someone who worked Clinton Township or
24       the other ones where there is only one person, how
25       would they request to leave for lunch?

Page 110

1    A   Clinton Township?
2    Q   Yeah.
3    A   Call me.
4    Q   Okay.  So you're saying, you are testifying today
5        that at the time prior to the changes, they would
6        have to call you?
7    A   Yes, and I would have to arrange coverage.
8    Q   Okay.  What happens if an employee needs to take a
9        lunch but you are not around for approval?
10           MR. MIGLIO:  Objection as to the form of
11   the question.  Are you talking about now?  Is that
12   what you're asking?
13           MR. FLYNN:  No, back before the changes.
14           MR. MIGLIO:  That's not what your question
15   was.
16           THE WITNESS:  So you asked me if they
17   needed to take a lunch, what would they do.  They
18   would have to call me, because at Clinton Township I
19   would have to set up coverage.
20   Q  (By Mr. Flynn)  Okay.  What if they set up coverage
21       themselves?
22   A   Well, they can't.  They have--I'm still involved in
23       that process, because if they are asking for
24       coverage, they are asking someone to leave a site
25       that they are at to cover that.

Page 111

1            So they would have to call to get my
2    approval for that.
3    Q   Who else is in the Clinton Township facility?
4    A   Who else?
5    Q   Yeah.  Who else with Henry Ford is in that facility?
6    A   Physicians?
7    Q   Not just physicians.  I mean people within your
8        department.
9    A   At any time it could be the courier picking up
10       specimens.  It could be Luain picking up sales
11       material.  It could be Maria picking up sales
12       material.  It could be Martha working at the site.
13   Q   So is it fair to say that if you are not around for
14       approval but an employee has one of those other
15       individuals who is willing to cover for the employee
16       that that would be acceptable?
17   A   No.
18   Q   Why is that not acceptable?
19   A   Because Luain and Maria don't draw blood.
20   Q   But what about Martha?
21   A   Martha doesn't either.  She has a lot of
22       obligations.
23   Q   You mean they are not certified to draw blood?
24   A   No.  I mean Martha, that's not her job.
25   Q   But it's not your job either.  Right?

Page 112

1    A   Correct.
2    Q   But you've done it?
3    A   Done it where?
4    Q   You have drawn blood when it was necessary because
5        someone didn't show up?
6    A   Correct.
7    Q   Okay.  So what rule says that Martha couldn't step
8        in and draw blood?
9            MR. MIGLIO:  Objection as to the form of
10   the question.
11   Q  (By Mr. Flynn)  What policy?
12           MR. MIGLIO:  Same objection.
13           THE WITNESS:  Martha being at the site
14   doesn't mean that she can cover a lunch.  Martha has
15   a job that requires her to be all over the place.
16   Q  (By Mr. Flynn)  Well, what if she consents?  What is
17       the issue if she consents?
18   A   She would contact me first.  We would talk about it.
19   Q   But let's say you're stuck in meetings.
20           MR. MIGLIO:  Objection as to the form of
21   the question.  Let's suppose you're stuck in
22   meetings?  Is that the question?
23   Q  (By Mr. Flynn)  Let's say you're stuck in meetings.
24       You're saying that it wouldn't be fine for a
25       phlebotomist just to ask another supervisor or to

31 (Pages 109 to 112)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 113

1   ask another employee, "Could you cover this shift"?
2   A   No.  It's--you need to get approval from your
3       supervisor.  That is clear to everybody.  That has
4       always been clear.
5   Q   Okay.  Are you saying that Martha Wiseheart has
6       never covered for a phlebotomist?
7   A   I know of one time that she watched the desk.
8   Q   So why couldn't--why isn't that something that
9       people did?
10  A   There was a requirement to have a TB test read, and
11      there is only a certain--you have to have it read
12      within a certain amount of time.
13          So this person unfortunately didn't plan,
14      you know, the way that they should have, to get
15      their TB test read when they didn't have to cover
16      the site.
17          So I was forced to let that person go get
18      read at the time.  Otherwise they would have to
19      repeat the whole thing over again.
20  Q   And that's a break.  Right?
21  A   It's not a break.  They were paid.
22  Q   Aren't breaks paid?
23  A   Yeah.
24  Q   Is there a difference between a break and a lunch
25      time, a lunch period at Henry Ford?

Page 114

1   A   Yes.
2   Q   What is the difference?
3   A   A lunch period is a 30-minute unpaid break, unpaid
4       period.
5   Q   Because they're different.  Right?
6   A   They are different.
7   Q   What is a break?
8   A   A break is something that happens--it can happen
9       throughout the day.  You're not allowed to leave
10      your work area.  It's during working hours.  You're
11      paid at that time.
12          You might like go into a back room or
13      something, but you're at your site.
14  Q   Can you think of a single employee who was
15      terminated for taking a lunch break?
16  A   No.
17  Q   Can you--you can't think of a single one?
18  A   No.
19  Q   Can you think of a single one who was terminated for
20      leaving the site to take a lunch break?
21  A   No.  I can think of a couple of employees that were
22      terminated for abandoning their job site.
23  Q   Okay.  Who can you think of?
24  A   Natalie Reeser, Shantae Stewart, Eric Lickteig,
25      Stephanie Hope, Rachel Holliman (phonetic).

Page 115

1   Q   Anyone else?
2   A   Yeah, Heather Adamo.
3   Q   Anyone else?
4   A   Not that I can recall.
5   Q   And these are all phlebotomists?
6   A   Correct.
7   Q   Okay.  Let's go through them one at a time.
8       Shantae, explain what happened with her.
9   A   She came to work, signed in, left the job site and
10      then came back.
11  Q   How long was she gone?
12  A   Thirty-something minutes.
13  Q   What site was this?
14  A   Nursing home.
15  Q   Now you had indicated earlier that people take lunch
16      at a nursing home when everyone else takes lunch.
17      Right?
18  A   Not a nursing home.  Nursing home we are only there
19      from 5:00 a.m. to 9:00 a.m.  I said physician
20      office.
21  Q   Oh, I apologize.
22  A   That's okay.
23  Q   So what is the lunch policy for nursing homes?
24  A   They don't get a lunch.  It's a four-hour shift.
25  Q   I see, okay.  So she just showed up and left with no

Page 116

1       explanation?
2   A   Yeah.  She took her son to the babysitter.
3   Q   How did you find that out?
4   A   The nursing home contacted me, let me know that I
5       had an employee that left the site.  Then I sat down
6       with her and asked her what happened, and she was
7       honest and told me.
8   Q   But at the time she didn't tell you about that?
9   A   No.
10  Q   Eric, what was his situation?
11  A   He was upset with co-workers, used an expletive and
12      walked out of the site and went to his car, and then
13      came back later.
14  Q   How much later?
15  A   I don't recall.  Maybe it was 30/40 minutes later.
16  Q   How was his attendance prior to this?
17  A   Good.
18  Q   What was the expletive?
19  A   The "F" word.
20  Q   What was the disagreement with his co-workers about?
21  A   It was about the centrifuge and the table that it
22      was put on, and then they were going to have the
23      table, and he had moved it to a spot he thought was
24      more efficient, and his co-workers didn't think so
25      and moved it back.

                                    32  (Pages 113 to 116)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 117

1　Q　That's a silly reason to get into a heated argument,
2　　it seems like. So did he ask for permission before
3　　leaving?
4　A　No.
5　Q　He just got up and left?
6　A　Uh-huh.
7　　　　　MR. MIGLIO: Yes?
8　　　　　THE WITNESS: I'm sorry, yes.
9　Q　(By Mr. Flynn) What was his position?
10　A　Phlebotomist.
11　Q　Was anyone else there who was a phlebotomist?
12　A　Yes. It was at the Shelby site, so there were four
13　　other people there.
14　Q　So there was no one else there for Shantae, but
15　　there was for Eric?
16　A　Correct.
17　Q　Stephanie, what was her situation?
18　A　She left a patient unattended, went out to the
19　　parking lot and took a phone call for an extended
20　　period of time, I think maybe 25 minutes as reported
21　　by the patient.
22　　　　Also, once I did the investigation with
23　　Stephanie, she admitted to that as well. So she
24　　left the site, left a patient unattended.
25　Q　What was the site?

Page 118

1　A　It was Wyandotte/Allen Park.
2　Q　Was that one of the ones that only has one employee?
3　A　No. They have two.
4　Q　So there was another person who was there?
5　A　Yes.
6　Q　And Stephanie didn't ask for permission to leave
7　　first?
8　A　No.
9　Q　She just left?
10　A　Yes.
11　Q　Did she take her lunch?
12　A　That day?
13　Q　Yeah.
14　A　I couldn't tell you. I would have to look at the
15　　records.
16　Q　She might have. You just don't know?
17　A　That is a physician office, so they would have
18　　break'd when the physician did, but I couldn't say
19　　that day what she did.
20　Q　What was Rachel's situation?
21　A　She was at the Shelby site and left to go shopping
22　　on Black Friday and then came back.
23　Q　Ouch. Again, I imagine she didn't ask for approval
24　　first?
25　A　No.

Page 119

1　Q　So how long was she gone?
2　A　I believe--I would have to look, but I think it was
3　　a couple of hours.
4　Q　Wow. Heather, what was her story?
5　A　She was at a physician site, and she left to get her
6　　hair done and came back.
7　Q　How long did that take?
8　A　I don't know. I'm sure at least an hour.
9　Q　Okay, and again, she didn't ask for permission?
10　A　No.
11　Q　So none of these folks asked for permission?
12　A　No.
13　Q　Do you recall whether or not Eric cursed in front of
14　　a patient or a client?
15　A　Not in front of a client, because it's our Shelby
16　　site, and I don't--it wasn't reported that he did it
17　　in front of a patient, so--
18　Q　But typically employees, phlebotomists I can't
19　　imagine are allowed to curse. Right?
20　A　No.
21　Q　Now you are giving me big huge eyes over that one.
22　　Why is that a big issue?
23　A　Well, because--I mean, curse in front of a patient?
24　Q　Yeah. Why is that an issue?
25　A　I mean, it's disrespectful, and it's not

Page 120

1　　professional.
2　Q　So it's a big issue? You don't want that to happen.
3　　Right?
4　A　No. I don't ever want that to happen.
5　　　　　MR. FLYNN: Okay. I'm ready to take a
6　　break.
7　　　　　(At 2:00 p.m., recess taken)
8　　　　　(At 2:13 p.m., back on the record)
9　Q　(By Mr. Flynn) I want to follow up regarding an
10　　earlier question regarding your personal phone. Who
11　　is your provider for your personal phone number,
12　　both the land line and your cell phone?
13　A　The land line is WOW, and personal cell phone is
14　　AT&T.
15　Q　We were just--I asked you some questions regarding
16　　the details of the other individuals who you say
17　　were terminated for job abandonment.
18　　　　You mentioned the attendance of, I think,
19　　Shantae. What was Eric's attendance like?
20　A　I didn't mention Shantae's attendance. I don't
21　　believe you asked me that. You asked me Eric's.
22　Q　Oh. Well, what is Shantae's like?
23　A　I know that she had had a couple of tardies. I
24　　can't remember how many though.
25　Q　More than five?

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 121

1   A  I don't know.  I would have to look.
2   Q  Eric, you said he didn't have any tardies or any
3      attendance issues?
4   A  Not that I recall.
5   Q  He could have, but you just don't remember today?
6   A  I don't--correct.  I don't recall, yeah.
7   Q  Stephanie?  Same question for Stephanie?
8   A  Yeah.  I'd have to look to be sure.
9   Q  You don't remember?
10   A  I don't--nothing stands out, but I don't want to say
11      no if that is not correct.
12   Q  Rachel?
13   A  I don't know.
14   Q  Heather?
15   A  I don't know.  It was long ago, so--
16      REPORTER:  I'm sorry?
17      THE WITNESS:  It was long ago, so--
18   Q  (By Mr. Flynn)  Which of these is the most recent?
19   A  I would say Eric and Stephanie would be the two that
20      would be the more recent ones.
21   Q  When were they terminated?
22   A  Probably a couple of years ago.
23   Q  Since Natalie was terminated, has anyone else been
24      discharged by you or by H.R. for job abandonment in
25      your department?

Page 122

1   A  No.
2   Q  Are you aware of other employees who skipped out to
3      go shopping on Black Friday?
4   A  No.
5   Q  No, you've never been made aware of other employees
6      who have done that?
7   A  No.
8   Q  And you also said that you are responsible for
9      evaluating performance.  Is that--
10   A  Correct.
11   Q  Again, just wait for me to ask the question.
12   A  Oh, I thought that was your question.
13   Q  It was, but I always have to leave off with the
14      question so that it's not confusing and we don't go
15      back and forth.  It's just the way of things
16      unfortunately.
17      You said that you are responsible for
18      performance evaluations of your employees.  Right?
19   A  Correct.
20   Q  What is that process like?
21   A  There is a mid-year review, and the employees
22      evaluate their own performance, and they submit that
23      to me through the H.R. portal, and then I review
24      their performance.
25      Then I send it back to them.  If they have

Page 123

1      questions, concerns, then they contact me.  It's a
2      pretty simple process.  It's all electronic, so--
3   Q  Okay, and how would you do your evaluation relative
4      to when they do their own?
5   A  There are set time periods, so they--I think it's--I
6      don't know if it's May or June.  You get an
7      E-mail that mid-year reviews are due by a certain
8      time, and they get the review form.  Mid-year review
9      form opens up for the employee to access and
10      evaluate their performance.
11      Then they send it to me, and I evaluate it
12      and send it back to them.
13   Q  What kinds of things are you evaluating?
14   A  There is different pillars, and there is goals that
15      are set, so it depends on the different--there is
16      different categories.
17   Q  So explain what you mean by "pillars" and by
18      "goals."
19   A  There is goals set at the beginning of the year.
20      The company rolls down goals to us as a department
21      that we need to meet, and then you have the
22      opportunity to set a personal goal if you choose to
23      do that.
24      The employee does, and then the goals that
25      I set are basically--you know, come from upper

Page 124

1      management, and there are a couple of goals that we
2      customize to our own department, like about error
3      rates or defect logs, that sort of thing that
4      relates to the job that they're doing.
5      Then there is categories that--like
6      safety.  There is HIPAA.  There is things like, you
7      know, our Standards of Excellence, how people work
8      together, the type of work that they do, patient
9      interactions, keeping the work place clean, safe
10      environment, that sort of thing.
11   Q  Is there a metric that goes along with this?
12   A  There is a rating system, so--
13   Q  Could you explain that?
14   A  The rating system?  I mean, it's a company rating
15      system, so it's--you could get a 2, a 3, a 4, 5.  I
16      can't remember if there is a 1 or not.
17   Q  Is there some guidepost to allow you to understand
18      which number to assign?
19   A  What do you mean?
20   Q  Like how do you know whether or not someone has
21      performed at a 5 as opposed to a 4?
22   A  Well, 5 is exemplary performance.  It's a leader.
23      That is someone that--I mean, a change-maker.  That
24      is somebody who is--I mean, that is kind of off the
25      charts type of performance.

34  (Pages 121 to 124)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 125

1    Q   How would a phlebotomist ever achieve an exemplary
2        rating like that?  What would you be looking for?
3    A   I would be looking for no patient complaints,
4        following all policies, no client complaints.  I
5        would be looking at phlebotomists that could roll
6        out a new process, like something that changes for
7        the entire organization, like this is a huge safety
8        event that will protect us or protect patients,
9        things like that that could not only save the
10       company money, but it could protect patients.
11           I mean, it's kind of a groundbreaking type
12       of process.
13   Q   How often have you awarded a 5 to a phlebotomist?
14   A   I don't know that I have, because we haven't had--
15   Q   It's kind of hard to reinvent the wheel, so-to-
16       speak, when it comes to phlebotomy, isn't it?
17   A   No.  I don't think so.  I think there is always an
18       opportunity to improve something or to improve a
19       process.  I mean, you know, the business that we're
20       in, we're constantly growing our business and
21       looking for better ways or more efficient ways to do
22       things.
23           So I don't think it's impossible.  I
24       think, you know, we can always learn something new
25       or different.

Page 126

1    Q   Now do you have any input into this process?  Like
2        does anyone make recommendations to you about what
3        number to assign, besides the employee themselves?
4    A   No.
5    Q   And part of this is you subjectively looking at that
6        person's performance and coming up with a numerical
7        score for it?
8    A   Correct.
9    Q   Is there any portion of the performance evaluation
10       which is based solely on a quantitative measure?  Do
11       you understand what I mean by that question?
12   A   I don't know what you're asking, no.
13   Q   Well, for instance, qualitative would be a
14       description of a person's performance.  Right?
15   A   Right.
16   Q   Quantitative would be this person brings in "X"
17       number of dollars.  Right?
18   A   Yes.
19   Q   Or this person is able to get through this many
20       patients, or this person is able to get this kind of
21       average evaluation from a client.  That is a
22       quantitative measure?
23   A   Quantitative for a phlebotomist?
24   Q   Is there anything quantitative for a phlebotomist?
25   A   The goals for error rates is quantitative.

Page 127

1    Q   Okay.  Is that the only thing that is quantitative?
2    A   The number of defects, error rates would be the only
3        thing that they would have control over that is
4        quantitative.
5    Q   When you are determining what number to assign, do
6        you compare--do you have a list of quantitative
7        scores, and do you assign a numerical rating based
8        off of those scores?
9            MR. MIGLIO:  Objection to the form of the
10       question.
11           THE WITNESS:  Give me an example.  I'm not
12       sure what you are asking me.
13   Q   (By Mr. Flynn)  Okay.  Well, for instance, you
14       mentioned that error would be a form of quantitative
15       measure.  Right?
16   A   Correct.
17   Q   Well, do you ever take a look at a list of all the
18       errors that were made by which phlebotomist and then
19       divvy up the scores like that?
20           So for instance, someone who had zero
21       would be a 5.  Someone who has like 1 or 2 would be
22       a 4.  Someone who has 3 or 4 would be--
23   A   No, because you are expected to not have errors if
24       you follow all the safety procedures.
25   Q   So even that measure on the performance evaluation

Page 128

1        is subjective.  Correct?
2    A   Not really, because if they have errors, then we
3        know about it.
4    Q   Right, but I'm saying do you ever assign numbers
5        based off of the number of errors, not just the fact
6        that they have errors?
7    A   No.
8    Q   Can some errors be more serious than others?
9    A   Yes.
10   Q   Can you think of an error that was particularly
11       serious?
12   A   Drawing the wrong patient.
13   Q   Oh.  Wow, that is pretty serious.  What happened to
14       that person?
15   A   They were terminated.
16   Q   Obviously you know who Natalie Reeser is.  You
17       mentioned her before?
18   A   Yes.
19   Q   And obviously you supervised her.  Correct?
20   A   Yes.
21   Q   What duration of time did you supervise her?
22   A   Well, she left in 2014.  I think she started in '11,
23       sometime in '11, 2011, so almost three years.
24   Q   Okay.
25   A   I don't have her actual file in front of me.

35  (Pages 125 to 128)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 129

1  Q  About three years. Right?
2  A  Correct.
3  Q  Where did she work?
4  A  Clinton Township.
5  Q  So she was never transferred?
6  A  What do you mean, transferred?
7  Q  Moved to a new location?
8  A  No. I'm thinking about--she was trained to work at
9     different sites, and she was scheduled to work at
10    different sites like a lot of people are, but she
11    mainly worked at Clinton Township.
12 Q  Okay. Well, that gets me back to a couple of
13    questions ago, maybe a couple of hours ago. You
14    testified that sometimes employees--not sometimes,
15    that employees are expected to be moved around.
16    Right?
17 A  They are.
18 Q  But do most employees typically stay at one of the
19    facilities for the most part?
20 A  Some may for extended periods of time. They could,
21    but they are never assigned a permanent site.
22 Q  And why are they--why do they stay at those
23    particular sites for elongated periods of time, as
24    opposed to others?
25 A  It just may be that that is the way the schedule is

Page 130

1     at that point in time, and we haven't had somebody
2     leave where I needed to make a change, or we haven't
3     added on additional business that required
4     phlebotomy services. It could be a number of
5     things.
6  Q  If the status quo is working, why not keep with the
7     status quo? Is that what you're saying?
8  A  I don't know if I'm saying that. I don't know that
9     I would say that, status quo, because I've always
10    made it clear to everybody that nobody is assigned a
11    permanent site.
12          So I don't want anybody to ever feel like
13    they are not going to be asked to go elsewhere, work
14    at different sites, because that is not the case.
15 Q  When she was there, who else worked at that site?
16          MR. MIGLIO: Objection to the form of the
17    question. I assume you are referring to the
18    Plaintiff. Right?
19          THE WITNESS: Do you mean a phlebotomist?
20 Q  (By Mr. Flynn) Yeah.
21 A  There was a time we had two people at that site,
22    years back. So I know that Cher has worked there
23    with her, Burjeau (phonetic), Jamil Wilson,
24    Marianne--I can't remember her last name.
25          There were a lot of different

Page 131

1     phlebotomists that worked at that site when we had
2     two people there.
3  Q  Why was the decision made to reduce it to one?
4  A  It was so slow. We just didn't have enough
5     patients, a very slow site.
6  Q  What is the closest other facility to that, to the
7     Clinton Township facility?
8  A  Shelby Township.
9  Q  That's the one with all the people at it?
10 A  Correct.
11 Q  Now you had testified that there were other
12    facilities that were similarly staffed, correct,
13    where there was only one phlebotomist?
14 A  Uh-huh. Yes. Sorry. I was swallowing. Yes.
15 Q  Okay. Where are they located relative--what is
16    their closest facility?
17 A  You mean where we have one person working at the
18    site? The Southgate one would be Allen Park. St.
19    Clair Shores would be probably Clinton Township.
20          The Warren site would be Clinton Township
21    or Shelby. There really isn't anything close to
22    Commerce. I mean, there is now with West
23    Bloomfield, but there was a time there wasn't.
24 Q  Okay. Was Natalie a good employee?
25 A  What do you mean by "good"?

Page 132

1  Q  Was her performance--how would you rank her
2     performance?
3  A  As a phlebotomist?
4  Q  Yeah.
5  A  She was--from what I observed, she was good with
6     patients.
7  Q  Anything else you observed about her?
8  A  She had a tendency to not follow the rules.
9  Q  What rules are you talking about?
10 A  We have an Internet use policy that she definitely
11    broke twice--well, I observed her breaking twice.
12 Q  And was she disciplined at any time?
13 A  I spoke to her about it. It is--it could have been,
14    but I did not discipline her.
15 Q  Had she been disciplined prior to her termination?
16 A  No.
17 Q  How was her attendance?
18 A  Her attendance, she wasn't tardy, but she would have
19    last-minute requests to leave, to get the following
20    day off, things like that. She had a lot of
21    requests.
22 Q  Do other employees have similar requests?
23 A  No.
24 Q  Did you grant those requests?
25 A  For Natalie? Yeah. I worked around each one that I

36 (Pages 129 to 132)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 141

1 Sometimes she gets documents, copies of documents
2 for me when I'm doing a new employee orientation so
3 I don't have to leave the employee.
4 I wouldn't know everything she did that
5 day.
6 Q  So then what did you say to Luain when you heard
7 this?
8 A  She told me I need to check my E-mail, I needed to
9 check my E-mail. I saw the E-mail. It was 30
10 minutes after Natalie had sent it, and I contacted
11 Jill and asked her, "Can she do this?"
12 Q  So you contacted Jill about when?
13 A  Right after I got the E-mail. I excused myself.
14 Q  So about 1:40?
15 A  Probably right around there, and I said, "Can she do
16 this? Because she had no authorization to just
17 close the site down."
18 Q  And what did she say?
19 A  She said no, she can't, and she said that that would
20 be considered job abandonment and that she was going
21 to contact a couple of people, and she told me that
22 I needed to meet with Natalie and suspend her
23 pending an investigation.
24 So once I was done with the new employee,
25 I drove out to Clinton Township and met with

Page 142

1 Natalie.
2 Q  And what happened when you arrived?
3 A  I had asked Martha Wiseheart to be there. With any
4 suspension I always have another manager there so
5 they can witness the process, and I always contact
6 Security with a suspension.
7 That is just part of the protocol, so I
8 got to the site and I waited until Security got
9 there, and then I went in and asked Natalie why she
10 felt that it was appropriate to leave the site
11 without approval or authorization.
12 Then I told her that she was being
13 suspended.
14 Q  When did you get to the facility?
15 A  I'm going to say maybe 3:30, around that time. It
16 was in the afternoon.
17 Q  Who did you--when did you talk to Martha and
18 Security?
19 A  On the way. I called.
20 Q  You show up at the facility around 3:30. What
21 happens?
22 A  I asked Natalie why she thought that that was
23 appropriate, to leave a site, close a site without
24 authorization. She said she put a sign on the door.
25 I asked her for the sign. She said she

Page 143

1 shredded it, and I told her that she was being
2 suspended pending an investigation. I think she
3 asked would she be paid, and I said no, not during
4 the investigation.
5 Then she said that she would be in contact
6 with H.R., that she wouldn't sign anything, because
7 I was going to try to get a statement from her about
8 what she was thinking, that she thought it would be
9 okay to go against the policy.
10 She said she wasn't going to sign
11 anything, and then I had Security come in, and she
12 wanted to collect some things, and she collected
13 some personal items and then she went to grab some
14 Henry Ford property, and she was stopped by Martha
15 and then by Security.
16 I got her key, her badge and phone, told
17 her that she can't be in contact with any HFML
18 employees or clients, and then Security escorted her
19 out.
20 Q  And that's it?
21 A  She took like two big bags of food out of the site
22 that she said that she had brought, you know, that
23 was her food for her to eat, so that was it.
24 Q  Okay. You said that you had a new employee
25 orientation from 12:00 to 3:00. Who was the new

Page 144

1 employee?
2 A  Erica Waters.
3 Q  Is she still an employee at Henry Ford?
4 A  No.
5 Q  What happened with her?
6 A  She was a No Call/No Show.
7 Q  So job abandonment is different than a No Call/No
8 Show?
9 A  Correct.
10 Q  Do you have her contact information to this day?
11 A  I don't have a phone number. We had to send a
12 registered letter to her, to her address, so the
13 address that I have, I mean, I got the signature
14 that she accepted it, so--
15 Q  Do you know what address that is?
16 A  It's in Westland.
17 Q  Do you know what happened to her since then?
18 A  No.
19 Q  Have you spoken with her since she was terminated?
20 A  No.
21 Q  When was she terminated?
22 A  Sometime last year, I think in the fall. Yeah, in
23 the fall, maybe November.
24 Q  Was anyone else present with you during that
25 orientation?

39  (Pages 141 to 144)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 145

1   A   Luain was there for part of it.  There are several
2       documents that the new employee signs, and I like to
3       have copies made at the time so that the employee
4       gets their copy.
5           I have their signed copy because of the
6       different policies they sign, so they have a copy of
7       what they are signing, and I have a copy of what
8       they signed.
9   Q   So prior to February 25th, did you have any--you
10      mentioned that you had several conversations with
11      Jill Hood.  Correct?
12          MR. MIGLIO:  Objection as to the form of
13      the question.
14          THE WITNESS:  I had several conversations
15      with Jill Hood about what?
16  Q   (By Mr. Flynn)  Natalie Reeser?
17  A   Yes.
18  Q   When do you recall the first conversation regarding
19      Natalie Reeser?
20  A   I don't--there--I don't know which came first.
21      There were a couple of E-mails that Natalie had sent
22      about why she wasn't training new employees, and why
23      she was being rotated, and they were very
24      passive/aggressive E-mails.
25          There was also an E-mail where I had asked

Page 146

1       her about EPIC registrations and wanted to make--it
2       was a reminder.
3           It was sent to her and a couple of other
4       employees about checking the queue and when there
5       is--as well as with the patient, to make sure you
6       are checking the queue and reg'ing patients.
7           She was offended by the E-mail and said
8       that she was doing us a favor.  That wasn't part of
9       her job description.
10  Q   What is EPIC?
11  A   EPIC is the EMR, the Electronic Medical Record.
12  Q   Oh, okay.
13  A   Yeah.  So we have to register patients to make sure
14      that everything crosses over.  So it was a very--I
15      mean, it is part of her job description.
16  Q   Well, let's slow it down a little bit, because you
17      mentioned a couple of events.  The first event that
18      you identified was a rotation?
19  A   Correct.
20  Q   And that is when you talked to Jill Hood?
21  A   What I said was there were a couple of E-mails that
22      I got, so I don't know if I talked to Jill about
23      Natalie with that or if it was I went to the site to
24      Clinton Township.
25          I was going to talk to Natalie about her

Page 147

1       review, and she refused to meet with me and said
2       that, you know, she wanted to meet with H.R., and
3       then, I think, sent an E-mail about meeting with me,
4       H.R., and Martha.
5           So I'm not sure like what came first,
6       because there were a couple of things that were
7       happening all within a short amount of time.
8   Q   What is the first conversation you can recall with
9       Jill Hood?
10          MR. MIGLIO:  About what?  Objection as to
11      form.
12  Q   (By Mr. Flynn)  Regarding Natalie Reeser.
13  A   I mean, the first one that comes to mind is the
14      performance review, because she refused to meet with
15      me.
16  Q   Well, explain that to me.  So the process is, she
17      reviews herself.  Then you review her.  Then she is
18      given this review.  Right?
19  A   Correct.
20  Q   Okay.  What is the remainder of the process?
21  A   Well, she is given that review, but with her review
22      there was--and what happens is when--once they
23      review themselves and I review them and I send it
24      back to them, I can't edit it in any way.
25          I had noticed on one of the categories I

Page 148

1       had given her 2 when she should have had a 3.  So I
2       talked to Jill about that.
3           That is one of the reasons I came over to
4       Clinton Township, because I wanted to make sure that
5       Natalie knew it should have been a 3 and not a 2,
6       but I couldn't change it because it wasn't in my
7       in-box.  It was in her in-box.
8   Q   What was the category that needed to be changed?
9   A   I don't recall the category.  If you have the review
10      I can tell you which one, but--on the 2013.
11  Q   So when would you--
12          (At 2:57 p.m., Plaintiff's
13          Deposition Exhibit 3 marked)
14  Q   (By Mr. Flynn)  Do you have 3 in front of you?
15  A   Yes.
16  Q   Is this what you were discussing?
17          MR. MIGLIO:  Take a look at it.
18          THE WITNESS:  This must be her employee
19      file copy, so it has already been corrected, but I
20      would have to see the one that was in error, because
21      I--
22  Q   (By Mr. Flynn)  Well, what did the error pertain to?
23  A   It was one of these categories on the annual review.
24      It should have been a 3 instead of a 2.
25  Q   Well, do you recall why it should have been a 3?

40  (Pages 145 to 148)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 149

1 A It was just a typo. It wasn't like I assessed
2  something and changed it. It should have been a 3.
3 Q Let's go through each one of these. So the top one
4  says:
5    "Team member Standards of Excellence."
6  What is that supposed to measure?
7 A Well, there are several Standards of Excellence.
8  There is like ten different ones, so--
9 Q So this top one is?
10 A "I am committed."
11 Q Oh, I see.
12 A See, these are all team Standards of Excellence,
13  so--
14 Q So this one deals with whether or not she is
15  committed, and committed to what?
16 A This one is commitment to team members and how well
17  she works within groups.
18 Q And it says that Natalie works well in groups, and
19  these are your comments. Right?
20 A Yes.
21 Q (Reading):
22    "Natalie works well in groups. She
23    asks for ideas, offers her own and maintains
24    good relations with everyone in the group.
25    Natalie is very passionate about her work

Page 150

1    and it shines through"?
2 A Yes.
3 Q But you gave her a 3.0 out of 5.0.
4 A "Fully successful."
5 Q What else should she have done differently to get 4
6  or 5?
7 A Be looked at as a leader, as a--
8 Q How could she be a leader if she is the only one in
9  the clinic?
10    MR. MIGLIO: Could she finish the answer
11  to the question?
12 Q (By Mr. Flynn) How could she be a leader if she is
13  the only one in the Clinton Township facility?
14 A Oh, easily. I mean, we have several co-workers. We
15  all work, you know, for the same team, so she could
16  definitely be a leader. She could, you know--she
17  communicated plenty with everybody that she worked
18  with, so she could--
19    For instance, we have a zero tolerance for
20  gossip. She could take a leadership role, and if
21  people called her, or if she felt the urge to call
22  to talk about someone, she could stop that.
23 Q So what is gossip in general Henry Ford terms, any
24  time you talk about someone else?
25 A Speaking poorly about a co-worker.

Page 151

1 Q And can you give me any examples of where she spoke
2  poorly of a co-worker?
3 A It would be hearsay. I mean, things that have
4  come--that have been told to me by other people,
5  but--
6 Q Who said what?
7 A There was a rub between Natalie and Deserie Miller.
8  Natalie told me about it. I don't know what the
9  issues were there, so there was a couple of people
10  that trained there that there was some issues with
11  how they got along, so--
12 Q Did you ever confront Natalie with those specific
13  allegations?
14 A Yes.
15 Q And you mentioned it was from Deserie Miller?
16 A Yes.
17 Q What did she say?
18 A She didn't know why Deserie didn't like her, and she
19  thought maybe she was jealous of her. She didn't
20  quite know. I mean, this is going back awhile, so I
21  always told Natalie just to take the high road.
22    Don't get involved in any gossiping with
23  anybody, talking about anyone. You know, if
24  somebody comes to you to talk about somebody else,
25  just stop them and say, "Hey, why don't we get that

Page 152

1  other person on the line, and we can all talk
2  together about it?"
3 Q Well, what did you say to Deserie?
4 A Same thing.
5 Q Did you mark--
6 A I said it to everybody.
7 Q Did you lower her performance evaluation?
8 A Pardon me?
9 Q Did she have a lower performance evaluation for
10  these same--
11 A Yeah, absolutely. She had a different evaluation.
12 Q The next one says:
13    "I am positive and responsive."
14  You state:
15    "Natalie is fully accountable for
16    every choice she makes and never seeks to
17    avoid or shift responsibility to someone
18    else. I can trust that she will act
19    decisively, follow through on her
20    commitments and quickly correct any
21    problems. Natalie was sent for additional
22    phlebotomy training due to numerous
23    complaints of bruising and pain."
24  Who complained about her?
25 A Three patients. We talked about it earlier. The

41 (Pages 149 to 152)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 153

1    client physician's office manager, and two other
2    patients.
3    Q   Okay.  Who specifically?
4    A   What do you mean, who specifically?  The patients'
5    names?
6    Q   No, no, the office manager.
7    A   The office manager--
8            MR. MIGLIO:  Well, the office manager
9    complained to you?
10           MR. FLYNN:  I'm asking a question.  You
11   don't get to ask a question right now.
12           MR. MIGLIO:  You don't get to ask about
13   patient information.
14           MR. FLYNN:  I'm not asking about patient
15   information.  Pay attention to the preposition.  I'm
16   asking about an office manager.
17           MR. MIGLIO:  If the office manager was a
18   patient, it's patient information.
19           MR. FLYNN:  No, it's not a patient.  She
20   just said it wasn't.
21           THE WITNESS:  She was a patient.
22   Q   (By Mr. Flynn)  She was a patient?
23   A   Yeah.  She was the third patient.  She was one of
24   the three.
25           MR. MIGLIO:  So she is not answering it.

Page 154

1    Q   (By Mr. Flynn)  (Reading):
2            "She learned a lot from her day of
3        training, including how to finish a lab
4        draw, as well as proper pressure to use
5        after a venipuncture"?
6    A   Correct.
7    Q   So you sent her for additional training.  What
8    resulted from that?
9    A   She had a competency check, and there was one
10   remediation, and that was for not applying enough
11   pressure after the draw, which can lead to bruising,
12   and also making sure that she labelled the patient
13   tubes while she was with the patient.
14           So that would allow the patient to put
15   pressure on their arm for long enough while she was
16   labelling tubes.
17   Q   Are you aware of other things that can cause
18   bruising?
19   A   If a patient is on Coumadin.
20   Q   What else?
21   A   If somebody digs around, if they go into what they
22   think is the vein and they are on the side of the
23   vein and they start, you know, taking left and right
24   turns in the patient's arm, that can cause bruising
25   as well.

Page 155

1    Q   Anything else?
2    A   I don't know.  I'm not a doctor, so there might be.
3    Q   And you're not even certified to be a phlebotomist.
4        Correct?
5    A   You don't have to be.
6    Q   You don't have to be certified to be a phlebotonist
7        (sic)?
8    A   Phlebotomist.
9            MR. MIGLIO:  Phlebotomist.
10   Q   (By Mr. Flynn)  So now let me ask you this.  Can
11       bandages, the kind of bandage that you use, bruise
12       someone?
13   A   If you put a band-aid on a patient that is on
14       Coumadin or an older patient, their skin is very
15       thin, so where--the points in which the band-aid
16       adheres to the skin could bruise, but not the actual
17       venipuncture site.
18   Q   Did anyone complain about the venipuncture site?
19   A   Yes.
20   Q   Okay, and those are the three people who complained
21       about that?
22   A   The three patients, correct.
23   Q   Then I'm looking down at the next one that says:
24           "I am innovative."
25       She got 3.0 for this one.  You say:

Page 156

1            "Natalie has made a contribution to
2        positive change.  She knows how to
3        communicate the benefits of change to
4        different people and obtain the necessary
5        resources to implement new ideas."
6        What do you mean there?
7    A   What I meant there is that communicating the
8        benefits of change to different people, we have had
9        changes within the system, like for instance, the
10       EPIC EMR that was rolled out.
11           We had to change--how to explain this.
12       The portal that we use for orders, we had to
13       interface with EPIC, but the patient record wouldn't
14       cross over if the patient was in--didn't have an
15       MRN, which is a unique identifier for the patient.
16           So that patient would require a
17       registration, and so Natalie and Deserie were sent
18       to train to learn how to register patients, and so
19       Natalie did a very good job registering patients,
20       and you know, if there was any questions, she could
21       answer questions because we had other staff that
22       started to register patients.
23           So it was a change, and I don't know,
24       sometimes with that kind of change it slows down the
25       process, and not everyone could maybe see the

42  (Pages 153 to 156)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 193

1   A   Luain had contacted me because Natalie had sent this
2       E-mail about why she was being pulled, and she was
3       upset because of all the question marks.
4           So she said she was going to ask Natalie.
5       She didn't understand why she was asking all
6       these--I mean, all these question marks, it's
7       disrespectful.
8           So she told me that she was going to
9       respond to her, and she asked me about the changing
10      the schedule, and I told her it didn't matter where
11      in the rotation Natalie was to train at that site.
12      She could go whatever time she wanted, and that's
13      what she was told.
14  Q   Did you have any conversation with Jill Hood about
15      this E-mail?
16  A   Not that I recall.  I don't know though.
17  Q   What was this about?  I mean, so why was she being
18      moved to the SPC site?
19  A   She wasn't being moved.  She was training at the
20      site.  We had an employee that resigned, and that
21      employee worked at that site on Saturdays, so she
22      was going to be involved in the Saturday rotation
23      with everybody else.
24          There were many employees that were going
25      to go.

Page 194

1   Q   Is this what you were referring to earlier, about
2       the Saturday rotation?
3   A   Correct.
4   Q   So did anyone indicate to Natalie that she wasn't
5       being pulled from Clinton Township?
6   A   She wasn't.
7   Q   Did anyone indicate that to Natalie?
8   A   Yeah.  It's--she knew.  It was either E-mail or
9       conversation, that the reason everybody was being
10      rotated--and the schedule went out to everybody that
11      was going to be added to the Saturday rotation.
12          Tanisha had left, so we needed to have
13      more people in the Saturday rotation.  Everyone
14      went.  It was on the east side.
15  Q   And so can you actually recall the specific E-mail
16      or specific conversation where it was announced to
17      everyone that there is going to be this training?
18  A   I don't know when it went out.  I don't know.
19      Everybody knew that Tanisha had left and that we
20      were adding people to the Saturday rotation.
21      I don't recall exactly when people were told or how.
22  Q   Why wasn't the response just to reassure Natalie
23      that she wasn't being pulled from the Clinton
24      Township site?
25          MR. MIGLIO:  Objection to the form and

Page 195

1       foundation for the question.
2   Q   (By Mr. Flynn)  She talked to the author of the
3       E-mail, the response?
4           MR. MIGLIO:  Same objection, to the form,
5       and lack of foundation for the question.
6   Q   (By Mr. Flynn)  Could you enlighten me why the
7       decision was made not just to say, "Natalie, you're
8       not being pulled"?
9   A   No, because everybody was told when they were hired
10      that we work Monday through Saturday, and they would
11      be involved in the Saturday rotation.  So it wasn't
12      anything different than what they were hired to do.
13  Q   Had this happened in the past?
14  A   No.  This was a site that we had, a person that had
15      covered it--
16  Q   So it hadn't happened in the past?
17  A   What do you mean?
18  Q   Had there been a rotation that everyone was required
19      to go to a training for in the past?
20  A   Yes.
21  Q   Or was this--
22  A   When they are first hired, they go to different
23      sites to train, because they have to be ready to go
24      to any site.
25  Q   But what was this specifically about, the SPC

Page 196

1       training?  How is this different than that training?
2   A   Tanisha resigned, and she worked most of the
3       Saturdays, so we had to get phlebotomists trained at
4       that site so that they could work the Saturdays that
5       Tanisha used to work.
6   Q   So I guess I'm wondering--so was the decision made
7       to just rotate people through that position?
8   A   They were rotating to train so that they could work
9       on a Saturday at that site.  We were going to add
10      people to the rotation, because Tanisha wanted to
11      work almost every Saturday, so we had to cover.
12          They are open every Saturday, so we had to
13      have enough people to rotate through SPC to train to
14      know how to work there on Saturday.
15  Q   Okay.  So I guess what I'm still not understanding
16      is, you're saying that there was this training day
17      that was planned so that you could have everyone
18      working there--
19  A   No, no, no, not the same--are you asking the same
20      day?
21  Q   Yeah.
22  A   No, no.  They wouldn't train there the same day.
23      They can't have all that--everybody there on one
24      day.
25  Q   Okay.  So they're breaking up training, and everyone

52 (Pages 193 to 196)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 249

1    I mean, you and I talked about it today.  You asked
2    me questions about it, but I've never talked to
3    anybody about the State.
4  Q   You never talked to Jill Hood about it.  You haven't
5    talked to John about it?
6  A   No.  I didn't know anything about the State until
7    after Natalie was gone, after she walked out.
8  Q   Okay.  You can put it to the side.
9         (At 5:21 p.m., Plaintiff's
10        Deposition Exhibit 16 marked)
11  Q   (By Mr. Flynn)  So this is Exhibit 16.  Let me know
12    when you are done reviewing it.
13  A   (Witness complied).
14  Q   This is an E-mail dated February 24, 2014, at 2:02
15    p.m. from yourself.  Is that correct?
16  A   Correct.
17  Q   And it's to a whole bunch of people.  I imagine
18    these are all of your employees?
19  A   Yes.
20  Q   And the subject line says, "Lunch," and it says it's
21    of high importance.  Right?
22  A   Correct.
23  Q   What led to this E-mail?
24  A   We were going to be going to Kronos in June, and so
25    at the time when we were told about Kronos, there

Page 250

1    wasn't a way to indicate a lunch hour.
2         So I asked everyone to prepare them for
3    that change to get used to sending an E-mail,
4    signing in and signing out for lunch, because the
5    Kronos system didn't accommodate that.
6  Q   And it says when you take--
7         REPORTER:  Spell that for me, please.
8         THE WITNESS:  Kronos, K-R-O-N-O-S.
9  Q   (By Mr. Flynn)  It says here:
10        "When you take your lunch please send
11        an email that you are signing out for lunch
12        and when you return from lunch please send
13        an email indicating that you are back from
14        lunch."
15  A   Correct.
16  Q   So this is a change in policy for the phlebotomists,
17    change in the past from what you did?
18  A   Yeah.  They didn't have to sign in or out when they
19    were taking their lunch.
20  Q   Okay.  Where in this E-mail does it say that they
21    have to get approval from you?
22  A   For what?
23  Q   To go on lunch?
24  A   I'm not sure why you're asking me that.  We talked
25    about this.

Page 251

1  Q   I'm asking you a question--
2  A   The lunches--
3  Q   Is there anything in the E-mail that indicates that
4    they would have to get your approval before signing
5    out?
6  A   No.
7  Q   So they could just sign out via E-mail, and then
8    they would just sign back in.  Correct?
9  A   Correct.
10  Q   And you mentioned this earlier, what a full
11    occurrence was.  It's just a--it's a tardy point.
12    Right?
13  A   Yeah.
14  Q   Once you get so many of them--
15  A   You go to a certain level of discipline.
16  Q   Okay.  So--okay.  You can put that to the side.
17        (At 5:24 p.m., Plaintiff's
18        Deposition Exhibit 17 marked)
19  Q   (By Mr. Flynn)  Now do you see the E-mail that is on
20    the first page from Reeser to yourself and Luain?
21  A   Yes.
22  Q   And it's dated February 25th at 12:27 p.m.  Do you
23    see that?
24  A   I do.
25  Q   Do you recall ever responding to this?

Page 252

1  A   I did respond later in the day.
2  Q   About when did you respond?
3  A   It was after I was done with the new employee, I
4    would assume, because that is the day I was training
5    the new employee from 12:00 to 3:00, so--
6  Q   So you responded later on?
7  A   Yes.
8  Q   Did you respond in any other way, other than E-mail?
9  A   No.
10  Q   Did you call her?
11  A   No.
12  Q   You can put that aside.
13        (At 5:26 p.m., Plaintiff's
14        Deposition Exhibit 18 marked)
15  Q   (By Mr. Flynn)  This is 18.  Do you have 18 in front
16    of you, ma'am?
17  A   Oh, yes.
18  Q   Do you recall seeing this E-mail?
19  A   Yes.
20  Q   You are one of the recipients.  Correct?
21  A   I am.
22  Q   And it's dated once again February 25th, and it's
23    12:50 p.m.?
24  A   Correct.
25  Q   It said:

66 (Pages 249 to 252)

52452883-3a3f-4243-9141-a75bcdc8ecdc

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

---

Page 253

```
 1        "I would also like to know if you
 2        moving me is just temporary or a
 3        permanent move."
 4        Do you see that?
 5   A    I do.
 6   Q    What was your response to that?  Did you respond?
 7   A    I did.
 8   Q    Is it the same response that you indicated just a
 9        second ago?
10   A    Yes.
11   Q    And what was your response?
12   A    She was covering Julisa's CTO.
13   Q    Okay.  You can put that aside.
14            (At 5:27 p.m., Plaintiff's
15            Deposition Exhibit 19 marked)
16   Q    (By Mr. Flynn) So this is Exhibit 19.  Do you
17        recall seeing this E-mail?
18   A    Yes.
19   Q    And you saw it at the time?
20   A    No.
21   Q    You didn't see this on the 25th?
22   A    Oh, on the 25th, but not at 1:12.
23   Q    When did you see it?
24   A    Around 1:40 when Luain came and got me and told me
25        to check E-mail.
```

Page 254

```
 1   Q    So now back up one more--actually two more E-mails,
 2        so back up to 17.  So 17, I'm looking at that.  This
 3        looks like she is following up from an earlier
 4        E-mail message.  What is she following up from?
 5            MR. MIGLIO:  Object to the form of the
 6        question.
 7            THE WITNESS:  What E-mail are you asking
 8        about?
 9   Q    (By Mr. Flynn)  I'm looking at the E-mail that we
10        just talked about, 12:27 p.m.
11   A    About why she's not training?
12   Q    Yeah.
13            MR. MIGLIO:  What E-mail--
14   Q    (By Mr. Flynn)  It looks like there was some kind of
15        communication between yourself, whether that be in
16        person, telephone, E-mail, regarding this subject?
17   A    That was later in the day.  It was like 3:00 or
18        something.
19   Q    What about--was anything said about this earlier
20        that day?
21            MR. MIGLIO:  I'm going to object.  I don't
22        understand the question.
23            THE WITNESS:  I don't know what you're
24        asking.
25   Q    (By Mr. Flynn)  Was there any communication
```

Page 255

```
 1        regarding the subject earlier in the day on February
 2        25th?
 3            MR. MIGLIO:  What are you referring to?
 4            MR. FLYNN:  I'm looking at the E-mail I
 5        just asked her about, which is on page 1.  It's
 6        Bates number HFH 112.
 7            THE WITNESS:  I do not--she sent it at
 8        12:27.
 9   Q    (By Mr. Flynn)  Yeah.
10   A    So I didn't see this at that time.
11   Q    No.  I'm saying that was there any communication
12        that led to this E-mail that you are aware of?
13   A    I don't know.
14   Q    Okay.
15   A    I don't know.
16   Q    You don't recall?
17   A    She is asking about HFC, so she had the schedule,
18        and that is where she was scheduled to work and
19        train, so--
20   Q    Then if you look at Exhibit 18, was there any
21        communication between you and her that led her to
22        think that there was going to be a move?
23            MR. MIGLIO:  Objection to the form and
24        lack of foundation.
25            THE WITNESS:  I don't--
```

Page 256

```
 1   Q    (By Mr. Flynn)  That you are aware of.
 2   A    I don't know what--you are asking me if she was
 3        going to--
 4   Q    She is referring to it is either going to be a
 5        temporary or permanent move.  Do you see that?
 6   A    I do.
 7   Q    What led her to think that there was even going to
 8        be a move?
 9            MR. MIGLIO:  Objection to the form and
10        lack of foundation.
11   Q    (By Mr. Flynn)  That you are aware.  Was there
12        anything--
13   A    A schedule.
14   Q    The schedule?
15   A    The schedule went out.
16   Q    When did the schedule go out?
17   A    February 18th.
18   Q    So you are saying that she waited several days in
19        order to discuss the matter with you?  There were no
20        other communications about this?
21   A    Not that I recall.
22   Q    It could have been.  You just don't remember?
23   A    I think there is an E-mail where she asked--there
24        might be another one in your packet.
25            (At 5:31 p.m., Plaintiff's
```

67  (Pages 253 to 256)

0e530149-106a-4a35-89e6-76b0bd8bd6bd

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 285

1    suspended?
2    A   No.
3    Q   In fact, it looks like there is a signature on page
4    2 of 3?
5    A   There is.
6    Q   So you have to sign the E-mail?
7    A   This one I requested a signature on so that--yeah,
8    because of the time sheets and the legal documents.
9         MR. FLYNN:  Okay.  I think that's it then.
10   I'm done with you.
11        THE WITNESS:  Okay.
12        MR. FLYNN:  Thank you for your time.
13        THE WITNESS:  You're welcome.
14        MR. MIGLIO:  I will bring a protective
15   order, and I will give you--what did you want, her
16   home phone number, her home address.  What else?
17        MR. FLYNN:  Her personal cell phone, home
18   phone number, address.
19        (At 6:18 p.m., witness excused and
20        deposition concluded)
21
22
23
24
25

Page 286

1         CERTIFICATE OF COURT REPORTER
2
3    STATE OF MICHIGAN )
4               )
5    COUNTY OF OAKLAND )
6
7
8         I certify that this transcript, consisting
9    of 286 pages, is a complete, true and correct record
10   of the testimony of Fiona Bork held in this case on
11   Monday, March 16, 2015.
12        I also certify that prior to taking this
13   deposition Fiona Bork was duly sworn to tell the
14   truth.
15
16   3/20/15      _Tamara A. O'Connor_
17                _____
18   Date         TAMARA A. O'CONNOR
19               CSMR 2656, CER 2656
20               2385 Jakewood Drive
21   pz          West Bloomfield, Michigan 48324

75  (Pages 285 to 286)

0e530149-106a-4a35-89e6-76b0bd8bd6bd