# Exhibit 5

Natalie Reeser
3/30/2015

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

NATALIE REESER,

        Plaintiff,

                                  CASE NO:2:14-cv-11916

vs.

HENRY FORD HOSPITAL,

        Defendant.

_____/


                Volume I of the deposition of NATALIE

REESER, taken before me, Lauri A. Sheldon, CSR 4045, RPR,

on March 23, 2015, at 39500 High Pointe Boulevard, Suite

350, Novi, Michigan, commencing at or about 10:07 a.m.

APPEARANCES:


    MILLER COHEN, P.L.C.
    BY:  KEITH D. FLYNN, ESQUIRE
    600 W. Lafayette Boulevard, 4th Floor
    Detroit, Michigan  48226
    313-964-4454
    Appearing on behalf of the Plaintiff.

    VARNUM, LLP
    BY:  TERRENCE J. MIGLIO
    39500 High Pointe Boulevard, Suite 350
    Novi, Michigan  48375
    248-567-7400
    tjmiglio@varnumlaw.com
    Appearing on behalf of the Defendant.

Natalie Reeser
3/30/2015

Page 149

1  A  Yes. I did this on a monthly basis for Martha Wiseheart,
2     my direct supervisor.
3  Q  Okay. Your direct supervisor.
4  A  She was one of my two direct supervisors, correct.
5  Q  Oh, okay.
6  A  This was a direct order from her to write down how many
7     patients I saw every day, keep a patient count, and to
8     watch it the whole time I worked there.
9  Q  So when -- How long would you typically spend with a
10    patient?
11 A  Between three to five minutes.
12 Q  Three to five minutes.
13 A  Have you ever had your blood drawn? It's three to five
14    minutes.
15 Q  Three to five minutes. So if you had nine patients . . .
16    Three to five minutes each. Okay. And your shift was
17    generally what?
18 A  I worked ten-hour days for the first year and half, and
19    then I worked eight-and-a-half hour -- eight-hour days
20    for the last year and half, except for on Fridays where I
21    worked a half day.
22        (Exhibit 55 marked.)
23 Q  (Continuing by Mr. Miglio): Let me show you what's been
24    marked as Exhibit 55 and ask you what this is.
25 A  It's an agenda for the meeting in October 2013.

Page 150

1  Q  And were you at that meeting?
2  A  Yes.
3  Q  Do you remember what was discussed at the meeting?
4  A  No.
5  Q  Do you remember what was discussed about breaks or
6     leaving the site or anything like that?
7  A  No.
8        (Exhibit 56 marked.)
9  Q  (Continuing by Mr. Miglio): I show you what's been marked
10    as Exhibit 56. What is this?
11 A  This is a sign that I created that I had to get
12    permission from Martha Wiseheart to put up in the lunch
13    room so that if I wasn't at work or if I was out on CTO
14    one of my teammates that might cover for me could go in
15    and have whatever I had there. I was allowing them to
16    have it.
17 Q  You were allowing other --
18 A  If I was going to be absent or take CTO time, they could
19    go in my drawer and have whatever they wanted. It was
20    just a note saying, "Hey, if you see something on the
21    counter and you want it, you can have it," because I was
22    awesome at being a teammate.
23 Q  So this was just your offering other employees food that
24    you brought onto the site?
25 A  Correct.

Page 151

1        (Exhibit 57 marked.)
2  Q  (Continuing by Mr. Miglio): I show you what's been marked
3     as Exhibit 57. What is this?
4  A  This is the note -- or the note that I created that had
5     to be approved by Martha Wiseheart to go on our front
6     door in early -- I created this, I believe, in 2011, and
7     Fiona, if that is her writing there that says "Saw for
8     the first time after her termination," she used this on
9     the day I went to get my TB test read, so that would be a
10    lie.
11 Q  Who used this?
12 A  Fiona had this on the door -- or I had this on the door
13    the day I left for my TB test to be read.
14 Q  Is that the day that Martha covered for you?
15 A  Correct. Martha was also there. She also saw this. She
16    also watched me fill out the time that I thought I'd be
17    back and she -- she had to approve everything I put up on
18    the wall.
19 Q  So what happened to the sign that you used that day?
20 A  When you use a sign, because you have to fill out the
21    time, you shred the sign. Anytime that I made a
22    document, even if it was for Christmas, for Thanksgiving,
23    Martha approved the document, it went up, I'd get it
24    back, it would be destroyed, because it's covered in
25    tape.

Page 152

1  Q  Threw the sign into the shredder.
2  A  All signs go in the shredder.
3  Q  Just as opposed to just crinkling it up and throwing it
4     in the garbage can?
5  A  We shred everything at Clinton Township.
6  Q  So how many times have you used this tiny sign?
7  A  Five.
8  Q  Five times.
9  A  At least that I remember. Yes.
10 Q  And those five times were the four that you identified
11    earlier?
12 A  Correct.
13 Q  Is it five or four times you recall putting a sign up?
14 A  I'm sure it was more than that, but I just don't recall
15    the instances.
16 Q  So --
17 A  But every time I left with the sign on the door Martha
18    Wiseheart was present, she saw the sign, she approved the
19    sign, and she was also one of my direct supervisors.
20 Q  So when you had your TB test, where did the -- where was
21    the test given?
22 A  Downtown.
23 Q  Okay.
24 A  It was read at Macomb.
25 Q  And you said there was -- What were the other occasions

38 (Pages 149 to 152)

Tri-County  Court Reporters
248-608-9250

Natalie Reeser
3/30/2015

Page 153

1    when you left and put a sign up?
2  A  I really don't recall. I told you earlier.
3  Q  You don't recall the five times?
4  A  I testified earlier as to my five times, so you'll have
5     to just look at the record for that. I don't know.
6  Q  Well, I'm asking you, on another occasion was Martha --
7     on every occasion that you put the sign up did Martha
8     approve it?
9  A  Martha approved the sign to be on my desk in the folder
10    that are all approved signs. She wouldn't approve it
11    every single time. She approved it when I created the
12    sign.
13  Q  So my question is different than that. My question is
14    are you saying that the five times that you left the
15    site, according to you without permission, did you get --
16  A  I had her permission.
17  Q  -- authorization -- All right. So you're saying that you
18    didn't leave the site without authorization; every time
19    Martha gave you permission?
20  A  Martha was one of my direct supervisors. She gave me
21    permission to leave the site. I left the site.
22  Q  My question is are you saying that you did not leave the
23    site without permission, whether it be Martha or Fiona?
24       MR. FLYNN: Objection. Asked and answered.
25       THE WITNESS: Yes.

Page 154

1  Q  (Continuing by Mr. Miglio): You're saying yes, you
2     didn't; unless you had permission, right?
3       MR. FLYNN: Same objection.
4       THE WITNESS: For occasions that I would have
5     to leave and leave my desk, yeah.
6  Q  (Continuing by Mr. Miglio): Okay. So every time you left
7     you got Fiona's permission or Martha's permission,
8     correct?
9       MR. FLYNN: Same objection.
10       THE WITNESS: If it was a break or if it was an
11    emergency situation, yes.
12  Q  (Continuing by Mr. Miglio): So if it wasn't a break or it
13    wasn't an emergency situation and you were leaving the
14    facility, then you didn't get their permission?
15  A  You can't leave the facility. You're responsible for the
16    site. I was responsible for Clinton Township. I never
17    left the site.
18  Q  Okay. That's not what I'm asking you.
19  A  I don't understand your question, sir.
20  Q  Well, we'll break it down so you understand it.
21  A  Okay.
22  Q  So if you had to leave the site for an emergency, is it
23    your testimony that you needed to get Fiona's or Martha's
24    permission?
25  A  Yes, because then you'd be using CTO time.

Page 155

1  Q  Okay. If you weren't leaving the site for an emergency,
2     were there situations where you didn't need to get Fiona
3     or Martha's permission?
4  A  I always asked for permission just -- from Martha because
5     she was there.
6  Q  Okay. So are you saying you never left the site for
7     whatever reason without getting Martha or Fiona's
8     permission? Is that what you're saying?
9  A  Up to the new policy that came out on February 24th,
10    correct.
11  Q  All right. Up to the new policy. All right. So up to
12    February 24th whenever you left the site for whatever
13    reason you got permission to do so from either Martha or
14    Fiona, correct?
15  A  Yes.
16  Q  All right.
17       (Exhibit 58 marked.)
18  Q  (Continuing by Mr. Miglio): Tell me what this is.
19  A  Another just one that I created for my coworkers. They
20    let me hang it up. So this one was in the break room.
21    That one was in -- at my desk. So that's what this is.
22    It is being a good teammate. It is allowing your
23    teammates to eat your food when you're not there.
24       (Exhibit 59 marked.)
25  Q  (Continuing by Mr. Miglio): Let me show you what's been

Page 156

1     marked as Exhibit 59.
2  A  Okay.
3  Q  What is this about?
4  A  Fiona changed my performance review based upon me having
5     3 people out of the 3,000-some-odd people I saw that year
6     getting bruises, and I felt that was wrong.
7  Q  That was wrong because what, she rated you as a two or
8     something?
9  A  Correct, which is unsatisfactory.
10  Q  Okay.
11  A  Which if you do 3,000 blood draws and you have 3
12    complaints out of 3,000 blood draws, that's 1 percent.
13  Q  And that was the evaluation for what year?
14  A  That was evaluation for 2014. You may have one that says
15    3.0, because Jill Hood changed it, but the one she sent
16    me says 2.0.
17       (Exhibit 60 marked.)
18  Q  (Continuing by Mr. Miglio): So let me show what you
19    what's been marked as Exhibit 60 and ask you to take a
20    look at that.
21       MR. FLYNN: Fully review it.
22       THE WITNESS: God. Okay. Okay.
23  Q  (Continuing by Mr. Miglio): What is that?
24  A  My performance review from 2014.
25  Q  And so what were you taking objection to?

Tri-County  Court Reporters
248-608-9250

Natalie Reeser
3/30/2015

Page 193

1          MR. FLYNN: Objection as to form.
2          MR. MIGLIO: Did you? Look at the email. I
3     mean can you read it?
4          MR. FLYNN: Would you like to point out a
5     specific email?
6   Q  (Continuing by Mr. Miglio): Yeah, the January 16th email.
7   A  Which one?
8   Q  At 4:48.
9   A  I was already set to go down, which means my coverage had
10     already been approved. Where is the approval letters
11     from Fiona? That should be an exhibit with this. If
12     you're going to question me about that, you should have
13     all documents that go with it.
14  Q  Okay. Now, are you willing to -- ready to answer my
15     questions?
16  A  I . . .
17  Q  Okay? Just take your time.
18  A  I don't know what I'm doing wrong, so.
19  Q  Just take your time and listen to my question and I'll
20     ask you. Okay?
21  A  Hm-hmm. Go ahead.
22  Q  So my question is isn't it true that you didn't confirm
23     your meeting with Jill Hood until after you were notified
24     of the conference call?
25  A  No, because I spoke verbally with Fiona that day on the

Page 194

1     15th when she was in the office humming and singing and
2     harassing me. I let her know that I wouldn't meet with
3     her because I had a meeting Friday with Jill Hood at
4     12:30. And Jill confirms that she --
5          MR. FLYNN: No. Wait for there to be a
6     question.
7          THE WITNESS: She --
8   Q  (Continuing by Mr. Miglio): So where do you say
9     that . . . Where do you say that that's what happened
10     with Fiona learning about the meeting? Show me that
11     email.
12  A  Right here on the 15th at 12:31 p.m. She came to my
13     office earlier that day and I told her I had a meeting on
14     Friday at 12:30 with Jill Hood, the HR representative.
15  Q  You told her that.
16  A  Hm-hmm. Sure did.
17  Q  Is that right?
18  A  Yes. And I did not meet with her.
19  Q  So why would you say in this email, "I will get back to
20     you asap about Friday 12:30 as soon as I know something
21     again"? Why would you say something like that if it was
22     all straightened out? Can you tell me that?
23  A  That was about Alicia Estell being able to cover me.
24  Q  Okay. Let's try this: Isn't it true that you never got
25     permission to go to that meeting?

Page 195

1          MR. FLYNN: Objection. Asked and answered.
2   Q  (Continuing by Mr. Miglio): Huh? You never got
3     permission from Fiona to attend the meeting at HR on
4     January 17th after 12:30, did you?
5   A  Yes. It's in the email somewhere.
6   Q  You got permission.
7   A  I have it in my phone, the email that says "approved."
8          MR. FLYNN: It's been turned over.
9          THE WITNESS: It's been turned over to you.
10     You have the documentation.
11  Q  (Continuing by Mr. Miglio): Well, if you read through the
12     email, Jill Hood doesn't even meet with you.
13  A  I keep explaining to you, this is not complete. There's
14     missing emails. So if you want to keep questioning me
15     about that, you might want to bring me the documents that
16     I need to answer the question properly.
17  Q  Show me where you got approval.
18          MR. FLYNN: Is there any email in here that
19     states that you got approval from Fiona?
20  Q  (Continuing by Mr. Miglio): Now you're saying it was a
21     text message?
22  A  No. It was an email from Fiona approving me.
23  Q  Didn't you just say it was a text message?
24  A  I did not say a text message.
25  Q  Where is the email approving you? Have you seen it yet

Page 196

1     today?
2   A  No. I'm waiting for it to come up in your exhibits, and
3     then I will point out that it connects to 67.
4   Q  So your testimony today under oath is that you did not
5     confirm -- that you confirmed with Jill Hood that you
6     would meet her on 12 -- at 12:30 p.m. on July 17th before
7     you were informed by Fiona that you had you a conference
8     call that was --
9   A  Yes, absolutely.
10  Q  Okay.
11  A  One hundred percent.
12  Q  And your testimony also is that Fiona approved you to go
13     to the meeting with Jill Hood.
14  A  Yes, she did.
15  Q  Okay.
16  A  However, she didn't send the approval to the coverage.
17     That's the text message from Alicia Estell that you see.
18  Q  So it's a text.
19          MR. FLYNN: The document we produced --
20          THE WITNESS: Today.
21  Q  (Continuing by Mr. Miglio): All right. Well, we can look
22     at that.
23  A  Okay. Let's look at it.
24          MR. FLYNN: Hold on. Wait for it to be marked
25     as an exhibit.

Tri-County Court Reporters
248-608-9250

Natalie Reeser
3/30/2015

Page 221

1  Q  Yeah, she was telling you you shouldn't be reading the
2     news.
3  A  Hm-hmm.
4  Q  Right?
5  A  Correct.
6  Q  Okay. And you say here --
7  A  Just to clarify that, that was earlier in 2011/2012.
8  Q  "Both she and our operations manager have viewed this
9     screen for months, and no one has ever mentioned it in
10    the past." See that?
11 A  Yes.
12 Q  And the operations manager is who?
13 A  Martha Wiseheart.
14 Q  Why didn't you just say "Martha Wiseheart, my direct
15    supervisor"?
16 A  Because I didn't type this letter, sir, my mom did, so
17    she probably wrote "operations manager" instead of
18    "Martha Wiseheart."
19 Q  How would your mom know what to write unless you told
20    her?
21 A  Mom was well aware that Martha Wiseheart was the
22    operational manager.
23 Q  So your mother just composed this letter. Did you read
24    it before you sent it?
25 A  Yep. Yes.

Page 222

1  Q  Okay. Now, "Also, based on emails I received last week,
2     I believe my supervisor altered or deleted goals that
3     were part of the original evaluation."
4  A  For --
5  Q  Now, when you say "my supervisor," who were you referring
6     to?
7  A  The person who writes my reviews. That would be Fiona
8     Bork.
9  Q  My supervisor.
10 A  When she writes performance reviews, she does the
11    performance reviews. That makes her that supervisor over
12    that portion of my job.
13 Q  And so you say you don't know whether there was one or
14    two goals or what.
15 A  Correct.
16 Q  What does that mean, "altered or deleted"?
17 A  For two years she allowed me to have a goal that I wanted
18    to raise the level of patients through repeat customers,
19    because one of the things that I had going for me there
20    that destroyed me was that I built a relationship base
21    with all the these customers. I had repeat customers on a
22    daily basis and -- What was the question, I'm sorry?
23 Q  I said what was the goal you thought she deleted?
24 A  Oh. And I -- The goal was that I wanted to build the
25    laboratory up from, you know, when I first started in

Page 223

1     2011 from 2 to 5 patients a day to 20 patients a day, and
2     that was one of my goals. However, Fiona deleted that
3     at -- on my 2013 one, but allowed it for 2012 and 2011,
4     because she was informed by Jill Hood that it was
5     inappropriate for her to allow me to have a goal like
6     that or something.
7  Q  So she deleted a goal that you had to do what?
8  A  To grow Clinton Township's patients.
9  Q  Okay. And you objected to her deleting the goal.
10 A  Correct, because I had been allowed to have that goal for
11    two years and then all the sudden she deleted it. So
12    when she went to HR, HR told her that is a good thing she
13    deleted it because it was irrelevant to me because I'm
14    not a salesperson.
15 Q  Wasn't the goal deleted after she went to HR?
16 A  No. I do believe it was deleted before.
17 Q  Didn't she respond to your complaint about being rated
18    inappropriately?
19 A  I did not have a response from Fiona about her
20    accidentally marking me down to a two until I had already
21    met with HR and was already on suspension.
22        (Exhibit 70 marked.)
23 Q  (Continuing by Mr. Miglio): Look at Exhibit 70. Have you
24    ever seen this before?
25 A  Yes.

Page 224

1  Q  If you look at the second page, the second bullet point.
2         MR. FLYNN: Do you mean above "Unemployment
3     hearing," counsel?
4         MR. MIGLIO: Yes.
5  Q  (Continuing by Mr. Miglio): It says, "Regarding the
6     altered or deleted goal." Do you see that? It says, "As
7     I shared with you at our meeting on January 20th, 2014,
8     after reviewing your performance evaluation I noticed
9     that you had a goal of," quote, "to grow CTPSC to 20-plus
10    customers as day," close quote. Did you have that goal?
11 A  Yes. That is the goal that I had since 2011.
12 Q  So she says, "The volume per day for 2013 didn't reach
13    that goal, and therefore you received a 2 -- a score of 2
14    with a 5 percent weight."
15 A  Then, according to this, she marked down two of my
16    performance goals to two.
17 Q  "Since that goal was not within your direct control and
18    since the score was less than satisfactory, I requested
19    that this goal be deleted and that the 5 percent weight
20    be attributed to another goal, which ultimately raised
21    your overall performance score." See that?
22 A  Okay.
23 Q  So you just said you were complaining because she -- that
24    Fiona removed a goal that you were supposed to be working
25    for and, in actuality, it was Jill Hood who removed the

56 (Pages 221 to 224)

Tri-County  Court Reporters
248-608-9250

Natalie Reeser
3/30/2015

Page 241

```
 1      question?
 2              MR. MIGLIO:  Yeah, I'll withdraw the question.
 3      She answered it.
 4              THE WITNESS:  Okay.
 5  Q   (Continuing by Mr. Miglio):  What is Exhibit 72A?
 6  A   This is a card and a gift card that Martha gave me for
 7      doing her work.
 8  Q   Gift card that she gave you.
 9  A   Yeah.  She gave me a $15 gift card to Subway for her
10      thanking me for all of the work -- administrative
11      assistant work that I do for her.
12  Q   Why would you think you needed to copy this and make
13      these notations on it?
14  A   Because it shows that I was doing extra work and it also
15      shows that I didn't have a problem doing extra work, and
16      it also shows that Martha gives me a direct order, I
17      follow it.
18  Q   How does this --
19  A   She's thanking me.
20              MR. FLYNN:  Counsel, why are you laughing?
21  Q   (Continuing by Mr. Miglio):  Show me where on --
22  A   It's not funny.
23  Q   -- this card with the $15 gift certificate from Subway it
24      proves that Martha was giving you orders and you were
25      following them?  How do you get to that from there?
```

Page 242

```
 1  A   Because she gave me a direct order to do something for
 2      her, I did it, and she gave me a card.
 3  Q   What was the direct order she gave you?
 4  A   I did some administrative assistant thing for her.  I
 5      typed up something, I remember, and it took me a long
 6      time to type it up for her, it was her job, she didn't
 7      want to do it, she gave it to me -- she delegated it to
 8      me -- I did it, and she went out and got me a card and
 9      bought me a $15 gift card.
10  Q   So we'll find what it is.  What was it you typed up?  It
11      was that extensive, you presumably remember what it was
12  A   I have no clue.
13  Q   You don't remember at all.
14  A   Nope.  This was back in 2011.
15  Q   So in 2011, three years before your termination, you
16      thought it was significant enough to keep a card that she
17      gave you, make copies of it, and make notations.
18  A   Yep.
19  Q   As early as 2011 in your employment you were keeping
20      track of this stuff.
21  A   I keep everything.  I'm a very organized person.  And I
22      happened to have the card sitting there, so I made a
23      copy.  It sat on my wall at my office for three years.
24      I'm sorry you feel that it's irrelevant.
25  Q   I didn't say it was irrelevant.  I just wondered why you
```

Page 243

```
 1      started keeping things back three years before your
 2      termination.
 3  A   I kept this card because it was an appreciation and I
 4      thought it was important, so I put it up on the wall.
 5  Q   So now you want to say that it's evidence that you were
 6      given direct orders to do her work.  Is that what I'm
 7      getting from you?
 8              MR. FLYNN:  Objection.  Asked and answered.
 9  Q   (Continuing by Mr. Miglio):  Right?
10  A   This card was a thank you for doing her work, correct.
11  Q   Yeah, and you were mad that you had to do it, right?
12              MR. FLYNN:  Objection.  Misconstruing her
13      testimony.  She actually testified to the exact opposite.
14              THE WITNESS:  If I was mad, I wouldn't have
15      been happy to do the work that she directed me to do,
16      sir.
17              (Exhibit 73 marked.)
18  Q   (Continuing by Mr. Miglio):  Let me show you what's been
19      marked as Exhibit 73.  Before I ask you that question,
20      what's the longest job -- what's the longest period of
21      time you've held a single job?
22  A   I don't recall.  I have no clue.
23  Q   Have you ever worked anywhere for more than four years?
24  A   Yes.
25  Q   Where would that be?
```

Page 244

```
 1  A   Moore Home Improvement.  I was the office manager there
 2  Q   And you worked there from what period of time to what
 3      period of time?
 4  A   I have no clue.
 5  Q   You don't know how long you worked there or what time
 6      period, but you know it was more than --
 7  A   I told you I worked there almost four years, but,
 8      however, I don't remember the exact dates I worked there,
 9      sir.  It was a long time ago.
10  Q   All right.  So we looked at 73.  So tell me what this is.
11              MR. FLYNN:  Read the whole document from
12      beginning to end.
13              THE WITNESS:  Is it backwards?
14              MR. FLYNN:  Yeah.
15              THE WITNESS:  Okay.  Hm-hmm.  Okay.
16  Q   (Continuing by Mr. Miglio):  Done reading it?
17  A   Yes.  Yes.
18  Q   So Jill Hood was apparently asking you what you -- what
19      Fiona told you to lie about at the unemployment hearing.
20              MR. FLYNN:  Objection.  Misconstrues the
21      document in question.
22  Q   (Continuing by Mr. Miglio):  Is that correct?
23  A   I didn't hear -- understand your question or hear it
24      properly.  What did you say?
25  Q   Well, she says here on page 122, "Natalie, I understand
```

61 (Pages 241 to 244)

Tri-County Court Reporters
248-608-9250

Natalie Reeser
3/30/2015

Page 245

1     that she requested that you participate in the hearing.
2     Did she, however, ask that you provide false information
3     at the hearing?" And your answer was on January 24th at
4     7:31 a.m., "Yes, she did."
5  A  Hm-hmm.
6  Q  And then Jill responds at 7:37 a.m. on that same day,
7     "What specifically did she ask you to say?"
8  A  Right. And in my email --
9  Q  I didn't ask you yet.
10  A  Oh.
11  Q  So you write here, "Unless I'm able to read what she had
12     me write, I don't want to confirm anything, because I
13     don't want it used against me." What did she have you
14     write?
15  A  A statement.
16  Q  Okay. A statement. What kind of a statement?
17  A  Of what happened that day.
18  Q  In an email or what?
19  A  I don't recall.
20  Q  "This was almost three years ago. I only have brief
21     memories, but I never forgot she asked me to say she quit
22     and that I heard her call her a B and that Judy was
23     swearing at Fiona."
24  A  Hm-hmm.
25  Q  Okay. So that sounds to me like Fiona was asking you to

Page 246

1     say that Judy quit and that you heard Judy call Fiona a
2     bitch.
3  A  No. I miswrote this, and the way I wrote it it's
4     misconstrued, and I meant to say I remember her saying
5     that she asked -- that she quit and called her a B. I
6     wrote that wrong. That's my thing. I was going to her
7     to tell her that I didn't want to testify in the meeting.
8     This is what is getting confused. You guys keep saying I
9     keep saying that I didn't mean that. Well, this email
10     right here I misspoke, because that's not what I meant to
11     say.
12  Q  Well, what did you mean to -- Well, first of all, did she
13     ask you to say that Judy Hale quit? Did Fiona ask you to
14     say that?
15  A  I didn't mean to write "Asked me to say." I meant to
16     say, "But I never forgot she said she quit and called her
17     a B."
18  Q  Just listen to my question and we'll get through this a
19     lot quicker. Did Fiona ask you to say that Judy Hale had
20     quit?
21        MR. FLYNN: So did she ask you specifically to
22     say --
23        THE WITNESS: No.
24  Q  (Continuing by Mr. Miglio): Okay. Did she ask you, did
25     Fiona ask you, to say that you -- she -- that you heard

Page 247

1     Judy Hale call Fiona a bitch?
2  A  Yes.
3  Q  Okay. Did you -- Did Fiona ask you to say that Judy was
4     swearing at Fiona?
5  A  Yes, because that's all true.
6  Q  Okay. So how did this get misconstrued?
7  A  I did not mean to say "Made to say." I was under so much
8     stress writing these emails back and forth about Fiona
9     being -- harassing me and I was going through so much
10     reporting Henry Ford to the State that I added some extra
11     words in there, but that's not what I meant, and she
12     understood that when I met her face to face, so why all
13     this is coming out now, I don't know.
14  Q  Well, what did she misconstrue? What did you mean to
15     say?
16  A  I told her that what I wrote I can't confirm, because who
17     knows if Fiona changed it or not. However, the thing I
18     didn't want to do was testify against her at her
19     unemployment meeting. It had nothing to do with what I
20     wrote being false. That's what I'm confused as to why
21     this is all coming out as she said she -- it's false. I
22     told her I misconstrued that. I misunderstood that whole
23     situation.
24  Q  Misunderstood what whole situation?
25        MR. FLYNN: Objection. Form.

Page 248

1  Q  (Continuing by Mr. Miglio): I mean did you misunderstand
2     Jill Hood's question when she said, "Did she, however,
3     ask that you provide false information at the hearing?"
4     And your answer was, "Yes, she did." Now, did you
5     misunderstand that question?
6  A  Yes, she did. However, it -- this is . . .
7  Q  No. I just asked you if you misunderstood Jill Hood's
8     question --
9  A  Yes.
10  Q  -- she asked you.
11  A  Yes. Obviously, I did. Well, no, I didn't. I
12     understood the question. I just accidentally added in,
13     "She asked me," and I didn't mean to write that. I must
14     have been typing fast.
15  Q  Then she says --
16  A  There's a lot of typos in my emails.
17  Q  She said, "What specifically did she ask you to say?"
18     And then after saying that "I don't want to confirm
19     anything, because I don't want it used against me since
20     it's almost three years ago, I only have brave memories,
21     but I never forgot she asked me to say she quit and that
22     I heard her call her a bitch and that Judy was swearing
23     at Fiona. For some reason these points never left my
24     head."
25  A  Hm-hmm.

62 (Pages 245 to 248)

Natalie Reeser
3/30/2015

Page 257

1    says, that there wasn't any Atlas activity after 3 p.m.
2        MR. FLYNN:  Read the whole thing, Natalie, from
3    beginning to end.
4        THE WITNESS:  I did.  Okay.
5    Q  (Continuing by Mr. Miglio):  So what do you make of this?
6    Somebody's criticizing you for not doing your work, it
7    sounds like.
8    A  Actually, I was doing copy to's and other administrative
9    insurance updates, so just because Atlas isn't active
10   doesn't mean I'm not working.
11   Q  Well, did you tell her that you weren't -- that you
12   didn't do any regs after she called at 16:38?
13   A  I don't know.  It depends on my workload that day and
14   what I was doing.  I don't remember this or recall this
15   particular day.  I have no clue.
16   Q  So were you doing . . . So the original email from Fiona
17   says, "Today there was over an hour without any patient
18   activity that could have been used at the end of the day
19   to register patients."  And that's what you got all angry
20   about, is it?
21   A  That would be in her opinion.  However, the workload that
22   I had at Clinton Township took me to the end of the day.
23   Q  Well, it sounds to me like you're saying no, there
24   wasn't -- just because there wasn't activity, I was doing
25   the regs.

Page 258

1    A  I was doing the insurance updates.
2    Q  Well, I don't see that here.
3    A  I mean --
4    Q  You said, "I did the regs when I could.  There wasn't a
5    point when I got to sit down yesterday."
6    A  Correct.
7    Q  So you're saying that now you weren't doing the regs
8    after -- during that time period of inactivity; you were
9    doing something else.
10   A  I was probably doing another administrative directly
11   directed by Martha Wiseheart.
12   Q  What do you remember that to be?
13   A  Could have been anything.  She had me do a lot.
14       (Exhibit 78 marked.)
15   Q  (Continuing by Mr. Miglio):  I show you what's --
16   A  Almost every day she had a direct order to do something
17   that she was supposed to do.
18   Q  Let me show you what's been marked as Exhibit 78.  Well,
19   what can you remember that we can go and find that you
20   were doing for her that would show that she was given --
21   A  All of her insurance updates.
22   Q  Okay.  Insurance updates, what are those?
23   A  Correct.  No other lab assistant did any insurance
24   updates.  Just me.  And that was because I asked her is
25   there anything else I can do to help you today and she

Page 259

1    would give me extra work.
2        MR. FLYNN:  Read this document carefully,
3    Natalie.
4        THE WITNESS:  Okay.
5    Q  (Continuing by Mr. Miglio):  What is that about?
6    A  That's about all the issues they were having at Shelby.
7    Q  Okay.  You received a copy of that?
8    A  Correct.
9    Q  Did you think it had application to you?
10   A  It all applies to me, except for the fact that I'm not
11   the reason this email came out.  The reason this email
12   came out is because they were having too many problems at
13   Shelby.  My office didn't have defects.
14   Q  What kind of defects did they have at Shelby?
15   A  They were stacking the labels.  They weren't labeling in
16   front of the patient.  They were running in and out of
17   the rooms, switching people.  I mean it -- Shelby's a
18   mess.  And these are the two PSC people, and I run
19   Clinton Township PSC, and this was directed towards the
20   Shelby Township PSC, if you see "Shelby Patient Safety
21   Procedure," because the Shelby Office was having defects.
22   I was copied to because I run a PSC.
23       (Exhibit 79 marked.)
24   Q  (Continuing by Mr. Miglio):  Let me show you what's been
25   marked as Exhibit 78 (sic).

Page 260

1    A  Yes.
2    Q  So this is an email at the bottom here that you sent to
3    Fiona, Luain and Martha at --
4        MR. FLYNN:  I hate to interrupt you, but the
5    exhibit's misnumbered again.  The earlier one, I believe,
6    was 78.
7        MR. MIGLIO:  Let me get that back.
8    Q  (Continuing by Mr. Miglio):  All right.  Let me show you
9    what we marked as Exhibit 79.
10   A  Okay.
11   Q  So the email that's on here, "I'm very upset.  I'm
12   putting a note on the door.  I'm taking a 30-minute lunch
13   today."  That's an email that you sent to Fiona, Luain,
14   and Martha.
15   A  Correct.
16   Q  At 1:12 on September 25th.
17   A  Yes.
18   Q  Okay.  What time did you start work that day?
19   A  7:30 a.m.
20   Q  And what happened after you started work?
21   A  I got a phone call from Fiona Bork.
22   Q  Okay.
23   A  Explaining to me that I think I'm some superior person or
24   something because I went to HR about her, but that I'd be
25   sorry and she hung up on me.  She told me -- Oh, before

65 (Pages 257 to 260)

Natalie Reeser
3/30/2015

Page 261

1    she hung up on me she told me she was changing my site,
2    and I informed her on that phone call that I planned on
3    taking a lunch that day from the new policy the day
4    before, and she never once said anything about the lunch
5    policy not being -- not allowing me to go.
6  Q   Okay. So let's get this it straight. So you're working
7    and she calls you.
8  A   Yes.
9  Q   And she calls you on what phone?
10 A   I don't know if it was the office phone, my work phone,
11    or my cell phone.
12 Q   Okay. So you don't know whether it was the office phone,
13    your work phone, or your cell phone.
14 A   Correct.
15 Q   And did you see what the number was that she was calling
16    from?
17 A   I don't recall.
18 Q   What time did she call?
19 A   Sometime in the morning.
20 Q   Okay. And tell me exactly what she said.
21 A   Just the facts of that I'm going to be sorry. I think
22    she thought that --
23 Q   I don't want to know what she thought. I just want to
24    know what she said.
25        MR. FLYNN: Just go bit by bit through that

Page 262

1    conversation now.
2        THE WITNESS: Basically it was how dare you
3    think that you can go to HR on me. How dare you think
4    that you, you know -- I don't . . . I don't recall word
5    for word what she said, but she was saying things like,
6    "You're going to be sorry," and that she wasn't going to
7    pay me for my lunches prior to that day.
8  Q   (Continuing by Mr. Miglio): Did you make a note of that
9    conversation?
10 A   I emailed her right after that conversation and I asked
11    her, "Is this move permanent or is this move" -- because
12    she told me on the phone conversation she was moving me,
13    so I wanted to know if my move was permanent or
14    temporary.
15 Q   All right. What else did she say during the
16    conversation?
17 A   She was just angry and . . . I don't . . . I don't recall
18    it word for word.
19 Q   Okay. And you say she said something about paying you?
20 A   I meant to also cc the HFML outreach that was in the new
21    email address that we were supposed to sign out our lunch
22    at, but . . . because they had been informed by the State
23    a month earlier.
24 Q   I don't care about that. What I'm asking you about is
25    what else did she say to you during that conversation?

Page 263

1  A   She said, "How dare you go to the State?" She was -- She
2    was upset that I told on her for not giving me a lunch
3    and she thought that was rude and not very friendly and
4    I'm not very team like, and she was calling me names and
5    telling me how sorry I'm going to be, and she hung up on
6    me after I told her that I was going to take a lunch.
7  Q   So let's explore that. She said how angry she was about
8    you going to the State?
9  A   Going to HR.
10 Q   Well, which is it? Is it the State or HR?
11 A   To me they're both the same thing. HR.
12 Q   So did she say "State" or "HR"?
13 A   She said going to HR about her.
14 Q   Okay. And she said she was angry that you went to HR
15    about her.
16 A   Yes.
17 Q   About her.
18 A   Yes.
19 Q   Okay. And what had happened up until that point with the
20    human resources investigation about whether or not you
21    should have gotten paid or not?
22 A   They ignored me for a month straight. I sent them emails
23    asking for direction. I got emails from Martha stating
24    she wasn't going to pay me. I got emails from Fiona
25    saying, "Lunches are mandatory. Why aren't you taking

Page 264

1    lunches?" But then in another state (sic) she's saying,
2    "Take a lunch and it's insubordination," so.
3  Q   So in other words, when you had this conversation with
4    her are you saying you didn't know whether you were going
5    to get paid or not?
6  A   I knew at that point I was not getting paid for lunches,
7    correct.
8  Q   Did you know whether Henry Ford Health System was going
9    to pay you or not?
10 A   At this time, this day, when I wrote this email, no,
11    they -- I did not know.
12 Q   Okay.
13 A   Jill Hood said they were doing an investigation and
14    looking into paying me, but never once did anyone tell me
15    they were directly going to pay me.
16 Q   Okay. So what happened after the phone call?
17 A   Martha came out of her office and I spoke with her.
18 Q   What did you say to her?
19 A   I told her what was going on with Fiona, what Fiona said
20    on the phone. She gave me a hug.
21 Q   What did you say to her exactly?
22 A   I told her that she was yelling at me. I told her that
23    she was upset because I reported the lunch piece, because
24    she thinks that she's all high and mighty and she doesn't
25    have to follow any rules, she makes up her own rules, and

66 (Pages 261 to 264)

Natalie Reeser
3/30/2015

Page 265

1    she basically gave me a hug, she told me she was so sorry
2    that I was going through that, and she also told me to go
3    to HR again.
4  Q   Okay. And then what happened?
5  A   And then I went back to my desk. I sent this email. I
6    proceeded to get my purse. I went back to the break room
7    where my purse and my coat and stuff was. I picked that
8    up. I looked in the room. Waved to Martha. Martha
9    waved to me. I walked out.
10 Q   Where did you go?
11 A   I went and sat in my car for 30 minutes and cried.
12 Q   Okay. And who was taking care of the patients while you
13    were doing that?
14 A   There was the sign on the door.
15 Q   Okay. What sign was that?
16 A   The sign that's allowed to use when you take a lunch.
17 Q   What did the sign say?
18 A   That I'll be returning in 30 minutes.
19 Q   Okay. Is that like a handwritten sign or something?
20 A   No. The exact sign that you have in your exhibit.
21 Q   Okay. So did you get Fiona's permission to leave the
22    site on that day?
23 A   Fiona never told me I could not go to lunch on that day,
24    no.
25 Q   Did you get Fiona's permission to leave the site on that

Page 266

1    day, yes or no?
2    MR. FLYNN: Asked and answered.
3    THE WITNESS: I was on the phone with Fiona. I
4    told her I was going to lunch. Not once did she say I
5    couldn't go to lunch. Not once did she say I could go to
6    lunch.
7  Q   (Continuing by Mr. Miglio): Okay. Did you get Martha
8    Wiseheart's permission to go to lunch and leave the site
9    that day?
10 A   Yes, I did.
11 Q   And what did she say specifically?
12 A   She said, "You need to take some time to yourself and you
13    definitely need to go to HR," and she gave me a big, long
14    hug. I mean we hugged for like three minutes, so.
15 Q   So that's what she said that made you think that you
16    could just put the sign up and go to lunch?
17 A   No. The new lunch policy that was given to me on
18    February 24th, the day before I was told I could go to
19    lunch.
20 Q   What did the policy say?
21 A   The policy said we now sign in and out through HFML and
22    we take a 30-minute lunch. And nowhere does the new
23    policy say that I had to get permission.
24 Q   Okay.
25 A   It says to email in, to email out, and I emailed in and I

Page 267

1    emailed out, just to the wrong email address, which
2    should have been an occurrence, not a suspension.
3  Q   All right. Let's take a break. I'm going to get that
4    email.
5  A   Hm-hmm.
6    (Whereupon a recess was taken at or about the
7    hour of 5:31 p.m., and the deposition was resumed at or
8    about the hour of 5:40 p.m.)
9    THE WITNESS: I have to correct my testimony on
10    record, because I was getting mixed up between two
11    different Fiona conversations from Fiona Bork. On the
12    conversation from February 25th, 2014, she yelled at me
13    for going to the State of Michigan on her.
14    MR. MIGLIO: I've got to take an emergency
15    call.
16    (Whereupon a recess was taken at or about the
17    hour of 5:40 p.m., and the deposition was resumed ab or
18    about the hour of 5:44 p.m.)
19    (Whereupon the following portion of the
20    transcript was read as follows:
21    THE WITNESS: I have to correct my testimony on
22    record, because I was getting mixed up between two
23    different Fiona conversations from Fiona Bork. On the
24    conversation from February 25th, 2014, she yelled at me
25    for going to the State of Michigan on her.")

Page 268

1    THE WITNESS: Basically told me she was going
2    to make sure I lost my job because I turned her into the
3    State for not giving me lunches.
4  Q   (Continuing by Mr. Miglio): How would she --
5  A   And that was why I was so upset.
6  Q   How would she even know that you went to the State when
7    you get didn't go to the State yet?
8  A   I told her I was going to the State.
9  Q   All right. You realize you've been under oath today,
10    don't you?
11 A   Yes.
12 Q   And you realize there's no record of any phone call that
13    she made to you, right?
14 A   I have no clue of that, but I know she called me.
15 Q   All right. Just like you've never been involved in a
16    lawsuit, never were terminated from a previous position,
17    just like those answers you gave today?
18    MR. FLYNN: Objection. We've -- I --
19    MR. MIGLIO: Is that what you're sure about?
20    MR. FLYNN: Objection. She testified about the
21    earlier lawsuit.
22 Q   (Continuing by Mr. Miglio): Where in any of the
23    documentation did you make a note or document that
24    conversation you had with Fiona on February 25th in the
25    morning?

67 (Pages 265 to 268)

Natalie Reeser
3/30/2015

Page 269

1  A  I specifically told Jill Hood when I met with her.
2  Q  Well, you wrote Jill Hood a lot of stuff. Did you put it
3     in any of those emails or any of those letters?
4  A  I don't recall.
5  Q  Something that significant, wouldn't you want to have
6     included that in the information you provided to HR?
7  A  It was one of the reasons why Martha gave me such a long
8     hug.
9  Q  Okay. But wasn't that a significant phone call in your
10    mind?
11           MR. FLYNN: Objection. She just testified it
12    was.
13 Q  (Continuing by Mr. Miglio): Wasn't it?
14 A  Yeah, I remember it.
15 Q  And wouldn't you think that would be important to tell HR
16    as to why you should not be fired and why you should be
17    reinstated?
18           MR. FLYNN: Objection. She just testified she
19    did.
20           THE WITNESS: I did tell HR.
21           MR. FLYNN: Asked and answered. I'm just
22    confused.
23           MR. MIGLIO: Don't object just because you're
24    confused.
25 Q  (Continuing by Mr. Miglio): I want to know whether or not

Page 270

1     you put that in writing. I want to know whether or not
2     you put the substance of the conversation you just said
3     you now recalled, which was different than what you
4     testified earlier about, whether you put that --
5  A  Right, because I was mixed up between the --
6  Q  -- conversation in writing.
7  A  The conversation that she called me at home and the
8     conversation on the last day that I worked there was two
9     different things.
10 Q  So what was the conversation she -- when she called you
11    at home? This is the one that happened sometime the
12    latter part of January, beginning part of February.
13 A  That was about going to HR on her. The day I was
14    terminated was about going -- or the day I was suspended
15    for taking a lunch was the day that she told me she was
16    going to make sure that I lost my job for going to the
17    State.
18 Q  Okay. And you hadn't gone to the State by that time, had
19    you?
20 A  By this day? The State paperwork was already filled out.
21 Q  Listen to my question. Had you gone to the State, had
22    you filed a complaint with the State, as of February
23    25th?
24           MR. FLYNN: Objection. Asked and answered.
25           THE WITNESS: I do believe so, yes.

Page 271

1  Q  (Continuing by Mr. Miglio): Okay. Well, let's take a
2     look at something. I was going to wait for it, but it's
3     just as fine that we brought it up now.
4  A  Okay.
5           MR. FLYNN: By the way, we're approaching the
6     seven-hour mark.
7           MR. MIGLIO: So what?
8           MR. FLYNN: So I mean under the Court Rules
9     this deposition is going to be over soon. I'll let you
10    get through this line of questions.
11           MR. MIGLIO: You terminate it at your own
12    peril, okay? That's your -- You do what you have to do.
13           MR. FLYNN: Under Rule 30 you know, just like I
14    know, depositions can only go seven hours.
15           MR. MIGLIO: I'm going to go to the Judge and
16    we'll see what happens.
17           MR. FLYNN: Now, granted I am still -- I am
18    still willing to stipulate to reconvening the deposition
19    for the sole purpose of going through those recordings.
20           MR. MIGLIO: Which --
21           MR. FLYNN: I don't want you to think I'm
22    backing off of that. I'm not.
23           MR. MIGLIO: So let's see. We're on Exhibit
24    80.
25           (Exhibit 80 marked.)

Page 272

1  Q  (Continuing by Mr. Miglio): Let me show you this. Do you
2     recognize this?
3  A  Yes.
4  Q  What is this?
5  A  This is the paperwork I filled out for the State.
6  Q  Do you see the time stamp on the side of it?
7  A  Yes.
8  Q  Do you see that? What's the date there?
9  A  February 27th, 2014.
10 Q  Okay. That's the date that it was filed with the agency.
11    You understand that?
12 A  No. That's the date they received it at the agency.
13 Q  How else would they be filed with the agency if they
14    didn't receive it?
15 A  It's different when you mail it in. I mean --
16 Q  Do you realize that you lied to the Court in this case
17    about when that was filed?
18 A  No.
19 Q  Do you remember making an allegation in the complaint
20    through your lawyer that it was filed before your
21    termination?
22 A  It was filed before I was terminated.
23 Q  Well, you know what? The State of Michigan says it
24    wasn't. So how do you think there is a discrepancy
25    there?

68 (Pages 269 to 272)

Tri-County Court Reporters
248-608-9250

Natalie Reeser
3/30/2015

Page 297

1    written here because you were under stress?
2         MR. FLYNN: Objection. Misconstrues her
3    earlier testimony.
4    Q  (Continuing by Mr. Miglio): Well, it seems kind of
5    detailed here, Miss Reeser, that "Since no one seemed to
6    care that I was taking a break, certainly no one
7    responded to my email or called me on either my office
8    line or my work phone to say, 'No, Natalie, you cannot
9    take a break.' I thought it was okay to take a rest."
10        MR. FLYNN: Objection.
11        MR. MIGLIO: Okay?
12        MR. FLYNN: As to form.
13   Q  (Continuing by Mr. Miglio): "Especially since Miss
14   Wiseheart was on site and aware of all situations." You
15   see that?
16   A  My mom is not an attorney, so she wouldn't know to use
17   the right genre.
18   Q  How would your mom know what to write down unless you
19   told her? I mean is she clairvoyant? Was she there? I
20   mean what? Did you give her a piece of paper?
21   A  I was probably crying to my mom all night.
22   Q  So you said, "Therefore, I put on my shoes, put on my
23   coat, posted the break sign on our entrance door, and
24   left for lunch -- or left for a much-needed rest."
25   A  That I was allowed per the new policy the day before.

Page 298

1    Q  Okay. Well, where does it say that? I thought the new
2    policy was about emailing in and emailing back -- I mean
3    emailing -- You said --
4    A  The new lunch policy --
5    Q  -- the new policy, according to you, meant that you could
6    take a lunch break just by emailing somebody and you
7    could go and leave the site. Did you say that?
8         MR. FLYNN: Objection. Asked and answered.
9         MR. MIGLIO: Didn't you say that?
10        MR. FLYNN: We're going to be here all night,
11   because you keep asking the same questions.
12        MR. MIGLIO: Didn't you say that, that was what
13   you understood the policy to be?
14        MR. FLYNN: Counsel, look it up in the record.
15        MR. MIGLIO: Isn't that what you said? You
16   just needed to email in order to take a lunch break?
17        MR. FLYNN: Counsel, look it up in the record.
18        MR. MIGLIO: Is that correct? Am I wrong?
19        MR. FLYNN: Objection. Asked and answered.
20        MR. MIGLIO: Go ahead. You can answer. He's
21   not going to instruct you not to answer.
22        MR. FLYNN: I haven't instructed her not to
23   answer.
24        MR. MIGLIO: I said that.
25   Q  (Continuing by Mr. Miglio): So isn't that what you said?

Page 299

1    A  Ask the question again.
2    Q  That the new policy -- You said you understood the new
3    policy that was set out on the 24th meant that you just
4    needed to email somebody and you could leave the site
5    without anybody's authorization, correct?
6    A  The new policy meant you just had to email HFML Outlook
7    your 30 minutes and email when you get back.
8    Q  Okay. By the way, did you ever email back again when you
9    got back in the office? Because I didn't see any such
10   emails.
11   A  No, but according to the new policy that would have just
12   been an occurrence.
13   Q  Well, if you were following the policy, why didn't you
14   email that you were back in at lunch and avoid getting an
15   occurrence?
16   A  I had gone through so much turmoil with Fiona's phone
17   call, with crying to Martha, with her telling me she was
18   going to make me lose my job because I had turned her in
19   to the State, those things had escalated me. My anxiety
20   levels were off the chart. I don't -- I don't know.
21   Q  So at the top of the second page of this Exhibit No. 86,
22   you wrote, or your mom wrote for you, "Additionally,
23   please know I have followed this same procedure in the
24   past when truly needing a break, and at no time in the
25   past has anyone, including Miss Bork or Miss Wiseheart,

Page 300

1    relayed to me that I was breaking any rules by taking a
2    break, that there would be consequences if I took a
3    break, that I would be abandoning my position by taking a
4    break, that I would be suspended from my position for
5    taking a break, and/or any other reason for taking a
6    break. Therefore, it was my logical understanding I
7    could take a break."
8         Now, I thought your understanding was you could
9    take a break on the 25th because of the email you got on
10   the 24th, not because of the policy or the procedure you
11   would have you followed in the past. Am I wrong with
12   that?
13        MR. FLYNN: Objection as to form and asked and
14   answered.
15        MR. MIGLIO: I mean --
16        THE WITNESS: I was given a new policy. I
17   followed the new policy.
18   Q  (Continuing by Mr. Miglio): Well, this seems to say
19   that -- and correct me if I'm wrong -- that you didn't
20   think you should have been fired because you were
21   following an old policy that you had followed, right?
22        MR. FLYNN: Objection. You're also misreading
23   the document.
24        THE WITNESS: The document speaks for itself on
25   everything. I don't . . .

75 (Pages 297 to 300)

Natalie Reeser
3/30/2015

```
                                                          Page 335
 1

 2      STATE OF MICHIGAN      )
                               )        ss:
 3      COUNTY OF MACOMB       )

 4

 5

 6           I hereby certify that the foregoing attached

 7      pages are a full and complete transcript of the

 8      proceedings held on the date and at the place

 9      hereinbefore set forth.  I reported stenographically

10      the proceedings held in the matter hereinbefore set

11      forth, and the testimony so reported was

12      subsequently transcribed under my direction and

13      supervision, and the foregoing is a full, true and

14      accurate transcript of my original stenotype notes.

15

16      _____

17                 Lauri A. Sheldon CSR-4045,RPR

18

19

        Notary Public
20      Macomb County, Michigan
        My Commission Expires:
21      February 8, 2022

22

23

24

25
```

Tri-County Court Reporters
248-608-9250