Exhibit 9

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATALIE REESER,

    Plaintiff,

v                          Case No. 2:14-cv-11916-GCS-MJH
                          Hon. George Caram Steeh

HENRY FORD HOSPITAL,

    Defendant.
_____/

DEPOSITION OF JILL HOOD

Taken by the Plaintiff on the 5th day of May, 2015, at the office of Keith D. Flynn, 600 W. Lafayette Blvd., Detroit, Michigan at 10:00 a.m.

APPEARANCES:

For the Plaintiff:    MR. KEITH D. FLYNN (P74192)
                        Miller Cohen, P.L.C.
                        600 W. Lafayette Blvd., 4th Floor
                        Detroit, Michigan 48226-0840
                        313.964.4454

For the Defendant:    MR. TERRANCE J. MIGLIO (P30541)

                        MS. BARBARA E. BUCHANAN (P55084)

                        Varnum LLP

                        39500 High Pointe Blvd., Suite 350

                        Novi, Michigan 48375

                        248.567.7828

Also Present:        NATALIE REESER, via telephone

Reported by:         TAMARA A. O'CONNOR
                        CSMR 2656, CER 2656

Page 33

1   coverage reasons?
2         MR. MIGLIO: Objection. She said she
3   didn't make the picks, so the question is totally--
4         THE WITNESS: Yeah. That was not within
5   the realm of my scope, so I don't know why the
6   decisions for the selections were made.
7   Q   (By Mr. Flynn) Okay, and you didn't follow up or
8       ask about the reason for the selection?
9   A   No.
10        MR. MIGLIO: Asked and answered.
11        REPORTER: I'm sorry. Your answer?
12        THE WITNESS: No.
13  Q   (By Mr. Flynn) What is the procedure for requesting
14      a transfer?
15        MR. MIGLIO: Objection to the form. Are
16  you asking her in the labs, in the system?
17        MR. FLYNN: Lab.
18        MR. MIGLIO: Hospital? What?
19        THE WITNESS: The employee would speak
20  with the manager, Fiona Bork, and have a
21  conversation with her about that request.
22  Q   (By Mr. Flynn) Any other procedure involved to it?
23  A   Not that I am aware of.
24  Q   And what is the criteria for granting such a
25      request?

Page 34

1   A   I do not know that. It's not something that I was
2       privy to.
3   Q   Is there a written policy on point regarding
4       transfers?
5   A   In the lab, I have not seen one.
6   Q   Are there written policies outside the lab?
7   A   If a person wanted to transfer to a different job,
8       then yes, it would be, you know, the process of
9       applying for a new job, but as far as transferring,
10      it would all be within that same recruitment.
11        You know, if the person wanted to transfer
12  to Wyandotte, they would go through Recruitment.
13  Q   Got you. So you have no role in deciding transfers?
14  A   I do not.
15  Q   Who is responsible for determining the hours
16      employees work in the labs?
17  A   Fiona.
18  Q   And is her decision--is her authority ever
19      questioned in that respect?
20  A   That would be a conversation with her and her
21      supervisor, John Waugh.
22  Q   But H.R. doesn't question it. Correct?
23  A   We do not question the running of their business.
24  Q   So it's Ms. Bork who determines the schedule?
25  A   Correct.

Page 35

1   Q   And do you know how it's determined?
2   A   I do not.
3   Q   Do you know how often the schedule is changed for
4       the labs?
5   A   I do not.
6   Q   Did you ever ask how often it's changed?
7   A   I did not.
8   Q   Did you ever ask how the schedule is determined?
9   A   I did not.
10  Q   And did you ever ask what criteria might be involved
11      in changing the schedule?
12  A   I did not.
13  Q   Who has the authority to determine who receives a
14      lunch period in the labs?
15  A   It is based on the number of hours that they work,
16      whether or not it is--we have a break and mealtime
17      policy. So it's outlined in that break and mealtime
18      policy by the number of hours that they work.
19  Q   Okay. So for instance, if someone has eight hours,
20      would they be entitled to a lunch period?
21  A   Yes.
22  Q   What would that lunch period entail?
23  A   It would entail two 15-minute breaks that are paid
24      by the company, and one half-an-hour break.
25  Q   Is the half-an-hour break paid or unpaid?

Page 36

1   A   It is unpaid.
2   Q   If a break is unpaid, does that mean that the
3       individual has to remain at the facility?
4   A   It depends on the facility.
5   Q   So if a break is unpaid, you may still require an
6       employee to remain at the facility?
7   A   If the break is unpaid--let me think about that a
8       second.
9   Q   Take your time.
10  A   So if it is unpaid and they are mandated to remain
11      at the facility, then we would need to pay them for
12      their time.
13  Q   What if an employee is told that they are not to be
14      paid for lunch? Would they still be required to
15      remain at the facility?
16  A   It would depend on the circumstances as to why they
17      were told that they were not getting paid for lunch.
18  Q   What circumstances are you thinking of?
19  A   I guess that would be my question to you. I guess I
20      didn't understand why if they are being told to stay
21      there, why they wouldn't be paid.
22  Q   Well, let's say that they are just not paid for
23      those lunch periods, but they are still required to
24      remain at the facility.
25  A   That should not be occurring.

12 (Pages 33 to 36)

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

Page 45

1  A  Not for walking off the job, no.
2  Q  What about no call/no show?
3     MR. MIGLIO: What about--what is the
4  question? What about no call/no show? Object to
5  the form of that.
6  Q  (By Mr. Flynn) Can you think of a single
7  circumstance that--where someone has been
8  immediately terminated for being a no call/no show,
9  where there were no other circumstances that
10 required a lesser penalty?
11    MR. MIGLIO: Objection as to the form of
12 the question. It doesn't even make sense.
13    THE WITNESS: I'm confused by that
14 question. I'm sorry.
15 Q  (By Mr. Flynn) Okay. Let me repeat. So let's say
16 you have a situation where someone is a no call/no
17 show. Correct?
18 A  Correct.
19 Q  So if someone is a no call/no show, you have
20 testified it's a Group 2 violation. Correct?
21 A  Correct.
22 Q  And so would that warrant immediate termination?
23 A  No.
24 Q  Why would that not warrant immediate termination?
25 A  Because the policy says that a no call/no show is an

Page 46

1  automatic written warning with suspension.
2  Q  And what policy are you referring to?
3  A  5.17, the Corrective Action Policy, as well as the
4  Attendance Policy, and I'm sorry, I believe actually
5  it is just the Attendance Policy. I'm not positive
6  about 5.17, now that I think of it, but I know it is
7  in the Attendance Policy.
8  Q  Where would I find the policy in walking off the
9  job?
10 A  The actual verbiage of walking off the job is not in
11 the system-wide Corrective Action Policy, 5.17.
12 There are other aspects, such as leaving your
13 assigned work area, that are in there.
14    For the lab, the lab has their own policy
15 on that.
16 Q  So now what I'm asking you is, for what--what is in
17 there instead of walking off the job?
18 A  Things such as being in your assigned work area.
19 Q  Anything else?
20 A  I would have to review the policy to see specific
21 verbiage.
22 Q  So that's all you can think of right now?
23 A  For the 5.17, correct.
24 Q  Okay, and what is the penalty for not being in your
25 assigned work area?

Page 47

1  A  It's situation-dependent, but it is a Group 2
2  violation, so it could be up to and including
3  termination.
4  Q  Well, the same thing you testified--same thing is in
5  effect for a no call/no show. Right?
6  A  No. That is incorrect.
7  Q  So okay. Your earlier testimony was given in error,
8  that no call/no show is a Group 2 violation?
9     MR. MIGLIO: Objection as to the form of
10 the question.
11    THE WITNESS: No. It was correct. A
12 Group 2 violation does not mean automatic
13 termination. Group 2 violation means that you can
14 skip steps.
15 Q  (By Mr. Flynn) Okay. So but it's a situation--it
16 is dependent upon the situation, just like as with
17 walking off the job or whatever you want to use in
18 its place. Correct?
19 A  Correct.
20 Q  So now I'm trying to figure out, well, what
21 situations would call for less than termination for
22 walking off the job, or whatever equivalent there
23 is?
24 A  Again, as I mentioned--
25    MR. MIGLIO: Objection as to the form of

Page 48

1  the question, "or whatever equivalent there is."
2     THE WITNESS: I cannot think of any
3  mitigating circumstances where we have waived
4  termination for that.
5  Q  (By Mr. Flynn) Okay, but some may exist. You just
6  can't recall right now?
7  A  I have never seen that situation occur during my
8  time there with my departments.
9  Q  Give me an example of someone walking off the job.
10 Can you think of a single employee who was
11 terminated for walking off the job?
12    MR. MIGLIO: Which question are you
13 asking?
14    MR. FLYNN: She looked confused, so I
15 clarified.
16    MR. MIGLIO: So the question is, can you
17 think of a single employee who walking off the
18 job--is that--
19 Q  (By Mr. Flynn) Again my question is, can you think
20 of a single example of an employee who was
21 terminated for walking off the job?
22 A  I know that there have been numerous ones that we
23 have--that have occurred that we have terminated
24 for.
25 Q  Who?

15 (Pages 45 to 48)

TAMARA A. O'CONNOR
248.882.1331

f4eadfd1-bc8b-47ff-a2ad-8aecc3d02951

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

Page 49

1  A  I cannot think of specific names right off the top
2     of my head, no.
3  Q  So you can't give me a specific example?
4  A  I cannot.
5  Q  And can you recall any of the specific circumstances
6     related to any of those individuals?
7  A  Not at this time, no.
8  Q  What is the regular progressive discipline policy
9     for Group 2 violations?
10 A  I'm sorry. I don't understand what you mean.
11 Q  Okay. Well, do you know what progressive discipline
12    is?
13 A  I do.
14 Q  What is the progressive discipline policy for Group
15    2 violations? What order of the disciplines,
16    starting from less severe to most severe?
17 A  The discipline track is written warning--I'm sorry,
18    documented counseling, written warning, written
19    warning with suspension and then termination.
20        So the policy for--the procedure for a
21    Group 2 is that depending on the situation you can
22    skip steps. You don't have to go one to the next.
23 Q  And you have testified you can't think of the
24    circumstances as of today. Correct?
25 A  The circumstances for what? I'm sorry.

Page 50

1  Q  Skipping from no discipline on the employee's record
2     to immediate termination?
3  A  There have been many circumstances where we--there
4     have been no circumstances, as I testified, that we
5     would waive termination for walking off the job.
6  Q  What do you mean "waive termination"?
7  A  Where we have done anything other than termination
8     for walking off the job.
9  Q  And these individuals, you can't recall any of their
10    names?
11 A  I cannot, not at this time.
12 Q  And you can't recall any of the circumstances
13    involving their termination?
14 A  I would have to go back and review my files. This
15    was--it has been awhile ago.
16 Q  Do you recall their past work record?
17 A  I don't recall who they were, let alone their past
18    work record. I'm sorry.
19 Q  Do you recall how many disciplines that they had
20    before termination?
21 A  Again, I don't recall the situations, so I don't
22    remember the specifics of the situations.
23 Q  Do you recall whether or not they received any kind
24    of written or verbal counseling?
25 A  No.

Page 51

1  Q  And do you recall whether or not those situations
2     were specifically just for walking off the job?
3  A  I do not recall the situations at all, so I do not
4     recall the specifics.
5  Q  Let me ask you this. Henry Ford has a policy
6     against falsifying time records. Correct?
7  A  That is correct.
8  Q  Is that part of your integrity policy?
9  A  I'm not positive which policy it is part of.
10 Q  Is there--obviously there is an issue with an
11    employee committing fraud in regards to their time
12    records. Correct?
13 A  Correct.
14 Q  What are--
15        MR. FLYNN: Do you have an objection?
16        MR. MIGLIO: Before you go ahead and
17    answer, let me just take a pause so I can voice an
18    objection, so I'm not speaking over you.
19        MR. FLYNN: Okay. Did you have an
20    objection, or did you just want to stop my line of
21    questioning?
22        MR. MIGLIO: No. It was objectionable.
23        MR. FLYNN: Okay. Well, you haven't put
24    an objection on the record, so the next question--
25        MR. MIGLIO: Objection as to form and

Page 52

1     foundation.
2  Q  (By Mr. Flynn) Okay. Next question.
3        MR. MIGLIO: Most of them are too.
4        MR. FLYNN: That is--thank you for that.
5        MR. MIGLIO: I'm just letting you know, in
6     case you want to conform yourself.
7        MR. FLYNN: Well, I don't think I need to.
8     The fact that you keep objecting on these improper
9     bases indicates that I don't need to.
10 Q  (By Mr. Flynn) So what is the most--is
11    falsification of a time record a Group 2 violation?
12 A  Correct, yes.
13 Q  It's a pretty severe violation. Correct?
14 A  Yes.
15 Q  Is there any kind of gradation between Group 2
16    violations? Like is one more severe than another?
17 A  It would be depending on the situation.
18 Q  Falsification would probably be one of the more
19    serious ones. Right?
20 A  Yes.
21 Q  Would it be as serious as walking off the job?
22 A  Depends on the situation.
23 Q  What situation would exist where walking off the job
24    would be more severe?
25 A  It depends on the staffing. If it compromised

16 (Pages 49 to 52)

TAMARA A. O'CONNOR
248.882.1331

f4eadfd1-bc8b-47ff-a2ad-8aecc3d02951

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

Page 57

1   A  It's different every time.
2   Q  It's different every time. Who are the managers who
3       are on the committee?
4   A  Different every time.
5   Q  And who would you select from in terms of managers?
6   A  I'm sorry. I don't understand that.
7   Q  Well, would it be across Henry Ford Health System?
8   A  It would be only at the Detroit location unless it
9       was, you know, a special circumstance.
10   Q  Could it be H.R. managers?
11   A  No. H.R. facilitates the process. We cannot sit on
12       the board.
13   Q  How far up does eligibility go? Could the CEO be on
14       the committee?
15   A  No, no. It stops at the senior leader level.
16   Q  And who are the senior leaders?
17   A  There is numerous senior leaders. For instance,
18       John Waugh could not be on that committee, so
19       anybody that is a Vice President or CEO, CFO, CNO,
20       they are not going to be sitting on that panel.
21   Q  Fiona or Martha could be on the committee?
22   A  Correct.
23   Q  What is the policy for absenteeism regarding
24       progressive discipline? Could you just go through
25       the progressive discipline track?

Page 58

1   A  Yes. So it's the documented counseling, written
2       warning, written warning with suspension, and then
3       termination. Everything is all on one track.
4   Q  Okay, and I've heard a term used in documents, an
5       "occurrence." What is an "occurrence"?
6   A  If you were late for work, that would be one
7       occurrence, if you didn't show up. "Occurrence"
8       means time or situation, event.
9   Q  So are there absentee violations that may be worth
10      less than an occurrence?
11   A  Yes. For tardies, if a person is less than a half
12      an hour late, it's a half of an occurrence.
13   Q  What if they take a half-an-hour break? What would
14      that be?
15   A  Their break period?
16   Q  Would that be an occurrence?
17   A  If they took their break?
18   Q  If they took a half an hour for a break?
19   A  They are allotted a half an hour for a break.
20   Q  What if they took 45 minutes for a lunch?
21   A  If they were--had authorization beforehand, then
22      that's fine, but otherwise it could be looked at as
23      half of an occurrence for returning late.
24   Q  And you mentioned no call/no show. How many
25      occurrences is a no call/no show?

Page 59

1   A  One.
2   Q  So the employer could be without any notice that an
3      employee is not going to report to their shift, and
4      yet that employee would still only receive one
5      occurrence?
6   A  It's one occurrence and then it's one incident, but
7      it in and of itself issue is warranting a written
8      warning with suspension.
9   Q  How many occurrences before you're terminated?
10   A  It depends where you are in the corrective action
11      path.
12   Q  Say you're at the beginning?
13   A  You're at the beginning?
14   Q  You haven't even received a verbal or written
15      warning yet.
16   A  Okay. So three occurrences in 30 days, you are
17      going to get your first corrective action. If then
18      you have three in 30 or four in 90 or seven at 160,
19      you are going to get your next corrective action.
20   Q  So it just keeps bumping up, based off of where you
21      are on the--
22   A  Correct.
23   Q  Scale. Got you. Are lunches mandatory at Henry
24      Ford in the lab outreach?
25   A  Mandatory? No.

Page 60

1   Q  Okay. So you are not required to take a lunch?
2   A  No.
3   Q  So if someone said that a phlebotomist was required
4      to take a lunch, an unpaid lunch, that would be an
5      error?
6   A  It would be semantics to be honest, because there
7      are times--it's highly encouraged. It's what our
8      practice is that they take a lunch, but we
9      understand that there are times for patient care
10     reasons that that does not happen.
11         So if it is going to compromise patient
12     care, they are not mandated to take that lunch.
13   Q  What if they just went and took a lunch after the
14     patient volume went down?
15         MR. MIGLIO: Objection to the form of the
16     question. So what? What is your--
17   Q  (By Mr. Flynn) You can answer the question.
18   A  I don't understand the question. I'm sorry.
19   Q  Okay. Well, let's dissect a little bit about what
20     you just said. So you mentioned that if something
21     compromises--if their lunch would compromise patient
22     care, then it may be elective. Correct?
23   A  Correct.
24   Q  When would it jeopardize patient care?
25         MR. MIGLIO: Objection as to form and

18 (Pages 57 to 60)

TAMARA A. O'CONNOR
248.882.1331

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

Page 61

```
 1    foundation.
 2              THE WITNESS:  For a variety of different
 3    patient needs.
 4  Q  (By Mr. Flynn)  Like what?
 5  A  For instance, if they are the only person there and
 6    a patient needs to be assisted.
 7  Q  So if a patient is there, you are going to have to
 8    hold off on your lunch?
 9  A  Correct.
10  Q  What if there is nobody there?
11  A  If there is nobody there, then it depends when your
12    break time is, but there should--if there is nobody
13    there, there should be no reason why you wouldn't be
14    able to take that break.
15  Q  Got you.  Now you mentioned Henry Ford has a policy
16    promoting the use of unpaid lunches.  Is that
17    correct?
18  A  I do not recall saying that.
19              MR. MIGLIO:  Objection as to the form.
20  Q  (By Mr. Flynn)  Okay.  Maybe I missed--
21              REPORTER:  Mr. Miglio, do you have an
22    objection?
23              MR. MIGLIO:  Objection as to form and
24    foundation.
25  Q  (By Mr. Flynn)  Maybe I'm mis-stating what you said,
```

Page 62

```
 1    so let me parse that out.  You mentioned that Henry
 2    Ford has a policy where you encourage employees to
 3    take lunch.  Correct?
 4  A  There is not a policy that encourages it.  It is our
 5    practice.
 6  Q  Oh, I'm sorry.  Practice.
 7  A  Yes.
 8  Q  You have a practice that you encourage employees to
 9    take a lunch.
10  A  Correct.
11  Q  What is the rationale for that practice?
12  A  Wellness.
13  Q  And what do you mean by "wellness"?
14  A  Given time to step away for a few minutes to be able
15    to--whether it's to get some sustenance, to get
16    something to drink, just to be able to take some
17    time to decompress.
18  Q  Any other reasons for that practice?
19  A  For the patients.  We--to ensure that the employees
20    aren't running themselves down and that they have
21    had some time away and can come back refreshed.
22  Q  Any other reasons for the practice?
23  A  Not that I can think of.
24  Q  Why is the policy that employees will receive an
25    unpaid lunch, as opposed to a paid lunch?
```

Page 63

```
 1  A  An unpaid lunch so that they can leave.
 2  Q  And what is the significance of that?
 3              MR. MIGLIO:  Objection as to the form of
 4    the question.  Significance as to what?
 5              MR. FLYNN:  Them leaving.
 6              MR. MIGLIO:  Asked and answered.  Go
 7    ahead.  You can answer it again.
 8              THE WITNESS:  The significance of them
 9    leaving?
10  Q  (By Mr. Flynn)  Yeah.  Why is it significant whether
11    or not they leave for Henry Ford's policy?
12  A  It's not significant, but if they are leaving, then
13    they know that they are not going to be, you know,
14    called over.
15              It's their time to do what they want, so
16    if they want to leave, they can leave.  So that's
17    why it is unpaid.
18  Q  Okay.  Well, you could pay them to leave to go to
19    lunch, but you choose not to.  Why is that?
20              MR. MIGLIO:  Objection as to the form of
21    the question, mischaracterizes her testimony.  I
22    don't understand how it--she is paying--
23              MR. FLYNN:  Counsel, you put your
24    objection on the record.  Let her answer.
25              MR. MIGLIO:  No.  It--
```

Page 64

```
 1  Q  (By Mr. Flynn)  My question was, you could pay them
 2    to go to lunch.  Correct?
 3              MR. MIGLIO:  Objection as to the form of
 4    the question.  Who is "you"?
 5  Q  (By Mr. Flynn)  You could--Henry Ford could pay them
 6    to leave and go take their lunch.  Correct?  That's
 7    a possibility?
 8  A  Sure, yes.
 9  Q  Well, why don't--why is it that it is going to be
10    unpaid, as opposed to paid?
11  A  They are already given a half an hour paid break
12    time, so if they are unable to take their lunch,
13    then that half an hour is paid, but if they are able
14    to take their lunch, then it is a half an hour
15    unpaid.
16  Q  Okay, but again, you could pay them for their
17    breaks, or you could pay them for lunch, or you
18    could do both.  Right?
19  A  Correct.
20  Q  Why do you choose to pay them for break time but not
21    for the 30-minute lunch?
22  A  That wasn't my decision.
23  Q  So you are not aware of why that decision was made?
24  A  Correct.
25  Q  Has there ever been any issues regarding overtime in
```

19 (Pages 61 to 64)

TAMARA A. O'CONNOR
248.882.1331

f4eadfd1-bc8b-47ff-a2ad-8aecc3d02951

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

Page 137

1    John?
2  A  Yes.
3  Q  What other conversations?
4  A  I had regular updates with John, as he is the main
5     V.P. that I supported, Vice President that I
6     supported.
7  Q  About Ms. Reeser?
8  A  About Ms. Reeser, about the investigation, about
9     anything that goes on in his lab.
10 Q  How often would you have discussions with John about
11    Ms. Reeser about this situation?
12 A  I kept him updated as things--as new information
13    came forth. So whether it was about the amount that
14    we were going to need to pay her from the breaks,
15    about the process of moving forward with lunch
16    breaks being covered moving on, whether it was about
17    what I found out about the perjury claim.
18       Any update that came along, I called John
19    and let him know.
20 Q  Do you remember any specific conversations to that
21    effect?
22 A  Yes.
23 Q  How many can you recall?
24 A  At least four or five.
25 Q  Let's go through each one of them.

Page 138

1  A  I don't remember specifics. Like I said, I had
2     regular updates with John, so you know, it's a
3     three-minute conversation.
4        I would say, "Hey, this is what I found
5     out. I'll keep you posted," so I don't have records
6     of dates and times with him.
7        It's my normal business protocol with
8     John, whether it was about Natalie or any of the
9     other employees or situations in the lab.
10 Q  Well, you said that you could recall four to five
11    conversations. Right? So we got one of them. When
12    is the next one?
13 A  Again, like I said, I do not know the dates or the
14    times.
15 Q  What was discussed during the next one?
16 A  An update on whatever the situation was.
17 Q  And what do you recall saying to John?
18 A  I remember giving him updates on the fact that we
19    were working with Payroll to find out the
20    compensation, giving updates to let him know that I
21    was working with Fiona to find out the scheduling,
22    to see not only when Ms. Reeser was working but when
23    other employees were covering her as well, because
24    they would need to get the back pay as well.
25       I would give him updates about the fact

Page 139

1     that there was no validity that I found--in fact, I
2     found it to be disingenuous--the claim on the issue
3     of perjury.
4        So again, as status updates like that came
5     along, I would call and tell him.
6  Q  But that all happened in one meeting?
7  A  No.
8  Q  So I'm trying to just ask about what happened at the
9     second meeting.
10 A  And as I mentioned, I do not recall specific
11    chronology of things. As things came up, I would
12    call John and let him know.
13 Q  Do you recall any conversation during any of these
14    meetings about Fiona Bork?
15 A  Specifically?
16 Q  Did he say anything about Fiona Bork or express an
17    opinion about her?
18 A  No.
19 Q  Did you get any opinion or sense of what he was
20    thinking in regards to Ms. Reeser?
21 A  During these conversations with the follow-up before
22    the job abandonment, you mean?
23 Q  Before her suspension?
24 A  Before her suspension? No. There was no--when I
25    was speaking with him about these updates, it was

Page 140

1     more the concern of, "What are we going to do to
2     correct this?"
3  Q  Okay.
4  A  And in regards to Fiona, the only sense that I
5     received from him was that he was very happy with
6     how quickly she was able to pull the two months--two
7     years worth of documentation together and how
8     quickly she was trying to correct this.
9  Q  Do you know what the hang-up was though when it came
10    to getting--to scheduling the time to notify the
11    physicians' patients that there was going to be a
12    change in policy?
13 A  It wasn't trying to get a schedule with them. It
14    was them having to reach out to their patients.
15 Q  So why couldn't that have happened like immediately
16    after this issue had been raised?
17 A  I was not a part of those conversations. The
18    conversations that they have with the physicians and
19    their physicians' patients are not something that I
20    participate in.
21 Q  Okay, and you never asked?
22 A  I asked for status updates, as I mentioned.
23 Q  And she didn't indicate what the delay was about
24    though. Right?
25 A  She did, that they were trying to work with the

38 (Pages 137 to 140)

TAMARA A. O'CONNOR
248.882.1331

f4eadfd1-bc8b-47ff-a2ad-8aecc3d02951

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

Page 181

1  question that was asked.
2       Then if the witness says, "I'm still
3  responding to that question," permit the continued
4  response.
5       If the witness accepts the argument that
6  this is beyond the scope of the question, then the
7  witness should stop, and if Mr. Miglio believes that
8  there should be some supplementation in order to
9  complete the record on that response, he should
10 follow up on cross-examination with it.
11      Then I think that is the best way to get
12 through this issue. There is always a lot of gray
13 area in examinations, and things are a little
14 fuzzier in depositions than they are at trials, but
15 that is what I would suggest that the two of you do
16 to get past this issue.
17      Just clarify with the witness what the
18 question is. If the witness appears to be going
19 beyond the scope of that and if the witness says,
20 "This is part of my response," I think the witness
21 should be permitted to complete the response.
22      If the witness acknowledges that is beyond
23 the scope of, say, the response as the question was
24 intended, that would be the end of it, and if Mr.
25 Miglio thinks that there is more that should be

Page 182

1  brought out, in fairness that can be accomplished on
2  cross-examination.
3       MR. FLYNN: Thank you, Your Honor.
4       MR. MIGLIO: So we are going to have some
5  clarification if there isn't what you think the
6  answer is what it should be. Right? That's how
7  we'll proceed?
8       If you think she is not answering the
9  question, you will ask her whether she is answering
10 the question to make sure she is--
11      MR. FLYNN: I mean, we're going to proceed
12 the way that Court just instructed us to proceed.
13      MR. MIGLIO: Yeah. Well, I thought--I'm
14 hoping you heard what I heard. That's all.
15      MR. FLYNN: I don't have any questions for
16 the Court. I think that that is how we should
17 proceed.
18      MR. MIGLIO: All right. Thank you, Judge.
19      JUDGE HLUCHANIUK: All right, gentlemen.
20      MR. FLYNN: Thank you, Judge.
21      JUDGE HLUCHANIUK: Have a good day.
22      MR. FLYNN: You too.
23      (At 2:06 p..m., telephone call concluded)
24      (At 2:06 p.m., Plaintiff's
25      Deposition Exhibit 6 marked)

Page 183

1       MR. FLYNN: Do you have a copy of Exhibit
2  6 there, Counsel?
3       MR. MIGLIO: I don't know. Did you give
4  me one?
5       MR. FLYNN: I thought I did.
6  Q  (By Mr. Flynn) All right. You have the document
7     marked Exhibit 6 in front of you, ma'am?
8  A  I do.
9  Q  Have you had time to review it?
10 A  I have.
11 Q  Do you recall this E-mail?
12 A  Yes.
13 Q  Did you have any conversations about this E-mail?
14 A  I spoke with Fiona.
15 Q  And when did you speak with Fiona?
16 A  I don't have the date.
17 Q  Could it have been the same day?
18 A  It could have been.
19 Q  And do you recall what was said?
20 A  I reiterated that she needed to be paid for her
21    lunch.
22      (At 2:07 p.m., Plaintiff's
23      Deposition Exhibit 7 marked)
24 Q  (By Mr. Flynn) Have you reviewed it?
25 A  I have.

Page 184

1  Q  What does this appear to be?
2  A  This appears to be an E-mail from me to the Manager
3     of Payroll, informing her that a back payment is
4     going to be necessary and we need to start working
5     on the calculations.
6  Q  Is that Becky?
7  A  Becky Woodring is the Manager of Payroll.
8       REPORTER: Becky--
9       THE WITNESS: Woodring, W-O-O-D-R-I-N-G.
10 Q  (By Mr. Flynn) You have a question here that says
11    in the first paragraph:
12      "Is she the only employee working at
13      one of our outpatient lab client sites and
14      has not had the ability to close the office
15      or have relief for lunch."
16    That is a question. Right?
17 A  That is correct.
18 Q  Was this question ever answered?
19 A  Yes.
20 Q  Who answered it?
21 A  Fiona.
22 Q  So not Becky?
23 A  No, not Becky.
24 Q  And what did Fiona say?
25 A  Fiona gave me the names and the schedules of the

49 (Pages 181 to 184)

TAMARA A. O'CONNOR
248.882.1331

f4eadfd1-bc8b-47ff-a2ad-8aecc3d02951

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

Page 185

1  other individuals who had also worked there, and we
2  reimbursed them as well.
3  Q  Do you recall who they were?
4  A  No. You had asked that before. I said no.
5  Q  Now I'm looking down a little bit further, and it
6     looks like this was also addressed to Fiona. It
7     says:
8         "Fiona, I have indicated on the
9         spreadsheet the actual days that Natalie
10        was off and thus other coverage may have
11        been placed at this site."
12     Do you see that?
13 A  Yes.
14 Q  What is the spreadsheet you are referring to?
15 A  The spreadsheets of the different days of coverage.
16 Q  What do you--is this a document you prepared?
17 A  Yes.
18 Q  And did you prepare it for the purposes of this
19     investigation?
20 A  For the back payments.
21 Q  Okay. Any reason why other coverage was not placed
22     at the site?
23 A  Other coverage was placed at the site. That's why
24     we had to issue back pay for the other individuals
25     as well.

Page 186

1  Q  Okay. I'm just wondering--
2  A  I just needed the information as to who was covering
3     and what days they covered, so that we know how to
4     pay them.
5  Q  So I'm looking at this incorrectly. It says:
6         "Thus other coverage may have been
7         placed at the site."
8     Was there--what was your rationale for thinking that
9     there may not have been coverage?
10 A  There was no rationale. There was no thought
11    process that there wasn't.
12 Q  And you had indicated that the other employees that
13    were discovered, they received compensation because
14    of Reeser's report?
15 A  No, because we found out that they weren't getting
16    paid.
17 Q  But the only reason that that came to light was
18    because Reeser complained about it?
19 A  That is correct.
20 Q  And it says here--there is in the fourth--the last
21    sentence in the fourth paragraph, it says:
22        "Note - we would like to be able to
23        discuss the final amount as well as future
24        plans for ensuring a lunch period with the
25        employee prior to her receiving the retro

Page 187

1     pay."
2     Do you see that?
3  A  Yes.
4  Q  Why did you want to do both of those before she
5     received the retro pay?
6  A  So that she knew what she was getting.
7  Q  Okay. So--
8  A  I wanted to be able to say, "Yes, it's complete, and
9     here is what we are putting into your account."
10 Q  Yeah, but having the retro pay, how did that prevent
11    you from--I guess my question is, why were the two
12    tied together in this sentence?
13 A  I guess my question is, why would they not be?
14 Q  Okay. Wasn't she terminated for taking her lunch?
15 A  No, not at all.
16 Q  She didn't request a lunch at the time?
17 A  She didn't get approval to lock the doors and
18    abandon the facility. That's why she was
19    terminated. It had nothing to do with the lunch.
20 Q  Did she request the lunch though?
21 A  She sent an E-mail.
22 Q  So and she said, "I'm going on lunch." Right?
23 A  She did not ask for approval. She did not wait for
24    approval. She sent an E-mail and left two minutes
25    and ten seconds later.

Page 188

1  Q  Okay. Well--
2  A  She did not try to call. She did not try to contact
3     anybody through the appropriate channels. That's
4     why she was let go.
5  Q  So she didn't contact Fiona?
6  A  E-mail is not the way to get approval for something
7     that you need urgently.
8  Q  Okay.
9  A  A two-minute and ten-second response time is not
10    realistic in anybody's view of--
11 Q  Let's go through the events that you discovered from
12    February 25th. On February 25th, what is the first
13    you heard about this situation developing with
14    Natalie?
15 A  I received an E-mail from Fiona. Fiona had
16    forwarded me Natalie's E-mail, saying that she
17    needed a break and that she was leaving, and that
18    she was--
19        I don't recall the E-mail, if it said that
20    she was locking the facility or not. Fiona had
21    forwarded that E-mail to me, asking if that was
22    something that she could do.
23 Q  And did you respond to that E-mail?
24 A  I called her.
25 Q  And what was discussed via the telephone call?

50 (Pages 185 to 188)

TAMARA A. O'CONNOR
248.882.1331

f4eadfd1-bc8b-47ff-a2ad-8aecc3d02951

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

Page 189

1  A   I asked her to fill me in on what exactly happened,
2      what was the timeframe, if there was anything that
3      Martha--if Martha was at the site, if there is
4      anything that Martha knew.
5          I asked if she truly did leave like she
6      said that she was going to. Fiona asked me if that
7      was something that was acceptable, can she just do
8      that.
9          When I found out that there was no waiting
10     for approval, she did not follow the proper protocol
11     to be able to get approval, then we had discussed
12     suspending her pending an investigation.
13 Q   Let's take each one of those. You had a couple--
14     several questions for Fiona. Your first question
15     that you asked her was what?
16 A   My first question was did she really indeed leave
17     the facility and leave it unattended.
18 Q   And what did Fiona say?
19 A   She said yes, she did.
20 Q   When did you make this phone call to Fiona?
21 A   After I got Fiona's E-mail.
22 Q   Was it immediately after she had sent you the
23     E-mail?
24 A   It was maybe within three, four minutes.
25 Q   So you talked to Fiona, and you asked that question.

Page 190

1      She said, "Yeah, she left."
2  A   Correct.
3  Q   The second question was, was Martha there, was she
4      aware of anything. Right?
5  A   Correct.
6  Q   What did she say?
7  A   She said that Martha was there, that she got the
8      same E-mail, that she was in the back office on a
9      call, on an EPIC call, and that there--that was all
10     the information that she had had, that there was--
11         Natalie did not go in and say, "I need to
12     leave. Is there any other way to get a hold of
13     Fiona" or anything like that. She just sent the
14     E-mail, went and got her belongings and left.
15 Q   And in your subsequent investigation of this, did
16     you ever talk to Ms. Reeser about what Martha had
17     told her, about any conversation she had with Martha
18     that day?
19 A   I'm not sure what conversations you are referring
20     to.
21 Q   Well, okay. In your discussions following this, did
22     you ever discuss with Ms. Reeser any conversation
23     she had with Martha that day?
24 A   I don't mean that I was confused about my
25     conversations with Natalie. What I meant was

Page 191

1      confused about Natalie's conversations with Martha.
2      What conversations are you referring to?
3  Q   I'm not asking you that. I'm asking you whether or
4      not you had any conversation with Ms. Reeser about
5      any conversations that took place between Natalie
6      and Martha.
7  A   No.
8  Q   Okay. Then did you--
9  A   I asked her if she spoke with her before she left.
10 Q   When did you ask her that?
11 A   During--after Natalie had called me, after she had
12     been suspended, right immediately after she left the
13     facility. She called me very upset, and I asked her
14     before she left if she had had any conversations
15     with Martha.
16         She told me no. That was the only
17     conversation I was concerned about at that point.
18 Q   Did you--so you are saying that any assertion made
19     by Plaintiff that she had a conversation with Martha
20     is false?
21 A   I'm not sure. I'm saying that if she is saying that
22     there was a conversation between when the E-mail was
23     sent and the two minutes and ten seconds between
24     when she left, both Martha and Natalie had told me
25     there was no conversation that had occurred during

Page 192

1      that two-minute time span.
2  Q   What about--
3  A   She may have had previous conversations earlier that
4      morning. That is not what I'm referring to.
5  Q   Okay. Did you ever request any conversations that
6      she had earlier in the day with Ms. Reeser?
7  A   No.
8  Q   Did she ever indicate that she had--did Ms. Reeser
9      ever indicate that she had had conversations with
10     Martha earlier that day?
11 A   I don't recall.
12 Q   She could have, but you don't recall?
13 A   Correct.
14 Q   Then you went on to say that during this
15     conversation with Fiona Bork that you had asked
16     several other questions. What other questions did
17     you ask Ms. Bork?
18         So we got the question did she wait. We
19     got the question was Martha aware of anything. What
20     else did you ask her that day?
21 A   I asked her if she had tried--if there was any
22     record on Fiona's cell phone of her trying to call
23     her cell phone, making an attempt to call her. I
24     had asked her if she had--
25 Q   Okay. Let's start with that one. What did Fiona

51 (Pages 189 to 192)

TAMARA A. O'CONNOR
248.882.1331

f4eadfd1-bc8b-47ff-a2ad-8aecc3d02951

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

Page 193

1 say?
2 A She said no, there was no call.
3 Q On her cell phone?
4 A Correct.
5 Q Were there other phones that were available to her?
6 A She does everything with her cell phone because she
7   travels. That is the number that Natalie always
8   calls her at.
9 Q How do you know that?
10 A Because that is her main contact. That is her only
11   number. There is no office line. Her office line
12   is her cell.
13 Q But at the time she only indicated her personal cell
14   phone?
15 A No, her work cell phone. I never said personal cell
16   phone.
17 Q Her work cell phone. I'm sorry?
18 A I never said personal cell phone. Her work cell
19   phone.
20 Q She has a personal cell phone too. Correct?
21 A I have no--I do not know if she has a personal one
22   or not.
23 Q Did you ask whether any call had been placed to
24   Fiona that day?
25 A Yes. That is what I had said.

Page 194

1 Q And she said, "Not to my work cell phone"?
2 A She said, "There has been no call placed to me."
3 Q Okay. Well, that changed your story a little bit.
4 A No, it did not.
5 Q Anything else that was asked during that phone
6   conversation?
7 A Not that I can recall.
8 Q And what did you say at the end of this
9   conversation?
10 A That we would suspend pending investigation and be
11   able to then gather not only Natalie's information,
12   a statement from her, but then any other information
13   that we needed.
14 Q Did Ms. Bork want to discipline Natalie?
15 A She doesn't want to discipline anybody.
16 Q Did she call asking to discipline?
17 A She called asking what she should do, what would be
18   appropriate based on other similar situations that
19   have occurred, what I would recommend in this
20   situation.
21 Q What similar situations?
22 A Any time anybody would walk off a position.
23 Q Can you give me a specific example?
24 A We have already discussed this. I do not recall the
25   specific examples.

Page 195

1 Q So you can't give me one?
2 A Correct.
3 Q So okay. After this phone conversation with Ms.
4   Bork, what was your involvement later that day?
5 A Natalie called me shortly after that conversation
6   with Fiona, was very upset because she had just been
7   suspended pending investigation.
8   I asked her to put all of her information
9   in writing to me. I explained to her that I needed
10   a statement from her so that we can gather all of
11   the data to be able to make the appropriate
12   decision.
13   There were specific items that Mrs. Reeser
14   had mentioned that I said, "Please make sure you put
15   this in your statement."
16   Specifically she said that she had done
17   that exact same act of walking off and locking the
18   door in the past, and that she had had permission to
19   do it, and that it at that time was not viewed as
20   job abandonment.
21   So I asked her to give me those examples.
22   I said, "Do you know who you received the
23   authorization from? Do you know when you did it?"
24   She said yes. I said, "Then please make
25   sure that that is in your statement." When the

Page 196

1   statement came in, none of that information was in
2   there, so I asked for follow-up information.
3 Q Did she indicate that she had had any conversation
4   with Fiona that day?
5 A I do not recall.
6 Q It could have happened, but you don't remember?
7 A Correct.
8 Q Did she indicate she had a conversation with Martha
9   Wiseheart that day?
10 A I do not recall.
11 Q It could have happened. You just don't remember?
12 A That is correct.
13 Q Anything else you can remember about that
14   conversation?
15 A With Ms. Reeser?
16 Q Yes.
17 A Just that she was very upset, and I asked her to get
18   her statement to me as quickly as possible so that
19   we could proceed.
20 Q Were you writing out notes at the time?
21 A No, I was not.
22 Q Any other conversation that took place that day
23   regarding Ms. Reeser?
24 A I believe I then spoke with Fiona and let her know
25   that I had received the call from Natalie. Yes, I

52 (Pages 193 to 196)

TAMARA A. O'CONNOR
248.882.1331

f4eadfd1-bc8b-47ff-a2ad-8aecc3d02951

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

Page 197

1  did. I called Fiona and wanted to find out how
2  things went.
3        I said, "I just heard from Natalie as
4  well, and I have asked for her statement, and once
5  we get her statement, then we will be able to
6  proceed forward."
7  Q  And anything else said during that conversation?
8  A  I don't believe so.
9  Q  When was this conversation?
10 A  I'm not sure what the timeframe was. It was
11    sometime still during business hours that day, the
12    day of the 25th.
13 Q  Did Fiona say anything in response?
14 A  No.
15        (At 2:23 p.m., Plaintiff's
16         Deposition Exhibit 8 marked)
17 Q  (By Mr. Flynn) This jumps us back to February 7th.
18    Do you see that?
19 A  Yes. Thank you.
20 Q  Let me know when you are done reviewing.
21 A  I'm done.
22 Q  This is--what does this E-mail appear to be?
23 A  This is an E-mail that is from Fiona to myself and
24    John Waugh regarding my request for information on
25    the work schedules.

Page 198

1        This was regarding trying to find out what
2  other employees had been working at the site on days
3  that Natalie had off, as well as Natalie's final
4  schedules as well.
5  Q  Now Fiona says here:
6        "This is a time consuming task that I
7        am willing to do. However, I may not have
8        it done before I leave tomorrow for vacation."
9     Do you see that?
10 A  Correct, yes.
11 Q  Did you ever get the impression that Fiona was
12    annoyed by this task?
13 A  No, no, not at all, because Fiona is one of those
14    people that she wants things done very quickly. So
15    my read of this is that her belief was that the
16    expectation was that this needed to be done by the
17    time she left the very next day for vacation, which
18    in reality my--and I shared this with her.
19        That was not my expectation. You have two
20    years worth of schedules that you need to go back,
21    put into an Excel spreadsheet and log. That is
22    going to take you more than one business day.
23        So this to me was saying, "I will do it.
24    I probably will not have it done before I leave for
25    vacation tomorrow."

Page 199

1  Q  Well, in the meanwhile, why wasn't something done to
2     address the fact that Reeser wasn't being allowed to
3     go on lunch at all?
4  A  As we have discussed four or five times, we wanted
5     to do this holistically, and we wanted to make sure
6     that the physicians were on board because we are
7     servicing their site.
8        This is not a Henry Ford site, and if we
9     do this improperly we are going to lose that
10    contract with those physicians.
11 Q  Well, why couldn't have--someone just have been
12    called over to cover for her during lunch?
13 A  Based on their scheduling as well. It's not just a
14    matter of coming over and you're going to spend a
15    half an hour there.
16       We have travel time. We have arrangements
17    that need to be made on their end as well. So we
18    wanted to do this holistically and make sure that
19    everything was done and done properly.
20 Q  Did you ask that question? Did you ever ask--
21 A  I did.
22 Q  Did you ever ask Fiona why you didn't bring over
23    coverage?
24 A  I did.
25 Q  And what did she say?

Page 200

1  A  Because they would then need to add other staffing
2     there.
3  Q  Okay, but you just said that they rotate at the
4     other facilities.
5  A  They rotate at the other facilities to be able to
6     cover for their lunches there, based on their
7     schedules, if we are talking the Shelby Township
8     site, okay, so--
9  Q  Or any.
10 A  The Shelby Township site being the closest one. So
11    if you were to bring a person over, you are now
12    having to rotate through three lunches if there were
13    two people there, four lunches if there are three
14    people there, and that is going to--
15       To do that on a daily basis was something
16    that they did not want to have as the long-term
17    plan.
18 Q  Okay, but for the short-term while you're figuring
19    this out--
20 A  Again, this was not my decision to make. It was my
21    decision to make sure that in the end things were--
22    she was paid, she was paid appropriately, and we had
23    a long-range fix for this.
24       This was a decision for Fiona and John
25    Waugh.

53 (Pages 197 to 200)

TAMARA A. O'CONNOR
248.882.1331

f4eadfd1-bc8b-47ff-a2ad-8aecc3d02951

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

Page 237

1  Q  Okay. Do you recall this conversation taking place?
2  A  That I--the conversation where I told her that it
3     would happen by January 24th?
4  Q  Yeah.
5  A  Absolutely not. There is no way humanly possible
6     that two years worth of back pay can be done in four
7     days.
8  Q  Did you ever tell her that conversation never took
9     place?
10 A  Absolutely I did.
11 Q  When did you tell her that?
12 A  When I called her and let her know that I still
13    needed more information from her.
14 Q  Okay. Explain that conversation to me. How did
15    that go?
16 A  I called her. I let her know that I received her
17    information, which I had also E-mailed her as well,
18    and I said, "I still need documentation."
19       As you will see from the E-mail pertaining
20    to this, I outlined some of the information I still
21    needed. In my phone call to her, I reiterated the
22    information that I needed, and I pointed out that
23    that was completely erroneous.
24       That never was a conversation had by me
25    that I was--told her that that would transpire

Page 238

1     within a four-day timeframe. In fact, there was no
2     date given to her at all.
3  Q  Did you ever indicate--did you ever memorialize the
4     fact that that was an error on Ms. Reeser's part in
5     writing?
6  A  Memorialize?
7  Q  Yeah. Did you write it down?
8  A  No. That to me is not the context.
9  Q  So the answer is no, you didn't write it down?
10 A  No, I did not. You have seen it in the E-mails.
11 Q  I don't know if that is true or not. Then she goes
12    on to say at the very end that she was being
13    suspended for abandoning her position, and she goes
14    on to say:
15       "After following the appropriate and
16       implemented procedures for taking a break."
17    Do you see that?
18       MR. MIGLIO: Does she see that, what you
19    just read?
20 Q  (By Mr. Flynn) At the last sentence, do you see
21    that?
22 A  I do.
23 Q  Did you ever ask her what appropriate and
24    implemented procedures she was referring to?
25 A  No, because I knew that she hadn't followed the

Page 239

1     appropriate procedure.
2  Q  How did you know that?
3  A  Because the appropriate procedure is not to E-mail
4     your manager and then two minutes and ten seconds
5     later lock the door and walk out and abandon the
6     site.
7  Q  And where is that? Where is it in writing that this
8     was--that she did not follow the appropriate and
9     implemented procedures? What procedure?
10 A  The procedure that she has from the staff meetings,
11    for several staff meetings that she had signed--that
12    actually the employees sign that they were there and
13    the date and the time, and letting them know what
14    the appropriate procedure was if you needed to leave
15    for any reason, how you could not leave the site
16    unattended, how you needed permission to be able to
17    leave or to get coverage.
18 Q  And do you know the number of that policy or
19    procedure?
20 A  I do not, but I know that it has been given, because
21    Terry had me review it the other day.
22       MR. MIGLIO: I'm ready for a break if you
23    get to a convenient point.
24       MR. FLYNN: This is convenient. We can go
25    off the record.

Page 240

1     (At 3:16 p.m., recess taken)
2     (At 3:27 p.m., back on the record)
3     (At 3:27 p.m., Plaintiff's
4     Deposition Exhibit 17 marked)
5  Q  (By Mr. Flynn) This is a collection of E-mails, and
6     two of the pages are stapled, but I'm also including
7     the third page as the exhibit. Okay?
8  A  Okay.
9  Q  And if you could just refer to those, if you could
10    just go over those real quick and let me know when
11    you're done.
12 A  (Witness complied).
13 Q  What do these appear to be?
14 A  A compilation of E-mails between Fiona and myself.
15 Q  And I'm looking at the first page, which was not
16    stapled together with the remainder, so it's HFH
17    606.
18       I'm looking at the first E-mail there from
19    yourself to Fiona. Do you see that?
20 A  I do.
21 Q  And it's on February 28th, so this is after Ms.
22    Reeser was suspended. Correct?
23 A  That is correct.
24 Q  And it says:
25       "Fiona, since we spoke about the need

63 (Pages 237 to 240)

TAMARA A. O'CONNOR
248.882.1331

f4eadfd1-bc8b-47ff-a2ad-8aecc3d02951

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

Page 245

1  A  I did not.
2  Q  And then it says, okay--I'm scrolling up from there,
3     and it says from Hood to--from yourself to Fiona:
4        "Thank you for the clarification."
5     Then it goes up further, and it looks like it's from
6     Bork--or it's from Hood. It's from you to Bork, and
7     you carbon copied yourself on it?
8  A  Yes.
9  Q  And it says:
10        "Actually, you can use the date that
11        Natalie first started writing `no lunches'
12        on her time card. That should have been
13        starting the first day she worked after
14        January 20th. Thank you."
15     Do you see that?
16  A  I do, and--I don't understand the chronology. We've
17     got the chronology, but it clearly doesn't flow,
18     does it?
19  Q  Yeah. That is what I was going to ask you about
20     actually. Do you recall any conversation prior to
21     this?
22  A  My--this should be here.
23  Q  Where are you referring to?
24  A  That the conversation about the fact that she didn't
25     start with the payment, and I asked her to do--

Page 246

1     inform Payroll and do one big check.
2  Q  So you are saying that 606 should be at the bottom
3     of 605. Is that correct?
4  A  That is correct. That is correct. I don't know why
5     it came out that way, but it would make much more
6     sense after saying we need to make sure to pay her
7     appropriately for me to then say, "Go ahead and
8     start using the first date that she wrote `no
9     lunches' on her time card."
10 Q  So now I'm looking at HFH 604, and Fiona writes to
11    you:
12        "I'm so sorry if this in any way
13        screwed anything up"?
14 A  Yes.
15 Q  Do you know what she is referring to?
16 A  Because I told her that we needed to comply with the
17    fact that she wasn't being paid properly.
18 Q  Well, what was she screwing up?
19 A  The back payment.
20 Q  Did you follow up with her about what she meant by
21    this?
22 A  No. It was very clear to me what she meant by this,
23    because we had been talking all along about the fact
24    that we needed to get her paid.
25 Q  So then it goes on to say:

Page 247

1     "Martha and I thought we would make one
2     big payment for the lunches."
3     Do you see that?
4  A  I do.
5  Q  What did Martha have to do with this decision?
6  A  Because Martha was the one that reviewed the time
7     cards when they came in, and Martha was helping her
8     get some of the time cards and the scheduling
9     information together, not that Martha had any
10    authority or supervisory capacity. She was just
11    helping her.
12       (At 3:35 p.m., Plaintiff's
13       Deposition Exhibit 18 marked)
14 Q  (By Mr. Flynn) So this will be Exhibit 18. Let me
15    know when you are done reviewing it.
16 A  (Witness complied).
17 Q  So first off, after reviewing this, what does it
18    appear to be?
19 A  This is an E-mail from myself to Fiona, trying to
20    get some clarification and finalization on my
21    investigation.
22 Q  And this is an E-mail from Fiona to you. Correct?
23 A  The top portion.
24 Q  The top portion is?
25 A  Yes, the top portion.

Page 248

1  Q  So now one question I have based off of these
2     responses. Why couldn't an arrangement have been
3     made to cover Reeser's lunch in this situation?
4  A  Why couldn't it--on this particular day?
5  Q  Not on this day, but--
6  A  On the day that she walked out?
7  Q  Yeah.
8  A  Because she gave us two minutes' notice.
9  Q  And that is based solely on Martha's testimony, you
10    said?
11 A  Even if you were to ask--regardless of the time
12    period, there was no ability to be able to schedule
13    for anything because there was no response given.
14       There was no waiting period that was
15    allocated to be able to get a response back. There
16    was no authorization received at all, so there was
17    no way--
18       By the time Fiona received this, Natalie
19    had already gone, so there was no way for Fiona to
20    do anything, to find any form of coverage, because
21    Natalie had already left.
22 Q  Based off of what Fiona told you?
23 A  Well, based off of the fact that by the time Fiona
24    got the E-mail and called Martha, Natalie had
25    already well exited the building.

65 (Pages 245 to 248)

TAMARA A. O'CONNOR
248.882.1331

f4eadfd1-bc8b-47ff-a2ad-8aecc3d02951

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

Page 253

1  A  I do.
2  Q  If she was entitled, then why was she terminated?
3  A  It wasn't about taking a break. The fact that she
4     took a break was not on the table. What it was is
5     that she chose to without authorization, without
6     notice, abandon her position and lock a facility
7     that dealt solely with walk-in patients.
8  Q  Well, now let's go into that a little bit. Did Ms.
9     Reeser ever receive an indication from Ms. Bork or
10    from Ms. Wiseheart that she couldn't leave?
11        MR. MIGLIO: Objection to--
12        THE WITNESS: Yes. If you take a look at
13    all of the departmental notes about not leaving the
14    site unattended, how you cannot leave, how you need
15    authorization, she received several correspondences.
16 Q  (By Mr. Flynn) Let me be clear. I think that you
17    are misunderstanding my question.
18 A  Okay.
19 Q  Did they ever affirmatively tell her, "You are not
20    approved"?
21 A  Approved for what?
22 Q  To go to lunch for 30 minutes?
23 A  For--in particular, or on that specific day?
24 Q  On that specific day?
25 A  She never gave them a chance to respond. She just

Page 254

1     E-mailed to them, got up, according to her own
2     deposition, put on her jacket, her shoes, and left.
3  Q  According to Fiona and Martha, that is what took
4     place?
5  A  No, no. According to Natalie Reeser's deposition.
6     She said in several places in her deposition that
7     she sent the E-mail out, she got up, she put on her
8     boots and her jacket, and she left.
9  Q  And you don't recall--okay, well, I won't get into
10    all of the ins and outs of Plaintiff's deposition,
11    but--
12        So your position is based off of select
13    statements that were made by Plaintiff during her
14    deposition? That is what you base that off of?
15 A  No, absolutely not. That was--because obviously I
16    couldn't have based my decision for termination off
17    of something that just happened well after her
18    termination. Obviously the deposition didn't happen
19    before.
20 Q  So let me be clear with you. I'm asking what you
21    based it off at the time.
22 A  Absolutely. So what I based it off was the fact
23    that she never tried to call. There is no
24    communication log on the phone.
25        There was no even indication from Natalie

Page 255

1     when I was speaking with her before about her not
2     getting authorization.
3         Never once did she say, "Well, I tried
4     calling Fiona," or "Then I went in and I knocked on
5     the door and interrupted the conference call and
6     tried to speak with Martha."
7         She was very clear that Martha was in the
8     back on a conference call, that she sent the E-mail
9     out and within moments she left. There was no
10    authorization.
11 Q  Didn't you indicate earlier that you--she could have
12    mentioned these things, but you just don't recall?
13 A  No. I never said I didn't recall. I recall this
14    very clearly. Clearly.
15 Q  Okay. Well, we'll take a look at the record.
16 A  I hope so.
17 Q  So now if that was the case, why didn't you list the
18    departmental policy? You listed HFHS Policy 5.05.
19 A  Because regardless of the policy, you are still
20    entitled to get paid. It doesn't--department policy
21    has nothing to do with whether or not once you work
22    over your time slot that you are supposed to be
23    getting that half-an-hour pay.
24 Q  Which takes precedent? Does Policy 5.05 take
25    precedent over the departmental policy or vice

Page 256

1     versa?
2  A  It depends on what you are looking at. So if you
3     are taking a look at something like compensation,
4     then obviously we have to go with the hospital-wide
5     policy, the system-wide policy.
6         If you are talking about things that are
7     procedural, this is how we implement the policy in
8     our business units in our department, then you go
9     with the departmental policies.
10        The departments have the right to be able
11    to say, "This is how we enact these guidelines."
12 Q  Where does it say that in the policies?
13 A  It doesn't. That is standard business protocol.
14 Q  That is just how you have interpreted them?
15 A  No. That is the way that the hospital--the health
16    system interprets them. That is not my
17    interpretation.
18 Q  Because your interpretation has changed since the
19    beginning of this deposition.
20 A  I would like you to show me where it did.
21 Q  Now I'm looking at "Reporting of Break Time." It
22    says:
23        "At the meeting on January 20, you
24    informed me that Fiona stated that you
25    would be terminated if you contacted Human

67 (Pages 253 to 256)

TAMARA A. O'CONNOR
248.882.1331

f4eadfd1-bc8b-47ff-a2ad-8aecc3d02951

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

Page 273

1   she abandoned her position.
2   Q  Okay.
3          (At 4:09 p.m., Plaintiff's
4          Deposition Exhibit 21 marked)
5   Q  (By Mr. Flynn) This will be Exhibit 21. There you
6      go.
7   A  (Witness reviewed document).
8   Q  What is this document?
9   A  I don't know.
10  Q  Is that your signature at the bottom?
11  A  It sure is, and I definitely wrote this. I just
12     don't know--I'm honestly not sure if this is
13     something that I had drafted to send--and sent to
14     Terry once we got your--the information in about the
15     lawsuit.
16  Q  It says HFH at the bottom, so--
17  A  Oh, no, absolutely. I mean, I wrote this. It's my
18     signature. It's my title, and it is obviously a
19     summary. This is--I was just going to say this is
20     something--
21         This is a summary that we would put
22     together for the Appeals Board, and so the only--
23     unless it was something that I drew up in case she
24     chose to appeal, because I was anticipating that she
25     would appeal, using our ADR process.

Page 274

1          So, I mean, it's a summary. It's a
2      summary of the termination.
3   Q  Did anyone review this?
4   A  I don't believe--I don't know. I don't know,
5      because I honestly don't know why I wrote it.
6   Q  Do you recall if there was an earlier draft?
7   A  I don't recall.
8   Q  It says that:
9          "This site is staffed by one employee
10         who attends to client needs on a walk-in
11         basis. For this reason, there is no
12         designated `lunch period' where the office
13         is closed. When a situation arises that
14         the staff member needs to take time away
15         or needs to leave early, they have been
16         given directions on how to find a
17         replacement for their absence. At no
18         time, however, should the office just
19         be closed."
20         Before you wrote this, what documents or
21     evidence did you rely on to figure out what
22     direction should be taken, on directions on how to
23     find a replacement for their absence?
24  A  Based on the departmental policies that Fiona had
25     already submitted that Natalie had signed off on,

Page 275

1      saying you can't leave the site unattended.
2          "If you do need to leave for any reason,
3      here is what you do to secure your own replacement.
4      First you contact me, make sure it's okay." Those
5      were the documents that I looked at.
6   Q  Did you talk to Natalie about it?
7   A  Did I talk to Natalie about this before I wrote
8      this?
9   Q  About the directions for finding a replacement for
10     their absence?
11  A  No.
12  Q  Did you talk to any of her co-workers about it?
13  A  No.
14  Q  Did you talk to Martha Wiseheart about it?
15  A  No. I didn't speak with anybody about this. I went
16     based off of their past practice and their
17     department policy, practices.
18  Q  And who told you about the past practice?
19  A  The past practice had been laid out for months in
20     their departmental meetings.
21  Q  So you're merely talking about the policy that Bork
22     gave you?
23  A  Yes, the departmental procedure.
24  Q  So that's the limit of it?
25  A  Well, that and even going back and looking for

Page 276

1      months. Fiona had sent me when I requested
2      information E-mails, any communication as to when
3      Natalie had previously requested that she needed to
4      leave or she needed some coverage and how she went
5      about doing that.
6          Fiona sent me months worth of
7      documentation where Natalie did exactly the correct
8      protocol that was outlined in that departmental
9      policy.
10  Q  Did those deal with unpaid or paid breaks?
11  A  Those had to deal with times when she decided that,
12     for whatever reason--I'm not saying that they
13     weren't valid, but for whatever reason--she needed
14     to leave or she needed to adjust her schedule.
15  Q  Did any of them deal with lunch?
16  A  She would take her--
17  Q  Do you recall--
18  A  I guess some of that time would be. I don't recall.
19  Q  Then you go on and say:
20         "We have no idea how many clients we
21         lost during this time that she was away."
22  A  Correct.
23  Q  Did you ask Martha?
24  A  No, I did not.
25  Q  Wasn't she there? Couldn't she have told you how

72 (Pages 273 to 276)

TAMARA A. O'CONNOR
248.882.1331

f4eadfd1-bc8b-47ff-a2ad-8aecc3d02951

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

Page 304

1        CERTIFICATE OF COURT REPORTER

2

3   STATE OF MICHIGAN )

4                     )

5   COUNTY OF OAKLAND )

6

7

8            I certify that this transcript, consisting

9   of 304 pages, is a complete, true and correct record

10  of the testimony of Jill Hood held in this case on

11    Tuesday, May 5, 2015.

12           I also certify that prior to taking this

13  deposition Jill Hood was duly sworn to tell the

14  truth.

15

16    5/11/15

17    _____    _____

18    Date                      TAMARA A. O'CONNOR

19                              CSMR 2656, CER 2656

20                              2385 Jakewood Drive

21    pz                        West Bloomfield, Michigan 48324

TAMARA A. O'CONNOR
248.882.1331

f4eadfd1-bc8b-47ff-a2ad-8aecc3d02951