Exhibit 15

Natalie K. Reeser
Lab Assistant
Henry Ford Medical Laboratories
Outreach Lab Service
Clinton Township, MI

January 20, 2014

Jill Hood
Sr. Business Partner
Human Resources
Henry Ford Hospital

Dear Ms. Hood,

Thank you for the opportunity to meet with you today. I am interested in Human Resources intervention with three areas of concern. Two areas are related to my *2013 Employee Performance and Development* markers, and one area is related to meal breaks. Through this meeting, I am seeking the assistance of Human Resources to investigate my concerns, and offer guidance and solutions to all parties in a positive and productive manner.

**2013 Employee Performance and Development Concerns** (*please see attachments*)
I believe my supervisor, Fiona Bork, was not impartial when she assigned '*2.0 Some Success*' markers to two performance categories on my annual review. I have been responsible for the Clinton Township Outreach Lab since my start date, and there has been no verbal meeting, written documentation or probationary period in these areas to support such unacceptable markers. As my supervisor knows, these markers prohibit transfer to a different position within Henry Ford Medical Laboratories, and worse, are cause for termination. Therefore, I am submitting documentation to demonstrate that these markers were assigned without any professional basis and, in at least one area, was assigned for personal reasons.

**Meal Breaks**
Employees assigned to the Clinton Township Outreach Lab, who are working alone, are required to stay on-site the entire work day as coverage for patients that may require blood draws at any time throughout each day. Employee schedules include additional time for a meal break (my schedule currently includes 30 minutes for lunch, and formerly included 60 minutes for about my first 18 months of employment); however, an actual lunch time is not provided. I was told that any "down time" was to be considered as lunch. However, I recently learned that The Fair Labor Standards Act (FLSA) states that hourly employees, who are required to work more than 40 hours in a work week, are to be compensated for those hours under a term called, "engaged to work." In order for an employee to not be "engaged to work," an employee must be completely relieved from duty for the purpose of eating regular meals.

Please know it is increasingly difficult to work busy days without any opportunity for a meal break and, some days even more difficult, because management and sales personnel bring in food for lunch, take meal breaks, and eat in front of/near me. I have been told by my supervisor that if I want a lunch break outside of the office, I will "lose" the opportunity to work in Clinton Twp. Please know I do not want to be reassigned from Clinton Twp. to another site. I have been successful in helping to grow our patient base, I personally know and respect each of our returning patients, and I look forward to working for them during each visit. Therefore, as defined by FLSA, I am asking Human Resources to intercede, and allow employees working alone at Clinton Twp. (and any other site working with similar constraints), a scheduled/advertised 30-minute closure of the lab each day for a meal break during the time that is already allotted for this purpose on individual work schedules.

HFH127

Natalie K. Reeser                                                                                          January 20, 2014
                                                                                                                Page II of II

In closing, this past week has been unnecessarily stressful for me. Since rejecting my annual evaluation and requesting this appointment with Human Resources, I have been subjected by my supervisor to abnormal bouts of loud humming and some laughter; needless paper shredding at my desk; repeated pacing by my desk while verbally stating in an accusing tone, "You know what? Okay, Okay. You know what? Okay, Okay, etc., followed by returns to her office and the shutting of her office door. She also yelled at me and told me to change my screen saver, which represented strength for my older brother who has recently battled leukemia (both she and our operations manager have viewed this screen for months, and no one has ever mentioned it in the past); and she intentionally embarrassed both me and a patient waiting to be drawn.

Also, based on e-mails I received last week, I believe my supervisor also altered or deleted goals that were part of the original annual evaluation I received, which truly concerns me. In addition, I believe there was an attempt to cancel my 12:30 p.m. appointment with you last Friday, through the scheduling of a last minute team conference call for EPIC, at the same exact time. There was also a change made at some point to my work schedule for Friday, requiring me to work overtime that afternoon at the Shelby Twp. lab – I only work half days on Fridays in Clinton Twp. In trying to work out all of the last minute demands for my time that day, I inadvertently learned that the work replacement/employee I found to cover Friday afternoon at Shelby Twp., who had been approved by our supervisor to work this shift, was never notified by our supervisor that she was approved to work this shift. I can support that supervisor notification is the procedure we follow through past e-mails of same situations.

Therefore, I would like to trust in, and thank Human Resources for remaining unbiased in its investigation, while working with all parties to establish acceptable solutions, based solely on facts, and not emotions. I would like to see our team stabilized again, so we can move forward this year, and continue to successfully grow our Clinton Township Outreach Patient Service Center.

Sincerely,


Natalie K. Reeser

Natalie K. Reeser  
Employee No: 090084

Request for Human Resources Intervention  
January 20, 2014, Page I of II

**Evaluation Category: Display a Positive Attitude/Respond in a Timely Manner – Marker 2.0**

**Supervisor Comments:** Natalie is fully accountable for every choice she makes and never seeks to avoid or shift responsibility to someone else. I can trust that she will act decisively, follow through on her commitments, and quickly correct any problems. *Natalie was sent for additional phlebotomy training due to numerous complaints of bruising and pain. She learned a lot from her day of training including how to finish a lab draw, as well as the proper pressure to use after a venipuncture.*

**Employee Response:** *To my knowledge, out of the 3,206 blood draws at the Clinton Township lab in 2013, only two patients stated in early February that they received hematomas and, since I had not received any complaints prior to this date, the hematomas were most likely related to the type of bandage used on the patients. Up until the time of these complaints, CoFlex, the industry standard bandage for all phlebotomy patients, was stocked in our lab for use on patients. CoFlex is made out of a material that does not hamper circulation or movement, is designed to prevent hematomas and leakage at the draw site, can be torn using one hand, while the other hand continues to hold pressure on a draw site, and is safe to use on all skin types.

On Jan. 31, 2013, our operations manager sent an e-mail stating CoFlex was being replaced by a non-adhesive (tan surgical) paper tape for non-Coumadin patients. Even though paper tape does not have adhesive, which is required to hold pressure on draw sites to prevent hematomas, as directed, I followed the new guidelines. An important fact is that, once patients leave the lab, phlebotomists have no control over pressure; patients depend on the hospital to provide the labs with the proper materials to control pressure on the draw sites. Non-adhesive paper tape is not intended to serve this purpose, and exiting patients have no extended pressure on the draw site which, again, controls the potential for hematomas.

I first learned of these patients on Feb. 14, 2013, when my supervisor called me and stated two patients had complained about hematomas and asked me if I was doing anything differently. I replied that the one step I was doing differently now, was using the required (tan surgical) paper tape instead of CoFlex, as directed by the operations manager. My supervisor then sent me an e-mail on Feb. 20 stating, because of the two complaints, she was sending me to Cottage Hospital on Mon., Feb. 25 for specialized training under Sherri Dedeyne.

I arrived before my 8 a.m. start time, and was met by another employee, as Ms. Dedeyne was not working in this lab on this date. This other employee observed my drawing techniques on a patient. Her reaction was that she thought their lab was being sent a beginning phlebotomist who needing training, not an experience phlebotomist adding, again, she wasn't sure why a skilled phlebotomist had been sent for training.

On that same date, Cottage Hospital was sponsoring a Coumadin Clinic, and the lab was extremely busy and short-staffed. Therefore this employee asked me to work in the clinic for the remainder of the day, not as a trainee, but as a skilled phlebotomist. At the end of the day, I was sincerely thanked for my work efforts on such an extremely busy day.

HFH129

Natalie K. Reeser  
Employee No: 090084

Request for Human Resources Intervention  
January 20, 2014, Page II of II

Evaluation Category: Display a Positive Attitude/Respond in a Timely Manner – Marker 2.0 - *Continued*

When I returned to work on Tuesday, my supervisor asked me what I had learned. Not knowing what to say (as I had not trained, but worked all day), I mentioned that the employee I worked with demonstrated an 'alternate' way to wrap CoFlex. In keeping with this, my supervisor's statement on my evaluation, *"She learned a lot from her day of training including how to finish a lab draw, as well as the proper pressure to use after a venipuncture,"* is misleading (garnered from something I casually shared) and not based on any fact – I was not "trained" on anything that day. If I did not know how to finish a lab draw or apply pressure to a draw site, I would not have been able to successfully draw from our patients, help to grow a solid repeat patient base, or would I have been left alone to manage an off-site phlebotomy lab for nearly two years prior to this event.

In addition, in the weeks following Cottage Hospital, each time I asked my supervisor for a copy of any feedback she received from Ms. Dedeyne's employee, my supervisor refused. Her refusal indicated to me that the employee at the lab was pleased with my work. I believe, based on my supervisor's management style, had any feedback been negative, she would have been shared such comments with me.

On May 1, 2013, three months after we began using the non-adhesive paper tape, our operations manager released an e-mail stating, **"URGENT ACTION REQUIRED.** Please remove the tan surgical paper tape that was distributed to many of our locations from use **IMMEDIATELY.** If it has not yet been done, this will be replaced with the **PROPER** white adhesive paper tape used in phlebotomy."

If there have been any other complaints about hematomas and/or pain, my supervisor has never brought them to my attention. As my supervisor stated, *"Natalie is fully accountable for every choice she makes and never seeks to avoid or shift responsibility to someone else. I can trust that she will act decisively, follow through on her commitments, and quickly correct any problems."* Therefore, as my supervisor used the word "numerous complaints," and since it is unlike my supervisor to refrain from sharing negative information, and because I received an unacceptable marker based on the words "numerous complaints," in order to not shift responsibility to someone else, I am asking to review copies of the written/signed complaints from these patients. In addition, if "numerous" written/signed complaints are provided to Human Resources, I am also asking that a representative in Human Resources reach out to these patients and validate such complaints, before the 2.0 marker I received in this category is permanently assigned to my evaluation.

In closing, can I also please ask how my supervisor's response even relates to a category entitled, "Display a Positive Attitude/Respond in a Timely Manner?"

— *Thank you.*

Natalie K. Reeser  
Employee No: 090084

Request for Human Resources Intervention  
January 20, 2014, Page I of II

Evaluation Category: Foster and Support Innovation – Marker 2.0

**Supervisor Comments:** Natalie has made a contribution to positive change. She knows how to communicate the benefits of change to different people and obtain the necessary resources to implement new ideas. *\*I have counseled Natalie on her mode of communication with new employees and have asked that when she speaks about a process or process failure that it is not escalated to an inappropriate level. I am looking for a noticeable improvement in Natalie's ability to stay away from destructive gossip and not lead or be any part of it. We are a no gossip employer.*

**Employee Response:** These are some of the comments my supervisor wrote about me in other areas of the annual evaluation: 1) *Natalie works well in groups*; 2) *Natalie has done her part to maintain an open, respectful workplace. She recognizes and values the different backgrounds, perspectives and opinions of all employees*; 3) *Natalie is respectful and attentive to people who are speaking, both in group and one-on-one situations. Her good listening skills have been useful to her in her job over the last period*; 4) *Natalie actively protects confidential information. She is always careful to guard again careless release of important information*; and 5) *Thank you Natalie for being so committed to always doing your best. You are a pleasure to work with and I appreciate all of your hard work.*

Then my supervisor states in this category that I participate in destructive gossip; the comments oppose each other.

*Keeping these comments in mind, I was honest with one new employee in direct response to a question she asked me. In the time I have worked for my supervisor, I have watched a significant number of employees be hired and fired in a relatively short period of time. From working with some of these individuals when they are newly hired, no matter their qualifications, if they are struggling in an area (perhaps draws, perhaps computers, perhaps something else), there is a good chance they will not stay on our team for very long. So when a new employee who was struggling with something asked me what would happen to her if she didn't "catch-on," I gave her an honest answer; she was asking for an honest answer. I shared that if she didn't "catch-on" with what she was struggling with, there was the possibility she could be terminated. She was surprised by my answer, and questioned our supervisor. I apologize if this was considered escalating something to an inappropriate level; I call it the truth, and she had a right to know the truth; I wasn't going to lie to her. And I didn't go looking for this conversation; the conversation came to me.

For reasons unknown to me, some of these employees have been called to our supervisor's office at Clinton Twp. for the purpose of termination. It is unnerving to watch a rotating door of phlebotomists; I always think about if/when it could be my turn.

To be honest, I suspect through the markers on my annual review, that my supervisor feels my time with our company is limited, but not for any of the above reasons. My supervisor has made a situation that started with her actions, very personal, *very personal with me*. In January 2013, my supervisor asked me to move so she could use my computer, even though there is a computer in the management office for her use. I stood up and waited at the counter for our next patient to arrive. About 20 minutes later, my supervisor got up from my desk and went to the restroom.

HFH132

Natalie K. Reeser                                                              Request for Human Resources Intervention
Employee No: 090084                                                                          January 20, 2014, Page II of II

Evaluation Category: Foster and Support Innovation – Marker 2.0 – *Continued*

At the same time, a patient arrived and I returned to my desk to prepare for this patient. Much to my shock, my supervisor had not logged out, and she had left on the screen a box containing her 2012 earnings. I immediately minimized her screen, and continued using my computer to prepare our patient's paperwork. When she came out of the bathroom, she waited until I was finished using the computer, and then she sat back down and continued with what she was doing earlier.

Several days later, *now former employee*, Tanisha Jordan, was working with me, and she was talking about something unusual that had happened in her office. It brought to mind our supervisor using my computer to view personal documents and, without really thinking about it, I simply mentioned what had happened earlier in the month, and how *embarrassed I was* because she had left such confidential information on my screen (especially since she had a computer in her office for her own personal usage; I never understood her purpose for using my computer). That was the end of our conversation; I never told Ms. Jordan our supervisor's salary, and the situation was never mentioned again.

On or about Nov. 18, Ms. Jordan walked into our office and she was very upset. She blurted out that two employees at Shelby Twp. had received "huge bonuses," and stated it "wasn't fair." She added that she felt I "should know, because of all of the extra work" I do at Clinton Twp. above and beyond my phlebotomy and lab responsibilities. The next day, I telephoned my supervisor and asked about the bonuses. I asked if this was true and, if it was true, was I going to receive a bonus too? She thanked me for the information, and said she would get back to me. On the morning of Nov. 21, my supervisor called me and, again, thanked me for bring the "bonus rumor" to her attention, and added that she found this rumor had opened the door to "several rumors going around at Shelby Twp. that were untrue," adding she "appreciated" me as an employee.

Later that day, our supervisor went to Shelby Twp. to meet with Ms. Jordan. From what was told to me following that meeting, when Ms. Jordan found out she was in trouble for coming to Clinton Twp. and talking to me, she retaliated by telling our supervisor about the conversation in January. My supervisor called me on the phone, and began yelling at me, hanging up on me at least four times. Then she would call me right back, and continue yelling in an uncontrolled manner. At one point, after she hung up, a physician's office called and I was speaking to them when she attempted to call me back again. When I didn't answer the phone, because I was talking to that physician's office, she accused me of ignoring her call. If we have maintained company telephone records, you will find the logs will support this statement. At one point during the call, my supervisor said something to the effect of, *"You are an excellent employee, Natalie, but this is personal; woman to woman, this is personal."*

The next few weeks were relatively quiet, until I opened my annual review and read that she lowered two markers this year that would again, open the door for termination. These markers *are* personal for my supervisor, based solely on her emotions, and not on facts, which is why I am seeking intervention from Human Resources, before the 2.0 marker I received in this category is permanently assigned to my evaluation.

In closing, can I also please ask how my supervisor's response even relates to a category entitled, "Foster and Support Innovation?" Innovation means the act of introducing something new.

— *Thank you.*

HFH131