# EXHIBIT M

Natalie K. Reeser
Lab Assistant
Henry Ford Medical Laboratories
Outreach Lab Service
Clinton Township, MI

January 20, 2014

Jill Hood
Sr. Business Partner
Human Resources
Henry Ford Hospital

Dear Ms. Hood,

Thank you for the opportunity to meet with you today. I am interested in Human Resources intervention with three areas of concern. Two areas are related to my *2013 Employee Performance and Development* markers, and one area is related to meal breaks. Through this meeting, I am seeking the assistance of Human Resources to investigate my concerns, and offer guidance and solutions to all parties in a positive and productive manner.

2013 Employee Performance and Development Concerns (*please see attachments*)
I believe my supervisor, Fiona Bork, was not impartial when she assigned '*2.0 Some Success*' markers to two performance categories on my annual review. I have been responsible for the Clinton Township Outreach Lab since my start date, and there has been no verbal meeting, written documentation or probationary period in these areas to support such unacceptable markers. As my supervisor knows, these markers prohibit transfer to a different position within Henry Ford Medical Laboratories, and worse, are cause for termination. Therefore, I am submitting documentation to demonstrate that these markers were assigned without any professional basis and, in at least one area, was assigned for personal reasons.

Meal Breaks
Employees assigned to the Clinton Township Outreach Lab, who are working alone, are required to stay on-site the entire work day as coverage for patients that may require blood draws at any time throughout each day. Employee schedules include additional time for a meal break (my schedule currently includes 30 minutes for lunch, and formerly included 60 minutes for about my first 18 months of employment); however, an actual lunch time is not provided. I was told that any "down time" was to be considered as lunch. However, I recently learned that The Fair Labor Standards Act (FLSA) states that hourly employees, who are required to work more than 40 hours in a work week, are to be compensated for those hours under a term called, "engaged to work." In order for an employee to not be "engaged to work," an employee must be completely relieved from duty for the purpose of eating regular meals.

Please know it is increasingly difficult to work busy days without any opportunity for a meal break and, some days even more difficult, because management and sales personnel bring in food for lunch, take meal breaks, and eat in front of/near me. I have been told by my supervisor that if I want a lunch break outside of the office, I will "lose" the opportunity to work in Clinton Twp. Please know I do not want to be reassigned from Clinton Twp. to another site. I have been successful in helping to grow our patient base, I personally know and respect each of our returning patients, and I look forward to working for them during each visit. Therefore, as defined by FLSA, I am asking Human Resources to intercede, and allow employees working alone at Clinton Twp. (and any other site working with similar constraints), a scheduled/advertised 30-minute closure of the lab each day for a meal break during the time that is already allotted for this purpose on individual work schedules.

HFH127

Natalie K. Reeser                                                                                   January 20, 2014
                                                                                                    Page II of II

In closing, this past week has been unnecessarily stressful for me. Since rejecting my annual evaluation and requesting this appointment with Human Resources, I have been subjected by my supervisor to abnormal bouts of loud humming and some laughter; needless paper shredding at my desk; repeated pacing by my desk while verbally stating in an accusing tone, "You know what? Okay, Okay. You know what? Okay, Okay, etc., followed by returns to her office and the shutting of her office door. She also yelled at me and told me to change my screen saver, which represented strength for my older brother who has recently battled leukemia (both she and our operations manager have viewed this screen for months, and no one has ever mentioned it in the past); and she intentionally embarrassed both me and a patient waiting to be drawn.

Also, based on e-mails I received last week, I believe my supervisor also altered or deleted goals that were part of the original annual evaluation I received, which truly concerns me. In addition, I believe there was an attempt to cancel my 12:30 p.m. appointment with you last Friday, through the scheduling of a last minute team conference call for EPIC, at the same exact time. There was also a change made at some point to my work schedule for Friday, requiring me to work overtime that afternoon at the Shelby Twp. lab – I only work half days on Fridays in Clinton Twp. In trying to work out all of the last minute demands for my time that day, I inadvertently learned that the work replacement/employee I found to cover Friday afternoon at Shelby Twp., who had been approved by our supervisor to work this shift, was never notified by our supervisor that she was approved to work this shift. I can support that supervisor notification is the procedure we follow through past e-mails of same situations.

Therefore, I would like to trust in, and thank Human Resources for remaining unbiased in its investigation, while working with all parties to establish acceptable solutions, based solely on facts, and not emotions. I would like to see our team stabilized again, so we can move forward this year, and continue to successfully grow our Clinton Township Outreach Patient Service Center.

Sincerely,


Natalie K. Reeser

Natalie K. Reeser  Request for Human Resources Intervention
Employee No: 090084  January 20, 2014, Page I of II

Evaluation Category: Display a Positive Attitude/Respond in a Timely Manner – Marker 2.0

Supervisor Comments: Natalie is fully accountable for every choice she makes and never seeks to avoid or shift responsibility to someone else. I can trust that she will act decisively, follow through on her commitments, and quickly correct any problems. *Natalie was sent for additional phlebotomy training due to numerous complaints of bruising and pain. She learned a lot from her day of training including how to finish a lab draw, as well as the proper pressure to use after a venipuncture.*

Employee Response: *To my knowledge, out of the 3,206 blood draws at the Clinton Township lab in 2013, only two patients stated in early February that they received hematomas and, since I had not received any complaints prior to this date, the hematomas were most likely related to the type of bandage used on the patients. Up until the time of these complaints, CoFlex, the industry standard bandage for all phlebotomy patients, was stocked in our lab for use on patients. CoFlex is made out of a material that does not hamper circulation or movement, is designed to prevent hematomas and leakage at the draw site, can be torn using one hand, while the other hand continues to hold pressure on a draw site, and is safe to use on all skin types.

On Jan. 31, 2013, our operations manager sent an e-mail stating CoFlex was being replaced by a non-adhesive (tan surgical) paper tape for non-Coumadin patients. Even though paper tape does not have adhesive, which is required to hold pressure on draw sites to prevent hematomas, as directed, I followed the new guidelines. An important fact is that, once patients leave the lab, phlebotomists have no control over pressure; patients depend on the hospital to provide the labs with the proper materials to control pressure on the draw sites. Non-adhesive paper tape is not intended to serve this purpose, and exiting patients have no extended pressure on the draw site which, again, controls the potential for hematomas.

I first learned of these patients on Feb. 14, 2013, when my supervisor called me and stated two patients had complained about hematomas and asked me if I was doing anything differently. I replied that the one step I was doing differently now, was using the required (tan surgical) paper tape instead of CoFlex, as directed by the operations manager. My supervisor then sent me an e-mail on Feb. 20 stating, because of the two complaints, she was sending me to Cottage Hospital on Mon., Feb. 25 for specialized training under Sherri Dedeyne.

I arrived before my 8 a.m. start time, and was met by another employee, as Ms. Dedeyne was not working in this lab on this date. This other employee observed my drawing techniques on a patient. Her reaction was that she thought their lab was being sent a beginning phlebotomist who needing training, not an experience phlebotomist adding, again, she wasn't sure why a skilled phlebotomist had been sent for training.

On that same date, Cottage Hospital was sponsoring a Coumadin Clinic, and the lab was extremely busy and short-staffed. Therefore this employee asked me to work in the clinic for the remainder of the day, not as a trainee, but as a skilled phlebotomist. At the end of the day, I was sincerely thanked for my work efforts on such an extremely busy day.

Natalie K. Reeser
Employee No: 090084

Request for Human Resources Intervention
January 20, 2014, Page II of II

Evaluation Category: Display a Positive Attitude/Respond in a Timely Manner – Marker 2.0 - *Continued*

When I returned to work on Tuesday, my supervisor asked me what I had learned. Not knowing what to say (as I had not trained, but worked all day), I mentioned that the employee I worked with demonstrated an 'alternate' way to wrap CoFlex. In keeping with this, my supervisor's statement on my evaluation, *"She learned a lot from her day of training including how to finish a lab draw, as well as the proper pressure to use after a venipuncture,"* is misleading (garnered from something I casually shared) and not based on any fact – I was not "trained" on anything that day. If I did not know how to finish a lab draw or apply pressure to a draw site, I would not have been able to successfully draw from our patients, help to grow a solid repeat patient base, or would I have been left alone to manage an off-site phlebotomy lab for nearly two years prior to this event.

In addition, in the weeks following Cottage Hospital, each time I asked my supervisor for a copy of any feedback she received from Ms. Dedeyne's employee, my supervisor refused. Her refusal indicated to me that the employee at the lab was pleased with my work. I believe, based on my supervisor's management style, had any feedback been negative, she would have been shared such comments with me.

On May 1, 2013, three months after we began using the non-adhesive paper tape, our operations manager released an e-mail stating, "URGENT ACTION REQUIRED. Please remove the tan surgical paper tape that was distributed to many of our locations from use IMMEDIATELY. If it has not yet been done, this will be replaced with the PROPER white adhesive paper tape used in phlebotomy."

If there have been any other complaints about hematomas and/or pain, my supervisor has never brought them to my attention. As my supervisor stated, *"Natalie is fully accountable for every choice she makes and never seeks to avoid or shift responsibility to someone else. I can trust that she will act decisively, follow through on her commitments, and quickly correct any problems."* Therefore, as my supervisor used the word "numerous complaints," and since it is unlike my supervisor to refrain from sharing negative information, and because I received an unacceptable marker based on the words "numerous complaints," in order to not shift responsibility to someone else, I am asking to review copies of the written/signed complaints from these patients. In addition, if "numerous" written/signed complaints are provided to Human Resources, I am also asking that a representative in Human Resources reach out to these patients and validate such complaints, before the 2.0 marker I received in this category is permanently assigned to my evaluation.

In closing, can I also please ask how my supervisor's response even relates to a category entitled, "Display a Positive Attitude/Respond in a Timely Manner?"

— *Thank you.*

HFH130