# EXHIBIT AAA

2011 WL 1157864
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Vanessa PEAKE, Plaintiff,

v.

MARTINREA FABCO HOT
STAMPING, INC., Defendant.

No. 09–10348. | Feb. 28, 2011.

**Attorneys and Law Firms**

Megan Bonanni, Pitt, McGehee, Royal Oak, MI, for Plaintiff.

Brian A. Kreucher, Jennifer D. Rupert, Keller Thoma,
Detroit, MI, for Defendant.

*REPORT AND RECOMMENDATION
MOTION FOR SUMMARY JUDGMENT/
MOTION TO DISMISS (Dkt.23)*

MICHAEL HLUCHANIUK, United States Magistrate Judge.

**I. PROCEDURAL HISTORY**

**\*1** Plaintiff filed her complaint with the Wayne County
Circuit Court in October, 2009. (Dkt.1). This matter was
timely removed to the federal district court on January 30,
2009. (Dkt.1). Plaintiff alleges claims under the Michigan
Whistleblower's Protection Act (WPA) and also alleges
common law public policy retaliatory discharge. (Dkt.1). On
August 26, 2010, defendant filed a motion for summary
judgment and motion to dismiss. (Dkt.23). Plaintiff filed a
response on September 28, 2010. (Dkt.26). Defendant filed
a reply on October 15, 2010. (Dkt.30). This matter was
referred to the undersigned for all pretrial proceedings by
District Judge Gerald E. Rosen. (Dkt.4). Pursuant to notice,
the Court held a hearing on this motion on November 17,
2010. (Dkt.29). At the hearing, plaintiff made it clear that
she was pursuing only two theories of retaliatory discharge:
(1) under the Michigan Whistleblower's Protection Act; and
(2) for her refusal to violate the City of Detroit ordinances
relating to the filing of falsified reports.

For the reasons set forth below, the undersigned
**RECOMMENDS** that defendant's motion for summary
judgment and motion to dismiss be **DENIED**.

**II. FACTUAL BACKGROUND**

In August, 2007 plaintiff was hired as Health & Safety
Coordinator ("HSC") for defendant, a metal stamping
fabricating company. Plaintiff's role as HSC was to
ensure defendant's compliance with local, state and federal
regulations relating to health, safety and the environment and
to provide employees with training. According to plaintiff,
the facility was rife with health and safety violations.
(Dkt. 26–3 ¶¶ 3–14;19–35;47–48) (Affidavit of former
Martinrea employee Paul Forster). According to plaintiff,
she immediately sought to implement measures to put
the company into compliance, including developing an
appropriate lockout/tagout and confined space protocol. (Dkt.
26–35 Clark–Denson dep, pp. 12–14, 18).

In early 2008, plaintiff asked MIOSHA official Jennifer
Clark–Denson to come to the plant so she could show her
the faulty machinery. MRE management was apprised of the
meeting including Johnson, Maintenance Manager Ted Barth,
Production Supervisor Mark Kalfayan and Engineering
manager Jack Snazza. (Dkt.26–17). The meeting was "very
long and tense" because managers were apparently unhappy
that Denson was at the plant and the measures she required.
(Dkt. 26–35, Clark Denson pp. 14–16; 33–35; Exhibit 16;
Exhibit 8). On May 16, 2009, defendant was issued a citation
for a series of serious safety violations, penalties totaling
$8800, including a violation related to the machines plaintiff
asked Denson to inspect. (Dkt.26–2).

Although plaintiff immediately outlined the steps which
needed to be taken in order to comply with the citation,
managers including Johnson refused to approve the
compliance measures because they would slow down
production and cost too much. (Dkt. 26–36, pp. 83–84; 149–
150; 172). In the months following the 5/16/08 citation,
plaintiff says she had numerous phone conversations about
defendant's refusal to approve the steps necessary to abate
the citation and defendant's unsafe practices with Denson
and investigator Earl Parker. (Dkt. 26–35, pp. 24–28; Dkt.
26–36, p. 104, 28–28, pp. 24–30; 26–9; Dkt. 26–17,
6/3/08 field report). According to plaintiff, she also reported
to MIOSHA officials Ray Bogle, Earl Parker and George
Zagresky that she was running into trouble with management,
in particular supervisor Johnson. (Dkt.26–36, pp. 101–103).
Defendant has presented the sworn affidavit of Clark–Denson

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works. 1

in which she stated that "Ms. Peake never told me that she had been asked or pressured to falsify any type of form by anyone at Martinrea ..." (Dkt.23–20, ¶ 9). Similarly, MIOSHA Investigator Zagresky stated in his sworn affidavit: "Ms. Peake never told me that management was resisting her efforts relative to health and safety issues." (Dkt.23–16, ¶ 16).

*2 After the citation was issued, plaintiff says that Johnson pressured her to make the MIOSHA citation "go away" since MRE would not spend anything more on compliance. (Dkt. 26–36, pp. 84, 89–90; 151–152). According to plaintiff, Johnson told her to lie to MIOSHA if she wanted to keep her job. (Dkt.26–36, pp. 69–70, 90, 157–158). Plaintiff testified that, while discussing MRE lockout/tagout deficiencies, Johnson urged plaintiff to just "take care of it" and then shared a story about an employee Matt Kulik. According to plaintiff, Johnson explained that Kulik "knew how to play the game" and "did what was necessary to keep his job." (Dkt.26–36, pp. 93,188, 158–159). Johnson revealed that Kulik falsified his quality data as part of an audit in order to keep his job. (Dkt.26–36, pp. 187–188, 157–158). In plaintiff's view, the only way to "make the citation go away" as Johnson wanted would be to lie to MIOSHA that corrective measures were being taken in response to the citation that were not actually taking place. (Dkt.26–36, pp. 157–159, 82, 154–157, 89–90, 151–152).

According to plaintiff, this was not the first time that Johnson asked her to "falsify" records. As early as February, 2008 Johnson instructed plaintiff to falsify documents for the 14001 audit documents. (Dkt.26–36, pp. 85–86). Since the company did not have the proper training documentation to pass the audit, Johnson instructed Peake to "create" training documentation so they could pass the audit. (Dkt. 26–36, pp. 87–88; 171). Peake refused and removed herself from participating in the ISO 14000 audit. (Dkt.26–36, p. 88).

In February 2008, plaintiff discovered that MRE was illegally dumping wastewater into the public sewers. (Dkt. 26–36, pp. 162–163; Dkt. 26–34, pp. 51–54, 105). Defendant's management acknowledges that such dumping of oil and water is illegal. (Dkt.26–34. p. 538). Plaintiff informed Johnson that defendant could either pay a company to remove the wastewater or have it tested and apply for a permit. (Dkt. 26–36, pp. 162–164; Dkt. 26–14, Ordinance 08–05). As per City of Detroit Ordinance 08–05, unless this strict protocol is followed, it is illegal for any company to dispose of its wastewater into the sewer. (Dkt. 26–14; Ordinance 08–05: §§ 56–3–59.1(a)(4); 56–3–61.1(a); 56–3–61(d)(4)).

According to plaintiff, Johnson denied plaintiff's requests to comply with the law. (Dkt. 26–36, pp. 164–165; 170–171).

Plaintiff went to the City of Detroit Water and Sewerage Department and obtained a copy of the relevant ordinance. During a conversation with City officials, she reported the improper dumping and asked for guidance. (Dkt. 26–36, pp. 165–166). Peake provided the ordinance to Johnson and Barth and disclosed that she reported defendant's illegal dumping to the City. (Dkt.26–36, p. 166) According to plaintiff, Johnson was furious. (Dkt.26–36, pp. 164–165). Barth told plaintiff to step aside and that he would try to "make the issue go away." (Dkt.26–36, p. 166). On April 25, 2008, Barth handed plaintiff a City of Detroit Slug Prevention Form (SCSPP) ordering her to fill it out. (Dkt. 26–15; Dkt. 26–36, pp. 166–168). The SCSPP is required under Ordinance 08–05 so that employers can identify the proper mechanism they use to dispose of wastewater. Plaintiff informed the management group, including Johnson that she would not violate the law because if the company wished to file this report, she would have to lie regarding alleged procedures and methods of disposal that defendant had in place for spill prevention and a description of "discharges" (i.e. releasing wastewater into the sewer) and "previous spill events." (Dkt. 26–33, pp. 57–58; Dkt. 26–36, pp. 163–164; Dkt. 26–34, pp. 32–34; Dkt. 26–16, pp. 1, 5, 6; Dkt. 26–14, §§ 56–3–66.1; 56–3–66.1(a) (1)). Management agreed that the dumping was illegal. (Dkt. 26–36, pp. 167–168; Dkt. 26–33, pp. 53–54). The SCSPP was ultimately filled out by Ted Barth soon after plaintiff's termination on July 25, 2008. (Dkt.26–16).[1] According to plaintiff, the illegal dumping continued until June, 2008 when the new Plant Manager Kevin Stuban overruled Johnson's refusal to hire a contractor to remove the wastewater. (Dkt.26–18). Johnson instructed plaintiff to tell the city that the management team was cooperating with abating the MIOSHA citation and stopping the dumping of the oil/water into the drain. (Dkt. 26–36, pp. 97–98; 143–144, 150). Instead, plaintiff says she told Stuban the truth, including defendant's continued MIOSHA violations, failure to abate and the illegal dumping of wastewater. (Dkt.26–36, pp. 95–96, 144). Plaintiff told Stuban that she was feeling so threatened by Johnson's pressure that she was thinking of resigning. (Dkt.26–36, pp. 95). Stuban asked plaintiff to give him a little time because he intended on changing the culture at MRE. (Dkt.26–36, pp. 95–96)

*3 After the June, 2008 conversation with Stuban and approval to hire SafetyKleen, plaintiff says that Johnson's behavior towards her turned aggressive. (Dkt.26–36, p. 144).

Johnson warned plaintiff that "she was on her own" and Johnson would no longer vouch for her to the MRE Chairman. (Dkt.26–36, pp. 175–176, 188). During a conversation about defendant's ongoing safety violations, Johnson threatened her with termination stating, "you may look good before Kevin Stuban....but you know what? The plug is going to be pulled on you." (Dkt.26–36, pp. 89–90). Then, she stopped speaking to her. (Dkt. 26–36, pp. 137; 171). At this point, plaintiff felt that her job was in jeopardy. (Dkt.26–36, pp. 172–173).

On July 9, 2008, plaintiff was seated at Martinrea's front reception desk covering for the regular receptionist who was on break. (Dkt. 26–36, pp. 46–48; Dkt. 23–8). According to defendant, plaintiff was identified as a witness to a conversation in which Stuban allegedly made harassing statements to Conry. (Dkt. 23–5, p. 58; 23–6, pp. 14–15; 23–4, pp. 15–16). Human Resources interviewed plaintiff as part of its investigation. (Dkt. 23–4, pp. 58, 60; 23–7). Quality Tech Shannon Conry told plaintiff that Plant Manager Kevin Stuban had made a comment to her about her butt. (Dkt. 26–36, p. 7; Dkt. 23–8). On July 10, 2008, plaintiff was summoned to meet with supervisor Brenda Johnson and Mark Kalfayan but, according to plaintiff, she was not given any explanation as to why she was being called to the conference room. Based on Johnson's recent job threats, hostile attitude and the pressure she was leveling against plaintiff to make false assurances to MIOSHA, plaintiff says she assumed that she was being terminated. (Dkt. 26–36, pp. 64, 69–70; 138). According to plaintiff, Johnson was extremely vague and without explanation or assurances of confidentiality asked plaintif "what occurred when [she] was at the desk the previous day." (Dkt.26–36, pp. 49, 53–54, 59–60, 67–70, 138). According to plaintiff, there was no preamble about the fact that there were discussions that a sex harassment complaint or any kind of context for the question. (Dkt. 26–36, pp. 63–64, 66–67; 137–139). Plaintiff says that she correctly and truthfully, told Johnson "nothing happened." (Dkt.26–36, pp. 66–67). Plaintiff says that she only "vague because they offered no details as to what specifically they were talking about. They were very vague." (Dkt.26–36, p. 71).

According to defendant, plaintiff initially denied that she heard the conversation between the Stuban and Conry. (Dkt. 23–5, pp. 61–62; 23–6, pp. 15–16; 23–7). In a subsequent interview, defendant asserts that plaintiff admitted that she had previously lied to management and, in fact, heard the conversation. (Dkt. 23–8, pp. 65, 183–184; 23–5, p. 136). Defendant maintains that plaintiff's employment was

terminated because of her dishonesty. (Dkt. 23–5, pp. 111–112, 132; 23–9).

*4 According to plaintiff, in fact, nothing happened that day at the reception desk. Plaintiff contends that there is no dispute about what happened and all witnesses (Stuban, Peake and Conry) confirm that there was a perfectly acceptable conversation between Conry and Stuban related to whether Conry's pants were appropriate from a safety perspective. (Dkt. 26–31, p. 12; 26–29, p. 27). According to plaintiff, the conversation was so banal that "it didn't stick out in my mind ... it meant nothing to me." (Dkt. 26–36, pp. 72, 137–139; 26–31, pp. 11–12). The next day, July 10, 2008, Stuban explained to plaintiff that there were charges of sex harassment that might be filed against him relative to the "pants" conversation at the front desk. Stuban was unsure of the specifics but he thought it might stem from the discussion about Conroy's pants. (Dkt.26–36, p. 141). Now understanding, plaintiff told Stuban that she had been very uncomfortable at the previous day's meeting and she agreed to relay what she heard about the conversation. (Dkt. 26–36, pp. 141–142; 26–31, pp. 19, 21)

That afternoon, as initiated by Stuban, plaintiff was called into a meeting where Johnson, Stuban, Conry and union president George Hardy were already present. Plaintiff described "almost word for word" what Stuban had just recounted moments earlier about the professional conversation about proper work attire. (Dkt. 26–36, pp. 142–123, 145; 26–31, pp. 17, 18, 21). At her deposition, Conry confirmed that the conversation at the front desk pertained to whether her pants were safe on the plant floor. (Dkt.26–29, p. 27). Plaintiff explained the prior day that she was not sure why she was there, she had been uncomfortable and then she made a reference to a prior employee investigation. (Dkt. 26–21, p. 3; Dkt. 26–36, p. 111). Plaintiff then shared a story about being teased as a young person in an effort to empathize with Conry's feeling self-conscious about her body. (Dkt.26–31, p. 22). At the close of the meeting, the Union represented that it would not pursue the issue formally. (Dkt.26–31, pp. 23, 25–27, 74–75). Claiming that she needed to investigate potential "perjury" further, Johnson immediately suspended plaintiff. (Dkt.26–36, pp. 73–76). According to plaintiff, Johnson failed to perform any investigation and merely terminated plaintiff one week later. (Dkt.26–31, pp. 77–78). Within 10 days of plaintiff's termination, Stuban was also mutually released and Stuban is "not sure" of the reasons. (Dkt.26–31, pp. 23–24, 79).

## III. ANALYSIS AND CONCLUSION

### A. *Standard of Review*

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Kocak v. Comty. Health Partners of Ohio, Inc .,* 400 F.3d 466, 468 (6th Cir.2005); *Thomas v. City of Chattanooga,* 398 F.3d 426, 429 (6th Cir.2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan,* 421 F.3d 433, 436 (6th Cir.2005), quoting, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Tucker v. Union of Needletrades Indus. & Textile Employees,* 407 F.3d 784, 787 (6th Cir.2005). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Twin City Fire Ins. Co. v. Adkins,* 400 F.3d 293, 296 (6th Cir.2005).

**\*5** Rule 56 limits the materials the Court may consider in deciding a motion under the rule: "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." *Copeland v. Machulis,* 57 F.3d 476, 478 (6th Cir.1995) (citation omitted). Moreover, affidavits must meet certain requirements:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

Fed.R.Civ.P. 56(e)(1). In accordance with Rule 56(e), the Sixth Circuit has held "that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded." *Moore v. Holbrook,* 2 F.3d 697, 699 (6th Cir.1993). Thus, in resolving a Rule 56 motion, the Court should not consider unsworn or uncertified documents, *id .,* unsworn statements, *Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 968–969 (6th Cir.1991), inadmissible expert testimony, *North American Specialty Ins. Co. v. Myers,* 111 F.3d 1273, 1280 (6th Cir.1997), or hearsay evidence, *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir.1996); *Wiley v. United States,* 20 F.3d 222, 225–226 (6th Cir.1994). Thus, "[a] party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact." *Id.,* quoting *Sperle v. Michigan Dept. of Corrections,* 297 F.3d 483, 495 (6th Cir.2002) (citation and quotation marks omitted).

### B. *Michigan Whistleblower's Protection Act*

Actions under the WPA are analyzed using the "shifting burdens" framework utilized in retaliatory discharge actions under Michigan's Elliott–Larsen Civil Rights Act. *Roulston v. Tendercare (Michigan), Inc.,* 239 Mich.App. 270, 280–81, 608 N.W.2d 525 (2000). Under that framework, the plaintiff bears the initial burden of establishing a prima facie case. *Id.* If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the challenged action. If the defendant produces evidence establishing the existence of a legitimate reason for the discharge, the plaintiff then has the opportunity to prove that the legitimate reason offered by the defendant was not the true reason, but was only pretext. *Id.*

To establish a *prima facie* case under the WPA, plaintiff must show that: (1) she was engaged in protected activity; (2) she was subsequently discharged, threatened, or otherwise discriminated against; and (3) a causal connection exists between the protected activity and the adverse action. *Chandler v. Dowell Schlumberger, Inc.,* 456 Mich. 395, 399, 572 N.W.2d 210 (1998). An employee is engaged in a protected activity under the WPA if he has reported, or is about to report, a suspected violation of law to a "public body." *Shallal v. Catholic Social Svs. of Wayne Co.,* 455 Mich. 604, 610, 566 N.W.2d 571 (1997). A plaintiff may establish a causal connection through direct evidence, which, if believed, requires the conclusion that the plaintiff's protected activity was at least a motivating factor in the

employer's actions. *Shaw v. Ecorse,* 283 Mich.App. 1, 14–15, 770 N.W.2d 31 (2009). The evidence presented will be sufficient to create a triable issue of fact if the jury could reasonably infer from the evidence that the employer's actions were motivated by retaliation. *Shaw,* 283 Mich.App. at 15, 770 N.W.2d 31. However, it is not required that plaintiff show that the protected trait or activity is the exclusive reason for discharge *Silberstein v. Pro–Golf of America, Inc.,* 278 Mich.App. 446, 454, 750 N.W.2d 615 (2008). A plaintiff can prove pretext directly by persuading the court that a retaliatory reason more likely motivated the employer. *Taylor v. Modern Engineering, Inc.,* 252 Mich.App. 655, 660, 653 N.W.2d 625 (2002).

### C. *Protected Activity*

**\*6** The parties spent considerable time debating whether plaintiff's actions, which involved reporting activity to various governmental agencies regarding defendant's compliance with environmental regulations, constitutes "protected activity" because she was doing so pursuant to her job duties. Michigan law on this issue is quite clear that there is no such requirement in the WPA:

> [T]here is also no language in the statute that limits the protection of the WPA to employees who report violations or suspected violations only if this reporting is outside the employee's job duties. The statute provides that an employee is protected if he reports a "violation or a suspected violation of a law or regulation or rule...." MCL 15.362. There is no limiting language that requires that the employee be acting outside the regular scope of his employment. The WPA protects an employee who reports or is about to report a violation or suspected violation of a law or regulation to a public body. The statutory language renders irrelevant whether the reporting is part of the employee's assigned or regular job duties.

*Brown v. Mayor of Detroit,* 478 Mich. 589, 596, 734 N.W.2d 514 (2007). Defendant's argument to the contrary are unavailing in light of this clear authority. Given that this is the only argument defendant makes regarding whether plaintiff's actions constitute "protected activity," the undersigned concludes that summary judgment in defendant's favor on this issue is not warranted.

### D. *Causation*

Defendant also argues that plaintiff has not established causation. For purposes of establishing a *prima facie* case

of retaliation under the WPA, a plaintiff must show that her participation in the protected activity was a "significant factor" in the adverse employment action question, and not merely that there was a causal link between the two. *Barrett v. Kirkland Community College,* 245 Mich.App. 306, 315, 628 N.W.2d 63 (2001). According to defendant, the "record is undisputed that plaintiff lied to management during an internal sexual harassment investigation" and plaintiff relying solely on the proximity in time between her protected activity and her discharge is not sufficient to establish causation. Plaintiff testified at her deposition that a person named Ron Shiver, the "head boss," as plaintiff described him, directed that plaintiff be terminated "because of cost." (Dkt.23–8, pp. 82–83). In order to prove causation under the WPA, according to defendant, plaintiff must show that Mr. Shiver had objective notice of plaintiff's claimed protected activity and that her protected activity caused him to order her firing. *Jennings v. County of Washtenaw,* 475 F.Supp.2d 692, 713 (E.D.Mich.2007); *Roberson v. Occupational Health Centers of America, Inc.,* 220 Mich.App. 322, 559 N.W.2d 86, 88 (1996). According to defendant, plaintiff has not offered any admissible evidence that Mr. Shiver was aware of any of plaintiff's protected activity, let alone that her protected activity was the reason that he allegedly ordered that she be fired. Thus, defendant concludes, plaintiff cannot establish causation.

**\*7** Plaintiff, of course, disagrees. "In order to prove causation, plaintiff must show that a decision-maker or a person who influenced the decision knew of plaintiff's protected activity. Knowledge may be shown by direct evidence or circumstantial evidence such as timing of the decision, conduct, or other evidence from which knowledge can be inferred." MI.Civ.JI 107.03 (Whistleblowers' Protection Act—Causation). Plaintiff contends that she has offered direct evidence of causation. According to plaintiff, in June, "following months of unrelenting pressure on Peake after her reports to make false claims to MIOSHA and the City, Johnson's behavior became overtly hostile. Johnson threatened Peake's job and validated Peake's concerns that she would be terminated because of her protected activities stating 'you may look good before Kevin Stuban....but you know what? The plug is going to be pulled on you.' " (Dkt.26–36, pp. 89–90). Then, according to plaintiff, Johnson stopped speaking to her. (Dkt. 26–36, pp. 137; 171). Plaintiff was terminated one month later. According to plaintiff, Johnson's statement is sufficient to establish the causal connection. Plaintiff also argues that her claim is supported by the following evidence of causation: (1) Johnson had knowledge

of plaintiff's protected activity; (2) defendant's managers were aware of plaintiff's protected activity; (3) close temporal proximity between plaintiff's protected activity and her termination; (4) Johnson's threats to plaintiff's job following the protected activity; (5) Johnson's animus and history of retaliation towards employees who made safety complaints; and (6) plaintiff was not provided with any warning or progressive discipline short of termination despite her record as an excellent employee.

In the view of the undersigned, plaintiff's testimony, if believed, and drawing all reasonable inferences in her favor, would allow a reasonable jury to conclude that retaliation was at least a substantial factor motivating her termination. *Henry v. Detroit,* 234 Mich.App. 405, 414, 594 N.W.2d 107, 112–13 (1999) (holding that there was sufficient evidence to establish a causal connection where plaintiff presented both a temporal connection and plaintiff's unblemished record of service prior to his sudden demotion). While defendant contends that plaintiff's deposition testimony is inconsistent with her admissions that she was "vague" during the interview, this is essentially a credibility determination for the jury to make. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ( "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

### E. *Pretext*

According to defendant, it has provided evidence of a legitimate nonretaliatory reason for plaintiff's termination (dishonesty during a sexual harassment investigation). In order to rebut this reason and establish pretext, plaintiff must produce sufficient evidence from which a trier of fact may reasonably reject defendant's explanation. *Robinson v. Radian, Inc.,* 624 F.Supp.2d 617, 638 (E.D.Mich.2008). In addition, plaintiff must show that retaliation was an actual motivating factor in her termination. *Hazle v. Ford Motor Co.,* 464 Mich. 456, 465, 628 N.W.2d 515 (2001). As with causation, temporal proximity by itself is not sufficient to establish pretext. *Taylor v. Modern Engineering, Inc.,* 252 Mich.App. 655, 662, 653 N.W.2d 625 (2002) ( "The short time between plaintiff's participation in protected activity and the termination of plaintiff's employment, without more, is insufficient to establish that the stated reason was a mere pretext."). Plaintiff argues that she has sufficient evidence to show that the stated reason for her termination was mere pretext.

**\*8** To raise a question of fact on the issue of pretext, a plaintiff must show, 1) that the proffered reasons had no basis in fact, 2) that the proffered reasons did not actually motivate the discharge, *or* 3) that they were insufficient to motivate discharge. *Manzer v. Diamond Shamrock Chemical Company,* 29 F.3d 1078, 1084 (6th Cir.1994). According to defendant, regardless of the label (vague, perjury, or lying) there can be no dispute that plaintiff was dishonest during the investigation given her admissions that "she was vague about what she overheard." (Dkt.1, ¶ 35). Defendant also points to plaintiff's testimony under oath at the MIOSHA hearing, she admitted she was "vague" with Kalfayan and Johnson. (Dkt.23–29). Defendant points to a document in which plaintiff purportedly explained to OSHA that she did not cooperate with the investigation because she thought it was "stupid." (Dkt.23–30).

Plaintiff appears to be proceeding under the first two theories of pretext only. According to plaintiff's deposition testimony, she did not understand during the initial meeting with Jackson and Kalfayan that any alleged sexual harassment complaint was being discussed. Rather, she testified that they were being vague in their questions about what happened at the front desk with Conroy and Stuban, which, based on what she overheard, had no sexual overtones. Instead, according to Stuban and plaintiff, Stuban had merely commented that he still thought Conroy's pants were a safety issue, which did not strike plaintiff as unusual or notable, prompting her statement that "nothing happened." According to plaintiff, she truthfully answered the questions posed and no one explained what she was being questioned about. Thus, plaintiff has offered evidence from which a reasonable jury could infer that she was not dishonest during the initial interview. Plaintiff has also offered testimony that Johnson became increasingly angry with her over the course of several months and had threatened her job on several occasions as it relates to plaintiff's efforts to get defendant to comply with health and safety regulations. As with the causation issue, plaintiff has offered evidence from which a reasonable jury could infer that her protected conduct was a substantial factor motivating the termination. A jury may well find plaintiff's version of events to be not credible in light of all the evidence ultimately admitted at trial. However, this will be a credibility determination for the jury to make.

### IV. PUBLIC POLICY CLAIMS

Defendant argues that plaintiff's common law public policy retaliatory discharge claims are preempted by the WPA and

other statutes containing express anti-retaliatory discharge provisions. (Dkt.23, pp. 27–28) (A public policy claim is sustainable "only where there also is not an applicable statutory prohibition against discharge in retaliation for the conduct at issue." *Dudewicz v. Norris–Scmid, Inc.,* 443 Mich. 68, 503 N.W.2d 645, 650 (1993), overruled in part on other grounds by *Brown v. Detroit Mayor,* 478 Mich. 589, 734 N.W.2d 514, 517 n. 2 (2007)). As set forth above, plaintiff made it clear at the hearing that the only public policy retaliatory discharge claim she is pursuing is the claim that she refused to violate City of Detroit ordinances by refusing to file falsified paperwork. To the extent that plaintiff's complaint contains any other public policy retaliatory discharge claim, those claims have been expressly abandoned. Defendant did not move to dismiss the claim based on the refusal to violate the City of Detroit ordinances. Thus, defendant's motion to dismiss should be denied.

## V. RECOMMENDATION

**\*9** For the reasons set forth above, the undersigned **RECOMMENDS** that defendant's motion to dismiss and for summary judgment be **DENIED.**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Sec'y of Health and Human Servs.,* 932 F.2d 505 (6th Cir.1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.,* 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

## Footnotes

1  According to plaintiff, the form was ultimately rejected and a City of Detroit investigation is ongoing as to defendant's dumping.

**End of Document**   © 2015 Thomson Reuters. No claim to original U.S. Government Works.