# EXHIBIT BBB

2009 WL 2591372
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Michael A MARKOS, Plaintiff,
v.
MOUNT BRIGHTON, INC., Defendant.

No. 08–cv–12588.  |  Aug. 24, 2009.

West KeySummary

1   **Federal Civil Procedure**
    Employees and Employment Discrimination, Actions Involving

    Employee established a causal connection between his request for Family Medical Leave Act (FMLA) leave and employer's decision to terminate his employment, and therefore employer's motion for summary judgment on employee's FMLA retaliation claim was denied. Employee's exercise of his protected activity occurred the same day as the adverse employment action, employee's termination. Based upon the immediacy of the termination, the court could infer a causal connection between the two actions, even if employee produced no other evidence of retaliation.

    Cases that cite this headnote

**Attorneys and Law Firms**

James K. Fett, Joshua Fields, Fett & Fields, Pinckney, MI, for Plaintiff.

Kevin S. Toll, Sheri B. Cataldo, Sullivan, Ward, Asher & Patton, P.C., Southfield, MI, for Defendant.

*ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

DENISE PAGE HOOD, District Judge.

**I. INTRODUCTION**

*1 This matter is before the Court on Defendant's Motion for Summary Judgment [**Docket No. 23, filed April 8, 2009**]. On April 29, 2009, Plaintiff filed his Response [**Docket No. 29**], to which the Defendant filed its Reply [**Docket No. 31, filed May 11, 2009**]. A motion hearing was held on May 20, 2009. For the reasons set forth below, Defendant's Motion is DENIED.

**II. STATEMENT OF FACTS**

Plaintiff Michael A. Markos brings this action against Defendant Mount Brighton, Inc. ("Mt.Brighton") pursuant to the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2611 *et seq.* Markos alleges that Mt. Brighton violated the FMLA by terminating him upon receipt of his notice requesting medical leave and by refusing to grant the requested leave. Markos also alleges a retaliation claim, in violation of his rights under Michigan's Worker's Disability Compensation Act, M.C.L. § 418.101 *et seq.*

**A. Employment and Job Performance**

The underlying facts are highly contested. Mt. Brighton is a corporation located in the City of Brighton, Michigan. During the winter months, Mt. Brighton operates primarily as a ski resort, and during the remainder of the year it operates as a golf facility hosting various golf-related outings. Plaintiff Markos began working in March of 2004 as the executive chef. In this capacity, Markos managed the resort restaurant, "The Bauery Bar and Grill," and was also responsible for booking banquets, and hiring entertainment.

Markos' performance in the role of executive chef is a subject of much debate between the parties. According to Markos, he performed well during his tenure and the restaurant's sales increased. For example, he offers the deposition testimony of Rudy Catal, the Mt. Brighton ski instructor and PGA professional since 1974, who described Markos as the "best chef" he had seen during his thirty year tenure at Mt. Brighton. [Pl.'s Resp. to Def.'s Mot. for Summ. J., p. 2]. Similarly, Kim Pikunas, Mt. Brighton's Lounge Manager, testified that Markos "did his job." [*Id.*, p. 3]. On the other hand, there is substantial evidence which tends to demonstrate Markos' unsatisfactory performance as executive chef. Starting with Markos employment application, wherein he falsely indicated that he had received culinary training from Schoolcraft

College, as well as failed to disclose multiple criminal convictions, Mt. Brighton officials also offer other specific incidents which prompted their decision to terminate Markos. However, Markos challenges the authenticity of each of the asserted grounds as mere pre-text for a discriminatory motive. The Court will describe each of the events in turn.

To begin, the Defendant alleges that within six to seven months of employment Markos was consistently under the influence of alcohol while at work, and had a noticeable drinking problem. The deposition testimony and affidavits of Markos' supervisors and other Mt. Brighton employees (Robert & Joseph Bruhn, Kim Pikunas, James Matheny, Deanie Fernandez), generally provide that Markos would appear or smell as if here were intoxicated or using marijuana. These witnesses also testified that they also noticed that "[e]mpty liquor bottles began appearing everywhere, poorly hidden in various kitchen locations," and that the liquor inventory frequently came up short, which ended after Markos' employment was terminated. [Def.'s Mot. for Summ. J., p. 2]. As a result, Mt. Brighton's management claims they had numerous discussions with Markos about his drinking and other problems.

**\*2** Markos' behavior, according to Defendant, took a turn for the worse at a July 3, 2005 pig roast for a graduation party. Although the graduation party was not a Mt. Brighton event, Markos and two other restaurant employees provided service for the pig roast. One of the employees, Andy LeVan, was so appalled by Markos' behavior at the pig roast that he wrote a six-page letter to Joseph Bruhn, President and General Manager of Mt. Brighton, detailing allegations of theft, poor workmanship, and Markos' sexual escapades at the resort. With respect to the allegations of the letter, Markos points out many of the letters' inaccuracies, and the fact that it was motivated by a disgruntled subordinate. For example, LeVan claimed that Markos sold illegal fireworks "for a couple of years," when Markos had only been working at Mt. Brighton since 2004. LeVan also indicated that the pig roast went poorly, while different accounts indicate otherwise.

On July 17, 2005, Mt. Brighton placed a classified ad in the Livingston County Daily Press & Argus, seeking an executive chef. The ad ran from July 17, 2005 through July 22, 2005. On July 18, 2005, there was a weekly meeting of Mt. Brighton department heads, where Markos was in attendance, to discuss upcoming golf events and the necessary food requirements. After the meeting, Diane Olmstead, the Lodge Manager, prepared a memorandum for Markos' personnel file, in which she indicated the following:

> Every Tuesday we meet for a meeting with department heads. On this Tuesday Mike Markos came to the meeting under the influence of alcohol. Mike has been spoken to about his drinking on the job on many occasions. Trying to conduct a meeting with him in this condition was impossib[ ]le. The signatures below were the other people involved in the meeting who will attest to Mikes['] condition on that day.

[July 18, 2005 Olmstead Memorandum, Def.'s Mot. for Summ. J., Ex. N]. The memorandum was signed by Diane Olmstead (Lodge Manager), Kim Pikunas (Lounge Manager), Rob Bruhn (Operations Manager), and Sarah Marshall (Wait Staff Manager). Diane Olmstead prepared a similar memorandum on July 23, 2005, which indicated that "Mr. Markos had a very bad attitude on this evening because he had been told by his managers on several occasions that we were not happy with the job he was doing." [July 23, 2005 Olmstead Memorandum, Def.'s Mot. for Summ. J., Ex. O]. Markos challenges the authenticity of the aforementioned memoranda and claims that they were fabricated. Specifically, he provides the affidavit of Sarah Marshall who submits that she never signed the July 18, 2005 Memorandum, nor had she seen Markos intoxicated while at work. Similarly, Kim Pikunas' affidavit of December 16, 2008 provides that she never saw Markos intoxicated or interfering with a meeting.[1] Markos also claims none of these documents were submitted to the Unemployment Insurance Agency, when Mt. Brighton challenged Markos' unemployment claims. In addition to denying their accuracy, Markos also submits that the memoranda were never shown to, or discussed with him. Markos alleges that no disciplinary action was ever taken against him, despite Mt. Brighton's stringent alcohol policy, which provides:

> **\*3** Any employee who consumes either drugs or alcohol while working will be **FIRED** on the spot. **NO EXCEPTIONS THIS IS YOUR ONLY WARNING!!!** [Substance Abuse Policy, 2005–06 Employee Handbook, Pl.'s Resp to Def.'s Mot. for Summ. J., Ex. C (emphasis in original) ].

On July 26, 2005, Olmstead performed a background check on Markos and discovered his criminal record. She indicated that someone told her about Markos' criminal record, which prompted her to perform a search. After discovering his criminal record, Olmstead told both Joseph and Robert Bruhn, however, Markos asserts that no disciplinary action was taken against or communicated to him.

Defendant claims to have made the decision to terminate Markos once a replacement could be secured in January of February of 2006. However, no action was immediately taken because the winter ski season is the busiest time for the resort.

### B. Plaintiff's Injury & Termination

On either April 1 or 2, 2006, Markos was injured while attempting to break up a fight that occurred at approximately 12:30a.m. Apparently, the fight erupted between two patrons, and Markos' knee was injured when one of them landed on top of him. As a result, he was placed in an iron brace and required crutches. On April 3, 2006, Markos informed Joseph Bruhn and Olmstead of his knee injury, and that he was unable to stand on his feet all day. However, Markos, Bruhn, and Olmstead agreed that Markos would continue to do his job to the best of his ability. According to Markos, Bruhn became upset after Markos reported his injury, and indicated to Bruhn that it occurred while he was working.

On May 1, 2006, Bruhn placed Markos on probation because he caught Markos drinking in the backroom on the north end of the ski lodge. Pursuant to the Employee Probation Report in his personnel file, Markos was put on probation because he "has been warned about drinking on the job .... [and] consistently feels he has to give free meals to customers." [May 1, 2006 Employee Probation Report ("Probation Report"), Def.'s Mot. for Summ. J., Ex S]. Markos challenges the validity of the Probation Report. Particularly, he alleges that it was backdated to May 1, 2006, "to create the illusion that it took an adverse action before Markos requested a leave on May 9, 2006." [Pl.'s Resp. to Def.'s Mot. for Summ. J., p. 8]. Markos contends that he was never shown the Probation Report. Markos also points toward subtle discrepancies in Bruhn's deposition testimony and affidavit concerning what prompted the Probation Report.[2]

On May 9, 2006, Markos gave Joseph Bruhn a proof of disability form from Dr. Jolie Holschen, in which she prescribed no work for one month and the continued use of an iron brace. Despite this prescription, both Markos and Bruhn agreed that Markos would continue working to the best of his ability due to the upcoming functions at Mt. Brighton.

On May 14, 2006, Mt. Brighton placed another advertisement with the Livingston County Daily Press & Argus seeking a new executive chef. This advertisement was nearly identical to the previous one, and ran from May 14, 2006 to May 26, 2006.

*4 On May 20, 2006, Mt. Brighton hosted the 20th anniversary celebration of the Motor City Chapter of the Harley Owners Group, more popularly known as the Hog Fest. The Hog Fest was a big event for the resort as between 500–700 individuals were in attendance. Markos was responsible for preparing the meal. Joseph Bruhn asserts that Markos' performance at the Hog Fest was the "last straw," and solidified his decision to terminate Markos. Specifically, Bruhn submits that Markos obstinately refused to prepare an additional food line, despite Bruhn's request. As a result, the organizer was furious and Mt. Brighton lost $500.00 by providing a price reduction. On this point, Markos claims that the organizer demanded a reduction simply because Markos took an extra twenty minutes to serve the food.

On May 28, 2006, Mt. Brighton again placed another advertisement for an executive chef in the Livingston County Daily Press and Argus. The substantially similar advertisement ran from May 28, 2006 to June 2, 2006.

On or about June 22, 2006, Mt. Brighton conducted an interview with John Evans, a chef who submitted his resume on April 1, 2006. After the interview, Joseph Bruhn claims that he decided to hire Evans as Markos' replacement, and that Evans would commence his employment on July 3, 2006. Joseph Bruhn's anticipated terminating Markos' employment on June 30, 2006.

Markos had a follow-up doctors appointment scheduled on June 30, 2006, wherein his doctor told him that he could no longer work. The same day Markos presented his second proof of disability form to Joseph Bruhn, after which he claims that Joseph Bruhn immediately terminated his employment. The exact details of Markos' termination is another subject of debate between the parties. Markos submits that after Bruhn read the second proof of disability he responded, "It doesn't matter because you don't work here anymore." [Pl.'s Resp. to Def.'s Mot. for Summ. J., p. 11].

Joseph Bruhn alleges that he did not even read the proof of disability, and that **Markos** never actually requested leave on June 30, 2006.

**Markos** filed a three-count complaint alleging interference and retaliation claims under the FMLA.

### III. STANDARD OF REVIEW

Defendant brings the instant motion pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party.

In reviewing a party's motion for summary judgment, all evidence must be viewed in a light most favorable to the nonmoving party, and summary judgment is appropriate whenever the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 332. Ultimately, the standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

### IV. LAW & ANALYSIS

#### A. FMLA Claims

\*5 Pursuant to the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.,* "a qualifying employee is entitled to up to twelve weeks of unpaid leave each year if, *inter alia,* the employee has a serious health condition that makes an employee unable to perform the functions of his position." *Daugherty v. Sajar Plastics, Inc.,* 544 F.3d 696, 706 (6th Cir.2008) (citing 29 U.S.C. § 2612(a) (1)(D)). Once the FMLA leave period is exhausted, the employee must be reinstated to his position or an equivalent position in terms of pay, benefits, and other conditions of employment. *Id.* at 706–

07 (citing 29 U.S.C. § 2614(a)(1)). Consequently, the FMLA declares it unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a) (1). It is equally unlawful "for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA.]" 29 U.S.C. § 2615(a)(2). Based on these statutory mandates, the Sixth Circuit has consistently recognized two distinct theories of recovery for violations of the FMLA: (1) the so-called "entitlement" or "interference theory," arising from 29 U.S.C. § 2615(a)(1) and; (2) the "retaliation" or "discrimination theory" arising from 29 U.S.C. § 2615(a)(2). *Daugherty,* 544 F.3d at 707; *Bryson v. Regis Corp.,* 498 F.3d 561, 570 (6th Cir.2007). In its Motion for Summary Judgment, Defendant avers that it is entitled to summary judgment on both Plaintiff's retaliation (Count II) and interference (Count I) claims.

#### 1. *Retaliation Claim*

Defendant first attacks the sufficiency of Plaintiff's retaliation claim by arguing that he cannot establish a prima facie case of retaliation under the FMLA. In order to establish an FMLA discrimination claim, a plaintiff must demonstrate that: "(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action." *Killian v. Yorozu Automotive Tennessee, Inc.,* 454 F.3d 549, 556 (6th Cir.2006). As the employer's motive is central to FMLA retaliation claims, courts are to apply the familiar burden-shifting test articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to assess whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason. *Edgar v. JAC Products, Inc.,* 443 F.3d 501, 508 (6th Cir.2006). If the employee is able to establish a prima facie case for retaliation, "the burden shifts to the employer to proffer a legitimate, nondiscriminatory rationale for discharging the employee." *Edgar,* 443 F.3d at 508. "If the defendant succeeds, the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination." *Bryson v. Regis Corp.,* 498 F.3d 561, 570 (6th Cir.2007).

\*6 Of the above enumerated prima facie elements, Defendant only contests the fourth one; specifically, that

there is no causal connection between Plaintiff's request for FMLA leave and Defendant's decision to terminate his employment. Chiefly, Defendant alleges that its decision to terminate Plaintiff was solidified well-before any notice of his disability, and as such does not implicate FMLA concerns. This Court disagrees.

As an initial matter, the Court emphasizes that the "plaintiff's burden in establishing a prima facie case is not intended to be an onerous one." *Bryson*, 498 F.3d at 571. The Sixth Circuit Court has previously held that "proximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection." *Id.* (citing *Skrjanc*, 272 F.3d at 314; and *Chandler v. Specialty Tires of Am.*, 283 F.3d 818, 826 (6th Cir.2002)). Under the instant circumstances, Plaintiff's exercise of his protected activity (the purported request for FMLA leave) occurred the same day as the adverse employment action (his June 30, 2006 termination). As such, this Court concludes, for purposes of surviving summary judgment, that he has sufficiently established a question of fact regarding the causal connection between the activity protected by the FMLA and the adverse employment action.

Despite Defendant's contrary assertion, in some instances temporal proximity alone may be sufficient to create a genuine issue of material fact as to a causal connection. In *Mickey v. Zeidler Tool and Die Company*, the Sixth Circuit had occasion to clarify the contours of when temporal proximity is sufficient to establish causality, in the context of age discrimination. 516 F.3d 516, 525 (6th Cir.2007). In so doing, the Sixth Circuit explained:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Id.* Plaintiff's termination coincided with the exact day of his request for FMLA leave, and as such, Plaintiff has met his prima facie burden for purposes of summary judgment. Viewing the evidence in a light most favorable to the Plaintiff, after giving Joseph Bruhn the proof of disability, Bruhn responded, "It doesn't matter because you don't work here anymore." Based upon the immediacy of the termination, the Court can infer a causal connection between the two actions, even if Plaintiff produces no other evidence of retaliation. *Id.; see also Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir.2006).

Having established a prima facie case, the Court now turns toward Defendant's proffered legitimate, nondiscriminatory reasons for Plaintiff's discharge. On this point, Defendant advances multiple justifications for its decision to terminate the Plaintiff: (1) his declining performance; (2) his poor attitude; (3) being under the influence of alcohol while at work; (4) giving free food to customers and other employees; (5) giving free golf privileges to his friends and covering it up; and (6) suspicions that he was stealing liquor. (Def.'s Mot. for Summ. J., p. 13). The second and more difficult question is whether Plaintiff has presented sufficient evidence to show that the reasons Defendant gave for his termination were pretextual. While the issue is far from clear-cut, the Court disagrees with Defendant and finds that under summary judgment standards, there is sufficient evidence to show pretext.

*7 Defendants' proffered reasons for termination are strong and well-taken. However, in the context of summary judgment, where the Court must examine the evidence in the light most favorable to the non-moving party, there is sufficient evidence to raise a genuine issue of fact as to Defendant's motives. In order to demonstrate that the employer's proffered reason is pretextual, the employee must offer evidence that the proffered reason: "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir.2008). Plaintiff has presented sufficient evidence to permit a reasonable jury to conclude that Defendant's reasons were merely a pretext for retaliating against Plaintiff for engaging in protected conduct.

The most significant evidence showing pretext are the inconsistencies supporting many of the Defendant's purported disciplinary actions that culminated in termination. According to the Plaintiff, who at this juncture is entitled to

all reasonable inferences drawn in his favor, he was never informed of nor required to sign any of the disciplinary actions that Defendant claims he received. In this same vein, the July 18, 2005 Olmstead Memorandum, which bears the apparent signatures of four **Mt. Brighton** employees is disputed by Sarah Marshall, who specifically disavows ever signing or even seeing the document. Equally inconsistent is the statement of Kim Pikunas, who in her December 16, 2008 affidavit, indicated that "she never saw Mr. **Markos** intoxicated," but in her March 30, 2009 affidavit indicated that "Plaintiff appeared ... as though he may have been under the influence of alcohol." The final inconsistency is Joseph Bruhn's varying accounts regarding Plaintiff's replacement. In his November 3, 2008 deposition, Joseph Bruhn testified:

**Q. Why did you fire him at the time?**

A. We had been planning for a long time, in May of '06 we ran two one-week ads in the paper, local paper, looking for another chef. We did some interviews. Did not find someone that fit our making. We had another employee that wanted the job. Gave his resume I believe to Diane, I believe, or Rob. We interviewed him and decided that was the way were going to go. We had talked to him before this date and he was willing to take the job and so we gave him the job.

...

**Q. What's the person's name that you're referring to?**

A. James [Matheny]

...

**Q. And your testimony is you had someone lined up, a James Mathney?**

A. James, yes. Chef James, it.

[November 3, 2008 Joseph Bruhn Deposition, Pl.'s Resp. to Def.'s Mot. for Summ. J., Ex. B, p. 49–50]. In contrast, Joseph Bruhn's April 3, 2009 Declaration indicates that the replacement he had in mind was a chef by the name of John Evans. [April 3, 2009 Joseph Bruhn Declaration, Def.'s Mot. for Summ. J., Ex. M]. All of this evidence combined lends credence to Plaintiff's assertion that the discipline on which Defendant so heavily relies was potentially "fabricated," and or "back-dated" for the purposes of masking a retaliatory motive. *Mickey*, 516 F.3d at 527 ("Such inconsistency and evasiveness seem to be the epitome of pretext meant to mask retaliatory discrimination, at the very least raising a factual question for a jury to resolve.").

*8 Additionally, Plaintiff has marshaled sufficient evidence to cast doubt on each of the Defendant's proffered reasons for his termination. As to his declining performance, Plaintiff again offers the testimony of Catal, in whose estimation and extensive experience considered Plaintiff the best chef **Mt. Brighton** ever had. Toward this same end, Plaintiff submits that the Defendant never directed him to do anything differently as it relates to his performance as executive chef. With regard to his poor attitude, Catal likewise confirms that Plaintiff was well-liked by both customers and employees. As it relates to the claims of alcohol use, Plaintiff expressly denies using alcohol while at work. On this point, like most others, the affidavits, and deposition testimony are in conflict. This Court is persuaded—for purposes of the tripartite burden shifting analysis—by the affidavits of several **Mt. Brighton** employees with substantial contact with Plaintiff, including Darren Holman (dishwasher and janitor), Sarah Marshall (Wait Staff Manager), and Rudy Catal (PGA professional), who claim they never saw him intoxicated while at work, that Plaintiff has raised a genuine issue of material fact on the question of pretext. (Pl.'s Resp. to Def.'s Mot. for Summ. J., p. 16). Plaintiff further submits that he was "never accused of being responsible for missing liquor," and that he along with the four other employees had access to the liquor. (*Id.*, p. 14). In reference to giving away free food and golf, Joseph Bruhn testified that on occasion he would authorize members of his staff to provide complimentary meals or golf. Catal also testified that Department heads were permitted to golf for free and could do so with up to three guests. As to all of these explanations, the Defendant correctly notes that, "conclusory allegations and [Plaintiff's own] perceptions ... are not sufficient to stave off summary judgment." *Wade v. Knoxville Utilities Board*, 259 F.3d 452, 463 (6th Cir.2001). However, Plaintiff has offered more than just his own conclusory allegations and perceptions as all of his assertions are at least corroborated by the testimony of one other witness. All of this evidence taken together, considered under the summary judgment standard where the Court evaluates all evidence in the light most favorable to Plaintiff, indicates that Defendant's stated reasons for terminating Plaintiff could be rejected as pretext for discrimination.

Finally, in its reply brief, Defendant recounts several facts that derogate Plaintiff's performance as the executive chef in order to demonstrate that it had an "honest belief" in its non-discriminatory reasons for Plaintiff's discharge. In order to

establish the honest belief defense, "the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Mickey,* 516 F.3d at 526. However, as established by the Plaintiff's justifications above, "[w]hen the employee is able to produce sufficient evidence to establish that an employer failed to make a reasonably informed and considered decision before taking its adverse employment action ... any reliance placed by the employer in such a process cannot be said to be honestly held." *Smith v. Chrysler Corp.,* 155 F.3d 799, 807–808 (6th Cir.1998).

*9 Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff's retaliation claim is DENIED.

## 2. *Interference Claim*

Under the entitlement or interference theory, "[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA-for example, a twelve-week leave or reinstatement after taking a medical leave." *Edgar v. JAC Products, Inc.,* 443 F.3d 501, 507 (6th Cir.2006). Employees who seek relief under "the entitlement theory must prove that their employer interfered with or denied them an FMLA benefit to which they were entitled." *Id.* at 511; *Arban v. West Pub. Corp.,* 345 F.3d 390, 401 (6th Cir.2003).

In order to state a prima facie claim of "interference" or "entitlement" under the FLMA a plaintiff must show that: (1) she is an eligible employee; (2) defendant is a covered employer; (3) she was entitled to leave under the FMLA; (4) she gave defendant notice of her intent to take leave; and (5) defendant denied her FMLA benefits to which she was entitled. *Hoge v. Honda of America Mfg. Inc.,* 384 F.3d 238, 244 (6th Cir.2004); *Cavin v. Honda of America Mfg., Inc.,* 346 F.3d 713, 719 (6th Cir.2003).

Defendant does not challenge the prima facie elements of the Plaintiff's interference claim, but instead presents two arguments in support of its summary judgment motion. First, Defendant argues that Plaintiff is unable to establish that he would not have been discharged if he had not taken FMLA leave. Second, Plaintiff is unable to establish that he would return to work at the end of the 12–week leave period.

Defendant argues that its reasons for terminating Plaintiff were wholly unrelated to his request for FMLA leave and would have occurred regardless of his request. This Court finds Defendant's reasoning unavailing. To be sure, "[a]n employee who requests FMLA leave would have no greater protections against his or her employment being terminated for reasons not related to his or her FMLA requests than he or she did before submitting that request." *Arban,* 345 F.3d at 401. Consequently, if an employer claims that the employee would have been discharged regardless of his requested leave, the employee must present sufficient evidence that he would not have been discharged if he had not taken FMLA leave. *Id.* As demonstrated above, sufficient evidence exists in this case on which a trier of fact could infer that Defendant would not have terminated Plaintiff if he had not requested the FMLA leave. Here, the Court must address Defendant's reliance on its claim that **Mt. Brighton** was actively seeking to replace Plaintiff as demonstrated by the use of three advertisements. These advertisements, and in particular the first one, create a strong inference in favor of Defendant's assertion that it was intending to terminate Plaintiff's employment. However, such information is insufficient for the Court to hold as a matter of law, that Defendant would have fired Plaintiff regardless of his request for FMLA leave. Particularly, because the conduct which Defendant asserts led to Plaintiff's termination had been ongoing for nearly two years, yet Defendant did not terminate him until the day he sought to invoke his FMLA leave. *Id.* at 402 ("the timing of this decision could lead a fact finder to infer that the employee would not have been fired absent her taking of leave [ ] if, for example, a supervisor who had been aware of problems with an employee did not decide to fire the employee until she took leave, and the supervisor based the firing on the incidents of which the employer had already been aware.")

*10 Defendant's second argument—that Defendant did not violate the FMLA because Plaintiff was unable to return to work after 12 weeks—is equally unavailing. The Sixth Circuit has previously held than an employer "does not violate the FMLA when it fires an employee who is indisputably unable to return to work at the conclusion of the 12–week period of statutory leave." *Edgar,* 443 F.3d at 507 (citing *Cehrs v. Northeast Ohio Alzheimer's Research Center,* 155 F.3d 775, 784–85 (6th Cir.1998)). The Court does not take issue with the Defendant's citation, however, it is the application of the asserted rule to these facts where the Court must disagree. Specifically, there is insufficient evidence in the record to conclude as a matter of law that Plaintiff "was undisputably unable to return to work." In fact, Defendant solely relies upon Plaintiff's decision to quit his other employment because he was unable to standup for hours at a time, and a time schedule for a surgery he never underwent (which, called for only 4–6 week post-op treatment plan). [**Markos**

Surgery Treatment Plan, Def.'s Reply, Ex. E]. Such evidence does not comport with either *Edgar* or *Cehrs*, where the Sixth Circuit found indisputable and uncontroverted medical documentation that employees were unable to return to work after 12 weeks of leave. *Edgar*, 443 F.3d at 507 (citing *Cehrs*, 155 F.3d at 784–85 (6th Cir.1998)). Defendant's proffered evidence is short of this standard.

Accordingly, Defendant is not entitled to summary judgment as to Plaintiff's interference claim.

### B. Michigan's Workers' Disability Compensation Act

In challenging the final count, Defendant argues that Plaintiff is unable to establish a prima facie case of retaliation under the Michigan's Workers Disability Compensation Act ("MWDCA"), M.C.L. § 418.301(11).

The MWDCA makes "it unlawful for an employer to 'discharge an employee or in any manner discriminate against an employee' because the employee filed a complaint or instituted a proceeding under the Act or because of the employee's exercise of a right afforded by the Act." *Harper v. AutoAlliance Intern., Inc.*, 392 F.3d 195, 203 (6th Cir.2004) (citing § 418.301(11)). In order to establish a prima facie case for retaliatory discharge under the MWDCA, a plaintiff must establish that: "(1) he asserted his rights to workers' compensation benefits; (2) the defendant knew that plaintiff asserted his rights to workers' compensation benefits; (3) the plaintiff suffered an adverse employment action; and (4) there was a causal connection between the plaintiff's assertion of his right to workers' compensation benefits and the adverse employment action." *Dortman v. ACO Hardware, Inc.*, 405 F.Supp.2d 812, 822 (E.D.Mich.2005) (citing *Chiles v. Machine Shop, Inc.*, 238 Mich.App. 462, 470, 606 N.W.2d 398 (Mich.Ct.App.1999)). Courts also utilize the *McDonnell Douglas* framework set forth above, once an employee establishes a prima facie case. *Chiles*, 238 Mich.App. at 470, 606 N.W.2d 398.

\*11 Defendant argues that Plaintiff is unable to demonstrate the causal connection between Plaintiff's assertion of his right to workers' compensation benefits and his termination. Further, Defendant articulates the identical legitimate, non-retaliatory reason for the adverse employment decision as asserted in the FMLA context. The Michigan Supreme Court has held that plaintiffs "must show something more than merely coincidence in time between protected activity and adverse employment action" in order to establish a causal connection. *West v. General Motors Corp.*, 469 Mich. 177, 186, 665 N.W.2d 468 (Mich.2003). Viewing the evidence in a light most favorable to the non-moving party, Plaintiff offers more than the temporal proximity in order to establish causation. In particular, Plaintiff submits that after he characterized his accident as occurring at work, Joseph Bruhn's attitude toward him "totally changed." (Pl.'s Resp. to Def.'s Mot. for Summ. J., p. 19). Evidence of a reaction or conduct on the part of a supervisor "that reasonably suggests that they were upset by the fact that plaintiff" engaged in a protected activity can support a causal connection when combined with a close temporal relationship. *West*, 469 Mich. at 186–87, 665 N.W.2d 468. As such, the Court finds that Plaintiff has presented sufficient evidence to establish a prima facie case of retaliation under the MWDCA for the purposes of this motion, and the Court further finds that Plaintiff has presented sufficient evidence to raise a genuine issue of material fact as to whether Defendant's proffered reasons for termination amount to pretext.

Accordingly, Defendant is not entitled to summary judgement as it relates to Plaintiff's MWDCA claim.

### V. CONCLUSION

For the reason set forth above,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment **[Docket No. 23, filed April 8, 2009]** is **DENIED.**

---

Footnotes

1    Strangely, Defendant offers a subsequent affidavit of Kim Pikunas, in which she indicates "I recall that I personally smelled alcohol on Plaintiff's breath during at least one department meeting for certain." [March 30, 2009 Pikunas Affidavit, Def.'s Mot. for Summ. J., Ex. H].

2    In his November 3, 2008 deposition, Bruhn testified that he did not specifically recall what precipitated Markos' probation. However, in his April 3, 2009 Declaration, he indicates the Probation Report was created after he caught Plaintiff drinking in the backroom of the North End of the ski lodge.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.