

**TRI-COUNTY COURT REPORTERS, INC.**

(248)608-9250 Fax (248)608-9252

www.tri-countycourtreporters.com

Transcript of the Testimony of
# Natalie Reeser

**Date:** March 30, 2015
**Volume:** I

**Case:** Reeser v. Henry Ford Hospital

Printed On: May 11, 2015

Natalie Reeser
3/30/2015

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

NATALIE REESER,

        Plaintiff,

                               CASE NO:2:14-cv-11916

vs.

HENRY FORD HOSPITAL,

        Defendant.

_____/


        Volume I of the deposition of NATALIE

REESER, taken before me, Lauri A. Sheldon, CSR 4045, RPR,

on March 23, 2015, at 39500 High Pointe Boulevard, Suite

350, Novi, Michigan, commencing at or about 10:07 a.m.

APPEARANCES:


    MILLER COHEN, P.L.C.
    BY:  KEITH D. FLYNN, ESQUIRE
    600 W. Lafayette Boulevard, 4th Floor
    Detroit, Michigan  48226
    313-964-4454
    Appearing on behalf of the Plaintiff.

    VARNUM, LLP
    BY:  TERRENCE J. MIGLIO
    39500 High Pointe Boulevard, Suite 350
    Novi, Michigan  48375
    248-567-7400
    tjmiglio@varnumlaw.com
    Appearing on behalf of the Defendant.

Natalie Reeser
3/30/2015

Page 36

1    A    I was given direct orders from Martha Wiseheart on a

2         daily basis to do all of her administrative assistant

3         work.

4    Q    We'll get through this a lot quicker if you just listen

5         to my questions.

6              MR. FLYNN:  Objection.  She's answering your

7         question.

8              THE WITNESS:  I answered the question.

9    Q    (Continuing by Mr. Miglio):  Were there additional job

10        duties other than what's listed on Exhibit 5 that you

11        were required to do?

12             MR. FLYNN:  Objection.  Asked and answered.

13        You can answer.

14             THE WITNESS:  On a daily basis Martha Wiseheart

15        directed me to do her administrative assistant jobs.

16   Q    (Continuing by Mr. Miglio):  So the answer to my question

17        is yes.

18   A    No.  There's more.

19   Q    Okay.  The answer to my question that you were required

20        to do job duties in addition to what's listed on

21        Exhibit 5 is yes?

22             MR. FLYNN:  Objection.  Asked and answered.

23   Q    (Continuing by Mr. Miglio):  Correct?

24   A    I don't know what you're asking.  I gave my answer.

25   Q    What additional job duties did you have other than what's

Tri-County  Court Reporters
248-608-9250

Natalie Reeser
3/30/2015

Page 92

1          Clinton Township site.

2     A    Martha Wiseheart let me leave for a TB test.  She let me

3          leave for cashing a check, the flood check.  She let me

4          leave to go to the bank one day and cash another check.

5          She let me leave and actually take a lunch one day.

6     Q    Any other occasions?

7     A    I can't recall the last one.

8     Q    All right.  When did she let you leave to go to a TB

9          test?

10    A    I'm not sure when that was.

11    Q    And how did she give you authorization?  Did she tell you

12         verbally or --

13    A    Yes.

14    Q    -- she said that, "Just go ahead and leave for the TB

15         test."

16    A    "Just run over there.  Go get your TB.  I'll watch the

17         desk."

18    Q    Okay.  Was that on the day that you were suspended?  Is

19         that the incident?

20    A    No.  No.

21    Q    Oh, there was another TB test before that -- or there was

22         a TB test that you were given authorization to leave

23         before that, right?  Is that what you're saying?

24    A    Nope.  Only one TB test.

25    Q    Okay.  And you're saying Martha gave you authorization.

Natalie Reeser
3/30/2015

Page 93

1   A   Yes, she did.

2   Q   Did Fiona give you authorization to leave --

3   A   I don't recall.

4   Q   -- on that occasion?

5   A   Don't know.

6   Q   Okay.  And this cashing the flood check, when did that

7       occur?

8   A   Sometime in 2012, 2013.

9   Q   And what site were you working at?

10  A   The only site I worked at primary, Clinton Township PSC.

11  Q   And what happened that you needed to leave the work site?

12  A   They issued the check.  Martha was acting like she was a

13      friend of mine.  She wanted me to be able to go buy some

14      clothes and some food, because she had taken me shopping

15      and bought me that stuff herself, so she wanted me to go

16      pick up the check, cash it from the insurance place, so

17      I'd have money to find a place to stay that night.

18  Q   Okay.  What happened to the site when you left?  Somebody

19      cover?

20  A   I'm not sure.

21  Q   Did somebody cover?

22  A   I have no clue.

23  Q   Okay.  And Martha said to you you can go ahead and leave?

24  A   Martha gave me permission to leave, correct.

25  Q   Did she give that to you in writing?

Natalie Reeser
3/30/2015

Page 94

1    A    No.

2    Q    And you say that was during 2012 or during 2013?

3    A    Correct.

4    Q    Well, which?  Do you know?

5    A    I don't recall when I got the check.

6    Q    Well, when was the place flooded?

7    A    It was flooded in 2012, but the whatever, lawsuit,

8         the . . . and when there's multiple people or whatever, I

9         don't know.  It was at the end of that lawsuit that we --

10   Q    Okay.  And then you said you went to a bank a second time

11        and Martha gave you permission.  When was that, the trip

12        to the bank the second time?

13   A    I believe in 2013.

14   Q    And what was that for?

15   A    She just let me have a lunch break finally.

16   Q    Did somebody cover?

17   A    No.

18   Q    Do you know whether Fiona gave you authorization to go to

19        the bank that second time?

20   A    I do not recall.

21   Q    Do you know whether Fiona was consulted to give you

22        authorization to go to cash the flood check?

23   A    I do not know.

24   Q    Okay.  And then you said you -- the fourth occasion was

25        you left to go to lunch and Martha gave you permission.

Natalie Reeser
3/30/2015

Page 95

1      Is that what you said?

2  A  Yeah.  As a matter of fact, Martha gave me money and I

3      bought her food and brought it back to her.

4  Q  When was that?

5  A  That was in 2013 some time.

6  Q  And you say Martha gave you authorization in writing or

7      verbally?

8  A  Martha was my standing manager, so she gave me

9      authorization verbally.

10  Q  Standing manager.  What does that mean?

11  A  That means she was in the building with me and gave me

12      direct orders all day long.  She was the manager I

13      reported to, basically.

14  Q  The manager you reported to.  And was she the manager

15      that you reported to throughout the course of your

16      employment?

17  A  Pretty much, yes.

18  Q  Did she perform your performance evaluation?

19  A  No.

20  Q  Did she set your wages, do you know?

21  A  I have no clue.  At the time of my employment there

22      Martha and Fiona acted like they were partners, and I'm

23      not the only employee who understands that.

24  Q  Who else would understand that?

25  A  Some of the employees that are no longer there.

Natalie Reeser
3/30/2015

Page 110

1   A    December 30th, 2011.

2   Q    Okay.  And when was the unemployment hearing?

3   A    These are probably all documents that I printed off to

4        send to Jill Hood.

5   Q    When was the unemployment hearing?

6   A    I have no clue.

7   Q    And why were you informing Jill Hood about this?

8   A    I was informing Jill Hood about that because I was given

9        a direct order from Fiona to testify against this person

10       so they would not receive compensation from Henry Ford

11       Medical Laboratories.  Unemployment.

12  Q    Okay.  And why were you telling Jill Hood this?

13  A    Because that's part of the harassment that Fiona gave me

14       after I reported the State about lunches and breaks.

15  Q    Exactly when did you report to the State that you were

16       not paid for your lunches?

17  A    The beginning of January 2015 -- or 2014 I called and

18       spoke with the Fair Labor Standards Acts, whatever

19       department.  They told me I absolutely had a case, they

20       were sending me the paperwork out in the mail, and they

21       expected me to fill it out and send it back in.

22  Q    So my question, as it was the first time, when did you

23       file a complaint with the State?

24  A    In January.

25  Q    Do you recall the date?

Natalie Reeser
3/30/2015

Page 115

1      page?

2   A  Yes.  Also, on this document the lunches doesn't ask to

3      be authorized.  Just wanted to point that out.

4   Q  Thank you.

5   A  You're welcome.

6                        (Exhibit 39 marked.)

7   Q  (Continuing by Mr. Miglio):  Let me show you what's been

8      marked as Exhibit 39.

9   A  Okay.

10  Q  So the first email of this chain is on the second page,

11     and it's an email that you sent to Fiona Bork on October

12     23rd, 2012, at 11:11 a.m.  Do I have that right?

13  A  Yes.

14  Q  Okay.  And you were asking Fiona what?

15  A  If I could take a 30-minute lunch break.

16  Q  And put a note on the door.

17  A  Most likely Martha Wiseheart was not in the office that

18     day.

19  Q  So you --

20  A  Otherwise, I would have asked her.

21  Q  So you were asking her, Fiona, whether you could take a

22     30-minute lunch and put a note on the door, correct?

23             MR. FLYNN:  Objection.  The document speaks --

24             MR. MIGLIO:  Is that right?

25             MR. FLYNN:  The document speaks for itself, and

Tri-County  Court Reporters
248-608-9250

Natalie Reeser
3/30/2015

Page 116

1      she just already answered from your question.
2   Q   (Continuing by Mr. Miglio):  Is that correct, you were
3      asking her to leave the site for 30 minutes and put a
4      sign on the door?
5               MR. FLYNN:  Objection.  Asked and answered.
6               THE WITNESS:  I already answered your question.
7               MR. FLYNN:  You can answer it again, but --
8               THE WITNESS:  I was asking probably because
9      Martha wasn't in the office.
10  Q   (Continuing by Mr. Miglio):  Okay.  So what was the
11      response you got?
12  A   I'm not sure.
13               MR. FLYNN:  The response isn't here, is it?
14               THE WITNESS:  Oh.  Yeah, it's right there.  She
15      wanted to know if someone could come over from Shelby.
16  Q   (Continuing by Mr. Miglio):  So somebody came over to
17      cover for you the time you were gone; is that right?
18  A   Looks like at this point in time, yeah.
19  Q   So why didn't the policy apply that you didn't need to
20      ask anybody for permission to leave for lunch?
21               MR. FLYNN:  Objection.  Misconstrues her
22      earlier testimony.
23               THE WITNESS:  The new policy did not require me
24      to get authorization for lunch.
25  Q   (Continuing by Mr. Miglio):  That's not what I asked you.

Natalie Reeser
3/30/2015

Page 151

1                    (Exhibit 57 marked.)

2    Q    (Continuing by Mr. Miglio):   I show you what's been marked

3         as Exhibit 57.   What is this?

4    A    This is the note -- or the note that I created that had

5         to be approved by Martha Wiseheart to go on our front

6         door in early -- I created this, I believe, in 2011, and

7         Fiona, if that is her writing there that says "Saw for

8         the first time after her termination," she used this on

9         the day I went to get my TB test read, so that would be a

10        lie.

11   Q    Who used this?

12   A    Fiona had this on the door -- or I had this on the door

13        the day I left for my TB test to be read.

14   Q    Is that the day that Martha covered for you?

15   A    Correct.   Martha was also there.   She also saw this.   She

16        also watched me fill out the time that I thought I'd be

17        back and she -- she had to approve everything I put up on

18        the wall.

19   Q    So what happened to the sign that you used that day?

20   A    When you use a sign, because you have to fill out the

21        time, you shred the sign.   Anytime that I made a

22        document, even if it was for Christmas, for Thanksgiving,

23        Martha approved the document, it went up, I'd get it

24        back, it would be destroyed, because it's covered in

25        tape.

Natalie Reeser
3/30/2015

Page 152

1    Q    Threw the sign into the shredder.

2    A    All signs go in the shredder.

3    Q    Just as opposed to just crinkling it up and throwing it

4         in the garbage can?

5    A    We shred everything at Clinton Township.

6    Q    So how many times have you used this tiny sign?

7    A    Five.

8    Q    Five times.

9    A    At least that I remember.  Yes.

10   Q    And those five times were the four that you identified

11        earlier?

12   A    Correct.

13   Q    Is it five or four times you recall putting a sign up?

14   A    I'm sure it was more than that, but I just don't recall

15        the instances.

16   Q    So --

17   A    But every time I left with the sign on the door Martha

18        Wiseheart was present, she saw the sign, she approved the

19        sign, and she was also one of my direct supervisors.

20   Q    So when you had your TB test, where did the -- where was

21        the test given?

22   A    Downtown.

23   Q    Okay.

24   A    It was read at Macomb.

25   Q    And you said there was -- What were the other occasions

Natalie Reeser
3/30/2015

Page 153

1      when you left and put a sign up?

2  A   I really don't recall.  I told you earlier.

3  Q   You don't recall the five times?

4  A   I testified earlier as to my five times, so you'll have

5      to just look at the record for that.  I don't know.

6  Q   Well, I'm asking you, on another occasion was Martha --

7      on every occasion that you put the sign up did Martha

8      approve it?

9  A   Martha approved the sign to be on my desk in the folder

10     that are all approved signs.  She wouldn't approve it

11     every single time.  She approved it when I created the

12     sign.

13 Q   So my question is different than that.  My question is

14     are you saying that the five times that you left the

15     site, according to you without permission, did you get --

16 A   I had her permission.

17 Q   -- authorization -- All right.  So you're saying that you

18     didn't leave the site without authorization; every time

19     Martha gave you permission?

20 A   Martha was one of my direct supervisors.  She gave me

21     permission to leave the site.  I left the site.

22 Q   My question is are you saying that you did not leave the

23     site without permission, whether it be Martha or Fiona?

24           MR. FLYNN:  Objection.  Asked and answered.

25           THE WITNESS:  Yes.

Natalie Reeser
3/30/2015

Page 158

1   A   Hm-hmm.

2   Q   January 13 you say, "Fiona, if we need to sit down with

3       HR, I understand, but I feel you changed the two markers

4       to 2.2 on me due to personal feelings and not based on my

5       job performance.  I would like to see a copy of these

6       several of complaints.  I know -- and I know I had two

7       and that's why I was sent -- I sent to training; however,

8       it was found that the tape provided to me was wrong, so

9       it was not strong enough to hold the skin; hence, the

10      bruise."

11             Okay.  So where is the reference to you

12      complaining about lunch here?

13  A   There's no reference in that email about lunch.  It's the

14      reason why all of a sudden she started changing

15      everything is because I brought up lunches to her.

16  Q   When you say "changing everything," I only thought you

17      complained about the two that you had here.

18  A   She also -- I mean when I talk about changing things, I'm

19      talking about taking away my location, calling me at

20      home, harassing me.

21  Q   Calling you --

22  A   Things like that.

23  Q   When did she call you at home and harass you?

24  A   Early January or early February.  Somewhere in there.

25      She called me at -- somewhere around 8 o'clock at night

Natalie Reeser
3/30/2015

Page 159

1    and basically told me off because I had reported that I

2    was reporting to the State --

3  Q  Okay.

4  A  -- about lunches.  And she said, "How dare you," and she

5    said that I'll be sorry, and from that moment on all of a

6    sudden then she started changing my review, changing my

7    sites, sending me here.  Everything started going

8    downhill once Fiona found out that I wanted to go to

9    lunch.

10  Q  So you don't know whether it was January or February when

11    she called you at home.

12             MR. FLYNN:  Objection.  Misconstrues her

13    earlier testimony.

14  Q  (Continuing by Mr. Miglio):  Is that what you're saying?

15  A  I don't recall exactly when it was, but it was Jan -- I

16    believe it was in January or early February, yes.

17  Q  All right.  And you say she called you at home at 8 p.m.

18  A  Approximately 8:30, 8:45.  Somewhere late at night.  It

19    was late at night.

20  Q  And did she call you on your cell phone?

21  A  I don't recall what she called me on, whether it was my

22    house phone or cell phone.

23  Q  What was your house phone number?

24  A  I don't recall.  I don't know my phone numbers by heart.

25  Q  Did you have a land line?

Tri-County  Court Reporters
248-608-9250

Natalie Reeser
3/30/2015

Page 202

1    evaluations before the 2013, correct?

2  A   Correcter.

3  Q   Unsatisfactory is a two?

4  A   Yep.

5  Q   So then you say here in the meal breaks, the second

6    paragraph, "I was told that any down" -- or first

7    paragraph.  "I was told any down time would be considered

8    as lunch.  However, I recently learned that the Fair

9    Labor Standards Act, FLSA, states that hourly employees

10    are required to work more than 40 hours a week are to be

11    compensated for those hours under a term called engaged

12    to work."  See that?

13  A   Yes.

14  Q   Who and how did you learn about the term "engaged to

15    work" and that that violated the Fair Labor Standards

16    Act?

17  A   Dr. Thakur had come to my office to let me know that he

18    wasn't happy about seeing me not take lunches.  He's a

19    new doctor in the building.  And when I let him know that

20    my down time was lunches, that I do get a lunch, he said,

21    "Down time is not lunch and you need to call the State."

22    So when I called the State in January, they informed me

23    down time is not lunch and that's called engaged to work

24    and that's where I learned those terms.

25  Q   And you learned those from Dr.Thakur.

Natalie Reeser
3/30/2015

Page 203

1   A    No.  I learned about the Fair Labors Standard Act from

2        Dr.Thakur.  He said it was against the law.  He didn't

3        state the law that he -- that I just stated.  I called

4        the State.  The State informed me of those two.

5   Q    What did Dr.Thakur tell you about the law or the Fair

6        Labor Standards Act?

7   A    He told me that down time is not considered a lunch.

8   Q    Okay.  When did he tell you that?

9   A    In January.

10  Q    Is that something you spoke to him about?

11  A    He came in my office.

12  Q    Came in your office and just said, "Hey, I'm upset

13       because you're not taking a lunch break"?

14  A    Correct.

15  Q    All right.  What's Dr.Thackur's first name?

16  A    I don't know.  He's in the same building at Clinton

17       Township PSC.

18  Q    So then in the second paragraph it says, "Please know

19       it's increasingly difficult to work busy days without any

20       opportunity for a meal break, and some days even more

21       difficult because management and sales personnel bring in

22       food for lunch, take meal breaks, and eat in front of

23       me."

24  A    Always.

25  Q    Okay.  So what was the issue here?  Was it that you

Natalie Reeser
3/30/2015

Page 204

1        weren't getting paid for taking lunch?

2    A   No.  It was that they were forcing me to work through

3        lunch and still not paying me.

4    Q   So are you saying that with the volume or lack of volume

5        of business there wasn't an opportunity for you to sit

6        down and take -- and eat your lunch?

7    A   There was never an opportunity that allowed me to leave

8        and go get or take a lunch that way.

9    Q   Listen to my question.  Are you saying that you didn't

10       have the opportunity to sit down and eat your lunch while

11       you were working at the facility?

12   A   In the first two years, yeah, there was time.  In the

13       last year, no.

14   Q   And there wasn't time for you to sit down at the facility

15       because you were so busy with the patients coming in?

16   A   Not just patients, but doing all of Martha's son's

17       wedding stuff, as well as her administration duties.

18   Q   Okay.  So because you were doing Martha's wedding stuff

19       and you had some other administrative duties, you weren't

20       able to sit down and eat lunch.

21   A   Correct.

22   Q   Then why did you bring all that food in?

23   A   That was diet food.  I have lost 150 pounds.

24   Q   Okay.  Well, why did you bring in the diet food if you

25       couldn't sit down and eat it?

Natalie Reeser
3/30/2015

1    A    Because the diet food was shakes, and I was allowed to

2         drink.

3    Q    Okay.  So what did you have to do for Martha's son's

4         wedding?

5    A    Martha had me do all of her table decorations.  She had

6         me working on her son's wedding at the PSC at least seven

7         months and on a daily basis had me working on it at least

8         for two to three hours a day.  She had me do all of her

9         popcorn bags.  She had me do all of her center pieces.

10        She had me do her movie theater table, which had chairs,

11        and her candy table.  And as a matter of fact, I ran the

12        candy table at the wedding.

13   Q    All right.  So while you were at the Clinton center site

14        working --

15   A    Hm-hmm.

16   Q    -- supposedly working, seeing patients, drawing blood,

17        you're saying that Martha made you do all of her table

18        decorations, right?

19   A    Yes.

20   Q    That's one thing.

21   A    Yes.

22   Q    What did you have to do for the table decorations?

23   A    I created all the center pieces.  They are candle votives

24        with diamonds all the way around it.

25   Q    How many were there?

Natalie Reeser
3/30/2015

Page 206

1   A    30, 40.

2   Q    Okay.  How long did it take you to do that?

3   A    A long time.

4   Q    Okay.  And so where were the materials to do the center

5        pieces?

6   A    Right there in the office.

7   Q    Okay.  So if somebody came in and -- they could see these

8        things laying around?

9   A    Yes.  Maria Inger (ph) came in on several occasions and

10       saw me work on the wedding.  Never said anything.

11  Q    Okay.  Maria Inger saw you.

12  A    Yes.

13  Q    Who else saw you?

14  A    It would be Dr. Meshach's office assistant come down and

15       she checked them out.  The girls down the hall would have

16       seen them because we were showing them off.

17  Q    Why were you showing them off?

18  A    Because they're cool.

19  Q    All right.  And did Fiona ever see you working on them?

20  A    No.

21  Q    Why not?

22  A    Because Martha kept that from Fiona.

23  Q    Well, if they were out and you were working there while

24       you were supposed to be drawing blood and stuff like that

25       for patients --

Natalie Reeser
3/30/2015

Page 207

```
 1    A    Hm-hmm.

 2    Q    -- what did you do with them when Fiona came to the site?

 3    A    Fiona barely ever came to my site.

 4    Q    Okay.  Well, did she ever come to the site when you were

 5         working on them?

 6    A    No.

 7    Q    All right.  So how many days did it take you to do the 30

 8         table decorations?

 9    A    Hmm.  We worked on that for probably two to three months.

10    Q    Every day?

11    A    Not every day, but almost.  Yes.  Her daughter came in

12         and helped do the popcorn bags, and that took quite some

13         time.

14    Q    I'm not talking about popcorn bags.  I'm just talking

15         about the table decorations.  Two to three months every

16         day to do the 30 table decorations.

17    A    Yes.

18    Q    What were they comprised of?

19    A    I glued diamond crystals all the way around them.  All

20         the way -- They're big vases.

21    Q    Well, you must have had a lot of down time at that site

22         if you had that kind of time to do those.

23    A    No, I just had a lot of work.  I had to do my patients, I

24         had to register, and I had to do what she asked me to do

25         because she was a direct supervisor, and when she gives
```

Tri-County  Court Reporters
248-608-9250

Natalie Reeser
3/30/2015

Page 222

1   Q   Okay.  Now, "Also, based on emails I received last week,

2       I believe my supervisor altered or deleted goals that

3       were part of the original evaluation."

4   A   For --

5   Q   Now, when you say "my supervisor," who were you referring

6       to?

7   A   The person who writes my reviews.  That would be Fiona

8       Bork.

9   Q   My supervisor.

10  A   When she writes performance reviews, she does the

11      performance reviews.  That makes her that supervisor over

12      that portion of my job.

13  Q   And so you say you don't know whether there was one or

14      two goals or what.

15  A   Correct.

16  Q   What does that mean, "altered or deleted"?

17  A   For two years she allowed me to have a goal that I wanted

18      to raise the level of patients through repeat customers,

19      because one of the things that I had going for me there

20      that destroyed me was that I built a relationship base

21      with all the these customers. I had repeat customers on a

22      daily basis and -- What was the question, I'm sorry?

23  Q   I said what was the goal you thought she deleted?

24  A   Oh.  And I -- The goal was that I wanted to build the

25      laboratory up from, you know, when I first started in

Natalie Reeser
3/30/2015

Page 259

1      would give me extra work.

2              MR. FLYNN:  Read this document carefully,

3      Natalie.

4              THE WITNESS:  Okay.

5  Q   (Continuing by Mr. Miglio):  What is that about?

6  A   That's about all the issues they were having at Shelby.

7  Q   Okay.  You received a copy of that?

8  A   Correct.

9  Q   Did you think it had application to you?

10 A   It all applies to me, except for the fact that I'm not

11     the reason this email came out.  The reason this email

12     came out is because they were having too many problems at

13     Shelby.  My office didn't have defects.

14 Q   What kind of defects did they have at Shelby?

15 A   They were stacking the labels.  They weren't labeling in

16     front of the patient.  They were running in and out of

17     the rooms, switching people.  I mean it -- Shelby's a

18     mess.  And these are the two PSC people, and I run

19     Clinton Township PSC, and this was directed towards the

20     Shelby Township PSC, if you see "Shelby Patient Safety

21     Procedure," because the Shelby Office was having defects.

22     I was copied to because I run a PSC.

23                      (Exhibit 79 marked.)

24 Q   (Continuing by Mr. Miglio):  Let me show you what's been

25     marked as Exhibit 78 (sic).

Natalie Reeser
3/30/2015

Page 260

1   A    Yes.

2   Q    So this is an email at the bottom here that you sent to

3        Fiona, Luain and Martha at --

4                MR. FLYNN:  I hate to interrupt you, but the

5        exhibit's misnumbered again.  The earlier one, I believe,

6        was 78.

7                MR. MIGLIO:  Let me get that back.

8   Q    (Continuing by Mr. Miglio):  All right.  Let me show you

9        what we marked as Exhibit 79.

10  A    Okay.

11  Q    So the email that's on here, "I'm very upset.  I'm

12       putting a note on the door.  I'm taking a 30-minute lunch

13       today."  That's an email that you sent to Fiona, Luain,

14       and Martha.

15  A    Correct.

16  Q    At 1:12 on September 25th.

17  A    Yes.

18  Q    Okay.  What time did you start work that day?

19  A    7:30 a.m.

20  Q    And what happened after you started work?

21  A    I got a phone call from Fiona Bork.

22  Q    Okay.

23  A    Explaining to me that I think I'm some superior person or

24       something because I went to HR about her, but that I'd be

25       sorry and she hung up on me.  She told me -- Oh, before

Tri-County  Court Reporters
248-608-9250

Natalie Reeser
3/30/2015

Page 261

1    she hung up on me she told me she was changing my site,

2    and I informed her on that phone call that I planned on

3    taking a lunch that day from the new policy the day

4    before, and she never once said anything about the lunch

5    policy not being -- not allowing me to go.

6  Q   Okay.  So let's get this it straight.  So you're working

7    and she calls you.

8  A   Yes.

9  Q   And she calls you on what phone?

10 A   I don't know if it was the office phone, my work phone,

11    or my cell phone.

12 Q   Okay.  So you don't know whether it was the office phone,

13    your work phone, or your cell phone.

14 A   Correct.

15 Q   And did you see what the number was that she was calling

16    from?

17 A   I don't recall.

18 Q   What time did she call?

19 A   Sometime in the morning.

20 Q   Okay.  And tell me exactly what she said.

21 A   Just the facts of that I'm going to be sorry.  I think

22    she thought that --

23 Q   I don't want to know what she thought.  I just want to

24    know what she said.

25        MR. FLYNN:  Just go bit by bit through that

Natalie Reeser
3/30/2015

Page 262

1       conversation now.

2              THE WITNESS:  Basically it was how dare you

3       think that you can go to HR on me.  How dare you think

4       that you, you know -- I don't . . . I don't recall word

5       for word what she said, but she was saying things like,

6       "You're going to be sorry," and that she wasn't going to

7       pay me for my lunches prior to that day.

8   Q   (Continuing by Mr. Miglio):  Did you make a note of that

9       conversation?

10  A   I emailed her right after that conversation and I asked

11      her, "Is this move permanent or is this move" -- because

12      she told me on the phone conversation she was moving me,

13      so I wanted to know if my move was permanent or

14      temporary.

15  Q   All right.  What else did she say during the

16      conversation?

17  A   She was just angry and . . . I don't . . . I don't recall

18      it word for word.

19  Q   Okay.  And you say she said something about paying you?

20  A   I meant to also cc the HFML outreach that was in the new

21      email address that we were supposed to sign out our lunch

22      at, but . . . because they had been informed by the State

23      a month earlier.

24  Q   I don't care about that.  What I'm asking you about is

25      what else did she say to you during that conversation?

Natalie Reeser
3/30/2015

Page 263

1    A    She said, "How dare you go to the State?"  She was -- She

2         was upset that I told on her for not giving me a lunch

3         and she thought that was rude and not very friendly and

4         I'm not very team like, and she was calling me names and

5         telling me how sorry I'm going to be, and she hung up on

6         me after I told her that I was going to take a lunch.

7    Q    So let's explore that.  She said how angry she was about

8         you going to the State?

9    A    Going to HR.

10   Q    Well, which is it?  Is it the State or HR?

11   A    To me they're both the same thing.  HR.

12   Q    So did she say "State" or "HR"?

13   A    She said going to HR about her.

14   Q    Okay.  And she said she was angry that you went to HR

15        about her.

16   A    Yes.

17   Q    About her.          `

18   A    Yes.

19   Q    Okay.  And what had happened up until that point with the

20        human resources investigation about whether or not you

21        should have gotten paid or not?

22   A    They ignored me for a month straight.  I sent them emails

23        asking for direction.  I got emails from Martha stating

24        she wasn't going to pay me.  I got emails from Fiona

25        saying, "Lunches are mandatory.  Why aren't you taking

Tri-County  Court Reporters
248-608-9250

Natalie Reeser
3/30/2015

Page 264

1        lunches?"  But then in another state (sic) she's saying,

2        "Take a lunch and it's insubordination," so.

3   Q    So in other words, when you had this conversation with

4        her are you saying you didn't know whether you were going

5        to get paid or not?

6   A    I knew at that point I was not getting paid for lunches,

7        correct.

8   Q    Did you know whether Henry Ford Health System was going

9        to pay you or not?

10  A    At this time, this day, when I wrote this email, no,

11       they -- I did not know.

12  Q    Okay.

13  A    Jill Hood said they were doing an investigation and

14       looking into paying me, but never once did anyone tell me

15       they were directly going to pay me.

16  Q    Okay.  So what happened after the phone call?

17  A    Martha came out of her office and I spoke with her.

18  Q    What did you say to her?

19  A    I told her what was going on with Fiona, what Fiona said

20       on the phone.  She gave me a hug.

21  Q    What did you say to her exactly?

22  A    I told her that she was yelling at me.  I told her that

23       she was upset because I reported the lunch piece, because

24       she thinks that she's all high and mighty and she doesn't

25       have to follow any rules, she makes up her own rules, and

Natalie Reeser
3/30/2015

Page 265

1      she basically gave me a hug, she told me she was so sorry

2      that I was going through that, and she also told me to go

3      to HR again.

4  Q   Okay.  And then what happened?

5  A   And then I went back to my desk.  I sent this email.  I

6      proceeded to get my purse.  I went back to the break room

7      where my purse and my coat and stuff was.  I picked that

8      up.  I looked in the room.  Waved to Martha.  Martha

9      waved to me.  I walked out.

10 Q   Where did you go?

11 A   I went and sat in my car for 30 minutes and cried.

12 Q   Okay.  And who was taking care of the patients while you

13     were doing that?

14 A   There was the sign on the door.

15 Q   Okay.  What sign was that?

16 A   The sign that's allowed to use when you take a lunch.

17 Q   What did the sign say?

18 A   That I'll be returning in 30 minutes.

19 Q   Okay.  Is that like a handwritten sign or something?

20 A   No.  The exact sign that you have in your exhibit.

21 Q   Okay.  So did you get Fiona's permission to leave the

22     site on that day?

23 A   Fiona never told me I could not go to lunch on that day,

24     no.

25 Q   Did you get Fiona's permission to leave the site on that

Natalie Reeser
3/30/2015

1      day, yes or no?

2                MR. FLYNN:  Asked and answered.

3                THE WITNESS:  I was on the phone with Fiona.  I

4      told her I was going to lunch.  Not once did she say I

5      couldn't go to lunch.  Not once did she say I could go to

6      lunch.

7   Q  (Continuing by Mr. Miglio):  Okay.  Did you get Martha

8      Wiseheart's permission to go to lunch and leave the site

9      that day?

10  A  Yes, I did.

11  Q  And what did she say specifically?

12  A  She said, "You need to take some time to yourself and you

13     definitely need to go to HR," and she gave me a big, long

14     hug.  I mean we hugged for like three minutes, so.

15  Q  So that's what she said that made you think that you

16     could just put the sign up and go to lunch?

17  A  No.  The new lunch policy that was given to me on

18     February 24th, the day before I was told I could go to

19     lunch.

20  Q  What did the policy say?

21  A  The policy said we now sign in and out through HFML and

22     we take a 30-minute lunch.  And nowhere does the new

23     policy say that I had to get permission.

24  Q  Okay.

25  A  It says to email in, to email out, and I emailed in and I

Natalie Reeser
3/30/2015

Page 267

1      emailed out, just to the wrong email address, which

2      should have been an occurrence, not a suspension.

3   Q   All right.  Let's take a break.  I'm going to get that

4      email.

5   A   Hm-hmm.

6                  (Whereupon a recess was taken at or about the

7      hour of 5:31 p.m., and the deposition was resumed at or

8      about the hour of 5:40 p.m.)

9                  THE WITNESS:  I have to correct my testimony on

10      record, because I was getting mixed up between two

11      different Fiona conversations from Fiona Bork.  On the

12      conversation from February 25th, 2014, she yelled at me

13      for going to the State of Michigan on her.

14                  MR. MIGLIO:  I've got to take an emergency

15      call.

16                  (Whereupon a recess was taken at or about the

17      hour of 5:40 p.m., and the deposition was resumed ab or

18      about the hour of 5:44 p.m.)

19                  (Whereupon the following portion of the

20      transcript was read as follows:

21                  THE WITNESS:  I have to correct my testimony on

22      record, because I was getting mixed up between two

23      different Fiona conversations from Fiona Bork.  On the

24      conversation from February 25th, 2014, she yelled at me

25      for going to the State of Michigan on her.")

Natalie Reeser
3/30/2015

Page 272

1   Q   (Continuing by Mr. Miglio):  Let me show you this.  Do you
2       recognize this?
3   A   Yes.
4   Q   What is this?
5   A   This is the paperwork I filled out for the State.
6   Q   Do you see the time stamp on the side of it?
7   A   Yes.
8   Q   Do you see that?  What's the date there?
9   A   February 27th, 2014.
10  Q   Okay.  That's the date that it was filed with the agency.
11      You understand that?
12  A   No.  That's the date they received it at the agency.
13  Q   How else would they be filed with the agency if they
14      didn't receive it?
15  A   It's different when you mail it in.  I mean --
16  Q   Do you realize that you lied to the Court in this case
17      about when that was filed?
18  A   No.
19  Q   Do you remember making an allegation in the complaint
20      through your lawyer that it was filed before your
21      termination?
22  A   It was filed before I was terminated.
23  Q   Well, you know what?  The State of Michigan says it
24      wasn't.  So how do you think there is a discrepancy
25      there?

Natalie Reeser
3/30/2015

Page 273

1          MR. FLYNN:  Counsel, she was terminated mid

2      March.

3          THE WITNESS:  I was terminated in the early --

4      on February 25th --

5  Q   (Continuing by Mr. Miglio):  Well, let's go back.

6  A   This is February 27th.

7  Q   Yeah.  Do you recall making an allegation --

8          MR. FLYNN:  You mean you were suspended.

9          THE WITNESS:  I was suspended.  Sorry.  I

10     wasn't terminated until March 5th.

11 Q   (Continuing by Mr. Miglio):  Do you recall making an

12     allegation in the complaint and attaching the unfiled

13     complaint saying that you filed this complaint before you

14     were suspended?  We can get it out if you want.

15 A   I don't understand.

16 Q   Yeah, here it is here.  Look at 22.

17 A   Okay.

18 Q   On February 25th Plaintiff filed a complaint with the

19     State of Michigan alleging violation of the Fair Labor

20     Standards Act --

21         MR. FLYNN:  Counsel, she's indicated several

22     times that --

23         MR. MIGLIO:  -- and retaliation.

24         MR. FLYNN:  -- she mailed it in at that date.

25         MR. MIGLIO:  Do you see that?

Natalie Reeser
3/30/2015

Page 291

```
 1        were you subjected to?  We know about the evaluation -- I
 2        guess we know about the evaluation.  What other -- And
 3        you said one time she showed there and she was humming
 4        loudly and shredding paper.  What other harassment?
 5   A    She called me at home.  She called me at work, and you'll
 6        hear the message where she's harassing me for a good 16
 7        minutes at work, when I'm on the job, for her own
 8        personal reason.
 9   Q    That's --
10   A    There was a lot of -- She had a personal vendetta against
11        me because I went to the State of Michigan on her.
12   Q    Well, what was the issue -- Well, first of all, when did
13        you go to the State of Michigan?  Let's get that down.
14   A    Early January was my first contact with the State of
15        Michigan.
16   Q    Early January.  Okay.  And did she know about that in
17        early January?
18   A    I told her I was going to the State.
19   Q    When did you do that?
20   A    Sometime in February.
21   Q    Okay.  So she didn't know about it in early January, so
22        what else did you receive in the way of harassment in
23        January?
24   A    Changing of my site, sending me . . . There's so much
25        that I've read and gone over today.  I'm getting confused
```

Natalie Reeser
3/30/2015

Page 296

1   A   The new lunch policy, correct.

2   Q   So tell me where the reference to the new lunch policy is

3       in this email.  Show me where that is, because I didn't

4       see it anywhere as a justification for what you were

5       doing.

6   A   Fiona didn't tell me I couldn't go to lunch on the phone.

7       Martha didn't tell me I couldn't go to lunch when I waved

8       at her.  Martha didn't tell me I couldn't go to lunch

9       when she received the email.  Nobody told me that the new

10      policy wasn't for me and it was allowed for everyone

11      else.  Nobody said that.

12  Q   I don't even see you referencing the new policy here.  Am

13      I mistaken?  Is it referenced here?

14              MR. FLYNN:  He's saying in the document.

15              MR. MIGLIO:   Yeah.

16  Q   (Continuing by Mr. Miglio):  If you were taking -- If you

17      were saying to Jill Hood, "I left in accordance with the

18      new policy," why didn't you say that in this email?

19  A   I was under distress.  I don't -- I was under major

20      distress on this day.  I don't know.

21  Q   You were under major distress when you wrote this.

22  A   I was having panic attacks.  I had just been walked out

23      of my office that I took care of for three years, all my

24      patients.

25  Q   So are you saying that we can't believe anything that's

Natalie Reeser
3/30/2015

Page 322

```
1              MR. FLYNN:  -- asked (sic) your question.

2         She's answered your question.

3              MR. MIGLIO:  The question was what Martha told

4         her, not what she did, okay?  Don't --

5              THE WITNESS:  I can't recall the exact

6         conversation that I had with Martha.

7              MR. MIGLIO:  Read the question back.  Let her

8         answer.

9              THE WITNESS:  It was more of a friendly thing

10        where she was hugging me and telling me how sorry she was

11        that I was going through this and how I definitely needed

12        to reach out to HR about Fiona's behavior and I

13        definitely should.

14   Q    (Continuing by Mr. Miglio):  The question is simply did

15        Martha Wiseheart tell you that you could go to lunch on

16        February 25th immediately or before you went and posted a

17        sign and left the site?

18              MR. FLYNN:  Objection.  Asked and answered.

19              THE WITNESS:  I didn't ask her on the 25th if I

20        could go to lunch.

21   Q    (Continuing by Mr. Miglio):  I didn't ask you whether you

22        asked her.  I asked you whether or not she told you.

23   A    She waved me on.

24   Q    Did she tell you that you could go to lunch on that day?

25              MR. FLYNN:  Objection.  She was just trying to
```