UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATALIE REESER,

    Plaintiff,

v                       Case No. 2:14-cv-11916-GCS-MJH
                       Hon. George Caram Steeh

HENRY FORD HOSPITAL,

    Defendant.
_____/

DEPOSITION OF JILL HOOD

    Taken by the Plaintiff on the 5th day of May, 2015,

at the office of Keith D. Flynn, 600 W. Lafayette Blvd.,

Detroit, Michigan at 10:00 a.m.

APPEARANCES:

For the Plaintiff:    MR. KEITH D. FLYNN (P74192)
                      Miller Cohen, P.L.C.
                      600 W. Lafayette Blvd., 4th Floor
                      Detroit, Michigan 48226-0840
                      313.964.4454

For the Defendant:    MR. TERRANCE J. MIGLIO (P30541)
                      MS. BARBARA E. BUCHANAN (P55084)
                      Varnum LLP
                      39500 High Pointe Blvd., Suite 350
                      Novi, Michigan 48375
                      248.567.7828

Also Present:         NATALIE REESER, via telephone

Reported by:          TAMARA A. O'CONNOR
                      CSMR 2656, CER 2656

```
 1  A    It is unpaid.

 2  Q    If a break is unpaid, does that mean that the

 3       individual has to remain at the facility?

 4  A    It depends on the facility.

 5  Q    So if a break is unpaid, you may still require an

 6       employee to remain at the facility?

 7  A    If the break is unpaid--let me think about that a

 8       second.

 9  Q    Take your time.

10  A    So if it is unpaid and they are mandated to remain

11       at the facility, then we would need to pay them for

12       their time.

13  Q    What if an employee is told that they are not to be

14       paid for lunch?  Would they still be required to

15       remain at the facility?

16  A    It would depend on the circumstances as to why they

17       were told that they were not getting paid for lunch.

18  Q    What circumstances are you thinking of?

19  A    I guess that would be my question to you.  I guess I

20       didn't understand why if they are being told to stay

21       there, why they wouldn't be paid.

22  Q    Well, let's say that they are just not paid for

23       those lunch periods, but they are still required to

24       remain at the facility.

25  A    That should not be occurring.
```

O'CONNOR COURT REPORTING
Certified Professional Reporters
248.360.1331

1  A    Correct.

2  Q    So have you ever countermanded a decision to

3       discipline or discharge?

4  A    I don't understand the question.

5  Q    So a supervisor comes to you and says, "I want to

6       discipline or discharge this employee." Have you

7       ever said, "No, you may not"?

8  A    No.

9  Q    I've seen documents from Henry Ford that refer to

10      Group 1 and Group 2 misconduct. Could you explain

11      the difference?

12 A    Yes. It's based on levels of severity. A Group 1

13      are things such as attendance. Group 2 are things

14      such as insubordination, walking off the job, things

15      that are more serious in nature.

16 Q    And what constitutes walking off the job?

17 A    Leaving your assigned work area without

18      authorization.

19 Q    So when there is no notice provided to the employer

20      and someone walks away, that would be walking off

21      the job. Correct?

22 A    Yes.

23 Q    As opposed to attendance. If there is an attendance

24      violation, that is when someone notifies management

25      but then doesn't show up. Correct?

40

```
 1   A   I cannot think of specific names right off the top
 2       of my head, no.
 3   Q   So you can't give me a specific example?
 4   A   I cannot.
 5   Q   And can you recall any of the specific circumstances
 6       related to any of those individuals?
 7   A   Not at this time, no.
 8   Q   What is the regular progressive discipline policy
 9       for Group 2 violations?
10   A   I'm sorry.  I don't understand what you mean.
11   Q   Okay.  Well, do you know what progressive discipline
12       is?
13   A   I do.
14   Q   What is the progressive discipline policy for Group
15       2 violations?  What order of the disciplines,
16       starting from less severe to most severe?
17   A   The discipline track is written warning--I'm sorry,
18       documented counseling, written warning, written
19       warning with suspension and then termination.
20               So the policy for--the procedure for a
21       Group 2 is that depending on the situation you can
22       skip steps.  You don't have to go one to the next.
23   Q   And you have testified you can't think of the
24       circumstances as of today.  Correct?
25   A   The circumstances for what?  I'm sorry.
```

49

```
 1   A   One.
 2   Q   So the employer could be without any notice that an
 3       employee is not going to report to their shift, and
 4       yet that employee would still only receive one
 5       occurrence?
 6   A   It's one occurrence and then it's one incident, but
 7       it in and of itself issue is warranting a written
 8       warning with suspension.
 9   Q   How many occurrences before you're terminated?
10   A   It depends where you are in the corrective action
11       path.
12   Q   Say you're at the beginning?
13   A   You're at the beginning?
14   Q   You haven't even received a verbal or written
15       warning yet.
16   A   Okay.  So three occurrences in 30 days, you are
17       going to get your first corrective action.  If then
18       you have three in 30 or four in 90 or seven at 160,
19       you are going to get your next corrective action.
20   Q   So it just keeps bumping up, based off of where you
21       are on the--
22   A   Correct.
23   Q   Scale.  Got you.  Are lunches mandatory at Henry
24       Ford in the lab outreach?
25   A   Mandatory?  No.
```

59

| | | |
|---|---|---|
| 1 | | so let me parse that out.  You mentioned that Henry |
| 2 | | Ford has a policy where you encourage employees to |
| 3 | | take lunch.  Correct? |
| 4 | A | There is not a policy that encourages it.  It is our |
| 5 | | practice. |
| 6 | Q | Oh, I'm sorry.  Practice. |
| 7 | A | Yes. |
| 8 | Q | You have a practice that you encourage employees to |
| 9 | | take a lunch. |
| 10 | A | Correct. |
| 11 | Q | What is the rationale for that practice? |
| 12 | A | Wellness. |
| 13 | Q | And what do you mean by "wellness"? |
| 14 | A | Given time to step away for a few minutes to be able |
| 15 | | to--whether it's to get some sustenance, to get |
| 16 | | something to drink, just to be able to take some |
| 17 | | time to decompress. |
| 18 | Q | Any other reasons for that practice? |
| 19 | A | For the patients.  We--to ensure that the employees |
| 20 | | aren't running themselves down and that they have |
| 21 | | had some time away and can come back refreshed. |
| 22 | Q | Any other reasons for the practice? |
| 23 | A | Not that I can think of. |
| 24 | Q | Why is the policy that employees will receive an |
| 25 | | unpaid lunch, as opposed to a paid lunch? |

O'CONNOR COURT REPORTING
Certified Professional Reporters
248.360.1331

```
 1                    (At 12:28 p.m., Plaintiff's

 2                    Deposition Exhibit 2 marked)

 3   Q   (By Mr. Flynn)  This will be Exhibit 2.  Let me know

 4       when you are done reviewing it.

 5   A   (Witness complied).

 6   Q   Have you ever received an E-mail like this before

 7       from Ms. Bork regarding Ms. Reeser, or at least

 8       prior to this E-mail?

 9   A   Regarding Ms. Reeser?  No, I have not.

10   Q   And you recognize this document.  Right?

11   A   I do.

12   Q   You remember receiving it from Ms. Bork?

13   A   I do.

14   Q   It's an E-mail.  Right?

15   A   It is.

16   Q   And the date on the E-mail, January 16th.  Correct?

17   A   Correct.

18   Q   The first line, it's addressed to you, and it's from

19       Ms. Bork, and it says:

20                   "Do you happen to know who is meeting

21             with Natalie at 12:30 tomorrow?"

22       Do you see that?

23   A   I do see that.

24   Q   Do you recall ever responding to her?

25   A   I remember purposefully not responding to her about
```

107

O'CONNOR COURT REPORTING
Certified Professional Reporters
248.360.1331

1     that.

2  Q    Okay.  Why did she even care?

3  A    That's why I did not respond, because it's not

4     her--she doesn't have a business need to know that.

5     Employees have a right to come to H.R. and keep

6     their information confidential.

7           So who she was meeting with was irrelevant

8     to Fiona.

9  Q    Why would she--why did you think at the time she

10     cared?

11  A    Fiona is very thorough.  She is very black and

12     white, and she does not like having things that are

13     unanswered.  So when she--when Natalie had told her

14     that she was coming to H.R., that was just a

15     question that she had.

16           So but I do specifically remember not

17     answering that.  That was just--

18  Q    And did you ever ask her why she was asking?

19  A    I did not.

20  Q    And then she goes on to say:

21           "Some notes from our call the other

22       day."

23     Do you recall that phone conversation?

24  A    Yes.  This was in regards to when Natalie was

25     supposed to be--I believe.  I would have to

O'CONNOR COURT REPORTING
Certified Professional Reporters
248.360.1331

1       prioritize first, because obviously Fiona had no

2       idea that that is one of the issues that she was

3       going to be raising with me.

4                   So if there was validity to that, I needed

5       to find that out.

6   Q   Okay, and so what were the issues with Fiona that

7       you just mentioned?

8   A   They are all laid out in here, about the performance

9       review, about the meal breaks, not being paid meal

10      breaks, about being told that she would be--

11                  I don't think she said it in here, but

12      being terminated if she brought it to H.R.'s

13      attention, and also about being asked to perjure

14      herself in an Unemployment hearing for Judy Hale

15      (phonetic).

16  Q   So just the issues that are raised in here?

17  A   Correct.

18  Q   What did John say about the lunch issue?

19  A   It was--he said, "Thank you for the status update.

20      Keep me posted and let me know what we need to do."

21  Q   Okay.

22  A   Because I touched base with him regularly.

23  Q   And did you indicate to him that she wasn't being

24      given coverage for lunch periods?

25  A   Yes.

O'CONNOR COURT REPORTING
Certified Professional Reporters
248.360.1331

1   A   The issue is that Natalie had brought some very

2       sensitive things to my attention regarding the

3       integrity of Mrs. Bork, things that before I would

4       say I'm looking into something such as this I wanted

5       to get to the bottom of first.

6           I had explained to Natalie that I was

7       going to be waiting until I was able to do some

8       investigation before I shared everything with Ms.

9       Bork all at once.

10          So I was the one that informed her--

11      actually my suggestion to her was that, "Go ahead

12      and submit your time as you normally do.  I will

13      make sure that you are paid for this compensable

14      time, and then moving forward, once I have been able

15      to speak with Ms. Bork, you put `No lunch' on your

16      time card."

17          Natalie's concern was that she is bringing

18      this information to me and it would be retaliatory.

19      Well, when you raise a question of integrity,

20      whether it is about perjury or whether it is about

21      saying, "Go to H.R. and you will be terminated," I

22      want to make sure that I look into that before I

23      bring any of the other concerns forward.

24  Q   And did you tell--you told Ms. Reeser all of this

25      during the January 20th meeting?

151

1     the phone with Ms. Bork.  You just told her that.

2     What did Fiona say?

3  A   That, like I said, was the conversation when she

4     confirmed with me that she had not been paying the

5     lunches, and I let her know that we were needing to

6     do all of the research on it to get her paid.

7  Q   And what did she say?

8  A   "Okay."

9  Q   Anything else?

10  A   She didn't understand at first why, when she had so

11     much time at that site of down time, why it could

12     not be considered lunch time, until I explained to

13     her that according to the Fair Labor Standards Act

14     you need 30 minutes of uninterrupted time, where you

15     can have that time to yourself.

16  Q   And what did she say at the end of that explanation?

17  A   That she had often more than a half an hour worth of

18     time, and that is when I had asked her, "but what if

19     the phone rings?  What if somebody walks in?  Is the

20     expectation that Natalie or whoever is manning the

21     site that day answer the call and attend to that

22     patient, or could she say, `No.  I'm sorry.  I'm on

23     my break right now'"?

24         When Fiona had confirmed with me that, no,

25     she needs to help the client, or she needs to answer

153

| | | |
|---|---|---|
| 1 | | the phone, that is when I let her know that it's |
| 2 | | compensable time. |
| 3 | Q | And what was Fiona's tone during this conversation, |
| 4 | | if you could recall? |
| 5 | A | She was fine with it.  Fiona is very concerned about |
| 6 | | doing the right thing and doing it consistently. |
| 7 | Q | So if she was required to take a lunch, why was she |
| 8 | | not provided a lunch on the 25th of February? |
| 9 | A | If she was required to take--it's not about not |
| 10 | | taking a lunch.  It's about leaving a site, locking |
| 11 | | the door and not having anybody there, about |
| 12 | | abandoning your job. |
| 13 | Q | But that's not my question.  My question isn't what |
| 14 | | you think it's about.  My question is, if she was |
| 15 | | required to take a lunch, why was she not provided a |
| 16 | | lunch on February 25th? |
| 17 | A | Because they were still doing the exact same |
| 18 | | schedule that they were doing before, like I said. |
| 19 | Q | But here she is saying-- |
| 20 | A | May I-- |
| 21 | Q | This is her saying that it is mandatory for her to |
| 22 | | take a lunch-- |
| 23 | | MR. MIGLIO:  Stop.  Stop.  Let her answer |
| 24 | | the--we're going to take a break.  Okay?  We're not |
| 25 | | coming back until-- |

1  Q   Okay.  Well--

2  A   She did not try to call.  She did not try to contact

3      anybody through the appropriate channels.  That's

4      why she was let go.

5  Q   So she didn't contact Fiona?

6  A   E-mail is not the way to get approval for something

7      that you need urgently.

8  Q   Okay.

9  A   A two-minute and ten-second response time is not

10     realistic in anybody's view of--

11 Q   Let's go through the events that you discovered from

12     February 25th.  On February 25th, what is the first

13     you heard about this situation developing with

14     Natalie?

15 A   I received an E-mail from Fiona.  Fiona had

16     forwarded me Natalie's E-mail, saying that she

17     needed a break and that she was leaving, and that

18     she was--

19          I don't recall the E-mail, if it said that

20     she was locking the facility or not.  Fiona had

21     forwarded that E-mail to me, asking if that was

22     something that she could do.

23 Q   And did you respond to that E-mail?

24 A   I called her.

25 Q   And what was discussed via the telephone call?

                          188

1  A    I asked her to fill me in on what exactly happened,

2       what was the timeframe, if there was anything that

3       Martha--if Martha was at the site, if there is

4       anything that Martha knew.

5            I asked if she truly did leave like she

6       said that she was going to.  Fiona asked me if that

7       was something that was acceptable, can she just do

8       that.

9            When I found out that there was no waiting

10      for approval, she did not follow the proper protocol

11      to be able to get approval, then we had discussed

12      suspending her pending an investigation.

13  Q   Let's take each one of those.  You had a couple--

14      several questions for Fiona.  Your first question

15      that you asked her was what?

16  A   My first question was did she really indeed leave

17      the facility and leave it unattended.

18  Q   And what did Fiona say?

19  A   She said yes, she did.

20  Q   When did you make this phone call to Fiona?

21  A   After I got Fiona's E-mail.

22  Q   Was it immediately after she had sent you the

23      E-mail?

24  A   It was maybe within three, four minutes.

25  Q   So you talked to Fiona, and you asked that question.

O'CONNOR COURT REPORTING
Certified Professional Reporters
248.360.1331

```
 1        She said, "Yeah, she left."
 2   A    Correct.
 3   Q    The second question was, was Martha there, was she
 4        aware of anything.  Right?
 5   A    Correct.
 6   Q    What did she say?
 7   A    She said that Martha was there, that she got the
 8        same E-mail, that she was in the back office on a
 9        call, on an EPIC call, and that there--that was all
10        the information that she had had, that there was--
11             Natalie did not go in and say, "I need to
12        leave.  Is there any other way to get a hold of
13        Fiona" or anything like that.  She just sent the
14        E-mail, went and got her belongings and left.
15   Q    And in your subsequent investigation of this, did
16        you ever talk to Ms. Reeser about what Martha had
17        told her, about any conversation she had with Martha
18        that day?
19   A    I'm not sure what conversations you are referring
20        to.
21   Q    Well, okay.  In your discussions following this, did
22        you ever discuss with Ms. Reeser any conversation
23        she had with Martha that day?
24   A    I don't mean that I was confused about my
25        conversations with Natalie.  What I meant was
```

190

1       confused about Natalie's conversations with Martha.

2       What conversations are you referring to?

3   Q   I'm not asking you that.  I'm asking you whether or

4       not you had any conversation with Ms. Reeser about

5       any conversations that took place between Natalie

6       and Martha.

7   A   No.

8   Q   Okay.  Then did you--

9   A   I asked her if she spoke with her before she left.

10  Q   When did you ask her that?

11  A   During--after Natalie had called me, after she had

12      been suspended, right immediately after she left the

13      facility.  She called me very upset, and I asked her

14      before she left if she had had any conversations

15      with Martha.

16          She told me no.  That was the only

17      conversation I was concerned about at that point.

18  Q   Did you--so you are saying that any assertion made

19      by Plaintiff that she had a conversation with Martha

20      is false?

21  A   I'm not sure.  I'm saying that if she is saying that

22      there was a conversation between when the E-mail was

23      sent and the two minutes and ten seconds between

24      when she left, both Martha and Natalie had told me

25      there was no conversation that had occurred during

                          191

1   A   But she was leaning towards that way, and I didn't

2       want to see her going down that path.

3   Q   So now there were two good conversations with Jill.

4       When were these conversations?

5   A   I don't recall.

6   Q   And one said--it said it was "this week," but it

7       doesn't indicate when.  So you don't recall that?

8   A   I do not.  Like I said, I saw this for the first

9       time last week when Terry had showed it to me during

10      our prep, so I don't recall.

11  Q   When insubordination was brought up by John, were

12      these during your calls back and forth or your

13      meetings back and forth where you were updating him

14      on the FLSA issue?

15  A   That is correct.

16            (At 2:32 p.m., Plaintiff's

17            Deposition Exhibit 10 marked)

18  Q   (By Mr. Flynn)  Can you review this to yourself and

19      let me know when you are done?

20  A   Certainly.  (Witness complied).

21  Q   So let's start from the beginning, so with the first

22      E-mail in this chain.  Do you recognize this chain

23      of E-mails?

24  A   I do.

25  Q   The first one is from Natalie to yourself on

```
 1        February 18th.  Right?
 2   A    Correct.
 3   Q    And in this E-mail she goes on to state that:
 4              "I still have heard nothing on the
 5           lunches I don't get yet am still not paid
 6           for either.  I have no choice but to file
 7           the paperwork with the state."
 8        Do you see that?
 9   A    I do.
10   Q    Did you discuss this E-mail with anyone?
11   A    I discussed it--no, actually.  All I did was reply
12        back, and I included my boss, as you will see,
13        because part of my response was, "If you would like
14        to meet with my boss, here is her info."
15   Q    And so you didn't discuss this with anyone else?
16   A    I did not.
17   Q    And by "paperwork," what was she referring to here?
18   A    I'm not sure.
19   Q    You don't know, even though it says, "paperwork with
20        the state"?
21   A    No, because, as I said, you will see from my E-mail,
22        I did not ask for E-mail clarification on this, and
23        I did not have a phone conversation with her.
24              What I did was I addressed her concerns as
25        to the length of time that it was taking and gave
```

O'CONNOR COURT REPORTING
Certified Professional Reporters
248.360.1331

```
 1        her the option as she requested to meet with my
 2        direct manager if she wanted to.
 3   Q    Excuse me, but I'm trying to get an answer to the
 4        question I asked which is, at the time what did you
 5        think she was referring to when she said that she
 6        had no choice but to file the paperwork with the
 7        state?
 8   A    I don't know what she was referring to.
 9   Q    You didn't follow up with that issue?
10   A    This was my follow-up.
11   Q    You didn't follow up with anyone else regarding the
12        issue that she was planning to file paperwork with
13        the state?
14   A    No, I did not, because her--to me, her intent was
15        clear, that she was going to file whatever paperwork
16        she wanted if she wasn't getting resolution.
17              So my response was to explain the
18        situation to give her the resolution, to assure her,
19        as I had in the past, that this was in progress and
20        she was going to be paid.
21   Q    Did you ever--do you know whether or not Debra had
22        ever informed John about her threat to go to the
23        state?
24   A    I certainly can't be 100% positive of what anybody
25        else does, but Debra wasn't having conversations
```

1    with John.  John was my contact, so there would be

2    no reason for that communication there.

3  Q   Isn't this her saying that the company may be liable

4    and "I'm going to go pursue my legal rights"?

5           MR. MIGLIO:  Objection as to the form and

6    foundation.

7           THE WITNESS:  We were already doing what

8    we needed to do to mitigate our liability and to

9    ensure that the proper payments were made, because

10    as I assured Natalie, we already had recognized that

11    we did owe her money back and that that was going to

12    be paid out to her, as she referenced in here, that

13    she hadn't gotten her payment yet.

14  Q   (By Mr. Flynn)  Could this be interpreted to mean

15    she is going to the state to report you?

16  A   It could be interpreted many different ways.  That's

17    not how I interpreted it.

18  Q   Can this be interpreted by a reasonable person

19    looking at this to be a threat to go to the state to

20    report the FLSA violations involving the lunches?

21           MR. MIGLIO:  Objection as to form and

22    foundation.

23           THE WITNESS:  It could be--

24  Q   (By Mr. Flynn)  Yes or no?

25  A   Yes.

O'CONNOR COURT REPORTING
Certified Professional Reporters
248.360.1331

1    Q    You mentioned that there was a decision made to

2         transfer Ms. Reeser.  What was the rationale for

3         that decision?

4              MR. MIGLIO:  Oh, boy.  I got to object to

5         this, because you asked this two times already.  Go

6         ahead.  Answer it again.

7              THE WITNESS:  There was no decision made

8         to transfer her.  As I said, they don't transfer

9         within the lab.  It is part of the expectation that

10        they can rotate at any time as needed.

11   Q    (By Mr. Flynn)  What was the rationale for that?

12   A    The rationale for that was that they had lost an

13        individual at one of the other sites.  They needed

14        coverage.

15             Now that was also paired with the fact

16        that Natalie had already stated that she was not

17        feeling safe at that site and didn't want to wear

18        her engagement ring.

19             So Fiona had thought that this would be a

20        good opportunity.  We need the coverage there.

21        Natalie is not feeling safe here.  We will do a

22        rotation.

23   Q    What expectation was there for her to be returned to

24        Clinton Township?

25             MR. MIGLIO:  Objection as to the form.

                              208

```
 1       Whose expectation?  Maybe you want to narrow it
 2       down.
 3               MR. FLYNN:  The company's.
 4               MR. MIGLIO:  That is a pretty large number
 5       of people.  The company.  That is a pretty large
 6       number of people.  Object to--
 7               MR. FLYNN:  Counsel, are you done with
 8       your speaking objection?
 9               MR. MIGLIO:  I'll object to the form of
10       the question.  The company isn't--
11   Q   (By Mr. Flynn)  So again, what was the anticipation
12       that Ms. Reeser would be returned to Clinton
13       Township?
14               MR. MIGLIO:  Same objection.
15               THE WITNESS:  I am not sure.
16   Q   (By Mr. Flynn)  You didn't ask?
17   A   I did not ask, because again, we do not run the
18       operation of the business, and the expectation when
19       all of them hired in was that they would rotate as
20       necessary based on staffing.
21   Q   So she may have been moved there for a very lengthy
22       time.  You didn't know?
23   A   I didn't know, but even if the answer would have
24       been yes--
25   Q   So the answer is, you didn't know.  Right?
```

209

```
 1   A    Nobody knew.

 2   Q    Okay.

 3              MR. MIGLIO:  I think you are supposed to

 4        ask her if she is answering your question before you

 5        go straight through now.

 6              MR. FLYNN:  Counsel, I think it was clear

 7        that she had already answered that one, but you

 8        know, if you want me to belabor the point and go

 9        into another lengthy debate of whether she had or

10        had not when it was clear that she had answered it

11        with a no, I don't know.

12              It just seems like you are trying to delay

13        at that point.

14                   (At 2:36 p.m., Plaintiff's

15                   Deposition Exhibit 11 marked)

16   Q    (By Mr. Flynn)  Let me know when you are done

17        reviewing it, if you would.

18   A    I will.   (Witness complied).

19   Q    What is this?  What is Exhibit 11?

20   A    It's an E-mail.

21   Q    It's a chain of E-mails.  Correct?

22   A    Yes.

23   Q    And you recall receiving this E-mail?

24   A    Yes, I do.

25   Q    This is from Fiona Bork to yourself and John.
```

```
 1        final decision on that, and they said, "Yes, indeed,
 2        you're right.  It is compensable time."
 3                So that is the final decision that I was
 4        referring to.
 5   Q    So that was before her suspension?
 6   A    Well before.
 7   Q    Then I'm skimming along to the next page.  This is
 8        HFH 605, and--
 9   A    I'm sorry.  I don't have a 605.  I have--
10   Q    Do you--
11   A    Oh, I'm sorry.  It's in the other--that's okay.  I'm
12        with you now.
13   Q    I apologize, yeah.  It's kind of confusing how we
14        did it, but--
15   A    That's okay.
16   Q    I'm looking at the first E-mail here, February 28th,
17        from Fiona, and she writes to you:
18                "Jill, I spoke with both Luain Hajjar
19            and Maria Anger and asked them the following:
20            Have you ever witnessed Natalie Reeser
21            placing a sign on the door at our Clinton
22            Township PSC and closing the site to take
23            a lunch,"
24        and she goes on to discuss what they told her?
25   A    Yes.
```

243

```
 1    Q    Who are Luain and Maria?

 2    A    Luain and Maria are sales managers, so they are part

 3         of the lab outreach, but they do not manage people.

 4    Q    So they are with Sales?

 5    A    Correct.

 6    Q    Why did she speak with them about this?

 7    A    Because Natalie's response when I had asked for

 8         further clarification, saying, "You told me that you

 9         previously had authorization.  Who authorized you,"

10         she specifically told me Luain, Maria and Martha

11         Wiseheart.

12    Q    Didn't you reach out to them individually?

13    A    No, I did not.

14    Q    Why did you choose not to reach out to them

15         individually?

16    A    Because Fiona was the one that needed to get the

17         statements at that point.

18    Q    Why is that?

19    A    That was just part of our business decision.

20    Q    Was there any conversation regarding who was going

21         to get the statements?

22    A    Not that I recall.

23    Q    So you could have done it technically?

24    A    Sure.  I could have, yes.

25    Q    But you didn't?
```

O'CONNOR COURT REPORTING
Certified Professional Reporters
248.360.1331

1      inform Payroll and do one big check.

2  Q   So you are saying that 606 should be at the bottom

3      of 605.  Is that correct?

4  A   That is correct.  That is correct.  I don't know why

5      it came out that way, but it would make much more

6      sense after saying we need to make sure to pay her

7      appropriately for me to then say, "Go ahead and

8      start using the first date that she wrote `no

9      lunches' on her time card."

10  Q   So now I'm looking at HFH 604, and Fiona writes to

11      you:

12           "I'm so sorry if this in any way

13       screwed anything up"?

14  A   Yes.

15  Q   Do you know what she is referring to?

16  A   Because I told her that we needed to comply with the

17      fact that she wasn't being paid properly.

18  Q   Well, what was she screwing up?

19  A   The back payment.

20  Q   Did you follow up with her about what she meant by

21      this?

22  A   No.  It was very clear to me what she meant by this,

23      because we had been talking all along about the fact

24      that we needed to get her paid.

25  Q   So then it goes on to say:

O'CONNOR COURT REPORTING
Certified Professional Reporters
248.360.1331

```
 1        you just rely on this statement from Reeser?
 2    A   No.  I individually followed up with John.
 3    Q   Or, I'm sorry, from Bork?
 4    A   From Bork.  No.  I followed up with John as well.
 5    Q   And when did you follow up with him?
 6    A   I do not recall if it was--the exact date.  It would
 7        have been obviously prior to the discussion with
 8        Natalie that we were ending her employment, but I
 9        don't have the exact date.
10    Q   Do you recall what was said during that meeting?
11    A   I do.  I let him know that we had finalized the
12        investigation, that there was nothing that I could
13        find that could identify any type of--make any
14        circumstances that would lend this to be anything
15        other than job abandonment, and therefore my
16        recommendation was to proceed with termination if he
17        was in support.
18    Q   And what did he say?
19    A   He said he was in support.
20    Q   Did he ask any questions?
21    A   He had lots of questions, but I had also been
22        updating--as we had talked, I had been updating him
23        all along as well.
24    Q   What questions did he raise?
25    A   I don't remember his specific questions.  He had
```

250

```
 1        questions about the investigation, if I was
 2        comfortable with things, did I get the statements
 3        back that I had already updated him on, so he had
 4        follow-up questions from our previous conversations.
 5   Q    Were any notes made by--during this meeting with
 6        John?
 7   A    No.  It was just a phone call with him, a regular
 8        update meeting.
 9   Q    Now I'm looking on HFH 72, which is the second page
10        of this exhibit.  I'm looking at the second to last
11        sentence in this document.  It says:
12                "I do believe that potential litigation
13            may come from this.  That is why I want to
14            make sure I have all possible documentation
15            prior to proceeding with termination."
16   A    Yes.
17   Q    Why did you believe that litigation could come from
18        this?
19   A    Because it was very unfortunate, the timing between
20        when her actions of walking off the job so closely
21        corresponded with when we were going to be issuing
22        her back pay for the lunches, and it's very clear to
23        me--
24                Clearly I'm not an attorney, but even the
25        prima facie of that is that it looks odd, so that's
```

251

```
 1           Resources about this unpaid lunch concern."
 2        You are not disputing she did inform you that is
 3        what--at the January 20th meeting that--
 4   A    That is correct.
 5   Q    Is there any record of the conversations that
 6        followed that you have discussed a little bit later
 7        regarding the co-workers?
 8   A    What do you mean, any record?
 9   Q    Any documentary record that you discussed with what
10        you discussed with these individuals?
11   A    Yes.  That was the document that you and Terry were
12        talking about, that you said that he didn't--
13   Q    Oh.  Okay.  So let's go into what powers Fiona has
14        to change HFHS policies.  What is her authority to
15        amend them or modify them?
16   A    If it's based--any manager can create their own
17        departmental procedures.  Okay.  So for instance,
18        the Attendance Policy.
19             She couldn't say, "This is our new
20        Attendance Policy and/or one occurrence you get a
21        corrective action."  No.  You have to go with the
22        hospital guidelines.
23             However, what she can say is, "This is how
24        we enact the hospital-wide policy," meaning here is
25        how you call in.  Here is how you notify if you are
```

257

1     going to be late or if you need to not be in today.

2     Here is the procedure that you follow.

3               That is what the business units or the

4     departments have the ability to create.

5   Q  What if the departmental policy infringes upon and

6     takes away a right guaranteed by the HFHS policies?

7   A  Then we would need that brought to our attention

8     right away so that we could rectify that.

9   Q  So if there is a policy or procedure that is put

10    into place by Fiona that prohibits a person from

11    receiving benefits afforded by the HFHS policy, that

12    would be a violation.  Right?

13  A  I wouldn't say it would be a violation.  It would be

14    an error that we would need to look at and rectify.

15              (At 3:50 p.m., Plaintiff's

16              Deposition Exhibit 20 marked)

17  Q  (By Mr. Flynn)  This is Exhibit 20.  Have you seen

18    this document before?

19  A  I have.

20  Q  What does it appear to be?

21  A  Well, it's a compilation.  It's my chronology report

22    as well as my investigation summary that we had just

23    reviewed.

24              The documentation that I had submitted the

25    compensation to get her back pay check issued to her

258

1    Q    Are those--

2    A    So that is what this is saying, is that there needs

3         to be the approval for that.

4    Q    Is that ever communicated to lab outreach employees?

5    A    It's communicated to all employees.

6    Q    Where do you get that from?

7    A    I would have to find the policy, but, I mean, that

8         has been our practice for the nine and a half years,

9         nine years that I have been there.

10   Q    But if a departmental--let's say if Fiona says

11        this--it's mandatory unpaid lunch, and she sends

12        that out to everyone, you might not be privy to

13        that.  Correct?

14   A    Certainly there are things that we don't know about.

15   Q    And so if lunch is mandatory, unpaid lunch is

16        mandatory for her based off of what Fiona says, then

17        if you look at this provision, how could you--how do

18        those two things not conflict?

19   A    That's why we were working to, as we keep saying, be

20        able to put something in place to move forward so

21        that the employees could take the unpaid break.

22             The way that it was set up in the interim

23        in between when Ms. Reeser brought it to my

24        attention and until we were able to get something in

25        place with the physicians' office was that even

267

 1          though she couldn't take an uninterrupted 30-minute

 2          period, she was going to get paid for that time.

 3   Q      So that was a problem?

 4   A      What was a problem?

 5   Q      That was a problem at the time, that she couldn't

 6          take an unpaid lunch?

 7   A      Right.  Well, that is what this is all about.

 8          Right?  The back pay for the money for the missed

 9          lunches, that is what this is all about.

10   Q      But that was a problem that was raised.  Correct?

11   A      That is correct.

12   Q      So what if she violated the mandatory unpaid lunch

13          rule that Fiona laid out?  Would that be

14          insubordination?

15   A      What mandatory--I'm sorry.  One more time?

16   Q      If she did not take her mandatory unpaid lunches,

17          would that be insubordination?

18   A      No, because it's very clear as she and I and Fiona

19          and John had been talking for the month prior, is

20          that she needed to be able to stay there and then

21          get paid for that time until we found a way to close

22          the building.

23   Q      Was any effort made in between January 20th and the

24          day that she was suspended to communicate to her

25          that she is to stay there and not request a lunch

                               268

1  A    But it certainly would not have lapsed the entire

2       pay period, two-week pay period, for her to be able

3       to write that on her card.

4  Q    And then from that point forward, Ms. Reeser wasn't

5       paid?

6  A    That is correct, because we were still gathering the

7       data.

8  Q    This is the problem I'm having difficulty with,

9       because then I look down at 5.6, and it says that:

10              "Employees may leave the premises

11          during unpaid lunch periods."

12     Do you see that?

13  A   Right.

14  Q   So why wouldn't she think that she could leave?

15  A   Because again--and we have already discussed this

16      today--

17              MR. MIGLIO:  Several times, I might add.

18              THE WITNESS:  That it's unpaid so that

19      they can go wherever they want, but since she was

20      not able to leave the site, that is why we were

21      saying, "You remain there and we will pay you the

22      extra 30 minutes."

23  Q   (By Mr. Flynn)  She wasn't paid for that until after

24      her termination?

25  A   Until we were able to--well, it's unfortunate that

                             272

```
 1        she abandoned her position.
 2   Q    Okay.
 3                  (At 4:09 p.m., Plaintiff's
 4                  Deposition Exhibit 21 marked)
 5   Q    (By Mr. Flynn)  This will be Exhibit 21.  There you
 6        go.
 7   A    (Witness reviewed document).
 8   Q    What is this document?
 9   A    I don't know.
10   Q    Is that your signature at the bottom?
11   A    It sure is, and I definitely wrote this.  I just
12        don't know--I'm honestly not sure if this is
13        something that I had drafted to send--and sent to
14        Terry once we got your--the information in about the
15        lawsuit.
16   Q    It says HFH at the bottom, so--
17   A    Oh, no, absolutely.  I mean, I wrote this.  It's my
18        signature.  It's my title, and it is obviously a
19        summary.  This is--I was just going to say this is
20        something--
21                  This is a summary that we would put
22        together for the Appeals Board, and so the only--
23        unless it was something that I drew up in case she
24        chose to appeal, because I was anticipating that she
25        would appeal, using our ADR process.
```

273

1  ahead," or just let her go.

2 A Do you mean in general?  Because we know that that

3  did not occur here.

4 Q Well, I'm saying that if we do know that occurred--

5  assuming that it occurred--

6 A Then it was just a totally different situation, and

7  a person just went on leave--or went on break and is

8  late coming back?

9 Q Right.

10 A Then, yes, it would be--it would fall under the

11  Attendance Policy.

12 Q Okay.  Now it goes on to say that--under 5.3:

13    "If an employee has received

14   corrective action for an issue in the

15   last year, attendance/tardy occurrences

16   will be addressed at the next level of

17   corrective action."

18  Is that what you were referring to earlier when you

19  were discussing progressive discipline?

20 A It is.

21 Q And you indicated that Reeser didn't have any prior

22  disciplines.  Did that include occurrences?

23 A I'm not sure if she had occurrences, but not enough

24  occurrences to bring her to the level of Corrective

25  Action.

O'CONNOR COURT REPORTING
Certified Professional Reporters
248.360.1331