# EXHIBIT A



## TRI-COUNTY COURT REPORTERS, INC.

(248)608-9250 Fax (248)608-9252
www.tri-countycourtreporters.com

# Transcript of the Testimony of
# **Natalie Reeser**

**Date:** March 30, 2015
**Volume:** I

**Case:** Reeser v. Henry Ford Hospital

Printed On: May 11, 2015

Tri County Court Reporters

Natalie Reeser
3/30/2015

Page 57

1        ad on Craig's List during working hours?

2                 MR. FLYNN:  Objection.  Asked and answered.

3                 THE WITNESS:  It was incorrect.

4    Q   (Continuing by Mr. Miglio):  Okay.  Does that refresh your

5        recollection as to whether or not you were fired or you

6        voluntarily resigned from Jeffrey Automotive Group?

7    A   I don't remember.

8    Q   Don't remember?  You went through an unemployment hearing

9        and you don't remember whether you were fired or you

10       quit?

11   A   Oh, I'm sure, then, if I was at unemployment that they

12       fired me.

13   Q   Okay.  And do you remember why they told you you were

14       fired?

15   A   For that Craig's List ad, now that I read it.

16   Q   What happened to this lawsuit?

17   A   My attorney had some personal issues and she kind of just

18       disappeared on me.

19   Q   Just disappeared on you?

20   A   Correct.

21   Q   Where did she go?

22   A   I have no clue.  She called me one day and said, "Do you

23       want to settle for 20,000?"  I said, "No," and I never

24       heard from her again.

25   Q   Never heard from her again.

Natalie Reeser
3/30/2015

Page 58

```
 1   A    Correct.

 2                    (Exhibit 21 marked.)

 3   Q    (Continuing by Mr. Miglio):  I show you what's been marked

 4        as Exhibit 21 and ask you to take a look at that.  Have

 5        you ever seen Exhibit 21 before?

 6   A    No.

 7   Q    Have you ever seen the letter that's attached to Exhibit

 8        21?

 9   A    Yes.

10   Q    Now, it doesn't say here that she's disappearing or

11        anything.

12   A    She didn't like the fact that I didn't take the

13        settlement for 20,000 and decided she didn't want to be

14        my attorney anymore.

15   Q    Did you tell her you were looking to obtain 150,000?

16                    MR. FLYNN:  Objection.  Attorney-client

17        privilege.

18                    THE WITNESS:  No.

19                    MR. MIGLIO:  No, you didn't tell her that?

20                    MR. FLYNN:  And I'm instructing the witness not

21        to answer.

22   Q    (Continuing by Mr. Miglio):  So the letter that she wrote

23        and submitted to the Court about you looking to obtain

24        $150,000 from Jeffrey Automotive Group is wrong?

25                    MR. FLYNN:  Same objection.  And I'm
```

Tri-County  Court Reporters
248-608-9250

Natalie Reeser
3/30/2015

```
                                                      Page 59
 1        instructing the -- I'm instructing Miss Reeser not to

 2        answer.

 3                  MR. MIGLIO:  On what basis?

 4                  MR. FLYNN:  On the basis --

 5                  MR. MIGLIO:  I'm asking her about a document

 6        that was a court document.

 7                  MR. FLYNN:  You're asking for any conversations

 8        between her and her attorney.

 9                  MR. MIGLIO:  No, just if you'd listen to the

10        question, maybe you'd --

11                  MR. FLYNN:  I just did.

12                  MR. MIGLIO:  Looking at the letter, is the

13        letter incorrect where it says that you were looking to

14        obtain $150,000 from the Jeffrey Automotive Group?

15                  MR. FLYNN:  Objection.  Calls for the witness

16        to discuss attorney-client privileged information.

17                  MR. MIGLIO:  It doesn't require her to do any

18        such thing.  I'm asking her --

19                  MR. FLYNN:  Yes, it does.

20                  MR. MIGLIO:  -- if that's true.

21                  MR. FLYNN:  -- because she has to disclose what

22        they said to her.

23                  MR. MIGLIO:  No.  She could be looking to

24        obtain that amount from her -- on her own.  She doesn't

25        have to communicate that to her lawyer.
```

Natalie Reeser
3/30/2015

Page 60

1                    MR. FLYNN:  Well, any discussions --

2                    MR. MIGLIO:  Don't waste my time with that.

3                    MR. FLYNN:  No, you can't have that kind of

4          information.  It's privileged and I'm instructing the

5          witness not to answer.

6                    MR. MIGLIO:  Well, we're going to make a

7          record, because we're going to go in front of the judge.

8                    MR. FLYNN:  That's fine.

9                    MR. MIGLIO:  Look at the Exhibit 1 to the

10         motion that your attorney filed.

11                   THE WITNESS:  Which exhibit?

12                   MR. MIGLIO:  The letter.

13                   THE WITNESS:  What page?

14                   MR. FLYNN:  I think that he's referring to this

15         letter.

16                   THE WITNESS:  Hm-hmm.

17                   MR. FLYNN:  Yeah, that's correct.

18    Q    (Continuing by Mr. Miglio):  So read the second sentence

19         in that first paragraph and tell me if that's true.

20    A    I'm not going to answer anything on this document,

21         because this was a conversation between me and my

22         attorney.

23    Q    Well, unless your attorney instructs you not to answer,

24         we'll go to the Court and get this resolved.

25                   MR. FLYNN:  Well, I'm instructing her not to

Tri-County  Court Reporters
248-608-9250

Natalie Reeser
3/30/2015

Page 61

1      answer because --

2               THE WITNESS:  It's the same question.

3               MR. FLYNN:  -- the sentence says, "As we

4      discussed, we do have a disagreement regarding our

5      opinions of your case and the likely value of your case."

6      That sentence right there you're asking her to either

7      agree or reject it, which requires --

8               MR. MIGLIO:  I'm not asking her that.

9               MR. FLYNN:  Which requires her to go into

10     attorney-client privileged information.

11              MR. MIGLIO:  I'm not asking her to do that, if

12     you'd just listen.

13              MR. FLYNN:  You are.

14              MR. MIGLIO:  Did you have an opinion --

15              MR. FLYNN:  And what's the relevance anyway to

16     any of this?

17              MR. MIGLIO:  Did you have an opinion -- I need

18     to explain that to you?

19              MR. FLYNN:  Yeah.

20              MR. MIGLIO:  Really?

21              MR. FLYNN:  Yeah, really.

22              MR. MIGLIO:  I'm not going to.

23              THE WITNESS:  I would like to know the

24     relevance.

25              MR. FLYNN:  Of course.  You can't.

Natalie Reeser
3/30/2015

Page 62

1    Q    (Continuing by Mr. Miglio):  Did you have an opinion that

2         you were entitled to $150,000 from Jeffrey Automotive

3         Group?

4              MR. FLYNN:  Objection.  If it -- You can

5         disclose your own internal perception.  You can't

6         disclose anything that was communicated to your attorney.

7              THE WITNESS:  I never gave my attorney an

8         amount.

9    Q    (Continuing by Mr. Miglio):  So the statement here that

10        you had an opinion that the case was worth $150,000,

11        that's not correct; is that right?

12             MR. FLYNN:  Same objection.  If it calls for --

13        If you have to discuss anything that you discussed with

14        your attorney, don't disclose that.

15             MR. MIGLIO:  So is it correct, Miss Reeser,

16        that you didn't have an opinion that the case was worth

17        $150,000?

18             MR. FLYNN:  Objection, asked and answered.  You

19        can answer only to your opinion, not to any

20        communication you made --

21             THE WITNESS:  I already answered, Keith.  I

22        have no other opinion.

23             MR. MIGLIO:  She didn't answer, so.

24             MR. FLYNN:  Yeah, she did.

25             MR. MIGLIO:  You deal with it or I will.  Okay?

Natalie Reeser
3/30/2015

Page 63

1      I'll get the Judge on the phone now.

2              MR. FLYNN:  That's fine.  I'm happy to talk to

3      the Judge.

4              MR. MIGLIO:  All right.  I'll get him on the

5      phone.  Let's take a break.

6              (Whereupon a recess was taken at or about the

7      hour of 11:30 a.m., and the deposition was resumed at or

8      about the hour of 11:49 a.m.)

9              THE WITNESS:  I gave my opinion, and I don't

10     remember having a conversation with her.

11  Q  (Continuing by Mr. Miglio):  Didn't ask you whether you

12     remember having a conversation with her.

13  A  About a dollar figure.

14  Q  I asked you -- And I don't want to know about

15     conversations you had with your counsel.  I want to know

16     whether or not you had an opinion that the Jeffrey

17     Automotive case was worth $150,000.

18  A  I didn't have an opinion on the case.  My attorney was my

19     opinions.

20  Q  So the answer is you did not have an opinion that the

21     Jeffrey Automotive Lawsuit that you filed was worth

22     $150,000.

23              MR. FLYNN:  Objection.  Asked and answered.

24  Q  (Continuing by Mr. Miglio):  Is that correct?

25  A  I answered that, sir.

Natalie Reeser
3/30/2015

Page 64

1   Q    Well, we'll read it back and we'll get an answer.
2              MR. FLYNN:  Yeah, please read the record back
3        and read her answer back.
4              MR. MIGLIO:  Just read the question.
5              MR. FLYNN:  No, read the answer, because --
6              THE WITNESS:  The answer.
7              MR. FLYNN:  -- the answer's important for the
8        objection.
9              (Whereupon the following portion of the
10       transcript was read as follows:
11              "Q  So the answer is you did not have an
12       opinion that the Jeffrey Automotive Lawsuit that you
13       filed was worth $150,000.
14              MR. FLYNN:  Objection.  Asked and answered.")
15              THE WITNESS:  Correct.
16  Q    (Continuing by Mr. Miglio):  What did you say?
17  A    That's the exact same thing I said before.
18  Q    What did you just say?
19  A    It was the exact same thing I said before.
20  Q    And what was that?
21             MR. FLYNN:  Objection.  Asked and answered.
22       She once, again, has told you on several occasions now,
23       counsel.
24             MR. MIGLIO:  What did he say about speaking
25       objections?  Do you remember that?

Natalie Reeser
3/30/2015

Page 65

1              (Exhibit 22 marked.)

2   Q   (Continuing by Mr. Miglio):  Let me show you what's been

3       marked as Exhibit 22.

4            MR. FLYNN:  Read it carefully.

5            THE WITNESS:  I already know what's in this.

6   Q   (Continuing by Mr. Miglio):  What are these documents?

7   A   They're the reason they said they were letting me go.

8   Q   And what are the photos that appear as the last two pages

9       of Exhibit 22?

10  A   That's the Craig's List ad they referred to.

11  Q   This is what you put on Craig's List?

12  A   Yep.  Yes.

13  Q   While working there.

14  A   Everyone was allowed to use the computers.

15  Q   While working there.  You put these ads on Craig's List

16      while you were employed, during the time; is that right?

17  A   I won my unemployment case.  I did nothing wrong.

18  Q   Did you hear my question?

19  A   I answered your question.

20  Q   I said did you post these ads on Craig's List while you

21      were employed at Jeffrey Automotive Group?

22  A   Yes.

23  Q   Thank you.

24  A   Hm-hmm.

25  Q   Did you ever post any ads on Craig's List or any other

Natalie Reeser
3/30/2015

Page 66

1    social media site while you were working at the Clinton

2    Township lab or any other lab within Henry Ford Health

3    System?

4  A  No.

5  Q  Can you look at the second page of Exhibit 22?

6  A  Hm-hmm.

7  Q  And read through those four or five paragraphs there and

8    tell me whether those are accurate.

9  A  No.

10 Q  Which of them aren't accurate?

11 A  The first paragraph is inaccurate.

12 Q  Okay.

13 A  The second paragraph is inaccurate, the third paragraph

14   is inaccurate, and the fourth paragraph is fine.

15               (Exhibit 23 marked.)

16 Q  (Continuing by Mr. Miglio):  I show you what's been marked

17   as Exhibit 23.  Have you ever seen these documents

18   before?

19 A  I don't know what this is.

20 Q  Do these look like things that you were posting on the

21   internet when you worked for Jeffrey Automotive?

22           MR. FLYNN:  Objection.  Foundation.

23           THE WITNESS:  I have no clue, sir.

24 Q  (Continuing by Mr. Miglio):  None of them are familiar to

25   you?

Natalie Reeser
3/30/2015

Page 67

1    A    None of these are posts.

2    Q    Well, do these looks like sites you went to or things you

3         saw while you were on the computer at Jeffrey Automotive

4         Group?

5    A    I have no clue.

6              MR. FLYNN:  Same objection.

7              THE WITNESS:  I don't know who put this packet

8         together and I have no clue.

9    Q    (Continuing by Mr. Miglio):  Do you have a Facebook page?

10   A    Yes, I do.

11   Q    Any other social media sites that you subscribe to?

12   A    No.  I had a Myspace page, but when Myspace shut down or

13        whatever, wasn't popular anymore, I never got back on, so

14        I haven't been on that in a long time.

15   Q    (Continuing by Mr. Miglio):  So what happened to the

16        lawsuit that you had against Jeffrey Automotive Group?

17   A    I already answered that.

18   Q    Well, was it settled?  Dismissed?  What?

19   A    It was dismissed because me and my attorney couldn't come

20        to an agreement.

21   Q    And you didn't have the opportunity to get another

22        attorney; is that what you're saying?

23   A    I couldn't afford another attorney at the time, sir.

24   Q    So you were afforded an opportunity to get another

25        attorney, but couldn't find one; is that what you're

Natalie Reeser
3/30/2015

Page 68

```
 1        saying?
 2   A    No.  I didn't look for one.  I just let it go.
 3   Q    Any other lawsuits or legal proceedings that you've been
 4        involved in other than this case and other than --
 5   A    The flood.
 6   Q    -- the Jeffrey Automotive Group lawsuit?
 7   A    The flood.
 8   Q    What's the flood?
 9   A    I was -- My apartment was flooded by my apartment complex
10        while employed at Henry Ford.
11   Q    And what happened with that one?
12   A    It was a class action lawsuit, never had to go to court,
13        never had to testify, and we all won a thousand bucks.
14   Q    Any other lawsuits or legal proceedings?
15   A    No.
16   Q    Did you ever file for bankruptcy?
17   A    Yes.
18   Q    When did you file for bankruptcy?
19   A    2011, I believe.
20   Q    When were you -- What was the outcome of that case?
21   A    I was granted bankruptcy.
22   Q    Was an order of discharge entered?
23   A    I don't know what that means.
24   Q    Were you discharged from the debts?
25   A    Yes.
```

Natalie Reeser
3/30/2015

Page 69

| | | |
|---|---|---|
| 1 | Q | Do you remember what debts you had? |
| 2 | A | Mostly hospital. |
| 3 | Q | And that was for what? |
| 4 | A | Injuries that I had sustained when I was younger. |
| 5 | Q | Do you remember what healthcare facilities you had -- |
| 6 | | owed money to? |
| 7 | A | No. |
| 8 | Q | Were some of those facilities Henry Ford Health System |
| 9 | | facilities? |
| 10 | A | I have no clue, sir. |
| 11 | Q | Don't know where you were treated; is that what you're |
| 12 | | saying? |
| 13 | A | I don't know if they were included in a bankruptcy.  I |
| 14 | | don't have them in front of me, so I wouldn't be able to |
| 15 | | answer that. |
| 16 | Q | What's your educational background? |
| 17 | A | I have two years of college at Rochester Christian |
| 18 | | College. |
| 19 | Q | Did you get a degree? |
| 20 | A | Nope. |
| 21 | Q | What was the course of study you were involved in? |
| 22 | A | Political science. |
| 23 | Q | Is that the only post high school education you've had? |
| 24 | A | No.  I went to Davenport for one year. |
| 25 | Q | What did you study at Davenport? |

Natalie Reeser
3/30/2015

Page 70

1    A    Business.  I went to Kirtland Community College while I

2         also dually enrolled in high school and got

3         certifications in art.

4    Q    What do you mean certifications?  What kind of

5         certifications?

6    A    Certifications in painting.  Certifications to teach

7         children.  Drawing.  Fundamentals of art.

8    Q    So what's the sum total of post-high school education

9         you've had?  How many college courses have you taken?

10   A    I have no clue.

11   Q    How many years or months did you spend in college?

12   A    Including high school years, four.

13   Q    In college?

14   A    I went to college while I went to high school.  It's

15        called dual enrollment.

16   Q    So what years were you dual enrolled?

17   A    One year.

18   Q    Okay.  So in addition to the one year where you were dual

19        enrolled, how many other years did you spend pursuing a

20        college education?

21   A    Three.  Two at Rochester Christian College; one at

22        Davenport.

23   Q    Have you ever seen a psychologist or a therapist?

24   A    Long time ago, yes.

25   Q    Who was that?

Natalie Reeser
3/30/2015

Page 73

1   A   20 milligrams of Paxil.

2   Q   Okay.  And what were you seeing the person for?  Anxiety?

3   A   Anxiety.

4   Q   And you said that you had some kind of traumatic

5       experience which caused you to seek counseling with this

6       person; is that right?

7   A   Correct.

8   Q   And what was that?

9   A   I was raped.

10  Q   When was that?

11  A   In 2000.

12  Q   Okay.  Where was that -- did that occur?

13  A   It occurred in Dryden.

14  Q   Dryden, Michigan?

15  A   Yes.

16  Q   Did you make a police report?

17  A   I'm sure there was a police report.

18  Q   Was there a prosecution?

19  A   No.

20  Q   Was the perpetrator apprehended?

21  A   Yes.

22  Q   And what happened to him?

23  A   You would have to understand the whole story, but he

24      was -- the evidence was signed away, so he got away

25      scot-free.

Natalie Reeser
3/30/2015

Page 76

1    A    I did.

2    Q    So you saw this social worker for, you said, a year or

3         two?

4    A    Yes.

5    Q    Is that clinic still there?

6    A    I have no clue.

7    Q    And then what caused you to stop seeing the social

8         worker?

9    A    I probably didn't have insurance anymore.

10   Q    Where were you working at the time?

11   A    I wasn't working.  I was going to college.  Well, I was

12        working probably for a gym at the time during college.  I

13        don't remember the name of the gym.  That was early --

14        early when I was a freshman, so.

15   Q    What gym was it, do you remember?

16   A    I have no clue.  It's not there anymore.  It was in

17        Rochester Hills.  They now have built a big fitness

18        center over it.

19   Q    So since seeing this psychologist, social worker, have

20        you seen anybody else for any depression, anxiety, any

21        mental or emotional conditions?

22   A    Yes.  I went to my personal primary care doctor, Dr.

23        Kahnamoui, after this incident with Henry Ford, because

24        my anxiety came back, my panic attacks came back, I

25        needed medicine.  This has put so much stress on me that

Natalie Reeser
3/30/2015

Page 77

1        I started having flashbacks of all these -- Just it

2        wasn't a good situation.  It caused anxiety.

3    Q   All right.  So tell me then, again now, when did you

4        start treating with the doctor for depression or anxiety?

5    A   I went to see him after my -- I was walked out the door

6        by security on my last day.  I went to see him soon after

7        that, because the medicine wasn't working, it made me

8        very depressed, it made me very anxious, very scared, I

9        didn't know what was going on, I didn't know why it was

10       happening to me, and I needed help.

11   Q   So my question is, though, when did Dr. Kahnamoui start

12       treating you for anxiety or depression or any mental or

13       emotional problems?

14   A   Soon after I was released from Henry Ford.

15   Q   And do you remember -- When was the last time you saw

16       that doctor?

17   A   I just saw him in December or November, because I had a

18       nervous breakdown, and he took me off work for a week and

19       upped my medicine.

20   Q   What do you mean you had a nervous breakdown?

21   A   All the stress that this lawsuit has caused me has been

22       tremendous.

23   Q   Okay.  And it hasn't had anything to do with your breakup

24       or your --

25   A   No.  It all has to do with --

Natalie Reeser
3/30/2015

Page 78

1    Q    -- fiance dropping you?

2    A    -- me going to the State and what Fiona did to me.

3    Q    So are you saying that prior to leaving the -- Strike

4         that.  Prior to leaving the employment of Henry Ford

5         Health System you weren't being treated by Dr. Kahnamoui

6         for any anxiety for depression.

7    A    Just my regular Paxil pills that I've been taking for 10

8         years, but he had to up them -- up it because the

9         depression was huge and the anxiety got worse.  Like I

10        was having panic attacks on a daily basis to the point

11        where I almost went agoraphobic and couldn't leave the

12        house, so.

13   Q    And how often before that, your termination from Henry

14        Ford, were you taking Paxil?

15   A    I took Paxil every day since 2001.  However, after the

16        termination at Henry Ford it needed to be upped and

17        adjusted, and now I take 50 milligrams of Paxil instead

18        of 20 milligrams of Paxil, and I also take Xanax to calm

19        my nerves for the anxiety and panic attacks this lawsuit

20        has caused me.

21   Q    And what do you mean this lawsuit has caused you?

22   A    The stress of knowing I have to testify about my rape and

23        you're going to ask me questions about that has caused

24        tremendous stress, the questions that you want to ask me

25        about, just this whole thing.  I mean it's caused a lot

Natalie Reeser
3/30/2015

Page 139

1    A    I have no clue.

2    Q    Well, don't you know that that's the patient's name?

3    A    Possibly.

4    Q    Do you know that I got this from your lawyer with the

5         patient's name not redacted?

6    A    Possibly.

7    Q    And if you took this without redacting the patient's name

8         that would have been inappropriate and a violation of

9         HIPAA, wouldn't it?

10              MR. FLYNN:  Objection.  Calls for a legal

11        conclusion.

12              THE WITNESS:  I'm not a lawyer.

13              INNOCENT/ISN'T

14   Q    (Continuing by Mr. Miglio):  Isn't that what you said

15        earlier, that taking information that identified patients

16        would be a violation of the law, HIPAA?

17              MR. FLYNN:  Objection.

18              MR. MIGLIO:  I mean we can go back and look for

19        it.

20              MR. FLYNN:  Objection.  Misconstrues her

21        earlier testimony and calls for a legal conclusion.

22   Q    (Continuing by Mr. Miglio):  So what I want to know is --

23   A    I'm not a lawyer.

24   Q    I didn't say you were.  What I want to know is why did

25        you keep a copy of this information with the patient's