# EXHIBIT E

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATALIE REESER,

     Plaintiff,

v                   Case No. 2:14-cv-11916-GCS-MJH
                   Hon. George Caram Steeh

HENRY FORD HOSPITAL,

     Defendant.

_____/

DEPOSITION OF JILL HOOD

    Taken by the Plaintiff on the 5th day of May, 2015,

at the office of Keith D. Flynn, 600 W. Lafayette Blvd.,

Detroit, Michigan at 10:00 a.m.

APPEARANCES:

For the Plaintiff:    MR. KEITH D. FLYNN (P74192)
                      Miller Cohen, P.L.C.
                      600 W. Lafayette Blvd., 4th Floor
                      Detroit, Michigan 48226-0840
                      313.964.4454

For the Defendant:    MR. TERRANCE J. MIGLIO (P30541)

                      MS. BARBARA E. BUCHANAN (P55084)

                      Varnum LLP

                      39500 High Pointe Blvd., Suite 350

                      Novi, Michigan 48375

                      248.567.7828

Also Present:       NATALIE REESER, via telephone

Reported by:        TAMARA A. O'CONNOR

                      CSMR 2656, CER 2656

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

| Page 153 | Page 155 |
|---|---|

**Page 153**

1     **the phone with Ms. Bork. You just told her that.**
2     **What did Fiona say?**
3  A  That, like I said, was the conversation when she
4    confirmed with me that she had not been paying the
5    lunches, and I let her know that we were needing to
6    do all of the research on it to get her paid.
7  Q  **And what did she say?**
8  A  "Okay."
9  Q  **Anything else?**
10  A  She didn't understand at first why, when she had so
11    much time at that site of down time, why it could
12    not be considered lunch time, until I explained to
13    her that according to the Fair Labor Standards Act
14    you need 30 minutes of uninterrupted time, where you
15    can have that time to yourself.
16  Q  **And what did she say at the end of that explanation?**
17  A  That she had often more than a half an hour worth of
18    time, and that is when I had asked her, "but what if
19    the phone rings? What if somebody walks in? Is the
20    expectation that Natalie or whoever is manning the
21    site that day answer the call and attend to that
22    patient, or could she say, `No. I'm sorry. I'm on
23    my break right now'"?
24       When Fiona had confirmed with me that, no,
25    she needs to help the client, or she needs to answer

**Page 154**

1    the phone, that is when I let her know that it's
2    compensable time.
3  Q  **And what was Fiona's tone during this conversation,**
4    **if you could recall?**
5  A  She was fine with it. Fiona is very concerned about
6    doing the right thing and doing it consistently.
7  Q  **So if she was required to take a lunch, why was she**
8    **not provided a lunch on the 25th of February?**
9  A  If she was required to take--it's not about not
10    taking a lunch. It's about leaving a site, locking
11    the door and not having anybody there, about
12    abandoning your job.
13  Q  **But that's not my question. My question isn't what**
14    **you think it's about. My question is, if she was**
15    **required to take a lunch, why was she not provided a**
16    **lunch on February 25th?**
17  A  Because they were still doing the exact same
18    schedule that they were doing before, like I said.
19  Q  **But here she is saying--**
20  A  May I--
21  Q  **This is her saying that it is mandatory for her to**
22    **take a lunch--**
23       MR. MIGLIO: Stop. Stop. Let her answer
24    the--we're going to take a break. Okay? We're not
25    coming back until--

**Page 155**

1       MR. FLYNN: No, no, no. You don't get to
2    just unilaterally determine--
3       MR. MIGLIO: You want to get the Judge on
4    the phone? We can do that. We can do that, but she
5    is entitled to answer a question, and you
6    continuously have interrupted other witnesses--
7       MR. FLYNN: You are interrupting a
8    question. You are interrupting a question that is
9    already on the record.
10       MR. MIGLIO: You have interrupted a
11    witness giving an answer.
12       MR. FLYNN: You can't just interrupt a
13    question, Counsel.
14       MR. MIGLIO: You interrupted her answer.
15       MR. FLYNN: No. She was answering a
16    question that I didn't even ask.
17       MR. MIGLIO: Well, we can terminate the
18    deposition. We can get Judge Steeh on the phone
19    again, and he can tell you how to ask questions and
20    how to object.
21       MR. FLYNN: Put it on the record how long
22    this break takes. This is ridiculous.
23       (At 1:27 p.m., recess taken)
24       (At 1:33 p.m., back on the record)
25  Q  **(By Mr. Flynn) I'm going to withdraw the last**

**Page 156**

1    **question, and I'm going to ask you a different**
2    **question.**
3       MR. MIGLIO: I want to get the Judge on
4    the phone unless you are going to assure me that you
5    are going to let this witness answer questions and
6    not interrupt her.
7       MR. FLYNN: Well, the issue is--
8       MR. MIGLIO: You can't do that.
9       MR. FLYNN: The issue, Terry, is when you
10    have someone who is not answering the question that
11    I pose and keeps wanting to give her spiel to me,
12    I'd like an answer to the specific question that I
13    posed.
14       MR. MIGLIO: She is entitled to give an
15    answer, and you are entitled to not interrupt her
16    and ask another question.
17       MR. FLYNN: And, you know--
18       MR. MIGLIO: Then you can move to whatever
19    you want to do to compel an answer or--
20       MR. FLYNN: In the spirit of--
21       MR. MIGLIO: To compel her testimony in
22    the appropriate manner, but she is entitled to give
23    an answer to a question that you have posed without
24    you interrupting her.
25       MR. FLYNN: In the spirit--

TAMARA A. O'CONNOR
248.882.1331

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

Page 249

1   Q   And you are currently not aware of any conversations
2       between Reeser and Martha, but you don't recall,
3       earlier that day?
4   A   No, no, exactly.  Like you had asked before, no, I
5       do not recall.
6   Q   Now it says:
7           "7.  Yes, John is aware and we have
8           his full support."
9       Do you see that?
10  A   I do.
11  Q   Do you recall any conversations--okay, let me ask it
12      to you this way.  Were you privy to any of those
13      conversations with John and Fiona?
14  A   Not when--no, not when Fiona was on the line, no.
15      Fiona has her own one-on-one follow-up with John
16      through the regular course of business.
17  Q   Why is that?
18  A   It is the way it always has been.  There is a lot
19      from a business standpoint that transpires,
20      regardless of--even if there were no employee
21      concerns.
22          John had touched base at least twice a
23      week with all of his managers so that he knows what
24      is happening in the business.
25  Q   And did you individually follow up with John, or did

Page 250

1       you just rely on this statement from Reeser?
2   A   No.  I individually followed up with John.
3   Q   Or, I'm sorry, from Bork?
4   A   From Bork.  No.  I followed up with John as well.
5   Q   And when did you follow up with him?
6   A   I do not recall if it was--the exact date.  It would
7       have been obviously prior to the discussion with
8       Natalie that we were ending her employment, but I
9       don't know the exact date.
10  Q   Do you recall what was said during that meeting?
11  A   I do.  I let him know that we had finalized the
12      investigation, that there was nothing that I could
13      find that could identify any type of--make any
14      circumstances that would lend this to be anything
15      other than job abandonment, and therefore my
16      recommendation was to proceed with termination if he
17      was in support.
18  Q   And what did he say?
19  A   He said he was in support.
20  Q   Did he ask any questions?
21  A   He had lots of questions, but I had also been
22      updating--as we had talked, I had been updating him
23      all along as well.
24  Q   What questions did he raise?
25  A   I don't remember his specific questions.  He had

Page 251

1       questions about the investigation, if I was
2       comfortable with things, did I get the statements
3       back that I had already updated him on, so he had
4       follow-up questions from our previous conversations.
5   Q   Were any notes made by--during this meeting with
6       John?
7   A   No.  It was just a phone call with him, a regular
8       update meeting.
9   Q   Now I'm looking on HFH 72, which is the second page
10      of this exhibit.  I'm looking at the second to last
11      sentence in this document.  It says:
12          "I do believe that potential litigation
13          may come from this.  That is why I want to
14          make sure I have all possible documentation
15          prior to proceeding with termination."
16  A   Yes.
17  Q   Why did you believe that litigation could come from
18      this?
19  A   Because it was very unfortunate, the timing between
20      when her actions of walking off the job so closely
21      corresponded with when we were going to be issuing
22      her back pay for the lunches, and it's very clear to
23      me--
24          Clearly I'm not an attorney, but even the
25      prima facie of that is that it looks odd, so that's

Page 252

1       why I was concerned.
2           I wanted to make sure that we had
3       everything that we needed to be able to substantiate
4       that these were clearly mutually exclusive.
5   Q   Well, along that note--
6           (At 3:42 p.m., Plaintiff's
7           Deposition Exhibit 19 marked)
8   Q   (By Mr. Flynn)  Feel free to read it, and let me
9       know when you're done.
10  A   (Witness complied).
11  Q   So looking under "Paid Meal Break," which is a
12      section here--
13  A   Yes.
14  Q   First off, what does this appear to be?
15  A   This appears to be the summary that I had typed up
16      and sent to Ms. Reeser in regards to the concerns
17      that she had brought forward to me on January 20th.
18  Q   So under "Paid Meal Break," it says:
19          "You informed me that you have not
20          been allowed to take this 30 minute break,
21          but rather were `engaged to wait' during
22          this time without compensation.  Per HFHS
23          Policy #5.05, employees are entitled to a
24          30-minute unpaid lunch break."
25      Do you see that?

66 (Pages 249 to 252)