# EXHIBIT F

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATALIE REESER,

     Plaintiff,

v                     Case No. 2:14-cv-11916-GCS-MJH
                     Hon. George Caram Steeh

HENRY FORD HOSPITAL,

     Defendant.
_____/

DEPOSITION OF FIONA BORK

     Taken by the Plaintiff on the 16th day of March, 2015, at the office of Keith D. Flynn, 600 W. Lafayette Blvd., Detroit, Michigan at 11:00 a.m.

APPEARANCES:

For the Plaintiff:    MR. KEITH D. FLYNN (P74192)
                      Miller Cohen, P.L.C.
                      600 W. Lafayette Blvd., 4th Floor
                      Detroit, Michigan 48226-0840
                      313.964.4454

For the Defendant:    MR. TERRANCE J. MIGLIO (P30541)
                      MS. BARBARA E. BUCHANAN (P55084)
                      Varnum LLP
                      39500 High Pointe Blvd., Suite 350
                      Novi, Michigan 48375
                      248.567.7828

Reported by:       TAMARA A. O'CONNOR
                      CSMR 2656, CER 2656

Page 113

1    phlebotomist just to ask another supervisor or to
2    ask another employee, "Could you cover this shift"?
3  A  No. It's--you need to get approval from your
4    supervisor. That is clear to everybody. That has
5    always been clear.
6  Q  Okay. Are you saying that Martha Wiseheart has
7    never covered for a phlebotomist?
8  A  I know of one time that she watched the desk.
9  Q  So why couldn't--why isn't that something that
10    people did?
11  A  There was a requirement to have a TB test read, and
12    there is only a certain--you have to have it read
13    within a certain amount of time.
14        So this person unfortunately didn't plan,
15    you know, the way that they should have, to get
16    their TB test read when they didn't have to cover
17    the site.
18        So I was forced to let that person go get
19    read at the time. Otherwise they would have to
20    repeat the whole thing over again.
21  Q  And that's a break. Right?
22  A  It's not a break. They were paid.
23  Q  Aren't breaks paid?
24  A  Yeah.
25  Q  Is there a difference between a break and a lunch

Page 114

1    time, a lunch period at Henry Ford?
2  A  Yes.
3  Q  What is the difference?
4  A  A lunch period is a 30-minute unpaid break, unpaid
5    period.
6  Q  Because they're different. Right?
7  A  They are different.
8  Q  What is a break?
9  A  A break is something that happens--it can happen
10    throughout the day. You're not allowed to leave
11    your work area. It's during working hours. You're
12    paid at that time.
13        You might like go into a back room or
14    something, but you're at your site.
15  Q  Can you think of a single employee who was
16    terminated for taking a lunch break?
17  A  No.
18  Q  Can you--you can't think of a single one?
19  A  No.
20  Q  Can you think of a single one who was terminated for
21    leaving the site to take a lunch break?
22  A  No. I can think of a couple of employees that were
23    terminated for abandoning their job site.
24  Q  Okay. Who can you think of?
25  A  Natalie Reeser, Shantay Stewart (phonetic), Eric

Page 115

1  A  Liptag (phonetic), Stephanie Hope, Rachel Holliman
2    (phonetic).
3  Q  Anyone else?
4  A  Yeah, Heather Adamo (phonetic).
5  Q  Anyone else?
6  A  Not that I can recall.
7  Q  And these are all phlebotomists?
8  A  Correct.
9  Q  Okay. Let's go through them one at a time.
10    Shantay, explain what happened with her.
11  A  She came to work, signed in, left the job site and
12    then came back.
13  Q  How long was she gone?
14  A  Thirty-something minutes.
15  Q  What site was this?
16  A  Nursing home.
17  Q  Now you had indicated earlier that people take lunch
18    at a nursing home when everyone else takes lunch.
19    Right?
20  A  Not a nursing home. Nursing home we are only there
21    from 5:00 a.m. to 9:00 a.m. I said physician
22    office.
23  Q  Oh, I apologize.
24  A  That's okay.
25  Q  So what is the lunch policy for nursing homes?

Page 116

1  A  They don't get a lunch. It's a four-hour shift.
2  Q  I see, okay. So she just showed up and left with no
3    explanation?
4  A  Yeah. She took her son to the babysitter.
5  Q  How did you find that out?
6  A  The nursing home contacted me, let me know that I
7    had an employee that left the site. Then I sat down
8    with her and asked her what happened, and she was
9    honest and told me.
10  Q  But at the time she didn't tell you about that?
11  A  No.
12  Q  Eric, what was his situation?
13  A  He was upset with co-workers, used an expletive and
14    walked out of the site and went to his car, and then
15    came back later.
16  Q  How much later?
17  A  I don't recall. Maybe it was 30/40 minutes later.
18  Q  How was his attendance prior to this?
19  A  Good.
20  Q  What was the expletive?
21  A  The "F" word.
22  Q  What was the disagreement with his co-workers about?
23  A  It was about the centrifuge and the table that it
24    was put on, and where they were going to have the
25    table, and he had moved it to a spot he thought was

32 (Pages 113 to 116)

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

Page 121

1    can't remember how many though.
2  Q  **More than five?**
3  A  I don't know.  I would have to look.
4  Q  **Eric, you said he didn't have any tardies or any**
5     **attendance issues?**
6  A  Not that I recall.
7  Q  **He could have, but you just don't remember today?**
8  A  I don't--correct.  I don't recall, yeah.
9  Q  **Stephanie?  Same question for Stephanie?**
10 A  Yeah.  I'd have to look to be sure.
11 Q  **You don't remember?**
12 A  I don't--nothing stands out, but I don't want to say
13    no if that is not correct.
14 Q  **Rachel?**
15 A  I don't know.
16 Q  **Heather?**
17 A  I don't know.  It was long ago, so--
18    REPORTER:  I'm sorry?
19    THE WITNESS:  It was long ago, so--
20 Q  **(By Mr. Flynn)  Which of these is the most recent?**
21 A  I would say Eric and Stephanie would be the two that
22    would be the more recent ones.
23 Q  **When were they terminated?**
24 A  Probably a couple of years ago.
25 Q  **Since Natalie was terminated, has anyone else been**

Page 122

1     discharged by you or by H.R. for job abandonment in
2     your department?
3  A  No.
4  Q  **Are you aware of other employees who skipped out to**
5     **go shopping on Black Friday?**
6  A  No.
7  Q  **No, you've never been made aware of other employees**
8     **who have done that?**
9  A  No.
10 Q  **And you also said that you are responsible for**
11    **evaluating performance.  Is that--**
12 A  Correct.
13 Q  **Again, just wait for me to ask the question.**
14 A  Oh, I thought that was your question.
15 Q  **It was, but I always have to leave off with the**
16    **question so that it's not confusing and we don't go**
17    **back and forth.  It's just the way of things**
18    **unfortunately.**
19    **You said that you are responsible for**
20    **performance evaluations of your employees.  Right?**
21 A  Correct.
22 Q  **What is that process like?**
23 A  There is a mid-year review, and the employees
24    evaluate their own performance, and they submit that
25    to me through the H.R. portal, and then I review

Page 123

1     their performance.
2        Then I send it back to them.  If they have
3     questions, concerns, then they contact me.  It's a
4     pretty simple process.  It's all electronic, so--
5  Q  **Okay, and when would you do your evaluation relative**
6     **to when they do their own?**
7  A  There are set time periods, so they--I think it's--I
8     don't know if it's May or June.  You get an
9     E-mail that mid-year reviews are due by a certain
10    time, and they get the review form, mid-year review
11    form opens up for the employee to access and
12    evaluate their performance.
13       Then they send it to me, and I evaluate it
14    and send it back to them.
15 Q  **What kinds of things are you evaluating?**
16 A  There is different pillars, and there is goals that
17    are set, so it depends on the different--there is
18    different categories.
19 Q  **So explain what you mean by "pillars" and by**
20    **"goals."**
21 A  There is goals set at the beginning of the year.
22    The company rolls down goals to us as a department
23    that we need to meet, and then you have the
24    opportunity to set a personal goal if you choose to
25    do that.

Page 124

1        The employee does, and then the goals that
2     I set are basically, you know, come from upper
3     management, and there are a couple of goals that we
4     customize to our own department, like about error
5     rates or defect logs, that sort of thing that
6     relates to the job that they're doing.
7        Then there is categories that--like
8     safety.  There is HIPAA.  There is things like, you
9     know, our Standards of Excellence, how people work
10    together, the type of work that they do, patient
11    interactions, keeping the work place clean, safe
12    environment, that sort of thing.
13 Q  **Is there a metric that goes along with this?**
14 A  There is a rating system, so--
15 Q  **Could you explain that?**
16 A  The rating system?  I mean, it's a company rating
17    system, so it's--you could get a 2, a 3, a 4, 5.  I
18    can't remember if there is a 1 or not.
19 Q  **Is there some guidepost to allow you to understand**
20    **which number to assign?**
21 A  What do you mean?
22 Q  **Like how do you know whether or not someone has**
23    **performed at a 5 as opposed to a 4?**
24 A  Well, 5 is exemplary performance.  It's a leader.
25    That is someone that--I mean, a change-maker.  That

34  (Pages 121 to 124)

NATALIE REESER v HENRY FORD HOSPITAL
DEPOSITION OF FIONA BORK

---

Page 133

1  Q  Did you grant those requests?
2  A  For Natalie? Yeah. I worked around each one that I
3     could. If I didn't have coverage, then I couldn't,
4     but I always try with everybody.
5  Q  Now you wanted to try and--you wanted to--it was
6     almost like you were distinguishing between a good
7     phlebotomist from a good employee.
8         What did you mean by that? Was there some
9     other criteria you look at to judge Natalie's
10    performance?
11        MR. MIGLIO: Objection as to the form of
12    the question.
13        THE WITNESS: Well, I wasn't sure what you
14    were asking me about good employee. That is very
15    broad.
16 Q  (By Mr. Flynn) Okay. Well, what was your confusion
17    about that?
18 A  Because I think she is good with patients, but I
19    wouldn't say that somebody who doesn't follow
20    policies is a good employee.
21 Q  So how many times can you count that she did not
22    follow policies?
23 A  Three that I recall immediately.
24 Q  And two of those are Internet-related. Correct?
25 A  Correct.

---

Page 134

1  Q  And the other one was probably her termination?
2  A  No, her job abandonment.
3  Q  Well, wasn't she terminated for job abandonment,
4     according to Henry Ford?
5  A  Yes.
6  Q  So it's the termination?
7  A  No. It was the job abandonment.
8  Q  Okay. Well, what specifically did she violate?
9  A  She violated the policy of not leaving a site
10    without proper authorization.
11 Q  And where is that policy to be found?
12 A  It's in our policy that she signed every year. It's
13    in our binder.
14 Q  Okay. So is it something unique to Outreach that
15    you drafted and put into the employee handbook?
16 A  No. That is a policy anywhere in the hospital.
17 Q  So are you suggesting that she never requested to
18    take lunch the day that she left?
19 A  What I'm saying is she didn't request approval. She
20    didn't get approval to leave, which is the policy.
21 Q  Well, we'll get to the events of that day. What
22    would happen if she didn't take her lunch?
23 A  If she didn't take her lunch, she would--
24 Q  For instance, the day that she left for lunch?
25        MR. MIGLIO: Objection as to the form of

---

Page 135

1     the question.
2        THE WITNESS: What do you mean, what would
3     happen?
4  Q  (By Mr. Flynn) What would happen if she didn't take
5     her lunch that day?
6        MR. MIGLIO: Same objection.
7        THE WITNESS: I don't know. I'm not sure
8     what you are asking me.
9  Q  (By Mr. Flynn) Would she be disciplined for not
10    taking a lunch?
11 A  No.
12 Q  Why would she not be disciplined for not taking a
13    lunch?
14        MR. MIGLIO: Same--
15        THE WITNESS: Why would she be disciplined
16    for--
17 Q  (By Mr. Flynn) Not taking a lunch?
18        MR. MIGLIO: Is it not taking a lunch or
19    taking a lunch?
20        THE WITNESS: Yeah.
21 Q  (By Mr. Flynn) Not taking a lunch. Why would she
22    not be--why would she not be disciplined for not--or
23    for taking--for not taking a lunch?
24        MR. MIGLIO: Objection to the form of the
25    question.

---

Page 136

1        THE WITNESS: Are you asking me would she
2     be disciplined for staying at her site and not
3     taking a lunch?
4  Q  (By Mr. Flynn) Correct.
5  A  No.
6  Q  So your testimony today is that employees could
7     disregard the mandatory lunch policy?
8        MR. MIGLIO: Same objection.
9        THE WITNESS: They can disregard the
10    mandatory policy. She was--that site--
11 Q  (By Mr. Flynn) That is a "yes" or "no" question. I
12    mean, can you disregard the mandatory lunch policy,
13    or can you not?
14        MR. MIGLIO: Objection as to the form of
15    the question.
16        THE WITNESS: The policy is that you
17    contact me if you can't take a lunch.
18 Q  (By Mr. Flynn) Okay. Well, are you saying that she
19    didn't contact you to say that she was going to take
20    a lunch?
21 A  She did not call me and seek approval for taking a
22    lunch, to leave a site unattended, close the site.
23    She did not have my approval, which is the policy.
24 Q  Now typically how long does it take you to get
25    people their--get people approval to leave for

---

37  (Pages 133 to 136)