# EXHIBIT I

2010 WL 1050330

2010 WL 1050330
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Deborah COMPTON, Plaintiff–
Appellant/Cross–Appellee,
v.
Helen Alexandra PASS, M.D. Jane E. Pettinga,
M.D., and William Beaumont Hospital,
Defendants–Appellees/Cross–Appellants.

Docket No. 260362.
|
March 23, 2010.

West KeySummary

1   Health
    Jury questions

Expert testimony established prima facie evidence of causation to create a question of fact for the jury. Patient suffered from breast cancer and alleged that the hospital and doctors removed at least 18 of her right axillary lymph nodes as part of a clinical trial without her informed consent. She alleged that if she had been properly informed, she would have chosen to undergo sentinel node removal. Patient's expert testified that if she had had the senitel node biopsy she would have avoided the problems she now suffers.

Cases that cite this headnote

Before: K.F. KELLY, P. J., and MARKEY and METER, JJ.

Opinion

PER CURIAM.

*1 This medical malpractice action is before this Court for the third time after a second remand from our Supreme Court. The matter first came before this Court in 2006 when plaintiff Deborah Compton appealed as of right the judgment of no cause of action entered in favor of defendants Alexandra Helen Pass, M.D., Jane E. Pettinga, M.D., and William Beaumont Hospital; and, defendants cross-appealed as of right the trial court's order denying them summary disposition on the basis of causation. Originally, we found one issue to be dispositive of plaintiff's claim and we reversed the trial court's order denying defendants' motion for summary disposition on the basis of causation. *Compton v. Pass (Compton I )*, unpublished opinion per curiam of the Court of Appeals, issued August 22, 2006 (Docket No. 260362).

Plaintiff appealed our decision to the Supreme Court. Instead of granting leave, the Court vacated *Compton I* and remanded "for reconsideration, in light of Stone v. Williamson, 482 Mich. 144, 753 N.W.2d 106 (2008), of whether this is a lost-opportunity case and whether the defendants are entitled to summary disposition under MCL 600.2912a(2)." *Compton v. Pass,* 482 Mich. 1038, 757 N.W.2d 119 (2008).

Following the Supreme Court's remand order, we reconsidered our determination in *Compton I* and determined that plaintiff had pled a lost opportunity case and had "failed to present any evidence to establish that she had a greater than 50 percent chance of [a better result]." *Compton v. Pass (On Remand) (Compton II )*, unpublished opinion per curiam of the Court of Appeals, issued March 5, 2009 (Docket No. 260362). Accordingly, in *Compton II* we again reversed the trial court's order denying defendants' summary disposition and remanded to the trial court for entry of an order in defendants' favor.

Plaintiff appealed our decision in *Compton II* to the Supreme Court. Instead of granting leave, the Supreme Court reversed our judgment in *Compton II.* The Court stated:

> The Court of Appeals erred in analyzing this case under the lost-opportunity standard set forth in MCL 600.2912a(2). The plaintiff alleges that the defendants failed to obtain her informed consent, that this breach of the standard of care caused her to undergo a more extensive medical procedure with a higher risk of morbidity than she would have knowingly elected, and that she was

Case 2:14-cv-11916-GCS-SDD   ECF No. 71-10, PageID.2140   Filed 03/07/16   Page 3 of 10
Compton v. Pass, Not Reported in N.W.2d (2010)
2010 WL 1050330

injured as a result. We conclude that the evidence is sufficient to allow a fact-finder to find that the alleged breach of the standard of care caused the plaintiff to suffer physical injury (including the removal of additional lymph nodes, axillary cording, and lymphedema) that more probably than not was proximately caused by the negligence of the defendants. As a result, the requirements of the first sentence of MCR 600.2912a(2) are satisfied, and this is a claim of traditional malpractice. *Stone v. Williamson,* 482 Mich. 144, 753 N.W.2d 106 (2008) (see the opinions of Taylor, C.J., at 147, 153; and Cavanagh, J., at 171). For these reasons, the Court of Appeals erred in ruling that the Oakland Circuit Court should have granted the defendants' motion for summary disposition. We REMAND this case to the Court of Appeals for consideration of the remaining issues raised by the parties but not previously addressed by that court. [*Compton v. Pass,* —— Mich. ——; —— NW2d —— (2009).]

*2 Accordingly, the issue whether plaintiff pled an ordinary negligence claim or a lost opportunity claim is no longer before us. Rather, we must now consider each of the issues originally raised in plaintiff's appeal and defendants' cross-appeal in 2006, but not addressed by this Court in *Compton I* or *Compton II.*

I. BASIC FACTS

*Compton I* set forth the factual background of this matter:

This claim arises out of an axillary lymph node dissection [1] treatment for cancer that Drs. Pettinga and Pass performed on plaintiff at Beaumont Hospital in April 2001. Plaintiff, who sought medical care from Dr. Pass for breast cancer, alleged that defendants surgically removed at least 18 of her right axillary lymph nodes as part of NSAB [2] Clinical Trial B–32, without obtaining her informed consent. Plaintiff alleged that if she had been properly informed, she would have opted not to participate in the B–32 trial, but instead would have chosen to undergo the sentinel node removal. [3] Plaintiff alleged that, as a result of defendants' failure to properly provide her with informed consent, she suffers permanent axillary cording [4] and lymphedema. [5] [Non-bracketed footnotes in original.]

A. PRE–TRIAL PROCEDURES

After discovery, plaintiff filed a motion in limine to exclude the deposition testimony of Sharon Cottingham, a former friend of plaintiff, with regard to plaintiff's prior use of drugs, dishonest acts, prior litigation, and cigarette smoking. Defendants responded that Cottingham's testimony was admissible under MRE 404(b) to the extent that it demonstrated plaintiff's scheme to file fraudulent lawsuits and plaintiff's demands that Cottingham give false testimony. Defendants also argued that plaintiff lied in interrogatories about her drug use, making assertions that were contradicted by medical records, and that evidence that plaintiff forged prescriptions for muscle relaxers was relevant to her credibility.

The trial court considered plaintiff's motion at the November 24, 2004, motion hearing. It stated,

> Here, the Court agrees in part with plaintiff. Any reference to prior use of controlled substances, dishonest acts, prior litigation or prior cigarette smoking will create unfair prejudice to plaintiff and confuse the issues to be placed before the jury. The focus is on the facts surrounding plaintiff's treatment and consent thereto regarding the surgical procedure. In the absence of a direct link that any of these caused plaintiff's condition, the Court grants plaintiff's request to preclude any mention of plaintiff's prior use of controlled substances, prior litigation or prior cigarette smoking, and the witness Sharon Conningham [sic] shall be instructed accordingly. However, the Court does not include in its preclusion the testimony of Conningham [sic] regarding any issue of purported

Case 2:14-cv-11916-GCS-SDD ECF No. 71-10, PageID.2141 Filed 03/07/16 Page 4 of 10
Compton v. Pass, Not Reported in N.W.2d (2010)
2010 WL 1050330

perjury or fraud. That is directly related to plaintiff's credibility.

Subsequently, the trial court entered an order granting plaintiff's motion in part. The trial court ordered that "Cottingham shall be precluded from offering any evidence of plaintiff's use of drugs and controlled substances, plaintiff's prior litigation, and plaintiff's cigarette smoking except for the reasons set forth by the Court in its ruling on November 24, 2004." The order also provided that "Cottingham may offer testimony at trial and that defense counsel shall not be precluded from offering documentary or testimonial evidence regarding plaintiff's credibility."[6]

*3 Defendants also filed a motion in limine to preclude admission of recordings made by plaintiff of her conversation about the axillary dissection with Dr. Pass and Amy Liles, a registered nurse. Defendants asserted that 45 gaps in the tape recording rendered its probative value outweighed by the danger of unfair prejudice. The trial court denied defendants' motion to exclude the taped conversation, noting that an expert would be testifying and defendants could question him about the gaps in the recording.

In addition, defendants filed a motion for partial summary disposition arguing that Dr. Pettinga should be dismissed because she was not involved in the informed consent procedure. Dr. Pettinga had assisted Dr. Pass in performing the axillary dissection, but before the surgery, plaintiff and Pettinga had never met or spoken. Plaintiff responded alleging that, as the principal investigator of B–32 trial, Dr. Pettinga had a duty to obtain informed consent. On the record, the trial court noted that plaintiff presented evidence that Dr. Pettinga was the sole investigator for the B–32 trial and that she signed the consent form. Thus, the trial court denied defendants' motion for summary disposition of plaintiff's claim against Dr. Pettinga.

B. TRIAL

The case proceeded to trial. Plaintiff testified that after she was diagnosed with breast cancer, she made an appointment to see Dr. Pass. On March 27, 2001, plaintiff met with Dr. Pass. She took a tape recorder with her to her appointment because she has a learning disability, she "had a million things going at the time," and she thought it would help her understanding. Dr. Pass told plaintiff that the cancer "looks really, really tiny on your mammogram," but to determine the course of treatment they would have to find out whether the cancer had spread to the lymph nodes. Dr. Pass told plaintiff that removing the lymph nodes under the arm does not really affect the immune system, but "[t]here is a risk of arm swelling if we take out the lymph nodes...." Dr. Pass further explained that the axillary lymph node dissection is a "good operation" because it is effective for finding whether cancer has spread, but the "down side is that you end up with a little drainage tube.... You need to do those shoulder exercises because you get stiff shoulders. Some people get numbness underneath their arm around to their back." Dr. Pass stated "The bad thing is it gives all these side effects.... So one of the things that we're fairly excited about is a new protocol called the sentinel lymph node mapping." Explaining the sentinel node biopsy, Dr. Pass stated,

> People do much better if we only have to take out two lymph nodes instead of all the lymph nodes because their shoulder moves faster. You normally don't need the drainage tube. Sometimes there's a risk down the road if we take out just a few and four days later they're telling us you know we looked at it underneath the microscope and there's cancer in those.

*4 Plaintiff testified that she did not know what lymph nodes do for her and did not know which procedure was better for her. She stated, "I'm hoping my doctor is going to make that choice." *Plaintiff testified that she was* never informed that she could have a sentinel node biopsy without taking part in the B–32 trial. When Dr. Pass explained that the clinical study would let the computer decide whether plaintiff would have an axillary lymph node or sentinel lymph node biopsy, plaintiff thought that the computer would decide the choice that was right for her.

After plaintiff spoke with Dr. Pass, she spoke with registered nurse Lyles. Lyles had given plaintiff a consent form and, when she was talking, she was going through the consent form. The risk section of the consent form stated,

> The procedures in this study have risks and side effects. Most of them are listed here but they will vary from person to person. There may be side effects we can't predict. Your doctor may be able to give you medications to make some of the side effects

Case 2:14-cv-11916-GCS-SDD ECF No. 71-10, PageID.2142 Filed 03/07/16 Page 5 of 10
Compton v. Pass, Not Reported in N.W.2d (2010)
2010 WL 1050330

> less bothersome. Many side effects go away shortly after surgery but in some cases side effects can be serious, long lasting or permanent and life threatening. You should discuss the risks and side effects with the study doctor.

Plaintiff did not make any further inquiries because she thought that she knew all the side effects and they included "stiff shoulder, the numbness, the swelling." Plaintiff only "breezed through" the consent form because she was busy planning her mother's birthday party and her sister was in town. On March 29, 2001, Lyles called plaintiff at home. Plaintiff did not ask Lyles any questions, but stated that she would sign and return the consent form. Lyles called plaintiff back later that day to see if plaintiff had sent in the form. Plaintiff signed the form that day.

Plaintiff met Dr. Pettinga on the date of the surgery. Plaintiff had not talked to Dr. Pettinga before that time. On the date of the surgery, plaintiff was prepared for surgery and the computer chose her to undergo the axillary lymph node procedure. But then plaintiff stated "in general," not to anyone specifically, that she did not want to be part of the trial. Plaintiff testified that she was not taken for surgery against her will. Five minutes before the procedure, plaintiff was given a consent form, which she signed. She did not read the form though because she was drowsy and in "shock."

At the close of plaintiff's proofs, defendants moved for directed verdict. Defendants argued, in regard to liability, that (1) plaintiff admittedly failed to read the consent form and (2) plaintiff's expert testified that he is not an expert in drafting clinical trial consent forms. With regard to causation, defendants argued that plaintiff's experts did not provide testimony that it was more probable than not that she would have had a better result with a sentinel node dissection. The trial court noted that the standard of care required a surgeon to "reasonably inform a plaintiff of risks or hazards which may follow the treatment contemplated by the surgeon. By reasonably informed the Court means that the information must have been given timely and in accordance with accepted standards of practice among members of the profession with similar training and experience in this community or a similar one." The trial court ruled,

> *5 According to MCJI 30.02 informed, informed [sic] consent must be timely as I just read and it must be in accord with the accepted standard of practice among members of the profession with similar training and experience in this community or a similar one.
>
> In analyzing this question the Court does so considering as it must the facts in light most favorable to the plaintiff.
>
> Here plaintiff admits having at least one of the forms and indeed the most thorough one in her possession. And by her own admission for at least two weeks. The issue of timeliness would resolve in defendant's favor.
>
> In addition, Doctor Steele testified from a prospective [sic] not similar to the one in Royal Oak from his own admissions on cross examination Royal Oak in general and Royal Oak Beaumont in particular are considerably larger than in his own area of practice in Indiana.
>
> Doctor Petersen as to his testimony the Court believes his testimony was deficient in that there was no record of his having experience in the community or a similar one. At least the Court could discern.
>
> \* \* \*
>
> Even more significantly he was repeatedly asked simply whether there was a breach of the standard of care. But was not asked if it was among members of the profession with similar training and experience in this community or a similar one. If anything he spoke personally about his testimony that that was not what I would do or he—it was not compliance with the B–32 protocol or in response to Ms. Joyner's questioning to the NIC template.
>
> For that reason the Court believes that plaintiff has not established her burden. The Court also finds that plaintiff's case fails as a matter of law on the proximate cause issue as argued for the reasons stated by [defense counsel].

Both parties appealed the trial court's order. The issues we must now consider, which were originally raised in 2006 but not addressed in *Compton I* or *Compton II,* include whether the trial court erred by granting a directed verdict in defendants' favor; whether the trial court erred by denying defendants motion for partial summary disposition; and, whether the trial court erred by denying defendants' motion in limine and granting plaintiff's motion in limine in part.

## II. DIRECTED VERDICT

Case 2:14-cv-11916-GCS-SDD ECF No. 71-10, PageID.2143 Filed 03/07/16 Page 6 of 10
Compton v. Pass, Not Reported in N.W.2d (2010)
2010 WL 1050330

Plaintiff contends that the trial court erred by granting a directed verdict in defendants' favor. In particular, plaintiff asserts that the trial court erred by ruling that she was required to provide expert testimony regarding the local standard of care, by ruling that plaintiff's expert only testified about what he would have done personally, and by improperly concluding that she had not met her burden of proving causation. We agree. We review de novo a trial court's order granting a directed verdict. *Sniecinski v. Blue Cross & Blue Shield,* 469 Mich. 124, 131, 666 N.W.2d 186 (2003). A directed verdict is appropriately granted when the evidence, viewed in a light most favorable to the nonmoving party, fails to establish a question on which reasonable minds could differ. *Smith v. Foerster–Bolser Constr., Inc.,* 269 Mich.App. 424,427–428, 711 N.W.2d 421 (2006).

**\*6** To prevail in a medical malpractice action, a plaintiff must prove (1) the applicable standard of care, (2) the defendant breached the standard, (3) an injury, and (4) the breach proximately caused the injury. *Wiley v. Henry Ford Cottage Hosp.,* 257 Mich.App. 488,492, 668 N.W.2d 402 (2003). In a medical malpractice claim, expert testimony is required to establish the standard of care and to demonstrate the defendant's alleged failure to conform to that standard. *Birmingham v. Vance,* 204 Mich.App. 418, 421, 516 N.W.2d 95 (1994). When a plaintiff's claim of medical malpractice is premised upon the doctrine of informed consent, which requires a physician to warn a patient of a medical procedure's risks and consequences, the plaintiff must establish these same elements. *Lincoln v. Gupta,* 142 Mich.App. 615,625, 370 N.W.2d 312 (1985). Specifically, the Michigan Model Civil Jury Instruction 30.02 provides:

> Negligence may consist of the failure on the part of the [*Name profession.*] to reasonably inform [*name of plaintiff*] of risks or hazards which may follow the [treatment/ services] contemplated by the [*Name profession.*]. By "reasonably inform" I mean that the information must have been given timely and in accordance with the accepted standard of practice among members of the profession with similar training and experience in [this community or a similar one/[*Name particular specialty.*]].

"Claims of negligence based on the failure of a physician or surgeon to adequately obtain informed consent before a procedure or to otherwise fail to instruct or advise a patient come within the general rule regarding the need for expert testimony." *Paul v. Lee,* 455 Mich. 204, 212, 568 N.W.2d 510 (1997), overruled on other grounds *Smith v. Globe Life Ins. Co.,* 460 Mich. 446,456 n. 2, 597 N.W.2d 28 (1999). To survive a directed verdict motion, a plaintiff must make a prima facie showing of each element. *Tobin v. Providence Hosp.,* 244 Mich.App. 626, 643, 624 N.W.2d 548 (2001), quoting *Locke v. Pachtman,* 446 Mich. 216,223, 521 N.W.2d 786 (1994).

A. LOCAL OR NATIONAL STANDARD OF CARE

Plaintiff first contends that the trial court erred in ruling that plaintiff was required to provide expert testimony on the local, rather than a nationwide, standard of care. As quoted above, MCJI 30.02 provides, in part, that "the information must have been given timely and in accordance with the accepted standard of practice among members of the profession with similar training and experience in [this community or a similar one/[*Name particular specialty.*]]." Although neither party makes note of it, MCL 600.2912a, which was enacted in 1977 and amended in 1993 provides:

> (1) Subject to subsection (2), in an action alleging malpractice, the plaintiff has the burden of proving that in light of the state of the art existing at the time of the alleged malpractice:
>
> (a) The defendant, if a general practitioner, failed to provide the plaintiff the recognized standard of acceptable professional practice or care in the community in which the defendant practices or in a similar community, and that as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury.
>
> **\*7** (b) *The defendant, if a specialist, failed to provide the recognized standard of practice or care within that specialty as reasonably applied in light of the facilities available in the community or other facilities reasonably available under the circumstances,* and as a proximate result of the defendant failing to provide that standard, the plaintiff suffered an injury. [Emphasis added.]

Since this provision's enactment, both our Supreme Court and this Court have consistently held that the standard of care for a general practitioner is a local standard of care while the standard of care for a specialist is a national standard of care. See e.g., *Bahr v. Harper–*

*Grace Hosp.,* 448 Mich. 135, 138, 528 N.W.2d 170 (1995) and *Cudnik v. William Beaumont Hosp.,* 207 Mich.App. 378,383, 525 N.W.2d 891 (1994). Further, we note that while the standard of care "within that specialty" applies to a defendant specialist, consideration of "facilities available in the community or other facilities reasonably available" must also be considered. MCL 600.2912a(1)(b). However, in this case, the sole allegation was that defendants did not provide informed consent. Such an allegation does not require any consideration of the facilities available to defendants.

Here, there is no dispute whether defendants are specialists; all parties agree defendants are board certified in general surgery, specializing in breast surgery. However, the trial court's ruling indicated that it considered plaintiff's expert witness testimony to be deficient because no evidence was presented regarding the local standard of care in the community. This was error. Defendants are specialists and the applicable standard of care is the national standard of care. Our review of the record reveals that plaintiff met her burden in this regard.

### B. WHAT EXPERT WOULD HAVE PERSONALLY DONE?

Plaintiff also contends that the trial court erred when it ruled,

> Even more significantly [Dr. Petersen] was repeatedly asked simply whether there was a breach of the standard of care. But was not asked if it was among members of the profession with similar training and experience in this community or similar one. If anything he spoke personally about his testimony that that was not what I would do or he—it was not in compliance with the B–32 protocol or in response to Ms. Joyner's questioning to the NCI template.

We agree that the trial court improperly discredited Dr. Petersen's testimony. The trial court correctly noted that it is generally improper for an expert to testify about the appropriate standard of care from the basis of what he or she would have personally done in a situation. *May v. William Beaumont Hosp.,* l80 Mich.App 728, 761; 180 Mich.App. 728, 448 N.W.2d 497 (1989). However, as plaintiff points out, when plaintiff's counsel posed a question to Dr. Petersen about what he would tell a patient about the B–32 trial, defense counsel objected, and both plaintiff's counsel and the trial court clarified that the question is what a "reasonably prudent doctor" would tell a patient. Dr. Petersen indicated his understanding and proceeded to answer the question. Furthermore, before this objection was made, Dr. Petersen testified about the proper standard of care for the researcher (Dr. Pass), without reference to what he personally would have done. He also testified on the standard of care for the principal investigator (Dr. Pettinga) without reference to what he would have done. Therefore, the trial court erred in finding that plaintiff's expert testified only about what he would have done and by discrediting Dr. Peterson's testimony for that reason.

### C. CAUSATION

*8 Plaintiff also contends that she produced sufficient evidence of causation and that the trial court's contrary conclusion was in error. According to plaintiff, the evidence presented was sufficient to create a question of fact for the jury. "To establish proximate cause, the plaintiff must prove the existence of both cause in fact and legal cause." *Weymers v. Khera,* 454 Mich. 639, 647, 563 N.W.2d 647 (1997). As noted, expert testimony is essential to establish a causal link between the alleged negligence and the alleged injury. *Dykes v. Williams Beaumont Hosp.,* 246 Mich.App. 471,476–482, 633 N.W.2d 440 (2001); *Thomas v. McPherson Community Health Ctr.,* 155 Mich.App. 700, 705, 400 N.W.2d 629 (1996). The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. *Skinner v. Square D Co.,* 445 Mich. 153, 165, 516 N.W.2d 475 (1994).

Here, the trial court ruled that plaintiff's case "fails as a matter of law on the proximate cause issue...." This was error. Our review of the record reveals that plaintiff elicited testimony about her chances of avoiding the arm morbidity that she now suffers. For example, the following colloquy occurred between plaintiff's counsel and Dr. Steele:

> [*Plaintifs Counsel* ].... To a reasonable degree of medical certainty, Doctor, as a professional medical oncologist, do you believe that if Ms. Compton had the sentinel node biopsy procedure that more likely than not she would have avoided all of these problems morbidity, sequali now that she suffers from?

Case 2:14-cv-11916-GCS-SDD ECF No. 71-10, PageID.2145 Filed 03/07/16 Page 8 of 10
Compton v. Pass, Not Reported in N.W.2d (2010)
2010 WL 1050330

[*Dr. Steele* ]. Yes.

This testimony alone is prima facie evidence of causation and is sufficient, in light of other contradictory evidence produced at trial, to create a question of fact for the jury. Taking all the foregoing errors together, [7] and after a review of the record evidence, we conclude that plaintiff met her burden of showing a prima facie case of medical malpractice premised on a theory of informed consent. The trial court's order granting a directed verdict in defendants' favor was error.

### III. SUMMARY DISPOSITION

On cross-appeal, defendants contend that the trial court erred in denying their motion for partial summary disposition because there was no genuine issue of fact as to whether Dr. Pettinga was involved in obtaining plaintiff's consent. Defendants argue that the evidence demonstrates that Dr. Pettinga was not involved in obtaining plaintiff's consent. Although they do not frame their argument this way, defendants essentially contend that Dr. Pettinga had no duty to ensure that plaintiff was properly informed. We disagree. The existence of a legal duty is a question of law for the court to decide. Oja v. Kin, 229 Mich.App. 184, 187, 581 N.W.2d 739 (1998). Further, we review de novo a trial court's decision on a motion for summary disposition. Dressel v. Ameribank, 468 Mich. 557, 561, 664 N.W.2d 151 (2003). Summary disposition is proper under MCR 2.1 16(C)(10) if the documentary evidence submitted by the parties, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. Veenstra v. Washtenaw Country Club, 466 Mich. 155, 164, 645 N.W.2d 643 (2002).

*9 Here, plaintiff testified in her deposition that she met Dr. Pettinga for the first time on the morning of her surgery. Dr. Pettinga never discussed with plaintiff the clinical trial or the risks of complications that could result. Dr. Pettinga testified that her role was to ensure that Dr. Pass performed the sentinel node mapping properly and to comfort plaintiff. She had no involvement in obtaining plaintiff's informed consent. Dr. Pettinga further indicated that, as the principal investigator, she assigned the duty of obtaining informed consent to the nurse. She also signed the consent form. Furthermore, Dr. Petersen testified that the principal investigator has the duty to ensure that the risks and benefits are explained to the patient. He testified that, as the only investigator for the B–32 trial at Beaumont, Dr. Pettinga had the duty to go over consent with every patient. The language of the consent form supports Dr. Petersen's opinion. The signature page states, "I have explained this study and have offered the study subject an opportunity for any further discussion or clarification." Under this language appears Dr. Pettinga's name and signature.

Thus, although the evidence demonstrates that Dr. Pettinga did not meet with plaintiff before the surgery and did not inform plaintiff of the risks of the surgery, it nonetheless demonstrates that Dr. Pettinga had a duty to ensure that informed consent was properly given. Accordingly, we conclude that the trial court did not err by denying defendants' motion for partial summary disposition of plaintiff's claim against Dr. Pettinga.

### III. EVIDENTIARY RULINGS

Defendants next contend that the trial court made several erroneous evidentiary rulings. We consider each point of error in turn.

#### A. AUDIOTAPE RECORDING

Defendants argue that the trial court erred by denying in part their motion in limine to exclude the taped recordings made by plaintiff of her discussions with Dr. Pass and Lyles. In defendants' view, the probative value of the taped recordings, which contained 45 inaudible gaps occurring when Dr. Pass and Lyles were explaining the B–32 trial to plaintiff, is outweighed by the danger of unfair prejudice and should have been excluded under MRE 403. We disagree with defendants. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. Craig v. Oakwood Hosp., 471 Mich. 67, 76, 684 N.W.2d 296 (2004).

MRE 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." See also Waknin v. Chamberlain, 467 Mich. 329, 334, 653 N.W.2d 176 (2002). Evidence is not unfairly prejudicial unless it threatens the fundamental goals of accuracy and fairness. The danger is that a jury will decide

Case 2:14-cv-11916-GCS-SDD ECF No. 71-10, PageID.2146 Filed 03/07/16 Page 9 of 10
Compton v. Pass, Not Reported in N.W.2d (2010)
2010 WL 1050330

that the evidence is more probative of a fact than it actually is. *Id.* at 334–335 n. 3, 653 N.W.2d 176.

**\*10** Michigan law generally permits audio recordings to be admitted into evidence despite technical defects. In *People v. Frison,* 25 Mich.App. 146, 148, 181 N.W.2d 75, (1970), this Court held:

> The fact that a recording may not reproduce an entire conversation, or may be indistinct or inaudible in part, has usually been held not to require its exclusion, however, the recording may be excluded if it is so inaudible and indistinct that the jury must speculate as to what was said. It has been held that unless the unintelligible portions of a tape recording are so substantial as to render the recording as a whole untrustworthy, the recording is admissible and the decision whether to admit it should be left to the sound discretion of the trial judge. [Citation and punctuation omitted.]

See also *People v. Parker,* 76 Mich.App. 432, 257 N.W.2d 109 (1977) (inaudible portions of a tape of a victim summoning help did not render the tape untrustworthy); *People v. Berkey,* 437 Mich. 40, 52, 467 N.W.2d 6 (1991) (with regard to an audiotape's admissibility, the Court stated, "It is axiomatic that proposed evidence need not tell the whole story of a case, nor need it be free of weakness or doubt. It need only meet the minimum requirements for admissibility. Beyond that, our system trusts the finder of fact to sift through the evidence and weigh it properly.").

The recording in the instant matter is not so inaudible and indistinct that the jury must speculate as to what was said. The unintelligible portions of the audiotape generally last approximately ½ a second each. And, although there are 45 such segments, the tape nonetheless meets the minimum requirements of admissibility. Thus, the problems with the audiotape relate to the weight it is to be afforded by the jury, not to its admissibility. Moreover, we note that defendants had the opportunity to probe the reliability of the recording through cross-examination of the witnesses. Under these circumstances, the evidence did not threaten the fundamental goals of accuracy and fairness. The trial court's decision was within the principled range of outcomes and it did not err by denying defendants' motion.

### B. PRIOR TESTIMONY

Defendants next assert that the trial court erred in granting in part plaintiff's motion in limine to exclude evidence of plaintiff's prior drug use, dishonest acts, litigation, and smoking elicited through plaintiff's former friend, Cottingham. Specifically, defendants' only complaint on appeal as to the exclusion of Cottingham's testimony is that the trial court improperly excluded it as it pertained to plaintiff's credibility. However, our review of the record reveals that the trial court allowed evidence on these matters to the extent it bore on plaintiff's credibility. Thus, defendants' argument lacks merit.

Reversed in part and remanded for further proceedings not inconsistent with this opinion. We do not retain jurisdiction.

**All Citations**

Not Reported in N.W.2d, 2010 WL 1050330

Footnotes

| | |
|---|---|
| 1 | Axillary lymph node dissection is the surgical removal of the fat pad that contains the lymphnodes under the arm. |
| 2 | National Surgical Adjuvant Breast and Bowel Project. |
| 3 | In the sentinel node procedure, material is injected into the area of the tumor. Only the nodes that accumulate the material are removed. |
| 4 | Axillary cording is when the ligaments and tendons scar, shrink, and become less mobile. |
| 5 | Lymphedema is a temporary or permanent swelling of the arm. |
| 6 | The matter arose again on the first day of trial when defense counsel asserted that Cottingham would testify that plaintiff asked her to lie in this case and in a prior case plaintiff filed against Detroit Edison. The trial court ruled that the testimony was admissible, but that the attorneys could not use conclusory words (such as perjury and felon) when questioning the witnesses. |

Case 2:14-cv-11916-GCS-SDD ECF No. 71-10, PageID.2147 Filed 03/07/16 Page 10 of 10
Compton v. Pass, Not Reported in N.W.2d (2010)
2010 WL 1050330

7   We note that plaintiff also argues that the trial court's ruling that plaintiff timely received an informed consent form is immaterial because defendants did not provide enough information about the risks of the axillary node dissection or the option not to take part in the trial. However, we do not consider plaintiff's argument because the court's ruling in this regard was not dispositive with respect to its ruling granting a directed verdict.

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.