# DEPOSITION EXCERPTS

Clinton Township site.
A Martha Wiseheart let me leave for a TB test. She let me leave for cashing a check, the flood check. She let me leave to go to the bank one day and cash another check. She let me leave and actually take a lunch one day.
Q Any other occasions?
A I can't recall the last one.
Q All right. When did she let you leave to go to a TB test?
A I'm not sure when that was.
Q And how did she give you authorization? Did she tell you verbally or --
A Yes.
Q -- she said that, "Just go ahead and leave for the TB test."
A "Just run over there. Go get your TB. I'll watch the desk."
Q Okay. Was that on the day that you were suspended? Is that the incident?
A No. No.
Q Oh, there was another TB test before that -- or there was a TB test that you were given authorization to leave before that, right? Is that what you're saying?
A Nope. Only one TB test.
Q Okay. And you're saying Martha gave you authorization.

A No.
Q And you say that was during 2012 or during 2013?
A Correct.
Q Well, which? Do you know?
A I don't recall when I got the check.
Q Well, when was the place flooded?
A It was flooded in 2012, but the whatever, lawsuit, the . . . and when there's multiple people or whatever, I don't know. It was at the end of that lawsuit that we --
Q Okay. And then you said you went to a bank a second time and Martha gave you permission. When was that, the trip to the bank the second time?
A I believe in 2013.
Q And what was that for?
A She just let me have a lunch break finally.
Q Did somebody cover?
A No.
Q Do you know whether Fiona gave you authorization to go to the bank that second time?
A I do not recall.
Q Do you know whether Fiona was consulted to give you authorization to go to cash the flood check?
A I do not know.
Q Okay. And then you said you -- the fourth occasion was you left to go to lunch and Martha gave you permission.

page?
A Yes. Also, on this document the lunches doesn't ask to be authorized. Just wanted to point that out.
Q Thank you.
A You're welcome.

(Exhibit 39 marked.)

Q (Continuing by Mr. Miglio): Let me show you what's been marked as Exhibit 39.
A Okay.
Q So the first email of this chain is on the second page, and it's an email that you sent to Fiona Bork on October 23rd, 2012, at 11:11 a.m. Do I have that right?
A Yes.
Q Okay. And you were asking Fiona what?
A If I could take a 30-minute lunch break.
Q And put a note on the door.
A Most likely Martha Wiseheart was not in the office that day.
Q So you --
A Otherwise, I would have asked her.
Q So you were asking her, Fiona, whether you could take a 30-minute lunch and put a note on the door, correct?
MR. FLYNN: Objection. The document speaks --
MR. MIGLIO: Is that right?
MR. FLYNN: The document speaks for itself, and

A December 30th, 2011.

Q Okay. And when was the unemployment hearing?

A These are probably all documents that I printed off to send to Jill Hood.

Q When was the unemployment hearing?

A I have no clue.

Q And why were you informing Jill Hood about this?

A I was informing Jill Hood about that because I was given a direct order from Fiona to testify against this person so they would not receive compensation from Henry Ford Medical Laboratories. Unemployment.

Q Okay. And why were you telling Jill Hood this?

A Because that's part of the harassment that Fiona gave me after I reported the State about lunches and breaks.

Q Exactly when did you report to the State that you were not paid for your lunches?

A The beginning of January 2015 -- or 2014 I called and spoke with the Fair Labor Standards Acts, whatever department. They told me I absolutely had a case, they were sending me the paperwork out in the mail, and they expected me to fill it out and send it back in.

Q So my question, as it was the first time, when did you file a complaint with the State?

A In January.

Q Do you recall the date?

evaluations before the 2013, correct?
A Correcter.
Q Unsatisfactory is a two?
A Yep.
Q So then you say here in the meal breaks, the second paragraph, "I was told that any down" -- or first paragraph. "I was told any down time would be considered as lunch. However, I recently learned that the Fair Labor Standards Act, FLSA, states that hourly employees are required to work more than 40 hours a week are to be compensated for those hours under a term called engaged to work." See that?
A Yes.
Q Who and how did you learn about the term "engaged to work" and that that violated the Fair Labor Standards Act?
A Dr. Thakur had come to my office to let me know that he wasn't happy about seeing me not take lunches. He's a new doctor in the building. And when I let him know that my down time was lunches, that I do get a lunch, he said, "Down time is not lunch and you need to call the State." So when I called the State in January, they informed me down time is not lunch and that's called engaged to work and that's where I learned those terms.
Q And you learned those from Dr.Thakur.

A No. I learned about the Fair Labors Standard Act from Dr.Thakur. He said it was against the law. He didn't state the law that he -- that I just stated. I called the State. The State informed me of those two.

Q What did Dr.Thakur tell you about the law or the Fair Labor Standards Act?

A He told me that down time is not considered a lunch.

Q Okay. When did he tell you that?

A In January.

Q Is that something you spoke to him about?

A He came in my office.

Q Came in your office and just said, "Hey, I'm upset because you're not taking a lunch break"?

A Correct.

Q All right. What's Dr.Thackur's first name?

A I don't know. He's in the same building at Clinton Township PSC.

Q So then in the second paragraph it says, "Please know it's increasingly difficult to work busy days without any opportunity for a meal break, and some days even more difficult because management and sales personnel bring in food for lunch, take meal breaks, and eat in front of me."

A Always.

Q Okay. So what was the issue here? Was it that you

were you subjected to? We know about the evaluation -- I guess we know about the evaluation. What other -- And you said one time she showed there and she was humming loudly and shredding paper. What other harassment?

A She called me at home. She called me at work, and you'll hear the message where she's harassing me for a good 16 minutes at work, when I'm on the job, for her own personal reason.

Q That's --

A There was a lot of -- She had a personal vendetta against me because I went to the State of Michigan on her.

Q Well, what was the issue -- Well, first of all, when did you go to the State of Michigan? Let's get that down.

A Early January was my first contact with the State of Michigan.

Q Early January. Okay. And did she know about that in early January?

A I told her I was going to the State.

Q When did you do that?

A Sometime in February.

Q Okay. So she didn't know about it in early January, so what else did you receive in the way of harassment in January?

A Changing of my site, sending me . . . There's so much that I've read and gone over today. I'm getting confused

A Hm-hmm.

Q January 13 you say, "Fiona, if we need to sit down with HR, I understand, but I feel you changed the two markers to 2.2 on me due to personal feelings and not based on my job performance. I would like to see a copy of these several of complaints. I know -- and I know I had two and that's why I was sent -- I sent to training; however, it was found that the tape provided to me was wrong, so it was not strong enough to hold the skin; hence, the bruise."

Okay. So where is the reference to you complaining about lunch here?

A There's no reference in that email about lunch. It's the reason why all of a sudden she started changing everything is because I brought up lunches to her.

Q When you say "changing everything," I only thought you complained about the two that you had here.

A She also -- I mean when I talk about changing things, I'm talking about taking away my location, calling me at home, harassing me.

Q Calling you --

A Things like that.

Q When did she call you at home and harass you?

A Early January or early February. Somewhere in there. She called me at -- somewhere around 8 o'clock at night

A Hm-hmm.

Q January 13 you say, "Fiona, if we need to sit down with HR, I understand, but I feel you changed the two markers to 2.2 on me due to personal feelings and not based on my job performance. I would like to see a copy of these several of complaints. I know -- and I know I had two and that's why I was sent -- I sent to training; however, it was found that the tape provided to me was wrong, so it was not strong enough to hold the skin; hence, the bruise."

Okay. So where is the reference to you complaining about lunch here?

A There's no reference in that email about lunch. It's the reason why all of a sudden she started changing everything is because I brought up lunches to her.

Q When you say "changing everything," I only thought you complained about the two that you had here.

A She also -- I mean when I talk about changing things, I'm talking about taking away my location, calling me at home, harassing me.

Q Calling you --

A Things like that.

Q When did she call you at home and harass you?

A Early January or early February. Somewhere in there. She called me at -- somewhere around 8 o'clock at night

and basically told me off because I had reported that I was reporting to the State --

Q Okay.

A -- about lunches. And she said, "How dare you," and she said that I'll be sorry, and from that moment on all of a sudden then she started changing my review, changing my sites, sending me here. Everything started going downhill once Fiona found out that I wanted to go to lunch.

Q So you don't know whether it was January or February when she called you at home.

MR. FLYNN: Objection. Misconstrues her earlier testimony.

Q (Continuing by Mr. Miglio): Is that what you're saying?

A I don't recall exactly when it was, but it was Jan -- I believe it was in January or early February, yes.

Q All right. And you say she called you at home at 8 p.m.

A Approximately 8:30, 8:45. Somewhere late at night. It was late at night.

Q And did she call you on your cell phone?

A I don't recall what she called me on, whether it was my house phone or cell phone.

Q What was your house phone number?

A I don't recall. I don't know my phone numbers by heart.

Q Did you have a land line?

would give me extra work.

MR. FLYNN: Read this document carefully, Natalie.

THE WITNESS: Okay.

Q (Continuing by Mr. Miglio): What is that about?

A That's about all the issues they were having at Shelby.

Q Okay. You received a copy of that?

A Correct.

Q Did you think it had application to you?

A It all applies to me, except for the fact that I'm not the reason this email came out. The reason this email came out is because they were having too many problems at Shelby. My office didn't have defects.

Q What kind of defects did they have at Shelby?

A They were stacking the labels. They weren't labeling in front of the patient. They were running in and out of the rooms, switching people. I mean it -- Shelby's a mess. And these are the two PSC people, and I run Clinton Township PSC, and this was directed towards the Shelby Township PSC, if you see "Shelby Patient Safety Procedure," because the Shelby Office was having defects. I was copied to because I run a PSC.

(Exhibit 79 marked.)

Q (Continuing by Mr. Miglio): Let me show you what's been marked as Exhibit 78 (sic).

A Yes.

Q So this is an email at the bottom here that you sent to Fiona, Luain and Martha at --

MR. FLYNN: I hate to interrupt you, but the exhibit's misnumbered again. The earlier one, I believe, was 78.

MR. MIGLIO: Let me get that back.

Q (Continuing by Mr. Miglio): All right. Let me show you what we marked as Exhibit 79.

A Okay.

Q So the email that's on here, "I'm very upset. I'm putting a note on the door. I'm taking a 30-minute lunch today." That's an email that you sent to Fiona, Luain, and Martha.

A Correct.

Q At 1:12 on September 25th.

A Yes.

Q Okay. What time did you start work that day?

A 7:30 a.m.

Q And what happened after you started work?

A I got a phone call from Fiona Bork.

Q Okay.

A Explaining to me that I think I'm some superior person or something because I went to HR about her, but that I'd be sorry and she hung up on me. She told me -- Oh, before

she hung up on me she told me she was changing my site, and I informed her on that phone call that I planned on taking a lunch that day from the new policy the day before, and she never once said anything about the lunch policy not being -- not allowing me to go.

Q Okay. So let's get this it straight. So you're working and she calls you.

A Yes.

Q And she calls you on what phone?

A I don't know if it was the office phone, my work phone, or my cell phone.

Q Okay. So you don't know whether it was the office phone, your work phone, or your cell phone.

A Correct.

Q And did you see what the number was that she was calling from?

A I don't recall.

Q What time did she call?

A Sometime in the morning.

Q Okay. And tell me exactly what she said.

A Just the facts of that I'm going to be sorry. I think she thought that --

Q I don't want to know what she thought. I just want to know what she said.

MR. FLYNN: Just go bit by bit through that

conversation now.

THE WITNESS: Basically it was how dare you think that you can go to HR on me. How dare you think that you, you know -- I don't . . . I don't recall word for word what she said, but she was saying things like, "You're going to be sorry," and that she wasn't going to pay me for my lunches prior to that day.

Q (Continuing by Mr. Miglio): Did you make a note of that conversation?

A I emailed her right after that conversation and I asked her, "Is this move permanent or is this move" -- because she told me on the phone conversation she was moving me, so I wanted to know if my move was permanent or temporary.

Q All right. What else did she say during the conversation?

A She was just angry and . . . I don't . . . I don't recall it word for word.

Q Okay. And you say she said something about paying you?

A I meant to also cc the HFML outreach that was in the new email address that we were supposed to sign out our lunch at, but . . . because they had been informed by the State a month earlier.

Q I don't care about that. What I'm asking you about is what else did she say to you during that conversation?

A She said, "How dare you go to the State?" She was -- She was upset that I told on her for not giving me a lunch and she thought that was rude and not very friendly and I'm not very team like, and she was calling me names and telling me how sorry I'm going to be, and she hung up on me after I told her that I was going to take a lunch.
Q So let's explore that. She said how angry she was about you going to the State?
A Going to HR.
Q Well, which is it? Is it the State or HR?
A To me they're both the same thing. HR.
Q So did she say "State" or "HR"?
A She said going to HR about her.
Q Okay. And she said she was angry that you went to HR about her.
A Yes.
Q About her.
A Yes.
Q Okay. And what had happened up until that point with the human resources investigation about whether or not you should have gotten paid or not?
A They ignored me for a month straight. I sent them emails asking for direction. I got emails from Martha stating she wasn't going to pay me. I got emails from Fiona saying, "Lunches are mandatory. Why aren't you taking

she basically gave me a hug, she told me she was so sorry that I was going through that, and she also told me to go to HR again.

Q Okay. And then what happened?

A And then I went back to my desk. I sent this email. I proceeded to get my purse. I went back to the break room where my purse and my coat and stuff was. I picked that up. I looked in the room. Waved to Martha. Martha waved to me. I walked out.

Q Where did you go?

A I went and sat in my car for 30 minutes and cried.

Q Okay. And who was taking care of the patients while you were doing that?

A There was the sign on the door.

Q Okay. What sign was that?

A The sign that's allowed to use when you take a lunch.

Q What did the sign say?

A That I'll be returning in 30 minutes.

Q Okay. Is that like a handwritten sign or something?

A No. The exact sign that you have in your exhibit.

Q Okay. So did you get Fiona's permission to leave the site on that day?

A Fiona never told me I could not go to lunch on that day, no.

Q Did you get Fiona's permission to leave the site on that

Q (Continuing by Mr. Miglio): Let me show you this. Do you recognize this?
A Yes.
Q What is this?
A This is the paperwork I filled out for the State.
Q Do you see the time stamp on the side of it?
A Yes.
Q Do you see that? What's the date there?
A February 27th, 2014.
Q Okay. That's the date that it was filed with the agency. You understand that?
A No. That's the date they received it at the agency.
Q How else would they be filed with the agency if they didn't receive it?
A It's different when you mail it in. I mean --
Q Do you realize that you lied to the Court in this case about when that was filed?
A No.
Q Do you remember making an allegation in the complaint through your lawyer that it was filed before your termination?
A It was filed before I was terminated.
Q Well, you know what? The State of Michigan says it wasn't. So how do you think there is a discrepancy there?

weren't getting paid for taking lunch?
A No. It was that they were forcing me to work through lunch and still not paying me.
Q So are you saying that with the volume or lack of volume of business there wasn't an opportunity for you to sit down and take -- and eat your lunch?
A There was never an opportunity that allowed me to leave and go get or take a lunch that way.
Q Listen to my question. Are you saying that you didn't have the opportunity to sit down and eat your lunch while you were working at the facility?
A In the first two years, yeah, there was time. In the last year, no.
Q And there wasn't time for you to sit down at the facility because you were so busy with the patients coming in?
A Not just patients, but doing all of Martha's son's wedding stuff, as well as her administration duties.
Q Okay. So because you were doing Martha's wedding stuff and you had some other administrative duties, you weren't able to sit down and eat lunch.
A Correct.
Q Then why did you bring all that food in?
A That was diet food. I have lost 150 pounds.
Q Okay. Well, why did you bring in the diet food if you couldn't sit down and eat it?

A Because the diet food was shakes, and I was allowed to drink.
Q Okay. So what did you have to do for Martha's son's wedding?
A Martha had me do all of her table decorations. She had me working on her son's wedding at the PSC at least seven months and on a daily basis had me working on it at least for two to three hours a day. She had me do all of her popcorn bags. She had me do all of her center pieces. She had me do her movie theater table, which had chairs, and her candy table. And as a matter of fact, I ran the candy table at the wedding.
Q All right. So while you were at the Clinton center site working --
A Hm-hmm.
Q -- supposedly working, seeing patients, drawing blood, you're saying that Martha made you do all of her table decorations, right?
A Yes.
Q That's one thing.
A Yes.
Q What did you have to do for the table decorations?
A I created all the center pieces. They are candle votives with diamonds all the way around it.
Q How many were there?

A 30, 40.

Q Okay. How long did it take you to do that?

A A long time.

Q Okay. And so where were the materials to do the center pieces?

A Right there in the office.

Q Okay. So if somebody came in and -- they could see these things laying around?

A Yes. Maria Inger (ph) came in on several occasions and saw me work on the wedding. Never said anything.

Q Okay. Maria Inger saw you.

A Yes.

Q Who else saw you?

A It would be Dr. Meshach's office assistant come down and she checked them out. The girls down the hall would have seen them because we were showing them off.

Q Why were you showing them off?

A Because they're cool.

Q All right. And did Fiona ever see you working on them?

A No.

Q Why not?

A Because Martha kept that from Fiona.

Q Well, if they were out and you were working there while you were supposed to be drawing blood and stuff like that for patients --

A Hm-hmm.
Q -- what did you do with them when Fiona came to the site?
A Fiona barely ever came to my site.
Q Okay. Well, did she ever come to the site when you were working on them?
A No.
Q All right. So how many days did it take you to do the 30 table decorations?
A Hmm. We worked on that for probably two to three months.
Q Every day?
A Not every day, but almost. Yes. Her daughter came in and helped do the popcorn bags, and that took quite some time.
Q I'm not talking about popcorn bags. I'm just talking about the table decorations. Two to three months every day to do the 30 table decorations.
A Yes.
Q What were they comprised of?
A I glued diamond crystals all the way around them. All the way -- They're big vases.
Q Well, you must have had a lot of down time at that site if you had that kind of time to do those.
A No, I just had a lot of work. I had to do my patients, I had to register, and I had to do what she asked me to do because she was a direct supervisor, and when she gives

Q (Continuing by Mr. Miglio): Let me show you this. Do you recognize this?
A Yes.
Q What is this?
A This is the paperwork I filled out for the State.
Q Do you see the time stamp on the side of it?
A Yes.
Q Do you see that? What's the date there?
A February 27th, 2014.
Q Okay. That's the date that it was filed with the agency. You understand that?
A No. That's the date they received it at the agency.
Q How else would they be filed with the agency if they didn't receive it?
A It's different when you mail it in. I mean --
Q Do you realize that you lied to the Court in this case about when that was filed?
A No.
Q Do you remember making an allegation in the complaint through your lawyer that it was filed before your termination?
A It was filed before I was terminated.
Q Well, you know what? The State of Michigan says it wasn't. So how do you think there is a discrepancy there?

MR. FLYNN: Counsel, she was terminated mid March.

THE WITNESS: I was terminated in the early -- on February 25th --

Q (Continuing by Mr. Miglio): Well, let's go back.

A This is February 27th.

Q Yeah. Do you recall making an allegation --

MR. FLYNN: You mean you were suspended.

THE WITNESS: I was suspended. Sorry. I wasn't terminated until March 5th.

Q (Continuing by Mr. Miglio): Do you recall making an allegation in the complaint and attaching the unfiled complaint saying that you filed this complaint before you were suspended? We can get it out if you want.

A I don't understand.

Q Yeah, here it is here. Look at 22.

A Okay.

Q On February 25th Plaintiff filed a complaint with the State of Michigan alleging violation of the Fair Labor Standards Act --

MR. FLYNN: Counsel, she's indicated several times that --

MR. MIGLIO: -- and retaliation.

MR. FLYNN: -- she mailed it in at that date.

MR. MIGLIO: Do you see that?

prioritize first, because obviously Fiona had no idea that that is one of the issues that she was going to be raising with me.

So if there was validity to that, I needed to find that out.

Q Okay, and so what were the issues with Fiona that you just mentioned?

A They are all laid out in here, about the performance review, about the meal breaks, not being paid meal breaks, about being told that she would be--

I don't think she said it in here, but being terminated if she brought it to H.R.'s attention, and also about being asked to perjure herself in an Unemployment hearing for Judy Hale (phonetic).

Q So just the issues that are raised in here?

A Correct.

Q What did John say about the lunch issue?

A It was--he said, "Thank you for the status update. Keep me posted and let me know what we need to do."

Q Okay.

A Because I touched base with him regularly.

Q And did you indicate to him that she wasn't being given coverage for lunch periods?

A Yes.