# DEPOSITION EXCERPTS

Natalie Reeser
3/30/2015

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

NATALIE REESER,

        Plaintiff,

                            CASE NO:2:14-cv-11916

vs.

HENRY FORD HOSPITAL,

        Defendant.
_____/

        Volume I of the deposition of NATALIE REESER, taken before me, Lauri A. Sheldon, CSR 4045, RPR, on March 23, 2015, at 39500 High Pointe Boulevard, Suite 350, Novi, Michigan, commencing at or about 10:07 a.m.

APPEARANCES:

    MILLER COHEN, P.L.C.
    BY:  KEITH D. FLYNN, ESQUIRE
    600 W. Lafayette Boulevard, 4th Floor
    Detroit, Michigan  48226
    313-964-4454
    Appearing on behalf of the Plaintiff.

    VARNUM, LLP
    BY:  TERRENCE J. MIGLIO
    39500 High Pointe Boulevard, Suite 350
    Novi, Michigan  48375
    248-567-7400
    tjmiglio@varnumlaw.com
    Appearing on behalf of the Defendant.

Natalie Reeser
3/30/2015

Page 76

1  A    I did.
2  Q    So you saw this social worker for, you said, a year or
3       two?
4  A    Yes.
5  Q    Is that clinic still there?
6  A    I have no clue.
7  Q    And then what caused you to stop seeing the social
8       worker?
9  A    I probably didn't have insurance anymore.
10 Q    Where were you working at the time?
11 A    I wasn't working.  I was going to college.  Well, I was
12      working probably for a gym at the time during college.  I
13      don't remember the name of the gym.  That was early --
14      early when I was a freshman, so.
15 Q    What gym was it, do you remember?
16 A    I have no clue.  It's not there anymore.  It was in
17      Rochester Hills.  They now have built a big fitness
18      center over it.
19 Q    So since seeing this psychologist, social worker, have
20      you seen anybody else for any depression, anxiety, any
21      mental or emotional conditions?
22 A    Yes.  I went to my personal primary care doctor, Dr.
23      Kahnamoui, after this incident with Henry Ford, because
24      my anxiety came back, my panic attacks came back, I
25      needed medicine.  This has put so much stress on me that

Natalie Reeser
3/30/2015

Page 77

1        I started having flashbacks of all these -- Just it
2        wasn't a good situation.  It caused anxiety.
3    Q   All right.  So tell me then, again now, when did you
4        start treating with the doctor for depression or anxiety?
5    A   I went to see him after my -- I was walked out the door
6        by security on my last day.  I went to see him soon after
7        that, because the medicine wasn't working, it made me
8        very depressed, it made me very anxious, very scared, I
9        didn't know what was going on, I didn't know why it was
10       happening to me, and I needed help.
11   Q   So my question is, though, when did Dr. Kahnamoui start
12       treating you for anxiety or depression or any mental or
13       emotional problems?
14   A   Soon after I was released from Henry Ford.
15   Q   And do you remember -- When was the last time you saw
16       that doctor?
17   A   I just saw him in December or November, because I had a
18       nervous breakdown, and he took me off work for a week and
19       upped my medicine.
20   Q   What do you mean you had a nervous breakdown?
21   A   All the stress that this lawsuit has caused me has been
22       tremendous.
23   Q   Okay.  And it hasn't had anything to do with your breakup
24       or your --
25   A   No.  It all has to do with --

Natalie Reeser
3/30/2015

Page 78

1  Q   -- fiance dropping you?
2  A   -- me going to the State and what Fiona did to me.
3  Q   So are you saying that prior to leaving the -- Strike
4      that.  Prior to leaving the employment of Henry Ford
5      Health System you weren't being treated by Dr. Kahnamoui
6      for any anxiety for depression.
7  A   Just my regular Paxil pills that I've been taking for 10
8      years, but he had to up them -- up it because the
9      depression was huge and the anxiety got worse.  Like I
10     was having panic attacks on a daily basis to the point
11     where I almost went agoraphobic and couldn't leave the
12     house, so.
13 Q   And how often before that, your termination from Henry
14     Ford, were you taking Paxil?
15 A   I took Paxil every day since 2001.  However, after the
16     termination at Henry Ford it needed to be upped and
17     adjusted, and now I take 50 milligrams of Paxil instead
18     of 20 milligrams of Paxil, and I also take Xanax to calm
19     my nerves for the anxiety and panic attacks this lawsuit
20     has caused me.
21 Q   And what do you mean this lawsuit has caused you?
22 A   The stress of knowing I have to testify about my rape and
23     you're going to ask me questions about that has caused
24     tremendous stress, the questions that you want to ask me
25     about, just this whole thing.  I mean it's caused a lot

Natalie Reeser
3/30/2015

Page 92

```
 1         Clinton Township site.
 2   A     Martha Wiseheart let me leave for a TB test.  She let me
 3         leave for cashing a check, the flood check.  She let me
 4         leave to go to the bank one day and cash another check.
 5         She let me leave and actually take a lunch one day.
 6   Q     Any other occasions?
 7   A     I can't recall the last one.
 8   Q     All right.  When did she let you leave to go to a TB
 9         test?
10   A     I'm not sure when that was.
11   Q     And how did she give you authorization?  Did she tell you
12         verbally or --
13   A     Yes.
14   Q     -- she said that, "Just go ahead and leave for the TB
15         test."
16   A     "Just run over there.  Go get your TB.  I'll watch the
17         desk."
18   Q     Okay.  Was that on the day that you were suspended?  Is
19         that the incident?
20   A     No.  No.
21   Q     Oh, there was another TB test before that -- or there was
22         a TB test that you were given authorization to leave
23         before that, right?  Is that what you're saying?
24   A     Nope.  Only one TB test.
25   Q     Okay.  And you're saying Martha gave you authorization.
```

Natalie Reeser
3/30/2015

Page 94

1  A  No.
2  Q  And you say that was during 2012 or during 2013?
3  A  Correct.
4  Q  Well, which? Do you know?
5  A  I don't recall when I got the check.
6  Q  Well, when was the place flooded?
7  A  It was flooded in 2012, but the whatever, lawsuit,
8     the . . . and when there's multiple people or whatever, I
9     don't know. It was at the end of that lawsuit that we --
10 Q  Okay. And then you said you went to a bank a second time
11    and Martha gave you permission. When was that, the trip
12    to the bank the second time?
13 A  I believe in 2013.
14 Q  And what was that for?
15 A  She just let me have a lunch break finally.
16 Q  Did somebody cover?
17 A  No.
18 Q  Do you know whether Fiona gave you authorization to go to
19    the bank that second time?
20 A  I do not recall.
21 Q  Do you know whether Fiona was consulted to give you
22    authorization to go to cash the flood check?
23 A  I do not know.
24 Q  Okay. And then you said you -- the fourth occasion was
25    you left to go to lunch and Martha gave you permission.

Natalie Reeser
3/30/2015

Page 110

1  A   December 30th, 2011.
2  Q   Okay. And when was the unemployment hearing?
3  A   These are probably all documents that I printed off to
4      send to Jill Hood.
5  Q   When was the unemployment hearing?
6  A   I have no clue.
7  Q   And why were you informing Jill Hood about this?
8  A   I was informing Jill Hood about that because I was given
9      a direct order from Fiona to testify against this person
10     so they would not receive compensation from Henry Ford
11     Medical Laboratories. Unemployment.
12 Q   Okay. And why were you telling Jill Hood this?
13 A   Because that's part of the harassment that Fiona gave me
14     after I reported the State about lunches and breaks.
15 Q   Exactly when did you report to the State that you were
16     not paid for your lunches?
17 A   The beginning of January 2015 -- or 2014 I called and
18     spoke with the Fair Labor Standards Acts, whatever
19     department. They told me I absolutely had a case, they
20     were sending me the paperwork out in the mail, and they
21     expected me to fill it out and send it back in.
22 Q   So my question, as it was the first time, when did you
23     file a complaint with the State?
24 A   In January.
25 Q   Do you recall the date?

Natalie Reeser
3/30/2015

Page 115

1  page?
2  A  Yes. Also, on this document the lunches doesn't ask to
3     be authorized. Just wanted to point that out.
4  Q  Thank you.
5  A  You're welcome.
6                    (Exhibit 39 marked.)
7  Q  (Continuing by Mr. Miglio): Let me show you what's been
8     marked as Exhibit 39.
9  A  Okay.
10 Q  So the first email of this chain is on the second page,
11    and it's an email that you sent to Fiona Bork on October
12    23rd, 2012, at 11:11 a.m. Do I have that right?
13 A  Yes.
14 Q  Okay. And you were asking Fiona what?
15 A  If I could take a 30-minute lunch break.
16 Q  And put a note on the door.
17 A  Most likely Martha Wiseheart was not in the office that
18    day.
19 Q  So you --
20 A  Otherwise, I would have asked her.
21 Q  So you were asking her, Fiona, whether you could take a
22    30-minute lunch and put a note on the door, correct?
23         MR. FLYNN: Objection. The document speaks --
24         MR. MIGLIO: Is that right?
25         MR. FLYNN: The document speaks for itself, and

Natalie Reeser
3/30/2015

Page 202

1      evaluations before the 2013, correct?
2   A  Correcter.
3   Q  Unsatisfactory is a two?
4   A  Yep.
5   Q  So then you say here in the meal breaks, the second
6      paragraph, "I was told that any down" -- or first
7      paragraph.  "I was told any down time would be considered
8      as lunch.  However, I recently learned that the Fair
9      Labor Standards Act, FLSA, states that hourly employees
10     are required to work more than 40 hours a week are to be
11     compensated for those hours under a term called engaged
12     to work."  See that?
13  A  Yes.
14  Q  Who and how did you learn about the term "engaged to
15     work" and that that violated the Fair Labor Standards
16     Act?
17  A  Dr. Thakur had come to my office to let me know that he
18     wasn't happy about seeing me not take lunches.  He's a
19     new doctor in the building.  And when I let him know that
20     my down time was lunches, that I do get a lunch, he said,
21     "Down time is not lunch and you need to call the State."
22     So when I called the State in January, they informed me
23     down time is not lunch and that's called engaged to work
24     and that's where I learned those terms.
25  Q  And you learned those from Dr.Thakur.

Natalie Reeser
3/30/2015

Page 203

1  A   No.  I learned about the Fair Labors Standard Act from
2      Dr.Thakur.  He said it was against the law.  He didn't
3      state the law that he -- that I just stated.  I called
4      the State.  The State informed me of those two.
5  Q   What did Dr.Thakur tell you about the law or the Fair
6      Labor Standards Act?
7  A   He told me that down time is not considered a lunch.
8  Q   Okay.  When did he tell you that?
9  A   In January.
10 Q   Is that something you spoke to him about?
11 A   He came in my office.
12 Q   Came in your office and just said, "Hey, I'm upset
13     because you're not taking a lunch break"?
14 A   Correct.
15 Q   All right.  What's Dr.Thackur's first name?
16 A   I don't know.  He's in the same building at Clinton
17     Township PSC.
18 Q   So then in the second paragraph it says, "Please know
19     it's increasingly difficult to work busy days without any
20     opportunity for a meal break, and some days even more
21     difficult because management and sales personnel bring in
22     food for lunch, take meal breaks, and eat in front of
23     me."
24 A   Always.
25 Q   Okay.  So what was the issue here?  Was it that you

Natalie Reeser
3/30/2015

Page 265

```
 1        she basically gave me a hug, she told me she was so sorry
 2        that I was going through that, and she also told me to go
 3        to HR again.
 4   Q    Okay.  And then what happened?
 5   A    And then I went back to my desk.  I sent this email.  I
 6        proceeded to get my purse.  I went back to the break room
 7        where my purse and my coat and stuff was.  I picked that
 8        up.  I looked in the room.  Waved to Martha.  Martha
 9        waved to me.  I walked out.
10   Q    Where did you go?
11   A    I went and sat in my car for 30 minutes and cried.
12   Q    Okay.  And who was taking care of the patients while you
13        were doing that?
14   A    There was the sign on the door.
15   Q    Okay.  What sign was that?
16   A    The sign that's allowed to use when you take a lunch.
17   Q    What did the sign say?
18   A    That I'll be returning in 30 minutes.
19   Q    Okay.  Is that like a handwritten sign or something?
20   A    No.  The exact sign that you have in your exhibit.
21   Q    Okay.  So did you get Fiona's permission to leave the
22        site on that day?
23   A    Fiona never told me I could not go to lunch on that day,
24        no.
25   Q    Did you get Fiona's permission to leave the site on that
```

Natalie Reeser
3/30/2015

Page 291

```
 1       were you subjected to?  We know about the evaluation -- I
 2       guess we know about the evaluation.  What other -- And
 3       you said one time she showed there and she was humming
 4       loudly and shredding paper.  What other harassment?
 5    A  She called me at home.  She called me at work, and you'll
 6       hear the message where she's harassing me for a good 16
 7       minutes at work, when I'm on the job, for her own
 8       personal reason.
 9    Q  That's --
10    A  There was a lot of -- She had a personal vendetta against
11       me because I went to the State of Michigan on her.
12    Q  Well, what was the issue -- Well, first of all, when did
13       you go to the State of Michigan?  Let's get that down.
14    A  Early January was my first contact with the State of
15       Michigan.
16    Q  Early January.  Okay.  And did she know about that in
17       early January?
18    A  I told her I was going to the State.
19    Q  When did you do that?
20    A  Sometime in February.
21    Q  Okay.  So she didn't know about it in early January, so
22       what else did you receive in the way of harassment in
23       January?
24    A  Changing of my site, sending me . . . There's so much
25       that I've read and gone over today.  I'm getting confused
```

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATALIE REESER,

    Plaintiff,

v                              Case No. 2:14-cv-11916-GCS-MJH
                              Hon. George Caram Steeh

HENRY FORD HOSPITAL,

    Defendant.
_____/

DEPOSITION OF JILL HOOD

    Taken by the Plaintiff on the 5th day of May, 2015, at the office of Keith D. Flynn, 600 W. Lafayette Blvd., Detroit, Michigan at 10:00 a.m.

APPEARANCES:

For the Plaintiff:    MR. KEITH D. FLYNN (P74192)
                        Miller Cohen, P.L.C.
                        600 W. Lafayette Blvd., 4th Floor
                        Detroit, Michigan 48226-0840
                        313.964.4454

For the Defendant:    MR. TERRANCE J. MIGLIO (P30541)
                        MS. BARBARA E. BUCHANAN (P55084)
                        Varnum LLP
                        39500 High Pointe Blvd., Suite 350
                        Novi, Michigan 48375
                        248.567.7828

Also Present:       NATALIE REESER, via telephone

Reported by:        TAMARA A. O'CONNOR
                        CSMR 2656, CER 2656

TAMARA A. O'CONNOR
248.882.1331

f4eadfd1-bc8b-47ff-a2ad-8aecc3d02951

DEPOSITION OF JILL HOOD
REESER v HENRY FORD HOSPITAL

Page 133

1  Q  Oh. Well, after the January 20th meeting--
2  A  Yes.
3  Q  Did you discuss this section of the letter with
4     anyone?
5  A  Yes.
6  Q  Who did you discuss it with?
7  A  I discussed it with Fiona. I discussed it with John
8     Waugh. I discussed it with my Director, Deb
9     Temrowski.
10 Q  Anyone else?
11 A  Compensation, the Compensation Department, the
12    Payroll Department. There were many different
13    moving parts that had to occur in order to look into
14    back payment.
15 Q  Let's go one by one through each of those. So when
16    did you discuss this matter with John Waugh?
17 A  I discussed it with John a couple of--probably about
18    two days after my meeting with Natalie. I told him
19    that there were some other concerns that were raised
20    about Fiona and that I needed to look into those,
21    that I did not want to speak with Fiona about these
22    concerns until I had some of the other back
23    information, specifically in regards to asking that
24    she perjure herself in an Unemployment hearing.
25        So there are things that I had wanted to

Page 134

1     prioritize first, because obviously Fiona had no
2     idea that that is one of the issues that she was
3     going to be raising with me.
4         So if there was validity to that, I needed
5     to find that out.
6  Q  Okay, and so what were the issues with Fiona that
7     you just mentioned?
8  A  They are all laid out in here, about the performance
9     review, about the meal breaks, not being paid meal
10    breaks, about being told that she would be--
11        I don't think she said it in here, but
12    being terminated if she brought it to H.R.'s
13    attention, and also about being asked to perjure
14    herself in an Unemployment hearing for Judy Hale
15    (phonetic).
16 Q  So just the issues that are raised in here?
17 A  Correct.
18 Q  What did John say about the lunch issue?
19 A  It was--he said, "Thank you for the status update.
20    Keep me posted and let me know what we need to do."
21 Q  Okay.
22 A  Because I touched base with him regularly.
23 Q  And did you indicate to him that she wasn't being
24    given coverage for lunch periods?
25 A  Yes.

Page 135

1  Q  And what did he say?
2  A  He did not realize that that was occurring.
3  Q  And what was his response to that? Was that
4     acceptable?
5  A  He said, "Just let us know what we need to do," not
6     only to get her--Natalie paid properly, but to
7     prevent it from occurring in the future.
8  Q  Did he indicate to you why he didn't want it to
9     occur in the future?
10 A  Because I told him that it was compensable time and
11    we needed to fix it.
12 Q  Okay, but did he indicate to you why he wanted her
13    to get paid in the future, or why he wanted her to
14    have lunch times in the future?
15 A  Because I told him it was compensable and we had to
16    do it.
17        MR. FLYNN: I'm sorry, Counsel. Is there
18    anything you would like to say on the record? You
19    are kind of distracting the examination.
20        MR. MIGLIO: Oh, we are? We apologize. I
21    was having a private conversation with Counsel here,
22    so I don't know how it was distracting you.
23        MR. FLYNN: Well, you know, you're getting
24    up. You're talking. It's pretty loud. It's kind
25    of distracting, so if you could just--

Page 136

1         MR. MIGLIO: Kind of just what?
2         MR. FLYNN: Not do it?
3         MR. MIGLIO: Well, we've heard all these
4     questions before, so possibly the reason why we're
5     doing other things is because these are the same
6     questions you asked to other people, but go ahead.
7         We'll try and be attentive to what you are
8     asking.
9         MR. FLYNN: I don't really care if you're
10    attentive. You can zone it out. I just don't want
11    to be bothered by you whispering and carrying about
12    my deposition.
13 Q  (By Mr. Flynn) Was there any other conversation
14    with John?
15 A  I had let him know all of the concerns that Natalie
16    had raised, all the four major concerns.
17 Q  When did you have your initial conversation with
18    John?
19 A  Like I said, it was either a day or two after
20    Natalie. My recollection is that Natalie came over
21    4:00 or 4:30 on the 20th, and she didn't leave my
22    office until about 7:00 p.m.
23        So I didn't follow up with John until the
24    following morning.
25 Q  And were there any conversations thereafter with

37 (Pages 133 to 136)

TAMARA A. O'CONNOR
248.882.1331