# EXHIBIT M

2014 WL 4715859
United States District Court,
N.D. Ohio,
Eastern Division.

Katherine KOVACIC, et al., Plaintiffs,

v.

Patricia Campbell PONSTINGLE, et al., Defendants.

No. 1:05CV2746.
|
Signed Sept. 22, 2014.

**Attorneys and Law Firms**

Jay F. Crook, Wickliffe, OH, for Plaintiffs.

Steven W. Ritz, Cleveland, OH, for Defendants.

OPINION AND ORDER

SARA LIOI, District Judge.

*1 This case is before the Court for consideration of a series of motions in limine filed by the parties. On September 19, 2014, the Court conducted a hearing on the motions. At the conclusion of the hearing, the Court announced, on the record, its rulings as to Doc. Nos. 157–160, 163–165, and 181. With respect to Doc. No. 168, the Court preliminarily announced to the parties and counsel that it was inclined to permit defendants' expert witness, Dr. Afsarifard, to provide testimony under Rule 702. As for Doc. Nos. 161, 162, and 166, the Court advised counsel and the parties that it was disinclined to permit lay testimony on plaintiffs' emotional injuries without expert testimony linking plaintiffs' injuries to defendants' actions. The Court now writes to confirm and further explain its ruling relative to these remaining motions.

I. **FACTUAL AND PROCEDURAL BACKGROUND**
The facts surrounding this civil rights action have been set forth in dispute arises out of a 2002 incident wherein defendants, all of whom were—at all times relevant to this lawsuit, employees of Cuyahoga County Department of Children & Family Services—as part of their official duties, took part in the decision to remove plaintiffs, Daniel and Katherine Kovacic, from the home of their mother, Nancy Kovacic. On March 26, 2002, defendant Patricia Campbell–Postingle, assisted by officers from the North Olmsted Police Department, forcibly entered and then, without further incident, removed plaintiffs from their mother's home. It is undisputed that defendants did not obtain prior judicial approval or have exigent circumstances to support the removal, and this Court has determined that the removal violated plaintiffs' Fourth Amendment and procedural due process rights. On March 29, 2002, a hearing was held in the Cuyahoga County Juvenile Court. At the conclusion of the hearing, the presiding magistrate issued an order finding that "there was probable cause for the removal of the children" from Nancy Kovacic's home, and plaintiffs were placed in foster care.

The jury trial in this matter shall be limited to a determination of potential damages flowing from the unlawful removal and procedural due process violation. Any damages award is limited to damages for any injuries plaintiffs establish by competent evidence were casual related to the removal and plaintiffs' temporary placement in their relative's home.

I. **LAW AND ANALYSIS**

A. **Motion in Limine Standard**
Although not explicitly authorized by the Federal Rules of Evidence or the Federal Rules of Civil Procedure, the practice of ruling on motions in limine "has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States,* 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). Motions in limine allow the court to rule on evidentiary issues prior to trial in order to avoid delay and focus pertinent issues for the jury's consideration. *See United States v. Brawner,* 173 F.3d 966, 970 (6th Cir.1999); *Jonasson v. Lutheran Child & Family Servs.,* 115 F.3d 436, 440 (7th Cir.1997).

*2 Courts should exclude evidence on a motion in limine only when it is clearly inadmissible. *Indiana Ins. Co. v. Gen. Elec. Co.,* 326 F.Supp.2d 844, 846 (N.D.Ohio 2004). If the court is unable to determine whether or not certain evidence is clearly inadmissible, it should defer ruling until trial so that questions of foundation, relevancy, and potential prejudice can be evaluated in proper context. *Id.* Ultimately, the determination whether to grant or deny a motion in limine is within the sound discretion of the trial court. *Goldman v. Healthcare Mgmt. Sys., Inc.,* 559 F.Supp.2d 853, 858 (W.D.Mich.2008) (citing *United States v. Certain Lands Situated in the City of Detroit,* 547 F.Supp. 680, 681 (E.D.Mich.1982)). In limine rulings are preliminary, and the district court may change its ruling at trial for any reason it

Case 2:14-cv-11916-GCS-SDD ECF No. 76-14, PageID.2516 Filed 03/24/16 Page 3 of 8

Kovacic v. Ponstingle, Slip Copy (2014)
95 Fed. R. Evid. Serv. 558

deems appropriate. *United States v. Yannott,* 42 F.3d 999, 1007 (6th Cir.1994).

**B. The Motions in Limine**

*1. Defendants' Motions in Limine # 4, # 5, and # 8*
Through a series of motions, defendants seek to preclude plaintiffs, and any other witness, from offering lay testimony regarding plaintiffs' claimed medical or mental health conditions or symptoms, or the causal relationship between those conditions and symptoms and defendants' actions. Defendants suggest that such testimony would be improper as it goes to an ultimate issue in the trial on damages. Under Fed.R.Evid. 701, if a witness is not testifying as an expert, her testimony in the form of opinions or inferences is limited to those opinions or inferences that are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Trial courts are afforded "broad discretion" when admitting lay opinion testimony. *Heritage Mut. Ins. Co. v. Reck,* 127 F. App'x 194, 199 (6th Cir.2005).

In *Jama v. City of Memphis,* No. 03–2965 Ma/P, 2006 WL 5499283, at *3 (W.D.Tenn. Dec.29, 2006), the district court ruled that the plaintiff could not testify that the physical conditions he now allegedly experienced (headaches, eye pain, and trouble breathing) were the result of the incident that was the basis for his case because his injuries did not have an obvious source. (In reaching this conclusion, the court distinguished the hypothetical situation wherein a plaintiff would obviously be able to testify that a laceration was caused by a cut from a sharp object.) *See, e.g., Mahaney v. Novartis Pharm. Corp.,* 835 F.Supp.2d 299, 304 (W.D.Ky.2011) (plaintiff's testimony that a drug made her bones "hard" was inadmissible opinion evidence under Rule 701). Nonetheless, plaintiffs are entitled to testify to their own observations about their conditions and other matters that are within their personal experience. *See Harris v. J.B. Robinson Jewelers,* 627 F.3d 235, 240 (6th Cir.2010) (customer could testify that replaced diamond was different in color than original); *Mahaney,* 835 F.Supp.2d at 304 (plaintiff could testify to observations of the symptoms experienced by the deceased plaintiff so long as the testimony did not address causation of the symptoms). Thus, plaintiffs may testify regarding their symptoms (and when they began), but may not testify to causation. *See, e.g., Meyers v. Wal–Mart Stores, E., Inc.,* 77 F.Supp.2d 826, 835–36 (E.D.Mich.1999) (plaintiff was competent, under similar Michigan law, to testify "relating to *how he felt* before and after his injury[,]" and, together with expert testimony was sufficient to establish causation) (emphasis in original).

**\*3** Defendants argue that without expert testimony as to causation, plaintiffs cannot rely on their lay testimony to establish damages. "When the alleged injury is the violation of a constitutional right, as here, *no* compensatory damages [can] be awarded for violation of [a] right absent proof of actual injury." *Pembaur v. City of Cincinnati,* 882 F.2d 1101 (6th Cir.1989) (quotation marks and citations omitted) (emphasis in original). A § 1983 plaintiff cannot recover unless he or she establishes a causal connection between the challenged conduct of the defendants and the harm suffered. *See Horn by Parks v. Madison Cnty. Fiscal Ct.,* 22 F.3d 653, 659 (6th Cir.1994) (notwithstanding a clear violation of the Juvenile Justice Act, defendants were entitled to judgment in the absence of any evidence that defendants' decision to place the plaintiff in an adult detention center contributed to his resulting injuries); *see Doe v. Sullivan Cnty.,* 956 F.2d 545, 550 (6th Cir.1992) (proximate causation is an essential element of a § 1983 claim for damages). "That is, a violation of a federally secured right is remediable in damages only upon proof that the violation proximately caused injury." *Horn,* 22 F.3d at 659; *see also Morrison v. Bd. of Educ. of Boyd Cnty.,* 521 F.3d 602, 605 (6th Cir.2008) (plaintiff could not maintain § 1983 action for nominal damages based on the "chilling" of a constitutional right); *see generally Glasson v. City of Louisville,* 518 F.2d 899, 912 (6th Cir.1975) (plaintiff, whose First Amendment rights were violated, could recover "not only for out-of-pocket expenses but also for emotional and mental distress") (citation omitted).

It is true that, in certain cases, "[a] plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden [to prove that a defendant's unconstitutional actions caused emotional distress]."[1] *Turic v. Holland Hospitality, Inc.,* 85 F.3d 1211, 1215 (6th Cir.1996); *see Moorer v. Baptist Health Care Sys.,* 398 F.3d 469, 485 (6th Cir.2005) ("emotional injury may be proved without medical support"); *Moody v. Pepsi–Cola Metro. Bottling Co .,* 915 F.2d 201, 210 (6th Cir.1990) (plaintiff established emotional injury solely on lay testimony); *but see Jama,* 2006 WL 5499283, at *3 ("Courts have held that, when injuries are of such a character as to require skilled and professional persons to determine the cause and extent of the injuries, the cause of the injuries must be determined by medical testimony.") (citing *Franklin v. Shelton,* 250 F.2d 92,

Case 2:14-cv-11916-GCS-SDD ECF No. 76-14, PageID.2517 Filed 03/24/16 Page 4 of 8

Kovacic v. Ponstingle, Slip Copy (2014)
95 Fed. R. Evid. Serv. 558

97–98 (10th Cir.1958)). *See, e.g., Moorer,* 398 F.3d at 485 ("Moorer's own testimony, combined with that of his wife and his treating physician, constituted competent evidence of Moorer's severe emotional distress stemming from his termination.")

However, "[a] jury should not be allowed to speculate as to causation, and to eliminate that speculation an expert witness may be necessary." *Bouchard v.Am. Home Prods. Corp.,* 213 F.Supp.2d 802, 806 (N.D.Ohio 2002) (citing *Turpin v. Merrell Dow Pharm., Inc.,* 959 F.2d 1349 (6th Cir.1992)); *see Dayton Veneer & Lumber Mills v. Cincinnati, N.O. & T.P.R. Co.,* 132 F.2d 222, 223 (6th Cir.1942) ("Liability cannot be predicated upon mere conjecture or speculation as to the proximate cause of damages.") "Courts have held that, when injuries are of such a character as to require skilled and professional persons to determine the cause and extent of injuries, the cause of the injuries must be determined by medical testimony." *Jama v. City of Memphis,* No. 03–2965 Ma/P, 2006 WL 5499283, at *3 (W.D.Tenn. Dec.29, 2006) (citing *Franklin v. Shelton,* 250 F.2d 92, 97–98 (10th Cir.1958)).

*4 In *Leonard v. Compton,* No. 1:03CV1838, 2005 WL 1460165 (N.D.Ohio June 17, 2005), plaintiffs brought suit after police arrested their mother (in view of the children) over a custody dispute. In ruling that plaintiffs did not need expert testimony to establish emotional injuries, the court noted that "just as expert testimony is not required to prove the existence of an emotional injury, expert medical testimony is not essential to forge the causal link between a traumatic event and the alleged serious emotional distress ." *Id.* at *11 (citations omitted). In reaching this conclusion, the court distinguished cases where expert testimony may be needed to "prove causation where there are multiple potential causes of plaintiff's alleged emotional injury and those causes are 'inextricably related[.]' " *Id.* ("[G]iven that the emotional injury flowed from a single, concrete incident, jurors can refer to their own experiences in order to determine whether, and to what extent, the defendant's conduct caused the emotional distress.") (citation omitted). *See Myers v. Ill. Ctr. R. Co.,* 629 F.3d 639, 643 (7th Cir.2010) ("where there is no obvious origin to an injury and it has 'multiple potential etiologies, expert testimony is necessary to establish causation' ") (quoting *Willis v. Amerada Hess Corp.,* 379 F.3d 32, 46–47 (2d Cir.2004)).

Similarly, in *Romaine v. St. Joseph Health Sys.,* 541 F. App'x 614 (6th Cir.2013), the plaintiff brought suit under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. The question of causation in that case dealt with the issue of whether plaintiff received substandard medical care when he visited the emergency room, and whether that care was the proximate cause of his injuries. The court found that expert testimony was necessary, explaining that "[l]ay jurors will usually have difficulty determining to what extent a plaintiff was harmed by the initial injury [that lead to the pursuit of emergency medical treatment] and to what extent she was harmed by the subsequent inappropriate care." 541 F. App'x at 619.

Unlike the situation in *Leonard,* there is no single, concrete incident from which plaintiffs can trace their alleged injuries. Rather, the record, here, establishes that there may be multiple causes of plaintiffs' injuries, including events that took place both well before and after the removal that is the remaining subject of this lawsuit. The unfortunate evidence in this case is that the plaintiffs came from an extremely dysfunctional family. It is beyond dispute that their parents' divorce and custody battle was bitter, and that both parents had acted in violence toward their children in the past. There is also evidence that Katherine Kovacic was afraid of her brother, Daniel, because of his violent outbursts. Additionally, there is evidence that Daniel had significant behavioral issues prior to the removal, both children were in counseling for years prior to the removal, and both children have complained that they were abused or mistreated, in one way or another, during the subsequent months they spent in foster care. Without expert testimony, there is no way that a lay juror can be expected to determine whether plaintiffs' alleged emotional injuries were caused by the discrete events that remain in this case. Without expert testimony as to causation, any monetary award of damages by a jury would be pure speculation.

*5 The Court will permit plaintiffs to testify to the events relating to the removal and the three-day period, and their reactions from those days. The Court will not permit plaintiffs to testify to mental health diagnosis and conditions, or mental health symptoms they are now experiencing.

Plaintiffs also seek to have Ms. Novak testify to the counseling that she provided Katherine approximately 10 years after the removal. Ms. Novak was not retained to treat Katherine for any alleged mental injuries flowing from the removal and her temporary placement with her relatives. As a result, Ms. Novak specifically declined to issue an opinion as to causation, as explained in her July 7, 2014 letter to plaintiffs' counsel. (*See* Doc. No. 160–1 at 999

Case 2:14-cv-11916-GCS-SDD ECF No. 76-14, PageID.2518 Filed 03/24/16 Page 5 of 8

Kovacic v. Ponstingle, Slip Copy (2014)
95 Fed. R. Evid. Serv. 558

["Unfortunately I am not able to address the impact of foster care because the focus of our therapy was not on the traumatic events of [Katherine's] removal from her mother's home and placement in foster care. In fact, Ms. Kovacic sought to avoid any discussion of the events related to it."]) Thus, Ms. Novak is not able to provide any testimony (lay or otherwise) on the issue of causation, though plaintiffs make clear that they do not intend to have Ms. Novak testify as to causation.

Instead, plaintiffs represent that Ms. Novak will only be testifying to "the treatment she was providing [Katherine] Kovacic and [a] description of the issues that [Katherine] raised in their therapy sessions." (Doc. No. 179 at 1311.) Again, none of these issues involve the events that underlie this litigation.[2] Plaintiffs also suggest that Ms. Novak should be permitted to testify to her observation that Katherine "shut down" when the removal from her home was mentioned in counselling.

Because Ms. Novak did not discuss with Katherine the facts surrounding the removal from her mother's home, any testimony she could give at trial would likely focus on the laundry list of emotional impairments Katherine identified in her deposition. Given the fact that Ms. Novak did not explore the connection between these impairments and the events that took place in 2002, the jury would, again, be left to speculate as to the connection. As for her observation that Katherine "shut down" when the subject of the removal was broached, the Court finds that the probative value of this testimony is slight. Ms. Novak's relationship with Katherine began over a decade after the events in question and was limited to the context of counseling—which did not include *any* discussions relating to the incidents in question in this litigation. Under these circumstances, the slight probative value of this testimony is substantially outweighed by the possibility that the testimony would either unfairly serve to bolster Katherine's credibility or confuse the jury.

Given the fact that Ms. Novak did not discuss the only events that are relevant to these proceedings, and, in the absence of expert testimony to establish causation, Ms. Novak will not be permitted to testify to Katherine's mental health counselling. Defendants' Motions # 4, # 5, and # 8 are granted.

*2. Plaintiffs' Motion in Limine to Exclude Testimony and Reports of Dr. Afsarifard*

*6 Plaintiffs insist that the 2006 and 2014 reports of Dr. Afsarifard, and his conclusions drawn therein, are inadmissible because defendants delayed in, and/or failed to produce, the underlying documentation (including test scores and video recordings), and because the testing methodology is unreliable. Plaintiffs also complain that some of Dr. Afsarifard's conclusions invade the jury's role as determiner of witness credibility.

In *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court addressed the standard for admitting expert scientific testimony and assigned a gatekeeping function in this regard to the trial court. *Id.* at 589. In *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Court extended the gatekeeping function to encompass all expert testimony.

The starting point for the analysis is Fed.R.Evid. 702. Under this rule, an expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. First, the witness must be qualified by "knowledge, skill, experience, training, or education[.]" Fed.R.Evid. 702. Second, the testimony must be relevant, meaning that it "will help the trier of fact to understand the evidence or to determine a fact in issue[.]" *Id.* Third, the testimony must be reliable. *Id.* Rule 702 guides the trial court by providing general standards to assess reliability: whether the testimony is based upon "sufficient facts or data;" whether the testimony is the "product of reliable principles and methods;" and whether the expert "has reliably applied the principles and methods to the facts of the case." *Id*. "The inquiry [under Rule 702] is a flexible one[,]" and its focus "must be solely on the principles and methodology, not on the conclusions [the expert] generate[s]." *Daubert,* 509 U.S. at 594–95. Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid [,]" whereas relevance depends upon "whether [that] reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93.

The first prong of the *Daubert* examination, reliability, requires the Court to assess carefully the methodology, reasoning, or technique employed by the expert. *See Pride v. BIC Corp.,* 218 F.3d 566, 577 (6th Cir.2000). *Daubert* set forth four nonexhaustive factors to aid in the determination of whether an expert's methodology is reliable: (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subject to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling

Case 2:14-cv-11916-GCS-SDD ECF No. 76-14, PageID.2519 Filed 03/24/16 Page 6 of 8

Kovacic v. Ponstingle, Slip Copy (2014)
95 Fed. R. Evid. Serv. 558

the technique's operation; and (4) whether the theory has been generally accepted by the scientific community. *Daubert,* 509 U.S. at 593–94. These enunciated factors do not constitute a "definitive checklist or test," but must be tailored to the facts of a particular case. *Kumho,* 526 U.S. at 150 (quoting *Daubert,* 509 U.S. at 593).

**\*7** Dr. Afsarifard interviewed and evaluated plaintiffs on two separate occasions, once in 2006 and again in 2014, and prepared reports that were produced during discovery in this case.[3] (2006 Report, Doc. No 168–1; 2014 Report Re: Daniel Kovacic ("Daniel Report"), Doc. No. 168–2; 2014 Report Re: Katherine Kovacic ("Katherine Report"), Doc. No. 168–3.) The focal point of the 2014 evaluations were "the psychological impact of the initial three days that [the children] spent at [their] aunt and uncle's home in March [2002]." (Daniel Report at 1110; Katherine Report at 1123.) The 2006 report also explored the impact of the children's stay in foster care. (2006 Report at 1079.)

The 2014 reports provide that Dr. Afsarifard administered two psychological tests: the Minnesota Multi phastic Personality Inventory–2 ("MMPI–2") and the Rorschach Inkblot Test. (Daniel Report at 1110; Katherine Report at 1123.) In his reports, Dr. Afsarifard notes that the MM PI–2 "is the most commonly used personality test designed to look at different areas of dysfunction and psychopathology. It is a 567–item, true-false question test that is criterion valid and allows for comparison of the individual to a normative group." (Katherine Report at 1123.) According to Dr. Afsarifard, the Rorschach test is "designed to provide some information regarding the underlying psychological functioning of the individual. It is less susceptible, though not impervious to, impression management tendencies than self-report tests. It is empirically validated and normed." (*Id.*)

Dr. Afsarifard is expected to testify that these tests have been subjected to peer review and publication and are generally accepted among forensic psychologists. *See Daubert,* 509 U.S. at 594–95 (listing non-exclusive factors that weigh into a reliability determination, including whether the method has been published and subject to peer review, and whether the witness' method is generally accepted as reliable in the relevant medical and scientific community). Courts have regularly approved of these tests as meeting the reliability prong of the *Daubert* test. *See United States v. Ganadonegro,* 805 F.Supp.2d 1188 (D. New Mex.2011) (accepting expert's use of the MMPI and Rorschach test as reliable methodology); *Stokes v. Xerox Corp.,* No. 05–71683, 2008 WL 275672, at \*11 (E.D.Mich. Jan.27, 2008) (rejecting argument that expert's methodology was unreliable under *Daubert,* and finding that "the MMPI consists of data that is reasonably relied upon by experts in psychiatry in forming opinions") (internal quotation marks and citation omitted); *see generally Horn v. Sec'y of Health and Human Servs.,* 780 F.2d 1021, at \*1 (6th Cir. Nov.26, 1985) (table decision) ("MMPI is a well-known reliable psychological inventory.")

Still, plaintiffs complain that Dr. Afsarifard's methodology is unreliable, in part, because he has failed to identify what led him to his conclusions. Yet the evaluations explain that he relied upon the results of the tests. Defendants' expert's reports make it clear that the above conclusions were based on the doctor's interpretations of the results of the administered tests, which he explained in the section entitled "Test Results." Moreover, the test results were further corroborated by Dr. Afsarifard's personal observation of plaintiffs during his interviews of Daniel and Katherine. While plaintiffs clearly take issue with Dr. Afsarifard's evaluation of the test results, his interpretations can be explored on cross-examination. *See also Best v. Lowe's Home Ctr. Inc.,* 563 F.3d 171, 182 (6th Cir.2009) ("Any weakness in a witness's methodology will affect the weight that his expert opinion is given at trial, but not its threshold admissibility.") (citing *Daubert,* 509 U.S. at 596). The Court finds that Dr. Afsarifard's methodology is reliable.

**\*8** After examining the reliability of the expert's opinion, Rule 702 also requires the trial court to evaluate the relevancy of the proposed testimony. *See Daubert,* 509 U.S. at 591. When considering whether the proposed opinion will assist the trier of fact, the Court must consider whether the expert testimony bears "a valid scientific connection," or "fits," the issues to be resolved at trial. *Id.* at 591–92. *See also Pride,* 218 F.3d at 578 ("there must be a connection between the scientific release or test result being offered and the disputed factual issues in the case in which the expert will testify").

Dr. Afsarifard's opinions—regarding the extent and degree of plaintiffs' mental injuries, and the cause of these injuries—are relevant to, and will assist the trier of fact in, understanding the evidence presented in this case. The Court finds that the relevance prong has been satisfied.

Nonetheless, plaintiffs argue that Dr. Afsarifard should not be permitted to testify because, while plaintiffs were provided copies of the doctor's evaluations, they were not provided the underlying data and test results for the MMPI–2 tests

Case 2:14-cv-11916-GCS-SDD ECF No. 76-14, PageID.2520 Filed 03/24/16 Page 7 of 8

Kovacic v. Ponstingle, Slip Copy (2014)
95 Fed. R. Evid. Serv. 558

until September 10, 2014, and the videotape of the 2006 interviews was never produced. Defendants respond that the underlying data was not requested until September 9, 2014, and was promptly produced. They admit that the video for the 2006 interviews can no longer be located, but point out that plaintiffs never moved to preserve this evidence. Further, they suggest that plaintiffs do not need the video because the expert documented his conclusions and observations in the 2006 report. Defendants also note that both parties agreed to an extension of the expert discovery deadlines in this case.

At the motion hearing, counsel conceded that he agreed to an extension of the expert discovery deadline, and further acknowledged that he chose not to depose defendants' expert. Moreover, plaintiffs have failed to identify any prejudice, as they will be afforded a full opportunity to test Dr. Afsarifard's opinions at trial. Ultimately, the Court concludes that Dr. Afsarifard is qualified under Rule 702 to render an expert opinion in this case. [4]

Plaintiffs also specifically challenge Dr. Afsarifard's conclusions, drawn from his interpretation of the test results administered to plaintiffs, that would suggest: (1) that Katherine was exaggerating her symptoms and suffering and is trying to blame everything in her life on the defendants' actions; and (2) that Daniel was trying to present himself as a moralistic person with good coping skills. Plaintiffs argue that such statements/observations are "tantamount to a declaration that [p]laintiffs are lacking in character, credibility and ability to accurately recollect the events that are the subject of trial." (Doc. No. 168 at 1072.) Plaintiffs suggest that this testimony is "inadmissible pursuant to Rule 702 because the opinion exceeds the scope of the expert's specialized knowledge and therefore merely informs the jury that it should reach a particular conclusion." (*Id.* at 1073 [quoting *United States v. Shay,* 57 F.3d 126, 131 (1st Cir.1995) ].)

*9 It is settled that "a psychiatrist may not testify to the credibility of a witness; that issue is one for the jury." *United States v. Cecil,* 836 F.2d 1431, 1441 (4th Cir.1988); *see United States v. Wertis,* 505 F.2d 683, 685 (5th Cir.1974) (noting that the question posed to an expert witness regarding a witness's tendency to be a reliable witness "is beyond the competence of any witness. Peeled of its thin veneer of jargon, it amounts to no more than an inquiry whether the witness is to be believed by the jury or not"); *H.C. Smith Investments, LLC v. Outboard Marine Corp.,* 181 F.Supp.2d 746, 751 (W.D.Mich.2002) (noting the "general rule that expert witness testimony may not be used for the purpose of assessing another witness's credibility on non-technical or nonscientific points[,]" and collecting cases); *see also Coney v. NPR, Inc.,* 312 F. App'x 469, 474 (3d Cir.2009) ("a doctor ... cannot pass judgment on the alleged victim's truthfulness in the guise of a medical opinion, because it is the jury's function to decide credibility") (citation omitted); *but see United States v. Shay,* 57 F.3d 126 (1st Cir.1995) (expert testimony that defendant suffered from "pseudologia fantasica," making him prone to false confessions, was improperly excluded where testimony would be helpful in determining a fact in issue).

Here, Dr. Afsarifard does not offer an impression on plaintiffs' overall credibility as witnesses. Instead, he merely interprets the results of the MMPI–2 administered to plaintiffs to determine whether plaintiffs' representation of their symptoms and condition was exaggerated. The MMPI–2 incorporates within it a scale for determining how truthful and candid the test subject is approaching the test questions and whether the test subject is malingering or producing invalid results. *See, e.g., McGrath v. Comm'r of Soc. Sec.,* No. 12–CV–11267, 2013 WL 4507948 (E.D.Mich. Aug.23, 2013) (MMPI relied upon by ALJ to find malingering in social security case). Plaintiffs have not suggested that Dr. Afsarifard is unqualified to interpret the MMPI–2 test results, nor is there any indication that to permit Dr. Afsarifard to do so would be to permit him to testify beyond his expertise. To the extent that plaintiffs wish to challenge the doctor's interpretation of the test results, they may do so on cross-examination. *See, e.g., Shea v. Long Island R.R.,* No. 05 Civ. 9768(LLS), 2009 WL 1424115, at *5 (S.D.N.Y. May 21, 2009) ("If certain MMPI–2 scales may be used to challenge [the doctor's] opinions, or there are weaknesses in his reasons for discounting alternative explanations for [plaintiff's] elevated scores, the remedy is not preclusion but cross-examination and presentation of contrary evidence.")

III. CONCLUSION

As set forth above, and as set forth on the record at the final pretrial conference, all of the in limine motions are now resolved. The parties are reminded that these are in limine rulings and may be subject to change depending on how the testimony and evidence develop at trial. The trial in this matter shall commence on September 22, 2014 with jury selection.

*10 IT IS SO ORDERED.

**All Citations**

Slip Copy, 2014 WL 4715859, 95 Fed. R. Evid. Serv. 558

Footnotes

1   Nonetheless, "[a]lthough medical evidence is not necessary in order for a plaintiff to be compensated for emotional distress, 'damages for mental and emotional distress will not be presumed, and must be proven by competent evidence.'" *Betts v. Costco Wholesale Corp.,* 558 F.3d 461, 472 (6th Cir.2009) (quoting *Turic,* 85 F.3d at 1215).
2   Ms. Novak did not produce an expert report, but "she did provide copies of all her treatment records to [d]efendants." (Doc. No. 179 at 1311.) Additionally, plaintiffs have made no effort to qualify Ms. Novak as an expert under Rule 702.
3   Plaintiffs do not suggest that the reports failed to comply with the requirements for expert reports set forth in Fed.R.Civ.P. 26.
4   Plaintiffs' motion also sought the exclusion of the expert reports. While Dr. Afsarifard may offer expert testimony in this matter, his reports will not be admitted at trial.

**End of Document**                                                © 2016 Thomson Reuters. No claim to original U.S. Government Works.