```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
                         SOUTHERN DIVISION
```

**NATALIE REESER,**

                   Plaintiff,

                                          **HONORABLE GEORGE CARAM STEEH**

        v.
                                          **No. 14-11916**

**HENRY FORD HEALTH SYSTEM d/b/a**
**HENRY FORD HOSPITAL,**

                   Defendant.
_____/

**MOTION HEARING**

**Thursday, April 21, 2016**

                         -   -   -

APPEARANCES:

For the Plaintiff:              ADAM C. GRAHAM, ESQ.


For the Defendant:             TERRENCE J. MIGLIO, ESQ.
                               BARBARA E. BUCHANAN, ESQ.

                         -   -   -

*To Obtain Certified Transcript, Contact:*
*Ronald A. DiBartolomeo, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard, Room 238*
*Detroit, Michigan  48226*
*(313) 962-1234*

*Proceedings recorded by mechanical stenography.*
*Transcript produced by computer-aided transcription.*

1                           **I   N   D   E   X**

2 _____Page

3 Motion hearing                                              3

4

5

6

7

8

9

10

11

12                       **E   X   H   B   I   T   S**

13 Identification_____Offered    Received

14

15                        N       O       N       E

16

17

18

19

20

21

22

23

24

25

         *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

```
 1                            Detroit, Michigan
 2                            Thursday, April 21, 2016
 3
 4                      -    -    -
 5            THE CLERK:  Case Number 14-11916, Reeser
 6   versus Henry Ford Health System.
 7            THE COURT:  Good morning.
 8            MR. MIGLIO:  Good morning.
 9            MR. GRAHAM:  Good morning.
10            THE COURT:  Would you like to state your
11   appearances?
12            MR. GRAHAM:  Adam Graham for Natalie Reeser.
13            MR. MIGLIO:  Terrence Miglio on behalf of
14   Henry Ford Health System.
15            MS. BUCHANAN:  Barbara Buchanan also on
16   behalf of Henry Ford Health System.
17            THE COURT:  All right.  I guess we'll deal
18   with the plaintiff's motions first.
19            MR. GRAHAM:  Your Honor, would it be all
20   right to argue from here?  I have a lot of materials.  I'm
21   happy to go up to the podium if you would like.
22            THE COURT:  It would help if you come to the
23   podium.
24            MR. GRAHAM:  All right.  So as I'm sure as
25   your Honor has seen, there are six distinct issues that we
```

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1        are attempting to prevent from being introduced at trial,

2        and I will go through them in the order that they are

3        presented in our motion, and I'm going to try to break

4        them down as we got in the response.  There were some

5        additional arguments that we didn't expect, but we will

6        try to address as much as we can, and if there are other

7        issues, of course, if you have questions, I will be happy

8        to answer.

9                So the first issue that we present is eliminating

10       speaking about Ms. Reeser's sexual assault, and from our

11       perspective it's difficult to see the relevancy of this

12       particular event, and I want to clear up a couple of

13       different things which have been stated in the motions.

14               The first is Ms. Reeser acknowledged somewhere in

15       her deposition that this is an event which is still

16       causing her to seek treatment to this day.  I think that

17       defense counsel cites a page in her deposition in the

18       response.  If you turn to that page, there's nothing on

19       that page which would indicate that Ms. Reeser, in fact,

20       had stated that she was still suffering from this

21       condition, which required treatment.

22               **THE COURT:**  What do we know about the sexual

23       assault?  Was there a prosecution?  Did -- was it somebody

24       at work?  What was the story?

25               **MR. GRAHAM:**  Sure.  So Ms. Reeser was

         *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    sexually assaulted approximately in the year 2000.  She

2    was in a situation where there was one assailant, but

3    there were three individuals involved.  During the event,

4    she had encountered an individual online, and this

5    individual with two other individuals went to her father's

6    home where she was staying at the time.

7         During the event, the two other individuals held

8    Ms. Reeser down while she was sexually assaulted.  After

9    she was -- during this process, she was hit in the head

10   and she was stabbed, and it is her belief that she was hit

11   in the head with a brick.  There is a question I think as

12   to perhaps, you know, was it the wall, was it a brick in

13   terms of where she was hit.

14        Afterwards, she did contact law enforcement, and

15   she discussed the issue.  She does not recall much of this

16   conversation.  In fact, she doesn't recall at all speaking

17   with police.  Part of that is due to the fact that she was

18   went through a traumatic event, and part of it is because

19   of the head injury as a result of the assault.

20        So Ms. Reeser has dealt with this issue for

21   awhile.  It was something that was traumatic in her life,

22   which is understandable, but it is now 16 years later,

23   and--

24             **THE COURT:**  So there was a report to law

25   enforcement by her.  She recalls that she made a complaint

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    to law enforcement, but law enforcement didn't investigate

2    or prosecute or what?

3              **MR. GRAHAM:**  She recalls that her and her

4    father -- after the event happened, she spoke with her

5    father about the event.  Eventually she went to the

6    hospital to be treated.  She recalls that there is a

7    police report, but she does not remember speaking to the

8    officer involved.

9              In terms of prosecution of the individuals, she

10   does not, I believe, any of the individuals were

11   prosecuted.  She has -- there was an issue with some

12   evidence of an ongoing property dispute between her father

13   and I guess her former mother-in-law, and there was an

14   issue as to whether or not that evidence was going to be

15   collected, and that is her recollection of the event.

16             **THE COURT:**  I'm sorry.  What her in-laws?

17             **MR. GRAHAM:**  The issue was that the assault

18   occurred in the bedroom of I believe her sister, and there

19   was a property dispute between her father and her

20   mother-in-law regarding who was going to receive ownership

21   of the property in the house, which would include this

22   particular evidence, and what occurred was that all of the

23   material which was in the room was turned over during this

24   dispute.  So it was not collected as evidence.  It was

25   turned over I believe to the mother-in-law, and, you know,

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    obviously this is something that happened a long time ago.

2    I think her story is generally consistent.

3          Defense counsel attempts to draw facts that she

4    has given wildly different stories, but the fact of the

5    matter is, he asked her very specific questions in her

6    deposition, and nothing in her deposition is inconsistent

7    with the medical reports that she had made, and to the

8    extent that there may be some form of discrepancy, what we

9    learned -- we just got the deposition of her -- one of her

10   treatment providers last week scheduled by defense

11   counsel, and I think it is incredibly revealing, it is

12   something we -- I have a copy of it today, and I'm happy

13   to present it to the Court -- it goes not only to this

14   issue, but also the issue of causation of harm from Henry

15   Ford.

16          I can represent to the Court -- and again, I'm

17   happy to present the deposition -- where -- and we'll get

18   into this a little bit later -- where her therapist says

19   in direct to questioning by defense counsel, her

20   termination from Henry Ford caused her anxiety and

21   depression, which limited her life activities, and that

22   she was able to make this statement even though an

23   assessment, even though this is an event which occurred

24   years in the past.  So I think it's incredibly relevant,

25   but one of the other things --

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1              THE COURT:  Okay.  So you're indicating that

2       this deponent, who is her therapist --

3              MR. GRAHAM:  Correct.

4              THE COURT:  -- after the -- following the

5       claimed raped?

6              MR. GRAHAM:  This is someone that she sought

7       treatment from September of last year through December of

8       last year.

9              THE COURT:  Okay.  So she didn't commence

10      treatment until 2015 with this therapist?

11             MR. GRAHAM:  Correct.

12             THE COURT:  Which is after the filing of this

13      lawsuit?

14             MR. GRAHAM:  Correct.

15             THE COURT:  And that the therapist indicated

16      that issues relating to the sexual assault were still the

17      subject in part of the treatment that she was receiving?

18             MR. GRAHAM:  Well, she indicated that they

19      had discussed many issues, one of which at some point was

20      the sexual assault, but she identified, you know, many

21      other issues.  I think --

22             THE COURT:  Was this person going to be

23      called as a witness in the trial?

24             MR. GRAHAM:  We do plan to augment our

25      witness list and to call her at trial.

        *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

9

1        THE COURT: Augment the witness list? You've

2   identified witnesses in the final pretrial order.

3        MR. GRAHAM: She was not identified as a

4   witness.

5        THE COURT: Why?

6        MR. GRAHAM: Because we submitted the final

7   pretrial order before we learned about the treatment that

8   had been sought after and had been performed. We didn't

9   know any of the information regarding the fact that she --

10  her treatment provider believed that there was anxiety and

11  depression. We didn't know that some drugs that plaintiff

12  had been prescribed had been prescribed.

13       THE COURT: She didn't know that?

14       MR. GRAHAM: What we didn't know was the

15  assessment of the medical care provider. We had not

16  received these records which were subpoenaed by defense

17  counsel I believe in March. We didn't have the deposition

18  scheduled by defense counsel until last week.

19       My understanding is that the defense counsel wants

20  to do another deposition with this witness. This is

21  someone that we had not proposed as a witness. We had not

22  subpoenaed the records, but defense counsel subpoenaed the

23  records, scheduled the deposition. We drove to Saginaw,

24  spent the day up there, and it's my understanding that

25  we're going to have some supplemental call with the

     *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    witness later.  We have a deposition, which we paid for

2    now, because of the deposition that was scheduled by

3    defense counsel.

4          So yes, we believe that there are relevant

5    facts -- extremely relevant facts which have come out of

6    the deposition that defense counsel scheduled.  We don't

7    believe that there is any prejudice because defense

8    counsel has already deposed her once, and will like depose

9    her again, has subpoenaed and has received and reviewed

10   the deposition all of the records with her treatment

11   provider.

12         So in terms of the relevancy, it is extremely

13   relevant because it's information that we didn't know the

14   assessment her treatment provider.  It was not something

15   that we sought to introduce, but something that defense

16   counsel made us spend time, cost and energy to go and have

17   this deposition, pay for the deposition transcript and

18   review the subpoenaed documents.

19         So yes, they obviously had an intent of using this

20   information regarding her emotional harm or regarding her

21   sexual assault, because why schedule the deposition if you

22   have no interest in using the evidence.  Now that they

23   have done it and there is helpful information in the

24   deposition, I think it is absolutely appropriate that it

25   be introduced.

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1          The issue regarding --

2               **THE COURT:**  Assume for a minute that she's

3    not going to be permitted to testify in the case, isn't it

4    reasonable to expect that a fact finder might conclude

5    that the source of her distress is the impact, all be it

6    from 2000, there aren't too many people who experience, I

7    assume, a gang rape, which is what you're describing, and

8    don't live with that the rest of their lives as a major

9    issue in their lives, and if you're asserting emotional

10   harm and psychological damages from the termination here,

11   isn't it pretty obvious that the jury should know about --

12   at least that she experienced what she says that she

13   experienced, the sexual assault, back in 2000, and perhaps

14   the more appropriate issue is the scope of the testimony

15   permitted as it relates to that occurrence, but the

16   occurrence itself has to be relevant to what is the source

17   of her emotional harm.

18               **MR. GRAHAM:**  Well, I think first I would say,

19   I don't know that is necessarily the case.  I think --

20               **THE COURT:**  We don't, but the jury could very

21   well conclude that, couldn't they?  I mean, if I'm

22   listening to testimony about the psychological injuries

23   that she's going to testify about, and then I learn that

24   she was gang raped, I've got to assume that it has caused

25   ongoing distress and problems for the woman and will for

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    the rest of her life.

2            **MR. GRAHAM:**  Well, I think the first thing to

3    remember is that we are dealing with a case where it is

4    retaliation as a result of reporting unpaid wages and

5    lunches, and that I think that it's fairly clear that

6    emotional harm -- the type of emotional harm that one

7    might suffer as a result of being terminated wrongly is

8    not quite the same type of emotional harm that some woman

9    would experience if they had been gang raped.  Both

10   perhaps could cause some type of harm, but I think the

11   jury might be confused by attempting to assess how much of

12   this event which happened 16 years involving a violent

13   sexual act, is related to emotional harm dealing with a

14   termination, and I think one, it would confuse the jury,

15   and two, the way defense counsel has presented it, where

16   he wants to present the sexual assault for two purposes;

17   one, to say that she is a liar or she has a propensity for

18   untruthfulness, and two, that she still suffers from

19   emotional harm as a result of this event, puts plaintiff

20   in a fairly difficult position, because to every argument

21   that we make establishing the truth of the event which

22   occurred defending the fact that she was raped, we are

23   then presenting to the jury facts that, you know, even

24   though this was 16 years ago, they are hearing it for the

25   first time, and if you present horrible facts, even if

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    someone could have recovered from an event 16 years later,

2    if you're hearing it for the first time, you're thinking,

3    oh, my goodness, you must be so damaged from that event

4    because it is the first time that you're hearing about the

5    events.

6         But every argument that we make saying she's

7    truthful in her assessment, we argue in effect that she's

8    still suffering from great emotional harm.  For every

9    argument that we make that she has dealt with this issue,

10   and that she, in fact, is not suffering from emotional

11   harm, that she has resolved this issue within herself, and

12   she has moved on, the jury is going come to the impression

13   that well, certainly you wouldn't be over an event like

14   that.  So it must not have happened.

15        So it puts us in this pretty difficult position

16   where either way, if we're forced to make both arguments,

17   it is incredibly and duly burdensome because we're put in

18   the position where we have to tread incredibly carefully

19   in making an argument that supports both the fact that she

20   was truthful, and that she no longer suffers from

21   emotional harm.

22        This gets back to the reason why I brought up the

23   deposition in the first place, and that is because in the

24   deposition her treatment provider discusses something

25   which I think is fairly common knowledge, and that is that

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1     individuals who suffered a sexual assault can recount the

2     details of it in different ways, that you can remember it

3     differently, and that this is not unusual, that if you

4     have assaulted, obviously your brain shuts down, and

5     you -- the memories that you're going to collect from that

6     events are not as clear as they would be at other times in

7     your life, and to argue that if there is any type of

8     inconsistency in the way that she has recounted her

9     assault over the past 16 years in any situation, I think

10    defendant is basically arguing that it is fair game to, in

11    a way, prey on the confusion that an assault victim faces

12    after an assault occurs, and I think that's somewhat

13    reprehensible.

14           In terms of -- so you got the two issues.  You got

15    the fact that they are arguing that there is some

16    untruthful activity.  I think one, her statements are

17    largely consistent, and two, if there is any type of

18    inconsistency, it can be explained by the fact that she

19    suffered a sexual assault.

20           In terms of emotional harm, we've cited cases in

21    our brief which discussed the length of time which might

22    be reasonable -- one of the cases was 17 years ago --

23    where there may be an event which happened in the past,

24    and I believe in that case it even dealt with an issue of

25    truthfulness, and the Court said look, 17 years later this

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1   may be irrelevant, and I think the fact that it has been

2   16 years, coupled with the fact that the type of harm that

3   she would have experienced is completely unlike the type

4   of harm that we are arguing in a retaliation for

5   complaining about unpaid lunches, but it's genuinely an

6   irrelevant issue.

7            **THE COURT:**  Okay.

8            **MR. GRAHAM:**  So that is the issue with sexual

9   assault.

10           Again, finally -- and I kind of mentioned in terms

11   of the way that we would be forced to deal with this, I

12   mean, really what it would force us to do, especially if

13   we don't limit this in pretty substantial way, is we may

14   end up having a trial about Natalie Reeser's sexual

15   assault, and I think that's obviously not something that

16   we should get into.

17           **THE COURT:**  All right.  Why don't I hear from

18   Mr. Miglio on the sexual assault.

19           **MR. MIGLIO:**  Well, a couple of things, your

20   Honor.  This is the first time ever that there was a

21   suggestion that there was going to be an amendment to the

22   final pretrial order to add a treater or psychologist or a

23   professional counselor to now testify in a trial that's

24   three weeks away.  Had they listed an expert, a treater or

25   anybody on the witness list and or through discovery, we

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    would wanted the opportunity to have the plaintiff

2    examined like is typical in every case where there's going

3    to be testimony about psychological damage and the

4    causation for it, although a treater isn't an expert and

5    can testify about causation, but whatever.

6          When we were here at the final pretrial

7    conference, it was revealed to us at or about that time

8    that she was know seeing a new counselor, and

9    interestingly, she saw the counselor while the trial was

10   set to go in December.  She started seeing a counselor in

11   September, and then she stopped seeing the counselor on

12   December 17th or has not been back after trial was

13   adjourned.

14         So what we have here with respect to the sexual

15   consult is that she testified in the deposition a year ago

16   that she was sexually assaulted, that it was one

17   assailant, that it happened in the bedroom of the parents'

18   home, taking psychotropic medication since that time,

19   Zanax and something else, and that as a result of this

20   traumatic termination that she suffered at Henry Ford

21   Health System, she's had flashbacks.  She's had panic

22   attacks.  She's had all kinds of stuff that she attributes

23   to the termination for a traumatic event.

24         So one of the motions that we have is to reduce

25   that as being in evidence, but let's talk about the rape.

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    So in her deposition she said there was one

2  assailant, and it happened in her sister's bedroom.

3  Because her father didn't want her sister's belongings to

4  leave the room, he would not allow them to be prosecuted

5  and the assailant went scot-free.

6    So the police report from that event says that she

7  was the one that didn't want to press charges.  She

8  refused the rape kit, and she refused to give the identity

9  of the assailant, even though she knew who the assailant

10  was.

11    When she came for treatment at Henry Ford Health

12  System's Medical Network in 2007 and 2008, her story now

13  changed.  It was now two men who held her legs and hands.

14  One man raped her, and since that time she said she was

15  feeling depressed, isolated, withdrawn and that she has

16  occasional crying spells.

17    Later on she told somebody in the treatment

18  session that she was not only sexually assaulted, but she

19  was stabbed by one man who had held her down, and that her

20  assailant is serving life sentences.  She was stabbed,

21  raped and beaten, and then the crowning glory of this is

22  when we took the counselor's deposition in Saginaw, and

23  now the story went to what Mr. Graham is suggesting that

24  she was not sure if it was one or two.  She wasn't sure if

25  there was a prosecution, but she was raped, stabbed,

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    beaten, dragged from the house, left on the premises for

2    dead.  So it is relevant in the context of a case where

3    credibility is so important.

4         If you remember, your Honor, this was an argument

5    that this plaintiff said that she received two phone calls

6    from her supervisor for which we submitted records showing

7    there wasn't any calls, that the supervisor threatened her

8    if she went to H.R. and went to the state.  Significant

9    credibility issues.

10        So now we have somebody who claims to be having

11   had her medication bumped up, claims to be having all of

12   these traumatic flashbacks which she testified to, and

13   they want to preclude us from saying, hey maybe there's

14   something else that's going on that will contribute to the

15   alleged psychological injuries that she claims she is

16   suffering.

17        I mean, it is absolutely unbelievable that we

18   would not allow the jury -- and juries have the ability to

19   go through this -- that whats she's asking for from my

20   client in the way of psychological damages is, in fact,

21   something that really was already there and really was a

22   continuing aspect.

23        Now when we took her counselor's deposition on

24   Friday -- and by the way, we wanted to take the

25   counselor's deposition for discovery.  The fact that we

        *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1  took the counselor's deposition, and I believe at the

2  pretrial conference, you required them to supplement their

3  responses because they then said there was somebody else

4  they were seeing.  So we wanted to take the counselor to

5  see what's going on in her life.  She's got employment.

6  She's got a whole lot of things going on, not with the

7  idea that all of a sudden by taking a discovery

8  deposition, we can see that counselor can now testify.

9        But so we took the deposition and got the records,

10  and throughout the records what the counselor said, and we

11  have yet to receive the intake form, the counselor said

12  that there are many past traumas, and that's what she was

13  treating her for.  So even when you break it down

14  according to what the counselor said, the counselor's

15  admission is yes, there are other things going on with the

16  rape.

17        I don't want to dwell on the nuances about the

18  rape.  I think it is significant for the jury to hear that

19  this particular plaintiff has had what she claims to be a

20  sexual assault, taking medication for which she sought

21  treatment, and continues to seek treatment up until

22  December of 2015, and that the jury can ascertain if

23  that's the case.

24        And then with respect to making false statements

25  about a traumatic event, well that's very close to what's

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1     going on in this case where she says all kind of things

2     happened, made a statement to the police that's

3     contradicting her deposition testimony, contradicts what

4     she told other people throughout 2007 and 2008.

5          So I don't know where we're going to go with it,

6     but to say that we can't introduce it and can't let the

7     jury decide how truthful she is when she tells all of

8     these stories, including in her deposition, to me is

9     extreme prejudice to our client because this is an issue

10    of credibility.  These are previous statements that she

11    made that are false and inconsistent, and the issue of the

12    alleged sexual assault -- I say that lightly -- but the

13    issue of the alleged sexual assault could have significant

14    ramifications.

15         She's testified -- and they've said in the

16    pretrial statement -- she's been on -- I can't remember

17    the medication, whatever it was --

18              **THE COURT:**  Paxil.

19              **MR. MIGLIO:**  Paxil -- that she was taking --

20    of course, that's not true either -- but she's been taking

21    10 milligrams of Paxil for the last several years, and

22    then recently it was up because she is experiencing all of

23    these flashbacks.

24         So all of that is fair game, especially in a case

25    where wage loss is minimal, if not significant, and she's

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    going to ask the jury for an award based on damages,

2    emotional distress damages and trauma.

3         **THE COURT:**  Well, the fact that she sought

4    treatment for this emotional difficulty that she's having

5    certainly is appropriate, but the inconsistencies among

6    her statements and the truth or falsity of what she's

7    describes, how do you prove that?  Are you going to call

8    the officers in who took the statement, and how much time

9    are we going to spend whether she lied about an incident

10   16 years ago?

11        **MR. MIGLIO:**  Not very much because the

12   records are already exhibits as part of the pretrial

13   statement.  I can call a custodian of records if I'm

14   required to.  There is a custodian of records for the

15   medical records where she gave these statements that these

16   assailants were prosecuted, serving life sentences, and

17   then it went from being raped to being raped and stabbed,

18   to be raped, stabbed and being bludgeon.  We can introduce

19   those records.  She can deny it or she can be asked in

20   cross examination if she made these statements.

21        **THE COURT:**  When you say introduce those

22   records, what records?  Police reports?

23        **MR. MIGLIO:**  The records that she sought when

24   she sought psychological treatment at Henry Ford Health

25   System.  In 2008 she gave two different -- completely

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1   different accounts of what the sexual assault was.  She

2   gave a completely different account to the Dryden Police

3   Department and police records to what the assault was, and

4   her deposition testimony is diametrically opposed to all

5   three or four versions of the events.

6          **THE COURT:**  Well, police reports are not

7   normally admissible.  So --

8          **MR. MIGLIO:**  She can be asked on cross

9   examination though as part of extrinsic evidence to see

10  whether or not to prove that she's not credible, and that

11  she lacks trustworthiness as a witness.

12         The issue of getting them in is not -- the issue

13  of getting them in -- I mean, that's like saying her

14  trauma in this alleged trauma that she suffered as a

15  result of termination, she's given five different

16  explanations about what happened, we should be allowed to

17  cross examine her on that.  I mean, this is a credibility

18  issue.

19         I agree that maybe extrinsic evidence would not be

20  admissible, but the fact that she said all of these

21  different statements that are different goes to her

22  credibility.

23         But as I stand before, I'm a little more concerned

24  about this Johnny come lately argument that somehow they

25  are going to amend the witness list because that to me

        *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    is -- they're going to amend witness list.  Mind you, to

2    add this person who's treating her for rape, but we can't

3    ask her about the sexual assault as a contributing factor

4    to her alleged mental and emotional distress.

5              **THE COURT:**  Did you have other treaters --

6    any other treaters that you deposed?

7              **MR. MIGLIO:**  No, we just subpoenaed records,

8    and there's another issue that I guess we should raise

9    with the Court in connection with her mental state -- and

10   I know that I'm getting ahead of myself -- but she claims

11   that she testified at length about how after she was

12   terminated by our client in 2014, she saw a Dr.

13   Kahnamouei, and he treated her,  her primary care

14   physician -- this is in her deposition -- he treated her

15   for anxiety attacks, panic attacks and that he upped her

16   Paxil prescription.  So we subpoenaed the records from Dr.

17   Kahnamouei and guess what?  He didn't see her at any time

18   after December of 2013.

19             Counsel here argued to you knowing full well that

20   he has the records that no treatment by Dr. Kahnamouei

21   after December of 2013, that that would be something that

22   she would be allowed to testify to.

23             So part of our concern here today is that we don't

24   have the records, and I don't want her getting on the

25   stand and then saying, you know?  I don't remember.  Maybe

             *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    it wasn't Dr. Kahnamouei.  Maybe it was somebody else who

2    upped my Paxil, but I'm taking more Paxil as a result of

3    Dr. Whoever.

4            So we're asking the Court to rectify that because

5    Dr. Kahnamouei has never seen her in 2014.  Of course, if

6    there isn't anybody, that's another issue of credibility,

7    but that's another issue that relates to this whole kind

8    of mental and emotional distress issue.

9            So as far as we're concerned, the rape -- and

10   again, I'm mindful that sexual assault is a very serious

11   thing, and I have no desire to dwell into it, and I have

12   no idea what's she's going to be allow to say on the

13   stand, but to the extent that becomes an issue as to a

14   competing or the cause for what she claims is mental and

15   emotional distress, the defendant should be able to

16   inquire about that, as well as to the extent she makes

17   claims about her truthfulness and so forth, that should be

18   fair game because that's an ability to cross examine a

19   witness about previous untruthful statements that should

20   be admissible.

21           THE COURT:  All right.  Well, so the -- do

22   you get pharmacy records to demonstrate what meds she's

23   taking?  I'm assuming she goes to the same pharmacist.

24           MR. MIGLIO:  We have what the doctors

25   prescribed and the dosages they've prescribed, and quite

        14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM

1    honestly, they don't support what she said.  She's been

2    prescribed 40 milligrams of Paxil over a period of several

3    years.  So another issue with respect to credibility that

4    she just upped them by seeing a doctor who doesn't have

5    any records of seeing her.

6           I mean, this isn't a sole practitioner doctor.

7    This is a practitioner who is part of the Henry Ford

8    Health System Network who worked out of Henry Ford Macomb

9    Hospital.  We have all of the records for her from the

10   Henry Ford Health System Network, including Dr.

11   Kahnamouei.

12          So we have no records whatsoever of any visits

13   that she made in 2014, and for counsel to assert that in

14   the motion that that's what she's going to testify about

15   is disingenuous and inappropriate.

16          **THE COURT:**  Okay.  Mr. Graham?

17          **MR. GRAHAM:**  Well first, I would like to say

18   that we have signed authorizations for all of her medical

19   records.  So in terms of not having access to anything,

20   opposing counsel should have access to everything that

21   they need.

22          In terms of -- again, I'm sure this is going to

23   come up in another motion -- but in terms of being able to

24   bring in the information in the deposition, I mean, you

25   just heard defendant talk about the medical records which

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    have been subpoenaed in order to support an argument that

2    we making.  Obviously, these records and testimony are

3    going to be relevant.  The deposition just happened on the

4    15th.  So really there has not been time in order to do

5    that.  Our plan is to get it done by Friday.  That's

6    aggressive.  I don't know if we can.  If not, it will be

7    on Monday.

8         I think it's important that defense counsel raises

9    the issue again of well, isn't it convenient that she went

10   to seek treatment -- in fact, he actually asked the

11   treatment provider in her deposition, isn't that the case?

12   Haven't you heard of this happening?  Haven't you heard of

13   people doing this, and she said yeah, I have heard of

14   people doing this, and he said, what about Natalie Reeser?

15   Is Natalie Reeser doing this?  She said no, I believe

16   Natalie Reeser is here for treatment.  I made an

17   assessment of her truthfulness.  I made an assessment of

18   her conditions, and I know that she is here because she

19   genuinely needs help.

20        I asked her in diagnosing a patient, and she had

21   said that she sent Natalie to a doctor for prescriptions

22   for drugs to deal with anxiety and depression.  I said,

23   well do you assess truthfulness and make a diagnosis, and

24   she said yes, and I assessed that Natalie Reeser was being

25   truthful, both in terms of the need for medication as a

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1   result of the termination from Henry Ford and also from

2   the sexual assault.

3         In terms of the sexual assault being inconsistent,

4   it is not at all inconsistent with the deposition

5   testimony.  In the deposition testimony, I think we

6   discussed the sexual assault in maybe two, three pages.

7   There was one assailant.  You know, whether or not we're

8   describing this as a gang rape or just multiple

9   individuals involved, her testimony has been that there

10  were two individuals who held her down and one who

11  assaulted her.  That is not inconsistent with her

12  deposition testimony.

13        In terms of being stabbed during the event,

14  counsel never asked her, were you stabbed during the

15  event?  This is not inconsistent with her deposition

16  testimony.

17        In terms of medical records, from I think -- you

18  were right to raise the issue of the police report.  In

19  terms of medical records, there's no indication in the

20  medical records in which she discusses the prosecution or

21  non-prosecution of these individuals, that Natalie Reeser

22  was the one that made the statement.  There is no one that

23  is going to verify that.  For all we know her parent

24  accompanied her on the visit and made that statement.

25        So Natalie, I can tell you, has no memory of

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    speaking to a doctor, especially that doctor in making a

2    statement about the prosecution of those individuals.

3         In terms of -- again, counsel said that he is not

4    going to go into the nuances of this, but yet, this is

5    exactly the argument that he wants to go into the nuances

6    of it, that he wants to compare multiple accounts.  Was

7    there a rape kit?  How many assailants were there?  Were

8    you stabbed?  Where did the rape occur?  These are not

9    questions simply establishing that there is an event that

10   could have caused emotional harm.  These are nuance

11   questions.  So I'm not quite sure where the argument that

12   this is not nuance comes in.

13        In terms of the increase of drugs, again, it is

14   our position that there was an increase in drugs, and like

15   I said, in fact, in terms of the deposition testimony

16   which was just presented  or that we have been

17   discussing -- and again, happy to present it to the Court,

18   will present it in our motion -- she indicates that

19   Natalie was sent to a doctor, and was prescribed drugs and

20   received those drugs as a result of anxiety and

21   depression, as a result of her termination from Henry

22   Ford.

23        So the point that there's some type of causation

24   issue -- and we'll into that in a little bit too I

25   guess -- that her medication was increased, that

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    substantiated in the testimony of her treatment provider,

2    which again was deposed by opposing counsel.  It was a

3    choice made, and you don't get the benefit of subpoenaing

4    all the records, having a deposition last all day and

5    schedule a second deposition, and use the records that you

6    subpoenaed in your argument, and then say well, we're not

7    allow to do the same.

8          So it is our position that will be introduce

9    those, and they will support the fact that she has

10   received increased medication.

11          THE COURT:  Well, haven't the medical records

12   been stipulated to in the --

13          MR. MIGLIO:  No, your Honor, not for this

14   particular treater, and we really don't have an intention

15   to use them.  We took the deposition where she was,

16   whether she was working, what else was going on.  I have

17   no intention of using those records.

18          THE COURT:  And you're not intending to

19   redepose the witness?

20          MR. MIGLIO:  No -- well, the only issue with

21   respect to the witness, you when you go -- well, I don't

22   know if you know -- but when you see a psychologist or a

23   psychiatrist, typically they have you fill out an intake

24   form and says, why are you here?  What kind of previous

25   things?  What's your employment situation?  What's

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1   bothering you, et cetera, et cetera.  We subpoenaed those

2   records, and usually that's the most valuable piece of

3   information that we get.

4          We drive up to Saginaw.  Do you have everything?

5   Did you have her fill out an intake form, and the

6   counselor says yes, but I didn't produce it to you.  It's

7   in a different folder or whatever, and so I can send it to

8   you, and what I said to Mr. Graham was, well, she said she

9   would send it to me, and if we need for some reason to

10  have a follow up deposition, we can do a follow up

11  deposition.  That's the only particular issue, but they

12  knew --

13              THE COURT:  And you have not yet received it?

14              MR. MIGLIO:  Well, I just had my paralegal

15  call.  She said she -- the therapist said she was going to

16  send it last Monday after the Friday deposition.  She

17  didn't send it.  I'm not too suspicious.  I had my

18  parallel call and she talked to her today, and said that

19  she is going to send it, but not until after 1:00 today.

20  So I expect to get that.

21              THE COURT:  Going to send it how?

22              MR. MIGLIO:  Fax or email, but that's the

23  issue.  We have no intention to use these records.  My

24  only point with respect to the records was that you can't

25  say it is not a contributing factor.  They argued in the

          *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    brief that she's completely recovered.  We shouldn't be

2    able to go back 17 years, and that's just not the case,

3    even according to their own treater.  So that was the

4    point.

5            But let me make one other point.  They knew of

6    this treater at the time of the pretrial conference.  They

7    knew of him.  We talked about it and, in fact, we also

8    knew about that this was this kind of case.  They filed a

9    pretrial conference, the pretrial order, and they made an

10   argument in their brief.  If you look at brief in response

11   to our motion to strike her testimony regarding medical,

12   that as a result of these illegal actions, referring to

13   the March 7, 2014 termination, plaintiff sought treatment

14   with her primary care doctor, Dr. Reza Kahnamouei, after

15   her suspension because, quote -- and they quoted right

16   from her deposition -- because my anxiety came back, my

17   panic attacks came back, I needed medicine.

18           They say plaintiff testified that the medicine was

19   not working, made me depress.  It made me very anxious,

20   and her primary care physician upped my medication.  Her

21   primary care physician Kahnamouei has no records that he

22   saw her in 2014.

23           I want -- I'm asking the Court in the context of

24   this, that either they have -- I don't want her getting on

25   the stand saying, I was wrong.  It wasn't Dr. Kahnamouei.

        *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    It was some other doctor.  We have all the records.  They

2    should not be able to next come out at trial and say, we

3    have some other doctor.  They've never identified that

4    doctor.  We've gone extensively.  He said that he has

5    given us all of the authorizations.  Nobody saw her in

6    2014 following her termination, and they put it in the

7    pretrial order.

8           So I want them to be precluded from producing --

9    from her saying anything other than what she has already

10   said because there are no other records showing such a

11   visit by any doctor.  That's what I'm asking for, but --

12          **THE COURT:**  Was this a motion that you filed?

13          **MR. MIGLIO:**  Well, I'm just saying when I

14   looked at his response to our motion in limine, he's

15   saying she wants to get on stand and say that she went to

16   Dr. Reza because the medication was not working following

17   her termination; that she saw the doctor; that he up her

18   medication when she was having panic attacks that she

19   reported to him.  There is no such information.  That's

20   what I'm responding to what they said, and I don't think

21   that he should be allowed to say that.

22          As with respect to the rape and the counselor, no,

23   we're not intending to call that woman.  We're not

24   intending to introduce the record.  We took it to see what

25   she's doing.  She's got a lot of things that she says goes

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    on, that she had to move up north and all of this other

2    stuff, and that's what -- that's the story, and we didn't

3    know anything about this treater until the final pretrial

4    conference, even though she had been seeing the treater

5    way back in September of 2015.  So they've been not only

6    diligent in identifying that stuff, they've been doing it.

7    So we don't want to get another doctor at trial is what

8    I'm saying.

9              **THE COURT:**  Okay.  Mr. Graham?

10              **MR. GRAHAM:**  Well, I think you were right to

11    raise the question is this in a motion, because it's not.

12    This would be motion in limine or some other form of

13    presentation to the Court.  This isn't something that we

14    talked about to prior to this hearing.  It's not something

15    that was submitted to the Court, and frankly we're talking

16    about whether or not this sexual assault should be allowed

17    in to present arguments about emotional harm and

18    unfruitfulness, not about whether or not she's able to

19    testify that a treatment provider increased her

20    medication.  That's an unrelated issue, and it's not

21    briefed for the Court right now.  So I don't feel we need

22    to go into it at great length.

23              **THE COURT:**  Well, you have a -- do you have a

24    claim that this was some other treater?  You have seen the

25    records, and she was receiving some prescriptions along

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1      the lines that you described?

2                MR. GRAHAM:   I can't represent to the Court

3      which doctors right now -- which doctors saw her and

4      increased her treatment.  I can't because that's not

5      something that we are here to argue about.  I can guess at

6      what would be there, but frankly, I think it would be

7      inappropriate for me to guess, because I think the

8      argument is inappropriate.

9             So I could either -- well, one, I don't think it's

10     appropriate that we discuss this issue at all because it

11     was never briefed as a motion in limine, but if we are

12     going to discuss, then we should have supplemental brief

13     on the issue rather than fiddling around whether or not

14     there was an additional doctor or whether or not the

15     medication was increased.

16             I would also --

17                THE COURT:   So the short answer is no, you

18     don't know of any other doctor who was prescribing the

19     medicine that she made have been confused about?

20                MR. GRAHAM:   I feel like agreeing that

21     statement would be suggesting that there was no other

22     doctor, and I don't know that is the case.  I cannot give

23     you a name standing here at the podium right now.

24                THE COURT:   All of her medical records are

25     marked as potential exhibits in the case?

        *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1              **MR. MIGLIO:**   Every treater, every physician,

2       every health care institution that she listed in

3       interrogatories responses and discovery responses and in

4       her deposition, we have subpoenaed them, and the records

5       should be part of what our final pretrial order is with

6       the exception of this last one who we didn't even know

7       about until after the final pretrial conference, and

8       there's no such any visits whatsoever, but we have a

9       couple of issues here.

10             They are arguing that she's going to be testifying

11      about that, and citing to her testimony, and they don't

12      even have support for it.

13             Secondly, we only learned about this of what she

14      wanted to testify about in response to the briefing that

15      she's saying, you know, she saw Dr. Kahnamouei in 2014

16      after her termination.  So that's the reason why we're

17      bringing it at this point three weeks before the trial,

18      and that he upped her Paxil and that's what she intends to

19      testify about, that the Paxil I was receiving was not good

20      enough, and now Dr. Kahnamouei, after I got fired, upped

21      it for me when I saw him.  So that's the issue, and I

22      apologize for bringing this up, but we're talking about

23      what medical records are, and what we're learning as we're

24      progressing to trial, and it's an issue for us.

25             **THE COURT:**   Okay.   The general proposition of

        *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1     the medical records will be admissible.  I guess if they

2     disclose someone who is increasing her Paxil in 2014, that

3     would be potentially available to explain the variance

4     with her testimony, but we're a little bit astray on the

5     question of the admissibility of evidence relating to the

6     sexual assault -- claimed sexual assault, and as my

7     questioning has already indicated, generally speaking

8     the -- that the fact that she sought and may still be

9     seeking treatment relating to that sexual assault is all

10    admissible evidence.

11          The underlying circumstances of that, and her

12    inconsistent statements concerning the assault itself are,

13    I think, the Court concludes generally going to be

14    inadmissible.  I'm not granting the plaintiff's motion in

15    limine as it relates to that testimony which may,

16    depending on the manner in which it is presented by

17    defense counsel, may ultimately be admissible.  So I'm not

18    precluding it altogether, but my guidance would be that

19    generally I think inconsistent statements about the manner

20    in which this assault, if it did occur, would -- even

21    though credibility is obviously an important assessment

22    for the jurors to make, there's -- it's present as it

23    appears to me that we could end up going on for hours

24    about the various statements made and their accuracy, and

25    it seems to me as it relates to that objective and the

         *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    cross examination as a general proposition, it is unlikely

2    that the Court will find the evidence admissible, but

3    again, it will depend on the manner in which the

4    examination goes of the plaintiff, and the manner in which

5    defense counsel at the time proposes to introduce it.

6              So defense counsel is generally not to admit such

7    evidence without first at the trial getting permission

8    from the Court to address questions going to those issues

9    of inconsistencies.

10             What's next?

11             **MR. GRAHAM:**   Next is, I think, maybe a more

12   straightforward issue.  The second issue that we raise is

13   financial assistance that Fiona Bork provided to Natalie

14   Reeser, and she did this a couple of times over the course

15   of Natalie's employment with Henry Ford.

16             Basically plaintiff's brother became ill, and

17   plaintiff's apartment flooded, and in response Fiona Bork

18   provided financial assistance to Natalie Reeser.

19             Now we would not have even thought to raise this

20   issue, but it came up repeatedly in Fiona Bork's

21   deposition, and our fear -- all of this are events that

22   occurred long before Natalie's reports, Natalie's

23   complaint internally to Henry Ford, Natalie's suspension,

24   Natalie's termination.  It really does not have anything

25   to do with the allegations or the defenses in this case,

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    and we're afraid defense counsel may use this as

2    impermissible character evidence specifically to show that

3    Fiona Bork is a generous or truthful, good character

4    individual, and that the jury should be sympathetic

5    towards her or find her more credible for these reasons,

6    and so we simply ask that the Court exclude this

7    completely irrelevant information about Fiona Bork giving

8    Natalie Reeser money.

9              **THE COURT:**  Okay.  I don't really need

10   response to that argument.  I agree that it is not

11   admissible as character evidence.  It might be appropriate

12   at the trial or at the point of instructions to a jury to

13   say that, but I do think the manner in which the two

14   interacted and the relationship they had is generally

15   admissible evidence, would assist the jury in deciding

16   whether the -- whether Ms. Fiona acted with retaliatory

17   intent for the plaintiff's exercise of protected rights

18   under the FMLA, and so it's -- that motion will be denied.

19             Next, evidence of her prior work history?

20             **MR. GRAHAM:**  Correct.  So here opposing

21   counsel is indicating that they are interested in

22   introducing this evidence for three purposes:  One, that

23   it is after acquired evidence that she would have been

24   terminated.  Here specifically they are referencing -- and

25   almost their whole argument is based around this

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    application that Natalie supposedly sent to Henry Ford.

2    This document is --

3                    **THE COURT:**  Supposedly sent?

4                    **MR. GRAHAM:**  Well, we have no idea where it

5    came from.  The first time that we ever learned of this

6    document was in the response to our motion, and so

7    Natalie's signature is not on the document.  Her name

8    appears on the signature block, but we've never seen this

9    before.  We've never been able to ask anyone at Henry Ford

10   about the application.

11          So as we state in our brief, it's inappropriate to

12   use information that has not been previously disclosed in

13   a motion or certainly at trial.  It's not on the pretrial

14   list of exhibits.  It's not in any document that has been

15   turned over.  I think we got it April 14th.  So it's not

16   quite clear what it is or where it comes from, but

17   certainly we would ask that it be excluded.

18          Now even it's not excluded, we still think that

19   there are problems with it.  One is that we believe that

20   the application has somewhat inconsistent language in

21   stating that, you know, it does say that this is something

22   if you leave out information, then it may be a terminable

23   offense, but at the same time in the same paragraph, I

24   believe it's states something different -- and I

25   apologize.  I will look for that as I continue.

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

```
 1            More importantly perhaps, is the fact that
 2    defendants knew that the two jobs -- assuming that this is
 3    her application, assuming it came from Henry Ford -- she
 4    submitted a resume along with the application as the
 5    application says that you should, and on that resume she
 6    listed more than two jobs, and so their argument that
 7    well, she only listed two jobs on her application, and
 8    therefore, we would have definitely fired her had we
 9    learned that in her entire life she worked more than two
10    place, is somewhat disingenuous because they have
11    knowledge that she worked more than two places with the
12    resume she submitted to Henry Ford.
13            So I mean first, the argument that they should
14    be -- I mean, the entire argument is based on the document
15    which should not be admitted and should not be considered
16    in the motion, but if you were to consider it, there's no
17    evidence that she would have been terminated because they
18    already had knowledge of the inconsistency.
19            The second argument is somewhat odd.  It argues
20    that they should be able to make, I guess, some general --
21    argue that she had a habit of frequently changing jobs,
22    and Natalie was -- had jobs before she went through school
23    and became a phlebotomist, that's true, and she did change
24    jobs before she became a phlebotomist, but I think, as is
25    the case for many people, before you finish your
```

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    schooling, you tend to switch jobs more often.  Once you

2    finish your schooling, you tend to stay at the same firm

3    or at the same business, whatever it would be maybe a

4    little bit longer because you found your career.

5         Here, it's fairly consistent that she's continued

6    to work in the health field.  She's worked at one of her

7    employers, Quest Diagnostics, for well over a year in

8    total, and we don't think that it's appropriate that

9    there's some evidence -- and also frankly, it's somewhat

10   problematic to say we're arguing that Henry Ford wrongly

11   terminating her, and then she was not able to find

12   consistent work after she was fired from Henry Ford.

13        So she's put in the position where she has been

14   attempting to find work and, in fact, we'll get to this a

15   little bit late in terms of looking at --

16        **THE COURT:**  Well, obviously work history

17   after her termination has got to come in as it relates to

18   whether she mitigated damages, right?

19        **MR. GRAHAM:**  Well, I think it's fine to

20   discuss her efforts to find work and her jobs.  What I

21   think we're objecting to is the purpose that defendant has

22   identified that it intends to use that evidence for, and

23   that purpose is to show that she is the type of person who

24   frequently changes her job, and therefore, probably would

25   not have stayed at Henry Ford for a long time any way,

        *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1      which is --

2              **THE COURT:**  So her work as a phlebotomist

3      obviously, to the extent that you're looking at that as a

4      different status in life, and that she had more continuous

5      employment as a phlebotomist than she had before, any work

6      history after her termination at Henry Ford is obviously

7      going to be significant though for whether she's taken

8      adequate steps or appropriate steps to mitigate damages,

9      and whether or not.  Her front pay will depend on, was

10     this loss -- did she work to avoid losing income?  Did she

11     voluntarily go up north when pay is lower, or would

12     reasonable mitigation require that she stay around in the

13     area where the pay is higher?  So --

14             **MR. GRAHAM:**  I guess the issue -- this is, I

15     think, a separate issue from defendant's motion which

16     addresses the issues that you just discussed.  What this

17     is -- why this is a particular problem, I think, again is

18     the specific argument that she is the type of individual

19     that would frequently change her job, and this is a

20     characteristic about her.

21             **THE COURT:**  Instability, in other words.

22             **MR. GRAHAM:**  Right, and not that she --

23     regardless of what she did moving forward, that she would

24     not have stayed at Henry Ford, that they should not have

25     to pay, you know, two years in the future in front pay,

        *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    because Natalie Reeser has a habit of only working at jobs

2    for one year, you know, and that's the argument they raise

3    and that's the argument that we are specifically

4    addressing here that is problematic; that they are able to

5    make the argument that looking at the pattern of her work

6    history, we can say to the jury that we don't owe her any

7    damages because she would have left anyways, and you look

8    at evidence that we submitted as part of the motion for

9    summary judgment where Natalie says, you know, I love this

10   place.  I love my clients.  I love working here.  This is

11   where I want to stay.  They are like my babies.

12        There's no indication at all that Natalie was

13   planning on leaving Henry Ford.  None, and what they are

14   attempting to do, according to their response is say yes,

15   she was because that's what she does.  That's the type of

16   person she is, and that's the evidence that we are -- or

17   the purpose that we're objecting to for the second

18   argument.

19        **THE COURT:**  All right.  Thanks.

20        **MR. GRAHAM:**  For the third --

21        **MR. MIGLIO:**  Shall I hear from Mr. Miglio on

22   that?

23        **MR. GRAHAM:**  Well, there's one additional

24   argument, if you want to --

25        **THE COURT:**  Go ahead -- that's related,

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1   that's a part of this issue?

2           **MR. GRAHAM:**  Correct.  Opposing counsel had

3   said that they were going to also attempt to use her past

4   employment record to show again that she has a propensity

5   for untruthfulness because she had somehow lied on her

6   applications, but there's no one who is going to be

7   presented who is testifying from those companies which is

8   saying that Natalie Reeser lied on these applications, and

9   this isn't information that we asked her to fill out.

10          You know, we put in -- again this kind of goes to

11  the frequent job changes and also the false statements.

12  We cited a case, Barbour, which kind of looks at what is

13  it that you should be considering here, and you're looking

14  primarily at, you know, the similar jobs that she sought

15  out, but I've don't want to get too much into that.

16          The main point I think on the false statement that

17  they are presented, there's no one that's going to testify

18  that anything that she submitted as false.  So to use

19  those applications to imply that somehow she didn't

20  provide the information that the employer was asking for

21  is inappropriate.

22          **THE COURT:**  Okay.  Thanks.  Mr. Miglio?

23          **MR. MIGLIO:**  First of all, your Honor, we

24  have an affirmative defense of after acquired evidence and

25  resume fraud, which is recognized by the courts that says

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    if an employer discovers after a case is filed that the
2    employee engaged in misconduct or lied and would not have
3    been hired on the resume because they misrepresented or
4    lied, that's a reduction in damages.  That's a cap.  The
5    case is Nashville versus Banner Linen (sic) and a number
6    of other cases.
7         We have always had that argument.  At her
8    deposition she was shown her resume that she submitted to
9    Henry Ford Health System.  She was asked a number of
10   questions about it, and there were a number of things that
11   number one she left off the resume.  There were a number
12   of things that she didn't include in her resume.  There
13   were a number of things that the jury will hear that she
14   misrepresented when she was interviewed by her supervisor,
15   who asked her, went down her resume, and so as an initial
16   matter, we are entitled to introduce evidence showing that
17   the false statements that she made and the information she
18   left off her resume and her application, would -- had she
19   been truthful and had we known about it at the time, would
20   not have hired her, and even more so, when we learned
21   about it in the deposition, that would have been the point
22   in time when the misconduct was discovered.  We would have
23   testimony as falsification of employment records and
24   resume is cause for termination.
25        So the whole thing about what statements she made

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    and what false statements she made, now this is a

2    plaintiff who testified who lo and behold she admitted

3    that she left off stuff on her resume because for some

4    strange reason she's got two resumes; one if she is

5    applying for a business job and another one if she is

6    applying for a health care job, and the gaps in the

7    employment don't match, the times that she worked there

8    don't match, the reasons why she claimed and gave to the

9    supervisor as to why she left are all false.  So from the

10   after acquired resume fraud defense, all of that

11   admissible.  That's number one.

12        Number two is I've never tried an employment case

13   where the background and work history and the

14   qualifications that the employee brings to the job are not

15   fair game.  I mean, the witness is going to take the stand

16   and say, I was a wonderful phlebotomist for all of these

17   years.  I had all of this experience.  I knew what I was

18   doing.  I mean, part of her work history is who the

19   plaintiff is, and the jury is entitled to hear about that.

20        Number three, I had cases where -- and I'm sure

21   this is not any different -- where a plaintiff gets on the

22   stand and said, I would have worked in this job until I

23   retired, and then you look back and you find as you do in

24   this case, that she changed jobs every couple of months,

25   and never held a job longer than one year or whatever the

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    case may be, and the jury is entitled as much as they are

2    entitled to see whether or not they agree with her that

3    she's worked for retirement, the jury is entitled to take

4    her previous work history into consideration for whether

5    or not they would give her front pay.

6           So all of that is completely relevant.  It's

7    completely significant relevant information, and more

8    important -- and going back to the issue of the resume

9    fraud -- we have the resume.  We discovered in connection

10   with this case, the employment application, it's an online

11   application that she fills out, was not turned over to the

12   plaintiff in the course of discovery.  We discovered and

13   immediately supplemented the response.

14              **THE COURT:**  When?

15              **MR. MIGLIO:**  We supplemented it three weeks

16   or something, but -- and I would ask the Court that there

17   is no prejudice there, and if they want to take a

18   deposition of somebody about what the application is, the

19   same would be true with respect to the treater, but the

20   bottom line is, the entire defense -- I'm not going to

21   rest on that employment application -- what she was

22   interviewed for and what she told the supervisor all of

23   which was false, which is significant, is on her resume

24   that she submitted in connection with that.

25              **THE COURT:**  How would that not have been

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    disclosed at the outset of the case?

2                    **MR. MIGLIO:**  What's that?

3                    **THE COURT:**  The application.

4                    **MR. MIGLIO:**  The application is apparently

5    kept.  They don't print it off and put it in the personnel

6    file.  It's kept electronically, and we just realized that

7    at some point in time that it had not been printed off and

8    produced it.  So we produced it, but we had produced her

9    personnel records, along with a number of other stuff,

10   which included records from -- resume that she submitted

11   to Henry Ford.  She was examined on it at her deposition.

12   So there's no mistake, and then what typically happened

13   was by the time we took her deposition, we had subpoenaed

14   her records from her previous employers.

15           So now you see she's got a resume.  Well, you

16   didn't work these dates that you put on the resume, and

17   you told Fiona Bork that you left there voluntarily when,

18   in fact you were fired.  I mean, those are the kind of

19   falsehoods that are extremely relevant and make a case for

20   resume fraud after inquired evidence, but they had all of

21   that.  The only issue he's talking about is the online

22   application where she fills it out online, and even in

23   that instance she didn't fill out.

24                    **THE COURT:**  What do you mean she didn't fill

25   out?  She didn't fill it out accurately?

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1          **MR. MIGLIO:**  Right.  She said that she had
2     never been fired from a job by the way, and she didn't
3     include all of her previous employers.
4          So -- but in any event, that's the employment
5     application, but the resume fraud case doesn't stand on
6     the employment application.  There's no prejudice giving
7     it over to them and using it, but that's part of the case,
8     and part of the case about her being in positions for a
9     couple of months and leaving, it's all consistent.  It's
10    no different than her saying, if I had not been terminated
11    by Ford Hospital, I would have been there for 100 years.
12    So I should be front pay all the way to the end of time.
13    So that's what our position is with respect to that.
14         **THE COURT:**  Okay.
15         **MR. MIGLIO:**  And if he wants to take the
16    deposition of somebody about the application, he is free
17    to do so, but the fact of her previous employment history
18    is relevant even without the employment application.
19         **THE COURT:**  Okay.  I agree with that last
20    statement because I think you will be operating without
21    the application, but the previous work experience is
22    pretty integral to the case, and the defendant's after
23    acquired defense, and the inconsistencies between that and
24    other applications, if those were -- those had been
25    disclosed as exhibits --

       *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1          **MR. GRAHAM:**   Could I just make one statement?

2          **THE COURT:**   Sure.

3          **MR. GRAHAM:**   I think the issue with the

4    application is that there are actually words on that

5    application which say that you could be terminated if the

6    information is not complete.  That's only the place that I

7    believe those words appear, and if the application is not

8    coming in, well then there's no indication that the

9    defendant would have terminated her for any type of

10   inconsistency on the resume.

11         **THE COURT:**   You don't think we will hear oral

12   testimony to that effect?  So maybe we will and maybe we

13   won't, and maybe there will be appropriate objections to

14   questions that are posed from you to that effect, but I've

15   got to believe that whoever the hiring person is is going

16   to be offering testimony in the case that she was advised

17   of that and -- or if not, advised of it through that

18   application that that is the employer's policy.

19         So the point is I think that the -- that this

20   general proposition that her prior work history is

21   irrelevant, I think is misplaced and is appropriate as a

22   subject of examination.

23         Okay.  So next we're talking about evidence of her

24   prior bankruptcy.

25         **MR. GRAHAM:**   We could do that.  The next one

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1      in order --

2                    **THE COURT:**  I see.  Jeffrey Automotive?

3                    **MR. GRAHAM:**  Yes.

4                    **THE COURT:**  Go ahead.  I'm sorry.

5                    **MR. GRAHAM:**  So here there was a lawsuit

6      which was filed by Ms. Reeser, and it is her understanding

7      that there was a settlement offered which was made, which

8      was lower than she wanted, and so the attorney, as often

9      the case, did not want to continue after she was unwilling

10     to agree to the settlement offer and decided not to

11     litigate the claim.  She didn't find another attorney.  So

12     the claim lapsed.

13             This is irrelevant.  Some of the documents which

14     are included from the exhibits list are actually

15     attorney-client privilege documents, communications

16     between Ms. Reeser and her attorney, but all of it is

17     irrelevant.

18             In terms of the stated reason for wanting to use

19     this lawsuit is that apparently a defense to the lawsuit,

20     the company had claimed that Ms. Reeser had used a company

21     computer for personal use, and they -- defendant states,

22     well one of the reasons that Natalie had at one time been

23     disciplined was for personal use of a computer, but the

24     defense in this case -- the reason in all of the pleadings

25     and the summary judgment motion and everything, their

           *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    claim as to why Natalie was terminated is job abandonment.

2    It has absolutely nothing to do with using a work computer

3    for personal use.  So admitting evidence of that issue

4    could give the jury some idea that there is an alternative

5    defense other than the one and only defense which has been

6    raised by defendant, that she was terminated for job

7    abandonment.

8         They raise some issue that this could be a common,

9    scheme or plan, but in reality, I think they basically

10   admit in their response that they are attempting to use

11   this to show that she is litigious, which, of course, is

12   impermissible.  So I think both because it is completely

13   irrelevant, because it raises a new defense which has

14   never been raised before, and because it's basically an

15   attempt to demonstrate that the client is litigious, any

16   admission of the evidence would be highly prejudicial.

17              **THE COURT:**  Okay.  Thanks, Mr. Graham.

18         Mr. Miglio?

19              **MR. MIGLIO:**  Well, there's a couple of

20   things.

21         First of all, her employment history with Jeffrey

22   Automotive is part of the after acquired evidence and what

23   took place at Jeffrey, and what she told everybody what

24   took place at Jeffrey is part of our resume fraud, but

25   secondly, she filed a lawsuit -- and I'm not suggesting

     *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    that we are going to introduce the motion to withdraw and

2    all of that -- filed a lawsuit in 2009, two years before

3    she started working at Henry Ford Health System.  It was

4    an employment case claiming that she was terminated in

5    violation of public policy and whatever, and lo and

6    behold, what is she asking for and claiming?  That she

7    suffered mental and emotional distress as a result of her

8    termination, and that she is entitled to be compensated

9    for that.

10        One more issue about this plaintiff's mental and

11   emotional distress is that she sought -- that she sued

12   another employer claiming that a termination, another

13   element of her mental and emotional distress caused her

14   the same kind of damages she's seeking in this case two

15   years before she came working there.

16        So our position is that the lawsuit is relevant

17   because it's another incident where she is claiming that

18   she's suffering a traumatic loss.  It goes to what the

19   jury is going to hear about her here, and that it is

20   relevant to show that this is a contributing factor, or a

21   factor in her background about which she sought medical

22   treatment and for which she sought to be compensated.

23        The circumstances about why she left or under what

24   circumstances she left is also part of the after acquired

25   evidence because she lied about that on the resume, but

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    the fact that she filed a lawsuit -- and we've cited cases

2    to the Court -- shows that she was seeking -- that she

3    herself admitted through her counsel that she suffered an

4    event for which she suffered mental and emotional distress

5    damages in 2009, two years before she started working for

6    us.

7          So it is relevant.  We don't plan on making an

8    argument that she's litigious to the jury because of two

9    lawsuits made to some people would be litigious.  I mean,

10   one lawsuit may be litigious, but we don't plan on making

11   an argument that she's litigious.  That would not be

12   really relevant.  We aim to show it on a previous occasion

13   she claimed mental and emotional distress two years before

14   she started working.

15          **MR. GRAHAM:**  Defense counsel is basically

16   arguing that it's not that we're arguing that she's

17   litigious.  It's just a common scheme or plan, but you

18   look at the cases that they actually cite in their brief,

19   and you see what is it that is a common scheme or plan?

20   Well, a common scheme or plan is situations where you file

21   a lawsuit, and in that you doctor evidence, and then in

22   order to get money from your employer, and then in another

23   lawsuit, you doctor evidence to strengthen your case, and

24   this is evidence that you falsified records, and that this

25   is a habit, and that this shows that there is a common

        *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    scheme or plan.  That's the case they cite in their brief.

2          Here, there's no allegations that Natalie has

3    engaged in any type of conduct which would demonstrate

4    some form of common scheme or plan.  All they're saying is

5    well the mere fact that she has alleged a mental anguish

6    and emotional harm is part of a common scheme or plan.

7    Well almost every lawsuit, unless it is a simple breach of

8    contract case that involves employment law, is going to

9    have usually some form of mental anguish and emotional

10   suffering.

11         So I don't see how the fact that she has two

12   lawsuits, both of which allege mental anguish and

13   emotional harm somehow demonstrates common scheme or plan.

14   It would not be a common scheme or plan if she filed the

15   lawsuit, and she was only looking for back pay, but the

16   fact that she's added these additional damages that she

17   would like somehow demonstrates common scheme or plan,

18   that does not make any sense.

19         So it would be our position that obviously this is

20   just a way to get around saying that we're trying to

21   demonstrate she litigious by saying well, it's not

22   litigious.  It's a common scheme or plan, and again, it is

23   highly prejudicial because it's going to demonstrate to

24   the jury that she's the type of person that might bring

25   lawsuits, and really we're talking about two lawsuits in

         *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    her life.  Even if it was to prove she was litigious, I

2    don't think it would prove that.  So I think it is

3    completely inappropriate.

4            **THE COURT:**  Okay.  Well, I think the prior

5    work history again is a significant subject of the case,

6    and I tend to agree first, that it is not -- this

7    experience at Jeffrey Automotive does not constitute

8    404(b) evidence as argued by the defense.  However, the

9    resume fraud after acquired evidence issue is an

10   appropriate subject for development with testimony, and

11   the fact that she claimed emotional distress in her --

12   arising out of the termination, the fact that she was

13   terminated is involuntarily is obviously admissible.  The

14   fact that she claim to have experienced emotional distress

15   and required treatment is admissible, again, because the

16   jury is going to be expected to award damages if they find

17   liability in this case for the termination, and the impact

18   that this termination had on her, and separate that out,

19   if possible, from the emotional distress and the treatment

20   that she was receiving, including the meds that she was

21   taking in relation to the termination from Jeffrey which

22   occurred shortly before.

23           So in general, I'm going to grant in part and deny

24   in part the motion.  The part of the motion that is

25   granted is that -- is the testimony about -- the potential

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1     testimony about why she was terminated, and the

2     circumstances of the termination, and the Court would

3     entertain and give a curvative instruction.  The testimony

4     includes that she filed a lawsuit asserting emotional

5     damages arising out of that termination.  The import of

6     the curvative instruction would be that they may not

7     conclude from that testimony that she is a litigious

8     person or -- and they have to separately consider in this

9     case the reasons for the termination.

10          So if they don't hear any testimony about the

11     reasons for termination, and they -- unless, of course,

12     the plaintiff herself wants to offer that testimony in

13     which case it opens it up, the -- and the curvative

14     instruction is this isn't to offered to demonstrate any

15     propensity on her part to engage in litigation, then that

16     should cure the harm -- the potential harm of the jury

17     concluding that she is litigious.

18          Okay.  So next is the bankruptcy.

19          MR. GRAHAM:  So we had originally submitted a

20     motion in limine because it was our understanding that

21     opposing counsel was interested potentially in using

22     plaintiff's 2011 bankruptcy to demonstrate some type of

23     motive or litigation, because that is often how

24     introducing testimony related to having a bankruptcy is

25     attempted to be used, and in response, opposing counsel

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    states that, in fact, this is not at all the intent, that
2    has nothing to do with motive for the lawsuit, which is
3    great, because from our perspective that is conceding the
4    point that it's improper to use bankruptcy evidence as
5    evidence of motive to file a lawsuit.  But instead they
6    say, we do intend to use it, but we intend to use it to
7    demonstrate that it is an alternative source of emotional
8    harm, and there is no real evidence that the bankruptcy
9    has caused Ms. Reeser emotional harm.
10           Nowhere in her deposition does she say that she
11   was harmed by her bankruptcy, and even the deposition that
12   we recently took, opposing counsel asked her treating
13   counselor, well has she ever mentioned problems with money
14   as a basis of having some type of emotional difficulty,
15   and the treating counselor said no, she hasn't.  So
16   there's no relevant evidence to demonstrate that
17   bankruptcy would be something which has caused her
18   emotional harm.
19           In the brief we cited the case of EEOC versus New
20   Breed Logistics where -- in the reply actually -- that
21   case where a defendant was attempting to use bankruptcy as
22   proof of an alternative source of emotional harm, and
23   court said it is completely irrelevant.
24           I think it is the same here because there's
25   nothing which is established that her bankruptcy would be

           *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1     relevant to emotional harm, and at the same time there is

2     significant danger that even if they don't introduce it as

3     motive, the jury could take it as motive, and so I think

4     it should be properly excluded.

5               **THE COURT:**  Thanks, Mr. Graham.

6               **MR. MIGLIO:**  Two reasons:  First of all, this

7     is a bankruptcy that was filed in 2011.  She was

8     discharged in 2011.  It is a possible and probable issue

9     for financial stress that she went through bankruptcy at a

10    time when she was working at Henry Ford Health System.

11    There's going to be no argument among anybody that having

12    to go through bankruptcy because you're financially

13    distraught is a source of stress.

14              She is going to argue as we've seen that she, as a

15    result of losing your job, she suffered some financial

16    distraught and distress, and the bankruptcy shows that

17    this was already in place long before that, that this was

18    a circumstance that was completely unrelated to Henry Ford

19    Health System, with the exception, of course, that one of

20    the biggest debts that she had in bankruptcy was Henry

21    Ford Health System for all of the medical care she got for

22    which she didn't pay for.

23              But the issue with respect to the bankruptcy is

24    that this occurred close in time.  She's got testimony now

25    that she moved because she couldn't afford her house that

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    she was living in, that she had to go up north to pursue a

2    less paying job.  So in the overall scheme of things, the

3    fact that her financial condition was such as it was, is

4    completely relevant to the claim that all of this

5    financial loss that she allegedly suffered as a result of

6    terminated, and that she suffered mental and emotional

7    distress is all relevant to what the jury is going to be

8    asked to reward her in the way of financial compensation

9    for losing --

10              THE COURT:  Is this Chapter 17 or 7?

11              MR. MIGLIO:  It was one where -- I'm not a

12   bankruptcy lawyer -- you get discharged right at the end,

13   no payments.  You're just released.  I think that's

14   Chapter 13.  I'm not sure.  Do we know?  I can find out.

15              THE COURT:  When did the discharge occur?

16              MR. MIGLIO:  2011.

17              THE COURT:  She filed in August of 11, and it

18   was completed before the end of the year?

19              MR. MIGLIO:  Yes, I believe so, your Honor.

20              THE COURT:  Okay.  Do you know Mr. Graham

21   whether it was 13 or 7?

22              MR. GRAHAM:  I do not, your Honor.

23              THE COURT:  It sounds like it had to be a 7,

24   but -- well, I think the fact of her bankruptcy proceeding

25   is -- maybe relevant by her testimony, I generally

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

 1    think --

 2                    MR. GRAHAM:  Could I address that, your

 3    Honor, just briefly?

 4                    THE COURT:  Yes.

 5                    MR. GRAHAM:  The testimony that opposing

 6    counsel mentions where she has to go up north because

 7    she's run out of money is an event that occurred after

 8    termination from Henry Ford.  She had no money because she

 9    was fired.  She had attempted to continue to live in the

10    southeastern Michigan area.

11                    THE COURT:  She broke up with the boyfriend

12    or something, lost his income.

13                    MR. GRAHAM:  Correct.  There were two of them

14    living in the same apartment each paying rent.  She was

15    fired.  She lost her income.  They split up.  There was no

16    way to pay the rent.  So she attempted to find cheaper

17    housing and assistance from family.

18            To say that we should be able to use her financial

19    stressor as a result of the bankruptcy, because she says

20    in her testimony that she experienced financial difficulty

21    because she had to move up north, makes no sense, because

22    the bankruptcy occurred in 2011.  She was discharged in

23    2011, and she fired in 2013 -- or 2014.

24                    THE COURT:  Okay.  I was in the process of

25    announcing a ruling that there might be some circumstances

        *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    where this would become relevant, but on its face it

2    appears to be irrelevant.  The Court will generally grant

3    the motion to the extent that I will not permit any

4    questions designed to elicit that testimony, absent some

5    approval in advance.

6            So I would expect counsel to approach to indicate

7    now have this answer, this is why I should be able to put

8    it in before it goes in, okay?

9            **MR. GRAHAM:**  Thank you.

10           **THE COURT:**  Let's take a five minute break.

11

12                   (Recess taken.)

13

14                   (Proceedings resumed.)

15

16           **THE COURT:**  Mr. Graham, you have one more?

17           **MR. GRAHAM:**  So the last issue that we're

18   dealing with is whether or not defendant can present

19   evidence that Ms. Reeser had engaged in some form of a

20   HIPAA violation, and here I think it's helpful to give

21   some background as to where these documents came from and

22   where they went.

23           Ms. Reeser was emailed documents in the ordinary

24   course of her business as an employee at Henry Ford, and

25   when she began having issues with Fiona Bork, as you might

     *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    recall from the motion for summary judgment and various

2    other motions in this suit, she contacted Jill Hood who

3    was the H.R. representative, and Natalie did not work at

4    central hospital where Ms. Hood worked.  She worked at the

5    Clinton Township office.  So in order to see Ms. Hood, she

6    had to drive to Ms. Hood.

7         She took with her some of the documents which had

8    been provided in the ordinary course of business to

9    provide to Ms. Hood as part --

10             THE COURT:  Some of the documents or some of

11   the files?

12             MR. GRAHAM:  Well, most of them I believe are

13   emails, and what it dealt with was the dispute between

14   Fiona Bork and Natalie, in terms of Natalie's belief that

15   Fiona Bork was targeting her, and she wanted to provide

16   this evidence to Ms. Hood.  She walked into Ms. Hood's

17   office with the documents, and handed them to Ms. Hood and

18   said, here are the things that support my claim, and Ms.

19   Hood said, I don't want the documents, and so Natalie took

20   the documents back, placed them in her car and drove back

21   to Clinton Township.  The documents remained in her

22   vehicle until she was suspended a short while later.

23         After she was suspended, she still had the

24   documents in her possession because they were in the

25   vehicle, and she provided them to our office.  We received

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    the discovery request for any documents related to Ms.

2    Reeser's time at Henry Ford, and we provided the documents

3    in discovery.

4        The issue here is whether or not this is a HIPAA

5    violation which could be used as after acquired evidence

6    that she should be terminated, and first thing that I will

7    say is I think we laid out in the brief how courts have

8    looked at this issue, and basically the idea being that if

9    you come across documents in the ordinary course of

10   business, you don't go searching for them, and here

11   defendant's manager emailed the documents to her, and then

12   you only disclose it to your attorney, and your attorney

13   discloses it in discovery.  Well, that's not really an

14   issue, and that's exactly what happened here, and that's

15   what Kempcke, Womack and Quinlan discuss.

16       It has not been disclosed to -- we have not

17   disclosed it to anyone other than defendants.  She has not

18   disclosed it to the general public.  This is just

19   documents that she had to transmit to Hood.  She got fired

20   or suspended.  She transmitted those documents to us and

21   we provided them as requested.

22       Two things are important.  I think we've cited

23   some cases which provide guidance on how this issue should

24   be decided, and the defendant doesn't really cite any case

25   law for the proposition that that is the incorrect way to

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    analyze this issue.

2          The only thing that they argue is that they

3    did not-- she did not come across these documents

4    innocently.  That is what is stated in the response, but

5    there's no evidence that she didn't come across the

6    documents or in the ordinary course of business.  They

7    were all emailed to her by her supervisors.

8          Another important issue is the argument of well,

9    okay.  Even if this was some type of violation --

10          **THE COURT:**  Why would they email to her in

11    the first place?

12          **MR. GRAHAM:**  As part of her job.  So for

13    instance, there was a patient who has, I guess, been

14    badgering her, and so she contacted Fiona Bork and said

15    this patient has been badgering me, and Fiona Bork wrote

16    back and said, thanks for letting me know, but didn't

17    identify the patent's name.  That's one instance.

18          **THE COURT:**  You said badgering?

19          **MR. GRAHAM:**  Well, I don't know if it was

20    badgering.  It was some type of creepy behavior.

21          There was another one where a patient had said

22    that Natalie had done a good job, and wanted to

23    communicate this, and send it to Fiona Bork, and Fiona

24    Bork gave to it Natalie.

25          So the documents -- some of the documents I

        *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    believe relate to Natalie's taking of blood and working

2    with different patients, either having problems or not

3    having problems or compliments related to the taking of

4    blood.

5           Natalie didn't -- it's not like Natalie published

6    these documents or used these documents in a malicious way

7    to blackmail the patients.  She had the documents because

8    they were sent to her.  She tried to give them to a Henry

9    Ford manager who rejected them, and then she was fired,

10   and she turned them over to her attorneys, who turned them

11   over in a discovery request.

12          If you look at the policy -- and both defense

13   counsel and us cite to the Systemwide Corrective Action

14   Program, H.R. Policy Number 5.17, and if you look there,

15   they have three different categories of what happens when

16   you disclose patient information, and one of them is if

17   you disclose the information with knowledge and approval,

18   one is if you disclose the information without knowledge

19   and approval, and one is if you maliciously use and

20   disclose the information.

21          If you do it with knowledge and approval, the

22   discipline is suppose to be written warning, policy

23   reeducation.

24          If you do it without knowledge or approval, you

25   should receive written warning with suspension, policy

     *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    reeducation.

2          If it's malicious use, then it could be

3    termination, but here malicious use is that you're

4    disclosing the information in a malicious and harmful

5    manner, or you're doing it to somehow gain a benefit.

6          Here the only use that she has used it for is to

7    disclose the information related to her dispute with Fiona

8    Bork.  This is not a malicious disclosure of patient

9    information, and certainly she didn't benefit.  So at the

10   most this would be a group two disclosure without

11   knowledge or approval, which would require a written

12   warning or suspension or policy reeducation.

13          And so the argument is one, this is not an issue

14   that should be allowed in under HIPAA through the analysis

15   that we provided, and which no cases have been cited

16   contesting that, and simply the argument comes down to was

17   it an innocent acquisition, and we're arguing well, how is

18   it not an innocent acquisition if she didn't -- if she

19   received emails from her managers, but even saying that's

20   not true.  Say this was some type of violation, well,

21   okay.  We have a guide.  We've both cited to it.

22          It is obvious that if anything, this is a

23   disclosure without knowledge and approval which gives you

24   a written warning with suspension or policy reeducation.

25   It does not lead to termination.

     *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1          And so obviously any implication not only is this

2     something which could be used to justify a termination, I

3     think one, it paints her in a bad light as a professional

4     as someone who is willy-nilly giving out patient

5     information, and two, it is an alternative reason argued

6     for termination that does not fly or does not mesh with

7     the Systemwide Corrective Action Program, and for those

8     reasons we think it should be excluded.

9          **THE COURT:**  All right.  Thanks, Mr. Graham.

10          **MR. MIGLIO:**  Well once again, we've attached

11    a copy of the corrective action policy which provides for

12    termination in the event an employee takes medical

13    information, whether it's in hard copy form or discloses

14    medical information, and whether or not it's for the

15    employee's benefit or whether it's removed from the

16    premises, I mean, those are terminable offenses under

17    Henry Ford Health System policy, and we will have

18    testimony that says that what the plaintiff did in this

19    instance was a terminable offense.

20          Now, you know, he's just arguing the merits of a

21    claim that she should not be discharged, but the bottom

22    line is when we got these records that were not redacted,

23    that had patients' names on them that were produced in

24    discovery, it really doesn't matter what she did.

25          Obviously she was in a remote site.  So the

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    patient information is transmitted over their secured

2    computer system.  She had access of that in the course of

3    her employment, drawing blood from patients.  Whether she

4    should have taken to human resources and whether she did

5    is another issue, but taking them from Henry Ford Health

6    System, showing them to her attorneys with patient

7    information on them, I mean -- or disclosing them, all of

8    that is strictly prohibited, and grounds for termination.

9         Henry Ford Health System, like all health care

10   institutions, have an absolute duty to protect patient

11   confidentiality, and producing them in a lawsuit or

12   showing them to a lawyer, doesn't get you by that.

13        She should have never had these records.  She

14   should have never kept them.  When she met with Jill Hood,

15   it was on January 20th, she had them in her car for

16   several weeks because she not suspended until a month

17   later.  So there's no excuse, and again, this goes to

18   another element of the health system's after acquired

19   evidence.  The policy is specific.  We'll have testimony

20   that people are terminated for these kind of violations.

21             THE COURT:  So why isn't it just a question

22   of fact, Mr. Graham?  Whether this particular -- I'm

23   gathering if there's testimony from other administrators

24   within the hospital that it is terminable conduct,

25   wouldn't that be left to the jury make the choice?

     *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1          **MR. GRAHAM:**  I don't believe so.  Again, the

2     only cases that we have discussed are the cases that we've

3     presented, and the cases that we've presented state that

4     if you acquire these documents innocently or in the

5     ordinary course of your business, and you disclose them

6     only to your attorney, this is protected activity, that

7     this is not illegal activity.  As a matter of law, she is

8     not engaging in conduct which would be a HIPAA violation.

9          **THE COURT:**  What about the conduct of keeping

10    these documents in her car for weeks before they were

11    delivered to you?

12         **MR. GRAHAM:**  Well, you know, what I can say

13    to that is throughout this time, Natalie was dealing with

14    retaliation from Fiona Bork, and she was in regular

15    correspondence with Jill Hood in terms of attempting to

16    resolve the matter, get paid the lunches that she was

17    owed, and was promised to be paid and was never paid until

18    after she was fired.

19         Her only resource in dealing with this issue was

20    Jill Hood.  Even after speaking with Jill Hood the first

21    time in January, she continued to try to speak with Jill

22    Hood.  She continued to try to transmit information and

23    meet with Jill Hood.

24         So the fact that the documents remained in her

25    car, I think, if anything, could be seen as she wants to

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1   continue to present this information as evidence that

2   Fiona Bork is retaliating against her, and the only way to

3   present that information is to go back to Jill Hood and

4   attempt to present the information.

5           In terms of whether or not she should have left

6   them in the car, again, I don't know whether or not it

7   should have been left in the car, but what I can tell you

8   is that the only transmittal of the documents was from her

9   employers to her, from her attempted to deliver to Jill

10   Hood, Jill Hood did not accept them, went back to Clinton

11   Township as she continued to try to contact Jill Hood and

12   she was fired, and they were sent to her attorneys, which

13   were turned over in disclosure.

14           In that chain of events, there was no time when

15   there is an improper disclosure, and so regardless of what

16   the employer's position would be, it would not be a HIPAA

17   violation.

18           So I think maybe there's some type of an issue if

19   that wasn't the law, and the law was this could be a HIPAA

20   violation, and then we would get into an issue of what

21   does the policy say?  Well, the policy clearly states that

22   you don't fire someone for something like this.  Could you

23   have an employer come in and argue that this is now not

24   the case?  Well, that would be contrary to all of the

25   established policies.

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1      So I think one, even without getting to the policy

2    as a matter of law, this is not a violation, and it is

3    highly prejudicial.  It is something, which if introduced,

4    you're basically saying this is an individual who does not

5    care about her patients.  This is an individual who could

6    have been terminated at anytime, and I think it

7    establishes a bit of an issue, because the cases that are

8    available now that have ruled on this issue have said, you

9    can give this to your attorney, and as long as you give it

10    to the attorney, and it's turned back over to the party

11    that you took it from in discovery, this is not a

12    violation.

13      If you were to rule in the opposite direction,

14    basically it would be saying is well, that's not quite

15    true even in situations where you only provide the

16    information to your attorney, that could constitute a

17    violation, and I think that is a dangerous precedent,

18    because then you can't have the same type of

19    attorney-client relationship where you could disclose

20    documents without fear of some type of after acquired

21    evidence argument preventing you from recovering full

22    damages that you would need in your case.  That's an

23    important relationship, and I think the Court should

24    recognize that.

25              **THE COURT:**  Okay.  Thank you.

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1           Well, much of the discussion here assumes --

2     assumes testimony describing the conduct as perhaps

3     without the consent of the patient, but without malice.

4     Malice is I'm assuming going to be the subject of the

5     testimony.  I have a proffer, if you will, from defense

6     counsel that the witnesses from Henry Ford are going to

7     claim that it is terminable conduct.  Obviously, the

8     plaintiff takes a different view of it, and one really

9     can't conclude from what's been presented here so far that

10    it is -- that it is one or the other.  That's what the

11    jury is here for.

12          If it turns out that the Court finds the testimony

13    from the defense insufficient to allow a reasonable fact

14    finder to conclude that this was terminable conduct, then

15    I can entertain a motion to that effect and make that

16    ruling before it goes to the jury, but the Court finds at

17    this juncture the motion is premature, and should be

18    denied.

19          Okay.  So we have defendant's motions.

20          **MR. MIGLIO:**  Your Honor, we have three

21    motions, and I know we heard a lot about medical and

22    psychological conditions, so I will brief.

23          We don't object to the plaintiff testifying about

24    how she felt when she was terminated.  We don't dispute

25    the law that says that she doesn't need expert testimony

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1   or treating testimony in order to establish a claim for

2   mental and emotional distress.

3       What we do dispute is her ability to testify about

4   a diagnoses that she has depression or that she has

5   schizophrenia or has anxiety.  We dispute that because

6   that's a diagnoses that left for a treating psychologist

7   or expert.

8       We dispute that her ability to testify that any

9   diagnoses is what she is related to her termination

10   because that is also subject of expert testimony.

11       We also dispute that she can testify that she's

12   prescribed certain medication to take care or treat

13   certain conditions because in the absence of showing that

14   those conditions were caused by Henry Ford Health System,

15   it is irrelevant that the doctors are prescribing

16   something for it.

17       We also dispute her ability to repeat what doctors

18   have told her diagnoses, how long it is, how long it

19   should be, and anything else that came out of the doctor's

20   mouth, including that she was getting increased medication

21   as a result of what the doctor saw and what the doctor

22   felt needed.

23       But we don't dispute -- and I think reading

24   opposing counsel's brief -- we don't dispute that she

25   can't tell the jury that she was upset, that she was

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    embarrassed, humiliated and all of that other stuff.  She

2    just can't talk about what the doctors told her or make

3    diagnoses or talk about the severity, extent or cause of

4    any sort of mental or psychological condition.

5                **THE COURT:**  Mr. Graham?

6                **MR. GRAHAM:**  So first thing that I would say

7    is if the Court is inclined to rule in favor of the

8    defendant, it would really be proper to reserve judgment,

9    because as we've discussed, there is a deposition that was

10   conducted by a treating medical provider in which she

11   clearly states that anxiety and depression are caused by

12   plaintiff's termination from Henry Ford.

13          So excluding all evidence when there's going to be

14   a motion very shortly seeking to introduce this, I think

15   it makes sense to reserve judgment, but I think the motion

16   simply be denied because as we cited in the numerous,

17   numerous cases that we have provided, especially Leonard

18   versus Compton, it states that expert medical testimony is

19   not essential to forge the causal connection between a

20   traumatic event and the alleged serious emotional

21   distress.

22          So causation is not really an issue, and in many

23   of the other cases that we cite also discusses situations

24   in which plaintiffs are allowed to testify about the

25   medication they are taking, and why are they taking that

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    medication.  They are able to testify that they've

2    experienced anxiety, stress and depression.  They are able

3    to state that they have sought help from physician.

4          Those cases where defendant kind of talks about

5    not being able to establish causation, you're really

6    dealing with a situation -- I think there was one case

7    where the plaintiff was arguing that somehow their bones

8    had grown or become more soft as a side effect of a

9    medication.  Certainly in that type of situation, I think

10    you're dealing with a fairly complex medical situation

11    where maybe it's not appropriate to allow someone to talk

12    about their anxiety or depression.

13          But witnesses are allowed to testify to the same

14    understanding that a lay juror could, and I think anxiety

15    and depression are things that people understand, that

16    they understand when they are depressed, they understand

17    when they are anxious.  They certainly can go to a doctor,

18    and I don't think there is any problem with her saying, I

19    went to a doctor.  I was prescribed medication.  I started

20    taking Zanax.

21          And it seems to be on the one hand the defendant

22    is saying, well, we're not trying to prevent her from

23    talking about her conditions except as to the extent,

24    causation, the depth, but that's basically everything.

25    It's basically everything that relates to her condition,

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1   and the cases that we've presented have said, she can talk

2   about causation.  She can talk about medication, and she

3   can be awarded damages simply based on her own testimony

4   to that effect.

5          More importantly, I think -- well, perhaps just as

6   importantly, if you were inclined to grant their motion,

7   obviously we have a deposition from a treating provider

8   that may be admitted, and it directly states that her

9   emotional harm is related to her termination from Henry

10  Ford, and that she is taking medication as a result of

11  that, I would ask that the Court reserve judgment.

12          **THE COURT:**  All right.  Thank you.

13          **MR. MIGLIO:**  Your Honor, I'm very, very

14  troubled by the suggestion that this testimony, this

15  deposition or this counselor's testimony would come in.

16          We were at final pretrial conference before the

17  Court on January 19th.  At that time opposing counsel

18  said -- disclosed for the first time that their client had

19  been seen by a therapist.  You said to them, you have two

20  weeks to file a motion to bring this witness in or to use

21  this witness, and you should also supplement the

22  discovery.  There has not been any activity to raise an

23  issue that they would be able to use a deposition, that

24  they would be able to call a witness this late in the

25  game, and the suggestion in the next week or so, he's

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    going to move to bring in her deposition or have her

2    testify is --

3                    **THE COURT:**  Okay.  Thanks.

4                    **MR. MIGLIO:**  Okay.

5                    **THE COURT:**  That's not going to happen.  It's

6    obviously way too late to be adding an expert witness who

7    has not written a report, who hasn't -- it just not going

8    to happen.

9            So as it relates to this motion, the Court is

10   going to permit her to talk about her medicines, what she

11   received.  The Court will permit her to describe her own

12   distress, and what motivated her to go to the doctor and

13   why the distress that she's experienced is attributable to

14   her termination.  Those are all obviously appropriate

15   areas of examination to be permitted.

16           The statements made by the doctor, generally not

17   going to be admissible as hearsay, and will -- so to the

18   extent that the plaintiff would be seeking to talk about

19   what the doctor told her is generally going to be

20   excluded.

21           It is a little difficult -- this is another one of

22   those motions that is going to depend in part on how the

23   evidence is going at the time that question is asked,

24   which might elicit a doctor's statement, but as a general

25   proposition, those would not admissible.

          *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    So again, the Court will deny the motion as -- by

2    the issuance of a hard and fast prohibition, but hopefully

3    you understand the scope of what is and what isn't from

4    what I indicated.

5    MR. MIGLIO:  Are you granting in part and

6    denying in part?

7    THE COURT:  Yes, I guess I'm granting part

8    and denying part.

9    MR. MIGLIO:  So she can talk about her

10   feelings, and I think you said --

11   THE COURT:  Why she sought treatment, what

12   she -- what motivated her to seek treatment, and what meds

13   she was prescribed.

14   MR. MIGLIO:  But -- I don't want to reargue

15   the issue -- but by saying what meds she was prescribed,

16   unless there's testimony that says she was prescribed

17   these meds for symptoms she was experiencing, which there

18   wouldn't be, that's the hearsay aspect of -- and allowing

19   the jury to imply from that that she's receiving

20   medication as a result of these circumstances, these

21   conditions which we don't have testimony about.

22   THE COURT:  Well, she said I went to the

23   doctor because I was waking up in the middle of the night

24   trembling with anxiety about my termination, and my -- so

25   I went to the doctor.  So far there's nothing wrong.

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1          **MR. MIGLIO:**  Right.

2          **THE COURT:**  And she says, as a result of my

3     appointment with the doctor so and so, I received a

4     prescription for Zanax, and I took it, and it helped a

5     little bit, but not enough to make a big difference.

6     Nothing wrong.

7          **MR. MIGLIO:**  Why wouldn't that be hearsay,

8     the fact that the doctor prescribed that medication for

9     her condition?

10         **THE COURT:**  Well, because she's going --

11    you're suggesting that she can't say I got Zanax and took

12    Zanax?

13         **MR. MIGLIO:**  Well, if she's saying the doctor

14    prescribed Zanax, that's hearsay, and that suggests to the

15    jury the doctor did it for a reason, and that the

16    medication -- the reason it was prescribed is as a result

17    of causation.  Doctor saw this and prescribed it.

18         She says, I'm depressed.  I went because I was

19    depressed.  Boom.  The doctor prescribed Zanax for my

20    depression, suggesting that it needed to be treated.  It's

21    all hearsay.  It brings in the doctor's verification of

22    what she said.

23         If you said you were on psychotropic medication,

24    unless it has something to do with what the case was, the

25    jury would not care.  We don't have a doctor to cross

          *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    examine as to why he prescribed it.  He could have

2    prescribed Zanax for some other--

3              **THE COURT:**  Presumably you have medical

4    records if they contradict what she says?

5              **MR. MIGLIO:**  Well, we have medical records

6    that contradicts the dosage that she claims she got.  We

7    don't have a doctor on the stand to say, isn't it true you

8    prescribed it because she was telling you of whatever

9    reasons she needed the medication.  That's the point.

10             **THE COURT:**  Well, I still don't -- I don't

11   know why she would be barred from testifying about what

12   medication she is taking for the anxiety that she

13   suffered.

14             **MR. MIGLIO:**  Because that would only be

15   relevant if it was for a condition that she was claiming

16   my client should compensate her, and without that

17   connection, it should not be relevant, and it goes to show

18   that a doctor looked at me and said, yeah, I am really in

19   need of medication, and that this medication is for what

20   I'm claiming to the jury I went to see the doctor for.

21             You're allowing her to substitute the

22   prescription, which I believe would be a hearsay

23   statement, or the fact that the doctor is going to get on

24   the stand -- which there is no possibility of that -- and

25   say, I saw her yes.  She was upset, and yes, I prescribed

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1   medication for it.

2          THE COURT:  I don't think furnishing a

3   prescription -- she can attribute what she -- she can

4   certainly talk about what she told the doctor for purposes

5   of obtaining medical intervention, and she can testify

6   what the treatment, which would include medications that

7   were prescribed, and the jury is free to accept that

8   testimony or not.  They can -- they can choose to reject

9   it because they think she's -- she's describing symptoms

10  she really didn't have, but I don't see them making any

11  conclusions about the -- about what the doctor's view of

12  that treatment session or treatment session was with the

13  plaintiff, especially after all of the evidence that you

14  intend to put in about her.

15         MR. MIGLIO:  I'm only saying if she gets on

16  the stand and says she's very upset, really distraught,

17  felt I was depressed and anxious, and I went to the doctor

18  and told the doctor that, and the doctor gave me

19  150 milligrams of Paxil to treat my depression, and who

20  takes 150 milligrams of Paxil unless you're really

21  depressed?  So the fact that the doctor wrote the

22  prescription, prescribed it for that, that's all hearsay

23  in my mind.

24         THE COURT:  Okay.  I'm not persuaded.

25         MR. MIGLIO:  Okay.


    *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1          **THE COURT:**  I mean, I think the -- especially

2     for jurors in this day and time, I don't think they take

3     anything away from the -- they certainly don't have --

4     don't reach any conclusions about the doctors diagnosis or

5     his -- the fact that he gets a prescription.  Everybody

6     goes in and asks for prescriptions, and she might have

7     very well asked him for the prescriptions because she saw

8     it on television the night before.

9          **MR. MIGLIO:**  I have a pretty good bet that's

10    not what the testimony will be.

11         **THE COURT:**  I'm sure not.

12         **MR. MIGLIO:**  Well, I kind of thought we

13    resolved this issue at the joint final pretrial that she

14    would not be able to substitute her testimony of that

15    treating physician, and this is allows her to do that.

16         **THE COURT:**  Well, to the slightest degree I

17    would say.  Okay.

18         **MR. MIGLIO:**  All right.  So next motion is

19    the issue of punitive damages, and I think that the Snapp

20    decision by the 11th Circuit is -- I mean, if the Court

21    has read the two decisions Snapp and Travis, Travis is

22    like a paragraph that says, based on the language of

23    216(b), it's for the Court to determine what are legal and

24    equitable relief.

25         The Snapp decision which has been followed by a

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    number of district courts, follows the statutory

2    construction that says, you know, in 1977 when Congress

3    amended the statute to provide for anti-retaliation

4    remedies, Congress knew full well and amended other

5    statutes to include punitive damages.  They didn't do so

6    in this instance.

7           If you look at the statutory scheme, it's all

8    compensatory with the exception of where an employer's

9    activity is willful and then there is some punitive

10   measures available, this follows the interpretation of

11   Section 626 of the ADA, where the courts have concluded

12   the same thing, that there is no punitive damages

13   available under the ADA, which borrows the same language.

14          And so the argument is that this claim for

15   punitive damage is not allowable under that Fair Labor

16   Standards Act, and again, counsel takes some great

17   liberties suggesting that the Eastern District court cases

18   allow it.

19          Well, in one case they looked at it and there was

20   a split of authority, and so for now we're going to let

21   it, and Judge Levy in a case was evaluating the

22   enforceability of an arbitration agreement which excluded

23   punitive damages, and found that was a knowing and

24   voluntary waiver, and that punitive damages were not part

25   of the arbitration case.

        *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1          There's nothing in 6th Circuit law that suggests

2     it.  In fact, the 6th Circuit cases that we cited on other

3     areas of statutory construction would support the 11th

4     Circuit's ruling that punitive damages in a Fair Labor

5     Standards Act retaliation case are simply not available

6     and should not be available in the absence of Congress

7     enumerating such relief in the statute.

8               **THE COURT:**  Okay.  Thanks.

9               **MR. GRAHAM:**  I think first I would say, I

10    don't think that I have taken liberties.  I think this is

11    exciting.  I think this is something new which we're

12    arguing over right now, but I think it's fair to say that

13    other district court judges in the Eastern District of

14    Michigan have at least discussed this issue before, and

15    that those judges had indicated that it's a situation

16    where broader remedies maybe available for violation of --

17    I mean, the exact language, broader remedies are only

18    available for violations of FLSA's anti-retaliation

19    provision.

20          So I think there's at least if not ruling on it,

21    an inclination to entertain that.  That is something which

22    a party could ask for.

23          I think if you look just at -- well, starting with

24    public policy, it doesn't really make sense to prohibit

25    the punitive damages.  You look at the FLSA, and you see,

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1   you know, it is not just compensatory.  Whenever you talk

2   about retaliation provision in the law, whether or not it

3   is a whistleblower law or reporting discrimination,

4   punitive damages are something which are readily

5   available.  They are available because there needs to be

6   some indication to the employer, not just that they

7   violated nonpayment of lunches or not correct payment of

8   wages, but because they did something wrong.  They did

9   something wrong, which was retaliating against someone for

10  raising their legal rights, and in those situations we

11  generally recognize that punitive damages are appropriate

12  to deter this type of conduct in the future.

13          I think especially Southerland kind of gets to

14  that point.  Looking at the statute itself, the statute

15  says that plaintiffs are entitled to equitable and legal

16  relief, and as Travis states that this amendment really

17  kind of demonstrates that plaintiffs are able to request

18  damages without limitation.  It doesn't make sense to have

19  the amendment if there wasn't a change in the FLSA at that

20  time.

21          Sines I think -- one of the cases that we cited --

22  goes into pretty good depth about why other

23  interpretations limiting damages are incorrect, and that

24  they are really failing to look at any Congressional

25  intent that would restrict damages in any way.

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1        Franklin is another case that we discuss, where

2    it's noted that there is a general -- when there is a

3    general right to sue, you are entitled to just about any

4    remedy which is available, and this is a situation where

5    there is a general right to sue.

6        We understand that circuits have disagreed, but I

7    think the stronger analysis is the analysis which allows

8    the punitive damages, and although you might be the first

9    judge that would suggest that this is the case in the 6th

10   Circuit, the other district court judges which have

11   approached this issue, not only in the 6th Circuit, but

12   specifically in the Eastern District of Michigan, have

13   seem to indicate that the proper approach is to follow the

14   guidance of the courts that have found that punitive

15   damages are available.

16           **THE COURT:**  Okay.  Thanks.

17       The Court is going deny this motion.  I recognize

18   that there is a split of authority.  The 7th Circuit says

19   that the punitive damages are appropriate, and the 11th

20   Circuit says they are not, and the only court actually

21   within the 6th Circuit to make a ruling on this is a

22   district court in Tennessee that I don't think either side

23   cited, but that court held that punitive damages are

24   recoverable.

25       I'm not prepared to say that they aren't, except

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    they may not be based on the testimony as it's presented.

2    So this is something that will relate to what instructions

3    are given to the jury.  Really, along with the only other

4    issue that is before the Court to decide today, this is

5    probably best decided in the context of a summary judgment

6    motion, but at this point it might be decided as a matter

7    of judgment as a matter of law at the end of the trial,

8    and before instructions are given to the jury.

9         The Court is going to similarly dispose of the

10    defendant's motion to strike the plaintiff's claim for

11    back pay.  I think that too is an issue that would --

12    should have been presented perhaps as part of a summary

13    judgment motion in the case.

14         The real issue is, I think as it relates to that,

15    the question of mitigation damages, and whether there

16    was -- and will reach that crossing at some point during

17    the trial when I'm sure I'll hear the defendant argue that

18    there is insufficient evidence supporting a finding that

19    the plaintiff properly sought to mitigate her damages in

20    the case, and will seek a ruling as a matter of law on

21    that question, which may affect back pay.  It may only

22    affect front pay, but as I say, we'll get to it at the

23    appropriate juncture of the trial.

24         So I think that's it.  Thank you, both.

25              **MR. GRAHAM:**  Thank you, your Honor.


*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1          **MR. MIGLIO:**   I had one -- I was a little bit

2     clear when I went back and thought about the motion with

3     respect to the employment at Jeffrey Automotive and the

4     lawsuit, and I think you said granted and denied in part.

5     You granted in part because you said the history of her

6     work history at Jeffrey Automotive was part of the work

7     history background as far as the after acquired evidence

8     and resume fraud, but I was not really clear -- and you

9     also said --

10          **THE COURT:**   And source of distress.

11          **MR. MIGLIO:**   Right, and it would be

12    admissible, including the fact that she was claiming

13    mental and emotional distress in the lawsuit, but I really

14    was not clear on what the denial was, unless it was just

15    to say it's not admissible as litigiousness or and it is

16    not admissible as to something else.   I can't remember.

17          **THE COURT:**   Right.   So the fact that she was

18    terminated is obviously after this acquired issue.   The

19    filing of the lawsuit is --

20          **MR. MIGLIO:**   I think you said that it was

21    admissible with a curvative instruction not to show that

22    she litigious.

23          **THE COURT:**   Right.   Maybe.   So I think I

24    might --

25          **MR. MIGLIO:**   We have a transcript.


      *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1          **MR. GRAHAM:**  I mean, what I remember being

2     was testimony about why she was terminated was not able --

3          **THE COURT:**  Right.  That would be off base,

4     and it would be granted with respect to that, unless

5     circumstances developed during the trial that would

6     justify its admission, but I just would expect no

7     questions designed to elicit that, and if the filing of

8     the lawsuit itself ends up coming in, I think I intended

9     to indicate that I could fashion a curvative instruction

10    with your help, of course.  That would adequately deal

11    with the wrong inferences that might be drawn from that,

12    but as to whether she -- to elicit testimony that she

13    filed the lawsuit, standing by itself I don't see why that

14    is an admissible piece of evidence, but again, it depends

15    on -- well, except that's where she claims distress.

16         **MR. GRAHAM:**  Would it be possible to make the

17    same ruling that you had in other circumstances where if

18    counsel was interested in presenting such information,

19    they simply request clearance from you before introducing

20    that?

21         **THE COURT:**  I think so.  Again, I should make

22    that decision based on the body of evidence that's been

23    introduced at that time.  I can see that there's relevance

24    to the source of distress that she's experienced, and I

25    can see that is, even with that relevance however, maybe

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

1    more prejudicial than probative, but I'll be in a much

2    better position to evaluate that question when getting to

3    her testimony, okay?

4              **MR. GRAHAM:**  Thank you.

5              **MR. MIGLIO:**  Thank you, your Honor.

6

7                    (Proceedings concluded.)

8                      -    -    -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    *14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*

```
 1                C E R T I F I C A T I O N
 2          I, Ronald A. DiBartolomeo, official court
 3     reporter for the United States District Court, Eastern
 4     District of Michigan, Southern Division, appointed
 5     pursuant to the provisions of Title 28, United States
 6     Code, Section 753, do hereby certify that the foregoing is
 7     a correct transcript of the proceedings in the
 8     above-entitled cause on the date hereinbefore set forth.
 9          I do further certify that the foregoing
10     transcript has been prepared by me or under my direction.
11
12     _____        _____
       Ronald A. DiBartolomeo, CSR                 Date
13     Official Court Reporter
14                        -   -   -
15
16
17
18
19
20
21
22
23
24
25
```

*14-11916; NATALIE REESER v. HENRY FORD HEALTH SYSTEM*