UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATALIE REESER,

    Plaintiff,                              Hon. George Caram Steeh
                                                  Case No.: 2:14-cv-11916

v.

HENRY FORD HOSPITAL,

    Defendant.

| MILLER COHEN, P.L.C. | VARNUM LLP |
|---|---|
| Keith D. Flynn (P74192) | Terrence J. Miglio (P30541) |
| Attorney for Plaintiff | Barbara E. Buchanan (P55084) |
| 600 W. Lafayette Blvd., 4th Floor | Attorneys for Defendant |
| Detroit, MI 48226 | 160 W. Fort, 5th Floor |
| 313-964-4454 | Detroit, MI 48226 |
| kflynn@millercohen.com | (313) 481-7300 |
| | tjmiglio@varnumlaw.com |
| | bebuchanan@varnumlaw.com |

## DEFENDANT'S TRIAL BRIEF

**STATEMENT OF FACTS**

**A.     Plaintiff's Position Of Laboratory Assistant With Defendant.**

On May 16, 2011, Plaintiff was hired as a full-time laboratory assistant or "Laboratory Service Representative" in the Laboratory Outreach Services division of Henry Ford Health System ("HFHS").  Fiona Bork, Sales Manager, Henry Ford Medical Laboratories, was Plaintiff's immediate supervisor.  Ms. Bork was recruited to start the Outreach Laboratory Services Program ("Outreach Program") which provides laboratory and pathological services for physicians outside of HFHS.  Ms. Bork's responsibility is to contract with non-HFHS physicians to get them to send their lab work to HFHS.  Lab work for the contracting physicians' patients is either collected at a "draw site" set up in the physicians' own offices (Warren and West Bloomfield) or "patient service centers" (Shelby Township and Clinton Township facilities).  Physicians are induced to contract with the Outreach Program based upon the fact that there will be a draw site and/or service center that is open at advertised times for the needs and convenience of their patients.

As a Laboratory Service Representative, Plaintiff drew blood, processed samples and registered patients among other duties.  Ms. Bork supervised thirty phlebotomists including Plaintiff, two Sales Reps, and six couriers (who picked up lab specimens).

All of the phlebotomists were told when they were hired that they could be required to work at any of the Outreach Program sites. They are all trained to work at any of the sites. Ms. Bork assigns the phlebotomists to the particular sites based on need. If there is a shortage of staff at a site for whatever reason, Ms. Bork will pull staff from a different site to cover the shortage.

When she was hired, Plaintiff was informed that she would be rotated between sites, as needed, like all other phlebotomists. For the majority of the time she was employed by Defendant, Plaintiff worked at the Clinton Township Patient Service Center ("CTPSC") CTPSC is the least busiest site. It is staffed with only one phlebotomist, who is required to take care of patients who walk in without notice during the advertised hours of operation. Hours may go by when there are no patients at the site.

**B.  The Outreach Program Policy Against Leaving A Site Without Authorization From Ms. Bork.**

The Outreach Program maintained a written policy that prohibited employees from leaving a site without permission of a manager. Plaintiff expressly acknowledged receipt of the policy. Plaintiff also admitted that she was aware that she and all other Laboratory Outreach Services employees were required to receive permission from a manager to leave the site during their working hours. Moreover, since Plaintiff was the only phlebotomist working at

CTPSC, if she left without having coverage the site would have to be closed, would not be able to serve patients, and business would be negatively affected. Throughout her employment, Plaintiff had consistently emailed Ms. Bork asking for permission to leave the site. In several of those requests, Plaintiff noted that she was aware that policy required her to receive such authorization.

The policy had been consistently and repeatedly enforced: Five other employees supervised by Ms. Bork, were <u>terminated for the same violation as Plaintiff – leaving a site without authorization as well as other employees within HFHS,</u>

C. **The Practice Regarding Lunch Breaks**.

Ms. Bork had an incorrect understanding of what was considered an unpaid lunch with respect to phlebotomists who worked at the CTPSC. She thought that since phlebotomists at CTPSC had significant down time to eat lunch (albeit at the site) that was considered an unpaid lunch. Thus, only when a phlebotomist so busy at the site that they could not take a lunch break, would the employee be paid for that time.

D. **Plaintiff's Complaints to Human Resources**.

In early January 2014, Plaintiff and Ms. Bork completed Plaintiff's annual performance review process. This process requires each employee to prepare a self-evaluation form and submit it electronically to her supervisor, who then

4

reviews and evaluates it, and electronically sends it back to the employee. Ms. Bork rated Plaintiff a "2" two areas. Ms. Bork realized that one "2" rating was a mistake and wanted to make sure that Plaintiff knew it should have been a 3 and not a 2. Plaintiff refused to meet with Ms. Bork.

Because she was angry about her performance rating on January 14, 2014 Plaintiff contacted Jill Hood requesting a meeting. When Plaintiff met with Ms. Hood she had a number of complaints about Ms. Bork. Most of the complaints related to incidents during the previous year where Ms. Bork had counseled Plaintiff about her inappropriate behavior. Plaintiff's complaints were intended sought to get Ms. Bork in trouble or fired by HFHS.

Ms. Hood investigated each of Plaintiff's complaints and found that virtually all of them were without merit and in some instances Plaintiff had lied about the facts. The remaining complaints were resolved, including Plaintiff's complaint that she should be paid for lunches since she could not leave CTPSC.

With respect to her Performance Review, Plaintiff was upset that she had received a "2" in the "Display a Positive Attitude/Respond in a Timely Manner" performance area. Ms. Hood discovered that the rating was based upon several complaints that Defendant had received from patients about being bruised as a result after having blood drawn by Plaintiff. While Plaintiff claimed the bruising was caused by a type of tape that was being used at the time, the bruises were at

5

the venipuncture site itself and would not have been caused by tape (which could cause bruising only on the points where the tape adheres to the skin). Ms. Hood learned that when Plaintiff underwent re-training, the trainer in fact, found an error in Plaintiff's blood drawing technique.

With respect to other "2" ratings Plaintiff complained about in her performance evaluation, Ms. Hood learned that one of the "2" ratings was merely an admitted typographical error by Ms. Bork, which had been changed to a "3" prior to the meeting. The remaining "2" rating was given as a result of Plaintiff not meeting a goal "To Grow CTPSC to 20 plus customers a day". However, because Ms. Hood felt that the goal was not within Plaintiff's direct control, she requested that it be deleted (which ultimately improved Plaintiff's overall performance score.) Incredibly, Plaintiff objected to the goal deletion, *even though it was to her benefit*.

After consulting with the legal department, Ms. Hood determined that the practice with respect to lunch breaks at CTPSC was incorrect and conducted a review of Plaintiff's schedules, payroll records, and compensation records for the prior two years. The review resulted in a finding that Plaintiff had worked 81 hours through lunch over the previous two years. Plaintiff was paid her for the unpaid lunches including overtime pay for any hours that crossed the 40-hour per

6

week threshold. Other employees who worked at the CTPSC were also reimbursed for unpaid lunches.[1]

**E.      Events Leading to Plaintiff's Suspension And Subsequent Termination.**

On February 25, 2014, Plaintiff angry over the fact that her complaints about Ms. Bork were not achieving the desired result, sent an email to Ms. Bork and two other employees (Martha Wiseheart, Ms. Bork's counterpart on the operations side of Henry Ford Medical Laboratories, and Luain Hajjar, neither of whom had any supervisory authority for Plaintiff): "I AM VERY UPSET AND AM PUTTING A NOTE ON THE DOOR AND TAKING A 30 MINUTE LUNCH TODAY." Plaintiff then got her coat, closed the site, put a sign on the door and left for 30 minutes. Plaintiff admitted that she did not request or receive permission to leave the site from Ms. Bork.

Ms. Bork immediately forwarded Plaintiff's email to Ms. Hood. Ms. Hood recommended that Plaintiff be suspended pending an investigation. Ms. Bork went to CTPSC and informed Plaintiff she was suspended.

---

[1] As a result of Ms. Hood's investigation of the lunch break practice, a new procedure was put into effect in March 2014. Notice was provided to the CTPSC patients and physician clients, that that the site would be closed for 30 minutes each day. This allowed the laboratory assistant to take a lunch break without having to remain on site.

Later that day, Ms. Hood spoke to Plaintiff who claimed that she had left the site without permission on other occasions. When asked for the sign she posted on that date, she said she had "shredded" it. Ms. Hood asked Plaintiff to provide a statement indicating what took place on that date and when on previous occasions did she leave the site without authorization. In addition to obtaining information from Plaintiff, she obtained statements from Ms. Bork, Ms. Wisehart and other employees. The investigation revealed:

- Plaintiff did not obtain permission from her supervisor or anyone for that matter to leave the site in fact, she made no effort to obtain Ms. Bork's permission;
- Plaintiff could not identify a single time when she had left CTPSC without permission;
- No other employees were aware of Plaintiff or any other employees leaving the site without permission or posting a sign; and
- Plaintiff was aware of the policy prohibiting an employee from leaving the site without permission and in fact had followed that policy in the past.

Plaintiff was informed of her termination by Hood via telephone on March 7, 2015. She was given the opportunity to resign or appeal the decision to the HFHS ADR process. She failed to respond and was informed she was terminated.

### F. Plaintiff's Complaint with Michigan Department of Licensing And Regulatory Affairs (LARA).

On February 27, 2015 two days after her suspension, Plaintiff filed a Complaint with LARA alleging she was not paid for her lunches when she worked

at CTPSC. Ms. Bork testified that she did not know anything about Plaintiff making a complaint to the State until after Plaintiff was no longer employed. In a May 14, 2014 decision, LARA found no merit to Plaintiff's claim.

## LAW AND ARGUMENT

**A.    Plaintiff Cannot Establish A Claim Of Unlawful Retaliation Under the FLSA Because She Cannot Demonstrate A Causal Connection Between Her Alleged Protected Activity And Her Suspension/Termination.**

To establish a case of retaliation under the FLSA, a plaintiff must prove that "(1) he or she engaged in a protected activity under the FLSA; (2) his or her exercise of this right was known to the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action." *Adair v. Charter County of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006), citing *Williams v. Gen. Motor Corp.*, 187 F.3d 553, 568 (6th Cir. 1999).

In order to establish the element of causal connection for retaliation under the FLSA, a plaintiff must proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action. *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F.App'x 524, 533 (6th Cir. 2011) (citing EEOC v. Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997)). Plaintiff must put forth evidence which deduces a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable

9

inferences from that evidence. *Id*. Temporal proximity, alone, is <u>not enough to establish the causal connection element</u> for retaliation claims. *Id*.

While Plaintiff sought to rely upon a "direct evidence" theory to avoid the application of the McDonnell-Douglas burden-shifting analysis the Court previously held that Plaintiff could not adduce direct evidence even in the context of a motion for summary judgment. As the Court found direct evidence requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action, but it also requires the conclusion that unlawful retaliation was a motivating factor in the employer's action. *Fuhr v. Hazel Park School Dist.*, 710 F.3d 668, (6th Cir. 2013) (internal quotations and citations omitted.) Plaintiff's alleged "direct evidence" of retaliation is comprised of: a) statements allegedly made by Bork during phone calls (Plaintiff has not proven were made) expressing dissatisfaction with Plaintiff because she went to HR and b) emails and excerpts of deposition testimony which Plaintiff claims shows Bork was critical of her. <u>None of what Plaintiff proffers constitutes "direct evidence" of retaliation which by definition requires the court to draw the conclusion that unlawful retaliation was a motivating factor in Plaintiff's discharge.</u> *Fuhr v. Hazel Park School District*, 710 F.3d 668, (6th Cir. 2013)[2] Every purported bit of alleged "direct evidence"

---

[2] The Sixth Circuit reaffirmed precedent holding there must be no room for inference. *Fuhr*, 673.

Plaintiff proffers required the Court <u>to infer</u> that: 1) Bork was angry with Plaintiff because of her complaint about not being paid for lunches <u>and</u>; 2) Bork[3] terminated her because of her complaint.

With respect to the phone calls Plaintiff alleges she received from Bork at night in late January or early February and on the morning of February 25th, the records show no such call took place. Plaintiff has not offered any evidence to refute Defendant's evidence that the calls did not take place. Plaintiff's purported "direct evidence" cannot meet this standard and must not be considered by this Court. Plaintiff has failed to present admissible evidence that constitutes "direct evidence" and must therefore rely upon the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Further, the only alleged protected activity Plaintiff engaged in was her complaint to Jill Hood that she was not paid for lunch breaks. Even assuming this could be deemed "protected activity" under the FLSA (or the WPA, see below), the *only* evidence supporting causal connection is that coincidental timing of Plaintiff's suspension and termination which *Plaintiff herself triggered* when she violated

---

[3] Plaintiff has offered no evidence that Hood harbored any animus toward Plaintiff because she complained about unpaid lunches. It was Hood who told Bork to suspend Plaintiff. It was also Hood who investigated Plaintiff's conduct in leaving the work site without permission and recommended she be terminated.

11

department policy and abandoned her worksite.[4] Plaintiff can point to no evidence suggesting disparate treatment for job abandonment, which is one way a Plaintiff can put forth evidence "which deduces a causal connection" in order to make out a prima facie case. HFHS has not disciplined any employees who walked off the job with anything less than termination.

Plaintiff can offer <u>no evidence</u> beyond temporal proximity. *See Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir.2001). "Temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Id.*, citing *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1397–98 (10th Cir.1997) (noting that temporal proximity alone does not constitute a pretext for retaliatory discharge under the FLSA).

Plaintiff argues that her misconduct was not properly deemed job abandonment (a violation of the Outreach Program policy and HFHS Corrective Action policy). A plaintiff "cannot simply show that the employer's decision was wrong or mistaken" to establish pretext. *Saulter v.Detroit Area Agency on Aging*, 562 F. App'x 346, 357 (6th Cir.2014). The soundness of Defendant's business

---

[4] Plaintiff's LARA Complaint was filed on February 27, 2014, two days *after* Plaintiff was suspended, so this could not have been protected activity triggering an alleged retaliatory termination.

12

judgment in maintaining the HFML policy requiring authorization and suspending and terminating Plaintiff for violating it "may not be questioned as a means of showing pretext." *Debano-Griffin v. Lake Cnty.*, 493 Mich. 167, 180; 828 N.W.2d 634, 641 (2013) (citation and internal quotation marks omitted).

Plaintiff simply has no evidence to offer to even attempt to show that her suspension and termination had no basis in fact, did not actually motivate Defendant's decision, or was insufficient to warrant suspension and termination. For these reasons, Plaintiff cannot establish an FLSA retaliation claim.

### B. Plaintiff's Whistleblowers' Protection Act Claim Fails.

To establish a claim under Whistleblowers' Protection Act, Plaintiff must prove 1) she engaged in protected activity, 2) an adverse employment action, and 3) a causal connection. *Shallal v. Catholic Soc. Services of Wayne County*, 455 Mich. 604, 610; 566 N.W.2d 571, 574 (1997).

Defendant does not concede that Plaintiff can demonstrate by the required "clear and convincing evidence" standard[5] that she reported or was about to report, violations of law, regulation, or rule to a public body. *Id.* at 611; *Henry v. City of Detroit,* 234 Mich. App. 405, 409-10; 594 N.W.2d 107, 110-11 (1999).

---

[5] The Michigan Supreme Court has recognized that the "clear and convincing evidence standard" is "the most demanding standard applied in civil cases," and has been incorporated into Michigan statutory enactments. See *In re Martin*, 450 Mich. 204, 226–27, 227 n. 22; 538 N.W.2d 399 (1995).

Moreover, Defendant asserts that Plaintiff cannot establish that Defendant was objectively aware that she was about to make a report **before** she was fired. See *Kaufman & Payton, P.C. v. Nikkila*, 200 Mich. App. 250, 257–58; 503 N.W.2d 728, 732 (1993). Thus, Plaintiff's WPA claim fails.

Respectfully submitted,

**VARNUM LLP**

BY: /s/ *Terrence J. Miglio*
Terrence J. Miglio (P30541)
Barbara E. Buchanan (P55084)
Attorneys for Defendant
160 W. Fort Street, Fifth Floor
Detroit, MI
(313) 481-7300
tjmiglio@varnumlaw.com
bebuchanan@varnumlaw.com

Dated: May 3, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2016, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all parties of record.

/s/Terrence J. Miglio
Terrence J. Miglio (P30541)

14