# EXHIBIT C

2010 WL 3906094
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

HARVARD DRUG GROUP, LLC, Plaintiff,

v.

Stephen D. LINEHAN, Defendant.

No. 08–13617.
|
Sept. 3, 2010.

**Attorneys and Law Firms**

Jeffrey M. Stefan, Stephen E. Glazek, Barris, Sott, Detroit, MI, for Plaintiff.

Donna A. Heiser, Kotz, Sangster, et al., Detroit, MI, for Defendant.

*REPORT AND RECOMMENDATION*
*PLAINTIFF'S MOTION FOR SUMMARY*
*JUDGMENT ON DAMAGES (Dkt.55)*

MICHAEL HLUCHANIUK, United States Magistrate Judge.

**I. PROCEDURAL HISTORY**

*1 The complaint in this matter was filed on August 20, 2008. (Dkt.1). Subsequently, the parties agreed to bifurcate the proceedings, separating the issue of liability from the issues of damages. On November 25, 2009, the undersigned recommended that plaintiff's motion for summary judgment as to damages be granted. (Dkt.46). That recommendation was adopted by District Judge Roberts by order entered on February 3, 2010. (Dkt.54). The order of Judge Roberts, in essence, found that defendant was liable for damages under the terms of a personal guaranty relating to shipments of pharmaceuticals by plaintiff to Soporex, Inc. following the execution of the personal guaranty on June 6, 2008 and also that defendant was liable for interest following the execution of an amended agreement on July 24, 2008. The amended agreement actually called for the interest to begin after July 22, 2008.

Plaintiff filed the present motion for summary judgment as to damages on February 17, 2010. (Dkt.55). Defendant filed a response to the motion on March 12, 2010. (Dkt.56). Plaintiff replied to the response on March 25, 2010, and the reply included a reference to revision of the settlement agreement in the preference action pending in bankruptcy court. (Dkt.58). Defendant moved to strike what was argued to be "new evidence" or to allow further discovery in the case based on allegations that were contained in plaintiff's reply. (Dkt.59). Defendant sought to strike an agreement in an adversary proceeding in the bankruptcy of Soporex, Inc., which was then pending in the bankruptcy court for the Northern District of Texas.

On April 16, 2010, plaintiff filed a supplemental brief regarding the motion for summary judgment and a response to the motion to strike. (Dkt.62, 63). On April 30, 2010, defendant filed a reply to plaintiff's response to the motion to strike. (Dkt.64).

The undersigned entered an order, on May 14, 2010, denying the motion to strike but allowing defendant to file a sur-reply to plaintiff's reply to the motion for summary judgment. (Dkt.66). Pursuant to the direction of the court, plaintiff filed an affidavit relating to the facts and circumstances leading up to the entry of the settlement agreement in the Soporex bankruptcy adversary proceeding on May 18, 2010. (Dkt.67).

On June 1, 2010, defendant objected to the undersigned's order regarding defendant's motion to strike. (Dkt.69). On June 3, 2010, defendant filed its sur-reply to plaintiff's motion for summary judgment as to damages. (Dkt.70). Plaintiff responded to the sur-reply on June 9, 2010. (Dkt.71). Two days later, plaintiff filed its response to defendant's objections to the order regarding the motion to strike. (Dkt.72). On June 18, 2010, Judge Roberts adopted the order of the undersigned regarding defendant's motion to strike. (Dkt.74). Pursuant to notice, the hearing on plaintiff's motion for summary judgment as to damages was held on June 23, 2010. (Dkt.68).

**II. RELEVANT FACTS**

*2 The facts are well known to the parties and are largely not in dispute. However, a review of the relevant facts is helpful to the analysis of the issues that are in controversy. For periods of time prior to June of 2008, plaintiff supplied pharmaceuticals to Soporex, Inc. (Soporex) and defendant was the CEO of Soporex during the relevant periods of time. As of May 2008, Soporex had accrued a large unpaid debt for the pharmaceuticals received from plaintiff and plaintiff refused, temporarily, to continue to ship such items to Soporex. Negotiations took place between plaintiff and

Soporex for the continuation of business relations between them and those negotiations resulted in defendant executing a personal guaranty for the payment of future shipments to Soporex. That personal guaranty, which was executed on June 8, 2008, was sufficient for plaintiff to resume shipping pharmaceuticals to Soporex.

The shipments resumed and, following the execution of the personal guaranty, $1,805,855.18 of pharmaceuticals were shipped to Soporex before the relationship broke down again, for which only $404,052.12 was paid. The present case was filed on August 20, 2008. On August 22, 2008, Soporex filed a Chapter 7 bankruptcy in Dallas, Texas. Plaintiff's initial motion for summary judgment was filed on December 23, 2008. (Dkt.9). While the motion was originally intended to address liability and damages, the parties subsequently agreed to bifurcate the process and address the liability question first.

Before the hearing was held as to the initial motion for summary judgment, the trustee in the Soporex bankruptcy action filed a preference action, as an adversary proceeding, seeking the return of money paid to plaintiff by Soporex during the 90 day period prior to the initiation of the bankruptcy action. The adversary proceeding was filed on August 6, 2009. The complaint in the adversary proceeding requested the return from plaintiff of $1,229,052.12, although apparently the real amount in controversy was $854,052.12, which included the $404,052.12 that had been paid in July of 2008.

The hearing on plaintiff's initial motion for summary judgment was held on September 22, 2009. At that time, plaintiff's counsel asked for summary judgment in the amount of $1,401,813, but noted that the amount might increase by $404,052 depending on the outcome of the adversary proceeding in the bankruptcy action. (9/22/09 Tr., pp. 4–5). On November 19, 2009, plaintiff filed its second amended complaint in which it was alleged that the claims of the plaintiff would depend, in part, on the resolution of the adversary proceeding in the bankruptcy action. (Dkt.45).

On November 25, 2009, the undersigned recommended that summary judgment be granted in favor of plaintiff as to defendant's liability under the personal guaranty for the pharmaceuticals shipped after the execution of the guaranty as well as interest and attorney fees. (Dkt.46). The recommendation to grant plaintiff's initial motion for summary judgment was adopted by Judge Roberts on February 3, 2010. (Dkt.54).

*3 On February 17, 2010, plaintiff filed its motion for summary judgment as to damages. (Dkt.55). On February 23, 2010, the parties to the adversary proceeding in the bankruptcy action in Texas filed a motion to approve the settlement of the adversary proceeding pursuant to the terms of a "draft" settlement agreement. (Dkt.67, pp. 2–3). Generally, the terms of the draft settlement agreement provided that $675,000 of the $854,052 be returned to the bankruptcy trustee in full satisfaction of the claims of plaintiff, the Chapter 7 trustee, and defendant in that case which is the plaintiff in the present case.

Defendant in the present case responded to plaintiff's motion for summary judgment on March 12, 2010, in part, by taking the position that the settlement agreement in the bankruptcy adversary proceeding constituted a waiver of any claim against defendant in the present complaint because the settlement agreement purported to release certain categories of individuals from liability in the Soporex case and defendant claimed to be within at least one of those categories. (Dkt.56, pp. 11–14).

On learning of the position that defendant in the present case had taken, counsel for Harvard in the bankruptcy action sought to revise the terms of the settlement agreement by stating that the release provisions of the settlement agreement did not apply to defendant in the present case. (Dkt.67, pp. 2–3). A revised settlement agreement and motion to approve settlement of adversary proceeding was filed with the bankruptcy court on March 24, 2010. (Dkt.67, p. 4). Plaintiff filed a reply to defendant's response asserting that the settlement agreement was not final or binding because it had not been approved by the bankruptcy court and that the settlement agreement had been revised to clearly reflect that any release contained in such agreement did not apply to defendant in the present case. (Dkt.58). A hearing was held in the bankruptcy court on March 30, 2010, and an order approving the revised settlement agreement was entered on April 9, 2010. (Dkt.67, p. 4).

Defendant filed a motion to strike on March 30, 2010, contending that the evidence of the terms of the revised settlement agreement should be stricken because such evidence was raised for the first time in a reply brief. (Dkt.59). Plaintiff filed a supplemental brief on April 16, 2010, indicating the entry of the order approving the settlement agreement in the bankruptcy court. (Dkt.62). Plaintiff also filed its response to the motion to strike on the same day.

(Dkt.63). Defendant replied to the response on April 30, 2010. (Dkt.64).

A hearing was held on the motion to strike on May 13, 2010, and an order was entered on May 14, 2010, denying the motion to strike, but allowing defendant to file a sur-reply. (Dkt.66). On May 18, 2010, plaintiff's counsel filed an affidavit which purported to outline the procedure resulting in the entry of the order approving the settlement agreement in the bankruptcy case and concluding the adversary proceeding regarding preferential payments. (Dkt.67). Defendant filed his sur-reply to the motion for summary judgment on June 3, 2010. (Dkt.70). District Judge Roberts adopted the order of the undersigned regarding the motion to strike on June 18, 2010. (Dkt.74). The hearing on the motion for summary judgment took place on June 23, 2010.

### III. ANALYSIS AND CONCLUSIONS

*4 Plaintiff seeks damages arising from the unpaid pharmaceutical shipments made after the personal guaranty was signed on June 8, 2008, and interest on that amount from July 23, 2008. Without regard to the claims resulting from the resolution of the preference action in the Soporex bankruptcy case, the amounts of the unpaid invoices for those shipments is $1,401,813.06 with interest, up to the date of the hearing on the motion for summary judgment as to damages, of $204,428. Defendant concedes these amounts.

Plaintiff also asserts attorney fees and costs arising out of the present action in the amount of $233,805.53, additional damages arising from the preference action in the amount of $319,275. and attorney fees relating to the preference action in the amount of $88,988.57. Defendant disputes the amount of these damage claims contending: (1) that he was released from all liability arising out of any of plaintiff's claims by virtue of the language in the settlement agreement in the preference action; (2) that plaintiff has not proved entitlement to damages arising from the resolution of the preference action because, under the terms of the judgment, it cannot be established how much of the judgment was attributable to his obligation under the guaranty; (3) that plaintiff has not established the reasonableness of the attorney fee claims with respect to either the number of hours claimed or the appropriate hourly rate to be assessed; and (4) that the attorney fee claim arising from the preference action was waived by the terms of the settlement agreement, which provided that each side to the case would bear their own costs.

The present motion is a motion for summary judgment as to damages. The party bringing the summary judgment motion has the initial burden of informing the court of the basis of its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.,* 276 F.3d 845, 848 (6th Cir.2002). Once that occurs, the party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). "[T]he party opposing the summary judgment motion must 'do more than simply show that there is some "metaphysical doubt as to the material facts.' " *Highland Capital, Inc. v. Franklin Nat'l Bank,* 350 F.3d 558, 564 (6th Cir.2003), quoting, *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 800 (6th Cir.1994); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1968).

A. *Release of All Liability*

In response to the preference action filed in the Soporex bankruptcy, Harvard initially challenged the claim of the bankruptcy Trustee, but ultimately entered into a settlement agreement with the Trustee to resolve the claims. The terms of the first version of the settlement agreement submitted to the bankruptcy court for approval, pursuant to Bankruptcy Rule 9019, included the following language:

> *5 Except for the obligations, representations, and warranties under this Settlement Agreement, Harvard Drug releases and forever discharges the Trustee, the Debtors, and their respective employees, agents, officers, and attorneys (the "Trustee Released Parties") from any and all claims and causes of action arising out of or relating to the Adversary Proceeding and all potential claims and causes of action that Harvard Drug could assert against the Trustee or Debtors of whatever kind or character, known or unknown, under equity, common law, or statute, that Harvard Drug may have or claim to have against the Trustee Released Parties as of the Effective Date. (The effective date is defined in the agreement as the date

Case 2:14-cv-11916-GCS-SDD ECF No. 112-3, PageID.3506 Filed 06/15/16 Page 5 of 12
**Harvard Drug Group, LLC v. Linehan, Not Reported in F.Supp.2d (2010)**
2010 WL 3906094

the Bankruptcy Court approves the Settlement Agreement).

(Dkt.71–1, p. 39). This initial proposed Settlement Agreement was never approved by the bankruptcy court.

After defendant asserted, in his response to the motion for summary judgment as to damages, that the above-quoted language released defendant from all liability in this matter, the settlement agreement was revised and re-submitted to the bankruptcy court by Harvard and the Trustee. The revised release language is as follows:

> Except for the obligations, representations, and warranties under this Settlement Agreement, Harvard Drug releases and forever discharges the Trustee, the Debtors, and their representative employees, agents, officers, and attorneys (but specifically excluding Linehan) (the "Trustee Released Parties") from any and all claims and causes of action arising out of or relating to the Adversary Proceeding and all potential claims and causes of action that Harvard Drug could assert against the Trustee or Debtors of whatever kind or character, known or unknown, under equity, common law, or statute, that Harvard Drug may have or claim to have against the Trustee Released Parties as of the Effective Date. Notwithstanding anything which may be contained herein to the contrary, Harvard Drug's release and discharge set forth herein does not include or apply in any manner to Harvard Drug's claims and causes of action asserted against Linehan under the Linehan Guaranty in the Guaranty Action or to any other claims or causes of action or potential claims and causes of action of whatever kind or character, known or unknown, under equity, common law or statute, that Harvard Drug may have or claim to have against Linehan.

(Dkt.71–1, p. 84). These terms were approved by the Bankruptcy Court on April 9, 2010, and Harvard and the Trustee executed the agreement on April 13, 2010, the same day the Trustee filed a motion to dismiss the adversary proceeding with prejudice. (Dkt.67, p. 4).

In his motion to strike, defendant claimed that plaintiff's reference to the "revised" Settlement Agreement in its reply brief was improper and sought to have it stricken or be allowed to conduct further discovery on that issue. The undersigned denied the request to strike the reference to the "revised" Settlement Agreement because defendant had raised the release language in the Settlement Agreement as a defense to the motion for summary judgment. The undersigned additionally denied the request for further discovery, but allowed defendant to file a sur-reply brief. (Dkt.66).

*6 Defendant objected to the order denying the motion to strike. (Dkt.69). On June 3, 2010, defendant filed his sur-reply to the motion for summary judgment arguing that the initial settlement agreement was an enforceable agreement, that the terms could not later be modified, that the release language released him from all claims of the plaintiff and that plaintiff should be equitably estopped from relying on the revised Settlement Agreement. (Dkt.70). In ruling on defendant's objections to the order of the undersigned regarding defendant's motion to strike, Judge Roberts considered the underlying issue of whether the initial Settlement Agreement in the bankruptcy action could be enforced by defendant here and determined that "the Revised Settlement operates as an implied novation on the Proposed Settlement" and, therefore, the Revised Settlement is the operative document for determining the relative rights of the parties. (Dkt.74, p. 8).

The undersigned concludes that the decision of Judge Roberts, in adopting the order of the undersigned and denying defendant's motion to strike, is conclusive of the issue regarding as to which version of the settlement agreement is controlling. The decision of Judge Roberts on this issue leaves no question as to the fact that the version of the settlement agreement eventually approved by the bankruptcy court, which specifically excludes defendant from the effect of the release provisions of the agreement, is the document that directs the outcome here. In that the approved and executed settlement agreement excludes defendant from the scope of the release provisions, defendant's attempt to oppose plaintiff's motion for summary judgment on the basis of a release claim is unavailing.[1]

Not addressed in Judge Robert's ruling is the claim of equitable estoppel made by defendant. Equitable, or promissory estoppel arises when a " '(1) promise [is made] that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, (2) which in fact produced reliance or forbearance of that nature, (3) in circumstances such that the promise must be enforced if injustice is to be avoided. 1 Restatement of Contracts, § 90, p. 110.' " *In re Timko Estate,* 51 Mich.App. 662, 666, 215 N.W.2d 750 (1974); see also, Association of Hebrew Teachers v. Jewish Welfare Federation, 62 Mich.App. 54, 60, 233 N.W.2d 184 (1975). Stated another way, equitable estoppel applies where "one party has knowingly concealed or falsely represented a material fact, while inducing another's reasonable reliance on that misrepresentation, under circumstances where the relying party would suffer prejudice if the representing or concealing party were subsequently to assume a contrary position." Adams v. City of Detroit, 232 Mich.App. 701, 708, 591 N.W.2d 67 (1999). The concept of "inducement" requires conduct that is intended to produce a result through persuasion or influence.[2] Defendant does not state how plaintiff "induced" him to believe he was released from his obligation to pay damages based on his personal guaranty, particularly after plaintiff had obtained a judgment as to liability on that guaranty, but defendant claims to have relied on such a representation. Defendant does not contend that any promise was made to him by plaintiff as to a release of claims against him and defendant does not point to any misrepresentation on the part of plaintiff. Without a promise or misrepresentation, there can be no "inducement" by plaintiff that was intended to cause defendant to take action in some way.

*7 The reliance claimed by defendant was the assertion of the release defense in his pleadings, which thereafter caused plaintiff to seek a revision of the Settlement Agreement for the purpose of clearly excluding defendant from the terms of the release provisions of the Settlement Agreement. In order to accept defendant's argument on this point, one would have to accept the proposition that plaintiff "induced" defendant to believe he was released from his obligation so that defendant, in reliance on the representation, would then be able to defend the current motion. The normal pattern of equitable estoppel involves one party making a representation to another party that benefits the first party in some fashion and results in a detrimental situation for the second party. Here, plaintiff's claimed "representation" actually resulted in harm to the plaintiff by virtue of the representation giving rise to a potential defense for defendant. Defendant's claim regarding inducement and reliance is not consistent with the principles of equitable estoppel and belies the application of that concept to the circumstances here.

Defendant asserts it would be an injustice to allow plaintiff to revise the Settlement Agreement only as a response to defendant raising the release claim as a defense to the motion, but cites no authority for his position. Certainly the revision of the settlement agreement was the result of defendant making a claim that the initial release language released him from liability on this debt. However, the undersigned sees no injustice in plaintiff revising the settlement agreement based on defendant's claim of release. Plaintiff broke no rules in seeking to revise an agreement that had not yet been approved by the bankruptcy court. The process was conducted under the very transparent process of a motion under Bankruptcy Rule 9019, following notice to interested parties. Plaintiff's conduct was a predicable strategic move that resulted from defendant's strategic move of raising this defense. Defendant has not made a case for the application of promissory or equitable estoppel.

B. *Damages From Preference Action*
The adversary proceeding action sought the return of funds that the Trustee in bankruptcy claimed had been paid to Harvard as a "preference" within 90 days of the commencement of the bankruptcy action. The complaint specifically referred to $404,052.12 that had been paid on July 10, 2008 as a portion of the funds paid as a preference. (Dkt.55–6, p. 4). This is the only payment made that would be applicable to the New Invoices that were covered by the personal guaranty of defendant. Besides those funds, another $450,000 in preference payments were made and subject to the adversary proceeding complaint. (Dkt.55–8, p. 4). The Settlement Agreement ultimately approved by the bankruptcy court and subsequently executed by the parties called for the return by Harvard of $675,000 to the Trustee as preference payments without any further allocation of the amount returned as between the amounts paid regarding the New Invoices and the other amounts. Plaintiff's claim for damages related to the preference action is an estimate based on the proportion of funds at issue that is represented by the New Invoice amount ($404,052.12), or 47.3% of the total of $854,052.12 and the remaining funds ($450,000), or 52.7% of the total. These percentages were applied to the $675,000 to arrive at the estimate of $319,275 as being the amount of payment to the Trustee, the "damages," attributable to the New Invoices. Defendant contends that the damage claim

Case 2:14-cv-11916-GCS-SDD ECF No. 112-3, PageID.3508 Filed 06/15/16 Page 7 of 12
Harvard Drug Group, LLC v. Linehan, Not Reported in F.Supp.2d (2010)
2010 WL 3906094

arising from the preference action has not been properly stated because there was no finding by a court that the $319,275 was attributable to the New Invoices payment. Defendant does not dispute plaintiff's entitlement, under the terms of the personal guaranty, to payment for amounts that are returned to the Trustee under a preference action, but does dispute that such damages have been sufficiently proved under the present circumstances.[3]

*8 With respect to the calculation of damages, Michigan courts have stated that a "trial court need not compute damages with mathematical exactness." *Auto Electric v. Rockwell International Corp.,* 111 Mich.App. 292, 298–99, 314 N.W.2d 592 (1982). " 'It is sufficient if a reasonable basis of computation be employed although the results be only approximate.' " *Id.,* quoting, *Waskin Development Co. v. Weyn,* 369 Mich. 121, 128, 119 N.W.2d 662 (1963). In the present case, defendant does not dispute plaintiff is entitled to damages relating to the return of funds pursuant to a preference action, but challenges the methodology used by plaintiff in estimating the damages in these circumstances. Defendant does not offer an alternate, more equitable, or more accurate method of calculating the damages. The undersigned concludes that the percentage allocation method employed by plaintiff to calculate its damages in this regard is a "reasonable basis of computation" and thus satisfies Michigan law with respect to the degree of certainty associated with a damage claim. The parties to the preference action reached a settlement, the most common method of resolving litigation, without specifying how the amount of the settlement should be apportioned between the funds that were in dispute. Reaching a settlement in this fashion is not fatal to plaintiff's claim in the present litigation. Working from the premise that plaintiff is entitled to some portion of the funds returned to the Trustee, the calculation proposed by plaintiff appears fair and reasonable and no alternative is readily apparent that would be more accurate or more reasonable.

C. *Attorney Fees*

Plaintiff seeks attorney fees, pursuant to the terms of the personal guaranty, for legal services associated with the efforts to collect on the guaranty and for legal services associated with defending the preference action in bankruptcy court in Texas. Defendant does not dispute plaintiff's entitlement to attorney fees associated with the efforts to collect on the guaranty, but does object to the amount of those fees as claimed by plaintiff. Defendant objects to plaintiff's entitlement to attorney fees associated with the defense of the preference action in bankruptcy court based on the position that plaintiff waived such a claim by the terms of the settlement agreement in that action which provided that each side to the lawsuit would bear its own costs.

1. Standards for the award of attorney fees

Both sides cite *Smith v. Khouri,* 481 Mich. 519, 751 N.W.2d 472 (2008) as the leading Michigan case relating to the standards for the award of attorney fees. *Smith* says the proper procedure for calculating a reasonable attorney amount begins with the establishment of a "reasonable hourly or daily rate customarily charged in the locality for similar legal services, using reliable surveys or other credible evidence." *Id.* at 522, 751 N.W.2d 472. The hourly rate determined to be applicable should then be multiplied by "the reasonable number of hours expended." *Id.* The product of that calculation should then be reviewed under the factors identified in *Wood v. Detroit Automobile Inter–Ins. Exch.,* 413 Mich. 573, 321 N.W.2d 653 (1982) and Rule 1.5(a) of the Michigan Rules of Professional Conduct, and perhaps other factors. *Id.* A "reasonable" fee is not necessarily the same as the "actual" fee charged by the attorney and it is not the "highest rate the attorney might otherwise command." *Id.* at 528, 321 N.W.2d 653. Nor is it the same as "the fees paid to the top lawyers by the most well-to-do clients." *Id.* at 533, 321 N.W.2d 653. "The reasonable hourly rate represents the fee customarily charged in the locality for similar legal services, which is reflected by the market rate for the attorney's work [which is] 'the rate that lawyers of similar ability and experience in the community normally charge their paying clients for the type of work in question.' " *Id.* at 531, 321 N.W.2d 653.

*9 With respect to establishing the reasonable hourly rate, the burden is on the fee applicant "to establish satisfactory evidence" of that figure and the applicant must present more than "anecdotal statements to establish the customary fee for the locality." *Id.* at 531–32, 321 N.W.2d 653. The customary fee could be established "by testimony or empirical data found in surveys and other reliable reports" such as those published by "the State Bar of Michigan, as well as other private entities." *Id.*

With respect to establishing the "reasonable" number of hours expended by the fee applicant, the applicant "must submit detailed billing records, which the court must examine and opposing parties may contest for reasonableness [and] the Court should exclude 'excessive, redundant or

otherwise unnecessary' hours regardless of the attorneys' skill, reputation or experience." *Id.* at 532, 321 N.W.2d 653.

**2. Fees relating to guaranty lawsuit**
Plaintiff seeks attorney fees relating to the present lawsuit in the amount of $195,255.45. These fees are divided between several lawyers and legal assistants who had worked on the case at various times. The respective hourly rates charged for the services of three of the lawyers are $390 for Mr. Glazek, $250 for Ms. Fitzgerald, and $240 for Mr. Stefan. The hourly rate for legal assistant/paralegal services is $130. (Dkt.55–10, p. 4). An examination of the actual billing statements also reflects the services of three other lawyers including Melonie L. Stothers at $230 per hour, Matthew J. Bredeweg at $220 per hour and Rebecca Simkins at $255 per hour. Plaintiff supports this claim with an affidavit by Mr. Glazek stating that these rates are "consistent with the rates charged by similar firms in the Detroit area for similar legal services rendered by attorneys with comparable experience, reputation, and ability." (Dkt.55–10, p. 5). Plaintiff also relies on the 2008 Directory of Michigan's Largest Law Firms (Directory) which lists the hourly rates reported by some of the firms included in the directory. Defendant argues that these rates actually charged by plaintiff's lawyers are too high to be considered "reasonable" and offers the 2007 Economics of Law Practice Summary Report (Summary) in support of his position.

The calculation of a reasonable fee begins with a determination of "the fee customarily charged in the locality for similar legal services ... based on reliable surveys or other credible evidence of the legal market." *Smith,* 481 Mich. at 530–31, 751 N.W.2d 472. The Directory included information for over 50 law firms (presumably the "largest" firms in Michigan with lawyers numbering between 21 and 232) in Michigan, but only 13 of those firms were in the Detroit area and listed their hourly rates for partners, associates and paralegals. The range of hourly rates for partners was a low of $200 and a high of $650, which has an average of $425, but with a weighted average of $359 for the responding firms.[4] The range of hourly rates for associates was a low of $110 and a high of $435, which has an average of $272.50, but with a weighted average of $221 for the responding firms. The range of hourly rates for paralegals was a low of $60 and a high of $245, which has an average of $152.50, but with a weighted average of $118 for the responding firms.

**\*10** The Summary shows median billing rates for litigation firms. The 50th percentile amount for all the responding firms is $195 per hour and the 90th percentile rate for all responding firms is $272 per hour. (Dkt.56, Ex. G). These figures are not adjusted by the age or experience of the attorneys. The Summary also shows median litigation billing rates by years of practice. The 50th percentile for lawyers with five to nine years of practice is $165 and the 90th percentile is $250. The 50th percentile for lawyers with 30–39 years of practice is $200 and the 90th percentile is $300. *Id.* The median billing rates by region show that the rate is $210 for downtown Detroit and $200 for Wayne, Oakland (south) and Macomb Counties. This statistic does not show a range of these rates based on percentiles. *Id.*

The initial objective is to identify the "customary" charges for "similar legal services." The nature of the legal services applicable to this case is legal services that would normally be provided to large corporate clients in commercial litigation situations. Based on related information included in the Directory, it would appear that the larger firms frequently represent corporations and are frequently involved in commercial litigation. The Summary does not list such information and, additionally, the firms responding to the Bar survey that was the basis for the Summary appear to be primarily small firms. Approximately 72%[5] of the firms responding to the litigation hourly rate survey were single attorney firms and there was literally no data included for firms that were greater than ten attorneys. It is not at all clear that the Summary is an accurate representation of the customary fees that would be charged by attorneys who represent corporate clients in commercial litigation circumstances, given the absence of any information in the Summary from which such a conclusion can be drawn and given the small firm database from which the information is apparently obtained.

The undersigned concludes that the Directory is a more accurate basis for establishing the customary charge for comparable legal services, and the data from that source will be examined. Taking the midpoint of the average and the weighted average for partners results in an hourly rate of $392. The similar calculation for associate attorneys is $246.75 and for paralegals is $135.25. No particular authority equates "average" numbers with "customary," but logic certainly suggests an affinity between those concepts. These numbers will serve as "customary" hourly rates for the services provided with respect to the present guaranty

Case 2:14-cv-11916-GCS-SDD ECF No. 112-3, PageID.3510 Filed 06/15/16 Page 9 of 12
Harvard Drug Group, LLC v. Linehan, Not Reported in F.Supp.2d (2010)
2010 WL 3906094

litigation. This will be the "starting point" for calculating the reasonable attorney fees applicable to this case.

The next step in the *Smith* analysis is to determine the "reasonable number of hours expended in the case." *Smith,* 481 Mich. at 531, 751 N.W.2d 472. Plaintiff has submitted billing statements, with some redactions based on privilege, with respect to the services rendered here. Defendant has challenged the submissions of plaintiff contending, correctly, that the burden is on the fee applicant and that the supporting documentation should be sufficiently precise to allow the Court to analyze the reasonableness of the time spent and to eliminate excess or redundant charges. During oral argument, defendant's counsel identified a few examples of claims for time spent that seemed out of proportion to the completed project and also objected to billings for two attorneys who worked on the same pleading or hearing. "The court has the obligation to scrutinize line-by-line bills to determine whether [the attorneys and paralegals] spent a reasonable amount of time on each discrete task, such as reading an adversary's brief, researching the law and writing its own brief, preparing for oral argument, traveling to oral argument, attending oral argument, etc." *Poly–Flex Construction v. Neyer, Tiseo & Hindo, LTD.,* 600 F.Supp.2d 897, 916 (W.D.Mich.2009) (applying Michigan law).

**\*11** The undersigned has reviewed, line-by-line, the billing statements of plaintiff's counsel. Admittedly a certain degree of deference must be given to attorneys who submit billing statements because it would be impossible to examine each and every transaction and conclude that the number of hours listed as being expended is out of proportion to the work performed. There is no mathematical equation that determines how many hours it takes to research and write a five-page brief. While defendant's counsel, during oral argument, suggested a few instances in which the time expended seemed inordinately long for the end result, such anecdotal observation is not persuasive and does not overcome the deference that should be given to an attorney who has submitted a statement to the court claiming to have put in the number of hours listed in the billing statement. The review undertaken by the undersigned does not suggest anything grossly out of line with the work described in the statement and, therefore, the amount of hours identified is found to be "reasonable." As defendant has noted, there were some instances in which two attorneys appeared at the same hearing or deposition. The undersigned finds that the presence of two attorneys at the same hearing is not, *per se,* unreasonable. The occasions in which such effort appears in the billing statements in not common and does not suggest a practice of double billing the client merely for the purpose of increasing the billable hours for the law firm. It may or may not be more efficient and cheaper to have a single attorney appear at a hearing or deposition but it is not "unreasonable" for two attorneys to function in that fashion on occasion. Further, contrary to defendant's contention that the billing statements are not sufficiently precise, the undersigned finds that the billing statements describe, with adequate detail, the nature of the work done and the time, in tenths of an hour, taken to accomplish the work described. Based on the showing plaintiff has made, the undersigned concludes that the amount of hours expended, as reflected in the billing statements, is reasonable.

The next step in the *Smith* analysis is reviewing the factors in *Wood* as well as the factors in Rule 1.5(a) of the Michigan Rules of Professional Conduct in order to determine if an up or down adjustment should be made from the "customary" fee charged for the services. *Smith,* 481 Mich. at 531, 751 N.W.2d 472. The *Wood* factors include: (1) the professional standing and experience of the attorney, (2) the skill, time and labor involved, (3) the amount in question and the results achieved, (4) the difficulty of the case, (5) the expenses incurred, and (6) the nature and length of the professional relationship with the client. *Id.* at 529, 751 N.W.2d 472. The MRPC factors include: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal services properly, (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer, (3) the fee customarily charged in the locality for similar legal services, (4) the amount involved and the results obtained, (5) the time limitations imposed by the client or by the circumstances, (6) the nature and length of the professional relationship with the client, (7) the experience, reputation, and ability of the lawyer or lawyers performing the services, and (8) whether the fee is fixed or contingent. *Id.* Clearly there is some overlap between the two sets of factors.

**\*12** It should be noted that, with one very small exception, the actual fees charged are less than the finding as to the "customary" fees in similar cases and, therefore, it would not appear necessary to consider any "up" adjustment of the customary fees in this instance in order to arrive at a reasonable fee calculation. While there may be some occasions where the "customary" fee should be adjusted upward to arrive at a "reasonable" fee, the instances where that would happen when the actual fee charged was less

Case 2:14-cv-11916-GCS-SDD ECF No. 112-3, PageID.3511 Filed 06/15/16 Page 10 of 12
Harvard Drug Group, LLC v. Linehan, Not Reported in F.Supp.2d (2010)
2010 WL 3906094

than the "customary" fee would be very few. Addressing the overlapping *Wood* /MRPC factors, plaintiff's attorneys appear to have high standing and, at least with respect to lead counsel, significant experience. The associate attorneys who worked on the case also appear to have reasonable amounts of experience. This matter was vigorously defended and the skill and effort expended by plaintiff's attorneys to prosecute the case was to a high standard. The case involved a large sum of money and the efforts of plaintiff's counsel resulted in a decision in favor of plaintiff. The issues litigated were far from simple and straightforward. Reasonably significant expenses were incurred in litigating this case given the depositions, court appearances, and case-related travel. Plaintiff and present counsel have been working together for a considerable length of time. Based on this evaluation, the undersigned concludes there is no justification for a downward adjustment from the "customary" fee calculation to arrive at a "reasonable" fee and, therefore, based on this record, the actual fees charged represent a reasonable fee for the legal services provided to plaintiff by its attorneys.

Defendant challenges an award of fees associated with the services of a paralegal. The basis of the challenge is that, in order for paralegal fees to assessable under M.C.R. 2.626, the paralegal must meet the criteria of Article 1, § 6 of the Bylaws of the State Bar of Michigan. These provisions require a showing that the paralegal meet certain educational or work experience requirements. Plaintiff has not disputed the argument of defendant in this regard. Additionally, there is some authority for defendant's argument. *L & M Brikho's Market, Inc. v. Emerson–Prew, Inc.,* 2007 WL 3357740 (Mich.App.2007). The record does not disclose any information indicating the paralegal fees claimed by plaintiff were the result of the efforts of someone who meets the required qualifications and, therefore, those fees will not be allowed.

Excluding the amount of the fees attributable to paralegal services from the claim of plaintiff for fees and costs regarding the present litigation results in an amount of $226,941.53.

D. *Costs From Preference Action*

1. Waiver of fees
Defendant claims that plaintiff waived any claim for fees associated with the preference action by entering into a settlement agreement that provided that each side would bear their own costs. (Dkt.56). Plaintiff argues that the language in the settlement agreement providing that each party will bear their own costs has nothing to do with the terms of the guaranty signed by defendant regarding reimbursement for expenses in defendant the preference action. (Dkt.58).

*13 It is clear that defendant was not a party to the preference action so these terms have no direct connection to defendant. The most reasonable interpretation of these terms of the settlement agreement in the preference action is that each party to the agreement will absorb their own costs of the litigation and will not seek recovery of those costs from the other parties to the litigation. No basis exists to conclude that these terms were intended to be a waiver of the costs for purposes of seeking reimbursement under the guaranty, a right that defendant generally acknowledges exists.

2. Amount of fees allowed
Plaintiff claims a total of attorney fees and costs associated the preference action of $188,136.52. Plaintiff applies the same allocation of those costs, 47.3%, as it did to the damages from the preference action to establish a $88,988.57 request for reimbursement from defendant. (Dkt.55). Defendant claims these fees are excessive, not properly supported, not properly justified and, with respect to paralegal fees, not reimbursable at all. (Dkt.56).

Following the procedure from *Smith,* the undersigned will first attempt to establish a "customary" attorney fee that will be applicable to these circumstances. The only survey "evidence" of the legal market where these services were provided (Dallas) is the excerpt from the *Texas Lawyer,* dated June 29, 2009, listing "survey averages" of hourly billing rates based on attorney status, geographic location and firm size. (Dkt.55–8, p. 77). Additional "evidence" includes the affidavit of Mr. Holmes, the lead attorney for plaintiff in the preference action, and the representation by defendant that the attorney for the Trustee in the preference action, Mr. Elmquist, charged $350 per hour.

Smith suggests that "customary" fees can best be established by either testimony or "empirical data found in surveys and other reliable reports [and that] anecdotal statements" are not, by themselves, sufficient. *Smith,* 481 Mich. at 531–32, 751 N.W.2d 472. The only survey results offered by either party here is the excerpt from the *Texas Lawyer.* That source indicates that the average hourly rate for a "partner" in the Dallas/Fort Worth area in 2009 was $478, the average hourly rate for a "non-equity partner" in the same area was $476 and the average hourly rate for a "4th-year associate" was $289.

Case 2:14-cv-11916-GCS-SDD ECF No. 112-3, PageID.3513 Filed 06/15/16 Page 11 of 12
Harvard Drug Group, LLC v. Linehan, Not Reported in F.Supp.2d (2010)
2010 WL 3906094

Mr. Holmes' status with the firm is that of "counsel," which is not further defined in the pleadings, but it is clear that such status is above that of "associate" and thus, the "non-equity partner" rate will be used as a comparable rate for his services. The background and experience of the associate who billed hours in this case is not described so the mid-level associate rates, or "4th-year associate," rates from the *Texas Lawyer* will establish the comparable rates for that service. While the survey results seem to indicate that the largest law firms have a higher hourly rate than these, there is no reason to believe that only the largest firms in the area have sufficient skill to provide legal services similar to those provided here and, therefore, the overall average seems the better indicator of the "customary" rate in the Dallas legal market. While this data appears reliable, it is the only survey data provided and conclusions regarding establishing customary fees will be drawn from that. The Holmes affidavit and the Elmquist fees seem too "anecdotal" to be helpful in establishing a customary fee.

*14 The billing statements from Hunton & Williams have been reviewed, line-by-line, and appear to be sufficiently detailed to allow for an understanding of the particular work done with respect to the charges assessed. The time spent is measured to a tenth of an hour. The time associated with the explanation of the work performed has been reviewed and all such times seemed within professional ranges of reasonableness and are not grossly out of line with general expectations for similar work. Defendant's critical comments regarding some of the work and the time associated with it are not persuasive in that it is very difficult to standardize the time it takes a lawyer to perform a particular function, given the number of variables involved in legal and factual research, consultation, drafting and other common aspects of the work of a lawyer. As indicated with respect to the earlier evaluation of the other billing statements in this case, a certain amount of deference is given to the statements of a lawyer and the time he or she may have spent on a particular task. Considering all of those factors the number of hours spent on behalf of plaintiff in the preference action, as indicated by the billing statements, is found to be a reasonable amount of time for the work involved in defending that action.

It should be noted that although the hourly rates applicable to the preference action are based on the legal market in Dallas, the procedure in assessing the award of fees is governed by Michigan standards because the basis of the award is the guaranty terms that were part of an agreement drafted in Michigan. Having established a "customary" fee and a reasonable number of hours, the next step in the *Smith* analysis is to determine if any adjustments should be made based on the *Wood*/MRPC factors that were identified earlier. No information has been provided with respect to the partners or associates in this matter so there is no basis on this record to adjust the "customary" fees, up or down, associated with those respective positions. The information associated with Mr. Holmes establishes that he is a very capable attorney and because the hourly rates associated with his services are very close to the customary rate indicated there would be no basis of adjusting his rate down from that point. The legal issues were relatively complex in this matter and the result achieved through the efforts of counsel appear to be reasonable from the perspective of plaintiff, when the merits of the case were considered. Given all of these factors, no further adjustment seems appropriate.

Given the above analysis, the reasonable attorney fees associated with services provided to plaintiff with respect to the preference action include the following: (1) 6.6 hours of "partner" services at the customary rate of $478 per hour equals $3,154.80; (2) 323.7 hours of the services of Mr. Holmes at the billed rate of $475 per hour (the customary rate was $476 but the actual rate billed was used because it was lower) equals $153,757.50; and (3) 22.3 hours of "associate" services at $289 per hour equals $6,444.70. The total for these "reasonable" legal services amounts to $163,357. No paralegal fees or file clerk fees will be allowed. Actual expenses, which were not challenged by defendant, in the amount of $11,812.37 (reflected in the billing statements) will be allowed. This results in a total amount of $175,169.37 in attorney fees and costs associated with the preference action that is subject to reimbursement. That amount should be allocated between the amounts of the preference action attributable to the "New Invoices" and the other amounts using the 47.3% factor previously identified. That nets an amount of $82,855.11 that will be awarded to plaintiff in addition to the other damage amounts noted. Given that the preference action is concluded, this appears to be a total amount.

## VI. SUMMARY AND RECOMMENDATION

*15 Based on the foregoing, the undersigned **RECOMMENDS** that summary judgment in favor of plaintiff be entered as follows:

Unpaid invoices: $1,401,813.06

| | |
|---|---:|
| Interest (to June 23, 2010) | 204,428.00 |
| Preference Action Damages | 319,275.00 |
| Attorney Fees/Costs (Guaranty) | 226,941.53 |
| Attorney Fees/Costs (Preference) | 82,855.11 |
| Total: | $2,235,312.70 |

The total amount will have to be adjusted based on interest through the date of judgment and additional attorney fees if necessary.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Sec'y of Health and Human Servs.,* 932 F.2d 505 (6th Cir.1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.,* 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3906094

Footnotes

1. During the oral argument on the motion for summary judgment on June 23, 2010, the question arose as to whether defendant could take advantage of the release under any circumstances based on whether he met the criteria for the "Trustee Released Parties." Defendant's counsel asserted that defendant held some position with Soporex, as of the effective date of the Settlement Agreement that qualified him for inclusion in the released parties definition, an assertion that was disputed by plaintiff. Defendant's counsel said she would submit something to the Court following the hearing demonstrating that defendant held such a position, but nothing has been submitted to that end. To the extent the claim of release is essentially an affirmative defense, defendant would have the burden of proof that he was eligible to make such a claim. In that defendant has not offered any evidence that he was eligible to come within the scope of the release provisions, even the version contained in the initial Settlement Agreement, defendant's claim of release fails regardless of which version of the Settlement Agreement is considered.
2. Webster's Unabridged Dictionary, 2d Edition, defines induce to mean "to lead or move by persuasion or influence or to bring about, produce or cause."
3. Defendant's concession in this regard as to the potential liability for the return of funds pursuant to a preference action was made on the record during the June 23, 2010, hearing.
4. The weighted average was determined by establishing the average rate for each firm and then taking the average of the average rate for all the 13 responding firms from the Detroit area.
5. The report included responses from 305 firms, of which 221 were identified as having a single attorney in the firm.

End of Document © 2016 Thomson Reuters. No claim to original U.S. Government Works.