# EXHIBIT C

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**NATALIE REESER**,

               Plaintiff,

v

**HENRY FORD HOSPITAL**,

         Defendant.

Case No. 2:14-cv-11916-GCS-MJH
Hon. George Caram Steeh
Magistrate Judge Michael Hluchaniuk

---

**MILLER COHEN, P.L.C.**
Keith D. Flynn (P74192)
Adam C. Graham (P79361)
*Attorneys for Plaintiff*
600 W. Lafayette Blvd., 4th Floor
Detroit, MI 48226-0840
(313) 964-4454 Phone
(313) 964-4490 Fax

**VARNUM LLP**
Terrance J. Miglio (P30541)
Barbara E. Buchanan (P55084)
*Attorneys for Defendant*
39500 High Pointe Blvd., Ste. 350
Novi, MI 48375
(248) 567-7828 Phone
(248) 567-7423 Fax

---

## PLAINTIFF'S RESPONSE TO
## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................... ii

MOST CONTROLLING AUTHORITIES ........................................... iv

STATEMENT OF QUESTIONS PRESENTED .................................... v

I.    INTRODUCTION ................................................................................ 1

II.   STATEMENT OF FACTS ................................................................... 2

      A. Plaintiff was not paid for lunch periods that she was "engaged to wait"
         in violation of the Fair Labor Standards Act, which she reported to
         the State of Michigan and Human Resources ............................................ 3

      B. Defendant's written policies have always required employees to take
         a 30 minute unpaid mandatory lunch .......................................................... 7

      C. On February 25th, Reeser was retaliated against by Bork for reporting
         to the State and was suspended for taking a lunch that three managers
         were aware that she was taking before she left .......................................... 9

      D. Plaintiff reported to the Michigan Department of Licensing and
         Regulatory Affairs (LARA) leading Defendant to terminate her
         employment after a sham investigation ..................................................... 11

      E. Defendant's discipline policy ..................................................................... 12

III.  ARGUMENT ........................................................................................ 14

      A. Henry Ford Hospital is an assumed name of Henry Ford Health
         System, Defendant has been on notice of the allegations in this lawsuit,
         and Plaintiff has submitted an amended complaint to cure any defect . 15

      B. Defendant unlawfully retaliated against Plaintiff for engaging in
         protected activity under the FLSA and WPA ............................................ 15

      C. Defendant's Nondiscriminatory Reason for Termination is Mere
         Pretext ........................................................................................................ 21

i

## TABLE OF AUTHORITIES

**Case**                                                                                                     **Page**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..............................................14

*Carlson v. Leprino Foods Co.*, 522 F. Supp. 2d 883 (W.D. Mich. 2007)...16, 19, 22

*DiCarlo v. Potter*, 358 F.3d 408, 421-22 (6th Cir.2004).........................................18

*Hamilton v. General Electric Co.*, 556 F.3d 428, 435-36 (6th Cir.2009) ..............19

*Hindman v. Transkrit Corp.*, 145 F.3d 986 (8th Cir. 1998) ...................................15

*Jacklyn v. Schering–Plough Healthcare Products Sales Corp.,*
 176 F.3d 921, 926 (6th Cir.1999) ........................................................................16

*Jones v Potter*, 488 F3d 397, 408 (6th Cir 2007) ....................................................21

*Light v. MAPCO Petroleum, Inc.,*
 No. 3:04-0460, 2005 WL 1868766, at *12 (M.D. Tenn. Aug. 4, 2005) ............18

*Markos v. Mt. Brighton, Inc.,*
 No. 08-CV-12588; 2009 WL 2591372 (E.D. Mich. 2009) ...............................18

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
 475 U.S. 574 (1986)..............................................................................................14

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ...............................16, 22

*McLemore v. Detroit Receiving Hosp. & Univ. Medical Center*,
 196 Mich. App. 391, 398 (1992) ..........................................................................20

*Moore v. Freeman*, 355 F.3d 558 (6th Cir. 2004) ............................................15, 21

*Morris v. Aon Service Corp.,*
 No. 10–14620, 2011 WL 5864757, at *1 (E.D. Mich. Nov. 22, 2011)..........4, 18

*Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) ...........................17

*Peake v. Martinrea Fabco Hot Stamping, Inc.,*
 No. 09-10348; 2011 WL 1157864, at *5 (E.D. Mich 2011) ..............................16

*Roberts v. Principi*, 283 Fed Appx 325, 333 (6th Cir 2008) ..................................17

*Shimkus v Hickner*, 417 F. Supp. 2d. 884 (ED Mich. 2006) ..................................15

*Thompson v. Aramark Sch. Support Servs., Inc*.,
 490 F.3d 506, 509 (6th Cir. 1007) ........................................................................19

*Turpin v. Cable Tel Servs., Inc.*,
  3:09-CV-147, 2010 WL 670080, at *3 (E.D. Tenn. Feb. 22, 2010) .................20

*Weberg v. Franks,* 229 F.3d 514, 523 (6th Cir.2000)...............................................16

*Whitaker v. U.S. Sec. Associates, Inc.*,
  774 F. Supp. 2d 860 (E.D. Mich. 2011) ......................................................16, 22

## Statutes, Rules and Regulations

29 U.S.C. § 215 ...........................................................................................................2

29 U.S.C. § 215(a)(3)................................................................................................15

F.R.C.P. 56(c) ...........................................................................................................14

M.C.L. § 15.361 ..........................................................................................................2

M.C.L. §15.362 .........................................................................................................15

## MOST CONTROLLING AUTHORITES

*Carlson v. Leprino Foods Co.*, 522 F. Supp. 2d 883, 888 (W.D. Mich. 2007)

*Hamilton v. General Electric Co.*, 556 F.3d 428, 435-36 (6th Cir.2009)

*McLemore v. Detroit Receiving Hosp. & Univ. Medical Center*, 196 Mich. App. 391, 398 (1992)

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)

*Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)

*Roberts v Principi*, 283 Fed Appx 325, 333 (6th Cir 2008)

*Weberg v. Franks,* 229 F.3d 514, 523 (6th Cir.2000)

*Whitaker v. U.S. Sec. Associates, Inc.*, 774 F. Supp. 2d 860, 867 (E.D. Mich. 2011)

## STATEMENT OF QUESTIONS PRESENTED

(1) Whether the Court should deny Defendant's Motion for Summary Judgment alleging that the above-captioned Complaint should be dismissed for naming the wrong Defendant where Plaintiff named Henry Ford Hospital, an assumed name of Henry Ford Health System, where Plaintiff's former employer received notice having been served with the Summons and Complaint, where Plaintiff has filed a Motion to Amend the Complaint that is currently pending, and where Defendant has had every opportunity to litigate this matter and would suffer no prejudice from the correction of an alleged misnomer.

Plaintiff Answers: Yes.                    Defendant Answers: No.

(2) Whether the Court should deny Defendant's Motion for Summary Judgment asserting that there is no genuine issue of material fact as to whether Plaintiff was terminated in retaliation for asserting rights under Fair Labor Standards Act or in violation of the Whistleblower Protection Act where Plaintiff had been threatened by her direct supervisor in the past for reporting unpaid wages for lunches she was "engaged to work" to Human Resources, where Plaintiff's direct supervisor indicated that she was going "to be sorry" for reporting her claims of unpaid wages to the State the day she was suspended, where Defendant's policies do not provide for termination for Plaintiff taking a lunch, where no one has ever been terminated for Plaintiff's alleged misconduct, where other employees who did not engage in protected activity have engaged is much more severe misconduct were not terminated, and where Plaintiff provided notice and received approval from a manager to leave prior to taking her lunch.

Plaintiff Answers: Yes.                    Defendant Answers: No.

(3) Whether the Court should deny Defendant's Motion for Summary Judgment asserting that there is no genuine issue of material fact that Plaintiff was terminated for a legitimate non-discriminatory reason for "job abandonment" where Plaintiff had been threatened by her direct supervisor in the past for reporting unpaid wages for lunches she was "engaged to work" to Human Resources, where Plaintiff's direct supervisor indicated that she was going "to be sorry" for reporting her claims of unpaid wages to the State the day she was suspended, where Defendant's policies do not provide for termination for Plaintiff leaving work to go to lunch without approval, where no one has ever been terminated for such conduct, where other employees who did not engage in protected activity have engaged is much more severe misconduct were not terminated, and where Plaintiff provided notice and received approval from a manager to leave prior to taking her lunch.

Plaintiff Answers: Yes.                    Defendant Answers: No.

# I. INTRODUCTION

Defendant claims that there is no genuine issue of material fact over whether Plaintiff's termination was motivated by Plaintiff's reports to Human Resources and the State of Michigan for not being paid for over 370 lunches she was forced to work through.  Yet, the morning that Plaintiff was suspended, her direct supervisor, Fiona Bork, threatened that Plaintiff would "be sorry" for going to the State of Michigan regarding the unpaid hours.  (Reeser Dep. 260-63, 264, 267)

Defendant alleges that Plaintiff was terminated for taking a thirty-minute unpaid lunch as she was entitled and **MANDATED** to take under Defendant's work rules.  (*Exhibits I & N*)   Notably, Defendant's own managerial witnesses acknowledged that no one has ever been terminated for taking a lunch.  (Wiseheart Dep. 44-47) Defendant's work rules even indicate that, at most, Plaintiff's discipline should only have been one occurrence.  (*Exhibit XX*)  Employees are not subject to the first corrective action, documented counseling, until they reach three occurrences.  (Id.)  Yet, Plaintiff had never been disciplined before the suspension.

Defendant cites to several other examples of employees who were terminated for similar issues.  Yet, the disciplinary records provided by Defendant indicate that these individuals were not terminated until after numerous occurrences, including employees who would leave their facility hours before the end of the day or employees who committed fraud or engaged in workplace violence.  (*Exhibits TT &*

1

*UU*; Wiseheart Dep. 44-47)  Defendant expects this Court to ignore all of that and find that Plaintiff's suspension, which occurred within a week after she threatened to report to the State and the same day her direct supervisor threatened her, and Plaintiff's termination, which occurred within a week after her report to the State, were solely related to Plaintiff's taking a lunch on February 25th.  Of course, this also ignores the fact that Plaintiff notified three managerial employees that she intended to take a lunch that day on several occasions and even had the approval of the manager who was at the site.  (Reeser Dep. 322; *Exhibits JJ & KK*)

Yet, Defendant argues that Plaintiff's claims of retaliation in violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 215, and the Whistleblower Protection Act, (WPA), M.C.L. § 15.361 *et seq.*, should be dismissed.  Simply put, this argument strains credulity.  At the very least, there are numerous genuine issues of material fact regarding these issues that should be addressed by a jury.

## II.  STATEMENT OF FACTS

On May 16, 2011, Plaintiff began her employment at Henry Ford Health System (Henry Ford) as a Laboratory Assistant. (*Exhibit A*) As a Laboratory Assistant, Plaintiff performed blood sample collection, among other duties. (*Exhibit B*) For the majority of the time Plaintiff worked for Defendant, she performed her work at the Clinton Township Patient Service Center (CTPSC). (Bork Dep. 129)

Plaintiff was supervised by two managers at CTPSC, Fiona Bork and Martha

Wiseheart. (Reeser Dep. 36, 222) Bork, a Laboratory Sales Manager, wrote Plaintiff's reviews. (Reeser Dep. 222) Wiseheart, a Regional Laboratory Manager, supervised Plaintiff's administrative work. (Reeser Dep. 36; Wiseheart Dep. 22) Wiseheart also advised Plaintiff on customer relations issues. (*Exhibit C*)

Before early 2014, Plaintiff had a good working relationship with Bork and Wiseheart and excellent performance reviews. (*Exhibits D, E, & F*) On multiple occasions, Plaintiff's supervisors complemented her and noted that she went "above and beyond the call of duty." (*Exhibits* G & H).

A.   **Plaintiff was not paid for lunch periods that she was "engaged to wait" in violation of the Fair Labor Standards Act, which she reported to the State of Michigan and Human Resources**

Defendant had an unpaid mandatory 30 minute lunch policy while Plaintiff was employed at Henry Ford. (*Exhibit I*) Regardless of this policy, Plaintiff's repeated requests to take a 30 minute lunch were denied and she was repeatedly denied compensation for being forced to work through lunch. (Reeser Dep. 92, 94, 115) From 2012 to 2014, Plaintiff was not paid for 376 lunches to which she was entitled. (*Exhibit J*)

In early January 2014, after learning from a doctor in the facility that this practice was illegal, Ms. Reeser contacted the State. (Reeser Dep. 110, 202-03, 291) On January 14, 2014, Plaintiff contacted Human Resources (HR) Senior Business Partner Jill Hood to request a meeting concerning this issue, among others. (*Exhibit K*)

Before Plaintiff's meeting with Hood on January 15, 2014, Plaintiff discovered that Bork had somehow learned of her planned meeting with HR. (*Exhibit K*) After Plaintiff confirmed that she was meeting with HR, Bork "was appalled" and adopted a "how dare [you]" attitude. *Id.*

On January 16, 2014, Bork wrote an unsolicited email to Hood, stating, among other things, that Natalie routinely engaged in poor behavior, such as "want[ing] to leave a site unattended so that she can 'run' to take care of something quickly." (*Exhibit L*) In the same email, Bork asked Hood "[d]o you happen to know who is meeting with Natalie at 12:30 tomorrow?" *Id.* Hood purposefully did not respond to this email noting that the request was odd because it was none of her business. (Hood Dep. 107-08) Bork later sent a second email to Hood on January 17, 2014, stating "Natalie is very immature and has a tendency to take everything personally." (*Exhibit L*).

On January 20, 2014, Plaintiff informed Hood that she had not been allowed to take 30 minute lunch breaks away from her office for years. (*Exhibit M*) Plaintiff indicated she "recently learned . . . The Fair Labor Standards Act (FLSA) states that hourly employees, who are required to work more than 40 hours in a work week, are to be compensated for those hours under a term called, 'engaged to work.'" *Id.* Plaintiff requested "[HR] . . . intercede, and allow employees . . . a scheduled/advertised 30-minute closure of the lab each day for a meal break." *Id.*

4

Plaintiff explained that Bork said she would be "terminated" if she reported this issue. (Hood Dep. 134) "I have been told by my supervisor that if I want a lunch break outside of the office, I will 'lose' the opportunity to work in Clinton Twp." (*Exhibit M*)

Hood explained that she would speak with Bork about the lunch policy and Plaintiff could then begin putting "no lunch" on her timecard to reflect the time owed pursuant to the FLSA. (Hood Dep. 151) On January 26, 2014, Bork emailed Plaintiff and asked "[c]ould you let me know what prevented you from taking lunch 8 out of the 10 days on your time card. Our policy has always been to contact me to get **approval not to get a lunch**. As you know **lunches are mandatory**." (*Exhibit N*) (emphasis added). On January 27, 2014, Plaintiff emailed Hood, stating "I went ahead and put no lunch and I get an email stating, I cannot with out approval, I need some direction on this, because this is upsetting." (*Exhibit N*)

After Plaintiff's email to Hood, Wiseheart sent an email to Plaintiff denying Plaintiff compensation for lunches she worked until verified by Bork. (*Exhibit O*) Plaintiff then emailed Hood, Bork, and Wiseheart, stating "Ladies, please be advised that HR has me recording days that I do not get a lunch. It is illegal to have me work through a lunch break and not pay me . . ." (*Exhibit P*) After receipt of this email, Hood called Bork, confirmed that she had not been paying Plaintiff's lunches, and informed her that under the FLSA an employee is entitled to 30 minutes of

uninterrupted time if their lunch is uncompensated. (Hood Dep. 153-54). After receipt of Plaintiff's email, Bork emailed her boss, John Waugh, Vice President of Laboratory Systems, indicating that Plaintiff's complaints raised "a huge problem" and arguing that Plaintiff was not entitled to pay because there were hours of downtime at CTPSC due to patient volume. (*Exhibit Q*)

Soon after Plaintiff's January 27 email, in late January or early February 2014, Bork called Plaintiff in the evening and "told [her] off", stating "[you'll] be sorry" for reporting unpaid lunches to the State of Michigan. (Reeser Dep. 158-59). Notably, even after being instructed by Hood to pay Reeser for lunches she worked in the future, Bork still refused. (*Exhibit RR*)

On February 7, 2014, Bork complained to Waugh, Hood, and others about being required to calculate the unpaid lunches owed to Plaintiff. (*Exhibit R*). On February 14, Waugh replied to Bork, thanked her "for doing this ridiculously tedious work", and explained that he had spoken with Hood "this week and she planned to reel in the insubordination in the afternoon call today." (*Exhibit S*) Waugh reiterated his concerns about Plaintiff in an email sent on February 18, stating "[i]n my view Natalie is out of line and appears to be empowered in spite of recent counseling." (*Exhibit T*) That same day, Bork wrote to Hood and Waugh complaining about being made to explain to Natalie why she made scheduled changes. (*Exhibit U*)

Plaintiff wrote to Hood on February 18 as well, reiterating the fact that she

6

was still being denied the opportunity to take a lunch break and had still not been paid for the missed lunches owed to her. (*Exhibit V*) Plaintiff stated "Thursday will be a month that I was in your office. This is NOT fair to me as an employee, that I have no answers from you a month later . . . I still have hea[r]d nothing on the lunches I don't get yet am still not paid for either." *Id.* Plaintiff added, "**I have no choice but to file paperwork with the state**." *Id.* (emphasis added)

Between February 18 and February 25, 2014, Bork, Hood, and Waugh decided to retaliate against Plaintiff by forcing her to transfer to a new site, even though Ms. Reeser had always been at CTPSC and against her wishes. (*Exhibit W, X, Y, Z, AA, & BB*; Hood Dep. 208-10; Reeser Dep. 296). In correspondence over this decision, the transfer was linked by managerial officials to Plaintiff's FLSA complaints.[1]

B.    **Defendant's written policies have always required employees to take a 30 minute unpaid mandatory lunch**

The Hospital's "Break Period" policy provides that "[E]mployees may not work through unpaid break periods unless requested by or otherwise approved by

---

[1] On February 18, Bork told Hood that she was planning on moving Natalie to a different site within two weeks. (*Exhibit W*) On February 23, Bork repeated this statement. (*Exhibit X*) On February 24, Hood wrote to Bork and Waugh and stated "This will not prevent us from moving forward . . . We can still proceed, as discussed, with Natalie." (*Exhibit Y*) Hood stated at her deposition that addressing Reeser's complaints presented "a good opportunity" to move Plaintiff from CTPSC to a different location. (Hood Dep. 208)

7

operational leadership." (*Exhibit FFF*) "Employees may leave the premises during unpaid lunch periods, although employees doing so must return punctually." (Id.) Defendant's HFML Lab Assistant Policies and Guidelines state "[e]ach Lab Assistant, regular full-time, part time, or temporary will . . . adhere to the following policies: Lunches and Breaks: 8 hours, but less than 12 hours = Two paid 15 minute breaks, One 30 minute unpaid." (*Exhibit CC*) Defendant's Payroll Instructions inform Lab Assistants that "[a]ll staff who work 8 or more hours are to take a 30 minute lunch. It is not acceptable to state no lunch unless it is authorized by HFML management." (*Exhibit DD*)

Defendant's lunch policy is designed for the benefit of both employees and patients, to make sure employees "aren't running themselves down and that they have had some time away and can come back refreshed." (Hood Dep. 62). If an employee is not paid for lunch, but is required to remain at a facility, "[t]hat should not be occurring." (Hood Dep. 36)

In the past, Bork instructed employees on several occasions that:

- "Lunches are **Mandatory**, **Not Paid** and are **30 minutes**. Everyone should be taking a lunch everyday that you work." (*Exhibit EE*) Unlike lunches, Bork explained, "[b]reaks are **NOT** mandatory and are paid." *Id.*
- On January 26, 2014, Bork emailed Plaintiff and asked "[c]ould you let me know what prevented you from taking lunch 8 out of the 10 days on your time card. Our policy has always been to contact me to get **approval not to get a lunch**. As you know **lunches are mandatory**." (*Exhibit FF*) (emphasis added)
- On February 24, 2014, Bork sent an email to a number of employees, including Plaintiff, changing the policy and instructing that "[s]tarting

8

tomorrow February 25th, 2014 When you take your lunch please send an email
that you are signing out for lunch and when you return from lunch please send
an email you are back from your lunch." (*Exhibit GG*) In her email, Bork
explained that this policy "is mandatory and failure to do so will result in a
full occurrence." *Id.*

In order to facilitate lunch breaks at CTPSC, employees had a practice of
placing a break sign on the front door of the office informing potential customers
that someone would return to the office soon. (Resser Dep. 115-16; *Exhibit HH*)
When Plaintiff sought to take lunch and another employee was not available to watch
the office, such a sign would be taken from the Emergency Door Sign Folder and
placed on the office door. (Resser Dep. 115-16, 153; *Exhibit II*). One of Plaintiff's
supervisors, Wiseheart, approved the sign every time Plaintiff utilized a sign in such
a manner. (Reeser Dep. 151) Plaintiff used such a sign with Wiseheart's approval
more than five times while at CTPSC. (Reeser Dep. 152).

**C.     On February 25th, Reeser was retaliated against by Bork for reporting
to the State and was suspended for taking a lunch that three managers
were aware that she was taking before she left**

On the morning of February 25, Plaintiff received a phone call from Bork.
(Reeser Dep. 260) Bork said "How dare you go to the State about me", told her that
she would be losing CTPSC, indicated that Plaintiff thought she was "some superior
person or something" for making a report to the State of Michigan, and threatened
that Plaintiff would "be sorry." (*Id.* at 260-63, 267) Plaintiff broke down and stated
"that [she] planned on taking a lunch that day from the new policy the day before."

9

(Id. at 261) Bork "never once said anything about the lunch policy not being – not allowing me to go." (Id.)

After this call, Plaintiff, in tears, spoke with Wiseheart and told her that Bork "was upset because I reported the lunch" issue. (Reeser Dep. 264) She also told Wiseheart "that she had to close down and go to lunch." (*Exhibit JJ*) Wiseheart stated: "You need to take some time to yourself and you definitely need to go to HR" and gave her a hug. (Reeser Dep. 266) Wiseheart waived her on to leave. (Reeser Dep. 322)

At 1:12 PM, in compliance with the lunch policy announced by Bork on 2/24/14, Plaintiff emailed a note to Bork, Wiseheart and Luain Hajjar, stating she was taking a break. (*Exhibit KK*) Plaintiff then picked up her coat and purse and prepared to leave for lunch. (Reeser Dep. 265) Plaintiff posted a sign on the front door of the office indicating she would return in 30 minutes and left the office. *Id.* After posting this sign, Plaintiff went to her car for 30 minutes. *Id.* Before her lunch and during her lunch, no staff member of CTPSC "responded to [her] email, or called [her] on either [her] office line, or [her] work cell phone to say, 'No Natalie, you cannot take a break today.'" (*Exhibit LL*)

Instead of responding to Reeser's emails, Bork sent an email to Hood asking her "Can she do this?" exactly twenty-six minutes after Plaintiff sent her email to Wiseheart and Bork confirming her intention to leave the office for lunch. (*Exhibit*

*MM*) Although only minutes had passed since Plaintiff placed the sign on the office door and left the office, Bork did not attempt to contact Plaintiff by email or phone to request she return to the office.   After Plaintiff returned, she was suspended pending an investigation and escorted off the premises by security without being allowed to take with her all of her personal belongings. (*Exhibit NN*)

**D.    Plaintiff reported to the Michigan Department of Licensing and Regulatory Affairs (LARA) leading Defendant to terminate her employment after a sham investigation**

Plaintiff completed her FLSA complaint and mailed it to LARA on February 25, 2014.  (Reeser Dep. 272) Hood was informed of Plaintiff's intent to file with LARA on February 18, 2014. (*Id.* at 204-07) LARA received the complaint on February 27, 2014. (*Id.* at 272-73)

Plaintiff was informed that she was being terminated on March 7th.  (*Exhibit OO*) Ms. Reeser was not paid for the lunches that she was forced to work until immediately before her termination. (*Exhibit PP*) Hood expressed concern "that potential litigation may come from this" and stated that she understood that "the timing between when her actions of walking off the job so closely corresponded with when we were going to be issuing her back pay for the lunches, and it's very clear to me . . . even the prima facie of that is that it looks odd." (Hood Dep. 251) Regardless, the decision to terminate was made by Waugh and Bork.  (Hood Dep. 250-51)  During her deposition, Hood admitted that she has never stood in the way

11

of a supervisor who wished to discipline an employee. (Hood Dep. 40)

Hood engaged in a sham investigation relying solely on statements made by Bork and Wiseheart, even when they contradicted one another.  (*Exhibit QQ*)[2] Although Bork was accused of harassing and retaliating against Ms. Reeser, Hood allowed Bork to conduct her own interviews with staff members at the site regarding Reeser's termination. (Hood Dep. 243-44).  When it was clear the facts provided by Plaintiff's managers were damaging to Henry Ford, Hood simply neglected to mention those facts.[3]

## E.   **Defendant's discipline policy**

Defendant has a progressive discipline policy to handle workplace violations. (Hood Dep. 49) Violations are divided into Group 1 and Group 2 violations. *Id.* at 40. Group 1 violations include "attendance." *Id.* Group 2 violations "are things such as . . . walking off the job." *Id.* Walking off the job occurs when there is no notice

---

[2] For instance, Hood indicated in her report that no verbal communication occurred between Plaintiff and Wiseheart before Plaintiff left for lunch, ignoring Plaintiff's statements to the contrary. (Hood Dep. 188-90) She later admitted that Plaintiff and Wiseheart "may have had previous conversations earlier that morning." (Hood Dep. 191) Only during discovery did Bork admit that Plaintiff did in fact communicate with Wiseheart before exiting from the building. (Bork Dep. 163) Yet, Wiseheart herself disclosed to both Bork and Hood that on February 25, 2014 Plaintiff told her Plaintiff planned "to close down and go to lunch." (*Exhibit JJ*) Hood never asked Plaintiff if she had a conversation with Wiseheart about lunch. (Hood Dep. 190-91).

[3] For instance, Hood neglected to mention that Bork made a decision to continue withholding pay for Plaintiff's lunches in February, after being expressly told by Hood that Plaintiff needed to be paid on an ongoing basis in January. (*Exhibit RR*)

provided and the employee walks away from their work. *Id.* The Group 2 progressive

discipline policy is "documented counseling, written warning, written warning with

suspension and then termination." *Id.* at 49.

Under HFML Employees Policies and Guidelines, if an employee fails to

obtain approval by "email[ing] [their] arrival and departure", the penalty is "a full

occurrence." (*Exhibit I*)[4]  According to the Attendance policy, if an employee fails

to report to work as scheduled, they incur a full occurrence. (*Exhibit GGG*) If an

employee leaves early or returns late from a lunch less than ½ an hour, that is ½ an

occurrence—anything over ½ an hour is 1 occurrence.  (Id.)[5]

There are numerous examples of Bork applying the progressive discipline

policy to individuals that performed actions substantially similar to Plaintiff's action.

(*Exhibit TT & UU*) In a May 2, 2012 corrective action, an employee who arrived to

work significantly late twice, no call no showed twice, and left significantly early

once received a written warning with one day suspension. (*Exhibit TT*) In a July 31,

2013 corrective action, an employee refused to answer her phone for twenty minutes,

---

[4] If an employee has three occurrences in 30 days, they "get [their] first corrective action." *Id.* at 59. If there are then three more occurrences in 30 days or four more occurrences in 90 days or seven more occurrences in 160 days, an employee will receive the next corrective action in the progressive discipline policy. *Id.* Before February 25, 2014, if Plaintiff had any occurrences, they were insufficient to bring her to **the first** corrective action level. (*Id.* at 292; *Exhibit SS*)
[5] According to Jill Hood of Human Resources, Hospital disciplinary guidelines must be followed and managers cannot change the attendance policy to require an employee with a single occurrence to face corrective action.  (Hood Dep. 257-58)

resulting in a delay of patient care. (*Exhibit UU*) When asked why the employee did not answer the phone, the employee responded, she didn't have to "for that bitch". *Id.* This employee was given a written warning with a three day suspension. *Id.* All employees who have been discharged by Defendant for job abandonment have numerous previous occurrences or engaged in falsification of timecards or workplace violence. (*Exhibit VV & WW*; Reeser Dep. 94-95) Wiseheart, an employee who has worked for Defendant for 20 years, could not recall any employee being immediately terminated for an act other than failing to show up to work for three days and being violent in the work place. (Wiseheart Dep. 44-47)

### III. ARGUMENT

Summary judgment is only appropriate under the Federal Rules of Civil Procedure when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." F.R.C.P. 56(c). "When reviewing a motion for summary judgment, the facts and any reasonable inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party."[6] However, the opposing party "must present more than a 'mere scintilla' of evidence; the evidence must be such that a reasonable jury could find in favor of the plaintiff.[7]

---

[6] *Morris v. Aon Service Corp.*, No. 10–14620, 2011 WL 5864757, at *1 (E.D. Mich. Nov. 22, 2011) (attached as *Exhibit YY*)(citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).
[7] *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Furthermore, employment actions are inherently fact-based. Summary judgment should "seldom

A.  **Henry Ford Hospital is an assumed name of Henry Ford Health System, Defendant has been on notice of the allegations in this lawsuit, and Plaintiff has submitted an amended complaint to cure any defect**

In the interest of space, Plaintiff incorporates Plaintiff's Motion to Amend Her Complaint, which is responsive as to whether Plaintiff's case should be dismissed due to an alleged misnomer. (*Exhibit ZZ*)

B.  **Defendant unlawfully retaliated against Plaintiff for engaging in protected activity under the FLSA and WPA[8]**

Under both the FLSA[9] and the WPA[10], Plaintiff has the burden to show as part of her *prima facie* case that the adverse employment action was caused by her protected activity under those statutes—either asserting her rights under the FLSA

---

be granted . . . unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." *Hindman v. Transkrit Corp.*, 145 F.3d 986, 990 (8th Cir. 1998).

[8] Defendant's Motion only asserts that there is no genuine dispute as to fact regarding whether a causal connection existed between the activity and the discharge and whether their proffered legitimate non-discriminatory reason is pretext. The remainder of Plaintiff's prima facie case under both statutes Defendant does not contest in this Motion.

[9] The FLSA provides, in relevant part, that, "it shall be unlawful for any person ... to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act...." 29 U.S.C. § 215(a)(3). FLSA anti-retaliation provisions can be triggered by informal, internal complaints. *Moore v. Freeman*, 355 F.3d 558, 562 (6th Cir. 2004).

[10] The WPA protects employees from discrimination and retaliation who report or are about to report a suspected violation of law to a public body. M.C.L. §15.362. In order to protect the public and deter retaliation, the Whistleblower Protection Act (WPA) is interpreted broadly. *See e.g.*, *Shimkus v Hickner*, 417 F. Supp. 2d. 884 (ED Mich. 2006).

or reporting or threatening to report a violation of law to a public body.  To show

causation for purposes of the WPA, Plaintiff must show that Plaintiff's protected

activity was at least a motivating factor in Defendant's decision to discharge.[11]  For

purposes of FLSA retaliation, "Plaintiff must produce evidence sufficient to raise

the inference that his protected conduct was the likely reason for his termination."[12]

Plaintiff may meet the causal burden of either statute by providing sufficient

direct evidence of retaliatory animus.[13]  In the alternative, without direct evidence of

discriminatory animus, the courts apply the burden-shifting test under *McDonnell*

*Douglas v. Green.* "The direct evidence and circumstantial paths are mutually

exclusive; the plaintiff can meet her burden with either method of proof."[14]  "[D]irect

evidence is that evidence which, if believed, requires the conclusion that unlawful

discrimination was at least a motivating factor in the employer's actions."[15]  For

example, "a facially discriminatory employment policy or a corporate decision

maker's express statement of a desire to remove employees in the protected group is

---

[11] *Peake v. Martinrea Fabco Hot Stamping, Inc.*, No. 09-10348; 2011 WL 1157864, at *5 (E.D. Mich 2011) (attached as *Exhibit AAA*).
[12] *Carlson v. Leprino Foods Co.*, 522 F. Supp. 2d 883, 889 (W.D. Mich. 2007)
[13] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Carlson v. Leprino Foods Co.*, 522 F. Supp. 2d 883, 888 (W.D. Mich. 2007); *Whitaker v. U.S. Sec. Associates, Inc.*, 774 F. Supp. 2d 860, 867 (E.D. Mich. 2011).
[14] *Weberg v. Franks,* 229 F.3d 514, 523 (6th Cir.2000).
[15] *Jacklyn v. Schering–Plough Healthcare Products Sales Corp.,* 176 F.3d 921, 926 (6th Cir.1999).

direct evidence of discriminatory intent."[16]

Here, there is significant direct evidence that unlawful retaliation was at least

a motivating factor in Plaintiff's termination. Bork, the decision-maker according to

Jill Hood,[17] conveyed retaliatory intent, as well as her displeasure with Plaintiff's

protected activity, to Plaintiff and others on several occasions, both in writing and

verbally:

(1) stating that Plaintiff was going to "be sorry" for reporting the lunch issue
    to LARA the day that Plaintiff was suspended and reprimanding her on
    other occasions for reporting to HR (Reeser Dep. 158-59, 260-61, 264,
    267);[18]

(2) communications indicating that she was resentful of Plaintiff's reports to
    HR and the State, including personal attacks on Reeser for desiring to
    leave the site for lunch (*Exhibits K & L*);[19]

---

[16] *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

[17] (Hood Dep. 40, 250-51)  At a minimum, knowledge of a plaintiff's protected
activities and retaliatory motive may be imputed to a decision maker under the "cat's
paw" theory. The Sixth Circuit has explained that, "[i]n the employment
discrimination context, 'cat's paw' refers to a situation in which a biased
subordinate, who lacks decision-making power, uses the formal decisionmaker as a
dupe in a deliberate scheme to trigger a discriminatory employment action." *Roberts
v. Principi*, 283 Fed Appx 325, 333 (6th Cir 2008) In other words, "the retaliator is
the decisionmaker, and the titular 'decisionmaker' is a mere conduit for the
retaliator's discriminatory animus. *Id.*

[18] Defendant argues that these statements never occurred, but that is an issue of fact
subject to a jury trial.  Defendant argues that this issue of fact is not genuine citing
to "phone records [that] demonstrate unequivocally" that this conversation "did not
ever occur." (Def.'s Motion for Summary Judgment, p. 19 fn. 5) These records are
certainly not "unequivocal" because Plaintiff has never asserted Bork called her
from her work or personal cell phone. (Reeser Dep. 261-62) Instead, Reeser noted
that there were other phone lines that Bork could have called from for which no
records have been provided.  (Id.)

[19] Where an employee had testified that his supervisor had a negative reaction to his
protected activity, he was able to successfully meet his causal burden.  *See e.g.,*

(3)  Bork's threats that if Plaintiff continued to request a lunch break that she
would be transferred or lose her job (Hood Dep. 134; *Exhibits L, W, Y,
AA, & BB*);

(4)  reprimanding Reeser for demanding that she be paid for the lunches she
was forced to work (*Exhibit N*);

(5)  emailing Waugh reiterating her concerns that Ms. Reeser's complaints
raised "a huge problem" (*Exhibit Q*);

(6)  directly expressing displeasure on several occasions about being forced
to calculate Plaintiff's compensation from unpaid lunches and with her
decisions regarding Reeser's schedule being questioned by Plaintiff
(*Exhibits R, S, U*); and

(7)  bypassing HR and going directly to the Waugh to deal with Reeser who
Waugh described as feeling too "empowered" after Reeser's reports.
(*Exhibit T*)

If the Court believes such evidence does not rise to the level of direct

evidence, under the burden-shifting test, Plaintiff may still submit indirect evidence

of her employer's unlawful motivations to show that a causal link exists between the

protected activity and the employer's adverse employment action.[20] "[C]lose

temporal proximity between two events is sufficient to constitute indirect evidence

of a causal connection so as to create an inference of retaliatory motive.*"[21]*

In *Morris v. Aon Service Corp.*, the court found "[d]etermining causation . . .

ultimately turns on temporal issues related to notice." *Morris* at *3. The court noted

that the Sixth Circuit has held that close temporal proximity between protected

---

*Markos v. Mt. Brighton, Inc.*, No. 08-CV-12588; 2009 WL 2591372 (E.D. Mich.
2009)(attached as *Exhibit BBB*).

[20] *See DiCarlo v. Potter*, 358 F.3d 408, 421-22 (6th Cir.2004) (overruled on different
grounds).

[21] *Light v. MAPCO Petroleum, Inc.*, No. 3:04-0460, 2005 WL 1868766, at *12 (M.D.
Tenn. Aug. 4, 2005) (citing *DiCarlo* at 421-22) (attached as *Exhibit CCC*).

activity and firing is sometimes enough, by itself, to establish prima facie causation. *Id.* at 4 (citing *Hamilton v. General Electric Co.*, 556 F.3d 428, 435-36 (6th Cir.2009)). Internal complaints about pursuing claims with a state agency can also be sufficient notice of a Plaintiff's report to a state agency even if a Plaintiff is terminated before providing specific notice of their report to an employer. *Id.*

Here, Plaintiff had never been disciplined, had received numerous accolades in the past from Bork prior to her complaints regarding the lunches, and had a largely unblemished performance history with Defendant. (*Exhibits Hamilton v. General Electric Co.*, 556 F.3d 428, 435-36 (6th Cir.2009))[22] That all changed about a month after Plaintiff's initial complaint about lunches, when she was suspended and ultimately terminated. Her suspension occurred the same week that she threatened to file paperwork with the State, which is protected by the WPA. (Hood Dep. 188-90, 204-07, 267, 272-73; *Exhibit OO*) The decision to terminate was made about a week after the complaint to the State was filed. (Id.)

In addition to temporal proximity, there is sufficient evidence for a reasonable jury to conclude that Defendant treated Plaintiff differently from other employees in terminating her employment.[23] Defendant claimed that other employees had been

---

[22] *Thompson v. Aramark Sch. Support Servs., Inc.*, 490 F.3d 506, 509 (6th Cir. 1007)(the fact that employee had no prior performance problems prior to reporting violations of law constituted indirect evidence of causation).

[23] *See Carlson v. Leprino Foods Co.*, 522 F. Supp. 2d 883, 889 (W.D. Mich. 2007)(employees who received similar absences were not disciplined as severely as

terminated in the past for "job abandonment."  In discovery, it became clear that the examples Defendant provided prove that there has never been a Lab Outreach employee who has been terminated for merely taking a 30-minute lunch.  All the examples provided by Defendant involved employees who falsified time sheets, provided no notice, cussed and acted in a threatening manner in front of a patient, abandoned a patient, or had numerous other disciplinary problems or occurrences. (*Exhibits TT & UU*; Wiseheart Dep. 44-47)[24]  Instead, she was terminated in contradiction to Defendant's own mandatory unpaid lunch policy and Attendance policy dictating that, at most, Ms. Reeser's February 25th lunch should only have warranted one occurrence.

Defendant failed to follow many of its policies in regards to Ms. Reeser and her lunches, which is indirect evidence of retaliatory animus:[25]

- Defendant **MANDATES** an unpaid 30-minute lunch period. (*Exhibits* I & N; Hood Dep. 267-68; Bork Dep. 83);
- Hood instructed Bork to pay Plaintiff for lunches she worked through; Bork refused without reason later apologizing if this "screwed up" the case. (*Exhibit HHH*; Hood Dep. 246; Bork Dep. 106-07);

---

the plaintiff in that case leading the court to find that a reasonable fact finder could use that fact as evidence to conclude that the company was applying its attendance policy differently to the plaintiff to attempt to ensure his termination following his protected activity under FLSA).

[24] See Section II.E.

[25] Employer's failure to follow its own policies and discriminatory treatment compared to other similarly situated workers are evidence of retaliation. *McLemore v. Detroit Receiving Hosp. & Univ. Medical Center*, 196 Mich. App. 391, 398 (1992); *Turpin v. Cable Tel Servs., Inc.*, 3:09-CV-147, 2010 WL 670080, at *3 (E.D. Tenn. Feb. 22, 2010)(attached as Ex. DDD).

- According to the Hospital's Absenteeism Policy and the February 24th email from Bork, (*Exhibit CC & GG*) Plaintiff's action should have resulted in a single occurrence; yet, Ms. Reeser was terminated. (Hood Dep. 257; Bork Dep. 43)
- Under the Hospital's Policies, if an employee fails to obtain approval by "email[ing] [their] arrival and departure", the penalty is "a full occurrence"; yet, Reeser was immediately terminated. (*Exhibits I & Z*); and
- Requesting security to escort Ms. Reeser out of the facility without her personal belongings unlike others who had been terminated for worse infractions (*Exhibit NN*).[26]

Finally, the record clearly establishes that Hood acted as a rubber stamp for Bork with the decision having been made well in advance. (*See* Section II.D) Clearly there is sufficient indirect evidence to prove causation.

**C.    Defendant's Nondiscriminatory Reason for Termination is Mere Pretext**

If this Court finds that Plaintiff's direct evidence is insufficient, Defendant must proffer a legitimate non-discriminatory reason for the adverse employment action.   Afterwards, the burden once again shifts to Plaintiff to provide enough evidence to where a jury could reasonably determine that the Defendant's legitimate non-discriminatory reason was mere pretext.[27]

To demonstrate a genuine issue of material fact exists with regard to Plaintiff's

---

[26] Evidence that the direct supervisor requested that police be on standby when he fired the plaintiff could be used to mean that he thought the plaintiff was a troublemaker due to his complaints regarding unequal pay.  *Moore v. Freeman*, 355 F.3d 558, 563 (6th Cir. 2004).

[27] The definition of pretext is when "The employer . . . waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true, longstanding motivations for firing the employee."  *Jones v Potter*, 488 F3d 397, 408 (6th Cir 2007).

proffered reason, Plaintiff may show that the proffered reason: (1) has no basis in
fact, (2) did not actually motivate Defendant's decision, or (3) was insufficient to
warrant the challenged decision.[28]

Defendant asserts that Plaintiff was discharged for "departure from the work
site without obtaining authorization." (Def.'s Motion for Summary Judgment, p. 20)
Plaintiff asserts that this reason is mere pretext for unlawful retaliation for the three
reasons described below.[29]

First, Defendant's proffered reason has no basis in fact. As indicated above,
Defendant's policy **MANDATED** employees to take a thirty minute **UNPAID** lunch
during which they could leave the facility.  (See Section II.B)  In an email that Bork
sent to staff the day before Reeser's suspension, she indicated that all
that was required to leave for lunch was notice.  (*Exhibit GG*) Failure to provide
notice or to otherwise not show up for work, leave early, or arrive late only warranted
an **occurrence**.  (Id.; *see* Section II.E) According to Henry Ford's work rules, three
occurrences were required before the employer could issue a corrective action—a
documented counseling.  (*Exhibit XX*) Plaintiff had never received corrective action.

Prior to Ms. Reeser's departure on February 25, 2014, Plaintiff provided

---

[28] *See McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973); s*ee also Whitaker
v. U.S. Security Associates, Inc.*, 774 F. Supp. 2d 860 (E.D. Mich. 2011).
[29] Evidence presented on the issue of causation is also relevant to proving pretext.
*See e.g., Carlson v. Leprino Foods Co.*, 522 F.Supp.2d 883 (W.D. Mich. 2007).

22

notice to Bork twice and notice to Wiseheart three times.  At no time did any manager instruct that she did not have authority to leave the facility.

Instead of instructing Ms. Reeser not to leave, Ms. Bork intentionally remained silent.  (*Exhibit LL*)  She did not respond to Ms. Reeser during their telephone call when Reeser indicated, in tears, that she needed to leave and wanted to take a lunch nor did Ms. Bork respond to Ms. Reeser's email, even though she took time to respond to the emails of others.  (*Exhibit LL*)

Defendant relies solely on a provision in the Lab Assistant Policies and Guidelines that requires employees who leave the facility to obtain "prior authorization from **a** **manager**." (emphasis added). (*Exhibit CC*)[30]   While Defendant's reliance is misplaced, even if this was applied to the current situation, Ms. Reeser was in compliance.  According to Defendant's Employees Policies and Guidelines, Wiseheart, **a** **Regional** **Laboratory** **Manager**, was an appropriate

---

[30] There are several problems with Defendant solely relying on this Provision.  First, this is a misreading—the Lab Outreach policy only limits an employee's ability to leave the facility to take "breaks" when there is inadequate staffing, not "unpaid lunches." (*Exhibit CC*)  Second, this interpretation ignores statements made by Bork to the contrary that approval was needed **NOT** to take a lunch. (*Exhibits EE, FF, & GG*)  Third, this interpretation conflicts with a Hospital policy **MANDATING UNPAID** 30-minute lunch. Yet, the Senior Business Partner testified that Hospital disciplinary guidelines must be followed and cannot be changed by a manager. (Hood Dep. 257-58)  Fourth, the law precludes enforcement of the Lab Outreach policy for precisely the reason that Ms. Reeser complained to Human Resources and the State of Michigan.  Under the FLSA, employees must be paid for all time they spend "engaged to wait."  If Defendant's interpretation is accepted, phlebotomists would be required to stay at the facility during lunch without being paid.

individual for Plaintiff to seek approval from to take lunch leave. Wiseheart provided direct authorization for Plaintiff's lunch telling her to take some time for herself and by waiving Plaintiff on when she stated that she was going to lunch as she had done many times in the past. (Reeser Dep. 94-95, 322)[31]

Second, there is a question of fact as to whether Ms. Reeser leaving for lunch was sufficient to warrant termination. Hood has characterized Plaintiff's actions as "walking off the job." (Hood Dep. 251). Walking off the job is a situation when there is no notice provided to the employer and the employee walks away from their work. *Id.* at 40. Yet, the managerial witnesses all testified that others had engaged in worse behavior who were not terminated.[32] Additionally, Defendant allegedly implemented a lunch period for CTPSC a week after Plaintiff's termination. (*Exhibit EEE*)

Third and finally, even if Defendant's proffered reason was not factually false

_____

[31] In order to facilitate lunch breaks at CTPSC, employees had a practice of placing a break sign on the front door of the office informing potential customers that someone would return to the office soon. (Reeser Dep. 115-16; *Exhibit HH*, Door Sign) Plaintiff used such a sign with Wiseheart's approval more than five times while at CTPSC. (Reeser Dep. 152)

[32] Bork applied Defendant's progressive discipline policy to two individuals that left work early, arrived late, or did not show up at all without providing notice. (*Exhibits TT & UU*) In a May 2, 2012 corrective action, an employee who arrived to work significantly late twice, no call no showed twice, and left significantly early once received a written warning with a one day suspension. (*Exhibit TT*) In a July 31, 2013 corrective action, an employee refused to answer her phone for an emergency request for twenty minutes and abandoned a patient. (*Exhibit UU*) This employee was given a written warning with a three day suspension. *Id.*

and could motivate dismissal, it is more likely than not the case that Bork's decision to terminate Plaintiff resulted from retaliation over Plaintiff's complaints regarding rights under FLSA. Bork stated on multiple occasions that any attempt by Plaintiff to report Pl`aintiff's lunch situation would result in adverse action. Bork told her that she would be "terminated" if she contacted Defendant's Human Resources department about her unpaid lunch concern. (Hood Dep. 134) Bork told her "[you'll] be sorry" for reporting unpaid lunches to the State of Michigan the day of her suspension. (Reeser Dep. 158-59)  At the end of the day, the decision to terminate Plaintiff was left to Bork according to Ms. Hood.  (Hood Dep. 40)

For the reasons provided above, Plaintiff has raised a question of fact regarding Defendant's proffered reason and, therefore, Defendant is not entitled to summary judgment on Plaintiff's FLSA and WPA claims.

## CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

**MILLER COHEN, P.L.C.**

By:   /s/Adam C. Graham
Keith D. Flynn (P74192)
Adam C. Graham (P79361)
*Attorneys for Plaintiff*
600 W. Lafayette Blvd., 4th Floor
Detroit, MI  48226
(313) 964-4454

Dated: June 10, 2015

25

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**NATALIE REESER**,

        Plaintiff,

v

**HENRY FORD HOSPITAL**,

        Defendant.

Case No. 2:14-cv-11916-GCS-MJH
Hon. George Caram Steeh
Magistrate Judge Michael Hluchaniuk

| **MILLER COHEN, P.L.C.** | **VARNUM LLP** |
|---|---|
| Keith D. Flynn (P74192) | Terrance J. Miglio (P30541) |
| Adam C. Graham (P79361) | Barbara E. Buchanan (P55084) |
| *Attorneys for Plaintiff* | *Attorneys for Defendant* |
| 600 W. Lafayette Blvd., 4th Floor | 39500 High Pointe Blvd., Ste. 350 |
| Detroit, MI 48226-0840 | Novi, MI 48375 |
| (313) 964-4454 Phone | (248) 567-7828 Phone |
| (313) 964-4490 Fax | (248) 567-7423 Fax |

## CERTIFICATE OF SERVICE

I hereby certify that on *June 10, 2015*, I electronically filed the foregoing document(s) with the Court using the ECF system, which will send notification of such filing to all counsel of record.

        Respectfully submitted,

        **MILLER COHEN, P.L.C.**

        By:   /s/Adam C. Graham
              Keith D. Flynn (P74192)
              Adam C. Graham (P79361)
              *Attorneys for Plaintiff*
              600 W. Lafayette Blvd., 4th Floor
              Detroit, MI  48226
              (313) 964-4454