# EXHIBIT E

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATALIE REESER,

          Plaintiff,

                                     CASE NO. 14-CV-11916
v.                                 HONORABLE GEORGE CARAM STEEH

HENRY FORD HEALTH SYSTEM,

          Defendant.

_____/

**OPINION AND ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT (Doc. 43)**

Plaintiff Natalie Reeser alleges retaliatory discharge in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 291 *et seq.*, and Michigan's Whistleblower's Protection Act ("WPA"), M.C.L. § 15.362, for reporting defendant Henry Ford Health System's ("HFHS") failure to pay her for lunch breaks to the Michigan Department of Licensing and Regulatory Affairs ("LARA"). Defendant moves for summary judgment on the basis that plaintiff was terminated for closing the clinic where she worked to take an unauthorized thirty minute lunch break. Defendant's motion shall be denied as genuine issues of material fact exist as to whether defendant's stated reason for discharging her amounts to mere pretext.

## I. Background

Beginning in May, 2011, Reeser began working as a laboratory assistant for HFHS. Essentially, Reeser worked as a phlebotomist, and her duties primarily consisted of drawing blood. Reeser's director supervisor was Fiona Bork whose job title is sales

manager. Bork oversaw a program designed to contract with non-HFHS physicians to send their lab work to HFHS. Under that program, HFHS has set up draw sites within physician offices and also operates several clinics offering laboratory services in the metro Detroit area. One of those clinics is located in Clinton Township. Although laboratory assistants are hired with the understanding that they can be reassigned to any location at any time, Reeser was assigned to the Clinton Township clinic. The Clinton Township clinic is the least busy of all of the HFHS laboratory outreach sites and it is the only clinic employing only one phlebotomist. In addition to reporting to Bork, Reeser claims Martha Wiseheart, a regional laboratory manager, supervised her administrative work, but HFHS denies that Wiseheart had any supervisory authority over Reeser.

Under HFHS policy, all employees working an eight to twelve hour shift are entitled to two fifteen minute paid breaks, and one thirty minute unpaid lunch. If an employee is unable to take a thirty minute lunch, they are paid for that time. At locations other than Clinton Township, laboratory assistants stagger their lunch breaks so there is always coverage in the office. At the Clinton Township location, however, such a schedule is impossible, as there is only one laboratory assistant assigned there and the clinic did not generally close for a lunch period. Instead, the phlebotomist working at the Clinton Township location was expected to bring a lunch and eat during her down time. Because that clinic serves significantly less patients than the other locations, it was assumed that the phlebotomist there would have ample time to do so. She was expected, however, to treat any patient arriving at any time. HFHS had a policy of not paying the laboratory assistant at the Clinton Township clinic for lunch based on the theory that she had plenty of time to take a lunch break throughout the day.

-2-

HFHS's official written policies make it clear that unpaid lunch breaks are mandatory, and if an employee is not to take such a break, she must receive approval from management. Specifically, the lab assistant polices and guidelines state, "[e]ach Lab Assistant, regular full-time, part time, or temporary will . . . adhere to the following policies: Lunches and Breaks: 8 hours, but less than 12 hours = Two paid 15 minute breaks, One 30 minute unpaid." (Doc. 49, Ex. CC). HFHS's payroll instructions state, "[a]ll staff who work 8 or more hours are to take a 30 minute lunch. It is not acceptable to state no lunch unless it is authorized by [HFHS] management." (Doc. 49, Ex. DD). On September 11, 2012, Bork sent an e-mail to all laboratory assistants explaining the lunch policy:

**Lunches:**

Lunches are **Mandatory, Not Paid** and are **30 minutes.** Everyone should be taking a lunch everyday that you work. We have multiple staff members at many sites that allow for staggered lunches. Take this time to yourself to relax and regroup for the rest of your shift. We have several sites that naturally provide time to take a lunch, either due to the office closing for lunch or the patient volume fluctuates enough to take your lunch. If we are shorthanded and you feel that taking your lunch will affect patient care then call me for direction.

(Doc. 49, Ex. EE) (emphasis in original).

In January, 2014, Reeser claims that she learned from a doctor in the clinic that she should be paid for her lunch break under the FLSA because she was "engaged to work" during the entire time that she was at the patient service center, as even during slow periods when there were no patients presenting for lab work, she was expected to be available to provide her services at any time. Reeser contacted Jill Hood, human resources business partner, on January 14, 2014 to request a meeting. It is unclear if she expressed the unpaid lunch break concern as the reason for the meeting.

Around this same time, but before Reeser raised the lunch issue with human resources, Reeser received a somewhat negative performance review from Bork who ranked her as unacceptable in three areas. One of those areas involved "displays a positive attitude/respond in a timely manner," and was based on several patient complaints of bruising around the blood draw site. The other area involved Reeser's alleged failure to meet the goal of growing the patient base at the Clinton Township site. A third category was also marked as unsatisfactory, but turned out to be a mere typo which was later corrected by Bork. Reeser planned to discuss her performance evaluation with Hood at the same time as the lunch compensation issue. A meeting was scheduled for January, 17, 2014, but Bork scheduled a telephone conference for the same time, which Reeser felt was done to prevent her from meeting with Hood as planned. On January 16 and 17, 2014, Bork sent Hood two e-mails complaining that Reeser was "immature" with a "tendency to exaggerate and be very dramatic." (Doc. 49, Ex. L).

Eventually, on Monday, January 20, 2014, Reeser met with Hood and discussed her poor performance review and the lunch compensation issue. As a result, her low mark for failing to grow the number of patients presenting at the Clinton Township clinic was removed on the basis that doing so was not part of her job description. As to the low mark for her blood drawing technique, plaintiff complained that the bruising was caused by HFHS's shift to a different type of tape used to wrap the puncture site, a practice which was later abandoned, and not to her technique. Hood's investigation of the matter, however, concluded that plaintiff's technique was defective. Reeser also complained to Hood that Bork had given her a poor performance review based on personal animosity stemming from the fact that Reeser had inadvertently seen Bork's salary on Bork's computer screen, and

Bork had accused her of sharing that information with another employee. In addition, at their meeting, Reeser accused Bork of asking her to lie at an unemployment hearing for another employee.

After their meeting, Hood instructed Reeser to put "no lunch" on her timecard. A plethora of e-mails followed regarding how to treat the lunch compensation issue. On January 26, 2014, Bork e-mailed Reeser stating "[c]ould you let me know what prevented you from taking lunch 8 out of the 10 days on your time card[?] Our policy has always been to contact me to get approval not to get a lunch. As you know lunches are mandatory." (Doc. 49, Ex. N). Reeser forwarded Bork's e-mail to Hood stating, "I went ahead and put no lunch and I get an email stating, I cannot without approval, I need some direction on this, because this is upsetting." *Id.* On January 27, 2014, Wiseheart sent Reeser an e-mail stating that she would not be paying her for lunches until Bork could verify that the lunches were to be paid. *Id.* at Ex. O. Reeser then sent a terse e-mail to Bork, Hood and Wiseheart stating:

> please be advised that HR has me recording days that I do not get a lunch.
> It is illegal to have me work through a lunch break and not pay me . . down
> [time] is not considered lunch in the eyes of the law, a lunch is a time where
> you can sign out and take a break. I do not get this, therefore you must pay
> me for my lunch breaks I do not get. If you have any questions contact Jill
> [H]ood in HR.

*Id.* at Ex. P. On the same day, Bork then e-mailed John Waugh, vice president of laboratory systems, regarding the issue, stating, "[w]e have a huge problem here. Jill did not tell me about this conversation with Natalie and 'recording lunches.' The [Clinton Township clinic] has hours of downtime and allows several opportunities for lunch. We only staff the site with one person due to the patient volume." *Id.* at Ex. Q. On February 7,

2014, Bork emailed Waugh and Hood that she was combing through records dating back two years to determine when Reeser received lunch breaks. *Id.* at Ex. R. Waugh responded, "Thank you for doing this ridiculously tedious work. I had two good conversations with Jill this week and she planned to reel in the insubordination in the afternoon call today." *Id.* at Ex. S.

As weeks passed without hearing from Hood on the compensation for lunch issue, Reeser grew impatient and sent a curt e-mail to her on February 18, 2014, expressing her dissatisfaction with Hood's delay in providing a response. *Id.* at Ex. V. Specifically, Reeser stated, "Thursday will be a month [since] I was in your office. This is NOT fair to me as [an] employee, that I have no answers from you a month later. . . I still have he[a]rd nothing on the lunches I don't get yet am still not paid for either." *Id.* In that e-mail, Reeser stated, "I have no choice but to file paperwork with the state." *Id.* Reeser also alleges that Bork telephoned her in the evening in late January or early February, 2014 and threatened her for complaining about the lack of compensation for her lunch breaks, telling her that she would be "sorry" for her conduct. (Doc. 55 at 14-15). Bork disputes that the calls were ever made and has submitted an affidavit as well as her work and personal phone records to prove that no such calls were placed. (Doc. 43, Ex. 21, Doc. 52, Ex. B).

After the January 20, 2014 meeting between Reeser and Hood, Bork made a series of employment decisions impacting Reeser. In particular, Bork did not allow her to train new employees, as she had done in the past. Reeser complained to Bork by e-mail about the loss of the opportunity to train, stating, "I've trained for two years all of a sudden I'm not good enough to train at my site??" (Doc. 49, Ex. U). In an e-mail, Bork reported to Hood that Reeser's attitude and e-mail amounted to insubordination. *Id*. Specifically, Bork

stated, "I do not have to explain to [Reeser] why I make schedule changes or validate my choice of mentors.  I would never question my managers decisions in such an insubordinate way. . . . [Reeser] is out of control.  There is no way I would ever subject a new employee to that kind of behavior."  *Id.*  Also, Bork told Reeser that she would be transferred from the Clinton Township clinic to another HFHS location.

On February 24, 2014, Bork issued an e-mail instructing employees to send an e-mail to "HFML Outreach" upon leaving for and returning from a lunch break, the same procedure followed for logging in and out for employees' daily schedules.  That e-mail further provides that "This is mandatory and failure to do so will result in a full occurrence." (Doc. 49, Ex. GG).  The e-mail further provided that by "midsummer we will have a new timekeeping system that will allow you to 'clock' in your arrival and departures times as well as your lunch breaks."  *Id.*  Reeser argues that this e-mail amounted to a new policy regarding mandatory lunch breaks on the part of HFHS which authorized her to close the clinic for a lunch break.  HFHS disputes this and contends that the new lunch policy of shutting the Clinton Township clinic went into effect on April 1, 2014.  (Doc. 52, Ex. H).

On the morning of February 25, 2014, Reeser claims she received a phone call from Bork.  (Doc. 55 at 24-27, 31).  Reeser testified at her deposition that Bork said, "How dare you go to the State about me," told her she would be transferred from the Clinic Township site, and indicated that Reeser would "be sorry" for her complaints to human resources. *Id.* at 24-27, 31.  Reeser further testified that she became very upset, which motivated her to close the clinic and take her lunch.  *Id.* at 29.  Reeser also claims that Wiseheart comforted her after the upsetting conversation with Bork and gave her permission to take a lunch break.  *Id.* at 28-30, 36.  After her alleged phone conversation with Bork, Reeser

-7-

then e-mailed a note to Bork, Wiseheart, and Luian Hajjar[1] stating, "I AM VERY UPSET AND AM PUTTING A NOTE ON THE DOOR AND TAKING A 30 MINUTE LUNCH TODAY." (Doc. 49, Ex. KK). Reeser claims she had left similar notes on the door and taken breaks on at least five prior occasions. After sending the e-mail, Reeser hung a note on the door, left the office, and sat in her car for thirty minutes. (Doc. 55 at 29). Reeser claims that her e-mail comported with the policy announced by Bork on February 24, 2014; however, the individuals to whom she sent the e-mail were not the "HFML Outreach" employees identified in that e-mail, and Reeser did not send an e-mail upon her return as required. Upon her return, she was met by Bork and security, was escorted from her office, and was told she was suspended.

On February 25, 2014, the same date she was suspended, plaintiff mailed a complaint to LARA asserting that HFHS was in violation of the FLSA for failing to pay her for lunch periods she was unable to take. The state received her complaint on February 27, 2014. On March 4, 2014, HFHS paid Reeser for two-years worth of unpaid lunch breaks while at the Clinton Township clinic. (Doc. 49, Ex. PP). On March 5, 2014, Hood sent Reeser a letter outlining her response to all of Reeser's complaints from their January 20, 2014 meeting. As to the lunch compensation issue, she informed Reeser that her compensation for unpaid lunch breaks had been direct deposited to her account. As to Reeser's complaints about her performance evaluation, Hood responded that Bork had evaluated her in good faith as to the complaint about her technique in drawing blood, and as to the other categories in which she received low marks, one was raised and was

---

[1] It is unclear what Hajjar's position is within HFHS, but defendant denies that he had any supervisory authority over Reeser.

identified as a mere typo, and the other category was eliminated as she lacked direct control over the goal of growing the Clinton Township location to twenty patients a day. Finally, as to Reeser's complaints that Bork asked her to lie at an unemployment compensation hearing, Hood found that the complaint had not been substantiated. (Doc. 49, Ex. PP). On March 7, 2014, HFHS sent Reeser a letter informing her that she was being terminated for job abandonment.

HFHS admits it employs a progressive discipline policy, but for major infractions known as Group II violations, which encompass such behavior as job abandonment, HFHS asserts that termination may be warranted as the first step. In its motion for summary judgment, HFHS argues that it terminated six other employees for similar misconduct. In support of this claim, HFHS has submitted the disciplinary records of four employees, as well as an e-mail and letter of resignation as to two other employees. (Doc. 43, Ex. 8). As to the four employees for whom personnel records were submitted, Reeser also has submitted employment records as to these same individuals. (Doc. 49, Ex. TT-WW). In each instance for which personnel records have been submitted, employees were warned that continued misconduct would result in termination prior to discharge. Specifically, one employee received a written warning of possible termination and one day suspension for several tardies, leaving work early, and failing to provide sufficient notice of absences. *Id.* at Ex. TT. Later, that same employee was terminated for falsifying her time card when she brought her son to work, signed in, and then left to drop him off at the babysitter without clocking out. *Id.* at Ex. 8. Another employee was referred to customer service training for failing to answer the phone, using profanity, and being unavailable to perform her job duties because of an extended conversation with a coworker. *Id.* at Ex. UU. Later, she was

-9-

terminated when she abandoned a patient during the middle of a blood draw to answer a personal phone call. (Doc. 43, Ex. 8). Similarly, two other employees were terminated for repeatedly falsifying time records, and both received prior warnings that termination would result for further infractions. *Id.* at Ex. VV, WW. In its answers to interrogatories, HFHS also states that two other employees were discharged for job abandonment, but HFHS has not submitted their personnel records as to the circumstances of their terminations. (Doc. 43, Ex. 7). As to one of those terminated employees, HFHS relies on an e-mail from Bork noting that an employee was terminated a few days after she started employment for walking off the job. *Id.* at Ex. 8. As to the other, HFHS relies simply on the employee's letter of resignation. *Id.* None of the terminated employees were discharged for taking an unauthorized lunch break.

## II. Standard of Law

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether

it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

### III. Analysis

**A.    Standard of Law for Retaliatory Discharge under the FLSA and WPA**

The anti-retaliation provision of the FLSA provides that an employer is prohibited from "discharg[ing] or in any other manner discriminat[ing] against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under the [FLSA]." 29 U.S.C. § 215(a)(3). Similarly, the WPA forbids an employer from, among other things, discriminating against an employee for reporting a violation of a state or federal law:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

M.C.L. § 15.362. To establish a claim of retaliation under the FLSA or the WPA, plaintiff may rely on direct evidence of discrimination, or circumstantial evidence of discrimination under the familiar burden-shifting analysis in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Evans v. Prof'l Transp., Inc.,* No. 14-6132, 2015 WL 3559186 at *3, __ F. App'x __, (6th Cir. June 8, 2015) (citing *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013)); *Debano-Griffin v. Lake Cnty.*, 493 Mich. 167, 171 (2013). Plaintiff seeks to proceed under both theories as analyzed below.

**B.    Sufficiency of Plaintiff's Direct Evidence of Unlawful Retaliation**

Direct evidence of retaliation is "evidence, which if believed, does not require an inference to conclude that unlawful retaliation motivated an employer's action." *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 534 (6th Cir. 2011) (quoting

-12-

*Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010)). Reeser argues that

numerous e-mails as well as her own testimony constitute direct evidence of discrimination.

As to the e-mails, none prove that she suffered adverse employment actions as a result of

her complaints about a lack of a paid lunch break. Instead, all of those documents, at the

very least, require an inference to reach that conclusion. Specifically, Reeser relies on an

e-mail that her supervisor Bork sent to human resources business partner Hood criticizing

Reeser for various reasons. That e-mail, dated January 17, 2014, discussed Reeser's poor

performance on her annual review. (Doc. 49, Ex. L). The record is unclear if Bork even

knew about Reeser's complaints about the lack of a lunch break prior to the time that e-mail

was drafted. Reeser also claims certain e-mails express Bork's threats that if Reeser

continued to request a lunch break, she would be transferred or fired, but a review of those

e-mails simply does not bear that out. (Doc. 49, Ex. L, W, Y, AA & BB). Reeser also relies

on several e-mails written by Bork regarding the task of computing Reeser's compensation

for the unpaid lunch breaks. (Doc. 49, Ex. R, S, U). Reeser characterizes the tone of

these e-mails as negative or complaining. Even if they could be so characterized, nothing

about Bork's admitted responsibility in calculating the backpay owing proves that HFHS

fired her in retaliation for exercising her rights under the FLSA. For the same reasons,

Reeser's reliance on an e-mail from Bork asking her what prevented her from taking a

lunch, (Doc. 49, Ex. N), or her e-mail to Waugh that Reeser's complaints amounted to a

"huge problem," (Doc. 49, Ex. Q), are too attenuated to offer direct evidence of retaliation.

Finally, plaintiff relies on an e-mail in which Waugh expresses concerns that Reeser is not

accountable and respectful and "is out of line and appears to be empowered," (Doc. 49, Ex.

T), an opinion that could just as likely be informed by Reeser's approach to the FLSA

problem, as to the mere reporting of the problem itself. While an employee is entitled to report an FLSA violation without fear of reprisal, the employee must still conform with general norms of professionalism in the manner in which she approaches her superiors with the perceived problem. Reeser has not shown that Waugh's concern that she was approaching the problem in an inappropriate fashion must lead to the conclusion that HFHS retaliated against her on the basis of her protected activity.

The only arguably direct evidence Reeser relies upon is her testimony that Bork threatened her that she would be "sorry" for reporting the lunch issue in late January or early February, as well as on the morning of the day she was suspended. Even this evidence, however, requires the inference that disciplinary action would be the consequence of her protected activity for which she would be "sorry." There are also innocent inferences that might be plausible from the same words. For example, the words could be an attempt to say "be careful what you ask for" because a restructuring of lunch policies may not be as desirable. Having concluded that plaintiff has failed to come forward with direct evidence of retaliatory discharge, the court now turns to the question of whether she has come forward with enough circumstantial proof to create a genuine issue of material fact under the *McDonnell Douglas* burden-shifting analysis.

**C.    Sufficiency of Plaintiff's Evidence under the Burden-Shifting Analysis**

Where a plaintiff is unable to establish retaliatory animus through direct evidence, then she may use circumstantial evidence such as timing of the decision, conduct, or other evidence from which knowledge can be inferred to establish a prima facie case under the *McDonnell Douglas* framework. *Adair v. Charter County of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006) (FLSA); *Debano-Griffin*, 493 Mich. at 171 (WPA). Under that framework, plaintiff

may establish a prima facie case of retaliation under the FLSA by showing that "(1) she engaged in a protected activity under the FLSA; (2) . . . her exercise of this right was known by the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action." *Adair*, 452 F.3d at 489. Similarly, under the WPA, to establish her prima facie case, the plaintiff must show that, (1) she was engaged in a protected activity under the WPA, (2) she was discharged or otherwise discriminated against, and (3) that "a causal connection exists between the protected activity and the discharge or adverse employment action." *West v. General Motors Corp.*, 469 Mich. 177, 183-84 (2003) (citation omitted). Under both the FLSA and WPA, once the plaintiff establishes her prima facie case, the burden shifts to the employer to set forth a legitimate non-discriminatory reason for the adverse employment action. *Adair*, 452 F.3d at 489; *Debano-Griffin*, 493 Mich. at 176. If the defendant carries its burden, the plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but merely a pretext for discrimination. *Adair*, 452 F.3d at 489; *Debano-Griffin*, 493 Mich. at 176.

### 1.    Plaintiff's Prima Facie Case

In its motion for summary judgment, defendant states that without conceding the point, for purposes of its motion, it assumes that Reeser could establish the first three elements of her prima facie case. (Doc. 43, at 17 n.4). Given defendant's assumption, the court will focus its attention solely on the causation prong of plaintiff's prima facie case.

Plaintiff relies on the following evidence to prove that she was terminated in retaliation for asserting her right to a paid lunch break under the FLSA: (1) the temporal proximity between her discharge on March 7, 2014, and her FLSA complaints, (2) evidence

-15-

that she did not engage in any misconduct because her lunch break was authorized, (3) evidence that she was entitled to less serious sanctions under the progressive discipline policy and other employees were treated more favorably than her for similar or more egregious conduct, and (4) e-mail and deposition testimony characterized as direct evidence of discrimination that may also be construed as circumstantial evidence. Each allegation is considered below.

First, Reeser relies on the close proximity in time between her discharge on March 7, 2014, and her protected activity. In some cases, very close temporal proximity between the protected activity and the adverse work action can establish causation for the purposes of establishing a prima facie case. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524-25 (6th Cir. 2008); *see also Hamilton v. GE*, 556 F.3D 428, 436 (6th Cir. 2009). In this case, Reeser first complained of her failure to be paid for lunch to Hood on January 20, 2014, (Doc. 49, Ex. M), and later threatened to report the FLSA violation to the state in an e-mail to Hood on February 18, 2014. (Doc. 49, Ex. V). Informal complaints at work constitute protected activity which can trigger the anti-retaliation provisions of the FLSA. *Moore v. Freeman*, 355 F.3d 558, 562 (6th Cir. 2004). In addition, Reeser filed her formal complaint with LARA on February 25, 2014. Even taking Reeser's first informal complaint of a possible FLSA violation to her employer on January 20, 2014 as the triggering date, the time that elapsed between her protected activity and her suspension on February 25, 2014, and her ultimate termination on March 7, 2014, is so close in time that this temporal proximity standing alone may be sufficient to establish causation. Reeser does not depend solely on temporal proximity, however, to establish causation, but has come forward with

other sufficient proofs to raise a genuine issue of material fact as to the final element of her prima facie case.

Second, Reeser argues she engaged in no misconduct because her lunch break on February 25, 2014 was authorized. In support of this allegation, she relies primarily on a February 24, 2014 e-mail from Bork to all of her employees notifying them of a new procedure for clocking in and out at lunch. (Doc. 49, Ex. GG). While this construction of the e-mail seems a stretch, given the surrounding circumstances of Reeser's ongoing discussions with human resources regarding her request for a paid off-site lunch break, Reeser's interpretation of the e-mail remains a possibility. Reeser also testified that Wiseheart authorized her lunch break. (Doc. 55 at 30, 36).

Third, Reeser argues she can prove causation because even if her lunch break was unauthorized, she was not treated in accordance with HFHS's progressive discipline policy which should have required the imposition of less serious sanctions prior to dismissal. Plaintiff contends other employees were treated more favorably than her for similar alleged misconduct, and she was treated unfairly when security escorted her from the building whereas employees terminated for worse infractions were not. While these allegations are very much in contention, Reeser has come forward with sufficient proofs regarding the treatment of other employees, as discussed in the discussion of "pretext" below, to raise a genuine issue of material fact as to the causation prong of her prima facie case.

Fourth, Reeser relies on her allegations that Bork telephoned her on two separate occasions, including the morning of her suspension, and threatened that she would be "sorry" for her conduct. Although this threat is arguably too vague to be viewed as direct evidence, a reasonable jury could make the inference that disciplinary action could be the

consequence of her protected activity for which she would be "sorry." Bork disputes that the calls were ever made and has submitted an affidavit as well as her work and personal phone records to prove that no such calls were placed. (Doc. 43, Ex. 21, Doc. 52, Ex. B). HFHS argues that these phone records "unequivocally establish that no such conversation took place." (Doc. 43 at 12.) However, these records are not unequivocal proof that these conversations did not take place, only that they were not made from Bork's work or personal cell phone. This creates a genuine issue of fact as to whether or not Bork called to threaten retaliation against Reeser for her protected activity. Additionally, the e-mails that Reeser improperly characterized as direct evidence may also serve as circumstantial evidence of causation. Viewed in a light most favorable to the non-movant, these allegations, when coupled with the temporal proximity between Reeser's protected activity and her dismissal, establish a triable issue of fact as to causation because a jury could reasonably infer from the evidence that HFHS's actions were motivated by retaliation.

### 2.    Defendant's Proffered Legitimate, Non-retaliatory Reason and Pretext

Under both the FLSA and WPA, once plaintiff establishes her prima facie case, the burden shifts to defendant to establish a legitimate, non-retaliatory reason for the adverse employment action. *Adair*, 452 F.3d at 489 (citing *McDonnell Douglas*, 411 U.S. at 802); *Debano-Griffin*, 493 Mich. at 176. Here, HFHS argues that it properly terminated Reeser for job abandonment. Once the employer establishes a legitimate non-retaliatory reason for discharge, the burden shifts back to the employee "to prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but merely a pretext for illegal discrimination." *Adair*, 452 F.3d at 489; *Debano-Griffin*, 493 Mich. at 176. To establish pretext, an FLSA retaliation plaintiff must show one of the following: (1) the proffered reasons had no basis in fact, (2) the proffered reasons did not actually motivate her discharge, or (3) that they were insufficient to motivate discharge. *Pettit*, 429 F. App'x at 535 (citing *Adair*, 452 F.3d at 491). Similarly, to establish pretext under the WPA, plaintiff must show that her protected activity was a "motivating factor" for the adverse employment decision. *Debano-Griffin*, 493 Mich. at 176. Reeser responds that HFHS's alleged reason for her discharge is mere pretext, and that she was really terminated in retaliation for asserting her rights under the FLSA. In this case, Reeser has met her burden to survive summary judgment.

First, as discussed above, she has submitted evidence in support of her claim that her lunch break was authorized sufficient to establish a genuine issue of material fact as to whether job abandonment was the reason for her termination or whether this stated reason was pretext. Second, she has introduced evidence arguably showing that no other employees were terminated for job abandonment in like circumstances.

Reeser has submitted the employment records of four employees who, despite repeated attendance problems, other performance issues, and multiple instances of falsifying time records and other integrity issues, were referred to counseling and received warnings prior to termination. (Doc. 49, Ex. TT-WW). HFHS argues Reeser's conduct amounted to "job abandonment" which it contends warrants immediate termination without recourse to its progressive discipline policy. Although defendant's corrective action policy does not specifically define "job abandonment," it does provide that Group II violations, defined as acts that are willful, malicious, deliberate, or negligent, allow the defendant to skip corrective action steps up to immediate termination. (Doc. 43, Ex. 10 at 3). HFHS has submitted evidence concerning six individuals who were terminated, four of whom are the same employees relied upon by Reeser, to support its claim that job abandonment is grounds for immediate termination. (Doc. 43, Ex. 8). The court has carefully reviewed those documents and finds that a genuine issue of fact exists as to whether HFHS's decision to terminate Reeser for taking a thirty minute lunch break was consistent with the way it treated other employees. As to the two discharged employees relied upon by HFHS and not by Reeser, records of one of them consists solely of his letter of resignation, and the other record consists solely of an e-mail from Bork stating than an employee walked off the job less than a week after starting and "her termination went in as job abandonment." *Id.* Moreover, as to the employee who resigned, Hood testified that prior to leaving his job site without permission, he used an expletive (the "F" word) directed at his co-workers. (Doc. 43, Ex. 2 at 116). As to the four discharged individuals that both HFHS and Reeser rely upon to support their competing arguments, all of those employees were arguably treated more favorably than Reeser.

One of the employees received counseling and a written warning and one day suspension for prior time card falsifications prior to her discharge. (Doc. 43, Ex. 8). Yet another employee was terminated for abandoning a patient to take a personal cell phone call in the parking lot. *Id.* Records submitted by Reeser show that this was not the employee's first infraction, and that she was previously disciplined for misconduct including using profanity in front of patients, and was warned that further infractions could result in disciplinary action up to and including termination. (Doc. 49, Ex. UU). Finally, as to two of the other employees who were terminated, both had a history of falsifying time records and both were warned of possible termination for further misconduct prior to their discharge. (Doc. 49, Ex. VV, WW). In addition, one of the employees admitted that she had left work three hours early without permission. (Doc. 43, Ex. 8). In its reply, HFHS also seeks to rely on Wiseheart's deposition testimony regarding an employee who walked off the job for four hours and was allegedly terminated. (Doc. 52 at 5 n.7). Actually, Wiseheart testified that the employee went out to lunch, never returned, and resigned. (Doc. 52, Ex. C at 49-50). Given this record, Reeser has raised an issue of fact as to whether she was disciplined more severely than other employees for similar alleged misconduct; thus raising a question of fact as to whether her termination for job abandonment amounts to mere pretext for retaliation.

HFHS contends that Reeser's only possible evidence of retaliation is the temporal proximity of her discharge and her protected activity, which it contends is not enough under the law to establish pretext. Defendant is correct that while temporal proximity alone may be sufficient to establish a causal connection as part of a plaintiff's prima facie case of retaliation under the FLSA, it is generally insufficient to raise a genuine issue of material

fact as to pretext. *Pettit*, 429 F. App'x at 535-36. In this case, however, Reeser does not rely solely on temporal proximity to establish pretext. When combined with evidence that her February 25, 2014 lunch break was authorized, and employment records suggesting other employees were treated more favorably than her for similar or more egregious infractions, the proximity in time of her discharge to her protected activity offers additional evidentiary support in favor of Reeser which is sufficient to defeat HFHS's motion for summary judgment.

## IV. Conclusion

Because genuine issues of material fact exist regarding whether HFHS's proffered reason for her discharge, namely "job abandonment," is pretext for retaliatory discrimination, HFHS's motion for summary judgment (Doc. 43) is DENIED.

**IT IS SO ORDERED**.

Dated: August 12, 2015

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
August 12, 2015, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

---