Exhibit 1

2014 WL 11309770
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan, Southern Division.

Christopher James Bailey, Plaintiff,

v.

Scoutware, LLC, Defendant.

Case No. 12−10281
|
Signed August 19, 2014

*OPINION AND ORDER GRANTING IN PART AND DENYING IN
PART PLAINTIFF'S MOTION FOR ATTORNEYS' FEES [145]*

Nancy G. Edmunds, United States District Judge

**I. Introduction**

 **\*1**  On August 8, 2014, a jury returned a verdict for Plaintiff Christopher James Bailey on his Michigan Whistleblowers' Protection Act and breach of contract claims against his former employer, Defendant Scoutware, LLC. (Dkt.143.) The jury awarded $18,000.00 in economic damages and $2,500.00 in non-economic damages for the WPA claim. (Dkt.143.) The jury awarded $2,000.00 for past economic damages on the breach of contract claim. (*Id.*)

On August 15, 2014, Plaintiff filed a motion for attorneys' fees and costs, which is now before the Court. (Dkt.145.) The Court needs neither a hearing nor a response to decide this motion; the Court therefore disposes with both and issues this order and opinion. E.D.Mich. LR 7.1(f).

Plaintiff requests the following amounts for the attorneys who worked on his case:

 • Tom Pabst: $43,875.00, 97.5 hours spent at $450.00 per hour;

 • William Moore: $140,612.50, 401.75 hours at $350.00 per hour;

 • Michael A. Kowalko: $8,953.00, 25.58 hours at $350.00 per hour; and

 • Jarret M. Pabst: $5,255.00, 21.02 hours at $250.00 per hour.

(Pl.'s Mot. at 25.) Plaintiff also requests $17,514.96 for actual costs in this case and interest. (*Id.*)

**II. WPA and Michigan attorneys' fees**

The WPA provides for an award of attorneys' fees. Mich. Comp. Laws § 15.364, in relevant part; "[a] court may also award the complainant all or a portion of the costs of litigation, including reasonable attorney fees and witness fees, if the court determines that the award is appropriate."

Plaintiff argues that the Court must award all actual attorneys' fees under the WPA. (Pl.'s Mot. at 2–3.) Despite his argument, Plaintiff has pointed to no Michigan or federal case that says the WPA mandates an award of attorneys. Michigan cases, in fact, hold to the contrary—a court, under the WPA, has discretion in awarding attorneys' fees. [1] *See*

*Heckmann v. City of Detroit,* No. 267391, 2007 WL 1989518, at \*10 (Mich.Ct.App. July 10, 2007) (citation omitted) (noting that an award of attorneys' fees under the WPA is "discretionary."); *Lease Acceptance Corp. v. Adams,* 724 N.W.2d 724, 733, n. 8 (Mich.Ct.Ap.2006) (pointing out that the WPA allows for the discretionary award of attorneys' fees.); *Gomery v. Crest Fin., Inc.,* No. 250881, 2005 WL 658818, at \*1–2 (Mich. Ct.App. Mar. 22, 2005) (citations omitted) (noting that the trial court has the "discretion" to award attorneys' fees under the WPA.).

[1]     Michigan law governs a court's award of attorneys' fees. *See Hometown Folks, LLC v. S & B Wilson, Inc.,* 643 F.3d 520, 533 (6th Cir.2011) (citation omitted) ("In diversity cases, attorneys' fees are governed by state law.")

Plaintiff bears "the burden of proving the reasonableness of the requested fees[.]" *SMith v. Khouri,* 751 N.W.2d 472, 478 (Mich.2008) (citation omitted). To start, a court is to determine the "fee customarily charged in the locality for similar legal services[.]" *Id. at 479.* A court should look to "reliable surveys or other credible evidence of the legal market" to make such a determination. *Id.* After making findings on that hourly rate, a court is to multiply that number by the reasonable number of hours expended on the case. *Id.* That total is to serve as a trial court's starting point in calculating reasonable attorneys' fees. *Id.* From that total, a court then is to look at other factors to determine whether to make adjustments to that initial figure. *Smith,* 751 N.W.2d at 478–79. Those factors include:

> **\*2**  (1) the skill, time, and labor involved, (2) the likelihood, if apparent to the client, that the acceptance of the employment will preclude other employment by the lawyer, (3) the fee customarily charged in that locality for similar services, (4) the amount in question and the results achieved, (5) the expense incurred, (6) the time limitations imposed by the client or the circumstances, (7) the nature and length of the professional relationship with the client, (8) the professional standing and experience of the attorney, and (9) whether the fee is fixed or contingent.

*Gomery,* 2005 WL 658818, at \*2 (the Wood factors) (citations omitted).

## III. Analysis

### A. Civil rights reasonable billing rate

The Court looks to the State Bar of Michigan's 2014 Economics of Law Practice Attorney Income and Billing Rate Summary Report to fix a reasonable billing rate.[2] That report shows that the median range for hourly billing rates in civil rights cases is $250.00. That amount is therefore the Court's starting off point. The Court notes that $250.00 per hour hovers around the median rate for those attorneys working in Detroit and Downtown Detroit and for those attorneys with twenty-six to thirty-five years of experience.

[2]     available at:http://www.michbar.org/pmrc/articles/0000151.pdf (last visited August 19, 2014).

### B. Reasonable hours expended in this case

The Court finds that a reasonable amount of hours expended in this case would have been one hundred hours. The Court notes that Plaintiff was in trial for around forty hours. The Court finds that sixty hours should have been a reasonable amount of time to spend on a motion to dismiss, a motion for summary judgment, and then other pretrial work.

### C. Other factors

The starting off reasonable attorneys' fees is therefore $25,000.00. Plaintiff has requested a significantly larger sum for attorneys' fees, over $200,000.00. The Court will not diverge from the starting off point. The case's claims were tenuous from the beginning. The WPA and breach of contract claims were basic claims that did not require any specialized skill. The pretrial matters were protracted and both sides involved in the pretrial litigation were at fault. Neither side acted in a civil manner that befits civil litigation.

Attorneys Pabst, Moore, and Kowalko are all requesting attorney fees above and beyond the median range. The Court will not increase the hourly rates for these three attorneys. As the Court has stated, the claims were not out of the ordinary. The claims did not require any specialized skill.

The Court also finds the fact that four attorneys worked on Plaintiff's case excessive. The Court will not allow an attorneys' fees award for work that could have been accomplished by one attorney. The Court specifically finds that the amounts requested by Kowalko and Jarrett M. Pabst unreasonable. Kowalko worked on jury instructions, which were not complicated and could have been handled by one attorney. Jarret M. Pabst is requesting fees for the time that he sat in on trial and the time that he read deposition transcripts into the record. An attorney need not have performed that function and the Court finds that award requested unreasonable.

The Court also finds that the $25,000.00 attorneys' fees award is reasonable in light of Plaintiff's recovery. Here, Plaintiff recovered only a sliver of what he hoped for, requested, and argued to the jury. The Court finds that Plaintiff's modest recovery should also limit his attorneys' fees recovery. *See Gomery,* 2005 WL 658818, at *2 (citations omitted) ("A trial court *may* reduce an award of attorney fees on the basis of a plaintiff's limited success, but it not required to do so.").

### D. Costs

**\*3** Plaintiff has also requested costs. (Pl.'s Mot. at 24.) The WPA also provides for a discretionary award of costs, "if the court determines that the award is appropriate." Mich. Comp. Laws § 15.364. The Court finds that the $25,000.00 award in attorneys' fees is sufficient. The Court does not award costs.

### E. Judgment interest

Plaintiff requests judgment interest, including pre-judgment interest. (Pl.'s Mot. at 2425.) The Court grants Plaintiff's request. Plaintiff is entitled to interest, including prejudgment interest, in accordance with Michigan Compiled Law § 600.6013. Plaintiff may calculate interest on the entire judgment award and attorneys' fees award, $47,500.00.

### IV. Conclusion

For the above-stated reasons, the Court GRANTS in PART and DENIES in PART Plaintiff's motion for attorneys' fees. The Court ORDERS Defendant to pay $25,000.00 in attorneys' fees to Plaintiff within sixty (60) days of this order, or upon arrangement between the parties. The Court DENIES Plaintiff's request for costs and GRANTS Plaintiff's request for interest.

So ordered.

### All Citations

Slip Copy, 2014 WL 11309770

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2572768

This decision was reviewed by West editorial staff and not assigned editorial enhancements.

United States District Court,
E.D. Michigan,
Southern Division.

Mikah Fialka–FELDMAN, Plaintiff,

v.

OAKLAND UNIVERSITY BOARD OF TRUSTEES, Gary D.
Russi, Mary Beth Snyder, and Lionel Maten, Defendants.

No. 08–14922.
|
June 23, 2010.

Attorneys and Law Firms

Chris E. Davis, Veena Rao, Michigan Protection and Advocacy Service, Livonia, MI, Mark A. Cody, Michigan Protection & Advocacy Service Lansing, MI, for Plaintiff.

Regan K. Dahle, Robert A. Boonin, Butzel Long, Ann Arbor, MI, for Defendants.

### OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR REASONABLE ATTORNEYS' FEES

PATRICK J. DUGGAN, District Judge.

 *1  Presently before the Court is Plaintiff's motion for reasonable attorneys' fees filed on January 20, 2010, pursuant to the attorney fee provisions in the Rehabilitation Act, 29 U.S.C. § 794a(2)(b), and The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. The motion has been fully briefed. On March 12, 2010, this Court issued a notice informing the parties that it is dispensing with oral argument with respect to the motion. For the reasons that follow, the Court grants Plaintiff's motion.

### Procedural Background

Plaintiff initiated this lawsuit against Defendant Oakland University Board of Trustees on November 25, 2008, claiming that Defendant's denial of his request for housing in one of Oakland University's on-campus dormitory living spaces violates the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(f)(3)(B), and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a). Plaintiff thereafter filed a motion for preliminary injunction based on his claims under the FHA. At the hearing with respect to his motion, Plaintiff asked the Court to also consider his Rehabilitation Act claims in deciding whether to grant his request for a preliminary injunction.

On February 5, 2009, this Court denied Plaintiff's motion concluding that the Board of Trustees is entitled to Eleventh Amendment Immunity and that Plaintiff in any event was not likely to succeed on the merits of his FHA claims. The Court indicated in a footnote that, even if it considered Plaintiff's Rehabilitation Act claims in deciding the motion and concluded that Eleventh Amendment Immunity did not bar those claims, it would reach the same result because its analysis of the merits of his FHA and Rehabilitation Act claims would be the same. (Doc. 12 at 11 n. 2.)

Plaintiff thereafter amended his complaint, with the Court's permission, to add University officials Gary D. Russi, Mary Beth Snyder, and Lionel Maten as defendants and to assert the following claims:

    (I) disparate impact discrimination in violation of the FHA;

    (II) disparate treatment discrimination in violation of the FHA;

    (III) disparate treatment discrimination in violation of the Rehabilitation Act;

    (IV) denial of a reasonable accommodation in violation of the Rehabilitation Act;

    (V) disparate treatment discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213; and,

    (VI) disparate impact discrimination in violation of the Rehabilitation Act.

The parties subsequently filed cross-motions for summary judgment.

At a hearing with respect to the summary judgment motions, Plaintiff's counsel informed the Court that Plaintiff was abandoning his disparate impact discrimination claims brought under the FHA and Rehabilitation Act. On December 23, 2009, this Court issued an opinion and order with respect to Plaintiff's remaining claims. The Court concluded that Plaintiff's request for an accommodation of the University's housing policy was reasonable and that Defendants violated § 504 of the Rehabilitation Act by refusing to provide Plaintiff with this reasonable accommodation. The Court noted that while it had previously found in its opinion and order denying Plaintiff's motion for a preliminary injunction that Plaintiff was not likely to succeed on this claim, in reaching that conclusion it failed to consider the Supreme Court's decision in *U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002), thus resulting in a flawed analysis. (Doc. 53 at 13 n. 2.) The Court held, however, that Plaintiff failed to demonstrate a prima facie case of disability discrimination to support his remaining claims. The Court issued a permanent injunction, requiring Defendants to provide on-campus housing for Plaintiff during his remaining semester at the University. A judgment was entered in favor of Plaintiff and against Defendants on January 7, 2010.

### Parties' Arguments

### Motion

  **\*2**  In his initial motion, Plaintiff seeks attorneys' fees in the amount of $176,841.43. This amount reflects hours billed by the following attorneys from the Michigan Protection and Advocacy Services, Inc. ("MPAS"), which represented Plaintiff in this matter: lead counsel Chris Davis, MPAS Legal Director Mark Cody, and staff attorneys Veena Rao, Joshua Kay, and Gabrielle Frampton. Ms. Frampton left MPAS while this matter was pending. Plaintiff has submitted affidavits from these attorneys detailing their education and legal experience and a "Time/Billable Hours Data Report" setting forth the tasks performed and hours spent by the attorneys on this matter. Plaintiff's attorneys are seeking the following hourly rates for the work performed in this case: $250 for Ms. Rao, Ms. Frampton, and Mr. Davis; $300 for Mr. Cody; and $150 for Mr. Kay.

### Response

Case 2:14-cv-11916-GCS-SDD   ECF No. 149-2   PageID.5277   Filed 07/20/17   Page 7 of 121
Feldman v. Oakland University Bd. of Trustees, Not Reported in F.Supp.2d (2010)
2010 WL 2572768, 41 NDLR P 141

In their response to Plaintiff's motion, filed on February 3, 2010, Defendants raise several objections to Plaintiff's requested attorneys' fees. First, Defendants maintain that the billing rates of Plaintiff's attorneys are unreasonably high. Based on the State Bar of Michigan: *2007 Economics of Law Practice in Michigan Survey* (Resp.Ex. 2), Defendants contend that the hourly rates of Plaintiff's counsel should be no more than the $200 for Mr. Cody, Mr. Davis, and Ms. Rao and $150 for Ms. Frampton. Next, Defendants contend that Plaintiff's request for fees is not supported by appropriate billing records. Specifically, Defendants point out that nearly a half of the time records submitted by Plaintiff's counsel lack specific descriptions as to the task performed and that where descriptions are provided, they are too vague or incomplete to assess the reasonableness of the work performed and/or time spent on the task.

Even if the Court concludes that the time records submitted by Plaintiff's counsel are not vague or incomplete, Defendants raise several alternative arguments for why the Court should conclude that the fees set forth in those records are unreasonable. These arguments, as they relate to all of Plaintiff's attorneys are:

    A. Excessive time on internal conferences is not reasonable;

    B. Plaintiff is not entitled to fees for time spent at depositions by lawyers other than the essential participating lawyer;

    C. Plaintiff is not entitled to the full amount of fees associated with travel time and should be awarded only a half of the total fees claimed for travel by Mr. Davis and no fees associated with Ms. Frampton as the billing records fail to support a justification for the travel time she billed;

    D. Plaintiff is not entitled to fees for pre-litigation activities;

    E. Plaintiff is not entitled to fees associated with his preliminary injunction motion because he did not prevail with respect to the motion; and

    F. Any fee award should be reduced to reflect Plaintiff's limited success on his claims.

Defendants raise arguments specific to each attorney representing Plaintiff, as well.

**\*3** With respect to Mr. Davis, Defendants contend that he spent hours performing tasks that should have been performed by attorneys billing at a lower hourly rate (e.g., performing Westlaw and Lexis research) or non-legal staff (e.g., filing and faxing) or that are not recoverable (e.g. attending Oakland University's Board of Trustee meetings). With respect to Mr. Cody, Defendants contend that his fees are unreasonable because Mr. Davis—who was lead counsel on the case—was (according to the statements in Mr. Davis' affidavit) more than qualified to take the lead in the case and did not require Mr. Cody's "supervision." As to Ms. Rao, Defendants object to $83.33 she billed for time spent associated with public and media relations and $208.34 she billed for tasks associated with replacing Ms. Frampton. Finally, as to Mr. Kay, Defendants contend that the services he performed were duplicative of those performed by other attorneys.

## Reply

In reply, Plaintiff has submitted revised billing records from his attorneys and asks the Court to base its decision regarding his motion for attorneys' fees on those records. In these revised records (Reply Ex. A), Plaintiff's attorneys have added entries derived from case notes in MPAS' client file to describe specifically the task performed and the aspect of the litigation to which it related. Additionally, Plaintiff's attorneys have removed from their revised billing records the following:

    • any fees related to Ms. Frampton and Mr. Kay;

• most fees related to Mr. Davis performing such tasks as faxing, filing, and records organizing that do not relate to discovery; [1]

[1]     In this category, there are four entries totaling 2.7 hours that still do not detail the task(s) performed (9/16/09; 10/27/09; 12/18/09; 12/21/09) and one entry for 3 hours where the specific task is described as "gathering list e-mails" (9/11/09). The Court cannot determine from these entries whether the time and/or task was reasonable and therefore, as set forth *infra,* is deducting these hours from the attorneys' fees awarded.

• the majority of case conference items except those that Plaintiff's counsel claims were necessary to review discovery strategy and to discuss pleadings to be filed;

• any hours expended before the complaint was filed that do not relate to researching and drafting requests for a reasonable accommodation;

• any hours related to publicity; and

• hours related to Mr. Cody's supervision and feedback.

Plaintiff's counsel further reduced by 50% the hours billed for a second attorney to attend depositions and reduced the hourly rate for travel to $125 (50% of Mr. Davis' and Ms. Rao's hourly billing rate and 40% of Mr. Cody's rate). As a result of these adjustments to the billing records, Plaintiff now seeks an award of attorneys' fees of $134,234.45 (as opposed to the previous $176,841.43).

Plaintiff continues to maintain that the hourly rates charged by his attorneys are reasonable in light of prevailing market rates and the various factors that courts consider to determine their reasonableness. *See infra* at 9 n. 2. He further argues that his lack of success with respect to his discrimination claims does not warrant a reduction in the requested fees because those claims and his reasonable accommodation claim under the Rehabilitation Act (on which he was successful) arise from a "common nucleus of operative fact" and assert indistinguishable legal theories. A full recovery also is warranted, Plaintiff argues, because he obtained excellent results.

### Sur–Reply

**\*4** Defendants argue that the revised billing records attached to Plaintiff's reply brief do not constitute "contemporaneous" time records and, as such, should not be considered to determine whether his attorneys' fees are reasonable. Defendants contend that these records were prepared after-the-fact, solely in response to the arguments asserted in their response brief, and therefore are not reliable. According to Defendants, "[i]t would be practically impossible for Plaintiff's counsel to recreate accurate detailed time records spanning a fourteen-month period." (Sur-reply at 3.)

### Applicable Law and Analysis

42 U.S.C. § 1988 and 29 U.S.C. § 794a(2)(b) grant courts the discretion to award reasonable attorney's fees to a "prevailing party." There can be no dispute in this case that Plaintiff prevailed in this lawsuit and therefore the Court will not discuss this issue further. The question is the reasonableness of the attorneys' fees that Plaintiff seeks.

The starting point for calculating a reasonable attorneys' fees award "should be the determination of the fee applicant's "lodestar," which is the proven number of hours reasonably expended on the case by an attorney, multiplied by his [or her] courtascertained reasonable hourly rate." *Adcock–Ladd v. Sec'y of Treasury,* 227 F.3d 343, 349 (6th Cir.2000)

Feldman v. Oakland University Bd. of Trustees, Not Reported in F.Supp.2d (2010)

2010 WL 2572768, 41 NDLR P 141

(citing *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983)). "The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939. The Supreme Court has instructed district courts to exclude fees that were not "reasonably expended," such as fees due to overstaffing or redundancy of work. *Id.* at 434, 103 S.Ct. at 1939.

Once the district court determines the fee applicant's lodestar, the court must consider other factors relevant to the reasonableness of any fee award. [2] One important factor is the "results obtained." *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940. As the Supreme Court has explained, there are two situations where the results obtained may affect the fee award:

[2]    The factors identified by the Supreme Court are:
> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.
>
> *Hensley,* 461 U.S. at 430 n. 3, 103 S.Ct. at 1937 n. 3 (citing *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974)).

> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit ... counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved." ... The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

*Id.* at 434–35, 103 S.Ct. at 1940. The *Hensley* Court expressed doubt as to whether such claims will arise with frequency; rather, the Court explained, most civil rights cases will present only a single claim or multiple claims involving a common core of facts or based on related legal theories. In this second situation:

> **\*5**  Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead, the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

*Id.* at 435, 103 S.Ct. at 1940. The Court explained that in this situation, if the plaintiff has obtained excellent results, his or her attorney should recover a fully compensatory fee. *Id.* "If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Id.* at 436, 103 S. Ct at 1941. As the Hensley Court instructed, it is within the district court's discretion to attempt to identify specific hours that should be eliminated or to simply reduce the award to account for the limited success. *Id.* at 436–37, 103 S.Ct. at 1941.

Turning first to the hourly rates charged by Plaintiff's counsel, this Court agrees with Defendants that those rates are too high. According to the State Bar of Michigan 2007 survey, the top median hourly litigation rate is $200 and the top median hourly litigation rate for firms the size of MPAS is $195. (Resp. Ex. 2 at 18, 21.) For attorneys in practice between 15 and 19 years, such as Mr. Davis and Ms. Rao, the median litigation hourly rate is $200. (*Id.* at 20.) The same median rate is found for attorneys in practice for 30 to 39 years, such as Mr. Cody. (*Id.*) Therefore, the Court concludes that a reasonable hourly rate for each of Plaintiff's attorneys is $200.

With respect to Defendants' complaint regarding the absence of case-specific descriptions or vague or incomplete descriptions in the billing records initially submitted by Plaintiff's counsel, this Court finds that the revised billing records

*Feldman v. Oakland University Bd. of Trustees, Not Reported in F.Supp.2d (2010)*

2010 WL 2572768, 41 NDLR P 141

attached to Plaintiff's reply brief resolve this issue for almost all of the billing entries. As Mr. Davis explains in an affidavit filed on February 23, 2010, case notes in MPAS' case management system were used to prepare the revised billing records and these notes were recorded contemporaneously with the work performed on the case. (Doc. 65.) The only action that was performed "after-the-fact" was incorporating the information in the case notes into the Time/Billable Hours Data Report. Plaintiff's petition for attorneys' fees therefore is supported by contemporaneous time records. *Compare Calhoun v. Acme Cleveland Corp.,* 801 F.2d 558 (1st Cir.1986) (finding attorney submissions insufficient where they listed the different tasks each attorney performed, the total number of hours, and hourly billing rate but did not give the dates when the tasks were performed or the amount of time spent on each task).

There are a handful of time entries related to Mr. Davis in the revised billing records still lacking in details sufficient for the Court to assess whether the work performed and/or hours expended are reasonable. These include 5.7 hours related to "faxing, filing, and record organizing" (as mentioned *supra* at n. 1) and 8.1 hours for "research, reading, review and/ or compiling information" (1.3 hours on 2/27/09; 1.5 hours on 8/7/09; 1.5 and 1.8 hours on 10/9/09; and 2 hours on 10/31/09). The Court therefore will reduce Mr. Davis' hours by 13.8 hours.

 **\*6** With the submission of the revised billing records, Plaintiff also has addressed most of Defendants' objections to the fees billed. Plaintiff's counsel removed the majority of their time related to attorney conferences and any hours preceding the filing of the complaint to the extent the time did not relate to researching and drafting requests for reasonable accommodations for Plaintiff. In their sur-reply, Defendants do not contest the reasonableness of the remaining time in these categories. Plaintiff's counsel also removed all of the hours billed by Ms. Frampton, thereby resolving Defendants' contention that the time she billed for travel was unreasonable. As Defendants suggested would be appropriate in their response brief, Plaintiff's counsel additionally reduced the hourly rate for the travel time incurred by Mr. Davis and Mr. Cody to 50% and 40% of their normal hourly rate, respectively. Further, Plaintiff's counsel removed any hours billed by Mr. Davis for those tasks (except legal research) that Defendants argued should have been performed by less costly associates or office assistants. They also removed any hours associated with publicity, such as the time Ms. Rao spent to "review news stories and articles," which Defendants objected to as unreasonable in their response brief. Finally, Plaintiff's counsel removed any hours that Mr. Cody previously billed that related to "feedback and supervision."

This leaves the following objections by Defendants to the reasonableness of Plaintiff's counsels' fees. First, Defendants contend that it was unreasonable for Mr. Davis—rather than a less expensive attorney—to conduct 68.60 hours of legal research. This objection may carry more weight if Plaintiff had been represented by a law firm with several tiers of associates and partners. In a small non-profit office such as MPAS (that employs only four lawyers), however, it is likely that there are few if any "less expensive attorneys" available to handle the work. The Court therefore does not find Mr. Davis' hours conducting legal research unreasonable.

Second, Defendants object to the 8 hours that Mr. Davis billed to attend Oakland University Board of Trustee meetings. Plaintiff indicates in response that Mr. Davis' presence at these public meetings aided his discovery efforts and provided an opportunity to resolve Plaintiff's claims. These efforts, however, sought to resolve Plaintiff's dispute with the University through its administrative or hearing process. As such, the Court does not believe that the time Mr. Davis spent monitoring the Board of Trustee's meetings is verable under 42 U.S.C. § 1988 or 29 U.S.C. § 794a. *See Webb v. Bd. of Educ. of Dyer County,* 471 U.S. 234, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985).

With respect to Ms. Rao's time for entering her appearance in this matter (.17 hours on 10/5/09), the Court does not believe that it is reasonable to include this amount in Plaintiff's award. Defendants further object to several hours that Ms. Rao billed to attend depositions conducted by other attorneys (as set forth in Exhibit 7 to their Response). [3] Of the hours listed on Exhibit 7, only 6 hours on 9/15/09 and 3 hours on 9/22/09 remain in the revised billing records and will be deducted. While Defendants also identify in Exhibit 7 an entry on 10/20/09 for 3.5 hours, that time is billed as preparation for a deposition and not actual attendance at the deposition.

Case 2:14-cv-11916-GCS-SDD   ECF No. 149-2, PageID.5281   Filed 07/20/17   Page 11 of 121
Feldman v. Oakland University Bd. of Trustees, Not Reported in F.Supp.2d (2010)
2010 WL 2572768, 41 NDLR P 141

3      Exhibit 7 also includes hours billed by Mr. Cody and Mr. Kay to attend depositions; however, Plaintiffs' counsel removed those hours from the revised billing records.

**\*7** Finally, Defendants contend that any fees awarded to Plaintiff should be reduced to reflect Plaintiff's lack of success with respect to his preliminary injunction motion and the claims alleged other than his FHA reasonable accommodation claim. As referred to earlier, the Supreme Court advised in *Hensley:*

> [Where a plaintiff has obtained excellent results] the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters. 461 U.S. at 435, 103 S.Ct. 1941. While Plaintiff perhaps did not achieve every result that he sought, he prevailed in his primary goal of opening access to University housing for himself. Plaintiff asserted various claims arising from a common core of facts and based on related legal theories that were focused on the overall relief he eventually obtained. With respect to Plaintiff's preliminary injunction motion, as noted in the Court's December 23, 2009 decision, the Court probably would have reached a different result if it had reviewed the Supreme Court's decision in *Barnett.* Therefore, this Court concludes that Plaintiff's award of attorneys' fees should not be reduced to reflect limited success in this litigation.

### Conclusion

In summary, this Court concludes that, except for the following hours, the remaining hours billed by Plaintiff's counsel as set forth in their revised billing records are reasonable:

- 8 hours billed by Mr. Davis to attend Oakland University Board of Trustee meetings

- 5.7 hours billed by Mr. Davis related to unspecified "faxing, filing, and record organizing"

- 8.1 hours billed by Mr. Davis for unspecified "research, reading, review, and/or compiling information

- 9 hours billed by Ms. Rao to attend depositions

- .17 hours billed by Ms. Rao to file her appearance in this matter.

The Court further concludes that a reasonable hourly rate for Plaintiff's counsel is $200, except with respect to hours billed for traveling and that rate is $100. Based on Plaintiff's attorneys' revised billing records, this results in the following billable hours, rate, and fees (minus the same percentage discount provided by counsel in their records):

| Attorney | Hours Billed | Hourly Rate | Total | Discount | Award |
|---|---|---|---|---|---|
| Cody | 11.92 (non-travel) 3.00 (travel) | $200 (non-travel) $100 (travel) | $2,384 (non-travel) *$ 300 (travel)* $2,684 | $1,250[4] | $1,434 |
| Davis | 530.95 (non-travel) 17.5 (travel) | $200 (non-travel)$100 (travel) | $106,190 (non-travel) *$ 1,750 (travel)* $107,940 | $12,990[5] | $94,950 |
| Rao | 31 (non-travel) | $200 (non-travel) | $6,200 | $908[6] | $5292 |
| **TOTAL** | | | | | **$101,676** |

2010 WL 2572768, 41 NDLR P 141

4 Plaintiff's counsel provided a 50% discount for 11 hours of Mr. Cody's time billed at $300/hr. and for 3 hours billed at $125/hr (travel related time) for a total discount of $1,612.50. The Court has recalculated the discount by applying the same percentage discount to the same hours but new hourly rate.

5 Plaintiff's counsel discounted 86.4 hours of Mr. Davis' time by 50% and 29 hours of his time by 75%. Again, the Court recalculated the discount based on the revised hourly rate of $200. In comparison to Ms. Rao, *see infra* at n. 6, none of the discounted hours have been eliminated by the Court.

6 Plaintiff's counsel discounted 18.25 hours of Ms. Rao's time by 50%, 9.17 of which this Court has deducted completely. The Court recalculated the discount based on the revised hourly rate and the remaining discounted hours.

Accordingly,

**\*8 IT IS ORDERED,** that Plaintiff's motion for reasonable attorneys' fees is **GRANTED** and Plaintiff is awarded fees pursuant to 42 U.S.C. § 1988 and 29 U.S.C. § 794a in the amount of $101,676.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 2572768, 41 NDLR P 141

---

End of Document     © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5283 Filed 07/20/17 Page 13 of 121
Terry v. Al-Naimi, Not Reported in F.Supp.2d (2009)

2009 WL 728542

2009 WL 728542
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

Cynthia TERRY, Plaintiff,

v.

Matthew AL–NAIMI, Recy–Clean Services L.L.C., and Recy–Clean Environmental Services L.L.C., Defendants.

No. 07–14130.
|
March 19, 2009.

West KeySummary

1    **Civil Rights**  👉  Amount and Computation

    **Civil Rights**  👉  Time Expended;Hourly Rates

An employee who was the prevailing party in a sexual harassment case was entitled to an award of $20,963.50 in attorney fees. The employee requested $43,625.82 in attorney fees. Although the employer did not question the hourly rates, the court found that $200 an hour for an attorney in the Detroit area with under three years' experience was excessive and thus reduced the rate to $150.

Cases that cite this headnote

**Attorneys and Law Firms**

Mary A. Mahoney, Scwartz Law Firm, Farmington Hills, MI, for Plaintiff.

Austin M. Hirschhorn, Austin Hirschhorn Association, Troy, MI, for Defendants.

*MEMORANDUM AND ORDER GRANTING PLAINTIFF'S MOTION FOR ATTORNEY FEES* [1]

[1]    The Court originally scheduled this matter for hearing. Upon review of the parties' papers, however, the Court finds that oral argument is not necessary. *See* E.D. Mich. LR 7.1(e)(2).

AVERN COHN, District Judge.

**I. Introduction**

*1  This is an employment discrimination case. On January 8, 2009, a jury found defendant Recy–Clean Environmental Services, L.L.C., (Recy–Clean) guilty of sexually harassing plaintiff Cynthia Terry (Terry) and awarded her $25,000 in compensatory damages and $125,000 in punitive damages. The jury acquitted Recy–Clean of retaliation and acquitted defendant Matthew Al–Naimi of sexual harassment and retaliation.

The Court entered a judgment on the verdict against Recy–Clean in the amount of $150,000.

Before the Court is Terry's motion requesting $43,625.82 in attorney fees. For the reasons that follow, the motion will be granted in the amount of $20,963.50.

## II. Legal Standards

"In any action or proceeding under [subchapter VI, Equal Employment Opportunities, of Chapter 21, Civil Rights, of Title 42] the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee ... as part of the costs." 42 U.S.C. § 2000e–5(k). "A court, in rendering a judgment in an action brought pursuant to [Michigan's Elliott–Larsen Civil Rights Act (ELCRA) ], may award all or a portion of the costs of litigation, including reasonable attorney fees and witness fees, to the complainant in the action if the court determines that the award is appropriate." M.C.L. 37.2802. A "prevailing party" is one who was entitled to some form of relief when the suit was brought. *Harrington v. Vandalia–Butler Bd. of Educ.,* 585 F.2d 192, 197 (6th Cir.1978). The awarding and amount of attorney fees are at the Court's discretion. 42 U.S.C. § 12205; *Dillery v. City of Sandusky,* 398 F.3d 562, 569 (6th Cir.2005).

The Supreme Court and the Sixth Circuit have recognized a modified rate-times-hours method of calculating a reasonable attorney fee. *E.g., Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Coulter v. State of Tenn.,* 805 F.2d 146 (6th Cir.1986). However, "[c]ases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary ...." *Hensley,* 461 U.S. at 434. For example,

> Hours spent in reviewing records, talking to other lawyers or experts, preparing legal documents and the like cannot be fully verified and require the court to trust the lawyer's word that the hours claimed represent necessary work actually performed. Depending on the situation, the lawyer may have strong economic incentives to spend too many hours on a piece of work or to exaggerate the number of hours spent or the necessity or importance of the work. Similarly, it is often difficult to assess the need for two lawyers at a deposition, an interview, or a trial.

*Coulter,* 805 F.2d at 150. After the lodestar is calculated, the Court may adjust the fee for factors such as the number of defendants against whom a plaintiff prevailed compared with the number joined, the proportion of claims on which plaintiff prevailed, the experience of the attorneys, duplicated hours, and whether the agreement was for a fixed or contingent fee. *Marr v. Rife,* 545 F.2d 554, 555–56 (6th Cir.1976); *Disabled Patriots of Am., Inc., v. Taylor Inn Enters., Inc.,* 424 F.Supp.2d 962, 965–66 (E.D.Mich.2006). "There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Hensley,* 461 U.S. at 436–37.

## IV.

**\*2** As the prevailing party, Terry is entitled to attorney fees under Title VII of the Civil Rights Act and ELCRA. She seeks $43,625.82. Recy–Clean urges the Court in its discretion to reduce the amount.

Terry's attorneys billed the following hours:

| Name | Experience | Rate | Hours | Total |
|------|-----------|------|-------|-------|

2009 WL 728542

| | | | | |
|---|---|---|---|---|
| Mary Mahoney | 20.5 years litigation, including Civil Rights actions | $275.00 | 128.4 | $35,310.00 |
| Susan Brown | 21 years in employment law, especially Civil Rights cases | 275.00 | 5.5 | 1,512.50 |
| Erik Graney | 2.5 years; 2006 magna cum laude graduate of MSU Law; clinic experience in school; two summers clerking at a law firm where work included employment law | 200.00 | 34.03 | 6,803.32 |
| **TOTAL** | | | | $43,625.82 |

Recy–Clean does not question the hourly rates of the attorneys but the Court finds that a $200 hourly rate for an attorney in the Detroit area with under three years' experience is excessive. The hourly rate allowed for Mr. Graney will be $150, reducing his total to $5,104.50 and the lodestar total to $41,927.00.

Counsel for Recy–Clean "believes" that some of the charges are not considered as taxable costs under local and federal rules; however, counsel does not cite any particular rules. Counsel for Recy–Clean also thinks "some of the costs" involve duplication of efforts by Terry's attorneys and charges for services unrelated to Recy–Clean but counsel does not cite any particular charges.

The original amount claimed by Terr's counsel was under $50,000, not an excessive amount for a case that went to trial. However, Terry prevailed against only one of two defendants, Recy–Clean, and was successful on only one of two claims against Recy–Clean.

Therefore, the Court will exercise its discretion in reducing the modified lodestar total by one-half. Recy–Clean is liable for $20,963.50 in attorney fees.

## V. Conclusion

The clerk will enter a supplemental judgment in Terry's favor in the amount of $20,963.50 as reasonable compensation for attorney fees.

SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2009 WL 728542

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 6524144
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan, Southern Division.

Yasin Reeder, Plaintiff,
v.
County of Wayne, Defendant.

Case No. 15-cv-10177
|
Signed 11/03/2016

**Attorneys and Law Firms**

Adam Michael Taub, Keith D. Flynn, Miller Cohen P.L.C., Detroit, MI, for Plaintiff.

Cheryl Yapo, Wayne County Corporation Counsel, Detroit, MI, Randal M. Brown, Wayne County Corporation Counsel, 500 Griswold, FL, for Defendant.

## ORDER GRANTING PLAINTIFF'S MOTION FOR ATTORNEYS' FEES [62] AND DENYING DEFENDANT'S MOTION FOR ATTORNEYS' FEES [70]

Hon. Gershwin A. Drain, United States District Court Judge

## I. INTRODUCTION

**\*1**  This Family and Medical Leave Act (FMLA) case was tried before a jury in July 2016. At the conclusion of the six-day trial, the jury returned a verdict in favor of the Plaintiff on one count of FMLA Interference and awarded him $187,500.00 in past economic damages. Dkt. No. 58.

This matter is now before the Court on Plaintiff's and Defendant's post-trial motions for attorneys' fees and costs, accrued pre-judgment interest and post-judgment interest. *See* Dkt. No. 62, 70. Defendant responded in opposition to Plaintiff's Motion, to which Plaintiff replied. *See* Dkt. No. 64, 67. Similarly, Plaintiff responded in opposition to Defendant's Motion. *See* Dkt. No. 74. Defendant did not reply to Plaintiff's response.

The Court heard oral argument on this matter on October 31, 2016, and at the conclusion of the hearing, took the matter under advisement. Having had the opportunity to review the parties' briefs, supporting documents, and the entire record of this matter, and having reviewed and considered the oral arguments of counsel, the Court is now prepared to rule on this matter. For the reasons stated below, the Court grants Plaintiff's Motion and denies Defendant's Motion.

## II. DISCUSSION

Under the American Rule, "parties are ordinarily required to bear their own attorney's fees," "absent explicit statutory authority." *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 602–03, (2001). Nevertheless, Congress has provided that a "prevailing party" may be awarded attorney's fees under numerous statutes, including the Civil Rights Act of 1964, 78 Stat. 259, 42 U.S.C. § 2000e-5(k), and the Americans with Disabilities

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5287 Filed 07/20/17 Page 17 of 121
Reeder v. County of Wayne, Slip Copy (2016)
2016 WL 6524144

Act of 1990 (ADA), 104 Stat. 327, 42 U.S.C. § 12205. Whether fees are awarded is a matter within the Court's discretion. *See id.* Additionally, Congress designated that an award of attorney's fees, reasonable expert witness fees, and other costs is mandatory when the plaintiff has proved that the defendant violated the Family Medical Leave Act (FMLA). *See* 29 U.S.C. § 2617(a)(3); *Bond v. Abbott Labs.*, 188 F.3d 506 (6th Cir. 1999) (per curiam).

### A. Defendant's Motion for Attorneys' Fees

Defendant seeks attorneys' fees under 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 12205. The Court, "in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, including litigation expenses, and costs" for claims brought under the ADA. 42 U.S.C. § 12205. Similarly, the Court, "in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs," for claims under Title VII. 42 U.S.C. § 2000e-5(k).

Defendant asserts that because Plaintiff's Title VII, ADA, and FMLA retaliation claims did not result in a favorable jury verdict, it is entitled to attorneys' fees in the amount of $208,867.50. Dkt. No. 70, p. 3 (Pg. ID No. 1642).

A prevailing defendant must meet a stricter standard to qualify for a fee award than a prevailing plaintiff under civil rights statutes. *See Hughes v. Rowe*, 449 U.S. 5, 14 (1980). A defendant is entitled to fees when the plaintiff's action was frivolous, unreasonable, or lacking foundation, even though it was not brought in subjective bad faith. *Id.* (quoting *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978)). "The plaintiff's action must be meritless in the sense that it is groundless or without foundation. The fact that a plaintiff may ultimately lose his case is not in itself a sufficient justification for the assessment of fees." *Id.*

**\*2** The Supreme Court specifically cautioned against granting awards of attorneys' fees too freely to prevailing defendants:

> In applying these criteria, it is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421–22 (1978). *See also Jones v. Cont'l Corp.*, 789 F.2d 1225, 1232 (6th Cir. 1986) ("An award of attorney's fees against a losing plaintiff in a civil rights action is an extreme sanction, and must be limited to truly egregious cases of misconduct.").

In the present case, Plaintiff's complaint originally alleged ten claims for discrimination arising out of his mental disabilities of anxiety and depression, his employer's refusal to accommodate his medical restrictions, and claims that coworkers of other races with physical disabilities were granted accommodations. Dkt. No. 3.

Two of Plaintiff's claims—Counts V and IX [1] for race discrimination under Title VII and the Elliot-Larsen Civil Rights Act (ELCRA)—were dismissed upon Defendant's Motion for Summary Judgment. Dkt. No. 28, p. 36 (Pg. ID No. 563). The Court came to this conclusion by finding that Plaintiff had not carried the burden of establishing he was treated differently than "similarly situated" employees, not by any finding that such claims were frivolous, unreasonable, or without foundation. *See id.*

1    Defendant claims in its motion that the Court granted its Motion for Summary Judgment as to Count IV, which is incorrect. Dkt. No. 70, pp. 6–7 (Pg. ID No. 1645–46) ("In its Opinion and Order, this Court granted Defendant's Motion for Summary Judgment as to Counts V and IV of Plaintiff's Complaint which were Plaintiff's claims of race discrimination in violation of Title VII and ELCRA.").

At trial, the Court granted Defendant's Motion for a Directed Verdict on two more claims, Counts VI and X, finding that Plaintiff failed to satisfy his burden to establish a prima facie case of racial retaliation under Title VII and ELCRA, respectively. *See* Dkt. No. 56. Again, the Court did not find that these claims had been groundless or without foundation. Rather, the Court found that the evidence presented did not meet the minimum standard required to proceed.

After deliberation, the jury determined that Defendant had interfered with Plaintiff's FMLA rights, and awarded him $187,500.00 in past economic damages. Dkt. No. 58. The jury returned a verdict in favor of Defendant on the five other remaining claims, arising under the ADA, Michigan Persons with Disabilities Civil Rights Act, and FMLA. *See id.*

**\*3** Defendant argues that the "only one claim [that was] assuredly not 'frivolous, unreasonable, or groundless,' " is the one "to which the jury returned a verdict in favor of Plaintiff." Dkt. No. 70, p. 8 (Pg. ID No. 1647). To accept such an argument would be to expressly disregard the Supreme Court's admonition that "a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." *Christiansburg Garment*, 434 U.S. at 421–22. The Court declines to engage in hindsight bias, particularly as the facts presented in this case do not warrant such an extreme sanction.

Plaintiff's conduct in filing and maintaining his civil rights claims does not rise to the level of a truly egregious case of misconduct that merits awarding attorney's fees to a defendant pursuant to 42 U.S.C. § 12205 and 42 U.S.C. § 2000e-5(k). Consequently, the Court DENIES Defendant's Motion for Attorneys' Fees [70].

### B. Plaintiff's Motion for Attorneys' Fees

Plaintiff seeks an award of $ 182,255.00 for attorneys' fees for 692.6 hours of attorney time. Dkt. No. 62, pp. 2, 12 (Pg. ID No. 1430, 1440).

The FMLA provides that the Court, "shall, in addition to any judgment awarded to the plaintiff, allow a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action to be paid by the defendant." 29 U.S.C. § 2617(a)(3). Thus, an award of attorney's fees to a prevailing plaintiff under the FMLA is mandatory, leaving only the amount of the award within the discretion of the judge. Despite the mandatory nature of the fees, courts analyze motions for attorney's fees under the FMLA the same way as motions for discretionary attorney's fees under other civil rights statutes. *Clements v. Prudential Protective Servs.*, LLC, 100 F. Supp. 3d 604, 613–14 (E.D. Mich. 2015), *aff'd*, No. 15-1603, 2016 WL 4120679 (6th Cir. Aug. 3, 2016) (citing *Bell v. Prefix, Inc.*, 784 F.Supp.2d 778, 781 (E.D. Mich. 2011)).

The Sixth Circuit considers of the twelve-factor test first enunciated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), when analyzing the reasonableness of a requested fee. *Reed v. Rhodes*, 179 F.3d 453, 471–72 (6th Cir. 1999). The twelve Johnson factors are:

(1) The time and labor required;

(2) The novelty and difficulty of the questions;

(3) The skill requisite to perform the legal service properly;

(4) The preclusion of other employment by the attorney due to acceptance of the case;

(5) The customary fee;

(6) Whether the fee is fixed or contingent;

(7) Time limitations imposed by the client or the circumstances;

(8) The amount involved and the results obtained;

(9) The experience, reputation, and ability of the attorneys; (10) The "undesirability" of the case;

(11) The nature and length of the professional relationship with the client; and

(12) Awards in similar cases.

488 F.2d at 717–19. The Court will apply the foregoing standards in determining the amount of Plaintiff's award of attorneys' fees in this case.

**1. Time and Labor**

The Supreme Court has held that the "most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). "The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Id.*

The present case spanned 18 months from the date of filing in January 2015, to the entry of the jury's verdict in July 2016. Defendant filed a motion for summary judgment in January 2016, which entailed briefing and oral argument. After the Court granted the motion in part and denied it in part, the parties were ordered to participate in private facilitation. After a settlement was unable to be reached, the parties took part in a six-day trial that resulted in a favorable verdict for Plaintiff and an award of $187,500.00. Plaintiff's attorneys report working a total of 692.6 hours on the case.

**\*4** Plaintiff's attorneys' records do not break down the time spent litigating each individual claim. There were several interrelated claims, asserting discrimination and denial of benefits based on disability and race. Although Plaintiff prevailed only on his FMLA claim, and not on his race and disability discrimination claims, there claims seemed to share a common core of facts with his FMLA interference claim from the beginning to the conclusion of the case. More specifically, Plaintiff seemed to consistently assert that he was denied FMLA benefits as a black employee with a mental disability, while white employees with physical disabilities were granted disability accommodations and FMLA benefits. Accordingly, his disability and discrimination claims were involved somewhat similar facts and evidence, all pertaining to Plaintiff's main claim that his employer interfered with his FMLA rights, which was the basis for the damages the jury awarded. Thus, it would be difficult for the Court to divide the hours expended, when it seems that counsel's time was "devoted generally to the litigation as a whole." *Barnes v. City of Cincinnati*, 401 F.3d 729, 745 (6th Cir. 2005) (quoting *Hensley,* 461 U.S. at 433).

The documentation of hours illustrates that Mr. Flynn engaged in "block billing," wherein long periods of multiple types of work are described in a single entry. *See, e.g.*, Dkt. No. 62-2, pp. 29–32 (Pg. ID No. 1484–87) ("Reviewed pleadings and discovery responses in preparation for trial and researched evidentiary issues re doctors' notes and edited motions in limine and discussed trial strategy with Adam Taub" for 8 hours; "Reviewed new documents from D, spoke with D, reviewed voir dire, verdict form, and jury instructions and drafting powerpoint presentation" for 8 hours). Even entries that do not combine many different tasks are labeled with brief descriptions that do not provide much aid in determining exactly what work was performed. *See id.* (describing over 50 hours' worth of entries with the words "prepped client" from June 21, 2016 to July 6, 2016). Such types of entries make it difficult for the Court to determine the number of hours expended on discrete tasks, and whether that number of hours is reasonable. *See Gratz v. Bollinger*, 353 F. Supp. 2d 929, 939 (E.D. Mich. 2005).

#### 2. Novelty and Difficulty of the Questions

Here, the parties litigated a number of issues related to Plaintiff's case, with a focus on the FMLA claims throughout the entirety of the proceedings. Much of the proceedings dealt with whether the notice Plaintiff gave was adequate to apprise his employer of his request to take FMLA leave. Another issue that arose was the question of whether Plaintiff's prior arbitration precluded his ability to recover under federal civil rights statutes. The records submitted by Plaintiff's attorneys detail substantial preliminary research on the case, prior to even filing the complaint. *See* Dkt. No. 62, pp. 2–3, 24–25 (Pg. ID No. 1457–58, 1479–80).

#### 3. Skill Required to Perform the Legal Service Properly

The FMLA is a complex and extensive statute. In the present case, the issues required better than average legal skills and the case required briefing on substantive motions, as well as trial skills. Plaintiff's attorneys exhibited the skills required and the jury awarded Plaintiff a considerable amount of damages. The verdict the jury rendered for past economic damages far exceeded the amount that Defendant had previously offered in settlement.

#### 4. Preclusion of Other Employment

Plaintiff's attorneys assert that they work for a "well-renowned labor and employment law firm in Detroit representing numerous employees and labor unions in active litigation." [citation]

From the date of filing Plaintiff's complaint to the completion of the jury trial, the docket in the Eastern District of Michigan shows that Mr. Taub had at least three other cases and Mr. Flynn had at least six other cases in this Court. It is conceivable that had Plaintiff's attorneys not spent time on Plaintiff's case, they would have spent that time on other clients.

#### 5. Customary Fee

**\*5**  This district traditionally relies on State Bar of Michigan's Economics of Law Practice Survey ("the Survey") as evidence of a reasonable billing rate in this district. *Bell*, 784 F. Supp. 2d at 783 ("Michigan federal courts routinely use this publication as evidence of reasonableness in determining attorney's fees."). The most recent Survey was published in 2014.

According to the survey, the average billing rate for an associate is $218 per hour (25th percentile of $175 per hour; 75th percentile of $250 per hour). The average billing rate for a senior associate is $264 per hour (25th percentile of $200 per hour; 75th percentile of $300 per hour). This rate varies by the attorney's years of experience. An attorney who has practiced for one to two years makes an average of $189 per hour; an average of $205 per hour for three to five years of experience; and an average of $236 per hour for six to ten years of experience. The average billing rate for a law firm located in Downtown Detroit is $304 per hour. The average billing rate for a plaintiff's attorney practicing employment law is $274 per hour.

#### 6. Fixed or Contingent Fee

Plaintiff had a contingency-based fee arrangement with his counsel. The Court does not believe that the contingency agreement should affect the award of statutory attorney's fee. Accordingly, using an hourly fee is appropriate to determine reasonable attorneys' fees in this case.

#### 7. Time Limitations Imposed

Plaintiff's counsel asserts that this fact is not relevant to the present case.

**8. Amount Involved and Results Obtained**

"The extent of a plaintiff's overall success must be considered in making an award of attorney fees." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1169 (6th Cir. 1996). However, a reduction in fees based simply on a ratio of successful claims to claims raised is not permitted. *Id.* Indeed, the Sixth Circuit has "repeatedly rejected mechanical reductions in fees based on the number of issues on which a plaintiff has prevailed." *Deja Vu v. Metro. Gov't of Nashville & Davidson Cty., Tennessee*, 421 F.3d 417, 423 (6th Cir. 2005).

Yet, as the Supreme Court noted in *Hensley*, there are some cases where a plaintiff achieves only partial success on interrelated and nonfrivolous claims that were raised in good faith. 461 U.S. at 436. ("Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill."). "[T]he most critical factor [in determining a fee award] is the degree of success obtained," such that an attorney should recover a fully compensatory fee for excellent results. *Id.* at 435–36. *See also Waldo v. Consumers Energy Co.*, 726 F.3d 802 (6th Cir. 2013) (finding an award of $400,000 in compensatory damages and $7.5 million in punitive damages on one of seven discrimination claims, sharing a common core of facts, was an excellent result).

In the present case, the jury awarded Plaintiff $187,500 in economic damages. This amount exceeded any settlement proposal offered by Defendant and is also more than double the amount of the case evaluation award ($70,000). Although the jury's award was significantly less than Plaintiff requested, the award was far from nominal. Furthermore, given the Sixth Circuit's repeated admonition that "a reduction in attorney fees [awarded to a prevailing plaintiff] is to be applied only in rare and exceptional cases where specific evidence in the record requires it," the Court hesitates to reduce the fee based on this factor in light of Plaintiff's success. *Waldo*, 726 F.3d at 822 (quoting *Isabel v. City of Memphis*, 404 F.3d 404, 416 (6th Cir. 2005)) (alteration in original). Finding this case is neither rare nor exceptional, the Court will not reduce the attorney's fee request based on the success Plaintiff achieved.

**9. Experience, Reputation, and Ability of the Attorneys**

**\*6** Keith Flynn, the lead attorney in this case, is requesting a rate of $275 per hour. Mr. Flynn has practiced in the state of Michigan for six years. Mr. Flynn has been counsel in one prior jury trial before the present case. The assisting attorney on this case, Adam Taub, is requesting a rate of $250 an hour. Mr. Taub graduated from law school in May 2013 and less than three years of practice in Michigan, Massachusetts, and Connecticut after passing the bar exam in each state. This case was Mr. Taub's first jury trial.

**10. Undesirability of the Case**

The Court finds no reason to assume that this case, an ordinary employment-discrimination case, is inherently undesirable. *See Bell*, 784 F. Supp. 2d at 782.

**11. Nature and Length of the Professional Relationship**

Plaintiff's counsel asserts that this fact is not relevant to the present case.

**12. Awards in Similar Cases**

Plaintiff argues that *Baier v. Rohr-Mont Motors, Inc.*, No. 12 C 8234, 2016 WL 1247451 (N.D. Ill. Mar. 30, 2016), is a similar case. In *Baier*, a district court approved $389,166.57 in attorneys' fees after a jury found for an employee on six counts and awarded over a million dollars in compensatory and punitive damages. *Id.* Examining the facts present in *Baier*, the Court does not find that it is a similar case. The next case Plaintiff argues is similar is *Gilster v. Primebank*, 884 F. Supp. 2d 811, 878 (N.D. Iowa 2012). In *Gilster*, a jury awarded an employee $900,301 in damages after finding that her employer discriminated against her on basis of her sex and retaliated against her for reporting sexual harassment, in

violation of Title VII and the Iowa Civil Rights Act. *Id.* The district court awarded the plaintiff a total of $161,418.24 in attorneys' fees on the case, "considering the exceptionally high 'degree of success obtained.' " *Id.* at 877–79. The Court also does not believe that *Gilster* is similar to the present case.

There are, however, several similar cases in the Eastern District of Michigan. In April 2015, following a jury award of $31,000 in damages in an employee's favor on a FMLA claim, this Court granted $77,233.50 in attorneys' fees. *Clements*, 100 F. Supp. 3d 604. The Court reduced the requested attorneys' fees by 10% for the employee's failure to prevail on Title VII and Michigan Elliott–Larsen Civil Rights claims, where counsel's billing records did not segregate out time spent on those claims as opposed to the FMLA claim. *Id.* In April 2012, this Court awarded an employee's counsel $57,366.64 in attorney's fees after a jury awarded the employee $57,000 in damages on a FMLA interference claim. *Garcia v. Renaissance Glob. Logistics, LLC*, No. 10-13122, 2012 WL 1130543, at *1 (E.D. Mich. Apr. 4, 2012). In August 2009, this Court awarded slightly over $100,000.00 in attorneys' fees to an employee who had been awarded over $275,000.00 in damages by a jury on her FMLA claim. *Mary-Jo Hyldahl v. AT & T*, No. 07-14948BC, 2009 WL 2567197 (E.D. Mich. Aug. 17, 2009).

Attorneys' fees are to be awarded at a reasonable rate under the FMLA. *See* 29 U.S.C. § 2617. "[A] reasonable hourly rate should be sufficient to encourage competent lawyers in the relevant community to undertake legal representation." *Lamar Advert. Co. v. Charter Twp. of Van Buren*, 178 Fed.Appx. 498, 501 (6th Cir. 2006).

Based on the attorneys' years of practice, respective experience, location of practice, and area of practice, the Court will award Mr. Taub's hours at the rate of $175 per hour and Mr. Flynn's hours at the rate of $225 per hour. *See, e.g.*, *Clements*, LLC, 100 F. Supp. 3d at 617 (awarding a rate of $250 per hour for attorneys practicing nine and 26 years; a rate of $200 per hour for attorneys practicing five years; and a rate of $165 per hour for an attorney practicing a few months in a FMLA case). The Court believes that such a rate is sufficient to encourage other competent attorneys to undertake similar legal representation and is commensurate with the skills and quality of lawyering provided.

**\*7** Additionally, the Court will reduce the time calculations slightly because some of the billing records utilize block billing instead of segregating out the work done on each specific claim. *See, e.g.*, *Clements*, 100 F. Supp. 3d at 618 (reducing the total amount of fees requested for 391 hours of work by 10% for block billing); *Auto Alliance Int'l v. U.S. Customs Serv.*, 155 Fed.Appx. 226, 228 (6th Cir. 2005) (affirming 25% overall reduction for excessive and block billing for 510.25 hours requested). A large reduction is not warranted, given the fact that only one of the attorneys in the case engaged in this practice. Accordingly, the Court will reduce the request for fees by ten percent for the nearly 700 hours Plaintiff's attorneys requested.

Based on the hours requested by Mr. Taub (328.4) and Mr. Flynn (364.2), the rates determined by the Court for Mr. Taub ($175 per hour) and Mr. Flynn ($225 per hour), and in light of the slight reduction for block billing (10%), the Court arrives at a fee award of $125,473.50. [2]

[2]      [ (328.4)($175) + (364.2)($225) ] x 0.9 = $139,415.00 x 0.9 = $125,473.50

## C. Costs

Plaintiff has also requested reimbursement of the costs incurred by his attorneys, which is contemplated under the FMLA. 29 U.S.C. § 2617(a)(3) ( "The court in such an action shall, in addition to any judgment awarded to the plaintiff, allow a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action to be paid by the defendant."). Title 28, United States Code, Section 1920, circumscribes the types of costs district courts may tax. *See* *Colosi v. Jones Lang LaSalle Americas, Inc.*, 781 F.3d 293, 295 (6th Cir. 2015).

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5293 Filed 07/20/17 Page 23 of 121
*Reeder v. County of Wayne*, Slip Copy (2016)
2016 WL 6524144

In the present case, Plaintiff requests $7,038.95 in billable costs. Dkt. No. 65, p. 1 (Pg. ID No. 1565). As Defendant does not contest this amount, Dkt. No. 64, p. 4 (Pg. ID No. 1549), the Court will award Plaintiff costs in the full amount of costs requested, $7,038.95.

### D. Pre– And Post-Judgment Interest

*(1) Pre–Judgment Interest*

Under the FMLA, pre-judgment interest "at the prevailing rate" is mandatory. 29 U.S.C. § 2617(a)(1)(A)(ii); *Clements*, 100 F. Supp. 3d at 619. The determination of the "prevailing rate" is committed to the discretion of the Court because the term is not defined in the statute. *Id.*; *Bell v. Prefix, Inc.*, 500 Fed.Appx. 473, 474 (6th Cir. 2012) ("The statute does not define 'the prevailing rate,' and trial courts have exercised their discretion to find different methodologies of calculation in different contexts."). District courts in the Sixth Circuit generally use the state statutory rate in calculating pre-judgment interest in FMLA cases. *Clements*, 100 F. Supp. 3d at 619.

Defendant does not contest the amount Plaintiff seeks in prejudgment interest, $6,379.14. Dkt. No. 64, p. 4 (Pg. ID No. 1549). Therefore, the Judgment in this case will reflect an award of compensatory damages in the amount of $187,500 plus an award of prejudgment interest in the amount of $6,379.14.

*(2) Post–Judgment Interest*

Title 28, United States Code, Section 1961, governs interest on money judgments obtained in the federal district court. Subsection (a) of Section 1961 provides that, "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a).

The Court takes notice that the published rate for the week ending August 12, 2016 was 0.56%. *See* Federal Reserve Board, Selected Interest Rates, *available at* http://www.federalreserve.gov/releases/h15/20160815/default.htm. Plaintiff shall be entitled to post-judgment interest in this case at that amount.

### III. CONCLUSION

**\*8** For all of the reasons set forth in this Opinion and Order, and for the further reasons stated by the Court on the record on October 31, 2016,

**IT IS HEREBY ORDERED** that Defendant's Motion for Attorneys' Fees [70] is **DENIED;**

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Attorneys' Fees [62] is **GRANTED,** as follows:

**IT IS FURTHER ORDERED** that, in addition to the $187,500.00 compensatory damages awarded by the jury on July 12, 2016, Plaintiff shall be awarded pre-judgment interest in the amount of $6,379.14, for a total award of compensatory damages and pre-judgment interest in the amount of $193,879.14.

**IT IS FURTHER ORDERED** that Plaintiff shall also be awarded attorneys' fees in the amount of $125,473.50 and costs in the amount of $7,038.95, for a total award of fees and costs in the amount of $132,512.45.

**IT IS FURTHER ORDERED** that Plaintiff shall also be awarded post-judgment interest at the rate of 0.56% as provided in 28 U.S.C. § 1961.

2016 WL 6524144

Let Judgment be entered accordingly.


## IV. JUDGMENT

The Jury having rendered a verdict on July 12, 2016 in favor of Plaintiff Yasin Reeder and against Defendant Wayne County and awarding Plaintiff compensatory damages in the amount of $187,500.00; and the Court having this date entered an Opinion and Order Regarding Plaintiff's Motion for Attorneys' Fees and Prejudgment Interest, and being otherwise fully advised in the premises,

**NOW, THEREFORE,**

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that **JUDGMENT** is hereby entered, in favor of Plaintiff Yasin Reeder and against Defendant Wayne County for compensatory damages and pre-judgment interest in the total amount of $193,879.14, plus attorneys' fees and costs in the total amount of $132,512.45, plus post-judgment interest accruing from the date of judgment forward at the rate of 0.56% as provided in 28 U.S.C. § 1961.


Dated: November 3, 2016.

**All Citations**

Slip Copy, 2016 WL 6524144

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5295 Filed 07/20/17 Page 25 of 121
Dallas v. Commissioner of Social Sec., Not Reported in F.Supp.3d (2014)
2014 WL 1767815, 202 Soc.Sec.Rep.Serv. 335

KeyCite Yellow Flag - Negative Treatment

Distinguished by Cortes v. Colvin, N.D.Ohio, September 10, 2014

2014 WL 1767815
United States District Court,
N.D. Ohio,
Eastern Division.

Jack C. DALLAS, Plaintiff,
v.
COMMISSIONER OF SOCIAL SECURITY, Defendant.

No. 1:13–CV–00591.
|
Signed May 2, 2014.

**Attorneys and Law Firms**

Kirk B. Roose, Roose & Ressler, Lorain, OH, for Plaintiff.

Erin Brizius, Office of the U.S. Attorney, Cleveland, OH, for Defendant.

**ORDER**

GREG WHITE, United States Magistrate Judge.

**\*1** Plaintiff Jack C. Dallas ("Dallas"), through counsel Kirk B. Roose ("Roose"), filed an application for payment of attorney fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d). (ECF No. 25.) The Acting Commissioner of Social Security ("Commissioner") filed a response on April 4, 2014, and Dallas replied on April 21, 2014. [1] (ECF Nos. 28 & 29.) For the reasons stated below, Dallas's application for attorney fees (ECF No. 25) and supplemental application for attorney fees (ECF No. 29) are GRANTED in part and DENIED in part.

[1]    In his reply, Dallas made a supplemental application for EAJA fees associated with the time spent crafting the reply.

**A. Procedural History**

On December 16, 2013, the Court remanded this matter for further proceedings. (ECF Nos. 23 & 24.) Thereafter, Dallas filed a motion for attorney fees pursuant to the EAJA requesting fees in the amount of $6,323.60. (ECF No. 25.) This sum includes $6,133.60 for 32.8 hours of work performed by Roose—a rate of $187.00 per hour. *Id.* It also includes $190 for 3.8 hours of work performed by Roose's appellate assistant—a rate of $50 per hour. *Id.* After submitting a reply in response to the Commissioner's opposition, Dallas filed a supplemental application for attorney fees requesting an additional award of $1,870.00 for fees in connection with that reply. (ECF No. 29.) This sum represents an additional 10 hours of attorney fees billed at a rate of $187.00 per hour. *Id.*

**B. Prevailing Party Status and Substantial Justification**

The EAJA " 'departs from the general rule that each party to a lawsuit pays his or her own legal fees' and requires the payment of fees and expenses to the prevailing party in an action against the United States, unless the position of the United States was substantially justified," or special circumstances would make an award unjust. *Howard v. Barnhart,* 376 F.3d 551, 553 (6th Cir.2004), *quoting Scarborough v. Principi,* 504 U.S. 401, 124 S.Ct. 1856, 1860, 158 L.Ed.2d 674

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5296 Filed 07/20/17 Page 26 of 121
Dallas v. Commissioner of Social Sec., Not Reported in F.Supp.3d (2014)
2014 WL 1767815, 202 Soc.Sec.Rep.Serv. 335

(2004); *see also* 28 U.S.C. § 2412(d)(1)(A). The party seeking attorney's fees bears the burden of proving that he is an eligible and prevailing party, while the Commissioner must prove that the government's position was "substantially justified." It is undisputed that Dallas is an eligible and prevailing party, as the Commissioner has not argued that her litigation position was substantially justified. (ECF No. 28.)

### C. Evidence Supporting an Increase in the Hourly Rate of Attorney Fees

Attorney Roose requests an hourly rate of $187.00, and urges the Court to utilize the national consumer price index ("CPI"). (ECF No. 29 at 8–9.) Under the EAJA, the amount of attorney fees awarded shall be based upon the prevailing market rates for the kind and quality of services furnished, except that "... attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A).

**\*2** Dallas has submitted the following evidence which he believes demonstrates that an upward departure from the statutory cap is warranted:

(1) Declaration of Dianne R. Newman, a Social Security attorney since 1982 in the northern Ohio area. (ECF No. 25–4 at ¶ 5) One-hundred percent of her practice consists of Social Security law, of which seventy-five percent focuses on appellate Social Security law. *Id* at ¶ 3. She declared that a rate of less than $200 per hour would be lower than the prevailing rates "in the Cleveland area for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Id.* at ¶ 13.

(2) Affidavit of Marcia Margolius, an attorney practicing for twenty-five years primarily in Social Security law in the northern and southern districts of Ohio. (ECF No. 25–5 at ¶¶ 1–2.) She only requests $125 per hour in EAJA applications, but does so for the sake of expediency and to avoid further litigation over fees. *Id.* at ¶ 5. She opined that based on the kind and quality of Roose's services the prevailing hourly rate for his services should exceed $175 to $200 per hour. [2] *Id.* at ¶ 10.

[2] It bears noting that counsel Margolius, before this Court, requested and received a greater rate of $180.54 per hour—a rate that the Commissioner did not challenge. *See Conley v. Comm'r of Soc. Sec.,* 2013 U.S. Dist. LEXIS 90510 at \*10, 2013 WL 1092457 (N.D.Ohio, Mar. 15, 2013).

(3) Declaration of Bradley J. Davis, an attorney who represented a successful social security claimant. (ECF No. 25–6 at ¶¶ 1–2.) He states that he requested $125 per hour in a subsequent fee application to avoid the additional time and research necessary to demonstrate a higher rate reflects the prevailing market rate. *Id* . at ¶ 4.

(4) The Ohio State Bar Association's profile of 2010 attorney hourly billing rates by both location and practice classification, including administrative law, showing hourly rates over $125. [3] (ECF No. 25–8.)

[3] In the area of administrative law, the mean is $203 per hour, while the median is $180. (ECF No. 25–8 at 3.)

(5) The Survey of Law Firm Economics, 2011 edition, by The National Law Journal and ALM Legal Intelligence showing the trend comparison of expenses in law firms as compared to the Consumer Price Index during the relevant time period. (ECF No. 25–9 at 9–10.) It also shows the trend comparison of average billing rates. [4] *Id.* at 11–24.

[4] The average hourly billing rate for an attorney in practice 21–30 years in the area of administrative law is $419, while the median is $425. (ECF No. 23–5 at 24.)

(6) The Consumer Price Index–All Urban Consumers for legal services from 1996 until May of 2012. [5] (ECF No. 25–11.)

2014 WL 1767815, 202 Soc.Sec.Rep.Serv. 335

5      The purpose of this exhibit is unclear. On its own, it does not offer any insight as to whether inflation in legal services outpaced inflation in general.

In support of the request for a rate of $187.00 per hour, Dallas has demonstrated that: (1) increases in law firm expenses in the relevant time frame have outpaced cost-of-living increases; (2) that the requested fee is less than or comparable to both the average and median rates in Ohio with respect to administrative law practice; and, (3) several attorneys who practice primarily or exclusively in social security law agree that prevailing hourly rates in this field exceed $200. In the recent past, this Court has repeatedly found that an upward departure from the statutory cap is justified based on identical evidence, or in some cases less evidence, as presented herein. *See, e.g., Gunther v. Comm'r of Soc. Sec.,* 943 F.Supp.2d 797 (N.D.Ohio 2013); *Coy v. Astrue,* 2013 U.S. Dist. LEXIS 50328, 2013 WL 1411137 (N.D.Ohio, Apr. 8, 2013); *Mohr v. Comm'r of Soc. Sec.,* 2013 U.S. Dist. LEXIS 18728, 2013 WL 557176 (N.D.Ohio, Fe.12, 2013); *Vasquez v. Astrue,* 2012 U.S. Dist. LEXIS 118588, 2012 WL 3637676 (N.D.Ohio, Aug. 22, 2012).

**\*3**  Nevertheless, the Commissioner rehashes an old argument based on *Bryant v. Comm'r of Soc. Sec.,* 578 F.3d 443 (6th Cir.2009), and asserts that the evidentiary materials Dallas presented do not demonstrate the prevailing rates for legal services of the kind and quality rendered in social security cases in the Northern District of Ohio. (ECF No. 28.) The Commissioner's position in these cases is perplexing. After repeatedly challenging increases in the statutory cap based on *Bryant* with limited success, the Commissioner for a time refrained from such arguments. *See, e.g., Hughley v. Comm'r of Soc. Sec.,* 3:11–cv–158 (N.D.Ohio) (attorney Roose requested a rate of $180.59 per hour for his services to which the Commissioner did not object) (ECF Nos. 20 & 23.) Furthermore, it does not appear that the Commissioner has appealed those cases wherein her position was rejected. The Commissioner, nonetheless, cites two recent decisions of the Northern District of Ohio that post-date this Court's most recent decision on the issue. (ECF No. 28 at 4–5.) In *Piporo v. Comm'r of Soc. Sec.,* 2013 WL 3006958, the court rejected an increase in the hourly rate based on similar though not identical materials. The *Piporo* court found that the evidence offered was insufficient because it was not specific to the prevailing rate for social security practitioners in particular. 2013 WL 3006958 (N.D.Ohio, Jun.12, 2013) (Wells, J.); *accord Hakkarainen ex rel. Blanton v. Comm'r of Soc. Sec.,* 2013 WL 2950529 (N.D.Ohio, Jun.11, 2013) (Wells, J.) The evidence offered here, however, is sufficiently specific as the affidavits of several attorneys specializing in the area of social security law support that the hourly rates charged exceed or are comparable to the inflation adjusted rates.

While the Court recognizes that a division may exist in the Northern District as to what level of evidence is required to satisfy the *Bryant* standard, it bears noting that at least one decision of this Court provides that the *Bryant* decision does not require more than a reference to the CPI. *See Elson v. Comm'r of Soc. Sec.,* No. 3:11–cv–183 at n. 2 (N.D Ohio, Aug. 7, 2012) (Carr, J.) ("The [*Bryant* ] court did not rule that as a matter of law that a judge's reliance on CPI is an abuse of discretion. Rather, the court merely stated that the district judge did not abuse his discretion by rejecting an increase under those circumstances.") While this Court does not necessarily agree with *Elson,* the *Bryant* decision did not delineate what kind of evidence could be used to justify an increase in the statutory cap. While it would be ideal if a survey existed that set forth the hourly rates of attorneys engaged in social security appellate practice in the Northern District, it does not appear that such a survey has been undertaken as the Court is unaware of any party ever citing such a source. The Court, however, believes that an upward departure from the statutory cap can be sufficiently demonstrated utilizing a combination of evidentiary sources as Dallas has herein.

### D. The Appropriate Hourly Rate

**\*4**  Attorney Roose requests an hourly rate of $187.00, and asks the Court to utilize the national consumer price index rather the "Midwest Urban" CPI the Court has used in the past. *See, e.g., Mohr v. Comm'r of Soc. Sec.,* 2013 WL 557176 (N.D.Ohio Feb.12, 2013), *Vasquez,* 2012 WL 3637676; *Jaworski v. Astrue,* 2012 WL 3552634; *Killings v. Comm'r of the SSA,* 2009 U.S. Dist. LEXIS 108524 (N.D.Ohio, Oct. 8, 2009). Roose has previously asked this Court to reconsider using the Midwest Urban CPI based on the finding in *Elson,* No. 3:11–cv–183 at n. 2 ("Because the statutory rate is fixed for all areas of the nation, logic dictates that I use the national CPI figure to maintain the uniformity Congress intended.") (Carr, J.)

Here, Dallas asserts that the Commissioner has advocated for using a national CPI in areas where the local rate of inflation exceeded the national rate. (ECF No. 29 at 8–9.) This argument merely highlights the fact that employing a more localized CPI is appropriate, because utilizing the national CPI would overstate inflation in some areas while understating it in others. Therefore, the Court continues to believe that utilizing a localized CPI is more consistent with the *Bryant* decision, which observed that requested fee rates should be "in line with those ***prevailing in the community*** for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Bryant,* 578 F.3d 443, 450 (6th Cir.2009) (emphasis added) (*quoting Blum v. Stenson,* 465 U.S. 886, 894 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *see also Killings v. Colvin,* 2013 WL 1455818 at *5 (N.D.Ohio Apr.9, 2013) (acknowledging a split among the courts, but agreeing that "the 'Midwest' CPI appears to be the more appropriate measure of the increase in the cost of living for purposes of EAJA"); *Rodriguez v. Astrue,* 3:11–cv–00398 (N.D.Ohio, July 16, 2012) (finding the Midwest CPI more appropriate than the U.S. City Average CPI); *cf. Ralston v. Astrue,* 2011 WL 7299836 (E.D.Mich. Aug.30, 2011) (finding that the relevant market for calculating attorneys fees for a court sitting in the eastern District of Michigan is the Detroit market and utilizing the U.S. Department of Labor's CPI–U for the Detroit–Ann Arbor–Flint area.)

Conversely, the Commissioner argues that the Court should use the CPI for the Cleveland–Akron area. (ECF No. 28 at n. 2.) This argument is not without its logic, and is a more reasonable approach than utilizing the national CPI.[6] Nonetheless, this Court will continue to use the Midwest Urban CPI as not all of the social security attorneys who practice in the Northern District of Ohio necessarily practice in the Cleveland–Akron area. Utilizing the "Midwest Urban" CPI for "All Items" for "All Urban Consumers," the index for March of 1996 was 151.7.[7] (Series Id: CUUR0200SA0, CUUS0200SA0) The second half index for 2013, when most of the attorney services were performed, was 222.381. *Id.* Given these figures, the appropriate hourly rate, using $125 as a base, would be $183.24 per hour.[8]

[6]    In *Lanken v. Comm'r of Soc. Sec.,* No. 5:11–cv–2607, 2013 U.S. Dist. LEXIS 8370, 2013 WL 237478 (N.D.Ohio Jan. 22, 2013) (Pearson, J.), plaintiff's counsel submitted a request for an increased hourly rate based on the Cleveland–Akron CPI, which the District Judge approved.

[7]    The Court utilizes March 1996 as the starting date in its calculations when Congress raised the EAJA cap to $125. The above CPI–U figures are from the web page of the Bureau of Labor Statistics and are not seasonally adjusted, http://data.bls.gov.

[8]    151.7 is to 222.381, as $125 is to x, resulting in x equaling $183.24. Notably, there is not a vast difference between this rate and the Cleveland–Akron area CPI, which would yield an hourly rate of $180.57. (CUURA210SA0, CUUSA210SA0.)

**E. Number of Hours Requested**

***5** The Commissioner also objects to the number of hours requested by Dallas and argues that the total numbers of hours should be reduced by 8.2. (ECF No. 28 at 7.) The Court must review Dallas's fee application to determine whether the requested hours are reasonable. *See* 28 U.S.C. § 2412(d)(1)(A), (B); *see also Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Courts are obligated to prune unnecessary hours from fee petitions because, "[c]ourts are not authorized to be generous with the money of others, and it is as much the duty of courts to see that excessive fees and expenses are not awarded as it is to see that an adequate amount is awarded." *ACLU v. Barnes,* 168 F.3d 423, 428 (11th Cir.1999).

The primary rationale behind the Commissioner's argument is that the Court addressed only one of Dallas's arguments, finding a remand necessary for a violation of the treating physician rule. (ECF No. 28 at 7.) The Commissioner, however, has not argued that any of Dallas's other arguments were frivolous or raised in bad faith. While a court might expect counsel to winnow out weaker arguments in favor of stronger ones, counsel cannot be expected to predict which argument will ultimately be most persuasive. Moreover, the Commissioner cites no authority for the proposition that time spent on losing arguments or on arguments that were not addressed by the Court are not compensable under the EAJA.

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5299 Filed 07/20/17 Page 29 of 121
Dallas v. Commissioner of Social Sec., Not Reported in F.Supp.3d (2014)
2014 WL 1767815, 202 Soc.Sec.Rep.Serv. 335

The Commissioner also challenges a total of thirty minutes of attorney Roose's review of the docket, occurring mostly in six minute increments. *Id.* It is not unreasonable for a diligent attorney to spend a few minutes reviewing the electronic notice of documents filed with the Court. Nonetheless, this Court has reduced such hours in the past. *See, e.g., Mischka v. Astrue,* 2010 U.S. Dist. LEXIS 130774, 6–7, 2010 WL 4923093 (N.D.Ohio, Nov. 29, 2010) (spending six minutes reviewing the most basic docket entries, such as motions for extension of time and returns of service, is excessive, especially when one considers the cumulative effect of such billings) Here, a total of thirty minutes over the course of the case is not excessive.

The Court finds that no reduction in the number of hours requested is justified. As such, Dallas is awarded attorney fees for all 32.8 hours requested at the reduced rate of $183.24 per hour.

### F. Work Performed by a Legal Assistant and Expenses

Dallas also requests $190 for 3.8 hours of work performed by Roose's appellate assistant—a rate of $50 per hour. (ECF No. 25.) The Commissioner argues that the rate for such services should be limited to $40 per hour. (ECF No. 28 at n. 1.)

Attorney Roose has repeatedly sought a twenty-five (25) percent increase for the services of his appellate assistant. This Court has rejected such an increase, as have numerous other decisions of this District. *See, e.g., Jeffries v. Comm'r of Soc. Sec.,* 2014 U.S. Dist. LEXIS 49019, 2014 WL 1394411 (N.D.Ohio Apr. 9, 2014) ("$40.00 rather than $50.00 is a reasonable fee for work performed by the appellate assistant."); *English v. Comm'r of Soc. Sec.,* No. 1:11–CV–2794 (N.D.Ohio August 31, 2012) (J. Adams) (finding $40.00 to be a reasonable fee for appellate assistant time); *De Nunez v. Comm'r of Soc. Sec.,* No. 1:11–CV–2285, 2013 U.S. Dist. LEXIS 863, 2013 WL 60429at *3 (N.D.Ohio January 3, 2013), (J. Adams) (same); *Gunther v. Comm'r of Soc. Sec.,* 943 F.Supp.2d 797, 804–05 (N.D.Ohio 2013) (same); *Montanez v. Comm'r of Soc. Sec.,* No. 1:11–CV–02475, 2013 U.S. Dist. LEXIS 166273, 2013 WL 6175651, at *3 (N.D.Ohio November 22, 2013) (same). Dallas has not provided this Court with any compelling reason to alter the hourly rate and any compensable hours will be limited to $40 per hour. [9]

---

[9] Dallas's reliance on *Ramos v. Comm'r of Soc. Sec.,* 1: 10:cv–01731 is disingenuous. Therein, the plaintiff was awarded the fees and rates requested because the Commissioner neglected to file a response to the EAJA application. The court never engaged in any discussion as to whether the rates or amounts requested were reasonable.

**\*6** The Commissioner asserts that the assistant should not be compensated for 2.0 hours spent preparing an outline and some language for Dallas's brief and fact sheet, because the assistant is not a lawyer. (ECF No. 28 at 7–8.) Courts in this Circuit have frequently awarded EAJA fees for the services of a paralegal or legal assistant. *See, e.g., Rhoads v. Comm'r of Soc. Sec.,* 2012 U.S. Dist. LEXIS 7252, 2012 WL 191756 (W.D.Mich., Jan. 6, 2012) ("Plaintiff is also entitled to recover the reasonable cost for legal assistant or paralegal services."); *Gilbert v. Comm'r of Soc. Sec.,* 2012 U.S. Dist. LEXIS 71809, 2012 WL 1890884 (E.D.Mich., May 23, 2012). However, "purely clerical or secretarial tasks should not be billed" under fee shifting statutes, "regardless of who performs them." *Missouri v. Jenkins,* 491 U.S. 274, 288 n. 10, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989); *accord Snyder v. Comm'r of Soc. Sec.,* 2011 U.S. Dist. LEXIS 2077 (S.D.Ohio, Jan. 10, 2011). "Notwithstanding the prohibition against compensation for secretarial or overhead costs, work done by non-attorneys such as paralegals or law clerks, may be compensable under the EAJA if the work is 'sufficiently complex' or work 'traditionally performed by attorneys.' " *Snyder,* 2011 U.S. Dist. LEXIS 2077 at ——4–5. Furthermore, "Excluding compensation for work done by paralegals or law clerks would be counterproductive because excluding reimbursement for such work might encourage attorneys to handle entire cases themselves, thereby achieving the same results at a higher overall cost." *Id.*

For these reasons, the Court finds the 3.8 hours of work performed by the administrative assistant is reasonable and compensable at a rate of $40 per hour for a total of $152.

2014 WL 1767815, 202 Soc.Sec.Rep.Serv. 335

#### F. Fees Associated With Preparation of a Reply

Dallas also requests an additional award of $1,870.00 for preparing the reply to the Commissioner's brief opposing the EAJA application. (ECF No. 29.) This sum represents 10.0 hours at the rate of $187.00. The time expended upon fee applications and on reply briefs in response to the Commissioner's opposition to such an application is recoverable.

A court may compensate a claimant for the value of attorney services rendered in defending the propriety of an EAJA award, including a reply brief and supplemental application. See *Rodriguez v. Astrue,* No. 3:11–cv–398, 2012 U.S. Dist. LEXIS 98046, 2012 WL 2905928, at *6 (N.D.Ohio July 16, 2012), citing *Spurlock v. Sullivan,* 790 F.Supp. 979, 982 (N.D.Cal.1992) (citing *Comm'r I.N.S. v. Jean,* 496 U.S. 154, 110 S.Ct. 2316, 110 L.Ed.2d 134 (1990)). A claimant need not prove and a court need not find a second "substantial justification" before awarding EAJA fees for the EAJA fee litigation itself. *Jean,* 496 U.S. 154, 159–160, 110 S.Ct. 2316, 110 L.Ed.2d 134 (1990). "[A]n award of attorney fees under the EAJA should encompass not only the fees incurred in the litigation on the merits, but also the fees incurred by the prevailing party in protecting that fee award in subsequent litigation by the government over the propriety or amount of the EAJA fee award, even if the position taken by the government in opposing the fee award is substantially justified." *Spurlock,* 790 F.Supp. at 982, citing *Jean,* 496 U.S. at 165.

*7 *Baker v. Colvin,* 2013 U.S. Dist. LEXIS 41426 at *3, 2013 WL 1284108 (N.D.Ohio Mar. 25, 2013). Here, the Commissioner has invited this expenditure by resurrecting its argument that the evidence offered was insufficient to support an upwards departure from the statutory cap. The Court finds the hours expended on the reply reasonable, but applies the Midwest Urban CPI rate—$183.24 per hour. Thus an additional award of $1,832.40 is appropriate.

#### G. Payment

In the instant matter, an agreement which shows that on June 24, 2010, Dallas consented to have all EAJA fees paid to counsel is attached to the application. (ECF No. 25–14.) In accordance with *Astrue v. Ratliff,* 560 U.S. 586, 130 S.Ct. 2521, 177 L.Ed.2d 91 (2010), any fees paid belong to Dallas—not his attorney—and can be offset to satisfy preexisting debt that he may owe the United States. If Dallas has no outstanding federal debt, the Commissioner should honor the assignment of attorney fees and make the check payable to counsel.

#### H. Conclusion

Dallas's application for attorney fees (ECF No. 25) and supplemental application for attorney fees (ECF No. 29) are GRANTED in part and DENIED in part. Specifically, Roose, through Dallas, is awarded $7,842.67 for 42.8 hours of work and $152.00 for the services of the appellate assistant—an aggregate sum of $7,994.67.

#### All Citations

Not Reported in F.Supp.3d, 2014 WL 1767815, 202 Soc.Sec.Rep.Serv. 335

---

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5301 Filed 07/20/17 Page 31 of 121
Disabled Patriots of America v. Genesis Dreamplex, LLC, Not Reported in F.Supp.2d...

2006 WL 2404140

2006 WL 2404140
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio,
Western Division.

DISABLED PATRIOTS Of AMERICA and Michael Miles, Individually, Plaintiff,
v.
GENESIS DREAMPLEX, LLC, Defendant.

No. 3:05 CV 7153.
|
Aug. 18, 2006.

**Attorneys and Law Firms**

Lawrence A. Fuller, Fuller, Fuller & Associates, Miami, FL, Owen Benton Dunn, Jr., Toledo, OH, for Plaintiff.

Karyn McConnell Hancock, Toledo, OH, for Defendant.


### MEMORANDUM DECISION AND ORDER

VERNELIS K. ARMSTRONG, Magistrate Judge.

**\*1** The parties have consented to have this discrimination case filed pursuant to the Americans with Disability Act (ADA) of 1990, 42 U.S.C. § 12101 *et seq* transferred to the docket of the undersigned Magistrate for purposes of entering final judgment. Pending is Plaintiff's Motion for Attorney Fees (Docket No. 25) to which Defendant filed an Opposition (Docket No. 29) and Plaintiff filed a Reply (Docket No. 34). For the reasons that follow, the Magistrate grants Plaintiff's Motion for Attorney Fees.


### *FACTUAL BACKGROUND*

Plaintiff Michael Miles is a Findlay, Ohio resident (Docket No. 1, ¶ a). Plaintiff Disabled Patriots of America (Disabled Patriots) is a not for profit corporation formed under Florida law with its principal place of business in Lake Worth, Florida (Docket No. 1, ¶ b). Defendant, a limited liability corporation, is a hotel and conference center located in Toledo, Ohio (Docket No. 1, ¶ c).

Plaintiff Miles visited Defendant's hotel and conference center and discovered several architectural barriers that (1) presented concerns for his safety and (2) impeded his use of the services offered by the facility. Plaintiffs conducted a preliminary inspection and discovered that the facility was not in compliance with the ADA requirement that public facilities have accessible facilities by January 26, 1992. In particular, Defendant had, *inter alia,* failed to adequately designate disabled use spaces, provide adequate edge ramps, provide adequate access to goods and services including lavatories and guest rooms, or generally accommodate disabled persons (Docket No. 1). Consequently, Defendant Miles filed this lawsuit seeking compensatory damages, declaratory and injunctive relief, and attorney fees and costs. The parties entered a consent agreement that was approved by the Court on March 3, 2006 (Docket No. 24). The parties agreed to refer the matters of the amount of fees, litigation expenses and costs to the undersigned Magistrate Judge. These issues are addressed as follows.

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5302 Filed 07/20/17 Page 32 of 121

Disabled Patriots of America v. Genesis Dreamplex, LLC, Not Reported in F.Supp.2d...

2006 WL 2404140

### *ATTORNEY FEE STANDARDS*

The ADA provides that "[i]n any action ... commenced pursuant to this chapter, the court or agency, in its discretion, may allow the prevailing party ... a reasonable attorney's fee." 42 U.S.C. § 12205. A district court's decision to grant or deny attorney's fees is reviewed for an abuse of discretion. *Fogerty v. MGM Group Holdings Corp.,* 379 F.3d 348, 357 (6th Cir.2004). In order for a plaintiff to receive attorneys' fees in a civil rights action, the plaintiff must be the prevailing party. 42 U.S.C. § 12205 (Thomson/West 2006). A plaintiff may be considered a prevailing party if the plaintiff "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." *Hensley v. Eckerhart,* 103 S.Ct.1933, 1939 (1983). "The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties," *Texas State Teachers Association v. Garland Independent School District,* 109 S.Ct. 1486, 1493 (1989), such that "the defendant's behavior [is modified] in a way that directly benefits the plaintiff," *Farrar v. Hobby,* 111-12, 113 S.Ct. 572-573 (1992); *Dillery v. City of Sandusky,* 398 F.3d 562, 569 (6th Cir.2005).

**\*2** It is well settled that the "lodestar" approach is the proper method to determine the amount of reasonable attorneys' fees. *Building Service Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway,* 46 F.3d 1392, 1401 (6th Cir.1995) (citations omitted). In applying the lodestar approach, "[t]he most useful starting point ... is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id. (citing Hensley,* 103 S.Ct. at 1939). There is a "strong presumption" that the lodestar figure represents a reasonable fee. *Id.* at 1401-1402 *(citing Pennsylvania v. Delaware Valley Citizen's Council,* 106 S.Ct. 3088, 3098 (1986); see also *Roland v. Johnson,* 978 F.2d 1339 (6th Cir.1992)).

Once the lodestar approach is calculated, the fee may be adjusted in consideration of a number of factors, including "(1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Disabled Patriots of America, Inc. v. Taylor Inn Enterprises, Inc.,* 424 F.Supp.2d 962, 965-966 (E.D.Mich.2006) (*citing Doran v. Corte Madera Inn Best Western,* 360 F.Supp.2d 1057, 1061 (N. D.Cal.2005)).

When counsel seeks compensation for an excessive number of hours, the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application. *Id.* at 969. In the case of *Disabled Patriots v. Taylor Inn,* a 40% reduction was deemed reasonable based on the ambiguities in the invoice and the bundling of otherwise discrete tasks. *Id.*

### *DISCUSSION*

Plaintiffs seek an award of $25,814.16 which consists of $18,228 in attorney fees, $5,950 in expert witness fees and $1,636.16 in litigation expenses [1] (Docket No. 25). Defendant argues that the number of hours spent by Plaintiffs' counsel on redundant and routine matters was excessive, the hours spent by counsel, the paralegal and expert are duplicative, the hourly rates charged by counsel do not comport with prevailing rates in the Toledo, Ohio, legal community, the expert fee is unreasonable and the request for expenses is not substantiated.

[1]   Plaintiffs projected that they would incur additional attorney fees and costs of $2400 if the Court conducted an evidentiary hearing on the merits of their request for attorney fees. Since such hearing was not required, this amount is disallowed.

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5303 Filed 07/20/17 Page 33 of 121

Disabled Patriots of America v. Genesis Dreamplex, LLC, Not Reported in F.Supp.2d...

2006 WL 2404140

The terms of the Consent Decree indicate that Defendant agreed to make substantial changes to the premises that comply with ADA regulations. In doing so, Defendant waived any defenses and gave up something it may have otherwise won if this case proceeded to trial. The compromise directly benefits Plaintiffs. Consequently, Plaintiffs are the prevailing parties in this litigation. Plaintiffs, as prevailing parties, are entitled to reasonable attorney fees, expert fees and costs.

## I. Amount of Legal Fees

### Mr. Fuller's Hourly Rate

**\*3** Plaintiffs argue that the issues in this case are complex, that it would be difficult to find competent and skilled counsel in the Toledo area able to undertake the "risk and expense of this type of civil rights action and that all services provided in this case were unique and tailored to their client's needs. Thus, Mr. Fuller is entitled to an hourly fee of $325. Defendant contends that co-counsel Owen Dunn could have provided equally skilled representation as he did in *Disabled Patriots of American, Inc. v. Suemar Realty, Inc,* Case No. 3:04CV7137 and *Disabled Patriots of America, Inc. v. Lane Toledo,* Case No. 1:04-CV-00538.

In determining the reasonableness of Mr. Fuller's request for an hourly rate of $325, the court must consider the prevailing market rates in the relevant community for similar services by attorneys with comparable skill, experience and reputation. *Disabled Patriots of America, Inc. v. Taylor Inn Enterprises, Inc.* 424 F.Supp.2d 962, 966 (E.D.Mich.2006) ( *citing Fuhr v. School Dist. of Hazel Park, supra,* 364 F.3d at 762). Proof of prevailing market rates may be demonstrated in a number of ways, including: (1) affidavits of other attorneys or experts; (2) citations to prior precedents showing reasonable rate adjudications for the fee applicant, for comparable attorneys, or for comparable cases; (3) references to fee award studies showing reasonable rates charged or awarded in the relevant community; (4) testimony of experts or of other attorneys in the relevant community; (5) discovery rates charged by the opposition party; and (6) reliance on the court's own expertise to recognize applicable prevailing rates. *Parker v. Secretary of Department of Health and Human Services,* 1992 WL 191102, \*1 (Cl.Ct.1992). ( *citing* NEWBERG, ATTORNEY FEE AWARDS 198 (1986)).

Plaintiffs failed to submit affidavits or testimony of the prevailing rates in this community but do cite prior precedent showing reasonable rate adjudication. In addition, the Magistrate relies upon the Court's own expertise to determine the applicable prevailing rates. Attorney Christopher Parker attested in *Cox v. Sandusky City Schools,* Case No. 3:00 CV 7657 (N.D.Ohio 2000), that lead counsel in the Toledo area with specialties in employment law billed at $200 per hour (Docket No. 136, Exhibits B, C, D, & E). Attorney William Connelly attested that the rates for attorneys in the local economy with at least twenty six years of experience and specialized practices of law, were entitled to fees in the range of $175 to $250 per hour. *See Hess v. City of Toledo,* 139 Ohio App.3d 581, 585, 744 N.E.2d 1236, 1238 (2000). Plaintiffs' counsel cite the court's approval of a $335 hourly attorney fee in *Sandusky v. Blackwell,* 361 F.Supp.2d 688 (2005). Chief Judge Carr found that the Sandusky case presented novel and difficult questions. *Id.* at 697. This case, however, presented routine issues regularly litigated in ADA cases and fails to justify the award of a $325 hourly fee.

**\*4** The Magistrate is persuaded by the testimony in *Hess* that the $250 hourly rate charged by similarly situated practitioners in this community is reasonable given lead counsel's expertise and skill. Adjusting this three-year old figure for inflation, the hourly rate is increased to $275 [2]. For these reasons, Plaintiffs are awarded fees which shall be calculated at $275 per hour.

[2] The inflation calculator shows that $250 in 2003 has the same buying power as $275 in 2006. United States Department of Labor, Consumer Price Index, *www.bls.gov.ifn*

### Mr. Fuller's Hours

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5304 Filed 07/20/17 Page 34 of 121
Disabled Patriots of America v. Genesis Dreamplex, LLC, Not Reported in F.Supp.2d...

2006 WL 2404140

Mr. Fuller requests that he be compensated for 50.10 hours of services provided for Plaintiffs in this case. Defendant argues that the time Mr. Fuller spent was excessive due to the repetitive nature of previous filings made by Plaintiff as well as tasks performed by Mr. Dunn [3].

[3]     The Court's docket indicates that Disabled Patriots is a named plaintiff in approximately twenty cases with the Fuller firm appearing as counsel.

The court must decide the reasonable amount of time spent on each task. *Cleveland Area Bd. Of Realtors v. City of Euclid,* 965 F.Supp. 1017, 1020 (N. D.Ohio 1997) (total requested hours were reduced by 10% for insufficient documentation). The district court is empowered to reduce the award when the documentation of hours is inadequate. *Id. (citing Hensley, supra,* 103 S.Ct. at 1939). Counsel is not expected to record in great detail how he or she spent every minute; however, the general subject matter must be identified. *Id. (citing Hensley, supra,* at 1941 n. 12). The documentation must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation." *Id. (citing United Slate, Tile & Composition Roofers v. G & M Roofing,* 732 F.2d 495, 502 n. 2 (6th Cir.1984)).

After careful review of the billing records, the Court found numerous entries made by counsel that were "lumped" together thereby rendering it impossible for the Court to ascertain with a high degree of certainty, the time spent on each individual task. In some instances, the hours spent by counsel duplicated the hours spent by Mr. Dunn.

Plaintiffs' claim that Mr. Fuller spent 1.6 hours on March 16, 2005 to prepare a complaint and summons along with several other tasks. Since Mr. Fuller filed similar complaints in *Disabled Patriots v. Hotel Ventures,* Case No. 3:05 CV 7154 and *Disabled Patriots v. Toledo Hotel Investors,* Case No. 3:04 CV 7138, it is difficult to ascertain the amount of time spent preparing the complaint and summons for this case. Therefore, the total request is reduced by 30% or .48 hours.

Defendant argues that the time spent to prepare a Consent Decree and a Motion for Summary Judgment was an effort to collect additional attorney fees. Plaintiffs contend that preparation for the Consent Decree and the Motion for Summary Judgment was necessary. The Magistrate finds that it was within Plaintiffs' best interest to pursue summary judgment in the event settlement discussions were unsuccessful. The preparation of a Consent Decree memorializing the parties' agreement was equally in the parties' best interest. The hours expended preparing these documents is reasonable. Likewise, the hours spent preparing discovery requests produced by Plaintiffs is reasonable in light of the circumstances.

 **5** Additionally, Defendant argues that the Consent Decree and Motion for Summary Judgment are boilerplate and the time spent in preparing them was excessive. After reviewing other Consent Decrees prepared by Plaintiffs in past cases, *e.g.* Case No. 1:05-CV-02466-PAG *Disabled Patriots of America v. Brighton Manor Company,* the court finds some similarity in content, however, the majority of the Consent Decree is case specific. Therefore, the hours spent by Plaintiffs' counsel preparing the Consent Decree are reasonable.

Defendant contends that the time expended by Plaintiffs' counsel reviewing the website is contrived since they have no website. Plaintiffs contend that Defendant's website is discoverable upon a Google search. The Magistrate finds that the time spent analyzing Defendants web site is reasonable [4].

[4]     Plaintiff has a viewable website as *www.dotoledo.org*

Defendant alleges that Plaintiffs' Applications for Attorney's Fees in Case No. 3:04CV7137, *Disabled Patriots v. Suemar Realty, Inc.* and Case No. 1:04-CV-00538 *Disabled Patriots, Inc. v. Lane Toledo* are identical to the Application for Attorney's Fees to the case at bar. The Magistrate finds that the applications used in the two previous cases used much of the same research and case law. The documents used and the research done closely duplicate previous cases filed with the court, thus the hours spent preparing are excessive. The Court reduces Plaintiffs' request for 5.2 hours to prepare the application for fees by 30% or 1.56 hours.

Disabled Patriots of America v. Genesis Dreamplex, LLC, Not Reported in F.Supp.2d...

2006 WL 2404140

Defendant alleges that the Application for Fees lacks adequate explanation for the numerous conferences between Mr. Fuller, Mr. Dunn and the expert witness, Mr. Pedraza. Plaintiffs believe that the conversations are cited with adequate detail. The Magistrate reviewed time requests submitted from Mr. Fuller and Mr. Dunn and finds that little or no detail is given about each phone call, with the exception of one. The phone conversation on August 22, 2005 goes beyond stating "phone call with Mr. Pedraza" and adds the phrase, "to discuss his inspection of the premises." This is enough to satisfy the court's specificity requirement and will not be reduced. However, the documentation of the remaining telephone calls lacks adequate detail from which the Court can determine if the telephone calls were actually and reasonably expended in the prosecution of this litigation. The Court reduces time spent "conferencing" with Mr. Pedraza by 30% as follows:

| Date | Time Spent |
| --- | --- |
| October 3, 2004: | 0.30 |
| February 8, 2005: | 0.90 |
| July 1, 2005: | 1.40 |
| August 9, 2005: | 1.30 |
| August 15, 2005: | 1.00 |
| August 16, 2005: | 0.40 |
| September 6, 2005: | 0.90 |
| October 3, 2005: | 0.70 |
| October 12, 2005: | 1.30 |
| October 17, 2005: | 0.80 |
| October 19, 2005: | 1.00 |
| November 1, 2005: | 1.10 |
| November 11, 2005: | 3.00 |
| January 3, 2006: | 0.60 |
| March 3, 2006: | 1.00 |

Total Reduction: 15.7 x 30% = 4.71 hours

Defendant challenges the fees requested for telephone conferences with Ms. Gallagher, President of Disabled Patriots. The Court finds that Ms. Gallagher is party to the suit and therefore a telephone call between the parties is reasonable. However, Plaintiffs' counsel fails to state with particularity the subject of the calls. Again, the calls are "lumped" with other tasks. Therefore, the time recorded as a phone call between Ms. Gallagher and Mr. Fuller is reduced by 30% as follows:

| Date | Time Spent |
| --- | --- |
| October 10, 2004: | 0.20 |
| March 17, 2005: | 0.60 |

Disabled Patriots of America v. Genesis Dreamplex, LLC, Not Reported in F.Supp.2d...

2006 WL 2404140

| | |
|---|---|
| August 9, 2005: | 1.30 |
| November 1, 2005 | 1.10 |

Total Reduction: 3.2 x 30% =.96 hours

**\*6** Defendant states on several occasions time listed by Mr. Fuller, where co-counsel conversed, was not recorded by Mr. Dunn. On July 8, 2005 it appears that Mr. Fuller lists "phone call(s) with co-counsel, Owen Dunn," while Mr. Dunn lists "spoke with Tracie Dickerson at Fuller, Fuller & Associates regarding our response to Order to Show Cause." Clearly, the court finds some discrepancy and therefore the time listed by Mr. Fuller and Mr. Dunn is reduced by 30%. On August 24, 2005, Mr. Fuller lists "Reviewing note from Mr. Dunn." While under Mr. Dunn's account for that day and several days prior no reference is made regarding a note written to Mr. Fuller. Therefore, due to the discrepancy in accounted time and the Court's inability to determine which note is referenced, the time spent by Mr. Fuller to review the note is reduced by 30%.

On September 7, 2005 Mr. Fuller listed, "prepar[ed] note to co-counsel." Again this "note" does not state any specificity and does not appear in Mr. Dunn's requested time. Thus, time spent to prepare the note is also reduced by 30%.

Finally, on November 17, 2005 Mr. Fuller stated he "review[ed] letter from co-counsel with attachment." There was no preparation of a letter on the part of Mr. Dunn and what was contained in the letter lacks specificity. This time spent is therefore stricken as well. As noted before, Plaintiffs' counsel "lumps" tasks together, thus the court reduces time spent on each day by 30% as follows:

| Date | Time Spent |
|---|---|
| July 8, 2005: | 1.50 |
| August 24, 2005: | 0.30 |
| September 7, 2005: | 2.00 |
| November 17, 2005: | 0.20 |

Total Reduction: 4 x 30% = 1.2 hours

In conclusion, the Magistrate reduces Mr. Fuller's hours by 8.91.

### *Mr. Dunn's Hourly Rate*

Plaintiffs contend that the hourly rate of $275 requested by Mr. Dunn was reasonable. Defendant contends that the hourly rate does not comport with Mr. Dunn's experience and directs the Court to consider the case of *Preferred Properties, Inc. v. Indian River Estates, Inc.,* Case No. 3:99 CV 7342 (N.D.Ohio Oct. 11, 2000) and theories on attorney fee awards included in an affidavit by Daniel J. Steinbock as support.

In calculating the reasonable hourly rate, the court must consider the prevailing market rates in the relevant community for similar services by attorneys with comparable skill, experience and reputation. *Geier v. Sundquist,* 372 F.3d 784, 796-797 (6th Cir.2004) *(citing Geier v. Sundquist,* 227 F.Supp.2d 881, 886 (M.D .Tenn.2002)). It is the burden of the fee applicant to submit evidence supporting the number of hours expended and the hourly rates claimed. *Hensley,* 103 S.Ct. at 1940.

Disabled Patriots of America v. Genesis Dreamplex, LLC, Not Reported in F.Supp.2d...

2006 WL 2404140

Although Plaintiffs cite *Sandusky v. Blackwell* to support the reasonableness of their fee requests, Chief Judge Carr characterized the issues in the *Sandusky* case as being "novel and difficult" unlike the routine issues in this case. 361 F.Supp.2d at 697. As previously discussed, litigators with twenty six years of experience and stellar reputations as litigation counsel for specialities were awarded attorney fees within a range of $175 to $250 per hour. *Cox v. Sandusky City Schools,* Case No. 3:00 CV 7657, Docket No. 158.

**\*7** While Mr. Dunn's resume boosts an impressive academic background, he was admitted to the Ohio bar in May, 2002; therefore, he has less than five years of experience as a practicing attorney (Docket No. 25). Based upon his experience level and the nature of this case, the Magistrate finds that a fee of $175 per hour is more reasonable for his work in Genesis Dreamplex.

### Mr. Dunn's Hours

Plaintiffs claim that Mr. Dunn expended 13.82 hours in preparing their case for trial. Defendant argues that the time spent on April 6, 2005 to review the Complaint, sign it, make copies and place it in a file are excessive. Plaintiff states that the Complaint contains a "list of 24 barriers to access and ADA violations that are specific to the Quality Hotel-Genesis."

After review of the Complaint, the court examined Complaints from the other cases filed by Plaintiff, in particular Case No. 3:04CV7137, *Disabled Patriots v. Suemar Realty,* and Case No. 1:04-CV-00538, *Disabled Patriots of America, Inc. v. Lane Toledo.* The Court finds the Complaint to be very similar to the Complaints in the cases listed above. The two hours claimed by Mr. Dunn for such review is excessive and reduced by 30% or .6 hours.

According to Defendant, Mr. Dunn expended several hours performing clerical duties. Plaintiff's reply does not address this issue. Mr. Dunn performed such duties as preparing a case file, mailings, filing and faxes on the following dates: April 6, July 21, August 11, August 15, August 22, September 8, October 24, and November 22, 2005; and January 27 and January 31, 2006.

This Court has previously found that "clerical or secretarial tasks ought not to be billed at lawyers' rates, even if a lawyer performs them." *Cleveland Area Bd. of Realtors v. City of Euclid,* 965 F.Supp. 1017, 1022 ("attention to file and setting up of litigation files ... fax[ing]" are considered to be secretarial tasks and cannot be billed at attorney rates) (*citing Missouri v. Jenkins,* 491 U.S. 274 (1989)). To remedy this improper designation, the court in *Cleveland Area Bd. of Realtors* deducted 2% from the amount of fees requested. *Id.* The Magistrate adopts this district court precedent and reduces the time spent to review the Complaint to one hour and the time spent performing clerical tasks by 2%. There were 7.04 hours expended completing clerical tasks. Such amount reduced by 2% totals a deduction of .14 hours.

Defendant also contends on June 17, and August 15, 2005 there were several discrepancies with listed time by Plaintiffs' counsel. Specifically, the overall time spent and hours listed by co-counsel do are inconsistent. Plaintiffs do not address this claim in their reply.

Upon review of Mr. Dunn's and Mr. Fuller's tasks and hours, the Court finds that on August 15, 2005 the tasks listed are inconsistent. The inspection lasted 1.5 hours in one request and two hours in another. The Court strikes the additional 0.05 hour. Equally, time spent claimed on June 17, 2005 for an inspection is excessive and reduced by 30%.

| Date | Time Spent |
| --- | --- |
| June 17, 2005 | 0.50 |
| August 15, 2005 | 2.0 |

Total Reduction: 2.5 x 40% = 1.54 hours

Disabled Patriots of America v. Genesis Dreamplex, LLC, Not Reported in F.Supp.2d...

2006 WL 2404140

**\*8**  In conclusion, the Magistrate disallows 2.33 of the hours requested by Plaintiffs for work performed by Mr. Dunn. Accordingly, of the 13.82 hours requested, Plaintiffs are entitled to fees for 11 .49 hours.

## II. Costs

*Expert Fees*

Plaintiffs claim that all hours expended by the expert, Dave Pedraza are reasonable. Defendant argues that the hours spent are unreasonable and inadequately cited.

In any action commenced pursuant to the ADA, the prevailing party may recover reasonable fees paid to an expert witness. 42 U.S.C. § 12205 (Thomson/ West 2005). Mr. Pedraza is a certified contractor by the State of Florida and is President and Registered Agent of ADA Compliance Team. *See Disabled Patriots v. Taylor Inn Enterprises, supra,* 424 F.Supp.2d at 967 fn. 2. He has extensive experience particularly as it relates to modification of existing buildings to accommodate disabled persons; however, the Court takes issue with the invoices submitted by the ADA Compliance Team. The descriptions of tasks and the amount of time spent on each task are minimal at best. First, the invoice states "Travel to and from location to perform additional ADA inspection." (Docket 25, Exhibit 12). The Court cannot ascertain if this is travel to and from Florida or travel limited to the Toledo area. Second, none of the items on the invoice give detail as to how much time each task took.

The Court is unable to determine if sending Mr. Pedraza from Florida twice to inspect a hotel in Ohio is reasonable. His account for time spent inspecting the property site is ambiguous and lacks the necessary specificity for the Court's evaluation of reasonableness. Therefore, if the travel time recorded is travel to and from Florida, the Court finds this request for travel to be unreasonable. Accordingly, this Court adopts the hourly rate awarded by the United States District Court in Southern Michigan and finds that a more reasonable hourly rate for Mr. Pedraza is $100. *See Id.* at 967.

| | | |
|---|---|---|
| Expert Fee February 8, 2005 | | 17 hours x $100 per hour |
| Expert Fee August 31, 2005 | | 17 hours x $100 per hour |
| | Total | 34 hours, $3400 |

*Additional Costs*

Plaintiffs contend that the amount requested for costs is reasonable. Defendant argues Plaintiffs did not substantiate costs requested. Specifically, Defendant points to the March 18, 2005 title search, the March 18, 2005 re-inspection fee to disability group, the April 11, 2005 service of process and multiple telephone, postage, long distance faxing, courier service, photocopying and filing.

After reviewing the documents submitted by Plaintiff, the court agrees with Defendant regarding the re-inspection fee to a disability group. Defendant states that this fee is a cost for re-inspection of the premises. However, the court finds that this re-inspection fee is not listed on Mr. Pedraza's invoice. Also, there are no other presented reasons why this cost was listed, who the disability group was and why they billed $750 for a re-inspection fee. Therefore, the $750 for a re-inspection fee to disability group is stricken. The remainder of costs, $886.16, listed by Plaintiffs appears to be reasonable given the twelve months spent on the case and the nature of the case (Docket No. 34, Exhibit 1, pp. 4-6).

**\*9**  In conclusion, Plaintiffs' Motion for Attorney Fees is granted. Plaintiffs are awarded attorney fees and costs as follows: $11,327.25 for Mr. Fuller, $2,010.75 for Mr. Dunn, expert costs of $3,400 and other costs of $886. The total award to Plaintiffs is $ 17,764.

2006 WL 2404140

IT IS ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2404140

---

End of Document © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5310 Filed 07/20/17 Page 40 of 121
Project Vote v. Blackwell, Not Reported in F.Supp.2d (2009)
2009 WL 917737

KeyCite Yellow Flag - Negative Treatment

Distinguished by Lavin v. Brunner, N.D.Ohio, February 12, 2013

2009 WL 917737
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio,
Eastern Division.

PROJECT VOTE, et al., Plaintiffs,
v.
J. Kenneth BLACKWELL, et al., Defendants.

No. 1:06–CV–1628.
|
March 31, 2009.

**Attorneys and Law Firms**

Donald J. McTigue, Mark A. McGinnis, McTigue Law Group, Columbus, OH, Brian W. Mellor, Dorchester, MA, Ezra W. Reese, Karl J. Sandstrom, Perkins Coie, Devlin Willis, Elliott M. Mincberg, People for the American Way Foundation, Washington, DC, Wendy R. Weiser, New York University School of Law, New York, NY, for Plaintiffs.

Damian W. Sikora, Richard N. Coglianese, Office of the Attorney General-Constitutional Offices, Columbus, OH, for Defendants.

## MEMORANDUM & ORDER

KATHLEEN McDONALD O'MALLEY, District Judge.

**\*1** Pending before the Court is *Plaintiffs' Motion for Costs and Attorneys' Fees* (Doc. 63). For the reasons articulated below, the Court ***GRANTS IN PART*** Plaintiffs' motion and concludes that Plaintiffs are entitled to ***an award of attorneys' fees in the amount of $312,925.00*** and ***an award of costs in the amount of $8,560.28*** for ***a total award of $321,485.28.***

## I. *BACKGROUND*

**A. THE UNDERLYING LITIGATION—PLAINTIFFS SECURED A PRELIMINARY AND PERMANENT INJUNCTION PROHIBITING ENFORCEMENT OF THE CHALLENGED PROVISIONS OF OHIO VOTER REGISTRATION LAW**

Plaintiffs are various civic organizations, and their individual members, who are engaged in voter registration activities throughout Ohio. The current Defendants are Ohio Secretary of State Jennifer Brunner and Ohio Attorney General Richard Cordray. [1]

[1]  Defendant Cordray, as the successor to now-former Ohio Attorney General Marc Dann, is automatically substituted as a party in this action under Rule 25(d) of the Federal Rules of Civil Procedure. Defendant Brunner similarly entered this case *via* substitution as the successor to former Ohio Secretary of State J. Kenneth Blackwell. (Court's July 17, 2007 Order.) This case also previously included Defendants William D. Mason (Cuyahoga County Prosecutor) and Sherri Bevan Walsh (Summit

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5311 Filed 07/20/17 Page 41 of 121
Project Vote v. Blackwell, Not Reported in F.Supp.2d (2009)

2009 WL 917737

County Prosecutor). By agreement of the parties, Plaintiffs' claims against those Defendants were dismissed without prejudice. (Court's August 1, 2007 Order.)

On July 6, 2006, after substantial efforts to achieve an administrative resolution outside of court failed, Plaintiffs filed an eight-count Complaint (Doc. 1), alleging that recent amendments to the Ohio Election Code unlawfully impacted third-party voter registration efforts in Ohio and hindered low-income, minority, and disabled citizens from registering to vote. Specifically, Plaintiffs challenged the validity of various portions of Ohio Revised Code §§ 3503.14, 3503.19, 3503.28, 3503.29, and 3599.11. These sections were codified in Title 35 (titled "Elections") of the Ohio Revised Code by what the parties referred to as "House Bill 3." In sum, Plaintiffs claimed that House Bill 3's modifications and/or additions to the Ohio Election Code, and the implementing regulations enacted by the Ohio Secretary of State, violated the First and Fourteenth Amendments to the United States Constitution, the Voting Rights Act ("VRA"), and the National Voter Registration Act of 1993 ("NVRA").

One week later, on July 13, 2006, Plaintiffs filed a motion for preliminary injunction (Doc. 3), seeking to enjoin Defendants from enforcing any of the challenged legislation and regulations. Defendants opposed Plaintiffs' motion arguing that, among other things, Plaintiffs failed to show that the legislation and regulations unduly burdened any protected First Amendment right (Doc. 18). [2] Plaintiffs replied (Doc. 26) by essentially restating the positions asserted in their Complaint and motion. Shortly thereafter, all parties filed voluminous evidentiary materials in support of their respective positions. (*See* Docs. 28–43.) The Court then met with the parties and scheduled a hearing on Plaintiffs' motion for preliminary injunction.

[2]     With the exception of then-Defendant William D. Mason, Defendants simultaneously (*i.e.,* as part of their opposition papers) moved to dismiss Plaintiffs' Complaint. (Doc. 18.) Briefing on the motion to dismiss proceeded separately. (Doc. 49.)

On September 1, 2006, the Court conducted a preliminary injunction hearing. The parties presented oral arguments with substantial interaction by the Court; they did not present additional evidence. Given the approaching general election, and the Boards of Elections' stated need for relatively immediate guidance (*see* Doc. 46 at p. 78), the Court agreed that the circumstances necessitated an expedited ruling. The Court, therefore, after a lengthy recess to review the record and to consider its ruling, proceeded to deliver a detailed oral ruling at the hearing in which it granted a preliminary injunction to Plaintiffs (*see id.* at pp. 80–103). One week later, on September 8, 2006, the Court issued a 24–page written Order (Doc. 45), which memorialized and supplemented the Court's oral ruling granting the preliminary injunction. In short, the Court held that the challenged portions of Ohio Revised Code §§ 3503.14, 3503.19, 3503.28, 3503.29 and 3599.11 and the Secretary of State's interpretation of those provisions were likely unconstitutional and that certain of those provisions also likely violated the NVRA. (Docs.45, 46.)

**\*2** Then, in the months that followed, the Court conducted two status conferences with the parties (*see* Docs. 50 and 52). Based on the parties' then-current belief that a resolution could be reached short of continued litigation, the Court referred the parties to mediation (*see* Doc. 52). In mid-June 2007, however, the parties determined that mediation would not be fruitful (*see* Doc. 54) and that the case should proceed toward a judicial resolution.

Several weeks later, on July 13, 2007, Plaintiffs filed a motion for partial summary judgment (Doc. 57), seeking final judgment on six of the eight counts alleged in their Complaint. The parties' briefing on the motion, however, presented nothing new for the Court's consideration; instead, the parties simply incorporated the evidence and arguments presented in their prior briefs. (Doc. 59 at pp. 4–5; *see also* Docs. 57, 58.) After again reviewing the parties' voluminous filings relative to the motion for preliminary injunction, and upon a further review of the Court's oral and written Orders resolving that motion (Docs.45, 46), the Court entered an Order concluding that Plaintiffs' motion for partial summary judgment should be granted for the same reasons that Plaintiffs' motion for preliminary injunction was granted (Doc. 59). In a separate Order, the Court then entered partial final judgment in favor of Plaintiffs and against Defendants on the six counts advanced in Plaintiffs' motion. (Doc. 60.) Specifically, the Court entered a declaratory judgment that the challenged provisions of the Ohio Revised Code, as well as their accompanying regulations and administrative practices,

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5312 Filed 07/20/17 Page 42 of 121
Project Vote v. Blackwell, Not Reported in F.Supp.2d (2009)
2009 WL 917737

violated the First and Fourteenth Amendments (Counts I, II, III, VII, and VIII) and the NVRA (Count VI), and the Court permanently enjoined Defendants from enforcing those provisions. (*Id.*)

The remaining two counts of the Complaint that were not litigated in Plaintiffs' motion for partial summary judgment were voluntarily dismissed without prejudice by Plaintiffs (*see* Docs. 49, 59, 65, 66), and the case was eventually closed (*see* Doc. 66).

## B. PLAINTIFFS' PENDING MOTION FOR ATTORNEYS' FEES AND COSTS

In the post-judgment context, Plaintiffs have now filed the pending motion seeking an award for the attorneys' fees and costs incurred in litigating this federal civil rights matter pursuant to 42 U.S.C. §§ 1988(b) and 1973*l* (e). (Doc. 63.) Plaintiffs argue that they are prevailing parties under the statutes and thus entitled to their reasonable attorneys' fees and costs. Plaintiffs request an award of $446,752.00 for attorneys' fees [3] and $10,808.32 in costs [4] for a total award of $457,560.32. [5] In support of their request for fees and costs, Plaintiffs have attached numerous documents to the motion (*e.g.,* declarations, [6] biographies of individuals who worked on the matter, billing time-entries, expenses), stating that they have properly computed the award to which they are entitled. Specifically, with respect to fees, Plaintiffs' request is based on bills for 1,416.45 hours by twenty-one time-keepers (fourteen attorneys, four law clerks/summer associates/interns, two administrative assistants, and one librarian) from four different firms/advocacy groups at hourly rates ranging from $500.00 to $110.00.

[3]  Plaintiffs originally requested $450,002.00 for attorneys' fees. (*See* Doc. 63 at pp. 2, 17.) Then, in their reply, Plaintiffs note that two particular billing entries were included in error and should be omitted from the total fee request. (*See* Doc. 68 at p. 12.) Specifically, Plaintiffs conceded that 5 hours should be deducted from Attorney Weiser's time, and 3 hours should be deducted from Attorney Bauer's time. Accordingly, Plaintiffs reduce the total fee request by $3,250 and list $446,752.00 as the total amount requested for attorneys' fees in their reply. (*See id.* at pp. 12, 16.)

[4]  Plaintiffs state in the text of their motion that the total amount of costs requested is $10,803.59. (*See* Doc. 63 at pp. 2, 17.) Based on the declarations and other supporting materials attached to their motion, however, the Court calculates the actual total amount of costs requested to be $10,808.32.

[5]  The Court notes that, in addition to the other modification described in previous footnotes, the spreadsheet submitted by Plaintiffs contains a clerical error by omitting Attorney Teresa James' requested fees in Project Votes's total amount requested and thus inaccurately lists Plaintiffs' total requested amount as $452,705.59. (*See* Doc. 63–3.)

[6]  Defendants state that none of Plaintiffs' "declarations" were properly executed affidavits. (Doc. 67 at p. 16 n. 8.) The Court largely disagrees. First, the declaration submitted by H. Ritchey Hollenbaugh was notarized and is a properly executed affidavit. (Doc. 63–2.) Second, the Court notes that unsworn declarations can be used as evidence if "subscribed ... as true under penalty of perjury and dated" under 28 U.S.C. § 1746. *Bonds v. Cox,* 20 F.3d 697, 702 (6th Cir.1994). Therefore, because the declarations submitted by Teresa James, Rayesh Nayak, Renee Paradis, and Wendy Weiser were all "subscribed as true under penalty of perjury and dated," each can be used as evidence under 28 U.S.C. § 1746. (Docs .63–7, 63–8, 63–9, 63–10.) Likewise, even though the declarations submitted by Karl Sandstrom and Donald McTigue do not technically comply with the requirements of 28 U.S.C. § 1746, these declarations cite the statute and satisfy the spirit of the rule and thus will be considered as evidence. (Docs.63–4, 63–5, 68–2.) The Court, however, notes that the "declaration" submitted by Brian Mellor is unsigned. (Doc. 63–6 at p. 3.) Consequently, his "declaration" cannot be used as evidence, and the Court cannot consider his statement. *See Smith v. Jefferson County Sch. Bd.,* 549 F.3d 641, 657 n. 8 (6th Cir.2008).

**\*3**  Defendants have vigorously opposed Plaintiffs' motion. (Doc. 67.) First, Defendants argue that Plaintiffs' request for attorneys' fees and costs should be denied in its entirety, because the fee application is an attempt to inflate bills and should shock the conscience of the Court. Defendants contend that Plaintiffs' request in this case—nearly a half million dollar fee to pay for more than a dozen attorneys to prepare a case involving no witnesses or discovery—is so unreasonable, excessive, and improper that the Court should deny Plaintiffs' motion outright. Citing a number of specific examples, Defendants assert that Plaintiffs' counsel have over-lawyered the case, billed duplicatively, expended

*Project Vote v. Blackwell, Not Reported in F.Supp.2d (2009)*
2009 WL 917737

unnecessary amounts of time on simple assignments, included tasks that cannot conceivably be related to the litigation, requested hourly rates that cannot be justified, and asked for "costs" that are not reasonable. As such, Defendants believe that a complete denial of the fee request is more than appropriate. Alternatively, Defendants argue that if fees and costs are awarded, deductions from Plaintiffs' requested amount should be commensurately large.

In response to Defendants' opposition, Plaintiffs have filed a reply and submitted a supplemental declaration. (Doc. 68.) Plaintiffs argue that nothing in the record supports Defendants' allegation that the request was either "grossly and intolerably exaggerated" or "so exorbitant to shock the conscience of the Court" and that, therefore, there is no basis for the complete denial of fees and costs. In particular, Plaintiffs suggest that Defendants' argument is particularly inappropriate given Defendants' agreement, after reviewing Plaintiffs' motion and accompanying documentation, not to request a hearing or seek discovery. Further, Plaintiffs contend that their request for fees and costs is reasonable and should be granted. Specifically, Plaintiffs argue that: (1) Plaintiffs' fee request is justified by the extraordinary results achieved, the complexity of the case, and the novelty of the issues presented; (2) the particular billing time-entries challenged by Defendants are reasonable; (3) Plaintiffs' various counsel each played distinct roles in the litigation; (4) Plaintiffs' proposed hourly rates are reasonable; and (5) the expenses claimed by Plaintiffs are reasonable and necessary.

Defendants have not sought leave to file a sur-reply or have otherwise responded to Plaintiffs' reply and supplemental declaration. Having received no other filings, the Court now resolves Plaintiffs' pending motion for fees and costs.

## II. *DISCUSSION*

In resolving Plaintiffs' pending motion, the Court first discusses generally the applicable law regarding awards for attorneys' fees and costs in federal civil rights suits. The Court then applies the applicable law to determine the appropriate award in this case.

## A. APPLICABLE LAW

### 1. The Federal Civil Rights Fee Shifting Statutes

**\*4** The federal civil rights fee shifting statutes provide for awards of reasonable attorneys' fees and costs to plaintiffs who prevail in civil rights suits, including suits to enforce First Amendment and voting rights. *See* 42 U.S.C. § 1973*l* (e) ("In any action or proceeding to enforce the voting guarantees of the Fourteenth or Fifteenth Amendment[s], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, reasonable expert fees, and other reasonable litigation expenses as part of the costs."); 42 U.S.C. § 1988(b) ("In any action or proceeding to enforce a provision of [42 U.S.C. § 1983], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs ...."); *see also* 42 U.S.C. § 1973gg–9(c) (providing for "reasonable attorney fees, including litigation expenses, and costs" for a prevailing party who brings suit under the NVRA). [7]

[7]    Because these fee shifting statutes contain nearly identical language and serve the same Congressional purposes, courts generally construe the sections similarly, and the same standards apply to fees recovered under all three sections. *See Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Nat'l Coalition for Students with Disabilities v. Bush,* 173 F.Supp.2d 1272, 1274 (N.D.Fla.2001).

### 2. Complete Denial Of Fees Only In Very Limited Circumstances

Accordingly, a prevailing plaintiff in a federal civil rights suit ordinarily should recover reasonable attorneys' fees and costs "unless special circumstances would render such an award unjust." *Hensley,* 461 U.S. at 429 (internal quotations omitted). Several courts have recognized that one special circumstance that justifies a district court's *complete* denial of fees is when the fee request is "so excessive it shocks the conscience of the court." *Scham v. Dist. Courts Trying Crim.*

2009 WL 917737

*Cases,* 148 F.3d 554, 557 (5th Cir.1998) (internal quotations omitted); *see also Fair Hous. Council v. Landow,* 999 F.2d 92, 96 (4th Cir.1993); *Lewis v. Kendrick,* 944 F.2d 949, 957–58 (1st Cir.1991); *Sun Publ'g Co. v. Mecklenberg News, Inc.,* 823 F.2d 818, 819 (4th Cir.1987); *Brown v. Stackler,* 612 F.2d 1057, 1059 (7th Cir.1980). These courts, however, generally have cautioned that the "[t]otal denial of requested fees ... is a stringent sanction, to be reserved for only the most severe of situations, and appropriately invoked only in very limited circumstances." *Jordan v. U.S. Dep't of Justice,* 691 F.2d 514, 518 (D.C.Cir.1982) (reversing district court order completely denying request for fees as an abuse of discretion). Further, in the Sixth Circuit, the defendant bears the burden of making a "strong showing" of special circumstances sufficient to warrant denying an award of fees and costs to a prevailing plaintiff. *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County,* 421 F.3d 417, 422 (6th Cir.2005) (quoting *Morscott, Inc. v. City of Cleveland,* 936 F.2d 271, 273 (6th Cir.1991) (citation omitted)).

### 3. The Lodestar Analysis

Once the Court finds that a prevailing plaintiff is entitled to attorneys' fees and costs under the fee shifting statutes, the primary concern with respect to attorneys' fees is that the fee awarded be reasonable. *Reed v. Rhodes,* 179 F.3d 453, 471 (6th Cir.1999). A reasonable fee is one that attracts competent counsel but avoids producing a windfall. *Id.*

**\*5** In determining what is a reasonable amount of attorneys' fees, a useful starting point is to determine the "lodestar," which is calculated by multiplying the proven number of hours reasonably expended on the litigation by a reasonable hourly rate. *Id.; see also Isabel v. City of Memphis,* 404 F.3d 404, 415 (6th Cir.2004).

When a court is calculating the lodestar, the party seeking attorneys' fees bears the burden of proving the reasonableness of the hourly rates claimed. *Granzeier v. Middleton,* 173 F.3d 568, 577 (6th Cir.1999) (citing *Hensley,* 461 U.S. at 433). The reasonableness of a claimed hourly rate is determined by reference to the prevailing rate in the relevant market—*i.e.,* the rate that is customarily paid in the community to attorneys of reasonably comparable skill, experience, and reputation—regardless of whether plaintiff is represented by private or nonprofit counsel. *See Johnson v. City of Clarksville,* 256 Fed. Appx. 782, 783 (6th Cir.2007) (citing *Blum v. Stenson,* 465 U.S. 886, 895–96, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)); *see also Fuhr v. Sch. Dist. of Hazel Park,* 364 F.3d 753, 762 (6th Cir.2004). In this regard, the Sixth Circuit specifically has found that the relevant market is "the venue of the court of record," rather than a foreign counsel's "geographical area wherein he maintains his office and/or normally practices." *Adcock–Ladd v. Sec'y of Treasury,* 227 F.3d 343, 350 (6th Cir.2000). Moreover, the hourly rate "should not exceed the market rates necessary to encourage competent lawyers to undertake the representation in question." *Reed,* 179 F.3d at 472 (quoting *Coulter v. Tennessee,* 805 F.2d 146, 149 (6th Cir.1986)). As the Sixth Circuit has stated, under the federal civil rights fee shifting statutes:

> [Attorneys'] fees are different from the prices charged to well-to-do clients by the most noted lawyers and renowned firms in a region. Under these statutes a renowned lawyer who customarily receives $ 250 an hour in a field in which competent and experienced lawyers in the region normally receive $ 85 an hour should be compensated at the lower rate.

*Id.* at 472–73 (quoting *Coulter,* 805 F.2d at 149). And finally, in exercising its discretion to determine a reasonable hourly rate, a district court may consider a party's submission (*e.g.,* affidavits or declarations from other attorneys or experts), awards in analogous cases, state bar association guidelines, and its own knowledge and experience from handling similar requests for fees. *See Johnson v. Connecticut Gen. Life Ins., Co.,* No. 5:07–CV–167, 2008 U.S. Dist. LEXIS 24026, at *14 (N.D. Ohio Mar. 13, 2008); *Mikolajczyk v. Broadspire Servs., Inc.,* 499 F.Supp.2d 958, 965 (N.D.Ohio 2007); *Barrett v. Detroit Heading, LLC,* No. 05–72341, 2007 U.S. Dist. LEXIS 41555, at *25–26 (E.D. Mich. June 7, 2007); *Ousley v. Gen. Motors Ret. Program for Salaried Employees,* 496 F.Supp.2d 845, 850 (S.D.Ohio 2006) (citing *Coulter,* 805 F.2d at 149–50).

**\*6** Similarly, the party seeking attorneys' fees also bears the burden of proving the number of hours reasonably expended on the litigation. *Granzeier,* 173 F.3d at 577 (citing *Hensley,* 461 U.S. at 433). Counsel for the prevailing party must make

2009 WL 917737

a good faith effort to exclude from a fee application hours that are "excessive, redundant, or otherwise unnecessary," just as an attorney in private practice is expected to use "billing judgment" before submitting a bill to a client, and the district court should exclude any such hours improperly submitted. *Hensley,* 461 U.S. at 434. Further, sufficient documentation must be offered in support of the hours charged, *i.e.,* the documentation "must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation." *Imwalle v. Reliance Med. Prods.,* 515 F.3d 531, 553 (6th Cir.2008) (noting that "counsel need not record in great detail each minute he or she spent on an item," but indicating that "the general subject matter should be identified") (internal quotations omitted). Where reductions to the requested number of hours reasonably expended on the litigation are appropriate, a court has the discretion to utilize a simple across-the-board reduction by a certain percentage as an alternative to line-by-line reductions, particularly when fee documentation is voluminous. *See Auto Alliance Int'l, Inc. v. U.S. Customs Serv.,* 155 Fed. Appx. 226, 228 (6th Cir.2005) (affirming the district court's reduction of the fee award by 25% for general excessiveness in billing); *Hudson v. Reno,* 130 F.3d 1193, 1209 (6th Cir.1997) (applying across-the-board reduction of 25% for duplication), *overruled on other grounds by Pollard v. E.I. du Pont de Nemours & Co.,* 532 U.S. 843, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001); *Loranger v. Stierheim,* 10 F.3d 776, 783 (11th Cir.1994) ( "Where fee documentation is voluminous ... an hour-by-hour review is simply impractical and a waste of judicial resources."); *Coulter,* 805 F.2d at 152 ("Where duplication of effort is a serious problem, as in this case, the District Court may have to make across the board reductions by reducing certain items by a percentage figure, as Judge Morton did here in reducing this item by 50%"); *Hisel v. City of Clarksville,* No. 3:04–0924, 2007 U.S. Dist. LEXIS 71766, at *6–16 (M.D.Tenn. Sept. 26, 2007) ("While cutting hours may appear arbitrary, it is an essentially fair approach ..., and an across-the percentage cut is a practical means of trimming the fat from a fee application.") (internal citations and quotations omitted); *see also Cmtys. for Equity v. Mich. High Sch. Ath. Ass'n,* No. 1:98–CV–479, 2008 U.S. Dist. LEXIS 25640, at *14–15 (W.D.Mich. Mar. 31, 2008).

Then, after a court determines the proper lodestar amount, that amount can be adjusted (*i.e.,* enhanced or reduced by a multiplier) based on a twelve-factor test for assisting in the determination of the reasonableness of an application for attorneys' fees. *Reed,* 179 F.3d at 471–72 & n. 3 (noting that these factors were "enunciated by the Fifth Circuit in *Johnson v. Georgia Hwy. Express, Inc.,* 488 F.2d 714 (5th Cir.1974), and adopted by the Supreme Court in *Hensley v. Eckerhart,* 461 U.S. 424, 432, 103 S.Ct. 1933, 76 L.Ed.2d 40 ... (1983)") (hereinafter, the "twelve *Johnson* factors"). [8] These twelve *Johnson* factors are as follows:

[8]   Although the Supreme Court has recognized that the twelve factors "are usually subsumed with the initial calculation of hours reasonably expended at a reasonable hourly rate," a court should still address the relevant factors after the lodestar analysis. *Hensley,* 461 U.S. at 434 n. 9.

   **\*7** (1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* (quoting *Johnson,* 488 F.2d at 717–19). Of the twelve *Johnson* factors, the "results obtained" factor is "highly important." *Adcock–Ladd,* 227 F.3d at 349 (citing *Hensley,* 461 U.S. at 435–36). In fact, "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Id.* at 349–50 (quoting *Hensley,* 461 U.S. at 435). There is, however, "a strong presumption that the lodestar represents the reasonable fee." *City of Burlington v. Dague,* 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992); *see also Bldg. Serv. Local 47 Cleaning Contr. Pension Plan v. Grandview Raceway,* 46 F.3d 1392, 1401 (6th Cir.1995).

**4. Costs And Expenses**

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5316 Filed 07/20/17 Page 46 of 121
Project Vote v. Blackwell, Not Reported in F.Supp.2d (2009)
2009 WL 917737

In addition to fees, a court also must consider the reasonable amount of costs to be awarded a prevailing plaintiff under the fee shifting statutes. The Sixth Circuit has explained that there are two types of expenses recoverable by prevailing parties in civil rights litigation:

There are two separate sources of authority to award out-of-pocket expenses. Some expenses are included in the concept of attorney's fees, as "incidental and necessary expenses incurred in furnishing effective and competent representation," and thus are authorized by 42 U.S.C.] § 1988.... The authority granted in section 1988 to award a reasonable attorney's fee includes the authority to award those reasonable out-of-pocket expenses incurred by the attorney, which are normally charged to a fee-paying client in the course of providing legal services.... Reasonable photocopying, paralegal expenses, and travel and telephone costs are thus recoverable pursuant to the statutory authority of section 1988....

Other costs are on a different footing. These include those costs incurred by a party to be paid to a third party, not the attorney for the case, which cannot reasonably be considered to be attorney's fees.... These include, among others, docket fees, investigation expenses, deposition expenses, witness expenses, and the costs of charts and maps.... Most of these expenses have long been recoverable in the court's discretion, as costs pursuant to 28 U.S.C. § 1920....

*Northcross v. Bd. of Educ. of Memphis City Sch.,* 611 F.2d 624, 639 (6th Cir.1979) (citations omitted); *see also Sigley v. Kuhn,* No. 98–3977/99–3531, 2000 U.S.App. LEXIS 1465, at *23–26 (6th Cir. Jan. 31, 2000).

### 5. District Court's Discretion
**\*8** And finally, it is worth noting that in awarding attorneys' fees and costs under the federal civil rights fee shifting statutes, a district court's decision is reviewed for an abuse of discretion, and the district court's "exercise of discretion is entitled to substantial deference because the rationale for the award is predominantly fact-driven." *Imwalle,* 515 F.3d at 551.

## B. APPLICATION
Here, Defendants do not contest that Plaintiffs are "prevailing parties" under the federal civil rights fee shifting statutes. *See* 42 U.S.C. §§ 1988(b) and 1973*l* (e). Defendants also do not contest that Plaintiffs' counsel have obtained anything less than "excellent results." *See Adcock–Ladd,* 227 F.3d at 349–50 (quoting *Hensley,* 461 U.S. at 435). Instead, as noted, Defendants challenge Plaintiffs' request for fees and costs, by arguing that the request is so unreasonable, excessive, and improper that it should be denied *in toto.* Alternatively, Defendants contend that if fees and costs are awarded, the Court should impose significant reductions.

As explained in more detail below, the Court declines to deny the request for fees and costs *in toto,* but exercises its discretion to reduce Plaintiffs' requested award in light of the applicable law and a thorough review of the parties' submissions.

### 1. Complete Denial Of Fees And Costs Is Inappropriate
Defendants primarily argue that Plaintiffs' request for fees and costs should be denied in its entirety, because the fee application—both on its face and with respect to repeated specific instances of double billings, inflated hours, improper charges, and exorbitant and unsubstantiated proposed hourly rates—should shock the conscience of the Court. In support of this argument, Defendants first point to a litany of examples from the record and contend that: (1) it is beyond question that this case was "over-lawyered" and that 1,416.45 hours of work in this case with no discovery and relatively little filings is patently "absurd"; (2) a close inspection of the fee application demonstrates that Plaintiffs' counsel billed duplicatively, expended unnecessary amounts of time on simple assignments, included tasks that cannot conceivably be related to the litigation, and asked for "costs" that are not reasonable; and (3) Plaintiffs have requested hourly rates that cannot be justified. Defendants then cite to a number of cases generally standing for the proposition that a *complete*

denial of a fee request is appropriate if the request is grossly and intolerably exaggerated, manifestly filed in bad faith, or wholly undocumented. *Jordan,* 691 F.2d at 518; *see also, e.g., Budget Rent–A–Car Sys., Inc. v. Consol. Equity LLC,* 428 F.3d 717 (7th Cir.2005); *Scham,* 148 F.3d at 557; *Fair Housing Council,* 999 F.2d at 96; *Lewis,* 944 F.2d at 957–58; *Sun Publ'g Co.,* 823 F.2d at 819; *Brown,* 612 F.2d at 1059; *Mendez v. County of San Bernardino,* No. CV 04–7131 GPS (RCx), 2007 U.S. Dist. LEXIS 75495, at * 1–4 (C.D.Cal. May 21, 2007).

**\*9** The Court, however, rejects Defendants' argument. While Defendants raise a number of valid concerns and Plaintiffs' fee application is lacking in some respects, the circumstances here do not justify the "stringent sanction" that Defendants seek, but instead direct the Court to reduce—not deny—the requested award. *Jordan,* 691 F.2d at 518, 521 ("To decline any fee award whatsoever simply because of doubts on parts of the claim is, in any but the most severe of cases, a failure to use ... discretion."). As Defendants do not dispute, Plaintiffs' counsel achieved "excellent results"—indeed, Plaintiffs secured all the relief that they sought in their Complaint: a declaratory judgment and a preliminary and permanent injunction prohibiting enforcement of the challenged provisions of Ohio registration law. This alone suggests that Plaintiffs' counsel should recover their requested fee. *See Adcock–Ladd,* 227 F.3d at 349–50 (quoting *Hensley,* 461 U.S. at 435). Further, Plaintiffs' counsel were forced to achieve these results on an expedited basis—in part because of the now-former Ohio Secretary of State's interpretation of the challenged provisions—by presenting a novel theory in a previously undeveloped area of election law. And finally, this is not a case where a party has failed to proffer *any* substantiation, as Plaintiffs' counsel has submitted multiple declarations, billing records, and other documents attached to their motion, demonstrating a significant effort to account for each hour spent working on this matter and to otherwise show that they are entitled to the requested award.

As such, the cases Defendants cite are easily distinguishable. In fact, the Court notes that the Central District of California's decision to deny an award entirely in *Mendez*—cited by Defendants for the proposition that it was unconscionable to bill over 2,500 hours to prepare for and try a case that only took a few days to try (*see* Doc. 67 at pp. 10–11)—has since been reversed by the Ninth Circuit and is particularly instructive. *Mendez v. County of San Bernardino,* 540 F.3d 1109, 1124–30 (9th Cir.2008). In its decision, the Ninth Circuit aptly discussed many of the same cases that Defendants argue are applicable here, concluding that those courts have denied a fee request in only two limited circumstances—in cases where the request appeared to be made in bad faith or where the plaintiff made no effort to eliminate time spent on unsuccessful claims:

Those courts of appeals that have upheld a denial of fees under the "shocks the conscience" test have done so only where the fee request appeared to have been made in bad faith, such as billing outrageous numbers of hours on simple matters, or where the plaintiff made no effort to eliminate hours spent on unsuccessful, unrelated claims. In the **first** category are cases such as *Brown,* where the Seventh Circuit denied all fees to an attorney who submitted a request for 800 hours of billable time, even though his work consisted of filing a six-page complaint and then simply await[ed] the outcome of pending litigation in the Supreme Court that "almost automatically ... disposed of the case." 612 F.2d at 1059. Similarly, in *Scham,* the Fifth Circuit upheld a total denial of fees where an attorney billed 936 hours for a case where "discovery was limited, and there were no meetings of the parties or attorneys, no settlement negotiations, no mediation, no court appearances, and no trial." 148 F.3d at 558. The counsel in *Scham* was also a solo practitioner with one year of experience, who nonetheless requested $750 per hour for his time. *Id.* Therefore, in both of these cases, it was altogether improbable that any attorney could have reasonably expended such hours in good faith on matters so simple. Falling into the **second** category are cases such as *Fair Housing Council,* 999 F.2d 92, where the Fourth Circuit upheld a denial of fees to a prevailing plaintiff who made no effort to eliminate large numbers of hours spent on unsuccessful, unrelated claims. In that case, plaintiffs brought separate claims for housing discrimination and breach of contract, succeeding only on their breach of contract claim. *See id.* at 95. Although the housing discrimination and contract claims were not related—and the discrimination claim was by far the more complex of the two to litigate—the plaintiffs nonetheless submitted a request for $537,113 in fees for the entire litigation, with billing entries that "failed to allocate the fees attributable to each claim." *Id.* The First Circuit similarly upheld the denial of fees in *Lewis v. Kendrick,* 944 F.2d 949, 957–58 (1st Cir.1991), where plaintiffs achieved only minor success and yet "made no reduction for claims" that had "no relation" to the victorious claim.

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5318 Filed 07/20/17 Page 48 of 121
Project Vote v. Blackwell, Not Reported in F.Supp.2d (2009)
2009 WL 917737

**\*10** *Id.* at 1127 (emphasis added). The Ninth Circuit distinguished those cases and found that there was no evidence that the plaintiff's fee request was either made in bad faith or contained excessive hours spent on unrelated claims and thus found nothing in the request that would "shock the conscience" of the court, such as was present in cases like *Scham, Brown, Lewis,* and *Landow. Id.* at 1128.

Similarly, here, while the Court again recognizes that Defendants properly raise several questions regarding some deficient aspects of Plaintiffs' fee application (which are all addressed in detail below), the Court finds that there is no evidence that the request was made in bad faith, and, further, the request could not have contained any excessive hours spent on unrelated, unsuccessful claims because Plaintiffs' counsel has obtained all of the benefits Plaintiffs sought by bringing this suit. In short, therefore, the Court determines that, like the request in *Mendez,* and unlike the requests in cases like *Scham, Brown, Lewis,* and *Landow* and the other cases Defendants cite, Plaintiffs' fee request does not "shock the conscience" of the Court and should not be denied in its entirety. Quite simply, Defendants have not met their burden of making a "strong showing" of special circumstances sufficient to warrant denying an award, *Deja Vu of Nashville, Inc.,* 421 F.3d at 422. Despite any reductions that should (and will) be made to Plaintiffs' fee request, moreover, a complete denial of fees in this case would not be a "fair result with far-reaching positive consequences" (Doc. 67 at p. 11), but instead would frustrate the purpose of the federal civil rights fee shifting statutes, which is to encourage socially productive litigation like the instant lawsuit, *see Cleveland v. Ibrahim,* 121 Fed. Appx. 88, 91 (6th Cir.2005). Plaintiffs achieved a significant civil rights victory in an area of law that was anything but simple, which ultimately allowed them to register thousands of new voters in time for the November 2006 elections; their counsel should be awarded attorneys' fees and costs under the fee shifting statutes.

### 2. The Court Reduces Plaintiffs' Requested Award

Having found that Plaintiffs are entitled to attorneys' fees and costs under the federal civil rights fee shifting statutes, the Court next must address what constitutes a reasonable award and whether Plaintiffs are entitled to their full request. In this regard, the Court will first examine the reasonable amount of fees to be awarded and then will consider the reasonable amount of costs to be awarded.

### a. Attorneys' Fees

In determining what is a reasonable amount of attorneys' fees here, the Court first calculates the lodestar by multiplying the proven number of hours reasonably expended on the litigation by a reasonable hourly rate. *See Reed,* 179 F.3d at 471. The Court then will analyze whether an adjustment of the lodestar should be made in light of the twelve *Johnson* factors.

### i. Reasonable Hourly Rates

**\*11** Under the lodestar approach, the first step in the analysis is to determine the reasonable hourly rate. This is determined with respect to those rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum,* 465 U.S. at 895–96; *see also Reed,* 179 F.3d at 471. Courts will frequently award fees based on an attorney's customary rate, because "normal billing rates usually provide an efficient and fair short cut for determining the market rate." *Dowling v. Litton Loan Servicing, LP,* No. 05–CV–098, 2008 U.S. Dist. LEXIS 31669, at \*3–4 (S.D.Ohio Mar. 31, 2008) (citing *Hadix v. Johnson,* 65 F.3d 532, 536 (6th Cir.1995)). This analysis becomes more complicated, however, where, as is generally the case here, the attorneys do not usually practice within the jurisdiction in which they seek fees. *Compare Adcock–Ladd,* 227 F.3d at 350 ("When a counselor has voluntarily agreed to represent a plaintiff in an out-of-town lawsuit.... [T]he 'prevailing market rate' is that rate which lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record, rather than foreign counsel's typical charge for work performed within a geographical area wherein he maintains his office and/or normally practices.") *with Berry v. School Dist.,* 703 F.Supp. 1277, 1283 (W.D.Mich.1986) ("A national market or a market for a particular legal specialization may provide the appropriate market.") (citing *Louisville Black Police*

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5319 Filed 07/20/17 Page 49 of 121
*Project Vote v. Blackwell, Not Reported in F.Supp.2d (2009)*
2009 WL 917737

*Officers Organization v. City of Louisville,* 700 F.2d 268, 277 (6th Cir.1983)).[9] Regardless, as noted, the party seeking attorneys' fees bears the burden of proving the reasonableness of the hourly rates requested. *Granzeier,* 173 F.3d at 577.

[9]  This is not, of course, to say that the ordinary rate charged by those attorneys can not be probative. For example, if the most highly compensated partners in Chicago charge $650.00 an hour and the most highly compensated partners in Cleveland charge $550.00 an hour, a Chicago attorney's testimony that her normal hourly rate was $650.00 an hour might strongly support a court's determination that her hourly rate for work performed in Cleveland should be $550.00 an hour.

Here, Plaintiffs request the following hourly rates:

| Organization | Name | Title | *Requested* Hourly Rate |
|---|---|---|---|
| ***Brennan Center for Justice*** | | | |
| | Wendy Weiser | Partner | $350.00 |
| | Renee Paradis | Counsel (2003) | $235.00 |
| | Raj Nayak | Counsel (2003) | $235.00 |
| | Margaret Chen | Administrative Assistant | $140.00 |
| | Heather McGhee | Intern | $140.00 |
| | John Infranca | Intern | $140.00 |
| ***McTigue Law Group*** | | | |
| | Donald J. McTigue | Partner | $450.00 |
| | Mark A. McGinnis | Associate (2003) | $250.00 |
| ***Project Vote*** | | | |
| | Teresa James | Counsel | $200.00 |
| ***Perkins Coie*** | | | |
| | Robert Bauer | Partner | $500.00 |
| | Karl Sandstrom | Of Counsel | $500.00 |
| | Marc Elias | Partner | $375.00 |
| | Scott Gingold | Associate (1998) | $250.00 |

*Project Vote v. Blackwell, Not Reported in F.Supp.2d (2009)*
2009 WL 917737

| | | |
|---|---|---|
| Ezra Reese | Associate (2002) | $240.00 |
| Patricia Alexander | Associate (2005) | $175.00 |
| Kerri–Ann Anderson | Summer Associate | $155.00 |
| Susan Cochard | Librarian | $175.00 |
| Christopher Johnson | Summer Associate | $155.00 |
| Lauren Lowe | Associate (2005) | $175.00 |

**\*12** (Doc. 63–3.) [10] In making these requests, Plaintiffs contend that the rates are consistent with the rates charged by attorneys with comparable litigation experience in Ohio (Doc. 63 at p. 14) and cite the attached declaration of H. Ritchey Hollenbaugh in support (Doc. 63–2). Plaintiffs do not assert that these rates represent the attorneys' normal hourly rates, but instead explicitly note that many of the attorneys, given their extensive experience and qualifications, could command even higher rates. (Doc. 63 at p. 14.) Further, while Plaintiffs suggest that courts are "free to look to a national market, an area of specialization market or any other market they believe appropriate to fairly compensate particular attorneys in individual cases," *Louisville Black Police Officers Org.,* 700 F.2d at 278, Plaintiffs do not argue that "out-of-town specialist" rates are being requested or were supplied to this Court, *see Hadix,* 65 F.3d at 535 (setting forth a two-part inquiry when fees are sought for an out-of-town specialist).

[10]    The Court does not include Plaintiffs' requested hourly rate for Attorney Brian Mellor from Project Vote. As noted, *supra,* Attorney Mellor did not sign his "declaration," and the Court cannot consider his unsworn statement. (Doc. 63–6 at p. 3.) Because of the absence of any competent evidence regarding Attorney Mellor's requested hourly rate or the reasonableness of the number of hours he expended on the litigation, the Court cannot award Plaintiffs any fees for the time that Attorney Mellor may have reasonably spent on this matter, and this amount will be reduced from Plaintiffs' requested amount. *See Granzier,* 173 F.3d at 577 (noting that the burden of proof is on the party seeking fees).

Similarly, the Court does not include Plaintiffs' requested hourly rate for Ellen Hepner of Perkins Coie, because Plaintiffs did not submit a biography for Ms. Hepner. (*See* Doc. 63–4.) Accordingly, the Court has no basis to confirm or deny the reasonableness of her requested rate. The Court does note that, based on the billing records submitted, it appears that Ms. Hepner may be a librarian, but that cannot be confirmed. (*Id.* at p. 20 .)

As an initial matter, upon a review of the requested hourly rates, the Court notes that it was somewhat concerned to realize that many of the rates requested by Plaintiffs are quite similar to the rates deemed reasonable for those practicing before courts in the District Court for the District of Columbia. *See Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354 (D.D.C.1983) (establishing the "Laffey Matrix," now frequently used to determine presumptively reasonable fees in Washington, D.C.); http:// www.laffeymatrix.com (last visited Mar. 30, 2009) (containing the current Adjusted Laffey Matrix); *see also Wade v. Kroger Co.,* No. 3:01CV–699, 2008 U.S. Dist. LEXIS 97200, at *31–32 (W.D.Ky. Nov. 20, 2008) (explaining that this on-line Laffey Matrix contains higher hourly rates than the Laffey Matrix maintained by the United States Attorney's Office for the District of Columbia). Although by no means dispositive, this does raise a number of flags for the Court. Election law, of course, is a difficult and worthy field, but there is no evidence before the Court that it is one known to command abnormally high billing rates. *See Luessenhop v. Clinton County,* 558 F.Supp.2d 247, 261 (N.D.N.Y.2008) (noting the award of an hourly rate of $225 in a "complicated election law case" to a lawyer whose practice was described as "unique"); *cf. Bryant v. Nighbert,* No. 03–183, 2005 U.S. Dist. LEXIS 37131, at *9 (E.D.Ky. Sept. 14, 2005) ("[A] reasonable rate is one which will attract qualified and competent counsel but will not produce a windfall to the attorneys.") (citing *Northcross,* 611 F.2d at 638).

Accordingly, in light of the seemingly high hourly rates requested by Plaintiffs—particularly given the similarity of those rates to the reasonable rates for one of the most profitable jurisdictions in which to practice law—and the absence of any request for "out-of-town specialist" rates, Plaintiffs must demonstrate why their requested rates are reasonable here in the Northern District of Ohio. *See Blackmore v. Misner,* No. 1:02–CV–33, 22005 U.S. Dist. LEXIS 25882, at *5

Project Vote v. Blackwell, Not Reported in F.Supp.2d (2009)

2009 WL 917737

(W.D.Mich. Oct. 20, 2005) ("It is the burden of the attorney seeking compensation to provide 'evidence supporting the hours worked and rates claimed.' ") (quoting *Hensley,* 461 U.S. at 433).

**\*13** After a thorough review of the parties' submissions, the Court finds that Plaintiffs have not met their burden. First, while the Court recognizes that Hollenbaugh's declaration is competent evidence submitted in support of Plaintiffs' request by a well-regarded Ohio expert in fee matters, with whose work the Court is familiar, the Court notes several deficiencies with the declaration and is not fully persuaded by his opinion. For example, Defendants are correct that Hollenbaugh's declaration is vague and conclusory, asserting that he has "reviewed the attorney declarations and itemized time records submitted in support of Plaintiffs' Motion for Attorneys' Fees in this case" and that it is his opinion that "the rates set forth in each of the declarations and attachments are reasonable for the nature of the legal action and based on the varying levels of experience of the attorneys involved." (Doc. 63–2.) There is no indication exactly what declarations or attachments Hollenbaugh reviewed, and upon close inspection, the Court notes that, given that he executed his declaration on March 21, 2008 (*id.*), Hollenbaugh could not have reviewed the declarations submitted by Attorneys McTigue, Nayak, Paradis, and Weiser, which were all executed after March 21, 2008 (Docs.63–5, 63–8, 63–9, 63–10). Further, the Court believes that Hollenbaugh's declaration does not adequately address the relevant legal inquiry: whether Plaintiffs' requested rates represent the prevailing market rates for lawyers of similar skill and reputation here in the Northern District of Ohio. Accordingly, while the Court does provide some deference to Hollenbaugh's affidavit, out of deference to his substantial experience in the area, the Court ultimately does not attach significant weight to the submission. *See Rau v. Apple–Rio Mgmt. Co.,* 1:97–CV–2345, 2000 U.S. Dist. LEXIS 20395, at \*11–12 (N.D.Ga. Mar. 29, 2000) ("[T]he weight the court gives to [this] affidavit is diminished by [the affiant's] failure to ... opine that the requested hourly rates of the plaintiff's attorneys are the prevailing rates for attorneys of their caliber for similar services in the Northern District of Georgia."); *Accord LeTourneau v. Pan Am Fin. Servs.,* No. 97–3543, 1998 U.S.App. LEXIS 20885, at \*12–13 (7th Cir. Aug. 21, 1998) (reversing a district court who awarded fees based only on a "self-serving" affidavit attesting that such fees were "reasonable"); *cf. Small v. Richard Wolf Med. Instruments Corp.,* 264 F.3d 702, 706 (7th Cir.2001) (affirming a district court that lowered billing rates after concluding that a supporting affidavit was unpersuasive).

Plaintiffs also are unpersuasive in their attempt to analogize to another recent case in this district. Plaintiffs point this Court to an affidavit filed in another election law action in this district. *See Boustani v. Blackwell,* No. 06–CV–2065 (N.D.Ohio 2006). That affidavit, however, did not opine on these attorneys or this case, did not address the appropriate hourly rate for summer associates, administrative staff, or of counsel, and was not actually relied upon by that court. (*Boustani,* No. 06–CV–2065, Docs. 23–4, 41.) For these reasons, while the Court notes and carefully considers that affidavit as well, the Court certainly does not consider it binding.

**\*14** Therefore, on this record, which is devoid of any evidence that Plaintiffs' requested hourly rates are reasonable in the Northern District of Ohio, that this particular case should be judged with reference to a national market or an "out-of-town specialist," or that the requested rates are what these particular attorneys ordinarily charge for their services, the Court cannot conclude that the Plaintiffs have met their burden of demonstrating that such high hourly rates are proper. In reaching this conclusion, the Court is mindful that "[t]he statutes use the words 'reasonable' fees, not 'liberal' fees." *Coulter,* 805 F.2d at 149 ("Under these statutes a renowned lawyer who customarily receives $250 an hour in a field in which competent and experienced lawyers in the region normally receive $85 an hour should be compensated at the lower rate."); *Robinson v. City of Edmond,* 160 F.3d 1275, 1288 (10th Cir.1998) ("Fee-shifting statutes ... do not permit an award of fees charged by 'the best attorneys that money can buy' if those rates exceed the prevailing market rate for similar services."); *Gratz v. Bollinger,* 353 F.Supp.2d 929, 947–948 (E.D.Mich.2005) ("[Section] 1988 only guarantees civil rights plaintiffs 'competent counsel.' "). *But see Cmtys. for Equity,* 2008 U.S. Dist. LEXIS 25640, at \*34 ("[E]specially in cases involving particularly complex issues ... [a] national market or a market for a particular legal specialization may provide the appropriate market.") (citation omitted). The Court has, accordingly, relied on its own experience; a careful review of all the parties' filings, including the declarations and submitted attorney biographies; and the Ohio State Bar Association 2007 Publication entitled "The Economics of Law Practice in Ohio" to set the appropriate hourly rates in this case.

Project Vote v. Blackwell, Not Reported in F.Supp.2d (2009)
2009 WL 917737

*Accord Barrett,* 2007 U.S. Dist. LEXIS 41555, at *25–26 (consulting the State Bar Association and relying on the court's own experience in determining a reasonable fee). As such, the Court will apply the following hourly rates [11] in this case:

[11]  The Court notes that it reduced the hourly rates for associates far more than for the partners with substantial relevant experience. This litigation required specialized skills, and although these hourly rates are still quite high for the Northern District of Ohio, the Court believes that lower rates would not adequately compensate such counsel. This rationale does not apply, however, to young associates. While these associates have assuredly bright futures, absent supporting documentation justifying these rates, the Court has no basis to compensate them at levels so far above their peers.

| Organization | Name | Title | Requested Hourly Rate |
|---|---|---|---|
| **Brennan Center for Justice** | | | |
| | Wendy Weiser | Partner | $310.00 |
| | Renee Paradis | Counsel (2003) | $165.00 |
| | Raj Nayak | Counsel (2003) | $165.00 |
| | Margaret Chen | Administrative Assistant | $100.00 |
| | Heather McGhee | Intern | $70.00 |
| | John Infranca | Intern | $70.00 |
| **McTigue Law Group** | | | |
| | Donald J. McTigue | Partner | $400.00 |
| | Mark A. McGinnis | Associate (2003) | $175.00 |
| **Project Vote** | | | |
| | Teresa James | Counsel | $200.00 |
| **Perkins Coie** | | | |
| | Robert Bauer | Partner | $450.00 |
| | Karl Sandstorm | Of Counsel | $450.00 |
| | Marc Elias | Partner | $340.00 |
| | Scott Gingold | Associate (1998) | $1750.00 |
| | Ezra Reese | Associate (2002) | $170.00 |
| | Patricia Alexander | Associate (2005) | $125.00 |
| | Kerri–Ann Anderson | Summer Associate | $70.00 |
| | Susan Cochard | Librarian | $80.00 |
| | Christopher Johnson | Summer Associate | $70.00 |
| | Lauren Lowe | Associate (2005) | $125.00 |

**ii. Reasonable Hours Expended**

**\*15** Defendants have objected to the number of hours that Plaintiffs' counsel have billed, primarily on the grounds that it appears to be unreasonably duplicative. While many of Defendants' concerns appear to be unfounded, the Court is troubled by a number of billing issues and will adjust the hours billed accordingly.

Defendants first assert that the case was "over-lawyered." They contend, for example, that it was unnecessary to use lawyers from outside the jurisdiction. (Doc. 67 at 12 ("Mr. McTigue and Mr. McGinnis, both Ohio attorneys, concentrate their practices on federal and state election and campaign finance law. It would seem, therefore, that they possessed the expertise to brief this case without reaching outside the state.").) They also point to numerous examples that they believe establish duplicative billing. For example, they note that five to seven attorneys regularly participated in conference calls, eight lawyers and one intern participated in drafting the Complaint, and six attorneys participated in preparing

2009 WL 917737

for the preliminary injunction hearing. These examples, upon close inspection, are not particularly troubling. This was a complex case that was litigated on an expedited time-frame, which justifies a somewhat higher than usual number of attorneys. Indeed, it is possible, in some circumstances, for a larger number of lawyers to be more efficient than a smaller number of lawyers.

On the other hand, this case involved twenty-one separate time-keepers spread across four different firms, which is an extraordinary number by any measure for a case that did not involve formal discovery. The Court notes that paying clients, for even the most complicated litigation, insist on a finite number of time-keepers devoted to any particular issue or task to ensure maximum efficiency. The Court is aware, for example, of one Fortune 100 firm that ordinarily will allow no more than two individuals to be involved in the actual drafting of any motion. While the use of so many time-keepers and law firms is not *per se* unreasonable, it raises substantial concerns where, as here, a party seeking fees has not provided back-up documentation attesting that the work could not have been done with less. *Accord Ky. Rest. Concepts Inc. v. City of Louisville,* 117 Fed. Appx. 415, 419 (6th Cir.2004) ("[T]wo law firms would have been sufficient as opposed to four.") The Court will, consequently, reduce the hours worked across-the-board by 10% to try and account for this inefficiency. *Accord id.* ("Plaintiffs are not entitled to have any number of well-qualified attorneys reimbursed for their efforts, when fewer attorneys could have accomplished the job.") (quoting the district court with approval); *see also Cleveland Area Bd. of Realtors v. City of Euclid,* 965 F.Supp. 1017, 1021 n. 5, 1022 (N.D.Ohio 1997) (deducting the request by 10% across-the-board for instances of excessive and duplicative work).

Once that adjustment is made, however, the number of hours billed by lawyers do not strike the Court as unreasonable. For example, one of Defendants' major concerns is that the attorneys billed over one-hundred hours to draft their successful motion for a preliminary injunction. (Doc. 67 at p. 5.) Yet, this was an exceedingly complicated motion. Contrary to Defendants' assertion, the Court finds this a fair measure of time to bill for such complicated work. [12]

[12] Defendants, for example, complain that Mr. McTigue billed 3.2 hours on the draft even after Perkins Coie lawyers had apparently completed it. (Doc. 67 at p. 5.) Although the Court notes an apparent clerical error reflecting the date of the work performed, there is nothing obviously unreasonable about this: Mr. McTigue was the expert on Ohio law. It would have been imprudent for him *not* to spend this time with such a critical brief, and imprudent for the original drafters not to seek confirmation that their positions on complicated areas of state law were supportable.

**\*16** The Court does note, however, that summer associates and interns have billed a substantial amount of time to this litigation. It appears, for example, that one summer associate from Perkins Coie billed fifty-eight hours drafting the motion for a preliminary injunction, which was then given to a relatively young associate who billed another thirty-five hours drafting this motion. As stated, the Court finds the total attorney time devoted to this motion to be generally reasonable and does not doubt that this summer associate added real value to that effort. Fifty-eight hours, however, is excessive, and the Court has similar concerns with the other summer associate on this case, as well as the interns from the Brennan Center for Justice (*see* Doc. 67 at p. 6 ("If the work product from the intern was such that the attorneys needed sixteen hours to rewrite it, there is no excuse for the Brennan Center trying to bill the intern's time.)). To account for these concerns, the Court will halve the amount of hours billed by the summer associates and interns.

The Court also notes that Defendants raise a valid concern with respect to a number of billing entries that were unrelated to the litigation. (Doc. 67 at p. 7.) Specifically, Defendants argue that Plaintiffs improperly attempt to bill for counsel's participation at various pre-litigation "administrative proceedings," which Defendants contend were not "reasonably necessary" to the litigation under the Supreme Court's standard set forth in *Webb v. Bd. of Educ. of Dyer County,* 471 U.S. 234, 242–43, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985). In response, Plaintiffs assert that the time spent by their counsel in attending these administrative hearings—which dealt with the third-party voter registration laws that were eventually challenged in this lawsuit—was reasonably necessary and cite in support *Chandler v. Vill. of Chagrin Falls,* No. 1:03–CV–2057, 2007 U.S. Dist. LEXIS 1223, at \*13–14 (N.D.Ohio Jan. 5, 2007) (awarding attorneys' fees for counsel's time prior to litigation at administrative proceedings that became adversary). Upon considering these arguments and the applicable law, the Court finds some merit to both parties' positions. While Defendants correctly point out that Plaintiffs' counsel

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5324 Filed 07/20/17 Page 54 of 121
Project Vote v. Blackwell, Not Reported in F.Supp.2d (2009)
2009 WL 917737

were not *required* to attend these hearings (*e.g.,* Plaintiffs did not have to exhaust any administrative remedies prior to filing this lawsuit), Plaintiffs' counsel's participation at the hearings was adversarial in a general sense, as the hearings took place after counsel had informed Defendants of the legal problems with the proposed interpretation of the voter registration laws and, further, was made in an attempt to avoid this litigation—certainly something the Court would encourage. Accordingly, on this record, and in its informed discretion, the Court will halve the amount of time billed by Plaintiffs' counsel spent attending the public hearings in question, in addition to the other adjustments to Plaintiffs' fee request outlined above. [13]

[13]  Specifically, the Court will deduct 2.85 hours from Attorney Nayak, 1.5 hours from Attorney McTigue, and 2.15 hours from Attorney James.

**\*17**  Beyond this, however, after a careful review of Defendants' other arguments and a close inspection of Plaintiffs' counsel's bills, the Court finds that the submitted time entries were reasonable under the circumstances. [14]

[14]  In this regard, the Court explicitly notes that it rejects Defendants' assertion that Attorney Paradis spent an unreasonable amount of time drafting Plaintiffs' summary judgment motion based on entries from October 2006. (*See* Doc. 67 at p. 6.) Plaintiffs submit that Attorney Paradis spent this time drafting much longer and more detailed motion papers, because at that point in the litigation, the case was still proceeding against then-Defendant Blackwell and that she could not have anticipated that the parties would later agree to rely on the parties' earlier briefs at the summary judgment stage. The Court notes that, as of October 2006, Attorney Paradis "believed the work to be reasonably expended in pursuit of success," and the hours in question should be awarded. *Woolridge v. Marlene Indus. Corp.,* 898 F.2d 1169, 1177 (6th Cir.1990), *overruled on other grounds by Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.,* 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001).

Accordingly, the Court will award the following number of hours [15] for each time-keeper:

[15]  The Court has rounded to the nearest whole number in the charts displayed in this opinion. **The Court used the exact provided numbers in its calculations.**

| Organization | Name | Title | Awarded Hours |
|---|---|---|---|
| *Brennan Center for Justice* | | | |
| | Wendy Weiser | Partner | 152 |
| | Renee Paradis | Counsel (2003) | 165 |
| | Raj Nayak | Counsel (2003) | 21 |
| | Margaret Chen | Administrative Assistant | 21 |
| | Heather McGhee | Intern | 10 |
| | John Infranca | Intern | 10 |
| *McTigue Law Group* | | | |
| | Donald J. McTigue | Partner | 131 |
| | Mark A. McGinnis | Associate (2003) | 45 |
| *Project Vote* | | | |
| | Teresa James | Counsel | 35 |
| *Perkins Coie* | | | |
| | Robert Bauer | Partner | 2 |
| | Karl Sandstrom | Of Counsel | 279 |
| | Marc Elias | Partner | 4 |

Project Vote v. Blackwell, Not Reported in F.Supp.2d (2009)

2009 WL 917737

| | | |
|---|---|---|
| Scott Gingold | Associate (1998) | 54 |
| Ezra Reese | Associate (2002) | 62 |
| Patricia Alexander | Associate (2005) | 68 |
| Kerri–Ann Anderson | Summer Associate | 30 |
| Susan Cochard | Librarian | 1 |
| Christopher Johnson | Summer Associate | 19 |
| Lauren Lowe | Associate (2005) | 1 |

**iii. Lodestar Calculation**

Therefore, based upon the above, the Court calculates the lodestar amount to be $312,925.00. Below is a quick-reference summary chart illustrating how the lodestar amount was calculated:

| Names | Title | Requested Rate | Awarded Rate | Requested Hours | Hours After Specific Reductions | Total Awarded Hours [*] | Total Compensation |
|-------|-------|---------------|--------------|-----------------|--------------------------------|-----------------------|--------------------|
| W. Weiser | Partner | 350 | 310 | 174 | 169 | 152 | $47,039 |
| R. Paradis | Counsel (2003) | 235 | 165 | 183 | 183 | 165 | $27,205 |
| R. Nayak | Counsel (2003) | 235 | 165 | 26 | 24 | 21 | $3,497 |
| M. Chen | Admin. Assistant | 140 | 100 | 23 | 23 | 21 | $2,106 |
| H. McGhee | Intern | 140 | 70 | 22 | 11 | 10 | $706 |
| J. Infranca | Intern | 140 | 70 | 23 | 11 | 10 | $718 |
| D. McTigue | Partner | 450 | 400 | 147 | 146 | 131 | $52,416 |
| M. McGinnis | Associate (2003) | 250 | 175 | 50 | 50 | 45 | $7,922 |
| T. James | Counsel | 200 | 200 | 41 | 38 | 35 | $6,903 |
| R. Bauer | Partner | 500 | 450 | 6 | 3 | 2 | $1,013 |
| K. Sandstorm | Of Counsel | 500 | 450 | 310 | 310 | 279 | $125,388 |
| M. Elias | Partner | 375 | 340 | 4 | 4 | 4 | $1,255 |
| S. Gingold | Associate (1998) | 250 | 175 | 60 | 60 | 54 | $9,466 |

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5326 Filed 07/20/17 Page 56 of 121
*Project Vote v. Blackwell, Not Reported in F.Supp.2d (2009)*
2009 WL 917737

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| E. Reese | Associate (2002) | 240 | 170 | 69 | 69 | 62 | $10,618 |
| P. Alexander | Associate (2005) | 175 | 125 | 76 | 76 | 68 | $8,561 |
| L. Lowe | Associate (2005) | 175 | 125 | 41 | 41 | 37 | $4,613 |
| S. Cochard | Librarian | 175 | 80 | 1 | 1 | 1 | $72 |
| C. Johnson | Summer Associate | 155 | 70 | 43 | 21 | 19 | $1,348 |
| K.Anderson | Summer Associate | 155 | 70 | 66 | 33 | 30 | $2,079 |
| | | | | | | | **$312,925.00** |

FN* Hours after specific reduction, reduced by ten percent.

### iv. The Twelve *Johnson* Factors

Having calculated the lodestar to be $312,925.00, the Court next must determine whether an adjustment should be made in light of the twelve *Johnson* factors. *See Hensley,* 461 U.S. at 430 n. 3; *Reed,* 179 F.3d at 471.[16]

[16]  As noted, the twelve *Johnson* factors are as follows:

> (1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

> *Reed,* 179 F.3d at 471 n. 3 (quoting *Johnson,* 488 F.2d at 717–19).

**\*18**  Upon review, the Court initially notes that a significant number of the factors weigh in favor of potentially enhancing the lodestar. In particular, the Court points out that the following factors suggest that Plaintiffs' counsel should be awarded a significant, if not a "fully compensatory fee":

(1) the time and labor required by the case;

(2) the novelty and difficulty of the questions presented;

(3) the skill needed to perform the legal service properly;

(7) the time limitations imposed by the client and the circumstances;

(8) the results obtained; and

(9) the experience, reputation, and ability of the attorneys.

*See Adcock–Ladd,* 227 F.3d at 349–50 (quoting *Hensley,* 461 U.S. at 435). As discussed, Plaintiffs' counsel achieved "excellent results" under considerable time limitations by presenting a novel theory in a previously undeveloped area of election law.

Here, however, the Court finds that the lodestar already incorporates the twelve *Johnson* factors and ultimately represents a reasonable attorneys' fee award for Plaintiffs. *See City of Burlington,* 505 U.S. at 562 (noting that there is "a strong presumption that the lodestar represents the reasonable fee"); *Hensley,* 461 U.S. at 434 n. 9 (noting that the twelve *Johnson* factors "are usually subsumed with the initial calculation of hours reasonably expended at a reasonable hourly rate"). Specifically, the lodestar already amounts to a substantial fee award based at least in part on a significant time commitment by a number of attorneys, several of whom had high hourly rates attributable to their experience and other qualifications—*i.e.,* the time, labor, skill, and experience required for counsel to successfully litigate this case already have been accounted for in the lodestar calculation. *See Adcock–Ladd,* 227 F.3d at 349 n. 8 ("Some of [the twelve *Johnson* ] factors ordinarily may be considered only when resolving the basic lodestar fee and thus cannot be used to augment that lodestar."). By contrast, if Plaintiffs' counsel had accomplished the same results in such a complex and novel case on an expedited basis with fewer and less experienced attorneys, then, in that situation, an enhancement to the lodestar may have been warranted. *See West v. Tyson Foods, Inc.,* No. 4:05–CV–183M, 2008 U.S. Dist. LEXIS 97928, at *7–11 (W.D.Ky. Dec. 3, 2008) (collecting "rare" and "exceptional" cases where courts enhanced the calculated lodestar). In this case, the lodestar has the effect of compensating items contemplated by the twelve *Johnson* factors.

Accordingly, the Court concludes that an adjustment to the lodestar is not appropriate, and Plaintiffs are awarded $312,925.00 for attorneys' fees.

#### b. Costs

Plaintiffs also request an award of costs and expenses in the amount of $10,808.32. As discussed above, costs and expenses that an attorney or law firm generally charge to the client are recoverable under the applicable fee shifting statutes. *See, e.g., Northcross,* 611 F.2d at 639; *Citizens Against Pollution v. Ohio Power Co.,* 484 F.Supp.2d 800, 815 (S.D.Ohio 2007); *Hall v. Ohio Educ. Ass'n,* 984 F.Supp. 1144, 1146 (S.D.Ohio 1997). The Court finds that most of the costs for which Plaintiffs request compensation are uncontroversial, sufficiently documented, and should be awarded as a matter of course. Certain expenses, however, are undocumented, excessive, or unnecessary.

#### i. Compensable Expenses

**\*19** It is well established that expenses such as travel (including airfare, milage, meal, and lodging), telephone bills, shipping and postage, photocopying, filing fees, and similar items are expenses necessarily incurred in the natural course of litigation and are recoverable. *See Say v. Adams,* No. 3:07–CV–377–R, 2009 U.S. Dist. LEXIS 23863, at *19–20 (W.D.Ky. Mar. 24, 2009) ("The Sixth Circuit has yet to address the issue of whether costs associated with computerized legal research are recoverable under § 1988. However, other circuit and district courts have awarded the costs associated with computerized research. *See Cleveland Area Bd. of Realtors, ... 965 F.Supp. at]* 1023 ... (compiling cases)."); *Cmtys. for Equity,* 2008 U.S. Dist. LEXIS 25640, at *75–76 ("The Third, Seventh, Tenth, and District of Columbia Circuit Courts of Appeal have all found these costs reasonable."); *Citizens Ins. Co. of Am. v. KIC Chem., Inc.,* No. 1:04–CV–385, 2007 U.S.

2009 WL 917737

Dist. LEXIS 73201, at *7 (reasoning that Westlaw and Lexis charges should be recoverable because they are routinely billed to clients and computerized legal research improves the quality of legal service and should be encouraged); *cf. Auto Alliance Int'l Inc.,* 155 Fed. Appx. at 228–29 (noting growing trend toward recoverability of cost of computerized legal research but affirming denial of award of such expenses for insufficient documentation). Furthermore, some courts exclude computerized legal research from recoverable expenses on the grounds that such research is either encompassed in the time the researching attorney billed or part of overhead. *See United States for the Use & Benefit of Evergreen Pipeline Constr. Co., Inc. v. Merritt Meridian Constr. Corp.,* 95 F.3d 153, 173 (2d Cir.1996); *Harco, Inc. v. Am. Nat'l Bank & Trust Co. of Chicago,* 38 F.3d 1429, 1440–41 (7th Cir.1994); *Standley v. Chilhowee R–IV Sch. Dist.,* 5 F.3d 319 (8th Cir.1993); *Weinberger v. Great N. Neekosa Corp.,* 801 F.Supp. 804, 827 (D.Me.1992).

The Court agrees with the line of recent authority finding computerized legal research recoverable. As even some of the cases cited for the alternative holding concede, computer research ultimately reduces the number of billable hours charged to the client.

> **\*20**  The added cost of computerized research is normally matched with a corresponding reduction in the amount of time an attorney must spend researching. Therefore, we see no difference between a situation where an attorney researches manually and bills only the time spent and a situation where the attorney does the research on a computer and bills for both the time and the computer fee.

*Harco,* 38 F.3d at 1040–41. In other words, even in *Harco,* where the court denied computerized legal research fees in the context of the cost analysis, it recognized the charges as compensable within the attorneys' fees context. This strikes the Court as mere semantics, and, moreover, as a matter of clarity and transparency, it seems more appropriate and accurate to characterize computerized legal research charges as expenses rather than attorneys fees. As the Sixth Circuit concluded in *Northcross,* 611 F.2d at 638–39, costs customarily passed along to the client which "aid in the effective practice of law" should be treated as reimbursable expenses under 42 U.S.C. § 1988. *Cmtys. for Equity,* 2008 U.S. Dist. LEXIS 25640, at *76. Westlaw and Lexis charges are just such an expense. Moreover, because they are typically billed to the client, computerized legal research charges should not be treated as overhead. Accordingly, the Court will award Plaintiffs their adequately documented expenses associated with computerized legal research.

Against this legal backdrop, the Court will proceed to scrutinize Plaintiffs' request for an award of $10,808.32.

First, Plaintiffs have submitted adequate documentation related to parking, travel, filing fees, docket fees, photocopying, telephone bills, postage, shipping, and computerized legal research in the amount of $9,394.20. [17]  Specifically, these expenses are supported by an affidavit or declaration of an attorney attesting to the authenticity of bills and records reflecting the reimbursements requested. Accordingly, $9,394.20 of expenses are compensable if reasonable. The remaining $1409.39 is attributable to two sources: (1) Attorney Brian Mellor, who requested $352.00 in travel expenses but did not sign his declaration or provide any documentation in support of the request; and (2) Attorney Elliot Mincberg, who requested $1,062.12 in expenses but did not provide *any* substantiation. Both of these request are denied *in toto* for insufficient documentation.

[17]  The Brennan Center for Justice submitted documentation in connection with travel in the amount of $643.92 for Attorney Nayak (Doc. 63–8) and $372.10 for Attorney Paradis (Doc. 63–9). In addition, Brennan Center Attorney Weiser submitted a request for $205.64 in telephone bills (Doc. 63–10). The McTigue Law Group submitted expense documentation in the amount of $1,676.67 in connection with travel, parking, *pro hac vice* fees, docket fees, and transcripts (Doc. 63–5). Attorney Karl Sandstrom of the law firm Perkins Coie LLP submitted expense documentation in the amount of $6,495.87 in connection with photocopying, telephone bills, travel, postage, shipping, and computerized legal research (Doc. 68–2).

Second, of the $9,394.20 in documented expenses, the Court finds that only $8,560.28 reflects the reasonable expenses incurred under the circumstances of this case. Defendants argue that Attorney Nayak requests $643.92 in travel expenses for a trip to Ohio that occurred before the Complaint was even filed in this case. Plaintiffs do not rebut this contention

Project Vote v. Blackwell, Not Reported in F.Supp.2d (2009)

2009 WL 917737

in their reply brief, and the Court finds Defendants' contention persuasive. Defendants also compellingly argue that the Brennan Center unnecessarily filed a costly *pro hac vice* motion for an attorney who never actively litigated in the Northern District of Ohio. This further reduces the expenses award by $190.00.

**\*21** Accordingly, the Court hereby awards Plaintiffs $8,560.28 in costs.

## III. *CONCLUSION*

For the foregoing reasons, the Court ***GRANTS IN PART*** Plaintiffs' motion and concludes that Plaintiffs are entitled to ***an award of attorneys' fees in the amount of $312,925.00*** and ***an award of costs in the amount of $8,560.28*** for ***a total award of $321,485.28.***

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 917737

---

End of Document © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5330 Filed 07/20/17 Page 60 of 121

Helfman v. GE Group Life Assur. Co., Not Reported in F.Supp.2d (2011)

2011 WL 1464678

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Thies v. Life Ins. Co. of North America, W.D.Ky., January 4, 2012

2011 WL 1464678

Only the Westlaw citation is currently available.

United States District Court,

E.D. Michigan,

Southern Division.

Joel HELFMAN, Plaintiff,

v.

GE GROUP LIFE ASSURANCE COMPANY, a foreign corporation, Genworth

Life and Health Insurance Company, a foreign corporation, and Sun

Life Assurance Company of Canada, a foreign corporation, Defendants.

No. 06–13528.

|

April 18, 2011.

**Attorneys and Law Firms**

J. Laevin Weiner, Tamara Fraser, Frank, Haron, Troy, MI, for Plaintiff.

James E. Brenner, Clark Hill, Francis R. Ortiz, Dickinson Wright, Detroit, MI, Kimberly J. Ruppel, Dickinson Wright, Bloomfield Hills, MI, for Defendants.

*ORDER*

VICTORIA A. ROBERTS, District Judge.

## I. INTRODUCTION

**\*1** This matter is before the Court on Plaintiff Joel Helman's motion for attorney's fees and supplemental motion for attorney's fees. These motions are **GRANTED IN PART AND DENIED IN PART.**

## II. BACKGROUND

On December 23, 2009, this Court entered an Order Granting in Part Plaintiff's Amended Motion for Attorneys Fees and Costs, (Doc. # 85), following the Sixth Circuit's decision that Sun Life Assurance Company of Canada ("Sun Life") terminated Helfman's long-term disability benefits arbitrarily and capriciously. *See Helfman v. GE Grp. Life Assur. Co., 573 F.3d 383, 396 (6th Cir.2009).* But, the Sixth Circuit held that the record did not clearly establish that Helfman was still disabled. The court remanded the case here and this Court remanded it to the plan administrator for a full and fair review. *Id.*

Helfman requested $81,046, representing the total amount of fees charged by his attorneys. (Doc. # 68). In its order, the Court found that Helfman was not entitled to: (1) the fees associated with his claim that ERISA did not apply; (2) any duplicate entries; and (3) the fees associated with his claims against Genworth. (*Id.* at 9).

Helfman then filed a revised affidavit and now seeks $60,251.25 in attorney's fees. (Doc. # 87). On December 15, 2010, Sun Life issued its re-determination of Helfman's benefits claim. Helfman sought disability benefits covering a forty-eight

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5331 Filed 07/20/17 Page 61 of 121

Helfman v. GE Group Life Assur. Co., Not Reported in F.Supp.2d (2011)

2011 WL 1464678

month period, from April 1, 2005 to April 3, 2009. Sun Life determined that Helfman was entitled to an additional six months of benefits, from April 1, 2005 to September 30, 2005, or $27,559.74. Helfman filed a Supplemental Motion for Attorneys Fees, seeking an additional $18,443.75 in attorney's fees purportedly incurred during the administrative review period. (Doc. # 97). Sun Life filed briefs in opposition to the amounts in both fee requests. The Court first addresses Helfman's original motion for fees and revised affidavit and then his supplemental motion.

## II. LEGAL STANDARD

"In an attorneys' fee case, the primary concern is that the fee awarded be 'reasonable.' " *Gonter v. Hunt Valve Co., Inc.,* 510 F.3d 610, 616 (6th Cir.2007) (citing *Reed v. Rhodes,* 179 F.3d 453, 471 (6th Cir.1999)). The award should be adequately compensatory to attract competent counsel but should also avoid producing a windfall for attorneys. *Adcock–Ladd v. Secretary of Treasury,* 227 F.3d 343, 349 (6th Cir.2000). "The trial court's initial point of departure, when calculating a 'reasonable' attorney fee, should be the determination of the fee applicant's 'lodestar,' which is the proven number of hours reasonably expended on the case by an attorney, multiplied by his courtascertained reasonable hourly rate." *Id.* The court may then adjust the "lodestar" based on relevant circumstances peculiar to the case. *Id.*

If the fee applicant has achieved only limited or partial success, "[a]n award based on the total number of hours reasonably expended on the litigation might [ ] result in an excessive amount." *Imwalle v. Reliance Med. Prods.,* 515 F.3d 531, 552 (6th Cir.2008) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). Work on an unsuccessful claim is not work "expended in pursuit of the ultimate result achieved" where plaintiff has presented distinct claims based on different facts and legal theories. *Id.* When a fee request is based, in part, on unsuccessful and distinct claims, the district court must reduce the fee award so that it is commensurate with "the degree of success obtained." *Hensley,* 461 U.S. at 436. "There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." *Id.* at 436–37. The district court has broad discretion to make these determinations. *Id.* at 437.

**\*2** In addition, "[t]he party seeking attorneys fees bears the burden of documenting his entitlement to the award." *Reed v. Rhodes,* 179 F.3d 453, 472 (6th Cir.1999). That party should submit evidence to support the number of hours worked and the rates claimed. *Id.* (citing *Hensley,* 461 U.S. at 433). The billing records submitted by Helfman's attorneys must "describe the work performed in sufficient detail to establish that the work is reasonably related to [Helfman's] claim that Sun Life acted arbitrarily and capriciously when terminating his benefits and to his defense to Sun Life's request for reimbursement]." *In re Pierce,* 190 F.3d 586, 593–94 (D.C.Cir.1999). Where documentation is insufficient to support the amount of fees requested, the district court may reduce the award accordingly. *Reed,* 179 F.3d at 472.

## II. ARGUMENTS AND ANALYSIS

### A. Helfman's Original Motion for Attorney's fees

In its Brief in Opposition, Sun Life alleges: (1) that Helfman did not adequately reduce his requested attorneys fees to reflect that he did not succeed on his claim that the administration of his disability benefits is not governed by ERISA, nor on his claims against Genworth; (2) that the revised affidavit contains duplicate entries; and (3) that Helfman's attorneys' hourly rates are excessive. (*Id.*) Sun Life says the maximum fee amount that Helfman should be awarded, at counsel's stated hourly rates, is $35,548.96, and that after reduction of the hourly rates the total fee award should be $30,853.61. (Doc. # 88, 6–7).

### 1. Reasonableness of Counsels' Hourly Rates

Sun Life contends that the hourly rates charged by Helfman's attorneys are excessive. (Doc. # 88, 6). It cites the 2007 Economics of Law Practice Report issued by the State Bar of Michigan in support of its claim that $200 per hour is an appropriate rate for his attorneys. (*Id.* at 6–7). Helfman responds that the rates charged are not excessive, are in fact

2011 WL 1464678

lower than those charged by Defendant, and that the Court should not rely on the median rate—which is not the true average—listed in a three year old report. (Doc. # 89, 6).

Generally, a reasonable hourly rate is calculated according to the prevailing market rates in the relevant community. *Stenson,* 465 U.S. at 895. The "relevant community" is the legal community within the court's territorial jurisdiction. *See Adcock–Ladd,* 227 F.3d at 350. "Such fees are different from the prices charged to well-to-do clients by the most noted lawyers and renowned firms in a region." *Coulter v. Tennessee,* 805 F.2d 146, 149 (6th Cir.1986).

Prevailing attorneys must justify the reasonableness of a requested fee award. *Stenson,* 645 U.S. at 896 n. 11. "To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence— in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.; see also Reed,* 179 F.3d at 472 (the party requesting the fee award bears the burden to produce evidence in support of the rates claimed); *Iley v. Metro. Life Ins. Co.,* No. 05–71273, 2007 WL 37740, at * 2 (E.D.Mich. Jan.4, 2007) ("Plaintiff, as the party requesting an attorney fee [,] has the burden of establishing that the hourly rates requested are based on comparable rates in the local community.").

 **\*3** The lead attorneys on the case were partner J. Laevin Weiner and associate Tamara Fraser. Mr. Weiner has been a member of the State Bar of Michigan since 1968; Ms. Fraser since 1994. (Rev. Aff. of J. Laevin Weiner ¶ 4, ¶ 7) Mr. Weiner requests compensation at the rates of $300/hour and, after January 2007, $350/hour. (*Id.* at ¶ 6) Ms. Fraser requests compensation at the rates of $195/hour, $200/hour, and later $225/hour. (*Id.* at ¶ 7) Five other attorneys performed work on the case, with experience ranging from six to sixteen years, at requested rates of $200/hour to $275/hour. (*Id.* at ¶ 8)

Helfman's Motion and supporting affidavit do not provide evidence that his attorneys' requested rates "are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Stenson,* 645 U.S. at 896 n. 11. Rather, Mr. Weiner's affidavit states, in a conclusory manner, that he believes the rates charged to be reasonable in the current marketplace given counsels' experience. (*Id.* at ¶ 6, ¶ 7). Helfman's Motion and counsel's supporting affidavit do not provide any information that would aid the Court in determining the prevailing market rate in southeastern Michigan for counsel competent in employment law and ERISA matters with comparable skill, experience and reputation. *See Blajei v. Sedgwick Claims Mgmt. Servs., Inc.,* No. 09–13232, 2010 WL 3855239, at *10–*11 (E.D.Mich. Sept.28, 2010) (unpublished) (reducing an attorney's rate from $325/hour to $275/ hour after finding that Plaintiff's Motion and supporting affidavit were "deficient" in establishing that the hourly rates requested were commensurate with rates in the local community).

In *Blajei,* this Court independently researched and reviewed several recent opinions from this district where the court awarded attorney's fees in an ERISA denialof-benefits case. *See id.* at *11. Based on its independent assessment, the Court found that $325/hour, for a "top" ERISA attorney with over forty years of experience, was too high. *See id.* (citing *Andrews v. Prudential Ins. Co. of Am.,* No. 08–14391, 2010 WL 1257784, at *2 (E.D.Mich. Mar.29, 2010); *Kramer v. Paul Revere Life Ins. Co.,* No. 04–74362, 2009 WL 2849067, at *7 (E.D.Mich., Sept.1, 2009); *Iley v. Metro. Life Ins. Co.,* No. 05–71273, 2007 WL 37740, at *2 (E.D.Mich. Jan.4, 2007)). This attorney, like Mr. Weiner, had over forty years experience as a practicing attorney. *Id.* He was rated "AV Preeminent" by Martindale Hubbell, and was named a "Top Lawyer" in ERISA law by DB Business Journal. *Id.* Nevertheless, the Court found the reduction warranted based on the attorney's failure to satisfy his burden to establish comparable local rates and based on its own review of those rates. *Id.*

Accordingly, the Court lowers Mr. Weiner's rate to $275/hour when determining Plaintiff's lodestar. On the other hand, the requested rates of Ms. Fraser and the other attorneys of record, all at or under $275/hour, appear reasonable based on their years of experience at the law firm and this Court's review of relevant case law.

### 2. Calculating Plaintiff's Lodestar

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5333 Filed 07/20/17 Page 63 of 121
Helfman v. GE Group Life Assur. Co., Not Reported in F.Supp.2d (2011)
2011 WL 1464678

**\*4** Helfman's records show that Mr. Weiner spent 58.75 hours litigating this action, after making reductions to account for Helfman's claims against Genworth and that ERISA did not govern the administration of his benefits. Applying counsels' hourly rates to their hours of work, Helfman's lodestar is $56,182.50.

### 3. Reduction of Plaintiff's Lodestar

The calculation of Helfman's lodestar does not end the inquiry. *See Hensley,* 461 U.S. at 434. "There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the 'result obtained.' This factor is particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief." *Id.* (internal citation omitted). The Court next considers the impact of Helfman's limited success on his lodestar, as well as the adequacy of his billing records.

### i. Limited Success, Vague Billing and "Block Billing"

Sun Life's next contention is that Helfman failed to adequately reduce his requested attorneys fees to account for the fact that his claims against Genworth, and his contention that ERISA did not apply to the administration of his benefits, were unsuccessful. (Doc. # 88, 2)

Sun Life states that there were four issues litigated: (1) whether ERISA applied to the Sun Life policy; (2) whether ERISA applied to the Genworth policy; (3) whether Sun Life's decision to terminate payment of Helfman's disability benefits was arbitrary and capricious; and (4) whether Helfman owed reimbursement to Genworth for overpayment of benefits. (*Id.* at 1). Helfman succeeded on only the third issue, Sun Life alleges.

Sun Life argues that the revised invoices reflect 123.5 hours of attorney time representing tasks associated with overlapping claims against Sun Life and Genworth, and to combined issues in the case, for a total of $31,611.16. (*Id.* at 5). This amount, Sun Life argues, must be reduced by seventy-five percent because Helfman did not prevail on three of the four issues. (*Id.*).

Helfman responds that it would be improper to reduce his attorney's fees by seventy-five percent for entries that cover tasks pertaining to claims other than Sun Life's termination of Helfman's benefits. He argues that Sun Life's mathematical approach lacks integrity for three reasons. (Doc. # 89). Specifically, Helfman contends:

(1) Sun Life brought a claim against Helfman for reimbursement of benefits, which was denied, meaning that Helfman succeeded on two of five claims, rather than one of four; it is misleading to state that Helfman's claims regarding the applicability of ERISA to his Sun Life and Genworth policies are two separate claims for purposes of calculating a fee award because the issue, research, and drafting were the same for both defendants; and (3) Sun Life's mathematical approach fails to take into account that Helfman's claim that Sun Life acted arbitrarily and capriciously required more factual and legal investigation than the other claims. (*Id.* at 2).

**\*5** Helfman argues that a fifty percent reduction for tasks relating to both Sun Life and Genworth is not warranted because "the bulk of the substance of the case was directly related to the claim against Sun Life," and to the extent a time entry reflected work relating to both Sun Life and Genworth, the appropriate reductions were made. (*Id.* at 3) Helfman says further, "to the extent an entry equally corresponded to both Defendants, and that fee would have been incurred regardless of whether GE was in the lawsuit, that amount was not reduced...." (*Id.*).

In its December 23, 2009 Order the Court instructed Helfman to exclude the fees associated with his losing claims. (Doc. # 85, 9) This is in line with Sixth Circuit case law upholding district court decisions to deny the award of attorney's fees to parties who did not prevail on their claims. *See, e.g., Cattin v. General Motors Corp.,* 955 F.2d 416, 427 (6th Cir.1992) ( "Plaintiffs were not the prevailing party on the ERISA claim, and, therefore, it was not an abuse of discretion to deny

plaintiffs' motion for attorney's fees."); *see also Nadeau v. Helgemoe,* 581 F.2d 275, 279 (1st Cir.1978) ( "[T]he amount of attorney's fees [plaintiffs] receive should be based on the work performed on the issues in which they were successful.").

In *Hensley,* the Supreme Court held that the degree of a plaintiff's success is a "crucial factor" in determining what amount of attorney's fees to award. 461 U.S. at 440:

> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants ... counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved." ... The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

461 U.S. at 434–35.

The Court also recognized that in some cases the plaintiff's "claims for relief will involve a common core of facts or will be based on related legal theories." *Id.* at 435. When this occurs, counsel's time is devoted more generally to the litigation as a whole, "making it difficult to divide the hours expended on a claim-by-claim basis." *Id.* In these instances, "[the] lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.* "In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the law suit." *Id.* "Where a plaintiff has obtained excellent results, his attorney should recover a full compensatory fee." *Id.*

**\*6** Helfman's case falls into the first category. Helfman's claim that ERISA did not apply to the administration of his benefits and his claim that Sun Life unlawfully terminated his benefits are distinct; their resolution requires the analysis of different facts and law. Moreover, the result achieved thus far, though favorable to Helfman, is not "excellent." *Id.* The claims administrator might still deny Helfman's request for benefits after a full and fair review. *Cf. Richard v. Oak Tree Grp. Inc.,* No. 1:06–362, 2009 WL 3234159 (W.D.Mich. Sept.30, 2009) (unpublished) (attorney's fee request reduced by eighty-five percent in part because plaintiffs only prevailed on a minor claim, and were awarded minimal statutory damages of $50.00, such that the award of $20,550.00 in attorney's fees "would be a windfall to plaintiff's attorney."). As the Supreme Court opined in *Hensley,* a fee award must be proportional to "the extent of a plaintiff's success." 461 U.S. at 440.

The Court agrees with Helfman that, under the circumstances of this case, the seventy-five percent reduction advanced by Defendant would not adequately reflect the amount of time Helfman's attorneys spent litigating his claim that Sun Life acted arbitrarily and capriciously. *See, e.g., Hensley,* 461 U.S. at 435 n. 11 ("We agree with the District Court's rejection of 'a mathematical approach comparing the total number of issues in the case with those actually prevailed upon.' ... Such a ratio provides little aid in determining what is a reasonable fee in light of all the relevant factors."). Helfman emphasizes that this claim required extensive research and "review and digestion of the medical evidence contained within Sun Life's voluminous administrative record." (Doc. # 89, 2). The ERISA claim and Genworth's claim for reimbursement did not require a substantial amount of administrative record review or other factual investigation. Likewise, Sun Life's seventy-five percent reduction fails to take into account that Helfman prevailed on Sun Life's counter-claim for reimbursement and that the ERISA claims against both defendants required the same legal research.

On the other hand, after reviewing the invoices submitting by Helfman to support his fee request, the Court finds that Helfman's attorneys have not satisfied their burden to produce adequate evidence that the fees requested are associated with only the claim on which Helfman prevailed. For example, one invoice states that on November 18, 2008, TEF spent five hours on "Continued research and appeal preparations; lengthy in office conference with JLW re issues on appeal." (Doc. # 87, Exh. 1, 11/18/08). Helfman's billing records include various additional vague entries where hours were not reduced, including, "Internet and westlaw research" for three hours; (*id.* on 11/13/08). "Review of additional

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5335 Filed 07/20/17 Page 65 of 121

Helfman v. GE Group Life Assur. Co., Not Reported in F.Supp.2d (2011)
2011 WL 1464678

case law, in office conference with JLW" for two and a half hours; (*id.* on 12/02/08) and "Telephone conference with client," (*id.*) among others. Other entries reference time spent preparing for oral argument before the Court of Appeals, reviewing briefs and recent cases, and arguing the issues before the Court of Appeals, without indicating what the preparation entailed, what issues the briefs and recent cases addressed, and what amount of time was spent arguing the winning versus losing issues. (*Id.* on 6/02/09–6/18/09).

**\*7** In *Imwalle,* the Sixth Circuit discussed the requirement that attorneys seeking fee reimbursement provide district courts with adequate billing statements. 515 F.3d at 553. The *Imwalle* court said:

The key requirement for an award of attorney fees is that "the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine *with a high degree of certainty* that such hours were actually and reasonably expended in the prosecution of the litigation." *United Slate,* [*Tile & Composition Roofers v. G & M Roofing,* 732 F.2d 495, 502 n. 2 (6th Cir.1984) ]. Where the documentation is inadequate, the district court may reduce the award accordingly. *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1933.

\* \* \*

Courts in this Circuit have reduced attorney fees on the basis of insufficient billing descriptions where the attorney did not "maintain contemporaneous records of his time or the nature of his work," *Keener v. Dep't of the Army,* 136 F.R.D. 140, 147 (M.D.Tenn.1991), *aff'd on the decision of the district court by Keener v. Dep't of the Army,* No. 91–5442, 1992 WL 34580, 1992 U.S.App. LEXIS 2822 (6th Cir. Feb.24 1992), and where billing records "lumped" together entries under one total so that it was "impossible to determine the amount of time spent on each task." *Cleveland Area Bd. of Realtors [v. City of Euclid,* 965 F.Supp. 1017, 1021 (N.D.Ohio 1997) ].

*Id.* (emphasis added).

Helfman's invoices make it impossible for the Court to ascertain whether the reductions he made are sufficient to account for the issues and claims on which he did not prevail. These vague entries—though some could pertain solely to the arbitrary and capricious claim—could apply to the ERISA issue. The billing records submitted are not adequate for the Court to determine "with a high degree of certainty" that the time claimed was actually and reasonably spent in pursuit of Helfman's claims that Sun Life acted arbitrarily and capriciously when it terminated his disability benefit payments, and that Sun Life was not entitled to reimbursement for benefits paid while Genworth was paying same. *See Keener,* 136 F.D.R. at 147 (citing *United Slate,* 732 F.2d at 502–03 n. 2).

While the Court recognizes that plaintiff's counsel is not required to provide a detailed record of how every minute of his time on the case is spent, counsel should identify the general subject matter of his time expenditures. *Hensley,* 461 U.S. at 436 n. 12. Entries such as "Internet and westlaw research" and "Telephone conference with client" do not identify the subject matter of the time expenditure. Such imprecise entries fail to identify the issue and Defendant(s) being addressed. They are problematic where Plaintiff achieved only limited success. Thus, the Court is constrained to find in Defendant's favor and reduce Helfman's lodestar amount accordingly.

**\*8** The common practice in this circuit, and in others, when the court is confronted with a request for the award of attorney's fees in the face of inadequate billing records, is "across-the-board fee reductions." *See City of Euclid,* 965 F.Supp. at 1021 n. 5, and cases cited therein; *Gratz v. Bollinger,* 353 F.Supp.2d 929, 938 (E.D.Mich.2005) ("The Court cannot possibly determine from Plaintiffs' billing statements the amount of hours expended on this issue as opposed to the 'narrowly tailored' issue on which they prevailed. The Court therefore opts to reduce the hours expended by a percentage amount."); *Pierce,* 190 F.3d at 593–94 (imposing a ten percent fee reduction where fee petitioner's billing records included generalized entries such as "Various calls" and "Review of materials," making it impossible for the court to determine the reasonableness of the billings in terms of necessity and amount of time expended).

2011 WL 1464678

The Court reduces the total fee requested by twenty percent. This is appropriate in light of Helfman's burden of production and in light of the "block billing" and vague entries included in the billing records which make it impossible for the Court to determine whether adequate reductions were made. *See, e.g., Bollinger,* 353 F.Supp.2d at 939 (reducing award of attorneys fees by ten percent to account for vague billing entries such as "research," "office conference," and "review article" and for block billing, and by fifty percent to account for plaintiffs' limited success); *City of Euclid,* 695 F.Supp. at 1021 ("The total request is reduced by 10% for this insufficient documentation."); *Ragin v. Harry Macklowe Real Estate Co.,* 870 F.Supp. 510, 521 (S.D.N.Y.1994) ("In light of the numerous entries which contain insufficient descriptions of the work done, a lack of contemporaneous records for a significant number of hours, duplicative billing and other errors found throughout the record, there will be a reduction of the lodestar by 30%.").

The Court takes into consideration Helfman's contention that his claim that Sun Life arbitrarily terminated his benefits required extensive factual and legal investigation as opposed to his other, more straightforward claims. The ERISA issue was important, but this claim was at least equally important; Helfman's success may result in retroactive reinstatement of his disability benefits. Thus, a larger reduction is not warranted. *Compare Bollinger,* 353 F.Supp.2d at 938 (reducing a fee request by fifty percent where plaintiffs failed to prevail on their primary argument, an issue of historical significance).

Moreover, Helfman's attorneys' billing records were kept contemporaneously and, while often overly generalized, they are not indecipherable. *Compare Richard,* 2009 WL at *3 (applying an eighty-five percent reduction where an attorney's bills were "cryptic and nearly unintelligible"); *Keener,* 13 F.R.D. at 147–50 (denying altogether an attorney's fee request where the attorney admitted to sloppy record-keeping practices, including keeping records on napkins and failing to maintain contemporaneous records of his time and the nature of his work).

**\*9** Helfman's lodestar is reduced by twenty percent because the Court cannot conclude, with a high degree of certainty, that the reductions made pursuant to this Court's December 23, 2009 Order adequately account for the limited nature of Helfman's success.

### ii. April 15, 2008 Time Entry

Sun Life next contends that the revised invoices contain two duplicate time entries on April 15, 2008, reflecting a task performed by two attorneys. (Doc. # 88, 3) Helfman responds that two lawyers may confer and both bill on a case for intra-office conferences, which keep legal fees down because they facilitate the use of junior, less-expensive attorneys. (Doc. # 89)

The Court agrees with Helfman. This is a common practice to keep costs down and the amount of time that was spent conferring, ninety minutes, is not excessive. Other courts sanction this practice. *See, e.g., McGrath v. City of Nevada,* 67 F.3d 248, 255 (9th Cir.1995); *Baughman v. U.S. Liability Ins. Co.,* 723 F.Supp.2d 741, 750–51 (D.N.J.2010); *Lenihan v. City of New York,* 640 F.Supp. 822, 826 (S.D.N.Y.1986); *Veterans Educ. Project v. Secretary of the Air Force,* 515 F.Supp. 993, 994 (D.D.C.1981).

### iii. August 16, 2006 Time Entry

Sun Life contends that TEF's August 16, 2006 time entry should be stricken in its entirety because it relates solely to Helfman's claims against Genworth and/or his losing ERISA argument. (Doc. # 88, 9). Helfman responds that research into whether preemption might apply to an ERISA claim is necessary for any disability benefit case. (Doc. # 89, 5). The Court agrees with Sun Life. The issue on which it prevailed is entirely divorced from any potential ERISA pre-emption issue. Accordingly, the Court deducts this entry of 0.75 hours, at a rate of $195/hour, or $146.25, from Helfman's lodestar.

### B. Helfman's Supplemental Motion for Attorney's fees

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5337 Filed 07/20/17 Page 67 of 121
Helfman v. GE Group Life Assur. Co., Not Reported in F.Supp.2d (2011)
2011 WL 1464678

In his supplement, Helfman seeks an award of $18,443.75 for over sixty more hours of work in connection with his administrative remand. Sun Life contends that because Helfman was only awarded benefits for an additional six month period, out of a possible forty-eight, he achieved only 12.5% success. As result, Sun Life says, he should be awarded no more than 12.5% of the reasonable fees that were incurred in connection with the remand. Sun Life invites the Court, however, to reweigh the *Sec'y of Dep't of Labor v. King,* 775 F.2d 666 (6th Cir.1985) factors as they apply to the administrative remand process, and to conclude that they weigh in favor of Sun Life this time, such that Helfman should not be awarded any additional fees. Sun Life also argues that $1,606.25 of the fees, for time purportedly spent discussing settlement, should not be awarded because it is unsupported by counsels' invoice. Finally, Sun Life contends that counsels' hourly rates must be reduced. Sun Life says the Court should award Helfman's attorneys no more than $1,500.

In reply, Helfman says the entries on the invoice pertaining to the $1,606.25 were redacted due to their confidential nature and that support for this amount is contained in J. Laevin Weiner's affidavit. Helfman further states that the $1,606.25 pertains to the administrative remand because but for Sun Life's failure to adequately review his claim in the first place, there would have been no need for settlement discussions. Helfman also takes issue with Sun Life's contention that the *King* factors do not warrant an award of fees related to the administrative remand period. Finally, Helfman contends the Court is not bound by orders from this district where fee awards were reduced based on the degree of success obtained.

### 1. Reconsideration of the *King* Factors

**\*10** The Court declines Sun Life's invitation to reconsider the *King* factors in relation to the administrative remand. That process is a part of the overall case, and the factors that weighed in Helfman's favor when the Court first awarded fees, continue to weigh in Helfman's favor in connection with the administrative remand process; he is entitled to attorney's fees for the work done on remand. The question remains, however, is he entitled to all of the fees requested, or should they be reduced for any or all of the reasons listed in Sun Life's opposition?

### 2. The $1,606.25 Amount

The Court agrees with Sun Life that Helfman is not entitled to $1,606.25 in fees which purportedly corresponds to time spent in confidential settlement meetings. The Court agrees with Helfman that he should not have to reveal confidential information to be entitled to an award of fees. However, Helfman's attorney's affidavit does not reveal how many hours were spent by each partner in settlement talks. The Court could not discern the number of hours from the blacked out portions of the billing records; the Court's calculations do not comport with the fee requested in the affidavit. Helfman is not entitled to $1,606.25.

### 3. Calculating Plaintiff's Lodestar

The Court already determined the appropriate hourly rates for the attorneys who worked on the administrative remand. Applying these rates to the number of hours spent litigating Helfman's administrative case brings Helfman's lodestar to $14,737.50.

### 4. Reduction Based on Degree of Success

In *Blajei,* 2010 WL 3855239, at *12, this Court held that a plaintiff's attorney's fees award should be proportional to the degree of success on the merits. That case also involved an ERISA disability claimant who was denied benefits without a full and fair review, and whose case was remanded to the plan administrator to determine if she was entitled to benefits. *Id.* at * 1.

Helfman v. GE Group Life Assur. Co., Not Reported in F.Supp.2d (2011)
2011 WL 1464678

It is appropriate for the Court to reduce the amount of fees requested by Helfman in connection with his administrative remand, so that it is proportional to his degree of success on the merits. As Sun Life points out, Helfman sought benefits for a forty-eight month period, but obtained only six month's worth. This constitutes "some degree of success on the merits," but only partial success, namely, 12.5%. Accordingly, the Court reduces Helfman's lodestar by 87.5%. He is entitled to $1,842.19 in attorney's fees in connection with the remand.

## III. CONCLUSION

Plaintiff's request for Attorney's Fees is **GRANTED IN PART AND DENIED IN PART.**

With respect to Plaintiff's original motion, the Court reduces Helfman's lodestar of $56,182.50 by twenty percent ($56,182.50 x 20%), bringing his fee award to $44,946.00. From this, the Court subtracts his August 16, 2006 fee request ($44,946–$146.25), for a fee award of $44,799.75.

With respect to Plaintiff's supplemental motion, the Court reduces Helfman's lodestar by 87.5% ($14,737.50 x 87.5%), bringing his fee award to $1,842.19.

 **\*11** Sun Life is ordered to pay **$46,641.94** ($44,799.75+$1,842.19). Payment must be made within 30 days of the date of this Order.

**IT IS ORDERED.**


**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1464678

---

End of Document <span style="float:right">© 2017 Thomson Reuters. No claim to original U.S. Government Works.</span>

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2 PageID.5339 Filed 07/20/17 Page 69 of 121
Crown Enterprises Inc. v. City of Romulus, Not Reported in N.W.2d (2011)
2011 WL 1687625

2011 WL 1687625
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

CROWN ENTERPRISES INC, Plaintiff–Appellee,

v.

CITY OF ROMULUS, Defendant–Appellant,

and

American Diesel Truck Repair Inc, Ruben Chacon, and Juan Molinia, Defendants.

Docket No. 286525.
|
May 3, 2011.

West KeySummary

1    **Municipal Corporations** ⬥ Costs

Award of $186,679 to owner of a truck terminal as an attorney's fee was unreasonable based on the degree of success obtained by owner in suit against city. Although owner was able to secure a temporary restraining order (TRO) ordering city to remove physical barricades it erected on a vacated street to prevent owner from routing commercial trucks to its truck terminal, city's zoning ordinance continued to preclude commercial trucks from legally driving on that street. Therefore, due to owner's limited success and the fact that the city's due process violation in erecting the barricades caused no real damages, a reasonable attorney's fee should have been limited to legal fees owner incurred through obtaining the TRO. 42 U.S.C.A. § 1988.

Cases that cite this headnote

Wayne Circuit Court; LC No. 05–519614–CZ.

Before: BECKERING, P.J., and MARKEY and BORRELLO, JJ.

ON REMAND

PER CURIAM.

*1 Plaintiff brought this action after the city of Romulus erected barriers to prevent plaintiff from using an unimproved, vacated street named Harrison Avenue for the purpose of accessing its truck terminal. The trial court dismissed all of plaintiff's legal theories except finding a violation of procedural due process under 42 USC 1983 in the city's initial action of precluding plaintiff's use of the easement without notice or an opportunity for hearing. This Court reversed, finding that plaintiff had abandoned its easement, and therefore, the city could not have deprived plaintiff of any property rights

without due process. *Crown Enterprises, Inc v. City of Romulus,* unpublished opinion per curiam of the Court of Appeals issued May 20, 2010 (Docket No. 286525). Our Supreme Court reversed in an order that reads as follows:

> [W]e REVERSE the judgment of the Court of Appeals on the issue of the abandonment of an easement for the reasons stated in the Court of Appeals concurring opinion and on the issue of the overburdening of a servient estate. While the Court of Appeals was correct that the plaintiff's use of the easement overburdened the servient estate, it provided no support for the proposition that such an act results in an automatic extinguishing of the easement right when the owner of the servient estate is not the complaining party. Therefore, we REINSTATE the decision of the Wayne Circuit Court that the plaintiff had an easement right in Harrison Road, that the defendant interfered with that right without notice and an opportunity to be heard and that, as a consequence, the plaintiff's due process rights were violated. In addition, we REMAND this case to the Court of Appeals for consideration of whether the award of attorney fees under 42 USC 1988 was reasonable under all of the circumstances of this case. [*Crown Enterprises, Inc. v. City of Romulus,* 488 Mich. 1025, 1026, 792 N.W.2d 342 (2011).]

## I. STANDARD OF REVIEW

This Court stated the standard for appellate review of a trial court's award of attorney fees under 42 USC 1988 in our prior opinion, *Crown Enterprises, supra,* slip op at 8:

> When contemplating an award of attorney fees under 42 USC 1988(b), [2] a court must employ a two-step analysis. The court must first determine whether a plaintiff seeking attorney fees is the "prevailing party." *Texas State Teachers Ass'n v. Garland Independent School Dist.,* 489 U.S. 782, 789, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989) ("no fee award is permissible until the plaintiff has crossed the 'statutory threshold' of prevailing party status"). Whether a plaintiff is a "prevailing party" is a question of law appellate courts review de novo. *Outdoor Systems, Inc. v. City of Clawson,* 273 Mich.App. 204, 209, 729 N.W.2d 893 (2006); *Radvansky v. City of Olmsted Falls,* 496 F.3d 609, 619 (C.A.6, 2007).

---

[2]     42 USC 1988(b) provides in pertinent part: "In any action or proceeding to enforce [various federal statutes, including 42 USC 1983] ... the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs...."



> Second, an appellate court must review for an abuse of discretion the reasonableness of an attorney fee awarded to a "prevailing party." *Cramblit [v. Fikse,* 33 F.3d 633, 634 (C.A.6, 1994) ]. "Abuse of discretion exists only when a district court relies upon clearly erroneous factual findings, applies the law improperly, or uses an erroneous legal standard." *DiLaura v. Ann Arbor Twp.,* 471 F.3d 666, 671 (C.A.6, 2006) (citations and quotation marks omitted). [3] The degree of success a plaintiff achieves is the most important factor in determining a reasonable attorney fees under 42 USC 1988. *Farrar v. Hobby,* 506 U.S. 103, 114, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). When a plaintiff wins only nominal damages, a reasonable attorney may be no fee at all. *Id.* at 115; *Cramblit,* 33 F.3d at 635–636.

---

[3]     Federal law governs plaintiff's federal constitutional right to due process and its 42 USC 1983 claim. *Markis v. City of Grosse Point Park,* 180 Mich.App. 545, 553, 448 N.W.2d 352 (1988). An abuse of discretion occurs under Michigan law when the trial court's decision is outside the range of principled outcomes. *Taylor v. Currie,* 277 Mich.App. 85, 99, 743 N.W.2d 571 (2007).

_____

## II. FACTS AND PROCEEDINGS

In an opinion and order issued May 30, 2008, the trial court awarded plaintiff an attorney's fee of $186,679.58 for work on this case through the issuance of an injunctive order on February 17, 2006. The court determined that plaintiff was a "prevailing party" under § 1988:

> Plaintiff prevailed on its procedural due process claim when the court ruled that Defendant's placement of barricades on Harrison Avenue in 2005 constituted a procedural due process violation, providing a basis for a cause of action pursuant to 42 U.S.C. § 1983 and an award of attorney fees pursuant to § 1988. *Pouillon v. Little,* 326 F.3d 713, 716 (6th Cir.2003).

\* \* \*

> In the case at bar, the Court's order enjoining Defendant from interfering with Plaintiff's use of Harrison Avenue as ingress to and egress from its truck terminal resolved the dispute initiated by Defendant's barricade of Harrison Avenue and affected Defendant's behavior toward Plaintiff.

The trial court then determined a reasonable attorney's fee to award under § 1988. The trial court discussed *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), and quoting *Hensley,* opined that "[w]here the plaintiff's successful and unsuccessful claims are based on 'a common core of facts' and 'related legal theories,' the lawsuit cannot be viewed as a series of discrete claims, and the court should focus on the 'significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.' " The trial court then parsed plaintiff's various claims as follows:

> Plaintiff alleged related claims seeking relief for the same course of conduct, Defendant's barricading of Harrison Avenue to prevent Plaintiff's use of the road to access its truck terminal. Plaintiff obtained relief, prevailing on the federal constitutional claim of a procedural due process violation when the Court granted its motion for preliminary injunctive relief and found that Defendant's placement of barricades to block access was without legal justification.... It is Plaintiff's success on the due process claim that entitles it to attorney's fees pursuant to § 1983 and § 1988.

> **\*3** Plaintiff's choice to pursue its easement rights under state law after establishing the due process violation and remedying the course of conduct that gave rise to this litigation, though successful, removes the easement claim from the purview of § 1988 attorney fee eligibility. Alternatively, Plaintiff cannot be considered a prevailing party entitling it to attorney's fees beyond February 17, 2006.

> Therefore, Plaintiff's total requested fee of $242,700.41 is reduced by $54,333.33, the latter figure reflecting all fees, in every category, incurred after February 17, 2006. Plaintiff's request for attorney's fees is granted in the amount $186,679.58.

Defendant filed a motion for reconsideration on June 13, 2008, which the trial court denied on June 19, 2008. This appeal followed.

## III. ANALYSIS

Applying the Supreme Court's analysis in *Farrar,* 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494, we conclude that the trial court correctly ruled that plaintiff achieved the status of "prevailing party" under § 1988. But we also conclude that the trial court abused its discretion by misapplying the legal principles discussed in *Farrar* and not limiting an award

*Crown Enterprises Inc. v. City of Romulus, Not Reported in N.W.2d (2011)*

2011 WL 1687625

of an attorney's fee to the very limited success plaintiff achieved—the removal of the barricade on Harrison Avenue. *DiLaura,* 471 F.3d at 671.

The threshold question regarding the propriety of an award of an attorney's fee pursuant to 42 USC 1988 is whether a plaintiff is a "prevailing party." *DiLaura,* 471 F.3d at 671, citing *Texas State Teachers Ass'n,* 489 U.S. at 789. The Supreme Court has explained that the *degree* of a plaintiff's success in relation to its overall goals are relevant to the reasonableness of a fee award, not the eligibility for a fee award as the prevailing party. *Texas State Teachers Ass'n,* 489 U.S. at 790. The Court held that "[a] prevailing party must be one who has succeeded on any significant claim affording it some of the relief sought, either *pendente lite* or at the conclusion of the litigation." *Id.* at 791. The Court further opined that "[i]f the plaintiff has succeeded on 'any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit,' the plaintiff has crossed the threshold to a fee award of some kind." *Id* at 791–792.

In this case, plaintiff received a temporary restraining order (TRO), on July 27, 2005, ordering defendant to remove the barricades it had placed that prevented plaintiff's access to and from its truck terminal by way of Harrison Avenue. The TRO achieved some of the relief plaintiff sought in its original complaint that requested damages, as well as injunctive and declaratory relief. In granting the TRO, the trial court concluded that defendant's actions displayed "unconstitutional lack of due process taking [plaintiff's] property." At the conclusion of the case, the trial court formally ruled in plaintiff's favor that the barricading of Harrison Avenue violated plaintiff's procedural due process rights.

**\*4** Despite plaintiff's success regarding defendant's initial action of barricading Harrison Avenue, the question remains whether removal of the physical barricade was a "significant" claim or issue given that, although it was ordered removed, the legal barrier of defendant's zoning ordinance, which precluded plaintiff's use of its Harrison Avenue easement for truck traffic, remained unaffected by the litigation. The Supreme Court has noted that "a technical victory may be so insignificant ... as to be insufficient to support prevailing party status." *Texas State Teachers Ass'n,* 489 U.S. at 792. This might occur when "a legal claim can be characterized as purely technical or *de minimis.... " Id.* In hearings on this issue, the trial court described plaintiff's success as more technical than substantive. "The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Id.* at 792–793. Defendant argues, correctly, that the material relationship of the parties remained unaltered by this litigation because the city's zoning ordinance precluded plaintiff from using Harrison Avenue for truck traffic. On the other hand, plaintiff can correctly argue that defendant no longer acts to enforce its zoning ordinance without notice and an opportunity for a hearing.

In *Farrar,* the Court held that the civil rights plaintiff who had received only nominal damages was a "prevailing party" under § 1988 even though the plaintiff's *de minimis* success required that a "reasonable" attorney's fee award would be no award at all. *Farrar,* 506 U.S. at 105, 115. The Court explained:

> [T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement. Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. Otherwise the judgment or settlement cannot be said to 'affect the behavior of the defendant toward the plaintiff.' Only under these circumstances can civil rights litigation effect 'the material alteration of the legal relationship of the parties' and thereby transform the plaintiff into a prevailing party. In short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff. [*Id.* at 111–112 (citations omitted).]

Plaintiff satisfies this test because it obtained an enforceable judgment (the TRO), which modified defendant's behavior in a way that directly benefited plaintiff by removing the physical barricade that blocked its access to its property via Harrison Avenue.

*Crown Enterprises Inc. v. City of Romulus, Not Reported in N.W.2d (2011)*

2011 WL 1687625

Pertinent to this case, the *Farrar* Court observed that " 'the denial of procedural due process should be actionable for nominal damages without proof of actual injury.' " *Farrar,* 506 U.S. at 112, quoting *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Further, quoting *Carey,* 435 U.S. at 266, the Court opined that "awarding of nominal damages for the 'absolute' right to procedural due process 'recognizes the importance to organized society that [this] right be scrupulously observed' while 'remaining true to the principle that substantial damages should be awarded only to compensate actual injury.' " *Farrar,* 506 U.S. at 112. Therefore, the Court held that "a plaintiff who wins nominal damages is a prevailing party under § 1988," which "inquiry does not turn on the magnitude of the relief obtained." *Farrar,* 506 U.S. at 113–114. In this case, because the trial court determined that defendant's violation of plaintiff's right to procedural due process qualified for a nominal damage award, plaintiff satisfied the threshold query under § 1988 of being a "prevailing party."

**\*5** The next question is whether the trial court abused its discretion by awarding plaintiff all claimed attorney fees through the date the court issued a preliminary injunction on February 17, 2006. Was the court's award of $186,679 as an attorney's fee reasonable? "Although the 'technical' nature of a nominal damages award or any other judgment does not affect the prevailing party inquiry, it does bear on the propriety of fees awarded under § 1988." *Farrar,* 506 U.S. at 114. " '[T]he degree of the plaintiff's overall success goes to the reasonableness' of a fee award...." *Id.,* quoting *Texas State Teachers Ass'n, supra* at 793. Indeed, when determining the reasonableness of an attorney's fee award under § 1988, " 'the most critical factor[,] ... is the degree of success obtained.' " *Farrar,* 506 U.S. at 114, quoting *Hensley,* 461 U.S. at 436. The *Farrar* Court further held that when a plaintiff seeking money damages achieves prevailing party status but wins only nominal damages, the only reasonable attorney's fee award may be no award at all. *Farrar,* 506 U.S. at 115. The Court explained:

> In some circumstances, even a plaintiff who formally "prevails" under § 1988 should receive no attorney's fees at all. A plaintiff who seeks compensatory damages but receives no more than nominal damages is often such a prevailing party. As we have held, a nominal damages award does render a plaintiff a prevailing party by allowing him to vindicate his "absolute" right to procedural due process through enforcement of a judgment against the defendant. In a civil rights suit for damages, however, the awarding of nominal damages also highlights the plaintiff's failure to prove actual, compensable injury. Whatever the constitutional basis for substantive liability, damages awarded in a § 1983 action "must always be designed 'to *compensate injuries* caused by the [constitutional] deprivation.' " When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all. In an apparent failure to heed our admonition that fee awards under § 1988 were never intended to " 'produce windfalls to attorneys,' " the District Court awarded $280,000 in attorney's fees without "considering the relationship between the extent of success and the amount of the fee award." [*Farrar,* 506 U.S. at 115–116 (citations omitted).]

The Sixth Circuit Court of Appeals has followed *Farrar* by holding that in civil rights actions where a plaintiff primarily is seeking monetary damages but obtains only nominal relief with respect to their claims, a reasonable attorney's fee award was no fee at all. *Pouillon,* 326 F.3d at 717–718; *Cramblit,* 33 F.3d at 635–636. Under *Farrar* and its progeny in the Sixth Circuit Court of Appeals, if plaintiff had obtained only nominal damages on its federal claims, then the only reasonable attorney's fee under § 1988 would have been no fee at all. However, as we have noted already, plaintiff's case is distinguishable from *Farrar, Pouillon,* and *Cramblit,* because plaintiff obtained more than just nominal relief. Plaintiff also obtained equitable relief in the form of the trial court's order to remove the barricade blocking Harrison Avenue. However, this relief was obtained by the issuance of TRO at the end of July 2005. We conclude that the trial court abused its discretion by awarding plaintiff attorney's fees through the subsequent injunctive relief for ingress and egress because that relief was based on plaintiff's state law claim to an easement in Harrison Avenue. Plaintiff obtained relief for the procedural due process violation in July 2005 when the trial court issued the TRO for the removal of the barricades the city erected. Procedural due process does not guarantee any particular result on the merits but only requires "notice of the nature of the proceedings and an opportunity to be heard by an impartial decision maker at a meaningful time and in a meaningful manner." *Mettler Walloon, LLC v. Melrose Twp.,* 281 Mich.App. 184, 214, 761 N.W.2d 293 (2008). After the trial court ordered the removal of the barricades, plaintiff was accorded procedural due process regarding its

2011 WL 1687625

easement and all other claims either party asserted. To the extent the trial court's determination in its February 17, 2006 order, "that placement of barricades by [defendant] to prevent access from Harrison was without legal justification," was a finding regarding a violation of due process, it resulted in only nominal damages so that "no attorney fee" is a reasonable attorney fee under § 1988. *Farrar,* 506 U.S. at 115–116.

**\*6** The only tangible success plaintiff achieved in this case, apart from the finding of a procedural due process violation warranting only nominal damages, was the July 2005 TRO ordering the city to remove the physical barricades it erected on Harrison Avenue. All of plaintiff's other state and federal claims were dismissed. Plaintiff initiated this lawsuit to enable it to use Harrison Avenue for the purpose of daily routing hundreds of commercial trucks to its truck terminal. Plaintiff succeeded early in the litigation by obtaining an order that the city remove the physical barrier to its planned use of Harrison Avenue for truck traffic, but the legal barrier of defendant's zoning ordinance and the substandard condition of Harrison Avenue remained unaffected by this litigation. Further, although plaintiff was successful in establishing its state law claim to an easement, it was unsuccessful in achieving its overall objective of securing the right to use Harrison Avenue for the purpose of daily routing hundreds of trucks to its truck terminal via Harrison Avenue without fully complying with defendant's ordinance. Consequently, in light of the very limited success that plaintiff achieved, and in light of the fact that the due process violation caused no real damages to plaintiff, we conclude the trial court abused its discretion by not limiting a reasonable attorney's fee under § 1988 to the legal fees plaintiff incurred through its obtaining the TRO that resulted in the removal of the barricades the city had erected without notice and an opportunity for a hearing. Such an award of reasonable attorney's fees under § 1988 would thus be limited to the " 'degree of success obtained.' " *Farrar,* 506 U.S. at 114, quoting *Hensley,* 461 U.S. at 436.

We reverse in part and remand for further proceedings consistent with this opinion. We do not retain jurisdiction. No taxable costs pursuant to MCR 7.219 as neither party fully prevailed.

**All Citations**

Not Reported in N.W.2d, 2011 WL 1687625

End of Document      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Reeser v. Henry Ford Health System, E.D.Mich., August 17, 2016

2005 WL 658818
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Appeals of Michigan.

Aileen GOMERY, Plaintiff/Counter-Defendant-Appellee/Cross-Appellant,

v.

CREST FINANCIAL, INC., and Linda Dargis-Giroux,
Defendants/Counter-Plaintiffs-Appellants/Cross-Appellees.

No. 250881.
|
March 22, 2005.

Before: SAAD, P.J., and SMOLENSKI and COOPER, JJ.

[UNPUBLISHED]

PER CURIAM.

**\*1** Defendant Crest Financial, Inc. [1] appeals as of right from an order granting plaintiff Aileen Gomery attorney fees in this wrongful termination action. Plaintiff cross-appeals from an order limiting her damages. We affirm the trial court's order limiting plaintiff's damages. However, we vacate the award of attorney fees and remand to allow the trial court to make findings of fact regarding the reasonableness of the awarded fees.

[1]     While both defendants are named as appellants, only Crest Financial actually has an interest in this appeal. Therefore, we will refer to Crest Financial as the singular defendant.

I. Facts and Procedural Background

This action arose when defendant terminated plaintiff's employment in June of 2002. The termination occurred one week after plaintiff threatened to contact the Department of Labor regarding defendant's failure to pay her accurate commissions. The termination also occurred on the same day that plaintiff's doctor placed her on leave due to work-related stress. As a result, plaintiff filed suit alleging that she was terminated in violation of the Whistleblowers' Protection Act (WPA) [2] and the Worker's Disability Compensation Act. [3] Before trial, the court granted defendant partial summary disposition under MCR 2.116(C)(10) and limited plaintiff's damages based on her failure to mitigate by accepting an offer for similar employment. Following a three-day jury trial, plaintiff was awarded $5,000. The trial court subsequently awarded plaintiff $35,715 in attorney fees pursuant to MCL 15.364.

[2]     MCL 15.361 *et seq.*

[3]     MCL 418.101 *et seq.*

Gomery v. Crest Financial, Inc., Not Reported in N.W.2d (2005)

2005 WL 658818

II. Attorney Fees under the WPA

Defendant argues that the trial court abused its discretion in awarding plaintiff $35,715 in attorney fees. Defendant contends that plaintiff was not a prevailing party, that the award was disproportionate to plaintiff's damages, and that the trial court abdicated its responsibility to exercise discretion in determining the reasonableness of the award. We review a trial court's award of attorney fees under the WPA for an abuse of discretion. [4]

[4] *O'Neill v. Home IV Care, Inc,* 249 Mich.App 606, 612; 643 NW2d 600 (2002).

We disagree with defendant's contention that plaintiff was not a prevailing party. "In order to be considered the prevailing party, [the party is] required to show at the very least that its position was improved by the litigation." [5] Under the "improved position" test, a plaintiff's position "improves" when the plaintiff receives a judgment "in an amount greater than the offer made by defendants." [6] Defendant argues that plaintiff did not prevail because the jury's award was very small compared to the amount she sought during settlement negotiations. However, the amount sought by plaintiff during settlement negotiations is immaterial. Plaintiff was a prevailing party because the judgment in her favor exceeded defendant's $500 offer of judgment.

[5] *Citizens Ins Co of America v. Juno Lighting, Inc,* 247 Mich.App 236, 245; 635 NW2d 379 (2001).

[6] *Stamp v. Hagerman,* 181 Mich.App 332, 337; 448 NW2d 849 (1989), citing *LaForest v. Grunow,* 43 Mich.App 254, 256; 204 NW2d 355 (1972).

Furthermore, in awarding costs and attorney fees under the WPA, the trial court is merely required to determine that "the award is appropriate." [7] "Because the WPA is a remedial statute, it is to be liberally construed to favor the persons the Legislature intended to benefit." [8] Due to its nearly identical language, this Court has held that case law interpreting MCL 37.2802 under the Elliott-Larsen Civil Rights Act (CRA) is applicable to MCL 15.364. [9] Under the CRA, "[t]o be considered a prevailing party, a plaintiff must receive at least some relief on the merits of plaintiff's claim, such as an award of damages, an injunction, or a declaratory judgment on a favorable consent decree or settlement." [10] As the jury verdict was in plaintiff's favor and she received some relief, she was also a prevailing party under the WPA.

[7] MCL 15.364.

[8] *O'Neill, supra* at 614.

[9] *Id.* at 612-613.

[10] *Meyer v. Center Line,* 242 Mich.App 560, 576; 619 NW2d 182 (2000).

**\*2** Therefore, the trial court had discretion to

determine the reasonable amount of fees according to various factors, including (1) the skill, time, and labor involved, (2) the likelihood, if apparent to the client, that the acceptance of the employment will preclude other employment by the lawyer, (3) the fee customarily charged in that locality for similar services, (4) the amount in question and the results achieved, (5) the expense incurred, (6) the time limitations imposed by the client or the circumstances, (7) the nature and length of the professional relationship with the client, (8) the professional standing and experience of the attorney, and (9) whether the fee is fixed or contingent. [11]

Case 2:14-cv-11916-GCS-SDD   ECF No. 149-2, PageID.5347   Filed 07/20/17   Page 77 of 121
Gomery v. Crest Financial, Inc., Not Reported in N.W.2d (2005)
2005 WL 658818

11    *Grow v. WA Thomas Co,* 236 Mich.App 696, 714-715; 601 NW2d 426 (1999), citing *Wood v. DAIIE,* 413 Mich. 573, 588; 321 NW2d 653 (1982).

Defendant contends that the trial court's award was unreasonably disproportionate to the amount of actual success plaintiff achieved at trial. This Court has emphasized that "the [United States] Supreme Court has held that the degree of plaintiff's success is a 'crucial' factor in determining a proper award of attorney fees...." [12] A trial court *may* reduce an award of attorney fees on the basis of a plaintiff's limited success, [13] but is not required to do so. Therefore, the trial court did not abuse its discretion by failing to limit plaintiff's award of attorney fees based solely on her limited success at trial.

12    *Schellenberg v Rochester Michigan Lodge No 2225, of Benevolent & Protective Order of Elks of USA,* 228 Mich.App 20, 47; 577 NW2d 163 (1998), quoting *Collister v. Sunshine Food Stores, Inc,* 166 Mich.App 272, 275; 419 NW2d 781 (1988) (emphasis omitted).

13    *Id.* at 45-46.

Defendant also contends that the trial court failed to engage in *any* consideration of the several factors. We agree. "[F]ailure to exercise discretion when called on to do so constitutes an abdication and hence an abuse of discretion." [14] The trial court's opinion contains an accurate summary of the purposes of the WPA and the factors to be considered under *Grow,* as well as a similar set of factors under *Crawley v. Schick.* [15] However, the trial court's opinion contains no findings of fact regarding any of the factors. The trial court stated that "Plaintiff seeks to recover attorney fees in the amount of $36,180." The trial court reduced that amount by $465, because the trial court agreed with defendant that three items should not have been included on plaintiff's billing statement.

14    *Rieth v. Keeler,* 230 Mich.App 346, 348; 583 NW2d 552 (1998), quoting *People v. Stafford,* 434 Mich. 125, 134 n 4; 450 NW2d 559 (1990).

15    *Crawley v. Schick,* 48 Mich.App 728, 737; 211 NW2d 217 (1973).

A "trial court need not detail its findings as to each specific factor considered." [16] However, the trial court is required to make findings of fact. [17] The trial court's bare conclusion that $35,715 was a reasonable amount of attorney fees is insufficient to show that it properly considered the reasonableness of plaintiff's requested fees. Accordingly, we must remand to allow the trial court to make a record of it findings regarding the reasonableness of the awarded fees. [18]

16    *Wood, supra* at 588.

17    *B & B Investment Group v. Gitler,* 229 Mich.App 1, 16; 581 NW2d 17 (1998), quoting *Howard v. Canteen Corp,* 192 Mich.App 427, 437; 481 NW2d 718 (1992).

18    See *JC Building Corp II v. Parkhurst Homes, Inc,* 217 Mich.App 421, 430-431; 552 NW2d 466 (1996).

### III. Mitigation of Damages

Plaintiff argues that the trial court erroneously granted defendant partial summary disposition, on the grounds that she failed to mitigate her damages by declining a job offer in favor of seeking a better job. We disagree. This Court reviews a trial court's determination regarding a motion for summary disposition de novo. [19] A motion under MCR 2.116(C)(10) tests the factual support of a plaintiff's claim. [20] "In reviewing a motion for summary disposition brought under MCR 2.116(C)(10), we consider the affidavits, pleadings, depositions, admissions, or any other documentary evidence submitted in [the] light most favorable to the nonmoving party to decide whether a genuine issue of material

*Gomery v. Crest Financial, Inc., Not Reported in N.W.2d (2005)*

2005 WL 658818

fact exists." [21] Summary disposition is appropriate only if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. [22]

[19] *Beaudrie v. Henderson,* 465 Mich. 124, 129; 631 NW2d 308 (2001).

[20] *Auto-Owners Ins Co v Allied Adjusters & Appraisers, Inc,* 238 Mich.App 394, 397; 605 NW2d 685 (1999).

[21] *Singer v. American States Ins,* 245 Mich.App 370, 374; 631 NW2d 34 (2001).

[22] *MacDonald v. PKT, Inc,* 464 Mich. 322, 332; 628 NW2d 33 (2001).

 **\*3** Although a plaintiff is required to mitigate her damages, a plaintiff is not required "to make *all* efforts to eliminate the economic damages resulting from the wrongdoing. Rather, [she] is only required to make efforts that are reasonable under the circumstances to find employment." [23] A plaintiff is not required "to accept an unacceptable job" or "employment that he or she finds demeaning, particularly inconvenient, or otherwise unacceptable," but a plaintiff *is* obligated "to accept, if offered, employment that is substantially similar to that from which the plaintiff was fired." [24] Although a defendant cannot use the duty to mitigate as a "sword," a defendant is entitled to some measure of protection against unnecessary loss-a plaintiff does not have an unlimited right to pick and choose. [25]

[23] *Morris v. Clawson Tank Co,* 459 Mich. 256, 264; 587 NW2d 253 (1998) (emphasis in original).

[24] *Id.* at 265, citing *Ford Motor Co v. EEOC,* 458 U.S. 219, 231-232; 102 S Ct 3057; 73 L.Ed.2d 721 (1982).

[25] *Id.* at 265, 268.

Plaintiff stated at her deposition that she was presented with two job offers in October of 2002, one with Wells Fargo and one with John Adams Mortgage Company. Her later affidavit states that John Adams did not extend an offer until December. However, a party may not submit an affidavit contradicting earlier sworn testimony in order to create an issue of fact and defeat a motion for summary disposition. [26] Both plaintiff's deposition testimony and her affidavit state that she turned down these jobs solely because she was seeking a better one, not because she found them unacceptable. Therefore, there was no factual dispute that plaintiff voluntarily extended her period of unemployment merely because she wanted better, rather than like, employment. Accordingly, summary disposition was appropriate.

[26] *Dykes v. William Beaumont Hosp,* 246 Mich.App 471, 480; 633 NW2d 440 (2001).

Affirmed in part. We vacate the trial court's award of attorney fees and remand for a factual determination regarding the reasonableness of the requested fees. We do not retain jurisdiction.

**All Citations**

Not Reported in N.W.2d, 2005 WL 658818

---

End of Document © 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 1989518
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Appeals of Michigan.

Eric HECKMANN, Plaintiff-Appellee,

v.

CITY OF DETROIT, Defendant-Appellant/Cross-Appellee,
and
Detroit Chief of Police, Mayor of Detroit, Detroit Deputy Chief
of Police, Marlene Hobbs and Hasumati Patel, Defendants.

Docket No. 267391.
|
July 10, 2007.

Wayne Circuit Court; LC No. 03-321385-NZ.

Before: WHITE, P.J., and SAAD and MURRAY, JJ.

**Opinion**

PER CURIAM.

*1 Defendant City of Detroit appeals as of right the trial court's denial of its motions for directed verdict, judgment notwithstanding the verdict, new trial or remittitur, and several other rulings, in this case brought under the Whistleblowers Protection Act (WPA), MCL 15.361 et seq. Plaintiff Eric Heckmann cross-appeals the trial court's denial of attorney fees. We affirm in both the principal appeal and the cross-appeal.

Plaintiff Eric Heckmann, a principal accountant (CPA and MBA) in the Fiscal Operations division of defendant City of Detroit's Police Department, brought suit against various individuals and the City alleging violation of the WPA, and intentional infliction of emotional distress. On defendants' motion for summary disposition, the trial court dismissed both claims.

Plaintiff appealed. This Court reversed the dismissal of the WPA claim, and affirmed the dismissal of the intentional infliction of emotional distress claim. *Heckmann v. Detroit Chief of Police,* 267 Mich.App 480; 705 NW2d 689 (2005). On remand to the circuit court, plaintiff's WPA claim was tried to a jury. On the first day of trial, the trial court granted defendants' motion to dismiss the individual defendants on governmental immunity grounds. Plaintiff does not appeal that ruling.[1] Trial proceeded against the City of Detroit alone. The jury found for plaintiff and awarded him $600,000. The trial court entered judgment in plaintiff's favor in the amount of $600,000 plus prejudgment interest of $62,363.10.

---

[1] Plaintiff's appellate brief states in a footnote that the court erred in dismissing the individual defendants because immunity is not a defense to WPA claims, citing *Ballard v. Ypsilanti Twp,* 457 Mich. 564, 574; 577 NW2d 890 (1998). However, other than this footnote, plaintiff did not brief the governmental immunity issue, and it is not stated in plaintiff's statement of questions presented.

Heckmann v. City of Detroit, Not Reported in N.W.2d (2007)

2007 WL 1989518

I

Defendant argues that the trial court abused its discretion by denying its motion to adjourn trial where a necessary and material witness, Hasumati Patel (plaintiff's immediate supervisor), was unavailable to testify due to an unexpected emergency. We disagree.

This Court reviews the trial court's denial of defendant's motion to adjourn trial for an abuse of discretion. *Zerillo v. Dyksterhouse,* 191 Mich.App 228, 230; 477 NW2d 117 (1991). MCR 2.503(C) governs adjournments due to absence of a witness:

(C) **Absence of Witness or Evidence.**

(1) A motion to adjourn a proceeding because of the unavailability of a witness or evidence must be made as soon as possible after ascertaining the facts.

(2) An adjournment may be granted on the ground of unavailability of a witness or evidence only if the court finds that the evidence is material and that diligent efforts have been made to produce the witness or evidence.

(3) If the testimony or the evidence would be admissible in the proceeding, and the adverse party stipulates in writing or on the record that it is to be considered as actually given in the proceeding, there may be no adjournment unless the court deems an adjournment necessary.

Defendant's motions to adjourn and arguments at the two pertinent hearings nowhere stated that Patel's surgery was emergency surgery or unexpected, or that the City could not have learned of her surgery earlier than 5 days before trial (September 21, the date of Patel's surgery and the date defendant filed its emergency motion). The letter from Patel's doctor, which defense counsel provided to the trial court belatedly (during trial), also does not state that the surgery was emergency surgery or performed on short-notice. The letter simply states that the surgery was "non-elective." Non-elective surgery is often planned at the patient's convenience.

 **\*2** The record does not otherwise support diligence on defendant City's part in ascertaining Patel's availability to testify as trial approached, either, even though Patel was a named defendant (until the first day of trial, when defendants moved and were granted summary disposition of the individual defendants on governmental immunity grounds). On this record, we are unable to conclude that the City exercised due diligence in investigating and securing Patel's availability for trial. MCR 2.503(C). It is reasonable to conclude that had the City contacted Patel as trial neared, it would have learned of Patel's impending surgery and Patel could have been deposed de bene esse and videotaped.

Under these circumstances, we conclude that the trial court did not abuse its discretion in denying defendant's motion to adjourn trial because the defense made no showing that it had made diligent efforts to produce Patel. Contrary to defendant's representations in its appellate brief, the defense produced no evidence that Patel's surgery was unexpected or done on an emergency basis, and thus did not show that it could not have made alternative arrangements for her to be deposed in lieu of testifying at trial. Further, defendant did not attempt to depose Patel or obtain an affidavit from her after her surgery, nor did defendant make an offer of proof at trial. In addition, we are not persuaded by defendant's argument that Patel's testimony would have convinced the jury where Deputy Chief Brenda Goss-Andrews' did not. Andrews testified that she oversaw both Patel and plaintiff, that she called the April 2003 meeting at which Patel was present and plaintiff was allegedly threatened, that she and Patel discussed in advance the memo Patel prepared and Andrews distributed, which reduced plaintiff's duties, and that the reason for calling the meeting with plaintiff was that Patel had problems with plaintiff's performance in several areas. Andrews testified that she and Patel both received copies of plaintiff's whistleblowing letter. Thus, it is far from apparent that Patel, had she testified at trial, would have given

2007 WL 1989518

testimony different from, or more persuasive than, Andrews'. Moreover, defendant could have called Marlene Hobbs to testify at trial but did not. Hobbs was present at the April 2003 meeting, along with Andrews, Patel and plaintiff.

We conclude the denial of defendant's motion to adjourn was not an abuse of discretion, and that defendant was not prejudiced by the denial.

II

Defendant also challenges to the trial court's denial of its motions for directed verdict, judgment notwithstanding the verdict, and new trial.

The WPA, MCL 15.362, provides that an employer may not discharge, threaten, or otherwise discriminate against an employee because the employee reports or is about to report a violation or suspected violation of a federal or state statute or regulation to a public body.

> The WPA, as a remedial statute, is to be liberally construed to favor the persons the Legislature intended to benefit ... those employees engaged in "protected activity" as defined by the act. The act protects those who report or are about to report violations of a law, regulation, or rule to a public body.... [*Chandler v.. Dowell Schlumberger,* 456 Mich. 395, 406; 572 NW2d 210 (1998). Citation omitted.]

**\*3** To establish a prima facie case under the WPA, a plaintiff must show that 1) he was engaged in protected activity as defined by the act, 2) he was discharged, threatened, or discriminated against, and 3) a causal connection existed between the protected activity and the discharge. *Shallal v. Catholic Social Services,* 455 Mich. 604, 610; 566 NW2d 571 (1997); *Heckmann, supra,* 267 Mich.App at 491.

We review a trial court's decision to grant or deny a directed verdict de novo. *Sniecinski v. BCBSM,* 469 Mich. 124, 131; 666 NW2d 186 (2003). "If reasonable jurors could honestly have reached different conclusions, this Court may not substitute its judgment for that of the jury." *Wiley v. Henry Ford Cottage Hosp,* 257 Mich.App 488, 491; 668 NW2d 402 (2003). We also review the trial court's decision on a motion for judgment notwithstanding the verdict de novo. *Sniecinski, supra* at 131. This Court must view the evidence and all legitimate inferences therefrom in the light most favorable to the nonmoving party. *Id.* If reasonable jurors could have reached different conclusions, the jury verdict must stand. *Zantel Marketing Agency v. Whitesell Corp,* 265 Mich.App 559, 568; 696 NW2d 735 (2005). We review a trial court's denial of a motion for new trial for an abuse of discretion. *Allard v. State Farm Ins Co,* 271 Mich.App 394, 406; 722 NW2d 268 (2006). A new trial may be granted on some or all issues if a verdict is against the great weight of the evidence. MCR 2.611(A)(1)(e); *Domako v. Rowe,* 184 Mich.App 137, 144; 457 NW2d 107 (1990), aff'd 438 Mich. 347 (1991). The jury's verdict should not be set aside if there is competent evidence to support it. *Ellsworth v. Hotel Corp of America,* 236 Mich.App 185, 194; 600 NW2d 129 (1999). This Court gives deference to the trial court's opportunity to hear the witnesses and its consequent qualification to assess credibility. *In re Leone Estate,* 168 Mich.App 321, 324; 423 NW2d 652 (1988).

Plaintiff testified at trial that he worked for defendant City of Detroit for 35 years (1970-2005) and was in the process of retiring. When he transferred to the Detroit Police Department's Fiscal Operations division from the Auditor General's office in 1992, he was a principal accountant (a civilian employee), and a member of the Association of Professional and Technical Employees Union (APTE). Plaintiff testified that in mid- to late August, 2002, he wrote Deputy Chief Andrews, plaintiff's superior and head of the Fiscal Operations division, and requested a confidential meeting to discuss ongoing problems in the division, placed it in a sealed envelope and gave it to Andrews' secretary. When Andrews did not respond, plaintiff wrote the September 11, 2002 letter addressed to Chief of Police Oliver, and carbon copied Mayor

Heckmann v. City of Detroit, Not Reported in N.W.2d (2007)

2007 WL 1989518

Kilpatrick. The September 11, 2002 letter (whistleblowing letter) was admitted into evidence and portions read into the record.

Plaintiff testified that on April 18, 2003, he was called into a meeting, without notice, at which Deputy Chief Andrews, Hobbs and Patel were present, and that each of them had a copy of his September 11, 2002 letter in hand. Plaintiff testified that during the meeting, which lasted approximately thirty minutes, Deputy Chief Andrews told him that his letter to the Mayor and Chief of Police was "the last straw," that he better start looking for another job, and that there was nothing he could do to save his job. Plaintiff testified that Hobbs and Patel expressed their displeasure with him at this meeting as well.

**\*4** On appeal, defendant does not dispute that plaintiff established that he engaged in protected activity under the WPA. Regarding an adverse employment action and a causal connection between protected activity and an adverse employment action, plaintiff testified that at the April 8, 2003 meeting in Deputy Chief Andrews' office, to which he was called without prior notice, Andrews, Patel and Hobbs each held a copy of his September 2002 letter, and that Andrews told him his letter was the last straw, that he should start looking for another job, and that there was nothing he could do to keep his job. This testimony, if believed by the jury is sufficient to establish both that Deputy Chief Andrews threatened to terminate plaintiff and a causal connection between Andrews' threat and plaintiff's whistleblowing letter. Plaintiff also testified that at this meeting, Patel told him he was not "part of the team" and Hobbs, who was named in the letter several times, told him she was extremely displeased that he forwarded the letter to the Mayor and Oliver.

Plaintiff testified that after the April 2003 meeting his duties were significantly reduced, as set forth in a letter Andrews distributed at a staff meeting that was prepared by Patel. Plaintiff testified that the morning after this staff meeting, Patel told him to get out of her office, would not speak to him, and told him to email her if he wanted anything. Plaintiff testified that Patel routinely received documents plaintiff needed for his projects, and that after the April 2003 meeting, she would not respond to his emails requesting the documents.

Defendant presented one witness, Deputy Chief Andrews. Andrews testified that she called the meeting in April 2003 to discuss problems that Patel had with plaintiff's performance. Andrews acknowledged that she received a copy of plaintiff's whistleblowing letter, and that Patel did as well. She denied raising her voice in the meeting, and denied threatening plaintiff. Andrews testified that she and Patel conferred before Patel prepared the memo that diminished plaintiff's responsibilities. Andrews acknowledged that plaintiff's responsibilities were reduced, although she denied that it was in retaliation for plaintiff's whistleblowing letter.

There was thus testimony from which the jury could have concluded that plaintiff engaged in protected activity, that defendant's agent Deputy Chief Andrews threatened to discharge him and reduced his duties, and that the causal connection between those factors was plaintiff's whistleblowing letter. We conclude that because evidence presented at trial established a genuine issue of fact regarding each of the elements of plaintiff's WPA claim, the trial court properly denied defendant's motion for directed verdict and JNOV.

Defendant's motion for new trial was also properly denied. As the above discussion indicates, there was competent evidence to support the jury's verdict. *Ellsworth, supra* at 194. The trial court thus did not abuse its discretion in denying defendant's motion for new trial to the extent it argued that the verdict was against the weight of the evidence. *Allard, supra.*

III

**\*5** Defendant also contends that the record evidence does not support the jury award of $600,000, and the trial court should have granted its motion for remittitur. We disagree.

2007 WL 1989518

This Court reviews a trial court's decision regarding remittitur for an abuse of discretion, *Palenkas v. Beaumont Hospital,* 432 Mich. 527, 533; 443 NW2d 354 (1989), viewing the evidence in the light most favorable to the nonmoving party. *Wiley, supra* at 499. A new trial may be granted when excessive or inadequate damages were awarded as apparently influenced by passion or prejudice. MCR 2.611(A)(1)(c) and (d), see also MCL 600.6098(2)(b)(iv) and (v); *McManamon v. Redford Twp,* 273 Mich.App 131, 139; 730 NW2d 757 (2006). If the court finds that the only trial error is the inadequacy of the verdict, it may deny a motion for new trial on the condition that, within 14 days, the nonmoving party consent in writing to the entry of judgment in the amount found by the court to be the highest amount the evidence will support. MCR 2.611(E)(1); *Burtka v. Allied Integrated Diagnostic Services, Inc,* 175 Mich.App 777, 780; 438 NW2d 342 (1989). In determining whether remittitur is appropriate, a trial court must decide whether the jury award was supported by the evidence. *Diamond v. Witherspoon,* 265 Mich.App 673, 692-693; 696 NW2d 770 (2005). The power of remittitur should be exercised with restraint. *Hines v. Grand Trunk Western R Co,* 151 Mich.App 585, 595; 391 NW2d 750 (1985).

Plaintiff argued below that the City's own trial exhibits established that plaintiff's salary was over $51,000. Defendant does not dispute that its exhibits showed plaintiff's salary, but notes that plaintiff did not testify regarding his wages, or benefits, or present evidence regarding his economic losses. Defendant did not ensure that its trial exhibits are before this Court, in violation of MCR 7.210(C). Nonetheless, the record supports that defendant's trial exhibits addressed plaintiff's wages, sick time benefits, and other fringe benefits, as plaintiff's counsel referred to those figures in closing argument while discussing a defense trial exhibit.

Plaintiff testified at trial that he was 58 years old and had worked for defendant City for 35 years. Plaintiff testified that he took a medical leave of approximately one year, from May or June 2004 until May or June 2005, during which he received full (sick) pay. Plaintiff testified at trial (held in September & October 2005) that he had recently applied to retire from defendant City, but that his retirement was not yet official.

Dr. Edward Herman, plaintiff's treating psychiatrist, testified by videotaped deposition that he recommended that plaintiff take a medical leave from work in May of 2004. He felt that plaintiff was distraught and developing suicidal ideation. He also recommended that plaintiff extend that sick leave in October of 2004. Dr. Herman testified that he had treated plaintiff since October 8, 2003, and had seen him thirty times. Dr. Herman testified that after conducting a psychiatric evaluation of plaintiff, he determined that plaintiff suffered from major depression of the recurrent type, and generalized anxiety disorder. Dr. Herman found that plaintiff had symptoms of a major depression diagnosis-a depressed mood, sleep disturbance, difficulty concentrating, and some psychomotor agitation. Dr. Herman testified that he found plaintiff to be under work-related stress that had started in 2002; with a letter plaintiff sent to the Mayor and Police Chief Oliver about overtime cheating in the Detroit Police Department. Dr Herman testified that depression and anxiety could have caused the worsening of plaintiff's diabetes.

**\*6** Dr. Herman also testified that plaintiff was already on the antidepressant Lexapro (prescribed by his family doctor) when he first saw plaintiff in October 2003, and that he prescribed Xanax to help with plaintiff's severe anxiety. After that, Paxil was added in December of 2003 for the depression. The Paxil was increased in April of 2004 and Restoril was added as a sleep aid. Lexapro was switched to Wellbutrin in January of 2005 for the depression. At the time of Dr. Herman's deposition, plaintiff was still taking all these medications as well as Risperdal for anger and anxiety.

In closing argument, plaintiff's counsel referred to "the sick time that Mr. Heckmann had to use, and we're also looking at the wages that he would have made, until the time he was going to retire at sixty-five years old. We're looking at his lost fringe benefits. And ... we're looking at non-economic damages. We're looking at the humiliation, the stress, the anxiety." In rebuttal, plaintiff's counsel asked the jury to award plaintiff damages in the amount of $1,869,600. The jury was instructed regarding damages under the WPA (with both counsel's approval and no challenge on appeal). Defendant prepared the verdict form used at trial. The verdict form was general, did not separate economic from non-economic

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5354 Filed 07/20/17 Page 84 of 121
Heckmann v. City of Detroit, Not Reported in N.W.2d (2007)
2007 WL 1989518

damages, nor did it separate past from future damages. The jury answered the lone verdict form question regarding damages, "State the amount of damages you find the Plaintiff is entitled to", with "$600,000.00."

We conclude that the damage award was supported by the evidence, and that the trial court thus did not abuse its discretion in denying defendant's motion for remittitur. Although plaintiff himself did not present evidence regarding his earnings or his fringe benefits, the record supports that defendant's trial exhibits did so. The jury instructions regarding damages were approved by both counsel. The verdict form was drafted by defendant and did not separate economic from non-economic damages, or past from future damages. Defense counsel argued in closing argument that plaintiff should receive no damages. Plaintiff's counsel requested $1,869,600 in damages. The jury awarded less than 1/3 of that amount. The jury could have concluded that plaintiff intended to work for defendant City until age 65 (seven years past the instant trial), that plaintiff's work record was impeccable both in terms of performance and otherwise (plaintiff took no sick days in 33 years with the City), and that as a result of the retaliation plaintiff suffered from having sent the whistleblowing letter, he was forced to leave work on a medical leave for one year, was prescribed numerous anti-depressant and other medications, and that the emotional and physical effects on plaintiff of the work stressors and humiliation suffered by being threatened with job loss were ongoing as of the time of trial. [2]

[2]     Defendant complains that plaintiff did not testify that he had received a job offer from the City of Hazel Park, but the record reflects that defendant did not ask plaintiff about his plans for the future or whether he had sought other employment.

Plaintiff is correct that this Court in *Henry v. Detroit*, 234 Mich.App 405, 415; 594 NW2d 107 (1999), deferred to the trial court's decision to deny remittitur where the defendants-appellants "simply challenge[d] the size of the noneconomic damages award and ma[de] no specific arguments." In the instant case, defendant does not claim the jury's verdict was excessive with regard to non-economic damages, but rather maintains that the award is unsupported because plaintiff offered no evidence of *economic* loss. As discussed above, defendant's own trial exhibits set forth plaintiff's wage and fringe benefit information, so this argument must fail. Beyond this, defendant's argument is simply a generalized one, as was the case in *Henry, supra.* Further, defendant cites no authority to support that a $600,000 verdict in a WPA case such as the instant one is per se excessive, and has thus abandoned this issue. *People v. Harris*, 261 Mich.App 44, 50; 680 NW2d 17 (2004); *Yee v. Shiawassee County Bd of Comm'rs*, 251 Mich.App 379, 406; 651 NW2d 756 (2002). In light of defendant's having submitted a general verdict form that asked for one damage figure alone, and given that this Court must not disturb the jury's award if it falls reasonably within the range of the evidence and within the limits of what reasonable minds would deem just compensation, *Frohman v. Detroit*, 181 Mich.App 400, 415; 450 NW2d 59 (1989), we conclude the trial court did not abuse its discretion in denying defendant's motion for remittitur.

## IV

**\*7** Defendant's appellate brief raises three issues not set forth in its statements of questions presented. These issues are thus waived, *McGoldrick v. Holiday Amusements, Inc*, 242 Mich.App 286, 298; 618 NW2d 98 (2000), but we address them nonetheless. Defendant asserts that the trial court abused its discretion in admitting into evidence the video deposition of plaintiff's expert witness, Dr. Edward Herman. We conclude that any error in admitting Dr. Herman's deposition was harmless.

After plaintiff testified, plaintiff's treating psychiatrist, Dr. Edward Herman, testified by videotaped deposition. Contrary to defendant's representation of the facts, plaintiff's witness list, filed on December 23, 2003 (nearly two years before the instant trial began on September 27, 2005), listed Dr. Herman as follows:

28. Edward Herman, M.D.

29. Medical Expert for the Plaintiff (yet to be determined).

2007 WL 1989518

Although it is true that plaintiff's witness list did not list Dr. Herman as an expert, defendant has not established that it was prejudiced by the admission at trial of his videotaped deposition, given that: 1) Dr. Herman was plaintiff's *treating* psychiatrist, as defendant City was well aware because Dr. Herman had corresponded with defendant City throughout plaintiff's medical leave regarding plaintiff's condition, in letters stating that "Eric Heckmann is [or continues to be] under my care for the treatment of Major Depression ..." (and defense counsel cross-examined Dr. Herman regarding these letters during his videotaped deposition), [3] l2) Dr. Herman's testimony was entirely based on his observations and interaction with plaintiff, not on hypothetical facts, and thus properly admissible as lay opinion testimony under MRE 701, and 3) even though the court qualified Dr. Herman as an expert, it was not necessary to do so under MRE 701. Under these circumstances, we conclude that error, if any, in the trial court's admission of Dr. Herman's videotaped deposition was harmless.

[3]      Letters to defendant City from Dr. Herman are appended to Dr. Herman's deposition, and are dated October 4, 2004, January 4, 2005, March 15, 2005, April 21, 2005, May 16, 2005, and May 31, 2005.

## V

Defendant also contends that the trial court erred by failing to address plaintiff's counsel's misconduct, specifically that staff of plaintiff's counsel's firm sat in the spectator's gallery and passed note(s) to plaintiff's counsel or each other in the presence of potential jurors.

The record establishes that the trial court did not ignore defense counsel's objection, rather, the trial court addressed it by noting that the sequestration order did not apply to employees of plaintiff's firm. Defendant does not argue that the sequestration order did apply to plaintiff's employees. In any event, the fact that an employee of plaintiff's firm was seated in the spectator's gallery does not in any way support that plaintiff's counsel committed misconduct, nor does a note being passed from the employee to plaintiff's counsel (if this did in fact occur). We therefore conclude defendant's argument lacks merit.

## VI

Defendant's final argument is that the trial court failed to follow the law of the case, and improperly denied defendant's motion for the trial to conform to the law of the case, i.e., to this Court's decision in *Heckmann*. Specifically, defendant argued that *Heckmann* held that plaintiff's allegation as to social isolation failed as a matter of law and fact, yet the trial court permitted plaintiff to testify to his social isolation.

**\*8** Whether a trial court violated the law of the case doctrine is a question of law this Court reviews de novo. *Ashker v. Ford Motor Co,* 245 Mich.App 9, 13; 627 NW2d 1 (2001). A trial court may not take any action on remand that is inconsistent with the judgment of the appellate court. *VanderWall v. Midkiff,* 186 Mich.App 191, 196; 463 NW2d 219 (1990). However, the law of the case doctrine applies only to questions actually decided in the prior appeal, and to those questions necessary to the prior appeal's determination. *Poirier v. Grand Blanc Twp (After Remand),* 192 Mich.App 539, 546; 481 NW2d 762 (1992).

Defendant's appellate brief cites only the following portion of plaintiff's trial testimony:
*Q.* Okay. Now, after this [April 8, 2003] meeting, were there any instances where your relationship with Ms. Patel changed?

*A.* I don't understand relationship.

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5356 Filed 07/20/17 Page 86 of 121
*Heckmann v. City of Detroit, Not Reported in N.W.2d (2007)*

2007 WL 1989518

*Q.* Is there-after this April eighth meeting, did Ms. Patel's attitude toward you change?

*A.* Oh, yes.

*Q.* Okay. How so?

*A.* Well, when she would come in in the morning, she would routinely say hello to each person in the room, except me. She would also, basically, not respond to my questions. And finally she told me to-

MR. JARVIS [*defendant's counsel*]: Objection, Your Honor, relevance. I believe the Court of Appeals has ruled on that issue. Restrict any testimony with respect to that. It's irrelevant. There's nothing in the Whistle Blower's Act. I believe the Court of Appeals-. It's not contained in the complaint. It's not actual. There are personal interactions in the workplace that are certainly not triable, are not a matter of Whistle Blower's Protection Act.

THE COURT: Well, I think the surrounding circumstances is [sic] relevant, and it's, I think this area is relevant to the Whistle Blower claim, the environment of work, etc. So the objection is overruled. You can answer the question.

*Q.* (By Mr. Rivers continuing:) Mr. Heckmann?

*A.* Yes, I'll start over, I guess. Basically, right off the first next morning, she wouldn't even talk to me. And then, she made a point of saying hello to each person with a special comment, but she walked right by me and didn't say a word. Later on that morning, I needed some information from her, and she yelled, get out of my office. She said, if you need to talk to me, send me an email.

*Q.* Were there any ways that Ms. Patel affected your ability to do your job?

*A.* Yes. In fact, there were many documents that would come first, either into her possession or the Deputy Chief's Office Possession [sic], that needed to be given to me to get my work done....

In *Heckmann, supra,* 267 Mich.App at 493, this Court concluded that plaintiff's claim that his being socially isolated in the office created a material question of fact regarding an adverse employment action was legally and factually deficient. However, *Heckmann* decided the issue whether plaintiff's alleged social isolation in the workplace, *standing alone,* could create a material issue of fact regarding an adverse employment action, and answered that question in the negative. We do not interpret the *Heckmann* Court's holding-that plaintiff's isolation claim was legally and factually deficient-as precluding testimony on remand that plaintiff's superiors isolated him, particularly in connection with his allegations that, after the April 8, 2003 meeting at which Andrews threatened him with losing his job in Patel's presence, his superiors did not provide him with documents and information he required to complete his work projects.

**\*9** Given that the holding in *Heckmann, supra,* did not preclude such testimony on remand, the paucity of testimony challenged, and that this scant testimony did not go unrefuted, we conclude any error was harmless.[4]

---

[4] There was testimony from which the jury could have concluded that Patel did not retaliate against or ostracize plaintiff after the April 8, 2003 meeting. This evidence included plaintiff's testimony on cross-examination, when presented with an email Patel sent him in June 2003, that Patel approved plaintiff's paid attendance at a CPA seminar, and Deputy Chief Andrews' testimony that both before and after the April 8, 2003 meeting, Patel and plaintiff had a good working relationship. The jury also heard testimony from which it could have concluded that plaintiff himself brought on any social isolation he experienced from Patel, as plaintiff admitted sending Patel an email stating that she lacked command of the English language.

2007 WL 1989518

VII

On cross-appeal, plaintiff asserts that the trial court in deciding whether to award plaintiff attorney fees under the WPA abused its discretion by not considering the proper factors, i.e., those set forth in *Wood v. DAIIE,* 413 Mich. 573; 321 NW2d 653 (1982).

This Court reviews for an abuse of discretion the trial court's determination to award or deny attorney fees, and the determination of the reasonableness of the fees requested. *Windemere Commons I Ass'n v. O'Brien,* 269 Mich.App 681, 682; 713 NW2d 814 (2006). The factual findings underlying an award of attorney fees are reviewed for clear error. *Solution Source, Inc v. LPR Associates Ltd Partnership,* 252 Mich.App 368, 381; 652 NW2d 474 (2002), and underlying questions of law are reviewed de novo, *Hines v. Volkswagen of America, Inc,* 265 Mich.App 432, 438; 695 NW2d 84 (2005). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake was made. *Solution Source, supra* at 381-382.

The WPA is a remedial statute and is to be liberally construed to favor the persons the Legislature intended to benefit. *O'Neill v. Home IV Care, Inc,* 249 Mich.App 606, 614; 643 NW2d 600 (2002). "The WPA was enacted to remove barriers to an employee who seeks to report violations of the law, thereby protecting the integrity of the law and the public at large." *Id.,* citing *Hopkins v. City of Midland,* 158 Mich.App 361, 375; 404 NW2d 744 (1987). Generally, attorney fees are not recoverable unless expressly authorized by statute, court rule, judicial exception or contract. *Haliw v. Sterling Hts,* 471 Mich. 700, 707; 691 NW2d 753 (2005). The WPA provides that attorney fees may be awarded to a successful plaintiff:

> A court may also award the complainant all or a portion of the costs of litigation, including reasonable attorney fees and witness fees, if the court determines that the award is appropriate. MCL 15 .364.

When assessing the reasonableness of requested attorney fees, the court should consider the following nonexclusive list of factors:

> (1) the professional standing and experience of the attorney; 2) the skill, time, and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expense incurred; and (6) the nature and length of the professional relationship with the client. *[ Wood v. DAIE,* 413 Mich. 573, 588; 321 NW2d 653 (1982).]

Although plaintiff asserts that the court improperly considered only one of the *Wood* factors, the contingency fee arrangement, that is not the case-the court referred to both the contingency fee arrangement and the verdict, i.e., the result obtained:

**\*10** THE COURT: It's totally discretionary with the Court [whether to award attorney fees under the WPA.] Well in this case the Plaintiff, Mr. Heckman [sic], sued the City of Detroit, he was a 35 year employee, he was a CPA with the City of Detroit. He applied for a promotion to department head, in a letter he sent to the mayor and some other individuals who would be responsible for the promotion. A letter indicating that many individuals in the department he didn't believe were doing their jobs, they were not working all day long, et cetera. Basically, disparaging some other employees in the department and in that letter asking for the promotion. He was not chosen for the promotion, he then sued, there were a number of counts in the original complaint. The case-this Court granted Summary Disposition on all counts. The case evaluation award was $5,000.00. The Court of Appeals affirmed-

MR. STEFANI: It was $6,000.00.

THE COURT: Don't interrupt, counselor.

Heckmann v. City of Detroit, Not Reported in N.W.2d (2007)

2007 WL 1989518

MR. STEFANI: I'm sorry. I just wanted to-I thought you made a mistake, your Honor, I wanted the record to be clear, I'm sorry.

THE COURT: Okay.

So the case evaluation was $6,000.00 and then the Court of Appeals sent it back on one count, the whistle-blower count. The case went to trial and the jury awarded $600,000.00. The Plaintiff has a contingent fee arrangement with his attorneys so the attorney award is going to be the-at least, $200,000.00 the current judgment is for $660,000.00 with interest. The Court does not-that is more than adequate award for this case. The Court does not feel that it is appropriate to award additional attorneys fees so, the motion is denied

In determining whether to award plaintiff attorney fees, the trial court could properly consider plaintiff's contingency fee agreement with his counsel as long as that was not the sole factor considered. See *Phinney v. Perlmutter,* 222 Mich.App 513, 561; 564 NW2d 532 (1997), citing *Wilson v. General Motors Corp,* 183 Mich.App 21, 42; 454 NW2d 405 (1990). In this case, the contingency fee agreement was not the only factor the court considered. See *Phinney, supra* at 561.

Plaintiff also argues that the trial court abused its discretion by not addressing additional *Wood* factors. We conclude that the trial court was aware of the *Wood* factors because both parties' briefs set forth the list of factors, and counsel mentioned several of them at the hearing. Under these circumstances, the court's failure to mention more than two of the *Wood* factors does not constitute error.

Problematic, however, are several of the factual findings underlying the court's denial of attorney fees, specifically:

> [Plaintiff] applied for a promotion to department head, *in a letter he sent to the mayor and some other individuals who would be responsible for the promotion.* A letter indicating that many individuals in the department he didn't believe were doing their jobs, that were not working all day long, et cetera. Basically, disparaging some other employees in the department *and in that letter asking for the promotion.* He was not chosen for the promotion, he then sued ... [Emphasis added.]

**\*11** There is no support for the trial court's finding that plaintiff's whistleblowing letter requested or referred to a promotion. However there is record support for the trial court's finding that plaintiff brought suit after not being chosen for promotion. Although it is not clear which particular promotion the court meant, there are several possibilities, including Patel's position, and the Head of the Fiscal Operations Division position.[5] Since both of these promotions occurred before plaintiff filed suit on July 1, 2003, the trial court could have been referring to either of them, although the record is not clear whether the position of Head of Fiscal Operations was *filled* before plaintiff filed suit.

[5] Regarding Patel's position, on cross-examination, plaintiff testified that when Patel was promoted to be his immediate supervisor, apparently in or around April 2003, the position had not been posted, and the union, of which he was a member, filed a grievance because of the City's failure to follow proper hiring procedure. Apparently, plaintiff was the named grievant. Plaintiff testified that he did not apply for the position because it was never posted-he could not have applied for it. Had it been posted, he would have applied. Regarding the position of Head of the Fiscal Operations division, there was testimony that after the April 8, 2003 staff meeting at which Deputy Chief Andrews allegedly told plaintiff he better start looking for another job, plaintiff e-mailed Andrews on May 23, 2003 that he was interested in being promoted to Head of the Fiscal Operations division.

Given that the trial court's award of attorney fees under the WPA is discretionary, MCL 15.364, and that in denying plaintiff attorney fees the court referred to two of the *Wood* factors, neither of which is related to its erroneous factual findings that plaintiff's whistleblowing letter requested a promotion, we conclude that the trial court did not abuse its discretion in denying plaintiff attorney fees under the WPA. See *Phinney, supra* at 560-561.

2007 WL 1989518

We affirm both in the principal appeal and the cross-appeal.

**All Citations**

Not Reported in N.W.2d, 2007 WL 1989518

---

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5360 Filed 07/20/17 Page 90 of 121
Reeser v. Henry Ford Health System, Slip Copy (2016)

2016 WL 4374916

🚩 KeyCite Red Flag - Severe Negative Treatment

Vacated by Reeser v. Henry Ford Hospital, 6th Cir.(Mich.), June 8, 2017

2016 WL 4374916
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan, Southern Division.

Natalie Reeser, Plaintiff,

v.

Henry Ford Health System, Defendant.

CASE NO. 14-CV-11916
|
Signed 08/17/2016

**Attorneys and Law Firms**

Adam Carl Dhunbiryun Graham, Richard G. Mack, Keith D. Flynn, Miller Cohen, PLC, Detroit, MI, for Plaintiff.

Terrence J. Miglio, Varnum LLP, Detroit, MI, for Defendant.

**OPINION AND ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR ATTORNEY FEES (Doc. 112)**

GEORGE CARAM STEEH, UNITED STATES DISTRICT JUDGE

**\*1** Plaintiff Natalie Reeser brought this lawsuit alleging retaliatory discharge in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 291 *et seq.*, and Michigan's Whistleblower's Protection Act ("WPA"), M.C.L. § 15.362, for reporting defendant Henry Ford Health System's ("HFHS") failure to pay her for lunch breaks to the Michigan Department of Licensing and Regulatory Affairs ("LARA"). Prior to trial, defendant offered $10,000 to $15,000 to settle the case, but made no formal offer of judgment. A jury returned a verdict of no cause on the FLSA retaliation claim, but awarded damages for lost wages and fringe benefits in the amount of $3,200 on the WPA retaliation claim. The jury awarded no emotional distress damages. Now before the court is plaintiff's request for attorney fees. Plaintiff seeks fees in the amount of $315,133.32. For the reasons set forth below, and giving due consideration to the modest nature of plaintiff's partial victory at trial, the court shall award attorneys' fees in the amount of $10,000.

**A. Standard of Law**

The WPA provides the court with discretion to award attorneys' fees to a prevailing complainant. Specifically, Michigan Compiled Laws § 15.364 provides in relevant part, "[a] court may also award the complainant all or a portion of the costs of litigation, including reasonable attorney fees and witness fees, if the court determines that the award is appropriate." Attorney fees to prevailing plaintiffs in WPA cases are not mandatory, but are within the court's discretion. *See Heckmann v. City of Detroit*, No. 267391, 2007 WL 1989518, at \*10 (Mich. Ct. App. July 10, 2007); *Lease Acceptance Corp. v. Adams*, 724 N.W.2d 724, 733, n.8 (Mich. Ct. App. 2006); *Gomery v. Crest Fin., Inc.*, No. 20881, 2005 WL 658818, at \*1-2 (Mich. Ct. App. Mar. 22, 2005). Plaintiff bears the burden of proving the reasonableness of the requested fee. *Smith v. Khouri*, 481 Mich. 519, 528-29 ( 2008). In determining a reasonable fee, the court considers the following non-exhaustive list of factors: "(1) the professional standing and experience of the attorney; (2) the skill, time, and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expenses incurred; and

(6) the nature and length of the professional relationship with the client." *Wood v. Detroit Auto. Inter-Ins. Exch.*, 413 Mich. 573, 588 (1982) (internal quotation marks and citation omitted). It would indeed be within this court's discretion to deny attorneys' fees altogether. However, in its discretion and for the reasons stated below, this court will award a modest attorneys' fee.

### B. Analysis

#### 1. Prevailing Party Analysis Inapplicable

Defendant argues that plaintiff did not qualify as a prevailing plaintiff because she did not recover more than it offered to settle the case, and thus, is not entitled to any attorney fees as a matter of law. In support of its position, defendant relies on *Gomery, supra,* 2005 WL 658818, at *1-2. Such reliance is misplaced. *Gomery* involved a formal offer of judgment in compliance with certain Michigan court rules which provide for cost shifting to the prevailing party. In *Gomery*, the court noted that a party must be a "financially successful or prevailing party" to be eligible for an award of fees and costs under the WPA. 2005 WL 658818, at *1. A plaintiff is considered a prevailing party if her position is improved by the litigation. *Id.* A plaintiff's position is improved when she receives a judgment "in an amount greater than the offer made by defendants." *Id.* Defendant argues that here, plaintiff's position was not improved by the litigation because the jury awarded plaintiff only $3,200, significantly less than defendant's pre-trial settlement offers of $10,000 and $15,000. (Doc 121, Pg ID 3898). However, the test referred to in *Gomery* applies to cases where the defendant has made a formal offer of judgment in accordance with Michigan court rules. The *Gomery* court specifically noted that settlement offers were not to be considered, only formal offers of judgment. 2005 WL 658818, at *1.

**\*2** Here, the defendant made settlement offers during pre-trial negotiations, but did not make any formal offers to stipulate to the entry of a judgment. *See* Fed. R. Civ. P. 68; Mich. Ct. R. 2.405. While it is certainly debatable whether Michigan fee shifting rules could ever apply to this federal case, even if they did, *Gomery* does not render plaintiff ineligible for attorneys' fees here where no formal offer of judgment was ever made. Even so, although the settlement offers defendant made in this case do not preclude an award of fees per se, they are nevertheless one factor that the court considers in its analysis below. [1]

[1] Defendant also argues that no attorney fees should be awarded as a sanction for discovery abuses. That is the subject of a separate motion and forms no basis of the court's analysis here. Also, the court has not considered defendant's argument that plaintiff herself engaged in misconduct at trial in reaching its decision here.

#### 2. Evaluation of Factors Weighs in Favor of Modest Attorney Fee Award

Considering all of the factors to be weighed in determining an appropriate fee award, the court determines that plaintiff's counsel is entitled to only a modest fee. Most significantly, the court finds that the modest results achieved and the unnecessary protraction of the litigation outweigh the other factors. Plaintiff's counsel's expenditure of 1,189.7 hours of time on this case was not reasonable given the weakness of Plaintiff's damages evidence and the size of her ultimate recovery. Likewise, although the parties dispute the amount of hourly fees, the court's determination of an appropriate hourly fee is irrelevant here because plaintiff's limited recovery necessitates a significant fee reduction. Even if the court were to accept the hourly billing rate sought by plaintiff's counsel, the court cannot sanction the extensive time expended.

This court recognizes plaintiff's attorneys' experience and professional reputation; however, the total attorneys' fees requested are unreasonable. The case could have been more straightforward and handled more efficiently. Any complexities in the lawsuit were the result of a lack of cooperation between the parties, the filing of numerous *in limine* and discovery motions that the parties should have been reasonably expected to resolve on their own, and the otherwise overly litigious conduct of counsel for both parties. Recognizing that defendant significantly contributed to the unnecessary complexities of what should have been a more streamlined case, the court does not base its decision here solely on the fact

that the hours plaintiff's counsel expended on the case were clearly excessive. The court's decision here is rooted primarily on the need for proportionality between the costs of representation and the ultimate success of the prevailing party.

In determining the fee award, defendant urges the court to consider its settlement offers of $10,000 and $15,000. Plaintiff had made a settlement demand of $50,000 in August, 2014, and defendant did not make a counter offer until two years later. Given this significant delay in settlement negotiations, plaintiff argues that her decision to proceed to trial was reasonable. Plaintiff's argument might have persuasive value should her ultimate recovery have exceeded or approximated defendant's settlement offer. Defendant appears to have staked its settlement position on its belief that plaintiff's case lacked merit, and was worth at most, a nuisance value. Given the fact that the jury issued a no cause verdict on the FLSA claim, awarded a pittance on the lost wages claim under the WPA, and awarded no emotional distress damages on the WPA claim, defendant appears to be vindicated on its analysis of the minimal to non-existent settlement value of the case. The $3,200 lost wages award is less than 33 percent of what defendant offered at the pre-trial settlement conference and less than 22 percent of what defendant offered before trial.

**\*3** Contrary to plaintiff's position, defendant cannot be faulted for not offering more to settle the case than it did, or for not making a counter-offer sooner, when the jury clearly agreed with its conclusion that plaintiff's claim was worth very little. Thus, although the court agrees with plaintiff that defendant did not engage in any meaningful settlement negotiations until the eve of trial, the fact remains that those settlement offers did exceed the ultimate value of the case as determined by the jury. For this reason, defendant cannot be faulted for maintaining its conviction that the case had little – to no settlement value. Thus, the court considers plaintiff's rejection of defendant's settlement offer as one factor, among many, for awarding modest fees.

Most significantly, the court bases its decision here on plaintiff's nominal recovery. The law is well settled that the court may reduce an award of attorney fees on the basis of a plaintiff's limited success. *Carlson v. Optima Oil Enter., Inc.*, No. 2579603, 2009 WL 2136879, at \*2 (Mich. Ct. App. July 16, 2009) (citing *Schellenberg v. Rochester Mich. Lodge No. 2225*, 228 Mich. App. 20, 45-47 (1998)). In fact, the Sixth Circuit has stressed that the degree of success obtained is the most critical factor to determining a reasonable fee. *McKelvey v. Sec'y of U.S. Army*, 768 F.3d 491, 495 (6th Cir. 2014) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)). One way to think about the degree of success is to compare the damages awarded to the amount sought. *Id.* (citing *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)). "Few, if any, reasonable litigants would call a monetary judgment that comes in well under the money offered to settle the case a success." *Id.* Numerous courts have reduced attorney fee awards based on a plaintiff's limited success. *See Gratz v. Bollinger*, 353 F. Supp. 2d 929, 938 (E.D. Mich. 2005) (imposing 50 percent reduction given plaintiff's limited success); *Collister v. Sunshine Food Stores, Inc.*, 166 Mich. App. 272 (1988) (awarding $2,000 in attorney fees where plaintiff recovered $6,400); *Richard v. Oak Tree Grp. Inc.*, No. 1:06-CV-362, 2009 WL 3234159, at \*4 (W.D. Mich. Sept. 30, 2009) (decreasing attorney fee award by 85 percent to $3,082 where plaintiff recovered minimal statutory damages).

Here, the jury awarded plaintiff less than 0.5 percent of the $730,000 plaintiff sought at trial and significantly less than defendant offered to settle the case. Accordingly, the court determines that plaintiff is entitled to a reduced attorney fee award that is proportional to plaintiff's mild success in the case. The court determines that an award of $10,000 is appropriate, and notes that this amount is over three times the amount of the jury verdict. The court finds this award to be consistent with the remedial aim of the WPA, given the unique circumstances of this case where plaintiff recovered, in defendant's words, a "paltry" amount.

## C. Conclusion

Based largely on the very modest results of the lawsuit, and for the additional reasons set forth above, this court grants, in part, plaintiff's motion for attorney fees (Doc. 112) and awards plaintiff attorneys' fees in the amount of $10,000.

2016 WL 4374916

**IT IS SO ORDERED**.


**All Citations**

Slip Copy, 2016 WL 4374916

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2471265
Only the Westlaw citation is currently available.
This case was not selected for publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial
decisions issued on or after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals,
Sixth Circuit.

Natalie REESER, Plaintiff-Appellant,

v.

HENRY FORD HOSPITAL, Defendant-Appellee.

No. 16-2303
|
Filed June 08, 2017

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

**Attorneys and Law Firms**

Adam Carl Graham, Keith D. Flynn, Miller Cohen, Detroit, MI, for Plaintiff-Appellant

Terrence J. Miglio, Barbara Eckert Buchanan, Varnum, Detroit, MI, for Defendant-Appellee

BEFORE: BOGGS, MOORE, and McKEAGUE, Circuit Judges.

OPINION

McKEAGUE, Circuit Judge.

**\*1** Plaintiff Natalie Reeser appeals the district court's order granting in part and denying in part her motion for attorneys' fees. Reeser sought $315,133.32 in fees pursuant to Michigan's Whistleblowers' Protection Act (WPA), MICH. COMP. LAWS § 15.364, but the district court determined that she was only entitled to $10,000. Her primary argument on appeal is that the district court did not follow the correct process required by Michigan law when it calculated this fee. We agree. As recently confirmed by the Michigan Supreme Court in *Pirgu v. United Services Automobile Ass'n*, 499 Mich. 269, 884 N.W.2d 257 (2016), when Michigan statutes, such as the WPA, entitle litigants to recover a "reasonable attorney fee," courts are required to follow a particular three-part framework when awarding the fee. This mandatory framework was not followed here. Because this oversight constituted an abuse of discretion, we vacate the district court's order and remand for recalculation in line with *Pirgu*.

Additionally, while this appeal was pending, Henry Ford Hospital filed a motion to strike portions of Reeser's appellate briefing that it claims raised new arguments not made in the proceedings below. We deny this motion and order Henry Ford's counsel to show cause within 14 days why it should not be sanctioned under 28 U.S.C. § 1927.

I

2017 WL 2471265

Natalie Reeser and Henry Ford Hospital have been embroiled in contentious litigation for approximately three years. Reeser brought federal and state retaliatory-discharge claims against Henry Ford after it fired her for leaving the clinic, where she worked as a laboratory assistant, unattended during the lunch hour. According to Reeser, she was fired for reporting Henry Ford to state regulatory authorities after it forced her to work through lunch without pay. Reeser filed the instant suit, alleging that Henry Ford unlawfully retaliated against her in violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 215(a)(3). She also sought state-law relief under the WPA, which prohibits an employer from discharging an employee for "report[ing] ... a violation or a suspected violation of a law ... [of] the United States to a public body." MICH. COMP. LAWS § 15.362.

After a hostile discovery process that included more than fifteen non-dispositive motion filings, the parties went to trial. Reeser sought $730,000 in economic and emotional distress damages. After seven days, the jury returned a no-cause verdict on Reeser's FLSA claim, but found in her favor on the WPA retaliation claim. It awarded her actual damages of $3,200 for lost wages and fringe benefits.

Reeser then filed a motion for attorneys' fees pursuant to the WPA, which provides a court with discretion to award "reasonable attorney fees ... if the court determines that the award is appropriate." MICH. COMP. LAWS § 15.364. Reeser requested $315,133.32. She arrived at this figure by multiplying 1,189.7 hours expended by hourly rates ranging from $250 to $300 for the four attorneys involved. Reeser primarily blamed Henry Ford's hostile tactics for the large number of hours accumulated.

**\*2** The district court granted Reeser's motion in part. First, it concluded that Reeser was entitled to attorneys' fees under the statute. Second, it determined that Reeser was entitled to a "modest" fee of $10,000. The district court did not indicate how it arrived at this specific figure, although it justified awarding a substantially lower amount than Reeser requested by referring to certain factors delineated by the Michigan Supreme Court in *Wood v. Detroit Auto. Inter-Ins. Exch.*, 413 Mich. 573, 321 N.W.2d 653 (1982) ("the *Wood* factors"). The district court did not explicitly discuss each *Wood* factor, finding that "the modest results achieved and the unnecessary protraction of the litigation outweigh[ed] the other[s]." R. 129 at 4, 7, PID 4599, 4602 (emphasizing that Reeser's ultimate recovery of $3,200 was less than 0.5% of the $730,000 she sought at trial). It also did not calculate a lodestar, instead concluding that Reeser's claimed hours "w[ere] not reasonable" and that the hourly rates she proposed were "irrelevant." *Id.* at 4, PID 5499. This appeal followed.

II

"Under both Michigan and federal law, a trial court's award of attorney fees is generally reviewed under the abuse-of-discretion standard." *Bailey v. Scoutware*, 599 Fed.Appx. 257, 258 (6th Cir. 2015) (quoting *Shields v. Gov't Emps. Hosp. Ass'n*, 490 F.3d 511, 514–15 (6th Cir. 2007)). A trial court abuses its discretion when it makes an error of law. *Pirgu*, 884 N.W.2d at 260.

When a state statute authorizes the grant of attorneys' fees, state law governs both whether the fees should be awarded and the amount of those fees. *See Shimman v. Int'l Union of Operating Eng'rs, Local 18*, 744 F.2d 1226, 1238 (6th Cir. 1984) ("Federal courts must generally apply state law regarding attorney fees to a state law claim pendent to a federal claim.") (citing *Aleyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n.31, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)); *Bailey*, 599 Fed.Appx. at 258 (applying Michigan law to a review of the reasonableness of attorneys' fees awarded under the WPA). Because the WPA is the source of authority for Reeser's award, Michigan law applies to the calculation of that fee.

A

2017 WL 2471265

Historically, Michigan courts have applied a multi-factor test when calculating reasonable attorneys' fees. *See Wood*, 321 N.W.2d at 661. However, in 2008 the Michigan Supreme Court eschewed this flexible method in favor of a more structured approach.

In *Smith v. Khouri*, the Michigan Supreme Court reviewed the reasonableness of attorneys' fees awarded under the state's case-evaluation statute, MICH. COMP. LAWS § 2.403(O). 481 Mich. 519, 751 N.W.2d 472, 479 (2008). In doing so, it provided a three-part framework for lower courts to follow. Step 1: "[A] trial court should begin its analysis by determining the fee customarily charged in the locality for similar legal services." *Id.* Step 2: "This number should be multiplied by the reasonable number of hours expended in the case." *Id.* The product of these two figures—i.e., the lodestar—"serves as the starting point." Step 3: "Thereafter, the court should consider the remaining *Wood*/MRPC factors to determine whether an up or down adjustment is appropriate." *Id.* at 479–80. This last step entails considering the *Wood* factors previously delineated by the Michigan Supreme Court as well as those listed in Rule 1.5(a) of the Michigan Rules of Professional Conduct (MRPC). The trial court in *Smith* did not follow this prescribed framework, as it failed to determine a reasonable hourly rate for each attorney. The Michigan Supreme Court held that this was an abuse of discretion. *Id.* at 475, 481.

In 2015, our own court applied the *Smith* framework to a review of attorneys' fees awarded under the WPA—the same statute at issue here. *See Bailey*, 599 Fed.Appx. at 257 ("Under Michigan law, when calculating a fee award, the trial court *must* first determine the hourly fee ... and multiply that fee by the number of hours reasonably expended in the case. The court *must* then consider whether an adjustment is warranted based on other specified factors....") (emphases added) (citing *Smith*, 751 N.W.2d at 478–80).

**\*3** After *Smith*, some Michigan Courts of Appeals grew uncertain as to whether its attorneys' fees framework was applicable beyond the case-evaluation context; however, in June 2016, the Michigan Supreme Court decided *Pirgu v. United Services Automobile Ass'n* and resolved this uncertainty. In *Pirgu*, the Michigan Supreme Court confirmed our earlier belief that the *Smith* framework applied to all fee-shifting statutes that provided for "*a reasonable fee*." *Pirgu*, 884 N.W.2d at 263 ("The operative language triggering the *Smith* analysis is the Legislature's instruction that an attorney is entitled to *a reasonable fee*."). It also reiterated that following this framework was not optional for lower courts: "a trial court *must* begin its analysis" by calculating the two figures that comprise the lodestar and then "*must* consider *and briefly discuss on the record* the remaining *Wood* factors and the factors in MRPC 1.5(a)." *Id.* (emphasis added). Since many of these factors overlapped, the *Pirgu* court distilled them into a single, eight-factor list. *See id.* at 264. Although trial courts were required to consider *all* eight factors, they were also permitted to consider other relevant factors as well. *Id.* "In order to facilitate appellate review," trial courts were directed to "briefly discuss ... each of the factors [ ] on the record and justify the relevance and use of any additional factors." *Id.* at 264–65.

As in *Smith*, the *Pirgu* court found the trial court abused its discretion by not following this framework when it awarded attorneys' fees under Michigan's no-fault insurance act: "The trial court erred by not starting its analysis by multiplying a reasonable hourly rate by the reasonable number of hours expended." *Id.* at 265. Moreover, it erred in "primarily relying on only one [*Wood*/MRPC] factor—the amount sought and the results achieved—and failing to briefly discuss its view of the other factors." *Id.*

## B

In this case, the district court did not follow *Smith* and *Pirgu* when it awarded Reeser $10,000 in attorneys' fees. Instead, it relied on Michigan's outdated, multi-factor approach under *Wood*. This was error. The WPA contains the *Smith* framework's triggering language: it provides courts with discretion to award "*reasonable* attorney fees." MICH. COMP. LAWS § 15.364 (emphasis added); *Pirgu*, 884 N.W.2d at 263.

The district court's principal error was in failing to follow the first two steps of the *Smith* framework, that is, in failing to calculate the lodestar. As to Step 1, the district court did not calculate a reasonable hourly rate for each of Reeser's four attorneys, finding instead that "the court's determination of an appropriate hourly fee is irrelevant here because [Reeser's] limited recovery necessitates a significant fee reduction." R. 112 at 4, PID 4599. As to Step 2, the district court did not calculate the reasonable number of hours expended by Reeser's attorneys, stating only that the 1,189.7 hours proffered "was not reasonable given the weakness of [Reeser's] damages evidence and the size of her ultimate recovery." *Id.*

But *Smith* required the district court to calculate a lodestar in order to establish a baseline figure from which to adjust downwards based on Reeser's limited recovery. Without such a baseline, courts are left with nearly unfettered discretion to award any seemingly arbitrary amount—a result that the Michigan Supreme Court expressly sought to prohibit. Moreover, Michigan law provides no exceptions to calculating a lodestar, even if, as the district court found here, the results achieved are disproportionate to the hours expended. *See Pirgu*, 884 N.W.2d at 261 (holding that "a trial court *must* begin its reasonableness analysis [by calculating the lodestar]") (citing *Smith*, 751 N.W.2d at 479). While the district court was not obligated to accept Reeser's proposed number of hours, it was required to formulate a reasonable alternative.

Finally, as to Step 3, the court appeared to consider at most only four of the eight *Wood*/MRPC factors. *Pirgu*, however, dictates that a district court consider "*all* of the [ ] *Wood* and MRPC 1.5(a) factors." *Id.* at 264. Here, the district court made the same misstep as the trial court in *Pirgu* by relying primarily on one factor—the amount in question and the results obtained—which was erroneous. *Id.* at 264, 265; *see also Kennedy v. Robert Lee Auto Sales*, 313 Mich.App. 277, 882 N.W.2d 563, 568 (2015) (reversing the trial court's award of fees where it "focused myopically on the amount obtained by plaintiff"). Although the district court was correct that Reeser's jury verdict of only $3,200—compared to the $730,000 sought—may undoubtedly be relevant, this factor comes into play only after the lodestar is calculated, and is considered alongside seven other factors. This single factor alone cannot serve as a substitute for dispensing with the *Smith* framework altogether. [1]

[1]     The district court also considered an additional, non-*Wood*/MRPC factor in determining Reeser's fee award: Henry Ford's prior settlement offers. This was appropriate and the trial court may do so again on remand, as *Pirgu* states that a "trial court may consider any additional relevant factors." *Pirgu*, 884 N.W.2d at 264.

**\*4**  In urging us to uphold the $10,000 award, Henry Ford primarily argues that the *Smith* framework does not apply and that, even if it does, the result a party obtains at trial is the most critical factor and can exclusively justify lowering an award. These arguments are unavailing. As to the former, our circuit had already applied the *Smith* framework to the WPA in 2015, and the Michigan Supreme Court's language in *Pirgu* removed any lingering doubt as to its applicability. Furthermore, Henry Ford cites exclusively federal law in support of its latter argument. But, as even it recognizes in its brief, Michigan law applies here. *See* Appellee Br. at 30 n.2. And while federal law may perhaps be more favorable to Henry Ford's position, Michigan has "rejected the federal lodestar method," instead preferring a stricter, more comprehensive analysis. *See Smith*, 751 N.W.2d at 483.

The Michigan Supreme Court implemented and reaffirmed the *Smith* framework with the intent that it would "lead to greater consistency in awards." *Id.* at 479. And as that court has reiterated, a failure to follow it amounts to an abuse of discretion. Because the district court did not calculate a lodestar nor consider all eight *Wood*/MRPC factors—both of which are required by *Smith* and *Pirgu*—it abused its discretion in calculating Reeser's $10,000 fee award. [2]

[2]     While the district court must follow the correct framework on remand, we express no opinion on the amount of the fee award that may be appropriate.

### III

Next, Henry Ford filed a motion while this appeal was pending to strike parts of Reeser's briefing referring to the MRPC 1.5(a) factors, *Pirgu*, and two other court cases discussing various reformulations of the *Wood*/MRPC factors. A motion to strike may at times be warranted, for example, in asking the court to strike extraneous materials from the appellate record. *See Bailey*, 599 Fed.Appx. at 257–58. But the motion is not a tool to strike words, sentences, or even arguments from an opponent's brief. *See Redwood v. Dobson*, 476 F.3d 462, 471 (7th Cir. 2007). Using the motion in this fashion "waste[s] everyone's time," "increase[s] the amount of reading the merits panel must do," and only serves "to aggravate the opponent." *Id.*

Yet this is precisely what Henry Ford has done. The appropriate tool for Henry Ford to have contested Reeser's allegedly new arguments was through its own responsive briefing. *Id.* It failed to utilize any of its 45-page merits brief for this purpose. Seeking to circumvent this oversight by way of its later filed motion to strike was improper. And it is worth noting that Henry Ford used the motion in a similarly inappropriate fashion below, where it filed three separate motions to strike specific claims from Reeser's complaint. The district court, in substantially denying each of these motions, concluded that Henry Ford should have raised its arguments in its earlier motion for summary judgment. *See* R. 83 at 88, PID 2893.

Moreover, what Henry Ford claims are new *arguments* are at most citations to new *authorities* unfavorable to its position. The argument Reeser raised below, and the one before us on appeal, are the same: that she should be entitled to reasonable attorneys' fees under Michigan law. And to the extent Reeser cites new authorities, there is no rule prohibiting a party from doing so. *See Costantino v. TRW, Inc.*, 13 F.3d 969, 981 n.13 (6th Cir. 1994). In fact, "a new citation to relevant, binding authority is as welcome on appeal as in the court below." *Id.* For example, asking us to ignore *Pirgu*, a recent, binding authority from the state's high court, is akin to asking us to shirk our duty to say what the law is, and if anything, signals Henry Ford's awareness of the weaknesses *Pirgu* exposes in its own case.

Besides being improper, we also find that Henry Ford's motion was disingenuous. Contrary to Henry Ford's assertions, Reeser explicitly asked the district court to consider the factors listed in "Rule 1.5(a) of the Michigan Rules of Professional Conduct" in her motion for attorneys' fees. R. 112 at 6, PID 3422. And the two other cases cited by Reeser to which Henry Ford objects are nothing more than examples of recent courts applying the same *Wood*/MRPC factors that Reeser mentioned below. *See Grow v. WA Thomas Co.*, 236 Mich.App. 696, 601 N.W.2d 426 (1999); *Hemlock Semiconductor Corp. v. Solarworld Indus. Sachsen GmbH*, No. 13-CV-11037, 2016 WL 6471192 (E.D. Mich. Nov. 2, 2016).

**\*5** In her response to the motion to strike, Reeser asks us to sanction Henry Ford's counsel under 28 U.S.C. § 1927, specifically, to order that he reimburse her attorneys for the time spent having to respond to this motion. Section 1927 provides that "[a]ny attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." The purpose of § 1927 sanctions is "to deter dilatory litigation practices and to punish aggressive tactics that far exceed zealous advocacy." *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006). Sanctions may be appropriate when an attorney "intentionally abuses the judicial process or knowingly disregards the risk that his actions will needlessly multiply proceedings." *Id.* No finding of bad faith is necessary, but something more than negligence or incompetence must be demonstrated. *Id.*

Although both parties are partly to blame for the acrimonious nature of this case, it seems that Henry Ford's counsel initiated much of the dilatory conduct. His continued improper use of the motion to strike and overall antagonistic behavior below, coupled with the frivolous allegations contained in his most recent motion to strike, convince us that sanctions may be warranted. Reeser's entire objective in filing this appeal was to be awarded more fees for the thousand-plus hours that her attorneys spent litigating this case—hours she claims were accumulated in large part due to Henry Ford's obstructionist tactics. Henry Ford's motion to strike certainly seems to support Reeser's theory. Accordingly, we

**Reeser v. Henry Ford Hospital, --- Fed.Appx. ---- (2017)**

2017 WL 2471265

order Henry Ford's counsel to show cause, pursuant to 28 U.S.C. § 1927, why he should not be sanctioned for filing the motion to strike and be required to pay Reeser's attorneys the fees associated with having to respond.


**IV**

For the foregoing reasons, we **VACATE** Reeser's award of attorneys' fees and **REMAND** the case to the district court for a recalculation based on *Pirgu v. United Services Automobile Ass'n*, 499 Mich. 269, 884 N.W.2d 257 (2016). Additionally, we **DENY** Henry Ford's motion to strike and **ORDER** its counsel to show cause why he should not be sanctioned. Counsel will have 14 days to submit a response to the clerk of this court.


**All Citations**

--- Fed.Appx. ----, 2017 WL 2471265

---

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 5657544
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Ilene TINMAN and Michael Tinman, as next friends of Tzvih Tinman, Plaintiffs–Appellees/Cross Appellants,
v.
BLUE CROSS AND BLUE SHIELD OF MICHIGAN, Defendant–Appellant/Cross Appellee.

Docket No. 322601.
|
Sept. 24, 2015.

Wayne Circuit Court; LC No. 99–932051–CK.

Before: K.F. KELLY, P.J., and CAVANAGH and SAAD, JJ.

**Opinion**

PER CURIAM.

**\*1** Defendant-appellant/cross appellee, Blue Cross and Blue Shield of Michigan (Blue Cross or BCBSM), appeals as of right an opinion and order awarding $876,885 in attorney fees to plaintiffs-appellees/cross appellants, Ilene Tinman and Michael Tinman, as next friends of Tzvih Tinman (plaintiff). We affirm in part, reverse in part, and remand for further proceedings.

## I. BASIC FACTS AND PROCEDURAL HISTORY

This attorney fee dispute arises from litigation in which plaintiff claimed that Blue Cross improperly failed to pay hospital emergency bills that incurred for Tzvih's medical care. Though the issues that confront us on appeal are rather straight forward, the long history of this case is not. In fact, this is the fourth time this case has been before this Court. See *Tinman v. Blue Cross & Blue Shield of Mich,* 264 Mich.App 54; 692 NW2d 58 (2004) (*Tinman I* ); *Tinman v. Blue Cross & Blue Shield of Mich,* unpublished opinion per curiam of the Court of Appeals, issued February 14, 2008 (Docket No. 268448) (*Tinman II* ); and *Tinman v. Blue Cross & Blue Shield of Mich,* unpublished opinion per curiam of the Court of Appeals, issued September 6, 2012 (Docket No. 298036) (*Tinman III* ). Because the parties are familiar with the extensive history of this case, we need not provide a detailed recitation of facts.

Plaintiff sued Blue Cross after Blue Cross refused to pay for Tzvih's emergency room visit, claiming that Blue Cross violated MCL 550.1418 by denying coverage based on Tzvih's "final diagnosis" as opposed to his presenting symptoms. Because plaintiff believed that Blue Cross systematically denied coverage for emergency services on the basis of an insured's final diagnosis, plaintiff brought suit on his behalf as well as other Blue Cross insureds. Blue Cross then removed the case to federal court, where the federal court dismissed some of the ERISA claims. The federal court declined to address the issue of whether plaintiff's action was properly brought as a class action. *Tinman v. Blue Cross & Blue Shield of Michigan,* unpublished memorandum opinion and order of the United States District Court, Eastern District of Michigan, issued January 31, 2002 (Docket No. 00–CV–72327–DT). On remand to the Wayne Circuit Court from the federal district court, former Judge Warfield Moore certified the class. However, this Court reversed that order,

2015 WL 5657544

finding that the individual questions of each plaintiff predominated over the common questions presented. *Tinman I,* 264 Mich.App at 564–656. On remand from this Court to the Wayne Circuit Court, Judge Moore denied plaintiff's attempt to certify a class for declaratory and equitable relief, which this Court affirmed in *Tinman II.* In the meantime, Judge Moore had granted plaintiff summary disposition. Plaintiff then sought attorney fees of over $900,000. An incomplete evidentiary hearing was held and Judge Stempien awarded plaintiff $655,000 in attorney fees and $2,440 in costs.

**\*2** The matter then came to this Court for a third time in *Tinman III.* We found that the trial court abused its discretion in refusing to complete the evidentiary hearing regarding attorney fees. *Tinman III,* slip op, pp 4–7. We also concluded that the trial court's analysis was insufficient to justify the award or enable meaningful appellate review, pointing to the trial court's failure to make adequate findings regarding "the customary fee in the locality for each attorney, the number of hours reasonably expended by each attorney on plaintiff's individual claim as opposed to their unsuccessful class-action claim, and the use of more than one attorney on the same general tasks." *Id.* at 7. The *Tinman III* Court ordered the trial court to, on remand, "make more specific findings, consistent with *Smith [v. Khouri,* 481 Mich. 519, 530–533; 751 NW2d 472 (2008) ] and *Augustine [v. Allstate Ins. Co.,* 292 Mich.App 408; 807 NW2d 77 (2011) ], regarding [1] the customary fee in the locality for each attorney whose fees plaintiffs seek to recover, [2] the reasonable number of hours expended by each attorney, and [3] the reasonableness of having multiple attorneys working on the same general task." *Id.* at 11.

Finally, the *Tinman III* Court addressed defendant's claim that the trial court improperly applied the "catalyst theory" to its fee award: "In assessing whether plaintiffs' baseline attorney fees were excessive in light of the size of the monetary judgment, the trial court abused its discretion in considering defendant's voluntary changes to its emergency-claims procedures." *Id.* at 11. Citing *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dep't of Health and Human Resources,* 532 U.S. 598; 121 S Ct 1835; 149 L.Ed.2d 855 (2001), the *Tinman III* Court concluded that "the results achieved should be considered in the context of the claim presented, i.e., the substantive merits of the case, rather than a change in the defendant's conduct that the trial court did not order." *Id.*

The case then returned to the trial court and Judge Stempien, where the court conducted an exhaustive evidentiary hearing.

John Zuccarini of the Simon firm testified that he was primarily responsible for keeping track of the hours spent on the Tinman case and class action.[1] Zuccarini had been practicing law since 1988 and was an editor for the Wayne Law Review. Zuccarini explained that Simon was the firm's owner and decided which cases to take. Wassman and Young were the principal attorneys who had primary responsibility for the Tinman case. The case was a collaborative effort, meaning that the attorneys met and talked about trial strategy. As a general rule, they would circulate complaints and briefs for review by other attorneys. Simon made it clear that all attorneys should enter their time contemporaneously with the work performed. Zuccarini would write his time on a piece of paper and have his secretary type it. For the Tinman case, there was no monthly summary, but the case was reviewed on a quarterly basis. Zuccarini denied that there was pressure to inflate the hours worked on the case.

[1]     Zuccarini stopped working at the Simon firm in 2012.

**\*3** Zuccarini testified to the extensive case history. There were 141 docket entries while the case was in federal court. In state circuit court, the entries through July 2008 alone numbered 259. He believed that the over 400 docket entries "jived" with the complexity of the case, whose file comprised several file cabinet drawers and 30 or more boxes. At least six different judges participated in some way with the case. Contrary to defense counsel's statement, Zuccarini testified that a principle allegation in the Tinman case was that defendant had violated MCL 550.1418(1) by denying payment based on final diagnosis.

2015 WL 5657544

Zuccarini testified that, in drafting the complaint, a significant amount of time was spent anticipating and preparing for possible defenses. In its answer, defendant denied withholding benefits based on illegal criteria. Defendant did not admit that they based the denial on a final diagnosis, specifically stating that "Blue Cross did not deny Plaintiff's claim or any alleged class claims on the basis of final diagnosis." Even after the class was decertified, defendant never admitted to wrongdoing. In light of these denials, Zuccarini believed that he had to show that the allegations in the complaint were true—that defendant was "in fact systematically denying claims on the basis of final diagnosis."

Zuccarini testified to certain "smoking gun" documents that were discovered while the case was in federal court. Defense counsel objected, arguing that "none of these documents are relevant under the Court of Appeals opinion that decertified the class in 2004." The trial court noted: "Well I'm overruling it because it go[es] to the amount of work that may go, I don't know, I have to look at it, but that may go to the amount of work that was put into the case whether it affects Tinman individually or not, I don't know."

Zuccarini testified that defendant's internal documents indicated that while payment for emergency care must be based on how a patient must be assessed at the time of treatment and not based on final diagnosis, payouts were administered and based on an outdated and inadequate benefit criteria in the Medical Emergency Diagnostic List (MEDL), which had the effect of basing reimbursement on the final diagnosis, rather than signs and symptoms. If the diagnosis on a claim was not on the MEDL, then the claim was rejected as a nonemergency. The documents revealed that, when resubmitted, previously rejected claims were paid 88 percent of the time. When manually reviewed, those claims were paid 99.6 percent of the time. This resulted in a $22 million increase in payout to defendant's customers. Zuccarini noted that, although these documents were prepared before plaintiff's claim was even rejected, defendant continued to deny wrongdoing in plaintiff's case. Zuccarini testified that defendant's repeated denials created additional work because the responses were inconsistent with defendant's own internal memos. And, while one memo indicated that coverage was triggered based on presenting symptoms, the professional claims form did not include a field for presenting symptoms.

 *4  Zuccarini did not believe the merits of the issue of liability were different for plaintiff than the other class members and the firm was not seeking fees for time dedicated to the class action. Only the Tinmans were interviewed; no other class plaintiffs were contacted. Zuccarini was also seeking fees for time spent researching and preparing the original motion for attorney fees.

Zuccarini testified to the contents of his February 6, 2008 Declaration, which set forth the specific time spent on the case. The fee application was for 2,257.5 hours, which reflected 1,896.5 hours spent by the Simon firm and 361 spent by Lebenbom. With hourly fees ranging from $250 to $495, the total request (without regard to hours spent seeking fees) was $937,462.50. The Simon firm also sought $241,843.75 for 562 hours spent in connection with the fee application.

Zuccarini spent considerable time at the evidentiary hearing defending the time spent, which included: extensive pre-filing investigation, including researching potential preemption defenses and ERISA; preparing interrogatories; general discovery, planning, and management; numerous motions to compel; responding to defendant's motions for protective order; responding to discovery requests; reviewing, indexing, and analyzing over 50,000 pages of documents; responding to privilege claims; responding to defendant's attempts to keep the records presented in the federal court under seal; preparing for and attending status conferences; reacquainting themselves after matters were adjourned; drafting and responding to motions for summary disposition; preparing motions for reconsideration; preparing a trial binder; and, time spent in settlement negotiations.

Zuccarini acknowledged that there were times when multiple attorneys did the same work. The firms had four attorneys and an associate, "so everybody pretty much knew what everybody else was doing." Plaintiff's attorneys "were faced with basically a scorched-earth defense in our view. It seemed that Blue Cross was throwing everything against the wall to see what would stick and in order to do our job appropriately we had to respond to whatever it is that they threw at us."

Zuccarini testified that, in all, the firm put in 1,953.50 hours on the case from 1999 to 2005. "Individual time for the first couple of months of the case" totaled 170.25. There was a computer change and then a "continuation of the non-discovery time attributed to litigation other than the class from the time of the computer change until the end of 2005" totaled 812.5 hours. Non-class discovery totaled 970.75. Zuccarini agreed that 57 hours should be excluded, bringing the total to 1,896.50. He added:

> I would make the proviso that this was an inexact science, we were asked to after-the-fact divide our time up between class and nonclass matters.
>
> We certainly didn't bill our time ... from 1999 to 2005 thinking that that was something we would have to do. So when we made the effort to divide our time we did the best we could and we tried to be as conservative as possible.

**\*5** So subject to that I think this is an accurate reflection of the time devoted by Plaintiff's counsel, counsel to the prosecution of Tinman's individual claim.

Zuccarini testified that any fees incurred after 2005 were for the recovery of statutory attorney fees. Through 2008, the Simon Firm had worked 641.25 hours for attorney fees and expenses. A total of 1,012.75 hours were spent over eight years of fee litigation. He testified that, if anything, the time was underestimated.

Zuccarini identified a 2006 survey of the top 250 firms reflected an average hourly rate of $348 per hour. He also considered what the Simon firm charged its hourly clients from 1999–2005. Simon billed $415 to $465 an hour; Zuccarini billed $395 to $440 an hour; Wassman and Young each billed $395 an hour. Importantly, he also pointed to defendant's billing records. The Bodman firm, which represented defendant, had 32 attorneys work on the case for various tasks. They billed 2,533.9 hours and the total amount was $493,720.05. There was also defendant's in-house counsel, who billed 1,250 hours. James Walsh, defendant's lead counsel, billed $410 an hour at the time. Zuccarini noted that his son was four when the litigation started and had just graduated high school and "we still haven't been paid a penny," while defense counsel was paid as fees were incurred. Plaintiff's counsel also presented surveys from the State Bar of Michigan Economics of Law Practice. The trial court considered the National Law Journal because attorneys had done work nationally.

During cross-examination, Zuccarini acknowledged that the Simon firm often acted as local co-counsel and that very few of their cases were ever tried. Defense counsel tried to hammer home the fact that the Simon firm was a class action law firm with very few, if any, non-contingency or fee-shifting clients. Zuccarini denied that the firm "padded" its time because it knew it was going to be paid by the opponent. The firm was seeking fees for time spent before Mrs. Tinman received the EOB as well as for investigating antitrust issues and ERISA preemption even though those issues did not apply to Tinman. Zuccarini defended spending 140.25 hours to research and draft the complaint. He acknowledged some differences between Wassman's time and other attorneys, but suggested that the attorneys simply did not claim the time or considered the time to be in pursuit of the class action. As defense counsel attacked the billings line by line, the trial court noted that defendant did not provide a breakdown of each task performed; it only supplied the total number of hours and the total amount billed.

The trial court questioned Zuccarini about the fact that defendant had changed the manner in which it administered emergency benefit claims in an effort to comply with the law and avoid further litigation.

Mark Bendure testified that he had been an attorney for 40 years and concentrated on appellate work. He was a member of numerous state and federal bars. He has been recognized by Super Lawyers every year since 2007, was honored by Michigan Lawyers Weekly, and Crain's Detroit. Bendure had entered into a "blended hourly/contingent fee" with plaintiff for his appellate work. It was originally a fixed amount of $8,000–$10,000 plus a percentage of any recovery. The $350 an hour that Bendure used, therefore, did not reflect the actual agreement; it was a reflection of what he believed to

be a reasonable hourly rate. His hourly rate to other clients was $300–$350 and he compared his rates to Walsh. He also consulted the Appellate Practice Section Survey, which had an average rate of $250, as well as State Economics Survey.

**\*6** Elwood Simon testified during earlier proceedings and the parties stipulated to admitting his prior testimony. Simon nevertheless testified at the hearing. [2] His area of expertise was class action litigation on complex matters. He defended the time spent investigating the case before filing the complaint as an attempt to comply with the court rules that require an adequate investigation in law and facts. Simon was "comfortable" to learn that there was a fee-shifting provision in the statute that would allow him to collect attorney fees, even if a class action failed. The Simon firm incurred substantial costs of over $60,000 but had been awarded a small percentage—just over $4,000. Plaintiff's counsel assured the trial court that he was not seeking additional costs, but was simply trying to dispel defense counsel's claim that there was a windfall. [3] Simon guessed that he had "written off" nearly 1,000 hours for class work.

[2]  Defense counsel acknowledged that Simon kept meticulous time records and, therefore, defense counsel did not doubt that Simon spent his time as accounted. However, defense counsel challenged whether the hours claimed by the other attorneys (especially Wassman) were actually spent doing what they did: "I'm challenging Wassman's time." "I don't know about Mr. Young, I want to see what he says." In short, defense counsel made it clear that, aside from Simon, he would be challenging whether the hours claimed were actually worked. The focus was not necessarily on whether the amount of time claimed was reasonable but whether the time records were accurate.

[3]  Plaintiff's counsel appeared to change his position at a later hearing, arguing that the trial court could revisit the matter of costs without contradicting *Tinman III.* But then during final arguments he added: "They are out $55,000 in costs, as well as the costs of our firm. And we're not seeking recovery of that."

Defense counsel objected when Simon testified that the firm learned about defendant's systemic claim denial by defendant after reviewing 50,000 pages of documents. The following exchange took place:

MR. WALSH: Objection, your Honor, that's completely irrelevant. The Court of Appeals has ruled that this case is about Mr. Tinman's claim and nothing else.

THE COURT: Overruled, for the reason that he's explaining what work he had to do for Mr. Tinman. He['s] explaining work he had to do for Mr. Tinman, also that he was doing for a class, that's what I'm getting.

MR. BENDURE: That's exactly where we're going, your Honor.

THE COURT: That's what I'm getting out of it.

MR. WALSH: For the record, your Honor, I'd like to state that the initial Court of Appeal[']s opinion decertifying the class ruled that it was Mr. Tinman's signs and symptoms that were determinative of his recovery and nothing else. Thank you.

Simon testified that the discovery process confirmed the existence of defendant's declining coverage on the basis of final diagnosis. It "allowed us to prevail in the Tinman case both in terms of disproving the defenses that had been asserted by counsel and by establishing a very, very extensive record to confirm that Blue Cross itself admitted and confirmed they were violating the statute, and had violated the statute by their practice."

Over objection, Simon testified that defendant had changed its policy as a result of the litigation. "[I]t has always been our belief that the reason they made this change was because they got caught, not because they voluntarily did it, although that may be true, they may have voluntarily did it but nothing that we found in our examination of the documentation which was referenced here indicates that it was anything other than a reaction to, among other things, this litigation." Simon testified that defendant had been saving $500,000 a month by rejecting emergency visit claims. The documents revealed that changes were necessary " 'to avoid challenges such as the one in the pending case.' " The documents specifically point to the class action lawsuit based on diagnosis-related rejections.

**\*7** Simon testified that they took a collaborative approach at the firm and, therefore, some activities were conducted by more than one attorney at the office. Each attorney played a role. Wassman was the lead attorney, Zuccarini's strength was his writing, and Young's strength was his command of economics. Simon believed the case was particularly difficult because it was a matter of first impression and "defendant was very staunch in its defense." Work on the Tinman case precluded the firm from taking other clients. Simon concluded: "Whatever the Court awards in terms of reasonable fee, it will never be a windfall to us, number one, and all it will do is to reduce the windfall that Blue Cross has benefited from not having to pay out the benefits and retaining those benefits that were due under the law that they didn't pay." When defense counsel tendered the $800 check in April 2005, there was no offer to satisfy the obligation to pay attorney fees.

Lance Young testified that he worked for a steel company for two years after law school before joining the Simon firm, where he worked for ten years before spending five years in private practice and ultimately joining the Sommers Schwartz firm. Young testified that he no longer had an economic interest in the outcome of the litigation.

Young testified that the Simon law firm kept accurate records, which were required by the courts and co-counsel. He testified that he accurately reported the time spent on the Tinman case. He denied being under any pressure to inflate his time. Zuccarini's declaration accurately reflected the time spent on the Tinman case and "if anything the numbers here are fairly light." Young remembered "30, 40, 50 boxes of physical documents in the hallway" containing 50,000 pages of documents that the attorneys had to review. It was among those documents that they unearthed evidence that defendant based its payment decision on final diagnosis instead of signs and symptoms. In Young's opinion, "Tzvih's case was to prove that Blue Cross denied his claim on the basis of final diagnosis." "What we were going to prove for Tzvih Tinman as the name class rep, had the case continued to be certified, would have proven the case for everybody else. The fact that it was decertified is no detraction from the fact we still had to prove these basic elements for Tzvih Tinman's case."

Young defended time claimed for general strategy, reviewing, indexing, and analyzing documents, as well as working on privilege logs, motions, and brief writing. Contrary to his colleagues, Young denied doing much pre-filing work on ERISA and was "surprised" when the case was removed to federal court. But he also did quite a bit of researching into the meaning of the term "final diagnosis." Young's hourly rate in 1995 was $250 to $300 an hour.

Attorney Michael Wassman lived in Pennsylvania and testified under subpoena. He was a graduate of Hillsdale College and George Mason Law School. He specialized in corporate and securities law and his first job was with the Simon firm in 1992. [4] He described the Simon firm as a "boutique specialty firm that focuses on commercial class action litigation," securities litigation, ERISA, and consumer protection. Nearly every case was a class action case. Most of the time the cases were assigned to one or two attorneys. However, strategy was one area where the firm did a lot of collaboration because invariably, the opposing side would have a team of attorneys. Wassman was primarily responsible for litigating the Tinman case. The Tinman's family attorney, Stuart Lebenbom, approached the Simon firm with what Lebenbom thought was a unique case—potentially the first case to apply the statute that prohibited denying coverage on the basis of final diagnosis. The case involved researching the statute for precedent and also determining whether this was a common practice. Wassman testified that not "skimping" on the complaint was critical. He defended the time put into the pre-filing as well as time spent drafting the complaint, noting that the complaint survived six years of litigation. He also defended the amount of time spent on responding to motions, including defendant's motions regarding sealing records. Time was also spent on deciding whether to accept defendant's settlement check and whether to settle. Wassman admitted that a concern in accepting the check was the potential waiver of fees.

[4]     He left the firm in 2005. He never had an equity interest in the firm.

**\*8** Wassman believed that defendant systematically refused payment to its insureds. He noted that defendant never admitted to refusing to pay emergency room claims on the basis of final diagnosis "and from what I'm hearing today they still deny it." Wassman explained that the merits of Tinman's individual claim jived with the class action and in order

to prove Tinman's claim, they had to "prove what was happening behind the curtain." Wassman believed efforts taken on behalf of the class were compensable as a result of the common benefit it created for all of defendant's customers, regardless of whether the class was decertified.

Wassman felt ethically obligated to represent Tinman even if there was no class certification. The decertification did not change the nature of the liability issue—"We still had to prove that his individual claim was denied based on final diagnosis." Wassman did not consider the fact that this was simply an $800 case—"I don't leave my client out to dry because their claim isn't big enough. Wassman believed defendant attempted to confuse the issue by using language such as preliminary diagnosis.

Wassman testified that he would often enter his time at the end of each day, but when he was busy he would keep a note pad next to his computer and enter his time that way, allowing a few days to go by. Wassman testified that his time was accurate and denied being encouraged to inflate his time. He made sure that the time spent on the individual claim was separated from the time spent on the class action. Wassman spent approximately 1,600 hours in class work and 1,223.75 hours for Tinman's individual claim. He underestimated the individual claim and overestimated the class work. Wassman also spent 213.5 hours on the fee application. He admitted that Tinman's claim did not involve ERISA. He also admitted to spending time seeking to unseal records because "sealing the record is a way for defendant who did bad things to hide from the public what they are doing" and "sunlight will make a defendant more willing to do right. And that helps the plaintiff."

When there were adjournments, it required preparing at least two times, which added to the time. Discovery was also difficult because, in Wassman's opinion, defendant wrongfully withheld documents, necessitating various motions to compel and "hoops we were forced to jump through." Once the documents were presented, the attorneys confirmed defendant's internal analysis and concluded that it was violating the law. Wassman categorized defendant's position as "scorched earth," meaning that nothing was produced unless a judge ordered it. Once produced, there were over 50,000 documents. There was no attempt to organize the documents and one key memo was shoved among 2,000 other exhibits; had the attorneys at Simon not gone through each page, the memo would not have been discovered. One document indicated that payment was based on the outdated MEDL, which confirmed plaintiff's suspicions that defendant looked to the final diagnosis instead of the signs and symptoms. Even in the face of these documents, defendant did not admit liability.

**\*9** Wassman testified that it was not unheard of for him to work over 16 hours a day. If there were discrepancies in time claimed for conferences, it was likely because Wassman was the lead attorney and had discussion topics to prepare.

The court issued a written opinion on June 19, 2014. The trial court initially noted that defendant "never presented any witnesses to rebut or otherwise dispute the testimony of Plaintiff's lawyers" and "never presented any witnesses, whatsoever, relying solely on cross examination of the lawyers from Plaintiff's firm, present and past." The court also noted that defendant "stipulated at the remand hearing that it was not challenging any fees or hours submitted by Mr. Elwood Simon."

The court took issue with this Court's conclusion in *Tinman III* that defendant voluntarily changed its emergency claims procedures: "Unrebutted and reliable evidence was presented at the remand hearing which established that the description 'voluntary' is an incorrect conclusion and the computer change, though not explicitly directed by a trial court order, was made by BC/BS as a natural and direct result of the Tinman lawsuit." The trial court concluded, therefore, that "[t]he matter of a computer change was not, by any stretch of the imagination, a voluntary change. This Court finds as a matter of fact based on pleadings, the testimony of witnesses, testifying that without this legal challenge, [defendant] would not have changed it's [sic] computer. *The computer change was not voluntary,* but a direct result of this lawsuit."

2015 WL 5657544

Specifically, the trial court referred to defendant's steadfast denials throughout the litigation that plaintiff's claims were rejected on the basis of a final diagnosis without consideration of the presenting signs and symptoms. The court noted that defendant's "form for emergency services does not even have a field 'presenting symptoms' that a health provider could utilize." It was only after the second denial for certification that defendant tendered a check and "even after [defendant] was confronted with its own internal documents evidencing that payment was based on final diagnosis in violation of the law, [defendant's] attorneys continued to deny the fact in open court."

The trial court then went on to address the manner in which to establish a reasonable attorney fee. The court noted that *Smith* and its reference to the customary charges in the locality for similar legal services was a plurality opinion and that it would focus primarily on the factors set forth in *Wood v. DAIIE,* 413 Mich. 573, 588; 321 NW2d 653 (1982). It noted the extensive file, number of attorneys on both sides, and number of judges who worked on the case. Extensive discovery was necessary because defendant consistently denied wrongdoing. As such, "Tinman, individually, had to prove that [defendant's answer to the complaint] was false before he could recover any amount from [defendant]. It was only through the discovery process that Tinman could ever obtain a summary disposition in his favor." The court found credible Wassman's testimony that the Simon firm remained obligated to Tinman even after class decertification and concluded that, as a matter of fact, "the discovery process was necessary to prove Tinman's individual claim," which included 50,000 unsorted and unlabeled documents. The court noted that "the key to the individual Tinman case was the discovery of the undisclosed computer program. Absent that proof, Plaintiff Tinman could never have prevailed on the summary disposition on the merits."

 **\*10** The trial court separated Simon's fees as "uncontested" in light of defense counsel's failure to challenge the hourly rate.

Addressing the *Wood* factors, the trial court found:

*Wood Factor # 1*—The professional standing and experience of the attorney are highly experienced and respected.

Many of their clients whom are not contingent fee based, paid Mr. Simon $480.00 per hour, Mr. Zuccarini $440.00 per hour, Mr. Wassman $395.00 per hour, Mr. Maloche $210.00 per hour, Mr. Young $420.00 per hour as of 2005. This Court's Opinion of 2010 awarded less per hour than the firm billed six (6) years prior to it's [sic] opinion.

*Wood Factor # 2*—the skill, time and labor involved.

Each witness has testified regarding the intense labor required to unearth the [defendant's] Answer to the Complaint. As noted, the 50,000 documents reviewed were necessary to disern [sic] that the computer system automatically violated Michigan law.

*Wood Factor # 3*—the amount in question and the results achieved.

This Court recognizes that the end result was a mere Eight Hundred Eleven and 00/100 ($811.00) Dollars recovery for Tinman. Yet Tinman and his lawyers were successfully granted summary judgment. The Appellate Court must keep in mind that by BC/BS attorney's own admission, BC/BS only paid Tinman after it heard it would not have to pay any other wrongfully rejected emergency room bills.

*Wood Factor # 4*—the difficulty of the case.

It is unquestionable to this trial Court that the Tinman case was very difficult to prove.

*Wood Factor # 5*—the expenses incurred.

There were over Fifty Thousand and 00/100 ($50,000.00) Dollars in costs and were absorbed by the Simon firm. The costs were necessary to prove Tinman's claim, let alone a class action. This was due to the intractable position of [defendant] to the very end of the remand evidentiary hearing.

*Wood Factor # 6*—the nature and length of the professional relationship with the client.

This factor is not particularly relevant in plaintiff cases. Most Plaintiffs are only clients for a specific case. Rarely is a[n] individual repeatedly injured by someone's wrongful conduct. A client such as [defendant] would be a repeat client because it is a very large entity whose need for an attorney would range from claims by its many employees, construction claims, contract claims and personal injury claims, to name a few.

The court then reviewed the factors of MRPC 1.5a:

The time and labor involved and the novelty of the question and skill required to perform the legal services.

This case is and remains unique. An analysis of a disputed computer program requires lawyering of the most sophisticated experience.

Likelihood that acceptance of the work would preclude other employment.

Mr. Wassman and Mr. Zuccarini testified that their firm generally accepted only 10–12 new cases at any given time. They also testified that once the firm was retained it continued its representation of the individual to its conclusion. Tinman was never abandoned in his pursuit of success on the merits.

**\*11** Factors 3, 4, 5, 6 & 7 are duplicative of the Wood Factors, though expressed with different terminology.

Factor 8—whether fee is fixed or contingent.

This was a contingent fee. However, the statute required attorney fees for a wrongful denial of an emergency room visit. It is obvious from all case law from *Wood* to its progeny and the Rules of Professional Conduct, that at some point an analysis of an attorney fee request can only be made by considering an hourly fee.

The trial court also pointed out the massive number of hours billed by defense counsel. It referenced the State Bar Study on the Economics of the Law, which showed that the Simon firm was at the top 5 percent for its hourly rate. And that in 2007 the ABA Journal noted that the largest law firms averaged $348 an hour. The court also considered that the Simon firm had not been paid for nine years. The trial court set an award of $400 per hour. It pointed to the fact that it had already eliminated duplicative tasks in its earlier opinion. It awarded a total of $655,000 in original attorney fees.

The court then addressed plaintiff's "fees for fees" request. It found plaintiff's position persuasive and believed that it would be illogical to allow defense counsel to be paid for defending a fee challenge and not allow plaintiff to do so as well. It awarded Simon and Zuccarini $400 an hour at 466 hours for a total of $186,300. It further concluded that Bendure was entitled to $350 an hour for his 94.7 hours spent for a total of $33,145. Thus the total fee recovery was $219,445.

The trial court declined to award plaintiff's request for fees or costs on appeal because when the Court of Appeals remanded the case, it did not specifically assess costs or attorney fees to either side.

Blue Cross now appeals as of right, arguing that the trial court failed to follow this Court's directives in *Tinman III*. Plaintiff cross appeals, arguing that it should have been permitted to recover attorney fees for services rendered in response to Blue Cross's prior appeal. Therefore, the issues on appeal are straight forward—whether the trial court properly followed this Court's remand directive in ordering attorney fees, whether plaintiff is entitled to "fees for fees" in pursuit of those fees, and whether plaintiff is entitled to attorney fees from a previous appeal.

## II. STANDARD OF REVIEW

An appellate court reviews for an abuse of discretion a trial court's award of attorney fees and costs. *Smith,* 481 Mich. at 519. "An abuse of discretion occurs when the trial court's decision is outside the range of reasonable and principled outcomes." *Id.*

Whether the law of the case applies is a question of law subject to de novo review. *KBD & Assoc., Inc. v. Great Lakes Foam Tech., Inc.,* 295 Mich.App 666, 679; 816 NW2d 464 (2012). Similarly, "[w]hether a trial court followed an appellate court's ruling on remand is a question of law that this Court reviews de novo." *Schumacher v. Dep't of Natural Resources,* 275 Mich.App 121, 127; 737 NW2d 782 (2007).

## III. WHETHER THE TRIAL COURT COMPLIED WITH THIS COURT'S REMAND ORDER

### A. THE CATALYST THEORY

**\*12**  Blue Cross argues that *Tinman III* soundly rejected any attempt to use the catalyst theory as a reason to justify attorney fees, having concluded that Blue Cross's change to its emergency claims policies was voluntary. However, Blue Cross argues, the trial court improperly revisited the issue. We conclude that, while the trial court did spend a great deal of time taking this Court to task for its alleged misinterpretation and application of *Buckhannon,* the trial court's discussion on the issue was largely irrelevant and did not form the basis for the trial court's ultimate fee award.

"On remand, a trial court is required to comply with a directive from an appellate court." *Duncan v. Michigan,* 300 Mich.App 176, 188; 832 NW2d 761 (2013). "The law of the case doctrine holds that a ruling by an appellate court on a particular issue binds the appellate court and all lower tribunals with respect to that issue." *KBD & Assoc, Inc v. Great Lakes Foam Tech, Inc,* 295 Mich.App 666, 679; 816 NW2d 464 (2012). Thus, "[t]he power of the lower court on remand is to take such action as law and justice may require so long as it is not inconsistent with the judgment of the appellate court." *Id.* at 544 (internal quotation marks omitted). Under this doctrine, the decision of an appellate court is controlling at all subsequent stages of litigation, so long as it is unaffected by a higher court's opinion. *Duncan v. State,* 300 Mich.App 176, 188189; 832 NW2d 761 (2013). "It is the duty of the lower court or tribunal, on remand, to comply strictly with the mandate of the appellate court." *Rodriguez v. Gen Motors Corp.,* 204 Mich.App 509, 514; 516 NW2d 105 (1994).

While the law of the case doctrine precluded the trial court from revisiting the catalyst theory on remand, there is no indication that the trial court used the catalyst theory previously rejected in *Tinman III* as a basis for enhancing fees on remand. When discussing *Wood* factor 3 (results achieved), the trial court noted:

> This Court recognizes that the end result was a mere Eight Hundred Eleven and 00/ 100 ($811.00) Dollars recovery for Tinman. Yet Tinman and his lawyers were successfully granted summary judgment. The Appellate Court must keep in mind that by BC/BS attorney's own admission, BC/BS only paid Tinman after it heard it would not have to pay any other wrongfully rejected emergency room bills.

The trial court was silent on whether plaintiff's action resulted in a "common good." The high fee award was not the result of the trial court finding that plaintiff's lawsuit was a catalyst to changing defendant's behavior; instead, the trial court allowed such fees because it ultimately blamed defendant's tactics during the litigation, which necessitated extensive discovery and excessive man hours. The trial court's discussion on the proper interpretation of *Buckhannon* notwithstanding, it does not appear that the trial court violated the law of the case in a technical sense.

## B. PLAINTIFF'S NEED TO DEMONSTRATE THAT BLUE
## CROSS DENIED THE CLAIM BASED ON "FINAL DIAGNOSIS"

**\*13** Blue Cross next argues that the trial court was operating under the misconception that this case required plaintiff to prove that defendant denied Tinman's emergency room claim on the basis of his "final diagnosis." It argues that the issue was much simpler—whether plaintiff manifested signs and symptoms at the time he presented to the emergency room. We disagree.

Blue Cross points to this Court's decision in *Tinman I,* as support for its assertion that only plaintiff's signs and symptoms were at issue. In *Tinman I,* the Court's sole purpose was to determine whether the trial court erred in denying defendant's motion to decertify the class action. The opinion focused on whether the individual questions of fact predominated over the issue common to the class members. The Court specifically held:

> Here, the trial court broadly framed a common question that merely encompasses the legal claim in this case. As correctly asserted by defendant, a highly individualized inquiry must take place to determine whether defendant engaged in a reasonable investigation based on the available information before denying a particular claim. In other words, whether a potential class member is "entitled" to coverage for emergency health services depends at least in part on whether the individual's condition rose to the level described in MCL 550.1418. In the context of plaintiff's contention that defendant's alleged violation of MCL 550.1418 also comprises a violation of MCL 550.1402, it must be determined with respect to each claimant whether the claimant was provided emergency health services "for medically necessary services" resulting from "the sudden onset of a medical condition that manifest [ed] itself by signs and symptoms of sufficient severity," as well as whether any denial of payment was for emergency health services up to or after the point of stabilization. The same inquiries apply in regard to plaintiff's assertion that defendant's alleged violation of MCL 550.1418 also constitutes a breach of contract.

> Rather than being subject to generalized proofs, the evidence of the type of emergency health services and medically necessary services provided, the medical conditions involved and whether they occurred suddenly, the signs and symptoms that manifested those medical conditions, and whether payment was denied for services up to the point of stabilization will all vary from claimant to claimant. Thus, it is evident that to determine defendant's liability, highly individualized inquiries regarding the circumstances relevant to each claim clearly predominate over the more broadly stated common question in this case. [*Tinman I,* 264 Mich.App at 5645–65.]

*Tinman I* concluded that individual claims dominated, but it set forth no particular path in how any one individual would prove his claim. Thus, contrary to Blue Cross's assertions, the Court in *Tinman I* did *not* hold that plaintiff merely had to show that he presented signs and symptoms warranting emergency room symptoms; at the heart of the matter was Blue Cross's basis for denying payment for the emergency room services. Plaintiff had to demonstrate that Blue Cross did not commit a "bona fide error" under MCL 550.1402(11). Although *Tinman I* indicated that individualized inquiries dominated, it does not follow that plaintiff was relieved of showing liability. As part of that undertaking, plaintiff set out to prove that Blue Cross systematically denied coverage to its participants based on the final diagnostic code, which was a direct violation of MCL 550.1418.

**\*14** Zuccarini testified that a principle allegation in the Tinman case was that defendant had violated MCL 550.1418(1) by denying payment based on final diagnosis. The following exchange took place on direct examination:

> Q. From an economic perspective would it make any sense as a lawyer to commit the time and resources to a case for Tinman alone for $800 without the statutory promise of a["]shall be["] attorney fee?

> A. For Tinman alone unless there was a fee shifting provision like this it's unlikely a case that we would pursue.

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5381 Filed 07/20/17 Page 111 of 121

Q. In terms of preparation before filing suit would it make sense to commit those resources without having some idea of what the potential remedies and recoveries might be?

A. It would not make sense to do that.

(Brief pause)

I'm not sure I answered your question correctly, but it would not make sense to do that without having first determined what your rights and remedies would be, that's what I meant to say.

Q. And did you understand as your ethical obligations if you decided you couldn't make enough money on the case could you just abandon it and say, class was decertified, sorry, Mr. Tinman, we're abandoning you?

A. Ethically we could, I would, could not and would not do that.

In light of Blue Cross's repeated denials that it failed to pay claims on the basis of a patient's final diagnosis, Zuccarini believed that he had to show that the allegations in the complaint were true—that Blue Cross was "in fact systematically denying claims on the basis of final diagnosis."

Zuccarini testified to certain "smoking gun" documents that were discovered while the case was in federal court. Defense counsel objected, arguing that "none of these documents are relevant under the Court of Appeals opinion that decertified the class in 2004." The trial court noted: "Well I'm overruling it because it go[es] to the amount of work that may go, I don't know, I have to look at it, but that may go to the amount of work that was put into the case whether it affects Tinman individually or not, I don't know." The following exchange took place:

MR. WALSH [defense counsel]: It's irrelevant under the legal standard articulated by the Court of Appeals, but we can't seem to disabuse Plaintiffs of that. So they continue to assert that final diagnosis is critical and it's not.

THE COURT: We're not here about final diagnosis, we're here about attorney fees.

I'm not here to decide whether or not Blue Cross did or did not pay a bill based upon a final diagnosis, that's not my role here.

MR. WALSH: Well that's what they're making it, they're making their whole case hinge on that.

THE COURT: No, I'm understanding them—well what I'm getting, and correct me if I'm wrong, I had assumed that you were presenting this as the documents you used to get Tinman's summary disposition granted by the state court [in 2005].

MR. BENDURE [plaintiff's counsel]: Exactly.

THE COURT: That's what I understood this to be. And it doesn't matter if it was produced in, well you can argue that later, but I'm not understanding your objection.

*15 I'm not deciding whether they did final diagnosis or not. Apparently Judge Moore decided that they did and granted summary disposition, and this would've been used to get Judge Moore to make that decision; am I correct?

MR. BENDURE: Yes.

MR. WALSH: Your Honor, our position is this line of argument is we had to spend hundreds and hundreds of hours in federal court to get these documents. If they're saying we're not asking for recovery of the time spent in federal court discovery I'll sit down, but they're not going to tell you that.

And it was relevant only to—

THE COURT: to what?

MR. WALSH:—the class prior to its decertification and I think that—

MR. BENDURE: Obviously it was the basis for summary disposition of the Tinman individual case, that's not the case.

THE COURT: That doesn't make this document any less admissible. Whether or not at this point in time I can't tell whether it's relevant, it may affect its weight in making a decision, but it doesn't make it any less admissible because it is part of the record of the Wayne County Circuit Court.

Zuccarini testified that Blue Cross's repeated denials created additional work because the responses were inconsistent with Blue Cross's own internal memos. And, while one memo indicated that coverage was triggered based on presenting symptoms, the professional claims form did not include a field for presenting symptoms.

Zuccarini did not believe the merits of the issue of liability were different for plaintiff than the other class members and the firm was not seeking fees for time dedicated to the class action. Only the Tinmans were interviewed; no other class plaintiffs were contacted.

Similarly, attorney Simon testified that the firm learned about a systemic denial by defendant after reviewing 50,000 pages of documents. The following exchange took place:

MR. WALSH: Objection, your Honor, that's completely irrelevant. The Court of Appeals has ruled that this case is about Mr. Tinman's claim and nothing else.

THE COURT: Overruled, for the reason that he's explaining what work he had to do for Mr. Tinman. He['s] explaining work he had to do for Mr. Tinman, also that he was doing for a class, that's what I'm getting.

MR. BENDURE: That's exactly where we're going, your Honor. THE COURT: That's what I'm getting out of it.

MR. WALSH: For the record, your Honor, I'd like to state that the initial Court of Appeal[']s opinion decertifying the class ruled that it was Mr. Tinman's signs and symptoms that were determinative of his recovery and nothing else. Thank you.

Simon testified that the discovery process confirmed the existence of Blue Cross's declining coverage on the basis of final diagnosis. It "allowed us to prevail in the Tinman case both in terms of disproving the defenses that had been asserted by counsel and by establishing a very, very extensive record to confirm that Blue Cross itself admitted and confirmed they were violating the statute, and had violated the statute by their practice."

 *16 Young remembered "30, 40, 50 boxes of physical documents in the hallway" containing 50,000 pages of documents that the attorneys had to review. It was among those documents that they unearthed evidence that defendant based its payment decision on final diagnosis instead of signs and symptoms. In Young's opinion, "Tzvih's case was to prove that Blue Cross denied his claim on the basis of final diagnosis." "What we were going to prove for Tzvih Tinman as the named class rep, had the case continued to be certified, would have proven the case for everybody else. The fact that it was decertified is no detraction from the fact we still had to prove these basic elements for Tzvih Tinman's case."

Wassman believed that Blue Cross systematically refused payment to its insureds and a bona fide error did not exist. He noted that Blue Cross never admitted to refusing to pay emergency room claims on the basis of final diagnosis "and

from what I'm hearing today they still deny it." Wassman explained how the merits of Tinman's individual claim jived with the class action:

> Mr. Tinman's individual claim was that his claim was rejected based on final diagnosis. Because defendant denied that they were using final diagnosis in the answer and they denied it in their responses to discovery requests the only way to prove that this claim was denied based on final diagnosis was to look at the reject code on his explanation of benefits.

> To dig into Blue Cross' computer systems, internal policies, internal practices to figure out what that reject code actually meant to figure out how their computer analyzed whatever claim data they had. And once we established what they did internally then we could prove that his reject code was based on final diagnosis.

> To the extent we could prove that then class members could use that proof for their own claims and say if they had the same reject code then they were denied based on final diagnosis as well. So that's the nature of an actual or potential class action, which is if you prove the individual's claim on the merits you've proven at least a significant portion of the class members' claims.

In order to prove Tinman's claim, they had to "prove what was happening behind the curtain." Wassman believed efforts taken on behalf of the class were compensable as a result of the common benefit it created for all of Blue Cross's customers, regardless of whether the class was decertified.

Wassman felt ethically obligated to represent Tinman even if there was no class certification:

> Not only from a legal ethics [standpoint] but just from a basic decency standpoint. Once you accept representation of the client I believe it's your obligation to continue to represent that client to the end unless the client does something to warrant severing the relationship. You've taken the client on. It's your obligation to see it through to the end. And it's your obligation to represent them to the best of your ability.

**\*17** The decertification did not change the nature of the liability issue—"We still had to prove that his individual claim was denied based on final diagnosis." Wassman did not consider the fact that this was simply an $800 case—"I don't leave my client out to dry because their claim isn't big enough."

That plaintiff's undertaking would have potentially benefited the class does not undercut the fact that the undertaking also benefited him by revealing the "smoking gun" documents forming the basis for his successful motion for summary disposition. As such, the trial court on remand did not abuse its discretion in allowing plaintiff to recover fees for time spent proving that defendant denied his individual claim on the basis of final diagnosis.


## C. CUSTOMARY RATE AND REASONABLENESS OF HOURS CLAIMED

Finally, Blue Cross argues that the trial court failed to make adequate findings regarding the customary local hourly rate of each attorney, the reasonableness of the hours claimed, and the need for more than one attorney on the same task. Unfortunately, we have to agree that the trial court failed to comply with the mandates of our *Tinman III* opinion.

In *Tinman III,* this Court clearly set forth the law regarding how attorney fees must be calculated:

> As discussed, the party requesting attorney fees bears the burden of proving that the fees are reasonable. *Smith,* 481 Mich. at 528–529. "In Michigan, the trial courts have been required to consider the totality of special circumstances applicable to the case at hand." *Id.* at 529. In *Wood v. Detroit Auto Inter–Ins Exch,* 413 Mich. 573, 588; 321 NW2d 653 (1982), mod by *Smith,* 481 Mich. at 522, the Michigan Supreme Court listed six factors relevant to computing reasonable attorney fees:

Case 2:14-cv-11916-GCS-SDD  ECF No. 149-2, PageID.5384  Filed 07/20/17  Page 114 of 121
Tinman v. Blue Cross and Blue Shield of Michigan, Not Reported in N.W.2d (2015)

2015 WL 5657544

(1) the professional standing and experience of the attorney; (2) the skill, time and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expenses incurred; and (6) the nature and length of the professional relationship with the client. [Internal citation and quotation marks omitted.]

The *Smith* Court noted that the eight factors listed in MRPC 1.5(a), which overlap the *Wood* factors, have also been used to determine reasonable attorney fees:

"(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

**\*18**  (8) whether the fee is fixed or contingent." [*Smith,* 481 Mich. at 530, quoting MRPC 1.5(a).]

"In determining 'the fee customarily charged in the locality for similar legal services,' the trial courts have routinely relied on data contained in surveys such as the Economics of the Law Practice Surveys that are published by the State Bar of Michigan." *Smith,* 481 Mich. at 530.

The *Smith* Court held that some fine-tuning of the multifactor approach was needed:

We hold that a trial court should begin its analysis by determining the fee customarily charged in the locality for similar legal services, i.e., factor 3 under MRPC 1.5(a). In determining this number, the court should use reliable surveys or other credible evidence of the legal market. This number should be multiplied by the reasonable number of hours expended in the case (factor 1 under MRPC 1.5[a] and factor 2 under *Wood* ). The number produced by this calculation should serve as the starting point for calculating a reasonable attorney fee. We believe that having the trial court consider these two factors first will lead to greater consistency in awards. Thereafter, the court should consider the remaining *Wood* /MRPC factors to determine whether an up or down adjustment is appropriate. And, in order to aid appellate review, a trial court should briefly discuss its view of the remaining factors. [*Smith,* 481 Mich. at 530–531.]

The *Smith* Court emphasized that the fee applicant bears the burden to produce satisfactory evidence that the requested rates are reasonable, and it explained the types of proofs needed to establish that the rates comport with those prevailing in the locality for similar legal services. *Id.* at 531–532.

The fees customarily charged in the locality for similar legal services can be established by testimony or empirical data found in surveys and other reliable reports. But we caution that the fee applicant must present something more than anecdotal statements to establish the customary fee for the locality. Both the parties and the trial courts of this state should avail themselves of the most relevant available data. For example, as noted earlier, in this case defendant submitted an article from the Michigan Bar Journal regarding the economic status of attorneys in Michigan. By recognizing the importance of such data, we note that the State Bar of Michigan, as well as other private entities, can provide a valuable service by regularly publishing studies on the prevailing market rates for legal services in this

state. We also note that the benefit of such studies would be magnified by more specific data relevant to variations in locality, experience, and practice area. [*Id.* at 531–532.]

"[R]easonable fees are different from the fees paid to the top lawyers by the most well-to-do clients." *Id.* at 533.

Next, the *Smith* Court explained that the "court must determine the reasonable number of hours expended by each attorney." *Smith,* 481 Mich. at 532. The fee applicant is required to "submit detailed billing records, which the court must examine and opposing parties may contest for reasonableness. The fee applicant bears the burden of supporting its claimed hours with evidentiary support." *Id.* The reasonable hourly rate must be multiplied by the reasonable hours billed to produce a baseline figure. *Id.* at 533. The court should then "consider the other factors and determine whether they support an increase or decrease in the base number." *Id.* If multiple attorneys expended hours on a case, the trial court "should be careful to perform a separate analysis with reference to [each attorney] ..., considering both the hourly rates and the number of hours reasonably expended ...." *Id.* at 534. A court should also consider whether it was reasonable to have multiple lawyers "on the clock" during the case. *Id.*

**\*19** In *Augustine,* 292 Mich.App at 413, 439, this Court vacated an award of attorney fees and remanded for rehearing and redetermination because, among other reasons, the trial court did not properly apply *Smith.* The trial court "did not comply with the first step in the *Smith* analysis, which is to determine the fee customarily charged in the locality for similar legal services. Though the trial court discussed the evidence presented regarding the fee customarily charged in the locality for similar legal services, it did not conclude that $500 an hour was the fee customarily charged." *Id.* at 426. "[T]he trial court apparently failed to credit the Michigan Bar Journal in its calculus of the appropriate hourly rate. The Michigan Bar Journal article not only ranks fees by percentile, it differentiates fee rates based on locality, years of practice, and fields of practice." *Id.* at 427. Although the trial court in *Augustine* found that $500 was a reasonable fee, it "did not find that $500 per hour was the *fee customarily charged in the locality for similar legal services* ." *Id.* at 427–428 (emphasis in original). Further, after multiplying the $500–an–hour rate by the number of hours reasonably expended, the trial court failed to determine "whether an upward or downward adjustment was appropriate on the basis of the *Wood* and MRPC 1.5(a) factors as our Supreme Court discussed in *Smith* ...." *Augustine,* 292 Mich.App at 428.

In addition, the *Augustine* Court concluded that "[n]ot only did the trial court fail to make specific findings consistent with *Smith* generally, but it also failed to make findings regarding each attorney whose fees plaintiff sought to recover." *Id.* at 428. This Court "direct[ed] the trial court to make specific findings, consistent with *Smith,* for each attorney whose fees plaintiff sought to recover." *Id.* at 439. This Court also found deficiencies in the trial court's finding regarding the number of hours expended, because of the meager state of the record. *Id.* at 434. [*Tinman III,* at slip op, pp 6–9.]

The *Tinman III* Court found the trial court's initial findings insufficient to allow for appellate review regarding fees customarily charged:

Here, the trial court failed to make adequate findings to aid appellate review, as required by *Smith* and *Augustine.* The trial court listed the *Wood* factors and then correctly cited *Smith* for the proposition that "[t]he first determination to be made is what the customarily charge [sic] fee is in the locality for similar legal services." However, as in *Augustine,* the trial court failed to state any findings regarding the customarily charged fee in the locality for similar legal services. Instead, the court merely stated, in conclusory fashion: "After considering all of the evidence in this case, a reasonable fee for attorneys Simon, Zuccarini, Wassmann and Young is $400 per hour. The remaining attorneys shall be entitled to the fees requested." The trial court did not state any findings regarding the fees customarily charged in the community for similar legal services or indicate that the fees awarded represented the customary fees. The trial court also failed to cite any evidence to establish the customary fee for the locality, such as "testimony or empirical data found in surveys and other reliable reports." *Smith,* 481 Mich. at 531–532. Mere anecdotal statements are insufficient. *Id.* at 532. In addition, the trial court did not explain why it was awarding the same hourly rate of $400 for Simon and three of the attorneys in his firm, given their differing levels of experience. We direct the trial court on remand to make specific

findings consistent with *Smith* and *Augustine* regarding the customary fee in the locality for each attorney whose fees plaintiffs seek to recover. [*Tinman III,* slip op, pp 9–10.]

**\*20** However, the trial court did not correct this problem. On remand, the trial court noted:

> The Appellate Court references the State Bar Study on the Economics of the Law. Even though somewhat outdated, the Simon firm is in the top 5% of practitioners per its hourly rate as of 2005. The fact that they have remained unpaid is a consideration. There is no provision in the law for penalty interest on the fees, such as in no-fault cases. Thus an award of Four Hundred and 00/100 ($400.00) per hour is not unreasonable given the fact that the law firm has remained unpaid for 9 years.

The trial court failed to follow *Tinman III*'s directive that it "make specific findings consistent with *Smith* and *Augustine* regarding the customary fee in the locality for each attorney whose fees plaintiffs seek to recover." *Tinman III,* slip op, p 10. In no way did it set forth the *customary* fee. Once again it stated in a conclusory fashion that $400 was a reasonable hourly rate. In fact, the trial court on remand undertook its own independent analysis of *Smith,* finding persuasive the concurring and dissenting opinions in that case. To the extent the trial court refused to establish the customary fee in the locality, it violated this Court's directive as well as the law of the case doctrine.

*Tinman III* also addressed the number of reasonable hours expended on the case. We noted:

> The trial court's analysis regarding the number of hours expended was also insufficient to aid appellate review. The trial court stated:
>
> BCBSM argues that Plaintiff's request includes time spent pursuing the class action. Plaintiff has already reduced the request for attorney fees by the number of hours attributable to the [unsuccessful] class action lawsuit. It is difficult for the attorneys and the court to allocate the remainder of the fees to either the individual claim or the class action claim. For example, because BCBSM utilized an automated procedure for handling all emergency claims, the discovery sought by Plaintiff related to both BCBSM's handling of Plaintiff's individual emergency claims and BCBSM's handling of all other claims. The fact that the evidence necessary to prove Plaintiff's individual claims was the same evidence necessary to prove other claims does not change the fact that the discovery Plaintiff conducted supported Plaintiff's individual claim. For that reason, where the attorney fees can reasonably be associated with the individual claim, they will be awarded.

The trial court further indicated that it had reduced plaintiffs' requested fee by 309 hours for excessive time on various tasks, including attendance at and preparation for motions, drafting pleadings and orders, preparation of a trial outline, book, and exhibits when no trial was scheduled, and attorney conferences. The court also stated that Lebenbom's fee request was "significantly reduced" because of a lack of detail in his request, but the court offered no further explanation regarding the reduction. The court then stated that plaintiffs were awarded $655,000 in attorney fees but did not explain precisely how it reached that figure.

**\*21** We conclude that the trial court did not explain adequately how the hours for which it was awarding a fee were reasonably expended in pursuit of plaintiffs' individual claim. Again, "[th]e fee applicant bears the burden of supporting its claimed hours with evidentiary support." *Smith,* 481 Mich. at 532. Defendant was entitled to contest the reasonableness of the hours submitted. *Id*. As discussed above, defendant was deprived of a fair opportunity to contest the hours expended because the trial court erroneously refused to complete the evidentiary hearing. Further, the trial court did not explain why the substantial time devoted to discovery efforts in federal court were reasonably necessary to establish plaintiffs' individual claim as opposed to the unsuccessful class-action claim. Given that plaintiffs bore the burden of providing evidentiary support for their claimed hours, it was not sufficient for the trial court to state that plaintiffs had already reduced the request by the number of hours attributable to the class-action effort or to state that it was "difficult for the attorneys and the court to allocate the remainder of the fees to either the individual claim or

the class action claim." Although the trial court later indicated that it had awarded fees where they were "reasonably associated with the individual claim," and that the evidence necessary to prove the individual claims was necessary to prove other claims, the court's explanation for this conclusion did not suffice to aid meaningful appellate review.

Finally, the trial court failed to explain adequately why it was reasonable for plaintiffs to have multiple lawyers "on the clock" in this case. The court stated that the use of more than one lawyer on the same general task is not necessarily excessive, that effective preparation often involves collaboration, and that "[i]n several instances, the court deems reasonable the use of more than one attorney in this case." The court stated that it reduced the number of hours to a more reasonable figure when deemed excessive. The court offered no specific findings explaining on what grounds it had concluded that multiple attorneys were required to perform specific tasks. The trial court should address this issue more fully on remand. [*Tinman III,* slip op, pp 10–11.]

Once again, the trial court failed to correct this issue on remand. While we agree with the trial court that the mere fact that many of the efforts that plaintiff undertook to prove his individual assertion (that Blue Cross rejected claims based on final diagnosis) would have also benefited the class does not compel a finding that those efforts were somehow overdone. Plaintiff's attorneys should be compensated for that time, as previously discussed. However, the trial court failed to provide a more detailed explanation for its award. Once again the trial court simply indicated that it had substantially reduced plaintiff's previous fee request by eliminating class action efforts. So, while plaintiff was entitled to fees that were incurred in proving his case, the trial court failed to specifically set forth which of the fees requested were incurred as a result of the individual suit and why or how those fees were reasonable. Again, the trial court's statements are conclusory. For example, regarding duplicative efforts, the trial court noted that "anyone who ever worked in a law firm acknowledges that the firm attorneys discuss cases, as would be in any firm whose client is their paramount concern. A different analysis of this phenomenon would be to ignore the fact that most attorneys take their oath of office seriously." Much of the evidentiary hearing was focused on efforts that plaintiff's attorneys claimed were for the benefit of plaintiff's individual claim, but may have been more related to the federal class action, such as investigation of ERISA claims, time spent preventing defendant's motion to seal the record, etc. The trial court did not address any of these individual issues.

**\*22** It is clear that this case must return to the trial court for another visit. However, we are of the opinion that there is no need to conduct additional hearings on remand. The trial court may take the vast testimony from prior evidentiary hearings to craft more detailed findings. We, therefore, leave it to the trial court's sole discretion whether to accept additional evidence and testimony on remand.


IV. FEES FOR FEES

Blue Cross next argues that the trial court abused its discretion in awarding "fees for fees" because they were not recoverable under MCL 550.1402(11). The fees were incurred, not as a result of maintaining the lawsuit itself, but as a result of post-judgment proceedings and were not related to the merits of the case. We agree.

On remand, the trial court made the following decision:

At closing arguments, [defendant] suggested that attorney fees for pursuing the attorney fee request is not compensable. Cases involving 42 USC 1988 have allowed recovery for time spent litigating fees. See *Weigant v. Okst.* 198 Fd 3rd 311 (2nd Cir.1992) [sic *Weyant v. Okst,* 198 F3d 311 (CA 2 1999)] as well as our own federal bench in *Weisenburger v. Huecker,* 593 F.2d 49 (6th Cir.1979). Michigan unpublished law regarding fee awards other than PA 350 have upheld the award of fees for the request, *Summers v. Summers, Court of Appeals # 309086 (10/11/12)* and *Johnson v. Johnson, Court of Appeals # 266026 (3/271/7).*

There is no published court of appeals opinion precisely on this point. This court finds that Tinman's argument is persuasive. In order to accept [defendant's] argument, [defendant] would be compensated for the 15 days of testimony

on attorney fees, but not the Plaintiffs. This is particularly illogical in light of the fact that [defendant] presented no evidence or witness[es] to rebut anything Plaintiff's attorneys stated. [The United States] Supreme Court held that even recovery of a nominal amount of damages is a prevailing party. The court finds, as a matter of unrebutted fact, that Mr. Simon spent 137.5 hours, Mr. Zuccarini spent 328.5 hours and Mr. Bendure (counsel representing the Simon law firm) spent 94.70 hours on fee recovery.

Mr. Wassman, Young and Yert testified either voluntarily or through subpoena. No evidence was ever introduced regarding their participation in the fee recovery aspect of this case. For Mr. Simon and Mr. Zuccarini this Court awards a fee of One Hundred Eighty-six Thousand Three Hundred and 00/100 ($186,300.00) Dollars. Mr. Mark Bendure submitted time of 94.7 hours as attorney fees for the Simon firm, limited to remand representation.

After discussing Bendure's qualifications, the trial court determined that his $350 an hour rate was within the State Economics Survey and awarded him $33,145.00 for the remand evidentiary hearing.

We conclude that the "fees for fees" issue has been waived, at least as applied to fees incurred by plaintiff's attorneys prior to the *Tinman III* decision. The trial court did not award such fees in its 2010 order. Although defendant appealed from that order, plaintiff did not file a cross appeal. As a result, this Court's decision in *Tinman III* is silent on the issue of "fees for fees." Although an appellate court may not have specifically addressed an issue in a prior appeal, the law of the case doctrine acts to preclude relitigation of questions "necessarily suggested" by the court's ruling. *City of Marysville v. Pate, Hirn & Bogue, Inc,* 196 Mich.App 32, 35; 492 NW2d 481 (1992). Therefore, the doctrine applies to "those questions necessary to the court's prior determination." *City of Kalamazoo v. Dep't of Corrections ( After Remand),* 229 Mich.App 132, 135; 580 NW2d 475 (1998). This is in keeping with the "primary purpose" of the law of the case doctrine, which "is to maintain consistency and avoid reconsideration of matters once decided during the course of a single lawsuit." *Id.* Thus, for the doctrine to apply, it is enough that the prior ruling implicitly decide an issue. "The doctrine applies to questions specifically decided in an earlier decision and to questions necessarily determined to arrive at that decision." *Webb v. Smith,* 224 Mich.App 203, 209; 568 NW2d 378 (1997) lv den 459 Mich. 862 (1998). *Tinman III* was silent on the issue because plaintiff never made it an issue by appealing from the trial court's previous order that failed to award such fees. Allowing plaintiff to pursue "fees for fees" would make for the type of piecemeal litigation that the law of the case doctrine seeks to avoid.

**\*23** However, while plaintiff's attorney "fees for fees" were waived prior to this Court's decision in *Tinman III,* the same may not be true regarding the fees incurred on remand. "The power of the lower court on remand is to take such action as law and justice may require so long as it is not inconsistent with the judgment of the appellate court." *Sokel v. Nickoli,* 356 Mich. 460, 464; 97 NW2d 1 (1959). Therefore, the trial court was within its right to determine whether plaintiff was entitled to the collection costs for proceedings that took place after *Tinman III.* Nevertheless, the trial court did not set forth an adequate legal justification for its award.

The trial court cited two unpublished Michigan cases in support of its "fees for fees" award. Unpublished opinions are not precedentially binding. MCR 7.215(C). Moreover, the cases themselves are not helpful. In the divorce case *Summer v. Summers,* unpublished opinion per curiam of the Court of Appeals, issued October 11, 2012 (Docket No. 309086), the wife's attorney sought attorney fees for the time spent having to seek attorney fees. The attorney noted that he had called opposing counsel and wrote several letters trying to resolve the matter but received a response on the eve of the evidentiary hearing. In the meantime, the attorney had already researched and contacted an expert to establish his hourly rate and also retained counsel to represent him at the hearing because he knew he would have to testify. *Id.* at p 5. After determining that the fees incurred by the wife were the result of the defendant's behavior, the trial court ordered the husband to pay her reasonable attorney fees. *Id.* at 6. This case is not helpful because it was decided under MCL 552.13, which permits a trial court to order a party to "pay any sums necessary to enable the adverse party to carry on or defend the action, *during its pendency,*" and MCR 3.206(C), which permits the trial court to order a party to pay attorney fees in a domestic relations action, *including post-judgment proceedings,* if (1) the party requesting the fees is unable to bear the expense and the opposing party has the ability to pay, or (2) the fees were incurred because of the opposing party's refusal

Case 2:14-cv-11916-GCS-SDD ECF No. 149-2, PageID.5389 Filed 07/20/17 Page 119 of 121
Tinman v. Blue Cross and Blue Shield of Michigan, Not Reported in N.W.2d (2015)
2015 WL 5657544

to comply with a previous court order. In contrast, MCL 550.1402(11) provides: "If successful on the merits, the member shall be awarded actual monetary damages or $200.00, whichever is greater, together with reasonable attorneys' fees." It is silent as to post-judgment proceedings. Therefore, it would appear that the statute focuses on awarding attorney fees to the extent those fees are incurred in pursuit of the merits of the case.

*Johnson v. Johnson,* unpublished opinion per curiam of the Court of Appeals, issued March 27, 2007 (Docket No. 266026), is similarly unavailing. The primary issue in that case was whether the trial court had complied with this Court's remand order in determining that a wife's fees incurred on remand constituted appellate fees. This Court had specifically ordered the husband to pay the wife's appellate fees and the issue was whether the proceedings on remand were properly categorized as "appellate proceedings." This Court found that the trial court did not abuse its discretion in finding that the fees incurred on remand following the Court of Appeals order were appellate fees. *Id.* at 1–4. It concluded that the trial court's award for fees incurred on the original remand were fees "associated with this case" and, therefore, proper. *Id.* at 3–4. Once again, however, this was a divorce case, which is different from the case at bar. Whereas "[a] trial court may order one party to a divorce to pay the other party's reasonable attorney fees and litigation costs if the record supports a finding that financial assistance is necessary because the other party is unable to bear the expense of the action." *Olson v. Olson,* 256 Mich.App 619, 635; 671 NW2d 64 (2003), MCL 550.1402(11) provides: "If successful on the merits, the member shall be awarded actual monetary damages or $200.00, whichever is greater, together with reasonable attorneys' fees." It is silent as to post-judgment proceedings and the parties' relative ability to pay. MCL 550.1402(11) permits fees to the extent those fees are incurred in pursuit of the merits of the case.

**\*24** While plaintiff is entitled to attorney fees incurred in pursuit of the merits of his case, the merits do not encompass fees for fees. The trial court cited 42 USC § 1988, which provides:

> In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C.A. § 1681 et seq.], the Religious Freedom Restoration Act of 1993 [42 U.S.C.A. § 2000bb et seq.], the Religious Land Use and Institutionalized Persons Act of 2000 [42 U.S .C.A. § 2000cc et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.], or section 13981 of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs ... [42 USC § 1988(b).]

In *Weyant,* the Second Circuit reiterated that a citizen must have the opportunity to recover the costs of vindicating a civil right in court and that "[a] culpable defendant should not be allowed to cause the erosion of fees awarded to the plaintiff for time spent in obtaining the favorable judgment by requiring additional time to be spent thereafter without compensation. Thus, a reasonable fee should be awarded for opposing the culpable defendant's unsuccessful postjudgment motions," including fees for time reasonably spent in preparing and defending an application for § 1988 fees." *Weyant,* 198 F 3d at 316.

Similarly, in *Weisenburger,* the Sixth Circuit determined that the time spent in pursing fees was compensable:

> When Congress passed the Act its basic purpose was to encourage the private prosecution of civil rights suits through the transfer of the costs of litigation to those who infringe upon basic civil rights. If a successful party in a civil rights suit is awarded attorney's fees under the Act and he cannot secure attorney's fees for legal services needed to defend the award on appeal, the underlying Congressional purpose for the Act would be frustrated. We conclude that implementation of Congressional policy requires the awarding of attorney's fees for time spent pursuing attorney's fees in the cases presently under review. [*Weisenberger,* 593 F.2d at 53–54 (CA 6 1979).]

Unlike vindicating a citizen's civil rights, however, an action such as the case at bar is not one of such societal interest that plaintiff should be entitled to fees for fees. Therefore, the fee shifting found in § 1988 is not exactly on par with MCL

550.1402(11). And, especially given the fact that the issue was previously waived and the fact that the law upon which the trial court relied was not on point, the trial court abused its discretion in awarding plaintiff fees spent defending their fee application.

## IV. APPELLATE FEES

On cross-appeal, plaintiff argues that the trial court abused its discretion in failing to award appellate fees. We disagree.

At the hearing after *Tinman III,* defense counsel objected to when plaintiff's appellate attorney, Mark Bendure, attempted to testify because there was no basis in law for fees spent defending the appeal. The trial court agreed:

**\*25** Generally, the Court of Appeals assesses costs, not specific costs, but says that costs are awarded and then it remands it back to the Circuit Court for a hearing on the matter as to costs.

In this instance, the Court of Appeals did not assess costs and fees, attorney fees, against anyone on either side. But I'm not going to create an appellate issue by not taking this testimony. We will take this testimony and then you can appropriately address the matter in a brief as to whether or not this section of the testimony is relevant to what we're here for today.

Ultimately, the trial court ruled:

Lastly remains the Appellate costs of Tinman. The Court of Appeals remanded the case; it did not assess costs or attorney fees to either side. Therefore, until so ordered by the Michigan Court of Appeals, the trial court does not consider attorney fees or costs on appeal.

Though not directly on point, the Supreme Court's decision in *Haliw v. City of Sterling Hts,* 471 Mich. 700, 702; 691 NW2d 753 (2005) is instructive. In *Haliw,* the Court was asked to decide whether appellate attorney fees and costs were recoverable as case evaluation sanctions under MCR 2.403(O). In so doing, the Supreme Court rejected the Court of Appeals' theory that, because the court rule did not specifically exclude appellate attorney fees, it must have necessarily included them as a part of a case evaluation sanction. *Id.* at 706. The Court noted, under the "American rule," attorney fees and costs are generally not recoverable in the absence of an exception set forth in a statute or court rule expressly authorizing such an award. *Id.* at 707. And because MCR 2.403 expressly authorizes recovery of "a reasonable attorney fee" and "costs," but does not expressly authorize appellate attorney fees and costs, the American rule mandates that appellate fees and costs not be read into the court rule. *Id.* The Court further added that MCR 2.403(O) is "trial-oriented" and there is no mention of the appellate process in the rule. *Id.* at 707–708. In a footnote, the Court added that "[w]hile a causal nexus plainly exists between rejection and trial fees and costs, the same cannot be said with respect to rejection and the decision to bring an appeal. Rather, appellate attorney fees and costs are arguably 'necessitated by' a perceived erroneous trial court ruling." *Id.* at 711 n. 8.

Although *Haliw* addressed MCR 2.403, we note MCL 550.1402(11) has similar language: "If successful on the merits, the member shall be awarded actual monetary damages or $200.00, whichever is greater, together with reasonable attorneys' fees." The language in both MCR 2.403 and MCL 550.1402(11) is the same to the extent that they each allow for recovery of "reasonable attorney fees." Both are silent as to post-judgment proceedings. As noted in *Haliw,* an appeal is brought when a party perceives the trial court to have made an erroneous ruling. Because this Court in *Tinman III* did not provide for an award of appellate attorney fees and costs and because MCL 550.1402(100) focuses on awarding attorney fees to the extent those fees are incurred in pursuit of the merits of the case, the trial court did not abuse its discretion in denying plaintiff's request for appellate attorney fees.

**\*26** Affirmed in part, reversed in part, and remanded for further proceedings. We do not retain jurisdiction.

**All Citations**

Not Reported in N.W.2d, 2015 WL 5657544

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.